UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL MACHADO ALVAREZ, | No. 2:97-cv-1895 KJM KJN P |
| Petitioner, | **DEATH PENALTY CASE** |
| v. | |
| WARDEN, San Quentin State Prison, | FINDINGS AND RECOMMENDATIONS |
| Respondent. | |

Petitioner is a state prisoner under sentence of death. The parties briefed the application of 28 U.S.C. § 2254(d) to each claim in the operative amended petition. After careful consideration of the parties' briefs and of the state court record, this court concludes that Petitioner has failed to satisfy the requirements of § 2254(d) for all claims in the amended petition, save and except for Claims BB, MM and BBB, which Petitioner has conceded or withdrawn. Accordingly, this court recommends the amended petition be denied.

**BACKGROUND FACTS[1]**

A. Guilt Phase

In November 1986, after serving a prison term for voluntary manslaughter and assault

---

[1] This overview of the facts is derived from the California Supreme Court's recitation of the evidence presented at trial and from the court's independent review of the state court record. See People v. Alvarado, 14 Cal.4th 155, 177-81 (1996).

1

with a deadly weapon, Petitioner was released on parole in Los Angeles.

In March of the following year, Petitioner moved from Los Angeles to Sacramento, in violation of the terms of his parole. There, he lived with Leslie Colyer and Neetelfer Hawkins, off and on, and spent the majority of his time seeking and using drugs and alcohol.

On the evening of May 12, 1987, Petitioner was socializing outside an apartment building on Boxwood Avenue near El Camino Avenue and Del Paso Boulevard in Sacramento where Sandra S. lived with her boyfriend and her 11-year-old son. At the time, Sandra worked as a prostitute. Petitioner "came on to" Sandra, but he was refused. He was drunk and weaving, and had thrown up at one point. Sandra eventually returned to her apartment at about 4:00 a.m., and went to bed. Her boyfriend, son and others were also sleeping inside.

At about noon the following day, Sandra woke up alone in the apartment. She had a "real bad feeling." Looking toward the foot of the bed as she began to get up, Sandra saw Petitioner. His fly was down and he was masturbating. She loudly said, "Oh, God, no." Petitioner responded firmly, "Oh, God, yes." After telling Sandra there was no one to hear or help her, Petitioner pinned her down and began to rape her. One of Sandra's friends walked in during that time and asked whether she was "having a date?" She yelled, "No, no[,] no, no, it's not," but Petitioner claimed that it was. Sandra repeated several times that there was no date. As he ran out of the room, her friend said to Petitioner, "Oh, man, don't be doing that."

Afterward, Petitioner kept Sandra in the bathroom until they could hear people coming into the apartment. Sandra then ran toward her friend Tony Simpkins, telling him Petitioner had raped her, and was standing with him in the kitchen when she saw Petitioner taking out and putting into his pants what looked like a large knife. Petitioner then ran out of the apartment.

Nearby, Edwin Glidewell had parked his 1975 Chevrolet Camaro outside his brother's home on Boxwood Avenue. He stood at the front door of the house, trying to hurry his wife along because he was late for a medical appointment. He saw Petitioner walking toward El Camino Avenue. Glidewell was familiar with Petitioner because Glidewell had previously stayed with his brother for about two months and would see Petitioner walking in the area. On this occasion, as Petitioner passed Glidewell's brother's house and the Camaro, Glidewell saw

Petitioner jump into the driver's seat of his car. Petitioner started the car with the keys Glidewell had left in the ignition. Glidewell jumped the fence and ran toward Petitioner once he realized what was happening, but he was unable to open the passenger side door of the then-moving vehicle. Glidewell yelled to the others in the house to call 911 and ran after Petitioner who had turned right onto El Camino toward Arden Way. Glidewell missed another opportunity to open the passenger door after seeing Petitioner stopped the wrong way on a one-way street; seeing Glidewell, Petitioner drove over the concrete median and headed west on El Camino.

Eventually, Glidewell recovered the vehicle at the police impound lot. Although his luggage was still in the vehicle, the clothing inside his luggage belonged to Petitioner.

A few days later, on May 15, Petitioner met Ross. She was cashing a welfare check. Thereafter, the two began a days-long binge of using drugs and alcohol. During the course of that binge, they visited Petitioner's friend Neetelfer Hawkins and Ross's friend Gail Patton.

Petitioner asked Ross to drive the Camaro late on the morning of May 17. The two entered a shopping center, and Petitioner directed Ross to the Golden 1 Credit Union. She parked, and he got out of the car. At 11:28 a.m., Allen Birkman, a civilian identification technician for the Sacramento Police Department, withdrew $60 from an account at the credit union's automatic teller machine. Petitioner confronted Birkman and a struggle ensued, wherein Petitioner stabbed Birkman in the heart. Ross and Petitioner then escaped in the Camaro.

Meanwhile, Birkman called for help. Within seconds, a passerby named Charles Kosobud came to his aid. Birkman was holding his right hand to his chest, and blood was flowing through his fingers. He held a wallet in his left hand. Steadying Birkman, Kosobud asked if they had robbed him; Birkman responded, "No, but they tried." Kosobud asked after the robber's identities, and Birkman responded, "Two blacks." (Ross is an African–American. Defendant is, in his own words, "Spanish and Islander," meaning "[a] native [Cuban].") Birkman soon collapsed.

When Officer Calvin Lim of the Sacramento Police Department arrived at the scene, Birkman was receiving emergency medical aid. Within several minutes, he was placed in an ambulance for transport to a hospital and Lim rode along. Birkman had difficulty breathing, and

3

1  appeared to be in pain; he said he felt numbness or tingling in his body.  When Lim asked

2  Birkman if he knew who had attacked him, he responded, "[a] male black, approximately six foot

3  tall" who escaped in "a Camaro."

4      Sometime before noon, Ross and Petitioner arrived at Gail Patton's apartment, located not

5  far from the Golden 1 Credit Union.  Ross parked the Camaro nearby.  When Ross entered the

6  apartment with a long knife in a sheath, Ross appeared frightened.  Ross went into the kitchen

7  with the knife, and returned, telling Patton to give it to Petitioner.  Petitioner then entered a few

8  minutes later, appearing normal.  Patton gave him the long knife and the sheath.  When police

9  officers approached Patton's apartment shortly thereafter, either petitioner or Ross, maybe both,

10 directed Patton not to say anything.  At the door to the apartment, the officers told Patton that

11 they were investigating the incident at the Golden 1 Credit Union.  They asked whether she knew

12 anything about the Camaro parked nearby and she said she did not.  When the officers left, Patton

13 told Petitioner to leave and he did so, leaving behind the long knife and sheath and some clothing,

14 as well as the Camaro.

15      On that same date, at about 1:30 p.m., 78-year-old Greta Slatten drove her new 1987 Ford

16 Taurus to a convenience store located about two-thirds of a mile from Patton's apartment.  No

17 other vehicles were in the lot at the time.  Slatten saw Petitioner, the only other person present,

18 walking across the parking lot.  She stayed in her vehicle for a few minutes, and when Petitioner

19 crossed to use a nearby public telephone, Slatten exited with her purse and keys, entering the

20 store.  After leaving the store to return to her vehicle, and having passed Petitioner who was still

21 using the phone, the next thing Slatten recalled was being in the hospital.  She suffered an injury

22 that required 20 stitches on her face that prevented her from opening her mouth, and dark bruising

23 on the left side of her face from her hairline down through her neck and jaw.  Slatten learned later

24 that Petitioner had taken her purse, keys and car.

25      Allen Birkman died on May 18, 1987, as a result of the stab wound to his heart.  The

26 wound could have been inflicted by the long knife that Petitioner left at Patton's apartment.

27 That day or soon thereafter, Leslie Colyer spoke with Petitioner over the telephone after Colyer

28 was approached by police.  The officers had inquired into Petitioner's whereabouts and advised

4

Colyer they were seeking him in connection with a homicide. When speaking with Petitioner, Colyer told him that the victim was a police officer.

On May 27, 1987, Petitioner was arrested in Mississippi and jailed, having been apprehended behind the wheel of Slatten's Taurus. A second long knife in a sheath was found in the car. The next day, Charles Robinson – Petitioner's passenger and a hitchhiker - was also arrested and jailed. While the two shared a cell, Petitioner told Robinson that "he had killed a police officer in California."

Petitioner told another story. Testifying on his own behalf and introducing other evidence, Petitioner denied raping Sandra S. He said she had consented, at least in part in order to obtain some cocaine he offered. He denied stealing Glidewell's Camaro, indicating Glidewell had given it to him as security for a drug debt. Petitioner also denied robbing or murdering Birkman, claiming he was elsewhere at the time of the attack, and was instead the victim of mistaken identity. Further, Petitioner denied robbing Slatten, again asserting an alibi and misidentification. In acknowledging possession of Slatten's Taurus, Petitioner claimed to have traded cocaine for the vehicle with a young man who called himself "J.R." He generally denied ever possessing a knife.

Ross told yet another story. Testifying on her own behalf and introducing other evidence, she did not deny that Petitioner robbed or murdered Birkman. Instead, Ross claimed she did not have the requisite mental state — she said she did not even suspect what Petitioner had evidently intended – but had accompanied him out of fear.

B. Penalty Phase

For the penalty of death, the People relied on the evidence introduced at the guilt phase relevant to the circumstances of the capital offense, including the attempted robbery and murder of Birkman, the rape of Sandra S., and the robbery of Slatten.

Moreover, the People presented evidence of three prior felony convictions. First, in 1982, in the Los Angeles Superior Court, Petitioner was convicted of voluntary manslaughter with personal use of a deadly weapon. Second, at the same time and in the same court, he was convicted of assault with a deadly weapon. Lastly, in 1983, in the San Luis Obispo Superior

5

Court, Petitioner was convicted of escape from prison without force or violence.

The People also presented evidence of four instances of criminal activity, beyond the circumstances of the capital offense, involving the use or attempted use of force or violence or the express or implied threat to use force or violence. The first and second instances involved the circumstances surrounding the convictions for voluntary manslaughter and assault with a deadly weapon.

More particularly, late one night in 1981, an unarmed man ran into a small liquor store in Hollywood with Petitioner in pursuit. Petitioner was brandishing a long knife in his right hand. When the man stopped and brought his hands up for protection, Petitioner pulled the man's hands down with his left hand, said, "Chinga su madre," stabbing the man in the throat. Withdrawing the blade and turning toward one of the store's clerks, Petitioner was stopped and fled when another clerk pulled out a shotgun. The third and fourth instances consisted of separate attacks on fellow jail inmates during the pendency of the Sacramento trial proceedings, one in 1987 and the other in 1988. On each occasion, Petitioner punched an individual unable to defend himself.

Arguing for life imprisonment without possibility of parole, Petitioner presented evidence relevant to his background and character. He was born in Cuba around 1960, and was raised there. As a young child, he suffered a significant injury to his head, potentially resulting in epilepsy. He also lost his mother. Thereafter, he lived an unstable life, having been subjected to abuse and neglect, particularly from a woman with whom his father lived. As a result, Petitioner exhibited problem behavior. He came to the United States in the so-called "Mariel Boatlift" of 1980. Following detention in camps, for about six weeks, Petitioner lived in Richmond, Virginia in 1981, under the sponsorship of a married couple with small children. He displayed kindness and generosity, but also anger and immaturity. Petitioner made his way to California later that year. For social and personal reasons, Petitioner did not successfully assimilate into American society. It was opined that he suffered from conditions including "profound emotional immaturity" and "extreme culture shock." Despite these issues, Petitioner was capable of love and helpfulness. For example, he displayed those qualities when dealing with Neetelfer Hawkins and her disabled son, as well as with her mother.

Petitioner further presented evidence responsive to the People's evidence. He tried disproving one of his attacks on two jail inmates. He also addressed the circumstances surrounding the prison escape conviction, showing, among other things, that, with two other Spanish-speaking prisoners, he essentially walked away from what was little more than an "honor camp" (albeit after somewhat elaborate planning), offered no resistance to the correctional officers who captured him, and even helped them by serving as an interpreter for his two companions. Petitioner also revealed that the killing in the liquor store was revenge for that man having burglarized the home of Petitioner's lover.

## PROCEDURAL HISTORY

The matter was assigned to Superior Court Judge Darrel W. Lewis for jury trial on February 2, 1989. (4 CT 771.)[2] Voir dire proceedings commenced March 1, 1989 (4 CT 962), and a jury was ultimately empaneled on April 10, 1989. (5 CT 1073-74.) The People's case began the following day. (5 CT 1075.) On April 26, 1989, the People rested and the defense case commenced. (5 CT 1101.) The defense rested on May 22, 1989. (5 CT 1130.) Rebuttal evidence was heard May 22 through May 31, 1989, and closing arguments were given May 31 and June 1, 1989. (5 CT 1130-39.) The jury began deliberations on the afternoon of June 1, 1989. (5 CT 1139.)

On June 9, 1989, the jury reached its verdicts. (6 CT 1275.) More specifically, the jury found Petitioner guilty of the following: first degree murder during the course of a robbery, with personal use of a deadly weapon; attempted robbery with personal use of a deadly weapon and infliction of great bodily injury; vehicle theft; rape; and robbery with personal use of a deadly weapon. (6 CT 1276-82.) Thereafter, the penalty phase of the trial was scheduled to begin with the People's case on June 26, 1989, and the defense portion to begin July 5, 1989. (6 CT 1284-85, 1291.) Penalty phase closing arguments were heard August 2 and August 3, 1989. (6 CT 1347, 1406.) On the afternoon of August 3, 1989, the jury rendered its verdict, setting the penalty

---

[2] "CT" refers to the Clerk's Transcript; "RT" refers to the Reporter's Transcript; "ECF" refers to the court's electronic filing system. Volume numbers or other specific identifying information are additionally provided for ease of reference.

at death.  (6 CT 1405-06.)

On September 14, 1989, Petitioner was sentenced to death for the murder of Allen Birkman, and a total determinate sentence of 17 years and 8 months for the remaining crimes of which he was convicted.   (6 CT 1488-98.)

Petitioner filed the Appellant's Opening brief in his direct appeal to the California Supreme Court on November 3, 1994, case number S012261, following the appointment of counsel and record correction proceedings.  (ECF No. 13 at A.)  Respondent's Brief and Appellant's Reply Brief were filed on October 10, 1995, and March 26, 1996, respectively.  (ECF No. 13 at B & C.)

The California Supreme Court issued its opinion, affirming the judgment in full, on December 5, 1996.  (ECF No. 13 at D.)  A petition for rehearing was filed and denied before a remittitur issued on February 19, 1997.  (ECF No. 13 at E-G.)

A petition for writ of certiorari was filed in the United States Supreme Court on May 16, 1997, case number 96-9028; certiorari was denied on October 6, 1997.

On October 8, 1997, Petitioner filed an application to proceed in forma pauperis, a request for the appointment of counsel, and for a stay of execution.  (ECF Nos. 1-3.)  On October 10, 1997, this court denied the stay, but granted the in forma pauperis application and appointed counsel.  (ECF No. 4.)

The initial petition for writ of habeas corpus was filed September 15, 1998.  (ECF No. 7.)  A motion to hold the petition in abeyance followed on October 1, 1998.  (ECF Nos. 10 & 12.)

On September 23, 1998, a petition for writ of habeas corpus was filed in the California Supreme Court, case number S073670; the petition was denied on October 28, 1998.  (ECF Nos. 13 at H & 285.)

On November 2, 1998, the abeyance motion was withdrawn by Petitioner and an amended petition for writ of habeas corpus was filed.  (ECF Nos. 21 & 22.)

Respondent filed an answer to the petition on September 30, 1999.  (ECF No. 45.)

On June 5, 2000, the court issued its order regarding discovery requests and set a briefing schedule regarding Respondent's assertions of procedural default as to certain claims.  (ECF No.

61.)

Briefing was completed by the parties on August 17, 2000.  (ECF Nos. 66, 68 & 73.)

On November 8, 2000, findings and recommendations were issued, holding Petitioner's claims were not procedurally barred for purposes of federal review.  (ECF No. 74.)

On December 22, 2000, the court issued its order adopting the findings and recommendations in part.  More particularly, the court sustained Respondent's objections pertaining to the contemporaneous objection rule and procedural bar concerning certain claims asserted by Petitioner.  (ECF No. 82.)

Numerous discovery and discovery-related motions were filed and resolved during the period between January 2001 and March 2004.  (ECF Nos. 84, 86, 95, 96, 105, 115, 121, 122, 125, 130, 131, 133, 134, 137, 146, 155, 156, 161, 163, 167, 168, 173, 178, 179, 182, 186, 191, 199, 207, 210-211, 213.)

Petitioner filed a motion for evidentiary hearing on November 9, 2004.  (ECF No. 222.)

On April 3, 2006, Petitioner filed a motion for leave to file a second amended petition for writ of habeas corpus.  (ECF Nos. 280 & 281.)  Respondent filed its opposition to the motion on May 10, 2006, and Petitioner replied on May 17, 2006.  (ECF Nos. 284 & 285.)

On June 16, 2006, the court issued an order (1) requiring Petitioner to withdraw claim DDD from the second amended petition or file a statement of reasons why it should remain; (2) requiring Respondent to file a memorandum of points and authorities specifically identifying each claim he alleges to be unexhausted and any argument concerning the applicability of the stay and abeyance procedure, and setting forth a briefing schedule; and (3) relieving Respondent of the need to file an opposition to Petitioner's then-pending motion for evidentiary hearing due to the possibility of a stay pending exhaustion.  The court indicated it would rule on Petitioner's motion to file a second amended petition following submission of the aforementioned briefing.  (ECF No. 292.)  That same date, Petitioner withdrew claim DDD from the proposed second amended petition.  (ECF No. 293.)

Respondent's memorandum of points and authorities regarding exhaustion of claims asserted in the second amended petition was filed July 5, 2006.  (ECF No. 294.)  Petitioner

responded July 24, 2006, and Respondent replied to the response on August 14, 2006.  (ECF Nos. 296 & 298.)

On September 11, 2006, Petitioner filed a second petition for writ of habeas corpus with the California Supreme Court, case number S146501.  (ECF No. 301.)

On December 7, 2006, this court determined the claims at issue were exhausted, except for a portion of the claim designated "UU" as it concerned Quivican Prison in Cuba.  It granted Petitioner's motion to file a second amended petition, agreed with the parties that four additional claims were unexhausted (FF, II, JJ & RR), and granted a stay and abeyance of the proceedings pending exhaustion of those claims.  (ECF No. 305.)

On or about December 12, 2007, Respondent filed an Informal Response to the second state habeas petition filed with the California Supreme Court.  (ECF No. 308.)  Petitioner filed a reply to the informal response on or about April 30, 2009.

On July 13, 2011, the California Supreme Court issued its order denying Petitioner's second habeas petition.  (ECF No. 314.)

On August 4, 2011, the stay was lifted by order of this court.  (ECF No. 315.)

The parties filed a joint statement regarding the effects of <u>Cullen v. Pinholster</u>[3] and the scheduling of further proceedings on September 22, 2011.  (ECF No. 318.)

On July 23, 2012, Petitioner filed his memorandum of points and authorities in support of the second amended petition.  (ECF No. 330.)

Respondent filed its opposition brief on September 16, 2013.  (ECF No. 345.)

A reply to the opposition was filed by Petitioner on March 13, 2015.  (ECF No. 361.)

## APPLICATION OF 28 U.S.C. § 2254(d)

I.    <u>Legal Standards</u>

Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a petition for writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is available under section 2254 only on the basis of some transgression of federal law binding on the

_____

[3] <u>Cullen v. Pinholster</u>, 563 U.S. 170 (2011).

state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

Where a state court resolves a federal constitutional claim on the merits, the petitioner in federal court may not succeed on that claim absent a showing that the state court resolution of the claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress adopted this standard when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death Penalty Act (the "AEDPA").  To meet the standards, a petitioner must establish that the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Section 2254(d) is a gateway.  If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo.  See Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (when section 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires"); Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

In 2011, the Supreme Court elucidated the section 2254(d) standards.  First, the Court made clear that when making the determination that a state court decision was contrary to law or unreasonable, a federal court may not consider evidence that was not before the state court. Cullen v. Pinholster, 563 U.S. at 180-82.  Second, the Court "tightened" section 2254(d)'s rule of deference:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 562 U.S. 86, 103 (2011); see also Amado v. Gonzalez, 758 F.3d 1119,

1131-32 (9th Cir. 2014). Thus, federal habeas relief is precluded if "'fairminded jurists could

disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101 (quoting

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). This objective standard of reasonableness

applies to review under both subsections of 28 U.S.C. § 2254(d). See Hibbler v. Benedetti, 693

F.3d 1140, 1146-47 (9th Cir. 2012). The federal court must engage in the deferential review even

where the state court has not provided a reasoned decision. Richter, 562 U.S. at 99-100.

In the present case, some of Petitioner's claims were raised, and rejected, in the California

Supreme Court's reasoned decision on appeal. However, some were raised in his state habeas

petitions, which were summarily denied. A summary denial is presumed to be a denial on the

merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012) (the

presumption that the denial is based on the merits, rather than on procedural grounds, may be

overcome if it is not "plausible"). While the federal court cannot analyze just what the state court

did when it issued a summary denial, the federal court must review the state court record to

determine whether there was any "reasonable basis for the state court to deny relief." Richter,

562 U.S. at 98. The federal court "must determine what arguments or theories . . . could have

supported . . . the state court's decision; and then it must ask whether it is possible fairminded

jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

decision of [the Supreme] Court." Id. at 102. The petitioner bears "the burden to demonstrate

that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d

925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When reviewing the California Supreme Court's summary denial of a petition, this court

must consider that

> the California Supreme Court's summary denial of a habeas petition
> on the merits reflects that court's determination that "the claims
> made in th[e] petition do not state a prima facie case entitling the
> petitioner to relief." It appears that the court generally assumes the
> allegations in the petition to be true, but does not accept wholly
> conclusory allegations, and will also "review the record of the trial
> ... to assess the merits of the petitioner's claims."

Pinholster, 563 U.S. at 188 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993), and citing

People v. Duvall, 9 Cal. 4th 464, 474 (1995)). Accordingly, the absence of a prima facie case is

12

the determination that this court must review under section 2254(d). See Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003). The Pinholster Court considered the reasonableness of the California Supreme Court's summary denial of an ineffective assistance of counsel claim in terms of the petitioner's failure to make a prima facie showing of ineffective assistance of counsel. The Court held that petitioner Pinholster "has not shown that the California Supreme Court's decision that he could not demonstrate deficient performance by his trial counsel necessarily involved an unreasonable application of federal law." Pinholster, 563 U.S. at 190. It is quite clear that the Court was considering what the state court in fact decided—that petitioner had failed to establish that "he could" prove his claim, in other words, that petitioner had failed to make a prima facie showing that he was entitled to relief.

A petitioner establishes a prima facie case of a constitutional violation if his assertions are sufficient to support the claim. Nunes, 350 F.3d at 1054-55. The question is whether the petitioner has demonstrated that "he ha[s] sufficient evidence for a reasonable fact finder to conclude" that he has proved his claim. Id. In other words, a holding that petitioner has not made out a prima facie case amounts to a holding that no reasonable factfinder could find in petitioner's favor. Id. at 1055. If this court finds petitioner has unarguably presented a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable. Id. Under subsection (d)(1), a state court decision is "contrary to . . . clearly established Federal law" if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). A state court decision is an "unreasonable application" of clearly established federal law if "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)). "Clearly established Federal law" is found in the United States Supreme Court's "applicable holdings." Carey v. Musladin, 549 U.S. 70, 74 (2006). It refers to "'holdings, as opposed to the dicta, of [the Supreme Court's] decisions' at the time the state court decides the matter." Cannedy v. Adams, 706 F.3d 1148, 1157 (9th Cir. 2013) (quoting Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir. 2010)), amended on other grounds, 733

F.3d 794 (9th Cir. 2013). "'[C]ircuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011) (quoting <u>Maxwell v. Roe</u>, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." <u>Marshall v. Rodgers</u>, 569 U.S. 58, 64 (2013) (citing <u>Parker v. Matthews</u>, 567 U.S. 37, 48-49 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." <u>Id.</u> Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. <u>Carey</u>, 549 U.S. at 77.

There are two ways a petitioner may satisfy subsection (d)(2). <u>Hibbler</u>, 693 F.3d at 1146. He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." <u>Id.</u> (citing <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004), <u>abrogated on other grounds by</u> <u>Murray v. Schriro</u>, 745 F.3d 984, 1000 (9th Cir. 2014)); <u>see also</u> <u>Hurles v. Ryan</u>, 752 F.3d 768, 790-91 (9th Cir. 2014) (if a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process is deficient and the state court opinion is not entitled to deference), <u>cert. denied</u>, 135 S. Ct. 710 (2014). The standard for determining whether the state court's fact-finding process is insufficient requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." <u>Hibbler</u>, 693 F.3d at 1146-47 (quoting <u>Lambert v. Blodgett</u>, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. <u>Id.</u> at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." <u>Perez v. Rosario</u>, 459 F.3d 943, 951 (9th Cir. 2006) (citing <u>Nunes</u>, 350 F.3d at 1055).

14

The Ninth Circuit explained in <u>Hibbler</u> that federal standards for determining when an evidentiary hearing is mandatory are a useful guide to determining the reasonableness of the state court's refusal to hold a hearing:

> A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question. <u>See Earp</u>, 431 F.3d at 1170 (noting that a state court is not required to hold an evidentiary hearing when it is possible to resolve the factual question "based on 'documentary testimony and evidence in the record'" (citation omitted)); <u>Perez v. Rosario</u>, 459 F.3d 943, 950 (9th Cir. 2006) (holding that it is reasonable for a state court to resolve a disputed factual question without an evidentiary hearing when the petitioner's allegations are "incredible in light of the record, or . . . when the record already before the court is said to establish a fact conclusively"). The ultimate issue is whether the state's factfinding procedures were reasonable; this is a fact-bound and case-specific inquiry.
>
> Because AEDPA does not provide any specific guidance on what sort of procedural deficiencies will render a state court's fact-finding unreasonable, we have sometimes turned for guidance to cases considering a similar issue in a different context: when a federal district court considering a habeas petition must or should conduct an evidentiary hearing. <u>See Earp</u>, 431 F.3d at 1166-67, 1169-70 (looking to <u>Townsend v. Sain</u>, 372 U.S. 293, 313 (1963), which governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing, in determining whether the state court decision was based on an unreasonable determination of the facts). In this context, the Supreme Court has recently clarified that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Landrigan</u>, 550 U.S. at 474. More specifically, "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> "'[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" <u>Id.</u> (quoting <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998)).
>
> While this framework for determining when a district court errs in failing to conduct an evidentiary hearing provides useful guidance, it is useful only by analogy and does not answer conclusively whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2) . . .. Unlike our review of a district court's determination that an evidentiary hearing is unnecessary, which is for abuse of discretion, <u>see Landrigan</u>, 550 U.S. at 474-75, we may not "second-guess a state court's fact-finding process"

15

unless we determine "that the state court was not merely wrong, but actually unreasonable." Taylor, 366 F.3d at 999. Nevertheless, the rules governing when a district court must grant an evidentiary hearing are informative: if a district court would be within its discretion in denying an evidentiary hearing, a state court's similar decision is probably not objectively unreasonable.

Accordingly, in considering a petitioner's argument that the state court's failure to hold an evidentiary hearing rendered its factual findings unreasonable, we may first consider whether a similarly situated district court would have been required to hold an evidentiary hearing. See Earp, 431 F.3d at 1167. We begin with the rule that no such hearing is required "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Landrigan, 550 U.S. at 474; see also Perez, 459 F.3d at 950; see also Lambert, 393 F.3d at 965-66 (holding that an evidentiary hearing is not a prerequisite to an adjudication on the merits triggering AEDPA deference). The ultimate question, however, is whether an appellate court would be unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record. Taylor, 366 F.3d at 1000.

693 F.3d at 1147-48.

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court may review the merits of the claim de novo. See Frantz, 533 F.3d at 737. For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Pinholster, 563 U.S. at 185-86.

For the reasons set forth below, the undersigned finds that none of Petitioner's claims survive review.

II.    Petitioner's Challenges to the Applicability of 28 U.S.C. § 2254(d)

Petitioner makes several broad challenges to the application of § 2254(d). Some involve vague arguments that capital habeas proceedings before the California Supreme Court, and in particular that court's summary decision process, are dysfunctional, and that political and economic pressures cause that court to perform arbitrary and bias reviews of capital cases. He cites various studies of California's capital case procedures, provides numerous appendices, and selectively cites statements from California Supreme Court decisions to demonstrate inconsistencies in that court's review of capital habeas cases. Despite the lengthy documentation

offered in support of his challenges, Petitioner has not shown that at the time it considered his claims the California Supreme Court had such a regular practice of requiring petitioners to meet a higher pleading standard than that required under federal law, of inappropriately considering the prejudicial effect of errors, or of giving capital habeas claims inappropriately limited review, such that this court should presume the California Supreme Court committed those alleged misdeeds here.

Petitioner does advance several more specific constitutional challenges to California's capital case procedures. Each is addressed and rejected by the undersigned below.

### A. Supremacy Clause

Petitioner argues that a California rule requiring a petitioner to make a higher showing in his pleadings than that required by federal law frustrates the enforcement of federal law, violating the Supremacy Clause. (ECF No. 330 at 70.) Petitioner relies primarily on the Supreme Court's statement that a "federal right cannot be defeated by the forms of local practice." Brown v. Western Ry. of Alabama, 338 U.S. 294, 296 (1949). In Brown, the Supreme Court examined a Georgia law that required a state court considering a demurrer to construe the complaint's allegations "most strongly against the pleader." Id. at 295. The Supreme Court held that it would not defer to this state court practice when considering whether the complainant in that case had made a prima facie showing of the violation of a federal law, stating that "we cannot accept as final a state court's interpretation of allegations in a complaint asserting it." Id. at 296.

Petitioner contends that in a California habeas proceeding, California law recognizes a presumption that the state court conviction is accurate. Petitioner relies in this regard upon statements by the California Supreme Court that "all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them." People v. Duvall, 9 Cal.4th 464, 474 (1995), quoting People v. Gonzalez, 51 Cal.3d 1179, 1260 (1990) (emphasis in original). According to Petitioner, the state court's reliance upon this presumption of the accuracy of criminal convictions creates a burden upon the consideration of his federal habeas claims that runs afoul of the Supreme Court's expressed concern in Brown that federal right cannot be defeated by a state's practice.

17

Petitioner's Supremacy Clause argument is without merit. First, the argument ignores the nature of collateral review. Petitioner's argument that state law burdens the consideration of his federal claims ignores the fact that, had he raised those claims in federal collateral proceedings, they would have been subject to a similar presumption in favor of preserving the finality of the judgment. In United States v. Frady, 456 U.S. 152 (1982), the Supreme Court considered whether the "plain error" standard applicable on direct appeal to excuse a procedural default should be applied to consideration of a claim for relief brought under 28 U.S.C. § 2255. In recognizing "the existence of a final judgment perfected by appeal," the Court held that once a defendant's direct review proceedings have concluded, "we are entitled to presume he stands fairly and finally convicted." Frady, 456 U.S. at 164. The Court in Frady "reaffirm[ed] the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." 456 U.S. at 166; see also Barefoot v. Estelle, 463 U.S. 880, 887-88 (1983); United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993).

The Supreme Court recognized "the distinction between direct and collateral review," in Brecht v. Abrahamson, 507 U.S. 619 (1993). In Brecht, the Court commented on the "extraordinary remedy" of habeas corpus and concluded that the beyond-a-reasonable-doubt harmless error standard applied on direct review should not be applied when determining the impact of a constitutional error raised in a federal habeas proceeding. 507 U.S. at 633–39. While Brecht involved claims raised under 28 U.S.C. § 2254, the Brecht harmless error standard has been applied to claims raised under § 2255 as well. See United States v. Montalvo, 331 F.3d 1052, 1058 (9th Cir. 2003); Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003). The Brecht Court's incentive involved "'considerations underlying our habeas jurisprudence' that apply equally to collateral attacks on both federal and state convictions – considerations such as the different purposes of direct and collateral review and the importance of finality in criminal convictions." Montalvo, 331 F.3d at 1058, quoting Brecht, 507 U.S. at 633.

Because federal law similarly views habeas corpus as a challenge to a presumptively final and correct judgment, it cannot be said that the California Supreme Court's application of the presumption in favor of the truth, accuracy, and fairness of a conviction and sentence under state

18

law amounted to a state-created impingement on a federal right.

Additionally, Petitioner's challenges in this regard are not supported by the authority he cites. In <u>Brown</u>, the Supreme Court held it would not defer to state court rules in construing the pleadings. This court is not being asked to construe Petitioner's claims under any standard announced under California law. Rather, this court looks to federal, not state law, to determine whether Petitioner has established a prima facie case for relief. If he has done so, this court looks again to only federal law to determine whether there were any reasonable bases for the California Supreme Court's denial of his claims. Therefore, the concerns at issue in <u>Brown</u> are inapplicable.

### B. Article III

Petitioner also argues that if the AEDPA requires deference to "novel state court rules for applying the Constitution," then it violates Article III of the United States Constitution by encroaching upon the role of the federal courts as the final arbiters of federal law. (ECF No. 330 at 70.) But, this argument relies upon the same false distinction between state and federal collateral review discussed above. It fails for the same reasons.

### C. Suspension Clause

As with his Article III challenge, Petitioner's argument that the Suspension Clause is violated by § 2254(d) (ECF No. 330 at 72) rests on the same incorrect underpinning.

A law acts to suspend the writ of habeas corpus in violation of the Constitution only where it explicitly bars habeas review. <u>Demore v. Kim</u>, 538 U.S. 510, 517 (2003). In fact, the Ninth Circuit has considered, and rejected, the Suspension Clause argument Petitioner makes here. In <u>Crater v. Galaza</u>, 491 F.3d 1119 (9th Cir. 2007), the court considered whether the deference due a state court under 28 U.S.C. § 2254(d)(1) constituted a suspension of the writ. That court held it did not. First, a suspension of the writ of habeas corpus occurs only when Congress "clearly and unambiguously" removes all federal habeas corpus jurisdiction. <u>Crater</u>, 491 F.3d at 1124 n.5. The AEDPA does not repeal federal habeas jurisdiction. The court in <u>Crater</u> also rejected an argument that § 2254(d)(1) "effectively suspends the writ." <u>Id.</u> at 1124–25. The court pointed out that altering the standards for granting habeas relief is not the same as suspending the privilege of the writ. <u>Id.</u> at 1125–26, citing <u>Felker v. Turpin</u>, 518 U.S. 651 (1996).

Petitioner's reliance on <u>Boumediene v. Bush</u>, 553 U.S. 723 (2008), where the Court struck down a statute denying some aliens access to the habeas remedy, is misplaced. Petitioner makes no comprehensible argument that the AEDPA has suspended the writ of habeas corpus in violation of the Suspension Clause.

### D. Liberty Interest

Under California law, if a habeas petitioner pleads "sufficient facts that, if true, would entitle him to relief," then the state court will issue an order to show cause requiring a response from the state. <u>People v. Duvall</u>, 9 Cal.4th at 475. Issuance of an order to show cause triggers rights to conduct fact-finding in support of claims set out in the petition. <u>Id</u>. at 475–77. Here, Petitioner asserts that this rule creates a liberty interest in the state habeas procedures. (ECF No. 330 at 92.) His assertion in this regard, however, cannot form the basis of a due process argument. "[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." <u>Olim v. Wakinekona</u>, 461 U.S. 238, 250 n.12 (1983); <u>see also</u> <u>Elliott v. Martinez</u>, 675 F.3d 1241, 1245–46 (10th Cir. 2012)

### III. Application of 28 U.S.C. § 2254(d) to Petitioner's Claims

The court addresses Petitioner's claims in the order in which they have been briefed by the parties in their most recent substantive filings (ECF Nos. 330 & 345).

### Claim D: The Propriety of the Prosecution's Use of Peremptory Challenges

In this lengthy claim, Petitioner complains the prosecutor systematically excluded several African-American and Hispanic venirepersons in violation of his constitutional rights and that the California Supreme Court's denial of his claim amounted to an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented. (ECF No. 330 at 100-209.)

Respondent maintains Petitioner's claim lacks merit, and a review of the record supports a finding that the California Supreme Court's determination was not contrary to nor did it involve an unreasonable application of federal law, and neither did that determination involve an unreasonable determination of the facts in light of the evidence presented in the state court. (ECF No. 345 at 53-95.)

***The Applicable Legal Standards***.

In <u>Batson</u>, the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the basis of race. <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986). <u>Wheeler</u> is the California state counterpart to <u>Batson</u>. <u>People v. Wheeler</u>, 22 Cal. 3d 258, 272 (1978) (<u>overruled in part on another ground in</u> <u>Johnson v. California</u>, 545 U.S. 162 (2005)); <u>Yee v. Duncan</u>, 463 F.3d 893, 896 (9th Cir. 2006). However, it is the standards of <u>Batson</u> that control the disposition of a petitioner's claim on federal habeas corpus review. <u>See</u> <u>Lewis v. Lewis</u>, 321 F.3d 824, 827 (9th Cir. 2003).

In order to prevail on a <u>Batson</u> claim, a defendant must first establish a prima facie case of purposeful discrimination. <u>Batson</u>, 476 U.S. at 96-97; <u>Lewis</u>, 321 F.3d at 830; <u>United States v. DeGross</u>, 960 F.2d 1433, 1442 (9th Cir. 1992). "To establish a prima facie case, the defendant must show that 'he is a member of a cognizable racial group,' <u>Batson</u>, 476 U.S. at 96, and that 'the facts and circumstances of the case raise an inference' that the prosecution has excluded venire members from the petit jury on account of their race." <u>McClain v. Prunty</u>, 217 F.3d 1209, 1219-20 (9th Cir. 2000) (quoting <u>Wade v. Terhune</u>, 202 F.3d 1190, 1195 (9th Cir. 2000)). In deciding whether a defendant has made the requisite showing, the trial court should consider all relevant circumstances. <u>Batson</u>, 476 U.S. at 96.

If a prima facie case is made out, "the burden shifts to the State to come forward with a neutral explanation for challenging" the jurors in question. <u>Batson</u>, 476 U.S. at 97; <u>DeGross</u>, 960 F.2d at 1442; <u>Stubbs v. Gomez</u>, 189 F.3d 1099, 1104 (9th Cir. 1999). "The prosecutor's challenges need not rise to a level justifying use of a challenge for cause." <u>United States v. Power</u>, 881 F.2d 733, 740 (9th Cir. 1989) (citing <u>Batson</u>, 476 U.S. at 87-88). Indeed, for the purposes of this step, the prosecutor's explanation need not be "persuasive or even plausible." <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995). Rather, a neutral explanation in this context "means an explanation based on something other than the race of the juror." <u>McClain</u>, 217 F.3d at 1220 (quoting <u>Hernandez v. New York</u>, 500 U.S. 352, 360 (1991)). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is

inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." McClain, 217 F.3d at 1220 (quoting Stubbs, 189 F.3d at 1105). As with any credibility determination, the trial court's own observations are of significant importance. Batson, 476 U.S. at 98 n.21. See also Lewis, 321 F.3d at 830.

At the final step of this inquiry, "the trial court must determine whether the defendant has carried the burden of proving purposeful discrimination." McClain, 217 F.3d at 1220 (quoting Hernandez, 500 U.S. at 359). See also Batson, 476 U.S. at 98. The court must evaluate the prosecutor's reasons and make a credibility determination. Lewis, 321 F.3d at 830. A comparative analysis of the struck juror with empaneled jurors "is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination." Id. If a review of the record undermines the prosecutor's stated reasons, or many of the stated reasons, then the explanation may be deemed a pretext. Id. The proffer of various faulty reasons and only one or two otherwise adequate reasons may undermine the prosecutor's credibility to such an extent that a court should sustain a Batson challenge. Id. at 831.

On the other hand, "[t]he fact that a prosecutor's reasons may be 'founded on nothing more than a trial lawyer's instincts about a prospective juror' does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions." United States v. Power, 881 F.2d at 740 (quoting United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989)). "Evidence in the record of objective reasons to strike a juror implies that racial bias did not motivate the prosecutor." Boyd v. Newland, 393 F.3d 1008, 1013 (9th Cir. 1987), amended by 467 F.3d 1139, 1148 (9th Cir. 2006).

Petitioner bears the burden of demonstrating the existence of unlawful discrimination, Batson, 476 U.S. at 93, as this burden of persuasion "rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768. However, petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 662 (1953)).

"Because 'it is widely acknowledged that the trial judge is in the best position to evaluate

the credibility of the prosecutor's proffered justifications,' due deference must be accorded to the trial judge's determination." Jamerson v. Runnels, 713 F.3d 1218, 1224 (9th Cir. 2013) (quoting Briggs v. Grounds, 682 F.3d 1165, 1171 (9th Cir. 2012)); see also Miller-El v. Cockrell, 537 U.S. 322, 339 (2003) (a "state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference"); Sifuentes v. Brazelton, 825 F.3d 506, 515 (9th Cir. 2016) (the "credibility determination relies on the trial court's 'evaluation of the prosecutor's state of mind based on demeanor and credibility,' and is a 'pure issue of fact' that lies 'peculiarly within a trial judge's province'" [citation omitted]), cert denied, 137 S. Ct. 486 (2016). "Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations." Miller-El, 537 U.S. at 339. "The upshot is that even if '[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, … on habeas review that does not suffice to supersede the trial court's credibility determination.'" Davis v. Ayala, 135 S. Ct. 2187, 2201 (2015) (quoting Rice v. Collins, 546 U.S. 333, 341-42 (2006)).

### *The Standard of Review*

This claim involves two different Batson/Wheeler motions made during trial. Notably, the parties and the court refer to the motions as Wheeler motions and reference the California Supreme Court case almost exclusively during oral argument.[4]  In the first motion, made during the exercise of peremptory challenges involving the first or original panel of prospective jurors, defense counsel approached the bench, indicating he wished to make a Wheeler motion after the prosecutor had exercised his fifth challenge. Ultimately, that motion involved seven prospective jurors of African-American, Hispanic or mixed race. The second or "renewed" motion involved the second panel of prospective jurors and defense counsel again asked to approach, this time after the prosecutor had exercised his fifth challenge as to the second panel (his 17th overall challenge) of an African-American juror.

---

[4] An objection at trial under People v. Wheeler, 22 Cal.3d 258 (1978), is the equivalent of an objection under Batson and is sufficient to preserve the federal constitutional claim. Boyd v. Newland, 467 F.3d 1139, 1142, n.2 (9th Cir. 2006), cert. denied, 550 U.S. 933 (2007).

With regard to the first motion, the trial court found a prima facie case as to the first step required of <u>Wheeler</u> and asked the prosecutor to state his reasons for exercising challenges against the prospective jurors identified by defense counsel. The prosecutor did so, completing the required second step. After argument by the parties, the trial court ultimately denied the motion following its review of the voir dire transcript, juror questionnaires, and relevant legal authority; thus, it completed the third step of the required inquiry.

The second motion concerned the excusal of a single prospective juror; it was styled as a "renewed" <u>Wheeler</u> motion. Defense counsel argued that, with the juror's excusal, there existed a pattern of improper racial bias. The trial court denied the motion, finding no pattern. Hence, as to this second motion, the inquiry stopped at step one because the court found Petitioner has failed to make a prima facie case of discriminatory motive.

Typically, a deferential standard of review would be applied to the trial court's ruling following the three-step analysis to be considered in a <u>Batson/Wheeler</u> challenge. To wit, reviewing the California Supreme Court's holding for a finding contrary to, or involving any unreasonable application of, clearly established federal law; or where the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) & (2). However, given the decision rendered by the United States Supreme Court in <u>Johnson v. California</u>, 545 U.S. 162 (2005), such deference cannot be accorded here.

Briefly, California's <u>Wheeler</u> decision called for the defendant to "show a strong likelihood" of impermissible bias at the first step of the relevant analysis. <u>Batson</u> called for raising a mere inference of that bias. As a result of this discrepancy, in 2000 the Ninth Circuit Court of Appeals held that because California courts employed the <u>Wheeler</u> procedure rather than that called for in <u>Batson</u>, the courts had not applied clearly established federal law and a federal habeas court need not defer to the California court's findings. <u>See</u> <u>Wade v. Terhune</u>, 202 F.3d 1190, 1197 (9th Cir. 2000). In response thereto, the California Supreme Court then held that "'strong likelihood' and 'reasonable inference' state[d] the same standard" and thus its "strong likelihood" language was consistent with <u>Batson</u>. <u>See</u> <u>People v. Johnson</u>, 30 Cal.4th 1302, 1313

24

1    (2003).

2          Despite so holding, the United States Supreme Court disagreed with the court. It held

3    California's requirement that the party alleging improper bias must show (at the first step) that it

4    was "more likely than not" that the other party's peremptory challenges, if unexplained, were

5    based on impermissible group bias was an inappropriate measure.  Johnson v. California, 545 U.S

6    at 168.  More specifically, the high court stated:  "The facts of this case well illustrate that

7    California's 'more likely than not' standard is at odds with the prima facie inquiry mandated by

8    Batson."  Johnson, at 173.

9          Here, because the trial court's two rulings occurred in 1989, and the California Supreme

10   Court issued its decision in this case in 1996, that determination is at odds with clearly established

11   federal law.  Hence, de novo review appears to be the proper standard for this court's review, at

12   least as to the second motion.

13         The court acknowledges that subsequent authority has emphasized that Johnson v.

14   California concerned the inquiry to be made at step one, versus step three, and therefore, where

15   the court conducts the entire three-step Batson analysis, de novo review is not required.  See

16   Aleman v. Uribe, 723 F.3d 976, 981, n.4 (9th Cir. 2013).  Thus, reasoning that such a finding can

17   be accorded AEDPA deference because the language found to be improper at step one was

18   obviously not an issue where the trial court found an appearance of impropriety at step one and

19   proceeded to require the challenged party to state its reasons at step two, and then made the

20   required determination at step three.  Id. at 981, n.4 (addressing Aleman's assertion de novo

21   review applies:  "This case concerns the California Court of Appeal's application of Batson's

22   third step.  Whether Aleman established a prima facie case of discrimination is not an issue.  And

23   even if the Court of Appeal considered the erroneous prima facie standard in its review of

24   Aleman's claim, any error would be harmless because application of the heightened 'strong

25   likelihood' standard at step one would only strengthen Aleman's claim of purposeful

26   discrimination at step three").

27         Incomparably however, Petitioner's claim involves two separate Batson challenges rather

28   than one.  A three-step analysis occurred after the first motion was considered, and a finding that

25

Petitioner did not meet his burden at step one occurred following the second or "renewed" motion. Arguably then, the findings regarding the first motion could still be afforded deference, whereas the findings of the second motion are subject to de novo review. But by virtue of the matters to be considered at step one of the second or "renewed" motion – where Petitioner correctly argues the consideration of all relevant circumstances involves the information at issue in the first motion – the court has determined de novo review of both motions is appropriate. Otherwise, in considering all relevant circumstances at issue in the renewed motion, where those circumstances involve the circumstances of the earlier motion, absent a de novo review concerning the circumstances involved in the first motion, review of the second would not truly be anew.

### *The Exercise of Peremptory Challenges*

Peremptory challenges as to the first group of prospective jurors occurred on the afternoon of March 20, 1989. (8 RT 1408.) Specifically, in order, the People excused the following prospective jurors: Maximina Troyer, Thomas Harris, Eleanor Zeboskey, Sheila Canepa, Charso Elliott, Tim Lacy, Rachel Klose, Clair Allen, Albert Davidson, Sylvia Gonzalez, James Del Rosario and Leon Soto. (8 RT 1408-18; 4 CT 983.) The defendant jointly exercised peremptory challenges as to the following group of prospective jurors: Tracy Jackson, Margaret Tutt, Bradley Payne, Sandra Roth, Herman Floyd, Regina Aguilera, Kenneth Boyce, Richard Carpenter, Nancy Yost, Henry Eisenbeisz, Joyce Wondra, Gene Carroll, Dale Norling, Raymond Schriefer, Linda Elliott and Marc Beauchamp. (8 RT 1409-17; 4 CT 983.) At the conclusion of the first exercise of peremptory challenges by all parties to the original group of prospective jurors, eleven prospective jurors remained and were directed to telephone the court at a later time to learn the date upon which they would be required to return for further jury selection proceedings. (8 RT 1418-21; 4 CT 983.)

The second series of peremptory challenges were exercised on the afternoon of April 4, 1989. (11 RT 2190; 5 CT 1066.) The defendants began and exercised their four remaining joint challenges as to prospective jurors Andrew Townsend, Susan Parsons, Scott Gear and Leo Esparza. (11 RT 2193-95; 5 CT 1066.) The People excused three prospective jurors – Erin

Franchino, Elizabeth Garland and Laura Easton – before passing on the panel as then comprised after the joint challenge to Esparza.  (11 RT 2194-96; 5 CT 1066[5].)  Petitioner then excused Stella Carr, the prosecution excused Richard Ringo, and codefendant Ross excused Charles Gailey; then with Gailey's excusal, Katrina George entered the box.  (11 RT 2197.)  The People then excused George.  (11 RT 2197.)  Thereafter, Petitioner and codefendant Ross each exercised three separate and alternating peremptory challenges as follows: David Shaw, Pamela Steiner, Jeanne Theobald, Russell Tweedy, James Estes and Glenda Barry.  During this same period, the prosecutor exercised five peremptory challenges – Bonnie Daniels, Linda Ruys, Jeanette Harrison, Judy Candlish and Christine Greene – before passing on the panel as comprised.  (11 RT 2197-200.)  When Petitioner next excused prospective juror Jennifer Karsikas, the People excused Judith McLaughlin.  (11 RT 2200.)  Codefendant Ross then passed, the People excused Suzanne Bragdon, and Petitioner elected to pass.  (11 RT 2200-01.)  Next, the People excused Agnes Packard and codefendant Ross excused Ruth Bartlett; after the People excused Scott Kollman, Petitioner excused Anthony Fanfan.  (11 RT 2201-03.)

Finally, on April 6, 1989, the third and final series of peremptory challenges were exercised.  (4 CT 1073.)  During the morning proceedings, the prosecutor thanked and excused the following prospective jurors: Don Morehouse, Harold Kaden, Virginia Breault, Irene Stebbins, Raymond Hummer, Constance Cummings and Jamie Silva. (12 RT 2416-17.)  Both Petitioner and codefendant Ross passed during the morning session, neither excusing any prospective juror as the panels were then comprised.  (12 RT 2416-17.)  That afternoon, when peremptory challenges resumed, codefendant Ross initially passed and the People excused Jesus Hernandez; when Petitioner passed thereafter, the prosecutor did as well.  (12 RT 2485.)  Codefendant Ross then excused Heather Salzman, the prosecutor passed, and Petitioner excused

---

[5] The Clerk's Transcript on Appeal, Volume 5, contains a clerical error where the minute order for the proceedings of April 4, 1989, mistakenly reads that "Constance Cummings" was excused by the People after Erin Franchino and before Laura Eaton.  However, while the corresponding Reporter's Transcript on Appeal clearly indicates that Constance Cummings entered the box before the People exercised its next challenge, the challenge itself was directed to Elizabeth Garland.  (Cf. 5 CT 1066 to 11 RT 2194-95.)

27

Dunn.  (12 RT 2486; 5 CT 1073[6].)  Following further voir dire proceedings, when peremptory challenges were again exercised, the prosecution passed on its next challenge and codefendant Ross excused Donna Garcia.  (12 RT 2532.)  There followed three consecutive passes by all parties in succession, leaving fifteen (15) persons to be empaneled to try the case.  The parties were to return the following Monday to select three alternate jurors.  (12 RT 2532-34; 5 CT 1073.)

### *The First Defense Motion & The Reasons Proffered*

On the afternoon of Monday, March 20, 1989, the first peremptory challenges were to be exercised as to the 39 venirepersons that remained from the first jury panel called.  (8 RT 1406.)  After explaining the process to the prospective jurors and confirming the number of joint and separate peremptory challenges with defense counsel, with the first 12 of those 39 venirepersons seated in the box, the trial court began by asking the People to exercise the first peremptory challenge.  (8 RT 1408.)

The prosecutor excused Troyer first.  (8 RT 1408-09.)  After the defense's first joint challenge, the court began to call forward random individuals to replace those who had been excused.  (8 RT 1409.)  The prosecutor's second challenge excused Harris.  (8 RT 1410.)  Next, the prosecutor excused prospective juror Zeboskey as his third selection, and Canepa as his fourth. (8 RT 1411.)  Elliott was his fifth peremptory challenge.  (8 RT 1412.)  At that point, defense counsel asked to approach the bench and an unreported discussion occurred.  (8 RT 1412.)

After excusing prospective juror Lacy as his sixth peremptory, the prosecutor thereafter passed on the panel as it was then comprised.  (8 RT 1413.)  When the defense exercised its next joint challenge as to prospective juror Boyce, the prosecutor then chose to excuse Klose as his seventh peremptory challenge.  (8 RT 1413-14.)  Thereafter, after exercising his eighth

---

[6] Two clerical errors appear in Volume 5 of the Clerk's Transcript on Appeal, concerning the minute order dated April 6, 1989.  First, prospective juror Barbara Bass is identified as both having been excused by Petitioner and having been selected to serve.  (See 5 CT 1073.)  The latter is the accurate entry; Barbara Bass served on the jury.  Second, Donna Garcia was excused by codefendant Ross on this date; however, her name is not recorded in the minutes as one of the two challenges exercised by Ross.  (Cf. 5 CT 1073 to 12 RT 2531-32.)

peremptory challenge as to prospective juror Allen, the prosecutor passed as to the panel on four more occasions as the defense continued to exercise its joint challenges. (8 RT 1414-16.)

After the defense exercised its joint peremptory as to prospective juror Norling, the prosecutor excused prospective juror Davidson. (8 RT 1416.) The prosecutor's tenth, eleventh and twelfth peremptory challenges were exercised as to Gonzalez, Del Rosario and Soto, respectively. (8 RT 1416-17.) Eleven persons remained of the original 39 – a total of 28 challenges having been exercised by the parties. (8 RT 1418.) Jury selection was to continue the following day with a second panel consisting of 70 venirepersons. (8 RT 1422-27.) Before concluding for the day, defense counsel reminded the trial court it had "a motion." (8 RT 1427.) Counsel for co-defendant Ross joined. (8 RT 1427.)

More specifically, counsel for Petitioner indicated the motion was made during the peremptory challenge proceedings when counsel asked to approach and a discussion occurred off the record, following the prosecutor's challenge as to Elliott, having previously excused Harris. (8 RT 1427.) He noted the prosecutor had thus excused a black female and black male, the "only two blacks on the entire panel, at least the panel that got through challenges for cause." (8 RT 1427-28.) Defense counsel further noted the prosecutor went on to exclude venirepersons of Puerto Rican, Filipino, American Indian and "Spanish" descent. (8 RT 1428.) Petitioner identified himself as "Spanish and Islander," "native." (8 RT 1428.) The prosecutor pointed out that he believed another venireperson, a young woman excused by the defense, was black. (8 RT 1429.) After consulting the prospective juror's questionnaire, it was agreed prospective juror Jackson was of mixed ancestry: "Japanese/black." (8 RT 1429-30.)

Asked to identify the individuals defense counsel believed had been excused by the improper exercise of peremptory challenges by the prosecution, Mr. Gable identified: Troyer, Harris, Elliott, Klose, Gonzalez, Del Rosario and Soto. (8 RT 1430-31.) In response to an inquiry from the trial court, defense counsel believed one minority remained on the panel following the exercise of peremptory challenges: Garcia. (8 RT 1431.)

The trial court recalled the prosecution had exercised 12 peremptory challenges, 7 of which included either "Hispanic or black" persons. (8 RT 1432.) Noting "the appearance of the

use of the peremptory challenges to exclude one or both of those groups," the trial court asked the prosecutor to state his reasons for excluding each individual. (8 RT 1432.) The prosecutor replied he did not have the questionnaires with him at that time and that those contained his reasons. (8 RT 1432.) It was agreed the prosecutor would bring the questionnaires to court the following morning and the motion proceedings would continue at that time. (8 RT 1434; see also 4 CT 984.)

The following morning, Tuesday, March 21st, the prosecutor provided his reasons, as excerpted here:

> MR. MARLETTE: You mentioned a number of names yesterday. Just to begin with, I'd like to mention that all I had yesterday was my scoring sheet; I did not actually have the questionnaires with me.
>
> The first was Miss Klose, and in going back over my notes, I found the reasons why I had rated her the way I did.
>
> It seemed to me that a number of factors made me feel she would be sympathetic to the defendants.
>
> One was that in the questionnaire, she said that she felt, or she said that she would not feel comfortable as a defendant on the stand.
>
> She also said in the questionnaire that she felt a rapist needed therapy, in response to a question about the death penalty for somebody who rapes and who kills.
>
> Also in the oral voir dire, she was the one who mentioned that her mother-in-law had just died the previous Sunday and, in fact, was crying in the box while she was being questioned.
>
> All those things taken together made me feel that she would be too sympathetic, and particularly on the question of the death penalty, that I could not count on her as a juror.
>
> That, along with, at the time I exercised Miss Klose, there appeared to me to be other jurors who were much higher rated.
>
> I had her rated approximately a three, on a scale of one to five, ones that I like, fives I need to have gone. And at the time I exercised that challenge, there were a number of ones and twos that were just coming up.
>
> Secondly with Miss Troyer, and with Miss Troyer, it was not a matter of comparison with other jurors; I just plain wanted her gone.
>
> She mentioned in voir dire that she had strong feelings against the death penalty, that it had no effect. In fact, she mentioned that she had to speak with her priest after filling out the questionnaire about the death penalty situation.
>
> Further, and primarily, she - - her son had been to trial for a - - apparently a murder charge and was acquitted.
>
> I felt that I could not count on her as, to be fair and impartial, particularly on the death penalty question, but also on the guilt question, given the experience with her son.
>
> The other was Mr. Thomas Harris. Again, it was not a matter of comparison with Mr. Harris. I just rated him immediately that I needed him gone.

In going through - - first of all, it appeared he had no family ties, all his time was taken with work or else relaxing with friends.

It particularly struck me that he had lost contact with brothers and sisters who lived in the area for just kind of out of not trying, not for any reason or any rift.

Further, on the death penalty questions, Mr. Harris continually looked for excuses to avoid the death penalty, talking about drugs and rehabilitation, talking about that he favored a long appeal period, so that other evidence could come forward.

In response to question 55 on the questionnaire, he said, "Before a defendant is brought to trial, anything could be brought forward could either invalidate or somewhat prove reasonable cause for doubting guilt," and number 56, he said, "Defendant should project all they know of their innocence to their attorneys 'cause they're the main hope of release."

On number 58, about whether a defendant should take the stand he said, "They might accidentally incriminate themselves," and number 59, he felt that "The burden on the prosecution should be greater for greater crimes."

He said that, further, "There can be no doubt or question left to prove a crime was in fact committed and the party involved did in fact commit it."

On page[s] 17 and 18 of the questionnaire, in the death-penalty sections, he had said that his general feelings about the death penalty were that if a person is totally and irrevers[i]bly in any type of rehabilitation in which to function in society then death is the only outlet besides no parole."

Number 97, he said, "The death penalty was one of the few alternatives was to remove them from productive people."

And on number 98, he felt the purpose of the death penalty "Would protect society and enable them to feel free from escapees and mistakenly released convicts or not quite rehabilitated individuals."

Also No. 1 on five, the question of, "How do you feel about this person getting the death penalty?"

"Any person who kills another," he said, "There's usually certain circumstances in which the murder was on the spur of the moment or unavoidable."

Number 16, he said maybe the crime was done on a diminished capacity, and i[f] so, maybe the person would be able to readjust and get rehabilitated.

It seemed Mr. Harris kept focusing on the possibility of rehabilitation for somebody, which to me, precluded a death-penalty vote from him.

Miss Sylvia Gonzalez, she mentioned on the questionnaire that she would vote for the death penalty for serial killers, mass killers, baby killers, mutilations, and when victims were beheaded.

Question 98, she mentioned "The death penalty might be appropriate for those people who are extremely demented," and it struck me that her mind set as to the appropriateness of the death penalty depended on very brutal - - in fact, she used the word "brutal" in her questioning by me, in oral voir dire, and I felt that in a case that was less than brutal or bloody that she would not vote for the death penalty.

Miss Charso Elliott - - also at the time that I excused Miss Gonzalez, again, she was about a three on my scale, and we were in a section down towards, from about juror number 30, to juror number 37, who with to my rating scale, much better jurors for me.

In regards to Miss Charso Elliott, she said on the questionnaire that she felt the death penalty actually served no purpose; she felt the death penalty might be appropriate for serial murders and mass murders.

31

There was quite a bit of confusion with Miss Elliott in trying to explain to her the life without possibility of parole, and it appeared to me that her questions, or her responses on the questionnaire had to do with feeling that an L-WOP could be released at sometime, and Mr. Gable took a stab at it and the Court went through [it with] Miss Elliott.

Once she finally understood that L-WOP meant no release, it appeared to me that she very much favored that.

She also mentioned in her questionnaire, question number 109, that not all people who were sentenced to the death penalty are guilty. And on question 43, she believed that the burden, she would have to be convinced beyond any shade of doubt.

It appeared to me that I could not count on Miss Elliott for a death-penalty vote in these circumstances, and, again, Miss Elliott, there were other jurors who I felt would be better for me.

With Mr. Delrosario, Mr. Delrosario was not a matter of comparison.

I wanted him gone from the responses on the questionnaire, although he did say that he felt he could be fair on the death penalty, depending on how the crime was committed.

He also indicated that very clearly, that he felt the death penalty would be appropriate for premeditated murder, but that he would vote for life in prison without possibility of parole on felony murders without premeditation. Of course, that is our case here, is a felony murder.

With Mr. Delrosario as well, some for the reasons he gave for the ways that crime problem may be solved was proper education and jobs.

It seemed to me that those were social as opposed to personal responsibility, responses.

Also, on the questions on the questionnaire about who should get the death penalty, the thing about rapists, murderers and people who kill more than once, he disagreed with all of those questions.

I felt that Mr. Delrosario leaned strongly and in fact expressly towards life without possibility of parole for felony murder.

Mr. Soto was a matter of comparison.

I felt there were other jurors on the new panel, and also in the jurors that I already selected who were better oriented to the prosecution.

Mr. Soto seemed to, in his responses to the Court and also on the questionnaire, his attitude was that he would go along with the law.

He said that he would support the death penalty if the Court decides it's proper.

On all the questions about who gets the death penalty, he would in certain, that he disagreed unless a person were proven guilty. At one point in the questionnaire, he mentioned, I forget the exact context, but he said that the defendant was the victim of the death penalty.

Mr. Soto also had a, apparently a situation where he was accused of kissing a 15 year-old girl in the Air Force and was found innocent.

Given the responses in the questionnaire where Mr. Soto was saying that the records were available, if necessary, and he underlined that he was accused of kissing only, this girl; it appeared to me that he had been through at least quasi-criminal proceeding and had been found innocent, and for that reason, would tend to identify with the defense, but primarily for the reason that it appeared to me Mr. Soto avoided personal responsibility, and I felt that he could not personally bring himself to vote for the death penalty in this case. (8 RT 1436-1443; see also 4 CT 985.)

32

In response, defense counsel asked the trial court to allow the submission of points and authorities analyzing the proffered reasons;[7] it was understood a resolution of the motion would not then occur. (8 RT 1443-44; see also 4 CT 985.)

### *Oral Argument on the First Motion*

On March 30, 1989, the trial court heard argument from the parties. More particularly, the prosecutor Mr. Marlette commented on points raised in the defense's written points and authorities, and defense counsel responded thereto:

MR. MARLETTE: Regarding Miss Klose - - Counsel stated that my reason that she seemed to identify with the defense, because of her statement she would feel uncomfortable on the stand, is not valid.

It's doubtful anyone would feel comfortable. It was important to me because she chose to identify her feelings with the defendant in that case.

That, together with the other matters, that made me feel she might be sympathetic, including the fact that her mother-in-law had just died and her emotional reaction on the stand made me feel that she was not a juror that I wanted, and had nothing at all to do with her race.

Regarding Miss Troyer, Counsel stated that I wanted her excused because of her strong feelings against the death penalty and the fact her son had been accused of murder, the charges that were later dropped.

I don't believe they were dropped. I believe he had actually be[en] acquitted after a trial.

I think clearly, she would tend to identify more with the defense having lived through an experience with somebody very close to her, and I'm sure all through that experience, hoping with all her might that in fact her son would be acquitted.

Regarding Mr. Harris, the defense brings up, with regard to Mr. Harris, and with regard to other jurors, as well, that I did not voir dire on a subject that I based my justification on, and I will submit to the Court that it is not necessary that I voir dire and try to rehabilitate somebody who has given an answer that makes me uncomfortable with them in the questionnaire.

We've all seen that, particularly in the Hovey[8] area, that jurors are anxious to give an acceptable answer, generally to the Court, but even in many instances to the attorney who's asking the question, and the fact that I did not further voir dire with Mr. Harris, I don't think that is a requirement, I don't think it is entitled to any weight.

His answers on the questionnaire consistently looked for excuse - - excuse is really kind of a perjorative word, looked for alternatives to the imposition of the death penalty, he would bring up on his own, well, if there were drugs involved, or if the guy was amenable to rehabilitation, then I wouldn't believe in the death penalty.

---

[7] Points and authorities were submitted one week later on March 28, 1989. (5 CT 1001-09.)

[8] People v. Hovey, 44 Cal.3d 543, 572-73 (1988).

33

These were things that he inserted on his own, which indicated to me a tendency to look for those kind of things.

It made me feel that he would most likely be a life without parole vote.

Again, with Miss Gonzalez, Counsel seemed to feel that the fact that I had not bothered to ask her questions on the matter which I deemed important, was somehow dispositive, and I would simply indicate to the Court that it is not even probative in that area.

Mr. Delrosario, he had very clearly stated that he would lean towards life imprisonment in the case of an unpremeditated murder.

In fact, we differentiated with him, planned murder as opposed to felony murder, and he indicated that he would, while he might tend to vote for the death penalty in a premeditated murder, that he would tend to vote for the other penalty in a felony murder without premeditation, which I expect will be the case here.

He also in his answers - - Counsel took exception to my putting weight on the fact that Mr. Delrosario felt the crime problem might be solved with better education and jobs, and I believe this was raised in response to other jurors as well, and I put quite a bit of weight on those questions on page nine, "What do you think of the crime causes and what do you think of the crime solutions," and if somebody tells me on that questionnaire that they think the causes of crime are basically social in nature, that there's lack of opportunity, that it's a poor family background, that it's peer pressure, and that the solutions are better opportunities for people, more equal distribution of wealth, for instance, if they give reasons that are based in social responsibility for crime, that is almost a litmus test, for me.

I believe that anyone who is going to be asked to impose the death penalty or even seriously consider the death penalty, must be at least amenable to the idea that a person is personally responsible for his own actions particular in this case, where I believe that much of the mitigation evidence in the penalty phase will have to do with Mr. Alvarez's upbringing, as opposed to, on the other hand, any good acts that he has done.

Also, with Mr. Delrosario, on all the, what I call the who-gets questions, "Do you think somebody who kills anybody should get the death penalty," "If they kill them twice, if they rape and mutilate."

All his answers there were strongly that he strongly disagreed with the proposition, except regarding drug dealers, I believe his answer was, that he agreed somewhat.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Regarding Mr. Soto he, again, I had stated that I felt he avoided personal responsibility, could not bring himself to vote for the death penalty, on all the what I've called the who-gets questions.

Mr. Soto strongly disagreed, he had different causes on each.

He would say, "Well, not without a hearing, found guilty without doubts, on the rape only," and although, as Counsel points out, those may be correct answers, I think the justifications that a juror summons up from himself in answering those questions, gives me an idea of where that juror's tendencies lie, and in those questions about imposing the death penalty, when a juror consistently summons up from himself reasons why the death penalty may not be appropriate, I put great weight on that.

Again, with Mr. Soto, Counsel said that - - I inquired into an incident where he was accused of kissing a 15 year-old girl.

On voir dire, again, I thought that his answers on the questionnaire were extremely telling, and I didn't have any desire to get less candid responses, simply so that he might

fit in.

On the questionnaire, he said that he was - - in fact I should read it - - the question about whether he'd ever been accused of a crime, or, were you every involved in any way with military law enforcement, court martials or investigation, and he checked yes, and gave, he said, "Investigation only of kissing, parenthesis, only, close parenthesis, a 15 year-old girl, found innocent and officially so stated by the staff judge advocate, parenthesis, 1984, close parenthesis, records available."

This was obviously a very important matter with Mr. Soto, and in much the same way as the woman whose son had been tried and acquitted for murder, I think Mr. Soto had been through a quasi criminal investigation and acquittal, and I think that with all his might, he was hoping through all of that, that he would be acquitted.

Those kinds of incidents cannot be ignored, and I don't think my failure to inquire further of it orally is probative.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[DEFENSE COUNSEL]: As the Court knows, I did not argue the fact that it was inappropriate for Mr. Marlette to make any observations he did, and I did that with full recognition of the holding in <u>Johnson</u>, which expressly overruled the holding in <u>People versus Trevino</u>, to the extent that it said that the court in ruling on a <u>Wheeler</u> motion, could not take into consideration the subjective reasons advanced by the prosecutor for dismissing the jurors, so I have not undertaken to quarrel with the subjective reasons, other than to the extent that those reasons do not find support in the transcript, in fact, to the extent that in some cases, I find that the contrary is found in the transcript.

Now, as far as how the Court is supposed to review the reasons advanced by the prosecutor for his peremptory challenges, think that the language as I quoted, from <u>People versus Snow</u>, written by Chief Justice Lucas, at 44 Cal. 3d 222, is extremely pertinent and appropriate, even in light of the <u>Johnson</u> case, and that says that once a prima face case has been shown and an explanation tendered, the trial Court must make a sincere and reasoned attempt to evaluate the explanation, in light of the circumstances of the case as then known, his knowledge of trial techniques and his observations of the matter in which the Counsel asserting the peremptory challenges has examined members of the venire and has exercised challenges for cause or peremptorily, and that is why I call to the Court's attention the fact that in many of these situations, Mr. Marlette did not avail himself of the ability to ask questions which would clarify somewhat ambiguous or amorphous answers supplied on the questionnaire.

To my way of thinking of it, that's the time when you should ask these questions, if you have any doubts as to what these folks were talking about, what they meant, what their true feelings are.

Instead what we end up with are reasons which are premised on speculation, based upon a failure to inquire.

Now, there may be strategic purposes for not doing that, and they may very well be such that under normal circumstances, it might be appropriate; however, if - - what it amounts to a wholesale exclusion of minorities by the Prosecutor by virtue of the use of his peremptory challenges.

I think that there's a lot more scrutiny has to be accorded those kinds of explanations, where there has not been any attempt made to voir dire in those areas, and that's why I call the Court's attention to those cases where there was no general voir dire or no death penalty voir dire conducted in the areas that has ultimately led to the Prosecutor exercising peremptory challenges, and indeed, with regard to Miss Troyer, I

35

think that the record, complete record will disclose that apparently, the charges were dropped after an investigation into the death of an individual, and it was ruled self-defense.

That was my understanding, after reading the transcript, where someone did in fact voir dire on that, and also, with regard to whether or not a specific answer is correct or, quote, correct, end quote, or not, and what litmus test that provides for counsel, I would just point out that I think that most minority people who have attempted to get jobs and been unable to or who live in an area where jobs are not quite as plentiful as they are in other segments of society, that you're gonna get a response like you got from Mr. Delrosario, that maybe jobs and better education would go a long ways towards clearing up the crime problem, and I don't see how in the world that can furnish a basis for an excusal for even peremptorily when you're dealing with minorities.

I mean, that is the type of thing that led to the <u>Wheeler</u> decision to begin with, and in closing, I just want to make one further point, and that is that even if the Court finds that one of these six were excused inappropriately, then the motion has to be granted, because the defendant is entitled to a cross section of - - representative cross section of the community, based upon a random drawing of the entire venire, and that is true, even if there's one.

MR. MARLETTE: If I may respond very briefly to one point Counsel made.

THE COURT: Yes.

MR. MARLETTE: I've been paying attention to those page nine questions about crime causes and solutions, and they do not break down on a racial basis by any means.

I would question what I might - - whether all people who feel that crime causes are social, would be a cognizable class, at any rate, and I think it's - - I won't say offensive, but entirely incorrect to say that that is, to equate that in any way with a racial characteristic.

As I go through these questionnaires, I find that people with high levels of education, whether black or white or whatever race, perhaps depending on what their job is, will state that they feel crime causes are social.

That's all I have.

THE COURT: All right. Thank you, gentlemen.

I'm going to review the transcript of the voir dire of that first panel, at least the individuals excused and perhaps others.

Now, start off - - both sides talking about a fact that six of nine blacks were excused by the prosecution, and then I think - -

MR. MARLETTE: No, sir, Counsel did group blacks and Hispanics together.

THE COURT: That's what I want to clarify.

MR. MARLETTE: I have a list for the Court the breakdowns racially of what we're talking about here.

THE COURT: Okay.

MR. MARLETTE: Thomas Harris is black, was excused by me.

Charso Elliott was black, was excused by me.

Tracy Jackson was black and Japanese, and was excused by the defense.

The Hispanic jurors included Klose, who said she was Spanish and Indian and was excused by me; Troyer, who said she was American Indian, Mexican and Spanish, who was excused by me; Aguilera, who is Mexican, was excused by the defense; Gonzales, who listed herself as Hispanic was excused by me, and Mr. Soto, who listed himself as Caucasian slash Puerto Rican, was excused by me.

36

And then Asians - - well, again, there was Miss Jackson, who said she was black and Japanese, excused by the defense; Donna Garcia, who listed herself as, she was a Filipino and remains on the panel, and Mr. Delrosario, who is Filipino and was excused by me.

I believe the remaining jurors said they were white. There may have been some who said they were white and then listed a European heritage.

THE COURT: Are there other minorities of black and Hispanic background that are still on the panel, besides Garcia?

MR. MARLETTE: No, sir.

[DEFENSE COUNSEL]: Not to my knowledge, Your Honor.

THE COURT: Okay, the prosecution excused Elliott, Troyer, Harris, Gonzales, Delrosario and Soto and [K]lose; is that correct, seven?

MR. MARLETTE: Yes, sir.

(10 RT 1963-76.)

### *The Trial Court's Ruling*

The trial court issued its ruling, after the matter was deemed submitted by the parties, on April 4, 1989. It ruled as follows:

Okay, that has just been a tremendous joy. I have spent about five or six hours on that motion, I'm prepared to rule on it at this time.

I went back, reviewed the transcript of the voir dire of each of the seven individuals in question. I reviewed their questionnaires, plus I reviewed the questionnaires of several others, of the other - - I reviewed all of the questionnaires briefly of the other individuals that were excused by the prosecution.

I've read the points and authorities submitted, I reread the Johnson case. Wheeler and others I've read in the past, and did not reread them, but I'm satisfied that, of several things; number one, that it does create a suspicious situation that those particular individuals were excused, and were excused quite early in the process; however, I have, in reviewing the manner in which the prosecution examined the members of this panel, left me with no real clue one way or another, not though I personally may not have excused certain individuals if I were in the prosecution's position.

That's not the criteria that the Court has to use in this type of motion, and particularly in the case of Miss Klose and Miss Gonzales, it didn't appear to be strong reason for dismissing those two individuals; however, after that, and just this morning, I went back and reviewed the transcript of the actual exercises of the challenges, and recreated that process and found that the Wheeler motion was made after the prosecution exercised their fifth peremptory challenge, and - - the prosecution exercised challenges on Troyer first, and then Harris, and then Zebosky, who's not one of the alleged group, and then Canepa, which is also not one of the group, and then Elliott, so - - at that point in time, counsel approached the bench and made a Wheeler motion at the side bar.

After that, so at that time, Klose and Gonzales were still on the panel, and the prosecution passed after the next defense challenge, so the prosecution passed while Klose and Gonzalez were still on the panel, then after the next defense challenge, excused Klose,

37

excuse me - - I believe the prosecution then passed three more - - no, the prosecution then excused Klose and then passed four consecutive times, at least four times, may not have been exactly consecutive - - the prosecution passed four or five times with Gonzales on the panel and ultimately excused Gonzales on the tenth peremptory challenge, that in itself does not conclusively prove anything, other than if the prosecution was trying to exclude members of that group, he was at least willing to take the chance that the defense wasn't going to pass so again, it doesn't conclusively prove anything; however, I am satisfied that in reviewing the manner in which the prosecution examined the members of the panel and exercised challenges, that certainly it does not prove that he was trying to exclude a cognizable group, and when the Court made the initial determination that there was, it appeared that this was happening, the prosecution was able to put forth neutral explanations related to each individual and related directly to this case, and in the time that I spent on this motion in reviewing the transcripts and the proceedings and the questionnaires, I'm satisfied that these are neutral explanations and they're not just sham excuses that were contrived to avoid admitting acts of group discrimination, and so I'm denying the motion on that ground.

Because of that, I didn't even reach the issue of whether or not all of these individuals are in a cognizable group, Delrosario was Filipino, Soto was Puerto Rican, and the other individuals appear to be black and/or Hispanic, so whether Filipinos and Puerto Ricans should be included, if there's a cognizable group that were Hispanic, Filipinos and Puerto Rican, I'm not sure, but I don't find it necessary to reach that point, so the motion pursuant to the Wheeler case is denied.

(11 RT 2178-80; see also 5 CT 1066.)

### *Allegations of an Unreasonable Determination of the Facts*

Petitioner complains the trial court's finding that a pattern of discrimination did not exist because the prosecutor passed with a minority in the jury box "is based on an erroneous reading of the facts." (ECF No. 330 at 140.) More particularly, he claims the trial court "made several unreasonable factual errors" concerning the pattern of strikes by the prosecutor, and that these mistakes amount to clear and convincing evidence entitling him to relief because the prosecutor did not pass with both Klose and Gonzalez in the jury box as stated by the trial court. (ECF No. 330 at 141-42.)

While not a model of clarity, the trial court's recitation, even while not accurate, does not amount to clear and convincing evidence that it was an unreasonable determination of the facts. Before the first exercise of peremptory challenges began, a number of venirepersons were seated in the jury box. Included among those first twelve persons seated were prospective jurors Klose, Troyer and Harris. (4 CT 982; 8 RT 1407-08.) The prosecutor's first challenge excused Troyer;

Klose and Harris thus remained in the jury box.  (8 RT 1409.)  Very shortly thereafter, Gonzalez was seated in the jury box as another vacancy occurred following an excusal.  (8 RT 1409.)  Harris was next excused by the prosecutor.  (8 RT 1410.)  Klose and Gonzalez remained on the panel through the prosecutor's subsequent two challenges.  (8 RT 1410-11 [Zeboskey & Canepa].)  With the prosecutor's fifth challenge, he excused prospective juror Elliott who had recently entered the jury box to fill a vacancy (left by Zeboskey's excusal).  (8 RT 1412.)  At that point, defense counsel asked to approach the bench to make his motion, as the record later reveals.  (8 RT 1412.)  The prosecutor had not yet passed on the panel but did so following his sixth challenge and before exercising his seventh against Klose.  (8 RT 1413.)   Thus, on the first occasion when the prosecutor elected to pass on the exercise of a peremptory challenge, both Klose and Gonzalez were in the jury box.  (8 RT 1413.)

After excusing Klose, Gonzalez remained in the jury box on four more occasions wherein the prosecutor elected to pass on the exercise of a peremptory challenge.  (8 RT 1415-16.)  The prosecutor passed on a total of five occasions where Gonzalez was seated in the jury box.  (8 RT 1413-16.)  He passed only once while Klose was in the jury box.  (8 RT 1413.)

It appears the trial court began to recite these events correctly in order (11 RT 2179 ["so the prosecution passed while Klose and Gonzalez were still on the panel"]), then became confused slightly itself:

> then after the next defense challenge, excused Klose, excuse me - - I believe the prosecution then passed three more, no, the prosecution then excused Klose and then passed four consecutive times, at least four times, may not have been exactly consecutive - - the prosecution passed four or five times with Gonzalez on the panel and ultimately excused Gonzale[z] on their tenth peremptory challenge …  (11 RT 2179.)

While the trial court may have recited the order of the prosecutor's challenges and elections to pass somewhat inaccurately, these slight inaccuracies do not change the ultimate facts:  that the prosecutor did elect to pass on the panel when it was comprised of both Klose and Gonzalez, and then again four more times when Gonzalez remained in the jury box.  Hence, the slight inaccuracies in the trial court's retelling do not amount to clear and convincing evidence that the trial court made an unreasonable determination of the facts.

39

*Analysis & Discussion*

*The Relevant Questionnaire Responses, Voir Dire & De Novo Review*[9]

**James Del Rosario**

James Del Rosario's questionnaire indicated he identified his race and ethnic origin as "Filipino." (ECF No. 302, Vol. I, Ex. 5 at 88.[10])

Under the heading entitled "Criminal Justice Experience" and in response to the question, "Have you or any member of your family or friend[s] ever been accused of, or arrested for a crime?" Del Rosario replied in the affirmative and when asked to describe the affirmative response, wrote "misdemeanor." (ECF No. 302, Vol. I, Ex. 5 at 95.) In response to an inquiry about his opinion concerning the cause of crime, Del Rosario wrote: "Drugs dependency supporting drug habits." (Id. at 96].) Further, asked about what "should or could be done about the crime problem," he responded: "Proper education and putting the prospective criminals to work so they can feel responsible and proud of themselves." (Id. at 96.)

In the portion of the questionnaire specifically seeking responses related to a respondent's feelings regarding the death penalty, when asked to provide his "general feelings regarding the death penalty," Del Rosario replied, "For heinous crime, premeditated murder of an individual and peace officers." (ECF No. 302, Vol. I, Ex. 5 at 105.) Asked how his views of the death penalty had changed over the years, Del Rosario simply wrote, "Yes." (Id. at 105.) In response to a question asking what purpose the death penalty serves, he replied, "I think that the individual on death penalty will not have a chance to kill again and ruin other peoples lives." (Id. at 105].) Asked to provide his impressions of the penalty of life without the possibility of parole, Del Rosario wrote it was "an excellent alternative to death penalty, however there's always a chance the individual can be rehabilitated and release on parole." (Id. at 105.) He indicated the death penalty was not used often enough "for heinous crime, pre-meditated murder killing of a peace

---

[9] The court will address the voir dire material in chronological fashion as it occurred and appears in the Reporter's Transcript on Appeal, rather than in the order Petitioner employs.

[10] The page numbers referred to in ECF Number 302 references are those Bates-stamped at the bottom corner of the document rather than the number assigned by the court's electronic filing system.

officers death penalty should be impose[d]." (Id. at 106.)  Question number 104 asked "In what types of cases/offenses do you feel the death penalty should be imposed;" Del Rosario responded, "For heinous crime, pre-meditated murder.  Killing of peace officers."  (Id. at 106.)

In response to the statement, "Any person who kills another should get the death penalty," Del Rosario "strongly disagree[d]" and explained: "Circumstances and reasons for killing another human being, sanity should be considered." (ECF No. 302, Vol. I, Ex. 5 at 106.)  In response to the statement, "Anyone who rapes and mutilates should get the death penalty," he again strongly disagreed with the statement, and explained as follows: "Again the sanity and condition of the criminal when the offense occurred." (Id. at 106].)  Another statement posited: "Anyone who kills more than once should automatically get the death penalty."  Del Rosario strongly disagreed, explaining, "Again evidence and sanity of an individual should be proven beyond a reasonable doubt."  (Id. at 107].)

During voir dire, Del Rosario responded to the court's general inquiry about whether he had any strong feeling concerning the death penalty by stating, "It depends, your Honor.  Worry about how the crime is committed."  (4 RT 683.)

Defense counsel asked Del Rosario a series of questions concerning his responses in the questionnaire.  (4 RT 684-87.)  He was asked to identify what types of crimes he would consider to be heinous, as he referenced on the questionnaire; Del Rosario replied, "Probably a person that didn't have any regards for life and things and just wanted to just go around and kill other people without regards for their being."  (4 RT 684.)  Asked whether a premeditated killing would warrant the death penalty, Del Rosario responded: "Well, when I say there for premeditated murder, this is a planned murder, that the person knows the other person and planned this.  That would be the criminal case."  (4 RT 684-85.)  Asked how he felt about a murder that occurred during the commission of another crime, Del Rosario stated as follows: "I would way [sic: weigh] the situation, I would say perhaps life imprisonment, possibility without parole.  Depending on the situation."  (4 RT 685.)  Asked what he meant by stating on the questionnaire that life without the possibility of parole was "an excellent alternative to the death penalty, however, there's always the chance that the individual could be rehabilitated and released on parole," Del Rosario

41

clarified:

> Well, when they say life without parole, and something else always come up about the situation. And there's always a chance that the accused could be - - The defense could get something that the accused could be released because of the evidence that was brought out - - A little later in the day.

(4 RT 685.) Asked whether he had any doubts that imposition of a sentence of life without the possibility of parole meant the individual would never be released from prison, Del Rosario replied, "The - - It shouldn't be any doubt. If that's what the defense determine the jury, you know, without the possibility of parole - - That determine, there shouldn't be any doubt." (4 RT 686.) When he was asked whether he had a strong preference for either penalty over the other, Del Rosario stated:

> If it's beyond a reasonable doubt and still, it got away on the evidence and the outcome of the trial - - Because this is a serious matter, and you just don't - - You know - - Make any decision based on what's before you; therefore, it - - I guess it's a serious matter, and then people should judge right away of whether this is going to be death or life in prison without the possibility of parole.

(4 RT 687.)

Del Rosario was also questioned on the subject by the prosecutor. (4 RT 687-94.) Asked about whether he had any feelings about his ability to impose the death penalty where premeditation was not involved, Del Rosario replied as follows:

> Well, like I've stated about the planning and things like that, I just indicated that it is - - Still a serious matter here, and I would not - - Well, like I say, if it was intentional and things like that, I would lean towards, you now, the - - If it's intentional and premeditated and planned and everything like that, I would lean toward the death penalty as I've, you've know, indicated by the questionnaire.
> Whereas if the evidence were there and there was a chance it wasn't premeditated and things, I think the alternative is the life imprisonment without the possibility of parole.

(4 RT 688.)

Later, when advised the law provides for the punishment of death or life without the possibility of parole for a crime that did not involve premeditation and instead involved the felony murder rule, Del Rosario indicated he "would still lean towards the life imprisonment." (4 RT

42

689.) He further stated under such a circumstance, he "would not vote for the death penalty, at this time." (4 RT 690.) Next, asked by the prosecutor whether premeditation and planning were requirements before he could impose the death penalty, Del Rosario replied no. Seeking to clarify Del Rosario's position, the prosecutor stated, "So we're just talking about leaning a little bit this way, but something could lean you on back - - "and Del Rosario responded to that statement as follows:

> Well, you know, probably in any trial, you could say that, well, he did murder this person, but, then again, depending on his capacity - - Although he meant to go ahead and murder this person, his mental capacity is not really to murder. So there could be a cloud in there and be confusing for the jury - - To really depict the person, see whether he's really mentally unstable. You say he did in his mind that he wanted to - - There again, it's hard to determine.

(4 RT 690.) Asked about his questionnaire response about changed feelings over the past few years where the death penalty is concerned, Del Rosario explained as follows:

> Changed in a way where, you know - - In a way like where I said, the ability - - The mental stability of a person in committing this crime, whereas before, you know, they just go ahead and do this thing. But in - - If the defense weren't actually providing a good defense for this people, meaning that they were convicted of this crime and should they go to prison or to the death penalty - - Whereas now, with the defense, that, well, will provide the evidence, like mental instability and things like that - - it - - That has a lot do with it.

(4 RT 690-91.) Del Rosario agreed his personal feelings and leanings fall toward the imposition of a sentence involving life imprisonment without the possibility of parole versus imposition of the death penalty. (4 RT 691-92.)

### This Court's De Novo Review

The prosecutor exercised a peremptory challenge against Del Rosario because of his responses on the questionnaire concerning his views on the death penalty, as well as his preference for the penalty of life without the possibility of parole. Additionally, the prosecutor pointed to Del Rosario's responses regarding crime and personal responsibility as a basis for excusing him. (8 RT 1441-42.)

First, Petitioner complains the prosecutor "failed to mention Mr. Del Rosario's answers

43

that showed his favorable views of the death penalty." (ECF No. 330 at 180.)  That may be so, but it certainly does not negate the fact the prosecutor's concerns about Del Rosario's views on the death penalty, where he leaned in favor of the death penalty but indicated a preference for a life without possibility of parole sentence in a felony-murder scenario, are supported by the record.  Giving more weight to responses provided in the questionnaire is an acceptable practice.  Cook v. LaMarque, 593 F.3d at 820.

Petitioner asserts that the prosecutor's reference to Del Rosario's feeling about the death penalty, expressly his "answers on the questionnaire to questions 105-109" were "exactly what makes a juror death-qualified - - the ability to listen to the evidence before deciding on a penalty and not automatically voting one way or the other."  (ECF No. 330 at 181.)  A review of those responses on the questionnaire, however, reveals a reasonable interpretation to be one unfavorable toward imposition of the death penalty.  More particularly, four of the five responses indicated strong disagreement with statements concerning Del Rosario's personal beliefs regarding the death penalty, and, for example, provided explanations that can be interpreted as seeking to avoid imposing the death penalty by referencing "sanity."  The prosecutor's concern that Del Rosario's responses to the death penalty focused questions indicated he would not, or be hesitant to, impose the death penalty in a felony murder case such as this was not "implausible or fantastic."  Purkett v. Elem, 514 U.S. at 768.

As the record demonstrates, both the responses to the questionnaire and Del Rosario's voir dire testimony plainly support the prosecutor's belief that the prospective juror leaned strongly in favor of life without the possibility of parole where there is a lack of premeditation, or "planning" in Del Rosario's words, or where the felony murder rule applies.  (4 RT 687-92.)

As to the third reason – that Del Rosario seemed to oppose personal versus social responsibility when asked about the crime problem – Petitioner argues the reason is "a surrogate for racial stereotypes," relying on United States v. Bishop, 959 F.2d 820 (9th Cir. 1992) (overruled on other grounds in U.S. v. Nevils, 598 F.3d 1158 (9th Cir. 2010)).  (ECF No. 330 at 184.)  That case, however, is distinguishable.

In Bishop, a black eligibility worker from Compton was excused by the prosecutor

44

because he believed the juror was "likely to take the side of those who are having a tough time, aren't upper middle class, and probably believes that police in Compton in South Central L.A. pick on black people." Bishop, 959 F.2d at 822. The Ninth Circuit noted that the prosecutor's explanation relied on a "group-based presupposition[] applicable in all criminal trials to residents of poor, predominantly black neighborhoods" and "both reflected and conveyed deeply ingrained and pernicious stereotypes." Id. at 825. There, it held, the prosecutor used residence "as a surrogate for racial stereotypes." Id. at 826.

Unlike Bishop, in this case, the prosecutor's comment that some of Del Rosario's responses referencing education and employment as solutions to solve the problem of crime seemed to reflect an assignation of social versus personal responsibility do not rely on any group-based supposition. No mention was made of race by the prosecutor, nor did he draw on any racial stereotype. Nothing in this record suggests that the prosecutor's comment about Del Rosario's responses differentiating social from personal responsibility were tied to race. There is no "discriminatory intent . . . inherent in the prosecutor's explanation." Purkett v. Elem, 514 U.S. at 767. Also unlike Bishop, the prosecutor did not use residence as a surrogate for racial stereotypes – there was no mention of residence whatsoever. Therefore, the prosecutor's reason on this basis is race-neutral.

Next, Petitioner complains the record does not support the "prosecutor's inference that Mr. Del Rosario was not 'at least amendable to the idea that a person is personally responsible for his actions.'" (ECF No. 330 at 185-86.) That argument is not accurate. This record supports the prosecutor's concern or belief that "some of" Del Rosario's responses tended to avoid the imposition of personal responsibility.

Del Rosario responded with "proper education and putting the *prospective* criminals to work" "so they can *feel* responsible and proud of themselves," in reply to an inquiry asking what could or should be done about crime. (ECF No. 302, Vol. I, Ex. 5 at 96, italics added.) Use of the word "prospective" reasonably infers Del Rosario's opinion on the crime problem is forward looking without addressing those who may have already committed crimes. Further, it can be reasonably inferred that Del Rosario's use of the word "feel" in the context of responsibility – or

that responsibility felt by those who commit crimes - lessens the importance of responsibility overall. The response does not read "so they can *be* responsible . . .". The prosecutor's concern with responsibility in this context is plainly directed to, or concerned with, a juror's ability to assign responsibility to an individual for committing a crime as it relates to consequences for that crime, rather than any notion of personal responsibility Del Rosario expressed for his own actions.

Because the prosecutor's three reasons for excusing Del Rosario are in fact supported by the record, Petitioner's recitation of "attributes that would make" the prospective juror attractive to the prosecution (ECF No. 330 at 186) is of no moment.

Petitioner next complains that the trial court did not specifically discuss any of the prosecutor's reasons for striking Mr. Del Rosario. (ECF No. 330 at 186-87.) But specifics are not required of the trial court. Rather, "a court must undertake a sensitive inquiry into such circumstantial and direct evidence as may be available." Batson v. Kentucky, 476 U.S. at 93. A trial court's succinct ruling can constitute a step three finding that no purposeful racial discrimination was shown. See McDaniels v. Kirkland, 813 F.3d 770, 777-78 (9th Cir. 2015) (en banc) ("The fairest reading of the state court's ruling is . . . that the court did find that the prosecution's proffered race-neutral justifications were genuine, even if its finding was terse"). Here, the trial court prefaced its ruling by indicating it had spent "five or six hours" on the motion, reviewing the questionnaires of the prospective jurors in question, as well as the "questionnaires of several others," the voir dire transcripts, and the legal authorities submitted. (11 RT 2178-80.) A fair reading of the trial court's ruling reveals it to be a sensitive one.

Further, explicit or express findings regarding the prosecutor's credibility are not required where the record establishes the trial court implicitly accepted the prosecutor's reasons. Cf. Rice v. Collins, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination"). This record establishes the trial court tacitly accepted the prosecutor's reasons. It indicated after its review that it was "satisfied" that the prosecutor was not seeking to exclude a cognizable group and it was further "satisfied that [the proffered reasons]

46

are neutral explanations and they're not just sham excuses that were construed to avoid admitting acts of group discrimination." (11 RT 2179-80.)

### Charso Elliott

Charso Elliott's questionnaire indicates she identified her race and ethnic origin as "Black American." (ECF No. 302, Vol. I, Ex. 4 at 66.)  The following information was gleaned from that same questionnaire and is relevant to Petitioner's argument here.

Elliott's responses in the section entitled "Criminal Justice Attitudes" included the following:  In response to number 55, asking the respondent to rate his or her feelings to the statement "If the prosecutor goes to the trouble of bringing someone to trial, the person is probably guilty," Elliott "strongly disagree[d]," and explained, "Innocent, until proven guilty, without a shade of doubt in my mind."  (ECF No. 302, Vol. I, Ex. 4 at 75.)

In the section entitled "Specific Questionnaire" wherein the respondents are asked a series of questions concerning their feelings about the death penalty, and in response to a question inquiring into her general feelings regarding the death penalty, Elliott wrote, "I believe in the death penalty within reasoning.  Reasoning is if it was planned or not an accident, a person intend to hurt some one else."  (ECF No. 302, Vol. I, Ex. 4 at 83.)  Asked how her views had changed in the last few years, Elliott replied, "See Reasoning."  (Id. at 83.)  In response to number 98, "What purpose do you feel the death penalty serves," she replied, "Well actual none, but I hope it would serve as a detour for others."  (Id. at 83.)  Next, Elliott was asked about her "impressions about the penalty of life without the possibility of parole," and she indicated, "Not too good."  (Id. at 83.)  Elliott believed the death penalty was not used often enough, but did not explain her response.  (Id. at 84].)  Number 104 asked the respondent to indicate the "types of cases/offenses" that she felt the death penalty should be imposed in; Elliott indicated the following: "Children murder (abuse cases) and planned murder."  (Id. at 84].)  Asked whether any person who kills another person should receive the death penalty, Elliott "disagree[d] somewhat" and wrote "See #96" as an explanation for her response.  (Id. at 84.)  In response to the question of whether an individual who had killed before and kills again should automatically get the death penalty, Elliott agreed strongly with the statement and wrote, "Like the person who commits serial killings,

1    killings at elementary school and college campus, and like at McDonald's in South Calif." (Id. at

2    85].)  Elliott somewhat agreed with the statement "Persons sentenced to the death penalty should

3    be swiftly executed," and indicated, "Not all people sentenced to death is guilty." (Id. at 85.)

4          During voir dire, Elliott was asked whether she had any strong feelings about the death

5    penalty in general and she replied, "No."  (4 RT 732.)

6          In response to a question by defense attorney Gable about what Elliott meant by "Not too

7    good," in reply to an inquiry about her impressions of life without the possibility of parole, she

8    said "people are sentenced to life imprisonment, and then after so long they let them out, and I

9    don't understand that.  I'm not quite sure as to why they do this." (4 RT 734.)  When advised that

10   if the jury were to "vote life without possibility of parole," it meant the individual would be

11   imprisoned for the rest of his life, and asked how she felt about that, Elliott repeated, on more

12   than one occasion, she did not understand the concept.  (4 RT 734-36.)  Eventually she indicated

13   whether life imprisonment involved parole or no parole, she would not "feel different."

14   Thereafter, she again indicated she did not understand and the court intervened to further explain

15   the concept of a sentence involving life without the possibility of parole.  (4 RT 736-37.)

16   Ultimately, in response Gable's question about whether she would consider life without the

17   possibility of parole as an alternative to the death penalty, Elliott replied, "Yes, yes, okay, yes.

18   Then I would." (4 RT 737-38.)

19         The prosecutor made immediate note of Elliott's confusion concerning the possibility of

20   parole and asked her whether she could vote for either penalty; Elliott replied she would be able

21   to do so.  (4 RT 738-39.)  Elliott was then asked about a response on the questionnaire wherein

22   she indicated a belief that a person was "innocent until proven guilty without a shade of doubt."

23   (4 RT 739-40.)  Advised the burden is "not beyond all possible doubt, and it's not beyond all

24   shade of doubt," and that the judge will instruct the jury regarding the correct legal standard,

25   Elliott indicated she would be able to follow the judge's instruction.  (4 RT 740.)  Later, Elliott

26   replied in the affirmative when she was asked if she had the ability to decide based only on the

27   evidence presented despite indicating on the questionnaire that "not all people sentenced to death

28   are guilty." (4 RT 743.)

48

The prosecutor's reasons for exercising a peremptory challenge against Elliott include responses on her questionnaire indicating she believed the death penalty served no purpose, and that the penalty might be appropriate for serial murderers and mass murderers. Additionally, the prosecutor noted "quite a bit of confusion" concerning Elliott's understanding of the life without the possibility of parole penalty, and that once Elliott's grasped the meaning she favored that sentence over the death penalty. Further, after pointing to two specific responses in Elliott's questionnaire, the prosecutor believed he "could not count on Miss Elliott for a death-penalty vote" and that there were other, better prospective jurors from his perspective. (8 RT 1441.)

A review of the record finds more than ample support for the prosecutor's proffered race-neutral reasons for exercising a peremptory challenge against Elliott.

The prosecutor's reliance upon Elliott having indicated on her questionnaire that the death penalty serves no purpose is well taken. Elliott replied to the inquiry about what purpose she felt the death penalty served with, "Well actual[ly] none, but I hope it would serve as a detour for others." (ECF No. 302, Vol. I, Ex. 4 at 83.) It is an acceptable practice to give more weight to responses in the questionnaire. Cook v. LaMarque, 593 F.3d at 820.

In response to the inquiry asking for the types of cases to which the death penalty might apply, Elliott wrote "Children murder (abuse cases) & planned murder." In response to a statement that an individual who kills more than once should be automatically sentenced to the death penalty, Elliott indicated she strongly agreed with the statement and analogized it to persons who commit "serial killings, killings at elementary school and college campus, and like at McDonald's in South Calif." (ECF No. 302, Vol. I, Ex. 4 at 84-85.) None of Elliott's responses addressing situations wherein she may find a sentence of death to be appropriate were similarly situated to the case against Petitioner. He was not accused of killing a child during an abusive act, or of planning the murder, nor did it relate to a serial, mass or execution-style murder. Petitioner complains the prosecutor did not ask Elliott "any questions about the purpose of the death penalty" nor did he ask her about her feelings that the penalty as appropriate in serial or mass murders. (ECF No. 330 at 173.) Both statements are accurate but do not negate the fact of

Elliott's written questionnaire responses and support of the prosecutor's proffered reasoning. Cook v. LaMarque, 593 F.3d at 820 (crediting prosecutor giving more weight to initial questionnaire answers than voir dire answers when exercising challenges). Notably too, the court notes that Petitioner's argument lacks any reference to legal authority. U.S. v. Karl, 264 Fed.Appx. 550, 553 (9th Cir. 2008) ("Failure to cite valid legal authority waives claim"); Heft v. Moore, 351 F.3d 278, 285 (7th Cir. 2003) ("The failure to cite cases in support of an argument waives the issue").

The prosecutor also referred specifically to questionnaire numbers 43 and 109 when articulating a basis for excusing Elliott. With specific regard to the prosecutor's references to question number "43" and Elliott's need "to be convinced beyond any shade of doubt," Petitioner argues the explanation is "contradicted by the record" because that question has "nothing to do with burden of proof." (ECF No. 330 at 176.) While number "43" does not reference the burden of proof, other questions did address the subject. Elliott strongly agreed with the statement in questionnaire number 54 that a "defendant in a criminal case is innocent until proven guilty beyond a reasonable doubt" and explained her personal belief: "Because a person is charge[d] with a crime, it does not mean they [are] guilty." (ECF No. 302, Vol. I, Ex. 4 at 74.) Elliott strongly disagreed with the statement in number 55: "If the prosecutor goes to the trouble of bringing someone to trial, the person is probably guilty." She explained her personal belief as follows: "Innocent, until proven guilty, without a shade of doubt in my mind." (Id. at 75.) Hence, there exists support in the record for the prosecutor's proffered reason.

During voir dire, the prosecutor asked Elliott about the burden of proof, referencing her belief that "someone is innocent until proven guilty without a shade of doubt." (4 RT 739-40.) He explained the judge would instruct the jury "that a person is presumed innocent until they're proven guilty beyond a reasonable doubt" and that beyond a reasonable doubt does not mean "beyond all possible doubt" or "beyond any shade of doubt." (4 RT 740.) The record does reflect that Elliott replied "yes" to the prosecutor's inquiry about whether she would be able to follow the judge's instruction as to the burden of proof (4 RT 740), yet Petitioner argues the exchange that occurred during voir dire "belies the prosecutor's explanation and shows it to be

pretextual." (ECF No. 330 at 177.)  Nevertheless, the court finds otherwise.

Elliott's own words support the prosecutor's belief that Elliott "would have to be convinced beyond any shade of doubt."  See People v. Watson, 43 Cal.4th 652, 679 (2008) (finding the prosecutor's concern the juror may hold him to a stricter standard of proof" was supported by the record where juror indicated on questionnaire that the death penalty is appropriate where "a defendant has been found guilty 'without a shadow of a doubt'").  Certainly, the prosecutor is not legally required to accept Elliott's answer at face value that she would follow the court's instruction in light of her written response.  Rice v. Collins, 546 U.S. at 341 ("That the prosecutor claimed to hold concerns despite Juror 16's voir dire averments does not establish that she offered pretext"); Cook v. LaMarque, 593 F.3d at 820.

And, misidentifying a question or accidentally referencing the incorrect, specific number of the questionnaire response that gave him pause does not establish the prosecutor acted with pretext.  See Rice v. Collins, 546 U.S. at 340-41 ("prosecutor simply misspoke with respect to juror's numerical designation . . . It is a tenuous inference to say that an accidental reference" makes for a lack of credibility nor does it establish a pretext).  The Ninth Circuit has explained "there is a 'fine distinction between a prosecutor's false statement that creates a new basis for a strike that otherwise would not exist and a prosecutor's inaccurate statement that does nothing to change the basis for the strike.'"  Aleman v. Uribe, 723 F.3d 976, 982 (9th Cir. 2013).  This is a situation wherein the prosecutor merely misspoke when attempting to specifically identify or reference a response in the questionnaire, misidentifying number 43 when he meant number 55.

The prosecutor was also concerned that Elliott's confusion surrounding the penalty of life without the possibility of parole, coupled with her responses to the relevant questionnaire inquiries on the subject, meant "she very much favored" a life without possibility of parole sentence.  (8 RT 1441.)  Petitioner's argument that there "is absolutely no support" in the record for the prosecutor's statement that "she very much favored" the penalty is not accurate.  (ECF No. 330 at 177.)  Elliott indicated on her questionnaire that she did not have a good impression of the penalty of life without possibility of parole, and the record reveals that that less than favorable impression plainly came from a misunderstanding of the penalty itself.  In other words, Elliott's

confusion that "without the possibility of parole" was directly related to her mistaken belief that those sentenced to life without the possibility of parole remained eligible for parole or release from prison.

Evidence of the confusion began during defense counsel Gable's questioning of Elliott, and required the trial court's intervention. (4 RT 734-37.) A fair reading of the exchange reveals Elliott's responses during voir dire, coupled with some of her answers to the questions posed in the questionnaire, support the prosecutor's proffered race neutral reason for exercising a peremptory strike. Elliott's initial dislike of a penalty she believed allowed underserving individuals to be paroled or released, coupled with her eventual understanding that a defendant sentenced to life without the possibility of parole meant the individual would never be released, and her responses in the questionnaire indicating the death penalty is a punishment reserved for those who abuse and murder children, or those who plan and premeditate a murder as well as those who commit serial or mass murder, reasonably infers Elliott was predisposed to favor a sentence of life without the possibility of parole in a case like this.

Simply put, all of the prosecutor's reasons for excusing Elliott are supported by the record. As to Petitioner's argument that the trial court did not discuss the prosecutor's reasons for excusing Elliott, as previously held, no particular format is required for the trial court's ruling. Batson v. Kentucky, 476 U.S. at 93; Rice v. Collins, 546 U.S. at 341-42; McDaniels v. Kirkland, 813 F.3d at 777-78. Moreover, the trial court found the prosecutor to be credible and this court will not supersede that determination. Rice, at 341-42.

**Sylvia Gonzalez**

Sylvia Gonzalez's questionnaire indicates she identified her race and ethnic origin as Hispanic. (ECF No. 302, Vol. I, Ex. 3 at 44.) The following information is taken from that same questionnaire and is relevant to Petitioner's argument.

In the section entitled, "Specific Questionnaire," Gonzalez indicated her general feelings about the death penalty: "I feel some known criminals deserved it." (ECF No. 302, Vol. I, Ex. 3 at 61.) Asked how her views of the death penalty had changed over the last few years, Gonzalez wrote: "I agree more and more. The crimes today are absolutely horrible and the criminals are

being released." (Id. at 61.)  She believed the purpose behind the death penalty was to "rids the extremely demented from killing again."  (Id. at 61.)  Number 99 inquired into the respondent's impressions of the penalty imposing life imprisonment without the possibility of parole; Gonzalez responded, "Why issue 3 lifes without parole. Just never let him out. Make convict earn his keep."  (Id. at 61.)  Asked whether the death penalty was used too often or not often enough, she wrote: "I don't have an opinion on this."  (Id. at 62.)  Number 104 asks what types of cases or offenses warrant imposition of the death penalty; Gonzalez indicated, "When people are badly mutilated, beheaded, mass or serial murderers, baby killers."  (Id. at 62.)  She disagreed strongly with the statement that all persons who kill another should get the death penalty, explaining "Some murders are purely self-defense" and also disagreed strongly with the statement that a person who "rapes and mutilates should get the death penalty," indicating she "would need to hear the whole story."  (Id. at 62.)  In response to a statement that a person who kills more than once should automatically receive a death sentence, Gonzalez "strongly disagree[d]" and wrote, "I would need to hear circumstances."  (Id. at 63.)  She "strongly agree[d]" with the statement that persons sentenced to death "should be swiftly executed," explaining, "Why let them sit and think about.  It must be terrifying."  (Id. at 63.)

During voir dire and in response to the court's general inquiry about whether she had strong feelings about the death penalty, Gonzalez stated she did not "have any thoughts for or against it."  (5 RT 841.)

Defense counsel asked Gonzalez what she meant by her response on the questionnaire when asked about her impressions of life without the possibility of parole, particularly where she wrote "'Why issue three lives without parole; just never let them out.'"  Gonzales explained as follows: "I didn't realize, cases where people that do these brutal deaths, they kill someone, and they go to prison, and within, you know, a year down the line, they're back out.  I don't understand why they let him back out."  (5 RT 842-43.)  Defense attorney Gable attempted to explain that life without the possibility of parole means that the individual would never be released, but Gonzalez was initially confused by the question "what are your impressions of that type of penalty?"  (5 RT 843.)  Ultimately, Gonzalez indicated she would "be satisfied" and

"endorse" such a penalty. (5 RT 843.) Asked to compare a life sentence without the possibility of parole to the death penalty, Gonzalez replied, "I feel that people are always on death penalty, and they, they're never put to death; I mean, I think that's a long time to spend in jail, or prison and never - - I mean, they never put them to death anyway. I never read about it or hear about it." (5 RT 843-44.) The court intervened to advise Gonzalez that if she were to serve as a juror she would have to assume an individual sentenced to death would be put to death and that an individual sentenced to life without the possibility of parole would be kept in prison for the rest of his or her life; she replied, "I have no problem with that." (5 RT 844.) Asked to clarify what she did not have a problem with by Gable, Gonzalez said: "I believe in the death penalty. I mean, if they're gonna be put to death, I believe in that. [¶] If they say life in prison without parole, I also believe in that." (5 RT 844.) Gonzalez believed both penalties were serious but did not consider them to be equal to one another. (5 RT 844-45.)

The prosecutor confirmed Gonzalez's testimony that the death penalty was the more severe of the two alternatives, and asked her what purpose she felt the death penalty served; Gonzalez replied "I feel that if, for instance, after hearing the story that this man was brutal, I mean, no mercy, I mean, there is something" and "I mean, if I hear the story that this man is extremely, extremely brutal without mercy, I mean the death penalty does have some cause." (5 RT 846.)

<u>This Court's De Novo Review</u>

The prosecutor offered the following reasons for exercising a peremptory challenge against Gonzalez: (1) her questionnaire involved a response identifying "serial killers mass killers, baby killers mutilations, and when victims are beheaded" as those crimes for which she would vote in favor of the death penalty; (2) her response to another question concerning her feelings about the death penalty indicated the penalty "might be appropriate for those who are extremely demented," signifying a "mind set" that the death penalty was to be reserved for "very brutal" or bloody crimes; and (3) there were other prospective jurors better suited from his perspective. (8 RT 1440.) A review of this record finds support for the prosecutor's proffered reasons.

First, in response to a question asking the respondent to identify the purpose served by the death penalty, Gonzalez "[it] rids the extremely dements from killing again." (ECF No. 302, Vol. I, Ex. at 61.) In response to number 104 on the questionnaire, asking "In what types of cases/offenses do you feel the death penalty should be imposed," she wrote "when people are badly mutilated, beheaded, mass or serial murderers, baby killers." (Id. at 62.) Gonzalez's responses are neither "ambiguous" nor "amorphous" as characterized by defense counsel. A prosecutor may accord responses provided in the questionnaire a greater weight than those offered in oral voir dire. Cook v. LaMarque, 593 F.3d at 820.

Petitioner argues that because the prosecutor did not ask Gonzalez specifically about her responses to numbers 98 and 104 on the questionnaire, his reason for striking Gonzalez on this basis is pretextual. The court acknowledges the United States Supreme Court has noted that a party's failure to engage in meaningful voir dire on a topic the party says is important can suggest the stated reason is pretextual. Miller–El v. Dretke, 545 U.S. 231, 246, 250, n.8 (2005). However, while the prosecutor may not have expressly asked Gonzalez about her numbered responses to specific questions on the questionnaire, her feelings about the death penalty were explored by the prosecutor during voir dire.

Asked what she felt was the purpose of the death penalty – a question that does in fact relate to number 98 on the questionnaire - Gonzalez replied, "I feel that if, for instance, after hearing the story that this man was brutal, I mean, no mercy, I mean, there is something" and "I mean, if I hear the story that this man is extremely, extremely brutal without mercy, I mean the death penalty does have some cause." (5 RT 846.) Given her reply during voir dire, coupled with the written questionnaire responses, it was not unreasonable for the prosecutor to be concerned that the facts of the case did not rise to the level of brutality by which Gonzalez would justify imposition of the death penalty to be appropriate. It is also worth noting that by the time the prosecutor conducted his voir dire of Gonzalez, she had already been questioned by defense attorney Gable about her feeling concerning the death penalty. (5 RT 842-45.) During that exchange, Gonzalez used the word "brutal," echoing language she employed in the questionnaire. Simply put, the record supports the prosecutor's expressed, race-neutral concern.

With regard to the fact the prosecutor believed better suited jurors were to follow, he specifically stated, "also, at that time that I excused Miss Gonzalez, again, she was a three on my scale, and we were in a section down towards, from about juror number 30, to juror number 37." (8 RT 1440.)

The prospective jurors comprising jury panel number 497 were randomly assigned numbers 1 through 42; the list appears in Volume 4 of the Clerk's Transcript on Appeal at page 982. Jurors number 30 through 37[11] include Nancy Yost, Henry Eisenbeisz, Joyce Wondra, David Shaw, Dale Norling, Albert Davidson and Susan Parsons. (4 CT 982.) Of those seven jurors, the defendants jointly excused six, to wit: Eisenbeisz, Yost, Wondra, Norling, Parsons and Shaw. (8 RT 1414-16; 11 RT 2194.) The prosecutor excused only one of those seven: Davidson. (8 RT 1416.)

More specifically, at the time the prosecutor excused Gonzalez, he had just exercised the challenge against Davidson immediately prior to that against Gonzalez. (8 RT 1416.) And Yost, Eisenbeisz, Wondra, and Norling were excused jointly by the defendants just prior to that. (8 RT 1414-16.) Therefore, of the prospective jurors expressly identified as those between "juror number 30, to juror number 37," Parsons and Shaw remained. Both were later excused when the second round of peremptory challenges were exercised. Parsons was jointly excused by the defendants and Shaw was then excused by Petitioner. (11 RT 2194, 2197.) Notably too, the remaining five names on the list subsequent to number 37, included Fred Trimble who ultimately served on the jury (4 CT 982), and Linda Elliott and Marc Beauchamp who were jointly excused by the defendants (4 CT 982; 8 RT 1417), in addition to Del Rosario and Soto (4 CT 982; 8 RT 1417-18), the subjects of Petitioner's argument. Thus, the record supports the prosecutor's belief that at the time, there were other jurors better suited from his perspective.

Significantly too, Gonzalez entered the box during the first set of peremptory challenges exercised. (8 RT 1409:17-20.) Thereafter, the prosecutor passed on panels of prospective jurors

---

[11] Prospective juror number 34, Warren Weikel, was excused for cause and a line appears through his name on the random selection list. (4 CT 982; 7 RT 1307.) Hence, the random list includes seven, rather than eight, prospective jurors for purposes of the exercise of peremptory challenges.

1   that included Gonzalez a total of five times (8 RT 1413: 15-19 [1st pass], 1415:3-5 [2nd pass],

2   1415:13-14 [3rd pass], 1415:21-22 [4th pass] and 1416:3-4 [5th pass]) before eventually excusing

3   her (8 RT 1416-17).  "Weighing against a finding of discriminatory intent . . . is the fact that the

4   prosecutor passed on challenges" five times while Gonzalez remained on the panel.  People v.

5   Gutierrez, 2 Cal.5th 1150, 1170 (2017); People v. Kelly, 42 Cal.4th 763, 780 (2007); People v.

6   Cornwell, 37 Cal.4th 50, 69-70 (2005); see also U.S. v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir.

7   1994); Palmer v. Estelle, 985 F.2d 456, 458 (9th Cir. 1993); U.S. v. Bishop, 959 F.2d at 827.

8        To sum it up, the prosecutor's proffered, race-neutral reasons for excusing Gonzalez are

9   supported by this record.

10       Next, with regard to Petitioner's argument referencing the trial court's comment that it did

11  not see a strong reason to dismiss Gonzalez, the comment does not evidence a pretext on the part

12  of the prosecutor.  Purkett v. Elem, 514 U.S. at 767–68 ("The second step of this process does not

13  demand an explanation that is persuasive, or even plausible").  Moreover, the trial court itself

14  acknowledged that was not the test before it.  (See 11 RT 2178-79 ["I personally may not have

15  excused certain individuals, if I were in the prosecution's position" but "[t]hat's not the criteria

16  that the Court has to use"].)  Indeed, "to accept a prosecutor's stated nonracial reasons, the court

17  need not agree with them."  Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006).

18       Lastly, and as previously noted, despite Petitioner's inference to the contrary, a trial

19  court's ruling need not include express findings regarding the prosecutor's credibility where the

20  record establishes the trial court implicitly accepted those reasons.  See Rice v. Collins, 546 U.S.

21  at 341-42; McDaniels v. Kirkland, 813 F.3d at 777-78.

22                                    **Thomas Harris**

23       Although the record does not include a questionnaire completed by Thomas Harris

24  wherein he identifies his race and ethnicity, the record makes clear Harris is African-American.

25  And, because Harris's specific responses to the inquiries posed by the questionnaire are not

26  available, they are not summarized here.

27       During voir dire proceedings, and in response to the court's general inquiry about whether

28  he had any strong feelings about the death penalty, Harris replied, "No."  (5 RT 855.)

Asked by defense attorney Gable how he would characterize his feelings about the death penalty, Harris replied, "Middle of the road," and indicated he believed a sentence of life without the possibility of parole was a viable alternative to the death penalty. (5 RT 855.) Harris felt life without the possibility of parole was both a "serious" and "severe" penalty. (5 RT 857.) Asked to elaborate on his questionnaire comment that the death penalty is not used often enough, Harris stated as follows: "Well, I just see and read so much about people being on death row, when there's not enough room for other people to get locked up and they're releasing criminals, so obviously something's wrong." (5 RT 857.)

After agreeing with the prosecutor that both sentences serve to protect society from further harm, Harris was asked what other purpose the death penalty serves; Harris explained:

> I would say, with the death sentence, well, they both have the - - with the death sentence he could never be put to death, probably, always be on death row, whereas if he does be put to death, as an alternative being sent up for life, he can always find out later on some new evidence would put him in a position for an appeal or something.

(5 RT 858-59.) Asked what purpose a life without the possibility of parole serves over a sentence imposing death, Harris replied, "It makes sure he'll never been able to, able to kill anybody inside or outside." (5 RT 859.) Next, the prosecutor inquired about several answers Harris provided in his questionnaire:

> MR. MARLETTE: I'm going to be very frank with you. I noticed in your answers that a lot of times you would say, "Well, unless there were drugs involved or unless he wasn't in his right mind or unless it was spur of the moment" or something like that. Do you remember those answers?
> A. Yes.
> Q. Okay. I kind of got the impression that you would vote for life in prison without possibility - - that you would always look for reasons not to vote for the death penalty?
> A. I didn't mean it to project that way, but I always look at all alternatives on both sides. I don't automatically jump into what I'm feeling, one way, I just have strong feelings toward it.

(5 RT 859-60.)

////

58

## This Court's De Novo Review

Initially, the undersigned notes Petitioner contends the prosecutor gave three reasons for striking Harris, identifying the first reason as "because he 'just rated him immediately that [he] needed him gone.'" (ECF No. 330 at 107-08.) Petitioner's quotation is without the necessary context and is, therefore, not accurate. A review of the record reveals the prosecutor gave two reasons for excusing Harris:

> MR. MARLETTE: The other was Mr. Thomas Harris. Again, it was not a matter of comparison with Mr. Harris. I just rated him immediately that I needed him gone.
> In going through - - *first of all*, it appeared he had no family times, all his time was taken with work or else relaxing with friends.
> It particularly struck me that he had lost contact with brothers and sisters who lived in the area for just kind of out of not trying, not for any reason or any rift.
> *Further*, on the death penalty questions, Mr. Harris continually looked for excuses to avoid the death penalty, talking about drugs and rehabilitation, talking about that he favored a long appeal period, so that other evidence could come forward.

(8 RT 1438, italics added.) The prosecutor went on to identify particular responses to the questionnaire by Harris that caused him concern. (8 RT 1439-40.) Thus, Petitioner's "first" reason is based upon a mischaracterization of the record.

Moving on, as to the prosecutor's reason that Harris appeared to have no family ties and had lost contact with his brothers and sisters, while the information relied upon was not gleaned by the prosecutor himself, defense attorney Holmes did ask Harris about the subject during voir dire:

> [DEFENSE ATTORNEY]: On page two here there were some questions about your brother and sister's occupations, where they are, what they do, their job, so forth.
> You said that you haven't seen them or spoke to them since your mother passed away in '81.
> Was there something that happened during the time period in which your mother passed away that caused this, or is this a logistic situation?
> A. It's been a puzzlement to me, because we were a close family, but it seems like when she passed away, my father got remarried to his high school sweetheart, he left town and moved back to his birth place, and it was just the kids left here.
> I got involved with my career; they got involved in whatever they was doing, and it just - - lost contact with them, haven't been able to find out why.
> Q. They still live here in Sacramento?

59

A. I know a sister does for sure. I've seen her off and on, and I know a brother, he lives in Colorado. But my older brother, I have no idea where he's at 'cause I haven't seen, spoken or heard since then.

Q. You just look at this as sort of a mystery to you as far as why it occurred?

A. Yes.

(5 RT 865-66.)

The inquiry referred to in the foregoing exchange relates to question number 11 on page 2 of the questionnaire; it reads: "Brother's and sister's occupation(s), and where do they or did they work, if known?" The question itself does not expressly concern any relationship the respondent may or may not have with his or her sibling or siblings. And while Harris's response indicating he had not seen or spoken with his brothers and sisters following the passing of his mother in 1981 does relate to a lack of relationship, the *reason for the lack of relationship was the issue* raised by the prosecutor. And that specific information was only revealed upon questioning by defense attorney Holmes, after the prosecutor had concluded his voir dire. Assuming Holmes' recitation of Harris's questionnaire answer is accurate, standing alone, the response may not have been particularly troubling. But when expounded upon in subsequent questioning by Holmes, the information provided by Harris in response became troubling for the prosecutor: "for just kind of out of not trying, not for any reason or any rift." That concern and interpretation is supported by the record; a record that also establishes the concern arose not from Harris's written response to the inquiry posed by the questionnaire itself, but rather his voir dire testimony given during questioning by defense attorney Holmes. Therefore, to the degree Petitioner argues the prosecutor's reason is implausible because he did not ask any questions of Harris on this subject, that assertion is misleading.

Moreover, the Ninth Circuit has noted that a concern about a prospective juror not knowing the ages or whereabouts of his children – reflecting poorly on his personal relationships and connection to the community - was relevant to the prosecutor's overall impression of the juror. Cook v. LaMarque, 593 F.3d at 820-21; see also U.S. v. Daly, 974 F.2d 1215, 1219 (9th Cir. 1992) (prosecutor challenged juror because he appeared to be a "loner," a plausible, neutral reason). Here then, the prosecutor's concern that Harris "had no family ties" and had lost contact

60

with his siblings due to a lack of effort to remain close in the absence of "any reason or any rift" was relevant to his overall impression of Harris.

As for the prosecutor's second reason – that Harris "continually looked for excuses to avoid the death penalty" (5 RT 1438) – the prosecutor expressly referred to more than a half-dozen responses by Harris to inquiries posed by the questionnaire, to wit: numbers 55, 56, 58, 59, 97 and 98, and more generally to the inquiries on pages 17 and 18 of the questionnaire (5 RT 1439), in the section entitled "Specific Questionnaire" that seeks to learn the respondent's feelings about the death penalty; the section includes questions 96 through 112. When giving the basis for his second reason for exercising a peremptory challenge against Harris, the prosecutor explained:

> In response to question 55 . . . he said, "Before a defendant is brought to trial, anything could be brought forward could either invalidate or somewhat prove reasonable cause for doubting guilt," and number 56, he said, "Defendant should project all they know of their innocence to their attorneys 'cause they're the main hope of release."

(5 RT 1439.) Those references are to two statements appearing in the questionnaire's section entitled "Criminal Justice Attitudes." The statements read: "If the prosecutor goes to the trouble of bringing someone to trial, the person is probably guilty" and, "A defendant i[n] a criminal trial should be required to prove his or her innocence." The respondents were asked to indicate whether they strongly agreed or disagreed, or somewhat agreed or disagreed, with both statements. (4 CT 933, 947.) While we do not know what box Harris checked relative to each statement, the prosecutor read the explanations Harris provided into the record and those could reasonably be understood to infer avoidance of the death penalty. And again, according the written responses in the questionnaire greater weight is permissible and race-neutral. Cook v. LaMarque, 593 F.3d at 820.

Further, when asked the main difference between the death penalty and life in prison without the possibility of parole, Harris replied as follows:

61

I would say, with the death sentence, well, they both have the - - with the death sentence he could never be put to death, probably, always be on death row, whereas if he does be put to death, as an alternative being sent up for life, he can always find out later on some new evidence would put him in a position for an appeal or something.

(5 RT 858-59.)  The prosecutor specifically referred to Harris's questionnaire responses during voir dire, acknowledging he had concerns: "I'm going to be very frank with you.  I noticed in your answers that a lot of times you would say, 'Well, unless there were drugs involved or unless he wasn't in his right mind or unless it was spur of the moment' or something like that," and "I kind of got the impression that you would vote for life in prison without possibility - - that you would always look for reasons not to vote for the death penalty."  (5 RT 859-60.)  Harris did indicate he "didn't mean it to project that way" (5 RT 860), but the prosecutor is not required to ignore the written responses.  Cook v. LaMarque, 593 F.3d at 820.

In sum, a thorough review of the record supports the prosecutor's race neutral reasons for exercising a peremptory challenge against prospective juror Harris.

Finally, a trial court's ruling need not include express findings regarding the prosecutor's credibility where the record establishes the trial court implicitly accepted those reasons.  See Rice v. Collins, 546 U.S. at 341-42; McDaniels v. Kirkland, 813 F.3d at 777-78.  Such is the case here. (11 RT 2178-80.)

**Rachel Klose**

Rachel Klose's questionnaire indicates she identified her race and ethnic origin as "Spanish/Indian."  (ECF No. 302, Vol. I, Ex. 1 at 1.)  Klose's questionnaire includes the information that follows and is pertinent to the argument asserted.

Concerning "Criminal Justice Attitudes," asked whether she agreed in principle with the criminal justice system and trial by jury, Klose responded "No."  (ECF No. 302, Vol. I, Ex. 1 at 11.)

In the "Specific Questionnaire" portion seeking information regarding the respondent's

feelings regarding the death penalty, Klose wrote that she agreed with the death penalty generally and that her feelings about it had not changed. (ECF No. 302, Vol. I, Ex. 1 at 18.) Asked what purpose the death penalty serves, Klose replied, "I think victims go through so much when someone commits a violent crime only to have the person released to be threatened again." (Id. at 18.) Asked what her impressions of a life without the possibility of parole sentence were, she wrote: "I'm not sure what purpose it serves." (Id. at 18.) Klose indicated she was "[n]ot sure" whether the death penalty was imposed too often or not often enough. (Id. at 19.) Asked to identify the types of crimes or cases wherein the death penalty should be imposed, Klose wrote "Crimes against children like molestation and intent to kill someone." (Id. at 19.) She "strongly disagree[d]" with the statement that anyone who kills another should "get the death penalty," and explained, "Every case and situation is different. I don't think it should always apply." (Id. at 19.) In response to the statement, "Anyone who rapes and mutilates should get the death penalty," Klose "strongly disagree[d]," indicating as follows: "I think someone who rapes needs professional help not necessarily death." (Id. at 19.) In response to the question of whether she could put aside her "personal feelings regarding what the law ought to be and follow the law as the court explains it," Klose selected "Not sure." (Id. at 20.)

During voir dire proceedings, and in response to the trial court's general inquiry regarding whether she had any strong feelings about the death penalty, Klose replied, "I am for it." (5 RT 935.)

During questioning by defense attorney Gable, when asked what purpose the death penalty serves, Klose responded, "It's a punishment for a severe crime." She agreed with Gable that both the death penalty and life without the possibility of parole were "severe" and indicated she could vote for either penalty, not favoring one over the other, after considering all of the evidence presented. (5 RT 937-39.)

Klose assured the prosecutor she understood the applicable burdens, and that if faced with the reality of imposing a sentence of death or life imprisonment without the possibility of parole, she would be able to do so. (5 RT 940-42.) Klose was then asked about a response given on the questionnaire she completed:

63

MR. MARLETTE: And you also said - - Now here it comes - - In response to one of the questions, that you did not agree with the criminal justice system and the system of trial by jury . . . You said there are some things - -

A. That I don't agree with.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Q. What kind of things do you disagree with?

A. Mostly punishments for crimes that are - - that end up going back and doing them again, that kind of thing.

Q. Okay. And what would you change if you had the power to change?

A. Um, I don't know. It's hard to say.

Q. Okay. When you say punishments for crimes, do you mean like if somebody's a repeat offender, they should get a harsher sentence?

A. Right, right. Exactly.

Q. In the disagreement with the basic concept where the defendant's presumed innocent, then I'm the one who has the proof - -

A. Oh, yes, I understand that.

Q. That's okay?

A. Yeah.

Q. Anything else on our questionnaire or your answers to our questions, anything else that - - The reason I'm asking you is, you're the one who best knows.

A. Right. [¶] No. I did just have a death in the family. But I don't know - -

Q. All right. And who was that?

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

A. My mother-in-law.

Q. And how did she die?

A. Heart attack.

Q. Do you think that that situation - - It's obviously a lot of concern to you right now?

A. Um-hum.

Q. Do you think that will keep you from paying attention to the evidence that is presented in this?

A. I don't think it should. It's just real new right now. It was Sunday.

(5 RT 944-46.)

This Court's De Novo Review

The prosecutor identified a few reasons he exercised a peremptory challenge against Klose: (1) sympathy for Petitioner, including a comment that she would not feel comfortable as a defendant on the stand and in response to a question about the death penalty "for somebody who rapes and who kills" that "a rapist needed therapy;" in combination with the fact she mentioned her mother-in-law had just died and she was "crying in the box while she was being questioned;" and (2) the prosecutor believed at that point "there were a number of" better rated prospective

64

jurors "coming up." (8 RT 1437.)

Petitioner argues the questionnaire responses identified by the prosecutor do not support his position and/or are "invalid," and that the loss of her mother-in-law "is related to" Klose, "but is wholly unrelated to the case," and further, that there is no indication in the record that Klose was crying. (ECF No. 330 at 148-49.)

Sympathy for or identifying with a defendant, regardless of whether the identifying feature relates to the merits of the case, is relevant to a Batson challenge. Jamerson v. Runnels, 713 F.3d at 1229; see also Ngo v. Giurbino, 651 F.3d 1112, 1116-17 (9th Cir. 2011). In response to number 58 on the questionnaire – asking the respondent to strongly agree or disagree or to somewhat agree or disagree – Klose strongly disagreed with the following statement: "If the defendant accused of a crime does not take the stand to tell the jury his side of the story, it probably means he is guilty." Asked to briefly explain, Klose wrote: "I don't think it means he's guilty only because I wouldn't feel comfortable as the defendant on the stand." (ECF 302, Vol. I, Ex. 1 at 10.) It is a reasonable inference by the prosecutor to conclude Klose may be sympathetic to or identifying with Petitioner based upon her written response. The prosecutor may properly accord more weight to Klose's written questionnaire response. Cook v. LaMarque, 593 F.3d at 820. Nevertheless, that response was not the only questionnaire response identified by the prosecutor as giving rise to a concern that Klose would sympathize with the defendant.

Klose's response to number 106 on the questionnaire was also a factor. The prosecutor stated "[s]he also said in the questionnaire that she felt a rapist needed therapy, in response to a question about the death penalty for somebody who rapes and who kills." (8 RT 1437.) While the prosecutor either misunderstood the question posed, or misstated it, the record does support the notion Klose believed a "rapist needed therapy," which can be reasonably inferred as potential sympathy for a defendant.

More particularly, the statement on the questionnaire reads: "Anyone who rapes and mutilates should get the death penalty." Klose strongly disagreed with the statement and provided an explanation: "I think someone who rapes needs professional help not necessarily death." (ECF No. 302, Vol. I, Ex. 1 at 19.) Transposing words in the questionnaire (rapes and

mutilates) when proffering a reason based upon a prospective juror's response to that particular inquiry and inaccurately recapping its subject matter (rapes and kills) does not negate the fact of Klose's written explanation. It still remains – regardless of the prosecutor's incorrect synopsis – that Klose believes an individual who commits rape should receive therapy.

For the prosecutor to infer from Klose's responses above that she may harbor sympathy for such a defendant is not unreasonable, nor does it make his reason "invalid." Cf. Rice v. Collins, 546 U.S. at 340 ("Seizing on what can plausibly be viewed as an innocent transposition makes little headway toward the conclusion that the prosecutor's explanation was clearly not credible"); Aleman v. Uribe, 723 F.3d at 982 ("if a prosecutor makes a mistake in good faith, such as an innocent transposition of juror information, then that mistake does not support the conclusion that the prosecutor's explanation is clearly not credible"). "'One of the most regular uses of peremptory strikes is to eliminate from the final venire persons whom either side believes will be too sympathetic to his opponent.' [Citation.]." People v. Dunn, 40 Cal.App.4th 1039, 1054 (1995).

Additionally, as previously noted in the court's analysis concerning prospective juror Gonzalez, the trial court's comment that it would not have exercised a challenge against Klose were it selecting a jury is not indicative of pretext by the prosecutor. Purkett v. Elem, 514 U.S. at 767–68 (an explanation need not be persuasive or even plausible). The trial court itself acknowledged that was not the test before it. (See 11 RT 2178-79 ["I personally may not have excused certain individuals, if I were in the prosecution's position" but "[t]hat's not the criteria that the Court has to use"].)

Considered together, Klose's aforementioned responses to the two questions reveal sympathy, or potential sympathy, for the defendant. "The very purpose of peremptory strikes is to allow parties to remove potential jurors who they suspect, but cannot prove, may exhibit a particular bias." Miller-El v. Dretke, 545 U.S. at 292-93.

Next, Petitioner complains that the death of Klose's mother-in-law may be related to the individual, but is not related to the case to be tried. Petitioner also complains there is no evidence Klose was crying, and that she "assured the prosecutor" her mother-in-law's recent death would

not interfere with her ability to sit as a juror.  (ECF No. 330 at 150.)

Starting with the latter premise, Petitioner mischaracterizes the record by asserting the "record indicates that Mrs. Klose assured the prosecutor" her relative's death would not interfere with her abilities.  The following exchange occurred shortly after Klose was asked whether there was "[a]nything else" they might need to know and she responded that she'd just had "a death in the family.  But I don't know - -":

> MR. MARLETTE: Do you think that that situation - - It's obviously a lot of concern to you right now?
> a.  Um-hum.
> Q.  Do you think that that will keep you from paying attention to the evidence that is presented in this?
> A.  *I don't think it should*. It's just real new right now.  It was Sunday.
> Q.  All right.  I'm sorry that you're going through that.  [¶] But as far as this case, you don't think it would be something that would be on your mind so much that you couldn't pay attention?
> A.  No, *I don't think so*.

(5 RT 945-46 (italics added).)  The record reveals Klose's responses are somewhat equivocal rather than the "assured" asserted by Petitioner.  And, indecisiveness is a legitimate reason to exercise a peremptory challenge.  See Brown v. Lambert, 451 F.3d 946, 958 (9th Cir. 2005) (reversed on other grounds by Uttecht v. Brown, 551 U.S. 1 (2007)).

In any event, on its face, the recent death of a prospective juror's family member is a race-neutral reason.  In this case, the record reveals that on Tuesday, March 14, Klose advised that her mother-in-law had passed away the previous Sunday when asked by the prosecutor whether there was anything else the attorneys might like to know in considering her for jury service.  (5 RT [3/14/1989] 945-46.)  Petitioner's assertion that Klose's mother-in-law's death, while relating to Klose, is unrelated to the case to be tried, is not well taken.  Where in the abstract the death of a prospective juror's relative is not related to the case to be tried, the fact the death occurred so close in time could certainly impact the prospective juror's ability to participate and remain

focused on the jury's task.

The prosecutor challenged Klose in part because she "was crying in the box while she was being questioned." (8 RT 1437.) Crying is an outward behavior, or demeanor. Demeanor is a race-neutral reason to exercise a peremptory challenge against a prospective juror. Snyder v. Louisiana, 552 U.S. 472, 477 (2008) ("race-neutral reasons for peremptory challenges often invoke a juror's demeanor"). See also, e.g., Stubbs v. Gomez, 189 F.3d at 1105 (demeanor and lack of eye contact are race-neutral reasons for exercising a peremptory challenge); United States v. Mallett, 751 F.3d 907, 915 (8th Cir. 2014) (juror who appeared to be sleeping or nodding off is a legitimate race-neutral reason for exercising peremptory challenge); United States v. Maseratti, 1 F.3d 330, 335-36 (5th Cir. 1993) (prosecutor gave race-neutral reason for striking African-American juror who "'appeared to be sleeping during part of the voir dire'").

During oral argument on the motion, the prosecutor again referred to Klose's demeanor:

> MR. MARLETTE: Regarding Miss Klose - - Counsel stated that my reason that she seemed to identify with the defense, because of her statement she would feel uncomfortable on the stand, is not valid.
> It's doubtful anyone would feel comfortable. It was important to me because she chose to identify her feelings with the defendant in that case.
> That, together with the other matters, that made me feel she might be sympathetic, *including the fact that her mother-in-law had just died and her emotional reaction on the stand* made me feel that she was not a juror that I wanted….

(10 RT 1964 (italics added).) Significantly, defense counsel did not argue that Klose was not crying, nor did he make any comment in response to the prosecutor's assertion she was emotional. (10 RT 1971-74.) A "prosecutor's demeanor observations, even if not explicitly confirmed by the record, are a permissible race-neutral ground for peremptory excusal, especially when they were not disputed in the trial court. [Citations.]" People v. Mai, 57 Cal.4th 986, 1052 (2013). And, a lack of objection from defense counsel supports a trial court's acceptance of the prosecutor's race-neutral reason. See Huguely v. Westbrooks, 2017 WL 3325008 (W.D. Tenn. Aug. 3, 2017) *32 (citing State v. Huguely, 185 S.W.3d 356, 375 (2006)). Therefore, this

situation is unlike that present in <u>Snyder v. Louisiana</u>, where the prosecutor argued the prospective juror was "very nervous . . . throughout the questioning," because in that case defense counsel disputed the proffered explanation.  <u>Snyder</u>, 552 U.S. at 477-79.  "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words.  That is seen below, but cannot always be spread upon the record."  <u>Reynolds v. United States</u>, 98 U.S. 145, 156-57 (1878).  Furthermore, Petitioner has failed to identify any other similarly situated juror, nor has a thorough review of the record revealed any other juror, who cried during voir dire.

Moreover, the prosecutor was not required to ignore the fact Klose brought up her mother-in-law's death despite Klose's indication that she thought she could perform the duties of a juror.  Cf. <u>Rice v Collins</u>, 546 U.S. at 341 ("That the prosecutor claimed to hold concerns despite Juror 16's voir dire averments does not establish she offered pretext").  Simply put, "nothing in the record shows that this reason was clearly pretextual."  <u>Briggs v. Grounds</u>, 682 F3d at 1178; <u>Jamerson v. Runnels</u>, 713 F.3d at 1228.

In combination with the aforementioned reasons, the prosecutor also indicated he excused Klose because there were better jurors "coming up" at that time.  (8 RT 1437.)  When the prosecutor excused Klose, she represented his seventh of twelve peremptory challenges exercised on that occasion.  (4 CT 983.)  Prior to the commencement of the exercise of that first set of peremptory challenges, Klose was seated in the box with others randomly selected as the first twelve prospective jurors. (8 RT 1407.)  After the prosecutor excused Klose (8 RT 1414), another fourteen prospective jurors were presented for challenge (8 RT 1414-18), nine of whom were jointly excused by defendants (8 RT 1414-17 [Carpenter, Yost, Eisenbeisz, Wondra, Carroll, Norling, Schriefer, L. Elliott, and Beauchamp]), and could have been preferred by the prosecution. Hence, the record supports the prosecutor's assertion.

69

Petitioner further argues that where a "prosecutor's fifth explanation is clear and specific, but there is no way" for a court to "review the legitimacy of that reason" in the absence of any explanation of the prosecutor's rating system, the trial court's acceptance of the reason was unreasonable. (ECF No. 330 at 153.) However, the undersigned finds each of the prosecutor's reasons to be supported by the record; therefore, there is no cumulative error, nor need for an explanation of the prosecutor's rating system.

Finally, despite Petitioner's argument to the contrary, a trial court's ruling need not include express findings regarding the prosecutor's credibility where the record establishes the trial court implicitly accepted those reasons. See Rice v. Collins, 546 U.S. at 341-42; McDaniels v. Kirkland, 813 F.3d at 777-78. Here, the record establishes the trial court accepted the prosecutor's reasons for excusing the prospective jurors and found the prosecutor to be credible. Davis v. Ayala, 135 S. Ct. 2187, 2201 (2015) (the trial court is best situated to evaluate words and demeanor of jurors and credibility of prosecutor who exercised strikes; in absence of exceptional circumstances, reviewing court will defer to trial court).

**Leon Soto**

Leon Soto's questionnaire indicates he identified his race and ethnic origin as "Cauc[asian]/Puerto Rican." (ECF No. 302, Vol. I, Ex. 6 at 110.) The following information was gleaned from that same questionnaire and is relevant to Petitioner's argument here.

Under the heading "Military" and in response to a specific inquiry into whether he had ever been involved "in any way with military law enforcement, court martials or investigations," Soto replied in the affirmative. Explaining that involvement, he wrote: "Investigation only of kissing (only) a 15 year old girl. Found innocent and officially so stated by the staff judge advocate (1984). Records available." (ECF No. 302, Vol. I, Ex. 6 at 112.)

////

Under the heading entitled "Criminal Justice Experience" and in response to the question, "In your opinion, what are the most important causes of crime," Soto replied "Drugs, alcohol, little or no education." (ECF No. 302, Vol. I, Ex. 6 at 118.)

Under the heading "Criminal Justice Attitudes" and in response to whether he strongly agreed, agreed somewhat, disagreed somewhat, or strongly disagreed with the statement "[a] defendant in a criminal case is innocent until proven guilty beyond a reasonable doubt," Soto indicated he strongly agreed with the statement and explained as follows: "There has been many misunderstandings and many victims of circumstances. Therefore, a defendant should be considered innocent until proven otherwise." (ECF No. 302, Vol. I, Ex. 6 at 118.) In response to an inquiry posed as follows: "[i]f the prosecutor goes to the trouble of bringing someone to trial, the person is probably guilty," Soto indicated he both agreed and disagreed somewhat, and explained that "[t]he prosecutor, most likely, is complying with rules & regulations, although he/she may be neutral in the case." (Id. at 119.) Asked whether he believed the prosecutor should have a "lesser or greater" burden of proof depending upon the crime charged, Soto replied affirmatively and wrote: "A line should not be drawn. Flexibility must exist depending on the case." (Id. at 119.)

In response to the section designed to understand the respondent's "feelings about the death penalty," and particularly asking about Soto's "general feelings regarding the death penalty," he indicated "support for it for specific cases in which a court decides that it is the proper punishment." (ECF No. 302, Vol. I, Ex. 6 at 127.) In response to an inquiry seeking the respondent's "impressions of the penalty of life without the possibility of parole," Soto provided the following response: "For the victim himself would be a good choice versus the death penalty. Our society feels safer with criminals behind bars." (Id. at 127.) Asked what types of cases or offenses warrant the death penalty, Soto indicated "Murder without reasonable doubt" and child rape. (Id. at 128.) Asked whether anyone who rapes and mutilates another should get the death penalty, he wrote: "No[t] without a hearing. Not unless is found guilty without doubt." (Id. at 128.)

During voir dire, Soto responded to the court's general inquiry about whether he had

strong feelings concerning the death penalty by indicating the following: "I don't feel that I'm totally qualified myself, to make such a big determination, so I have confidence on the laws." (7 RT 1202.) The court and defense counsel made efforts to explain to Soto, and ensure he understood, that the decision whether to impose the death penalty or a sentence of life without the possibility of parole is a jury's decision following a defendant's conviction, rather than a decision made by the judge or court. (7 RT 1202-04.) In an exchange wherein defense counsel Gable sought to clarify Soto's responses on the questionnaire, the following occurred:

> [DEFENSE COUNSEL]: I noticed in your answer to the balance of the questions on the questionnaire, that you, would be willing to look at all the facts in a case before you make up your mind that one punishment or the other is appropriate; is that right?
> A. Yes, I remember that.
> Q. From that, I get the feeling that you are not a strong advocate of the death penalty?
> A. No, I'm not, not without.
> Q. Pardon me.
> A. Not without the backing of the statements I made here?
> Q. So, could you see yourself, even in a case of a first-degree murder with a robbery, where you found that to be true beyond a reasonable doubt, could you see yourself honestly considering the evidence and voting, if you feel that that's the right decision for life without possibility of parole?
> A. Yes, I would.

(7 RT 1204-05.) The prosecutor asked Soto a series of questions about his feelings regarding the death penalty from a philosophical point of view versus the reality of making such a determination; Soto indicated he could make the choice in reality. (7 RT 1205-06.) Later, during questioning by defense counsel Holmes, Soto indicated a belief that a defendant should be required to prove his innocence. (7 RT 1214.) When asked further about that belief, Soto responded, "Well, I believe just by talking to the group over here, I've learned a few things today that I didn't know at the time I was filling [out] the questionnaire." He agreed he was "a little lost" and would "really have to re-evaluate my answer, I'm afraid I just come up with the right answer now." (7 RT 1214-15.)

////

The prosecutor proffered the following reasons for exercising a peremptory challenge against prospective juror Soto:

> Mr. Soto was a matter of comparison. [¶] I felt there were other jurors on the new panel, and also in the jurors that I already selected who were better oriented to the prosecution.
> Mr. Soto seemed to, in his responses to the Court and also in the questionnaire, his attitude was that he would go along with the law. [¶] He said that he would support the death penalty if the Court decides it's proper.
> On all the questions about who gets the death penalty, he would in certain, that he disagreed unless a person were proven guilty. At one point in the questionnaire, he mentioned, I forget the exact context, but he said that the defendant was the victim of the death penalty.
> Mr. Soto also had a, apparently a situation where he was accused of kissing a 15 year-old girl in the Air Force and was found innocent. [¶] Given the responses in the questionnaire where Mr. Soto was saying that the records were available, if necessary, and he underlined that he was accused of kissing only, this girl; it appeared to me that he had been through an at least quasi-criminal proceeding and had been found innocent, and for that reason, would tend to identify with the defense, but primarily for the reason that it appeared to me Mr. Soto avoided personal responsibility, and I felt that he could not personally bring himself to vote for the death penalty in this case.

(8 RT 1442-43.) Petitioner alleges none of the reasons proffered by the prosecutor are supported by the record.

First, Petitioner claims the prosecutor's purported race-neutral explanation "is belied by the fact Mr. Soto was the last peremptory challenge that the prosecutor exercised in the first group," thus, "there were no venire members from which to choose." (ECF No. 330 at 188.) Petitioner is mistaken.

On the afternoon of March 20, 1989, the first exercise of peremptory challenges began with those prospective jurors comprising the original panel number 497. (4 CT 983.) Soto was among this original panel. (4 CT 962.) And the prosecutor did in fact exercise his twelfth and last challenge of the day against Soto. (8 RT 1417-18.) But, contrary to Petitioner's assertion, more than ten venirepersons from that original panel remained following this initial exercise of

peremptory challenges. Immediately after Soto was excused, the trial court read the eleven names of those who remained, and then stated the following: "Counsel, if you'll take a moment while these 11 people are before you, and consider whether or not you expect to have challenges of these individuals …" (8 RT 1418.) As a result, the prosecutor's statement there were "jurors that I already selected who were better oriented to the prosecution" is supported by the record. And the prosecutor's reference to "other jurors on the new panel" is supported by the record as well where the trial court advised the remaining members of panel 947 that the court and counsel "are going to have to interview more people and go through the process for a few more days …" (8 RT 1419.) It further advised them that while they were not "definitely on the jury," they were "definitely down to a more final group." (8 RT 1421.) Once the prospective jurors were excused for the afternoon, the court ordered a new panel of prospective jurors for the following morning. (8 RT 1421-22; 4 CT 984.) It was reasonable to infer that amongst a new panel of prospective jurors will be those persons better suited from the prosecution perspective, regardless of whether the new panel venirepersons had not yet completed the questionnaire.

Second, Petitioner argues the prosecutor's fears or concerns about Soto's feelings on the death penalty "should have been allayed" by Soto's explanation of his written response on the questionnaire. (ECF No. 330 at 188-90.) Petitioner's argument, however, does nothing more than ask this court to substitute his interpretation of Soto's questionnaire responses and voir dire testimony for that of the prosecutor. But that is not the court's task, even if it were so inclined.

In any event, the record supports the prosecutor's reason. Soto often gave answers that could reasonably be inferred to indicate a potential hesitancy about voting for the death penalty. Those answers include his questionnaire response: "I support [the death penalty] for specific cases in which a court decides that it is the proper punishment" (ECF No. 302, Vol. I, Ex. 6 at 127.) He also used language pertaining to the burden of proof that affected the prosecutor's

reference to a potential hesitancy:  Soto stated "murder *without reasonable doubt*" might be an offense wherein the death penalty should be imposed and indicated he strongly disagreed with the death penalty applying where an individual rapes and mutilates, explaining "[n]ot unless is found *guilty without doubt*s."  (Id. at 128 (italics added).)  Without doubt is obviously a greater burden than beyond a reasonable doubt.  The prosecutor also referenced Soto's response that "the defendant was the victim of the death penalty" as a factor in his decision.  (8 RT 1443.)  That is a reference to Soto's questionnaire.  Respondents were asked about their impressions of the penalty life without the possibility of parole; Soto wrote "[f]or the victim himself would be a good choice versus the death penalty."  (ECF 302, Vol. I., Ex. 6 at 127.)  It is certainly an awkward statement and one that could reasonably be interpreted to express potential sympathy for an individual facing the death penalty or a sentence of life in prison without the possibility of parole.  The question asked for the respondent's impression of the death penalty, rather than the impression of either the victim or the accused.  This court acknowledges that when defense counsel asked Soto about his response during voir dire, Soto corrected himself, stating he meant to refer to the "accused" rather than the victim of the crime.  (7 RT 1204.)  Again however, a prosecutor can accord more weight to responses given in the questionnaire.  Cook v. LaMarque, 593 F.3d at 820. The prosecutor was not bound to accept Soto's explanation.

To the degree Petitioner argues the prosecutor was obligated to ask Soto questions pertaining to the statement on the questionnaire indicating his support of the death penalty where a court decides it is proper (ECF No. 330 at 191), the fact the prosecutor did not ask a specific question or questions on that subject is not indicative of pretext where he did address the subject of the death penalty more broadly in light of Soto's responses in the questionnaire.  (7 RT 1205-06.)  Often a prosecutor is required to "make fine judgment calls about which jurors are more or less willing to vote for the ultimate punishment" and those "judgment calls may involve a

75

comparison of responses that differ only in nuanced respects, as well as a sensitive assessment of jurors' demeanor." Davis v. Ayala, 135 S. Ct. at 2201. And the undersigned notes that Soto's response is neither "ambiguous" nor "amorphous" and does not otherwise cause speculation.

The record reveals other responses offered by Soto could reasonably be inferred to indicate a hesitancy to impose the death penalty. In response to the court's initial inquiry into whether he had any strong feelings about the death penalty, either for or against it, Soto replied: "I think for the most part, I have, I would agree with the laws and go along with the views from the top. I have no question, I have never questioned it - - I don't feel that I'm totally qualified myself, to make such a big determination, so I have confidence in the laws." (7 RT 1201.) He did later indicate he understood the jury made the penalty determination and that he could do so personally. (7 RT 1203-04.)

Next, Petitioner complains the prosecutor's credibility is undercut by the fact he did not ask Soto any questions about the Air Force allegations and related proceeding. He claims the prosecutor's credibility is further damaged because other Caucasian jurors had "circumstances in their background that might raise similar concerns." (ECF 330 at 191-93.)

Question number 15 on the questionnaire asks whether the respondent served in the military. Soto replied in the affirmative and identified the "United States Air Force." He answered three sub-part questions pertaining to dates of service, rank and station locations, before checking the "Yes" box in response to the last sub-part inquiry: "Were you ever involved in any way with military law enforcement, court martials or investigations?" Explaining his involvement, Soto wrote, "Investigation only of kissing (only) a 15 year old girl. Found innocent and officially so stated by the Staff Judge Advocate (1984) Records available." (ECF No. 302, Vol. I, Ex. 6 at 112.)[12]

_____

[12] Soto did not reference this proceeding when asked whether he had ever been accused of a

76

1    The prosecutor did not ask Soto about this issue during voir dire.  (7 RT 1205-08.)

2    Neither did defense counsel for either party.  (7 RT 1203-05, 1208-15.)  The court notes that

3    Petitioner has failed to cite to any specific legal authority in support of his position that because

4    the prosecutor did not ask Soto about the Air Force investigation into the kissing incident his

5    "credibility is undercut."  United States v. Karl, 264 Fed.Appx. at 553; Heft v. Moore, 351 F.3d at

6    285.

7    In any event, the undersigned finds the fact the prosecutor did not ask Soto any questions

8    pertaining to this incident does not "undercut" or call into question his credibility.  Soto's

9    questionnaire response was readily understood as written.  There is no ambiguity about the

10   incident giving rise to the quasi criminal proceeding as Soto describes having been accused of

11   "kissing (only) a 15 year old girl."  Neither is there any ambiguity about the outcome of the

12   proceeding as Soto indicated the military decisionmaker found him "innocent" in 1984, and that

13   records of the proceeding were available.  Written responses such as this may be permissibly

14   accorded greater weight and are race neutral.  Cook v. LaMarque, 593 F.3d at 820.

15   At oral argument, in response to defense counsel's comment that he did not inquire into

16   the Air Force incident, the prosecutor noted that "[o]n voir dire, again, I thought that [Soto's]

17   answers on the questionnaire were extremely telling, and I didn't have any desire to get less

18   candid responses, simply so that he might fit in."  (10 RT 1968-69.)  After reading the content of

19   Soto's explanation for the incident during oral argument, the prosecutor commented further on

20   the issue:

> This was obviously a very important matter with Mr. Soto, and in much the same
21   way as the woman whose son had been tried and acquitted for murder, I think Mr. Soto
> had been through a quasi criminal investigation and acquittal, and I think that with all his
22   might, he was hoping through all of that, that he would be acquitted.
>           Those kinds of incidents cannot be ignored, and I don't think my failure to inquire
23   further of it orally is probative.

24

25   (10 RT 1969.)  This circumstance is unlike that in Miller-El v. Dretke, upon which Petitioner

26   relies.  In that case, the prosecutor either misunderstood or misstated a juror's comments about

27

28   crime.  He checked the "No" box in his questionnaire.  (ECF No. 302, Vol. I, Ex. 6 at 117.)

rehabilitation. When defense counsel pointed out the error, the prosecutor neither defended nor withdrew his strike, and instead suddenly offered a prior conviction of the juror's brother as another reason for exercising a peremptory challenge. Miller-El, 545 U.S. at 247-48. Here, the prosecutor did not misstate any portion of Soto's response concerning the Air Force inquiry. Moreover, the prosecutor did not offer this reason as a basis for excusal only after being challenged by defense counsel.

As previously noted, sympathy for or identifying with a defendant, regardless of whether the identifying feature relates to the merits of the case, is relevant to a Batson challenge. Jamerson v. Runnels, 713 F.3d at 1229; Ngo v. Giurbino, 651 F.3d at 1116-17 (not wanting a juror "who felt he had been wrongfully accused of a crime" was an appropriate race-neutral justification for striking a prospective juror). It is reasonable to infer from Soto's questionnaire response that he felt he had been wrongfully accused of kissing an underage girl; the prosecutor's desire to exclude Soto from serving as a juror on this basis is a race-neutral justification supported by the record. And, nothing about the questions the prosecutor asked or failed to ask Soto suggests that he was attempting to manufacture a reason to exclude Soto.

Lastly, Petitioner contends there is no support in the record for the prosecutor's assertion that Soto avoided personal responsibility and would not vote for the death penalty. (ECF Doc. 330 at 193-94.)

In addition to indicating his belief that Soto "avoided personal responsibility" and feeling that Soto could not vote in favor of the death penalty, the prosecutor addressed the issue further at oral argument on the motion:

> Regarding Mr. Soto [h]e, again, I had stated that I felt he avoided personal responsibility, could not bring himself to vote for the death penalty, on all the what I've called the who-gets questions.
> Mr. Soto strongly disagreed, he had different causes on each.
> He would say, "Well, not without a hearing, found guilty without doubts, on the rape only," and although, as Counsel points out, those may be correct answers, I think the

78

justifications that a juror summons up from himself in answering those questions, gives me an idea of where that juror's tendencies lie, and in those questions about imposing the death penalty, when a juror consistently summons up from himself reasons why the death penalty may not be appropriate, I put great weight on that.

(10 RT 1968.)   Again, a prosecutor can accord more weight to the response in a questionnaire than that offered during voir dire.  Cook v. LaMarque, 593 F.3d at 820.  Soto did indicate that he strongly disagreed with all but one of the statements in the portion of the questionnaire specifically addressing the death penalty, and the explanations provided as to each can be reasonably inferred to further qualify his response in a manner consistent with a hesitancy to assign responsibility.

Reading the entirety of Soto's voir dire testimony, coupled with a review of his completed questionnaire, reveals adequate support for the prosecutor's stated reasons, even where the undersigned acknowledges Soto gave other responses that could be interpreted as "an ideal juror for the prosecutor," to use Petitioner's words.

Despite Petitioner's oft-repeated argument, this court finds the trial court's ruling need not include express findings regarding the prosecutor's credibility where the record establishes the trial court implicitly accepted those reasons.  Rice v. Collins, 546 U.S. at 341-42; McDaniels v. Kirkland, 813 F.3d at 777-78.

**Maximina Troyer**

Maximina Troyer's questionnaire indicates she identified her race and ethnic origin as "American Indian-Mexican-Spanish."  (ECF No. 302, Vol. I, Ex. 2 at 27.)

Under the heading entitled "Criminal Justice Experience" and in response to a question about whether any family members had been victims of crime, Troyer indicated on six occasions her family members had been victims of crime, including "murder kidnapping-assault assault & battery."  (ECF No. 302, Vol. I, Ex. 2 at 30.)  Number 48 of this section asked whether any family member had been accused or arrested for a crime.  Troyer responded in the affirmative and

explained as follows: "Young man shot – ruled self-defense all charges dropped."  (Id. at 30.)

In the section designed to understand the respondent's "feelings about the death penalty," and particularly asking about Troyer's "general feelings regarding the death penalty," she wrote the following:

> I myself do not think I would have started a death penalty.  But since it is in the law books it must be put into effect if all the facts that come out in trial convince a jury that all that the prosecutor's charged has been found proven beyond a reasonable doubt to a moral certainty.

(ECF No. 302, Vol. I, Ex. 2 at 40.)  Asked what purpose the death penalty serves, Troyer replied, "In some cases it does not seem to serve any."  (Id. at 40.)  Also, her impression of life without the possibility of parole was "better than the death penalty."  (Id. at 40.)

During voir dire, when the court inquired of Troyer whether she had strong feelings about the death penalty, she replied, "I would say I do."  (7 RT 1220.)  She explained she is "against it, because I don't think that it has that much of an effect on people, they still keep on doing these things."  (7 RT 1220.)  After making a brief statement about the jury's role in a capital case and referencing the applicable burdens of proof, the following exchange occurred between the court and Troyer:

> [COURT]: If you were put in that situation and if you in your own heart felt that the appropriate penalty was the death penalty, would you be able to vote that way?
> [PROSPECTIVE JUROR]: Well, I would have to go that way, I would have to, I would feel that I had to vote that way.
> Q. Okay.  And if you in your own heart felt that the appropriate penalty was life in prison, would you be able to vote that way?
> A. If I felt that life imprisonment was –
> Q. Was, just –
> A. A just verdict?
> A. Well, I would have to go by the evidence, and if it seemed suitable, that the death penalty was necessary, I'd have to vote that way.
> Q. Okay.  Now, you used the term "have to," and again, the law –
> A. No, no, I would have to, that's how I would go.
> Q. Okay, that's –
> A. Not that the law is making me –
> Q. I thought that's what you meant, 'cause you understand the law doesn't direct you one way or the other . . ..

80

(7 RT 1221-22.)

During questioning by defense counsel Gable, asked if she would "meaningfully consider" the death penalty despite not favoring it, Troyer replied, "That's what I feel, that I have to consider it, and I have to go with what I feel – After all the facts and everything are in." (7 RT 1223.) When pressed a bit further, Troyer explained that the jury selection process and questionnaire were on her mind. (7 RT 1224.) "I even called the priest and spoke with him, and it's just like what I thought, it has to be a final on the jury, then I have to make the decision." (7 RT 1224.)

The prosecutor asked a series of questions concerning Troyer's feelings about the death penalty. Asked what purpose she believed the death penalty served if both the death penalty and a sentence of life without the possibility of parole removed the convicted individual from society for all time, Troyer replied that she "really didn't see the purpose." (7 RT 1224-25.) When asked, "philosophically, can you imagine any purpose that the death penalty would serve," Troyer stated as follows: "That I feel, no, I don't feel that," before indicating she would perform her duty as a juror if selected. (7 RT 1226.) She further indicated, "I'm going to do what I feel I have to do, and if that's part of what I have to do, I can do it." (7 RT 1227.)

The prosecutor also inquired of Troyer about her reference on the questionnaire to several family members who had been victims of crime. (7 RT 1227-29.)

<u>This Court's De Novo Review</u>

Initially, the court acknowledges that Petitioner recites the prosecutor's first proffered reason as he "just plain wanted her gone," claiming that reason is "invalid" and "could be a pretext for discrimination." (ECF No. 330 at 155.) However, a review of the record reveals that, in context, the prosecutor's statement was not an independent reason for exercising the challenge, but rather an introductory remark:

1
2          . . . with Miss Troyer, and with Miss Troyer, it was not a matter of comparison
           with other jurors; I just plain wanted her gone.
3                  She mentioned in voir dire that she had strong feelings against the death penalty,
           that it had no effect.  In fact, she mentioned she had to speak with her priest after filling
           out the questionnaire about the death penalty situation.
4                  Further, and primarily, she - - her son had been to trial for a - - apparently a
           murder charge and was acquitted.
5                  I felt that I could not count on her as, to be fair and impartial, particularly on the
           death penalty question, but also on the guilt question, given the experience with her son.
6
7      (8 RT 1437-38.)

8          The prosecutor proffered two reasons for exercising a peremptory challenge against

9      Troyer: her strong feelings in opposition to the death penalty, and the fact her son had been tried

10     and acquitted of murder, leading the prosecutor to believe she could not be fair and impartial.

11         As to the prosecutor's belief that Troyer had strong feelings against the death penalty, the

12     record supports his statement.  In preliminary voir dire by the court, when asked whether she had

13     any strong feeling concerning the death penalty, Troyer replied "I would say I do," explaining she

14     was "against it, because [she didn't] think that it has that much of an effect on people."  (7 RT

15     1220.)  During questioning by defense counsel Gable, asked whether she could meaningfully

16
17     consider the death penalty although she did not favor it, Troyer replied, "That's what I feel, that I

18     have to consider it, and I have to go with what I feel - - After all the facts and everything are in."

19     (7 RT 1223.)  She then indicated that the jury selection process and the questionnaire had been on

20     her mind, indicating she "even called the priest and spoke with him, and it's just like what I

21     thought, it has to be a final on the jury, then I have to make the decision."  (7 RT 1224.)  When

22     the prosecutor questioned Troyer about the purpose of the death penalty, she indicated that she

23
24     really didn't "see the purpose."  (7 RT 1224-25.)  When the prosecutor further inquired of Troyer

25     whether she could "imagine any purpose of that the death penalty would serve," she stated the

26     following: "that I feel, no, I don't feel that," before indicating she would perform her duty as a

27     juror if selected.  (7 RT 1226.)  Plainly then, the record supports the prosecutor's stated first

28
                                                    82

reason for exercising a peremptory challenge against Troyer.

Petitioner argues Troyer's responses indicate she was "careful and attentive in completing her questionnaire," and her answers "unequivocally" indicate she would consider the death penalty. (ECF No. 330 at 156-57.) The undersigned's review of the record does not support Petitioner's characterization of Troyer's responses as unequivocal. A fair reading of the record supports the prosecutor's belief because Troyer continually used language that could reasonably be inferred to convey a sense of duty in spite of a personal opposition to the death penalty. Troyer's repeated use of phrases that included the words "have to" or "had to" in response to inquiries by the court, defense counsel and the prosecutor are evident throughout. (E.g., 7 RT 1221 ["I would have to go that way, would have to, I would feel that I had to vote that way," "I'd have to vote that way"], 1224 ["it has to be final on the jury, then I have to make the decision"], 1227 ["I'm going to do what I feel I have to do, and if that's part of what I have to do, I can do it"].) In response to the court asking about her use of "the term 'have to," Troyer did indicate that "the law" was not "making" her choose the death penalty, but the prosecutor was not required to accept the statement. The record supports the prosecutor's stated reason and the trial court found the prosecutor to be credible. While a reasonable inference might also be that Troyer was "careful and attentive," Petitioner's interpretation is not the only interpretation supported by the record.

Notably too, Troyer's questionnaire responses in the portion pertaining specifically to the death penalty, also support the prosecutor's stated belief that Troyer could not be fair and impartial. Asked her general feelings regarding the death penalty, Troyer began her response by writing, "I myself do not think I would have started a death penalty." (ECF No. 302, Vol. I, Ex. 2 at 40.) Troyer's impression of the penalty of life without the possibility of parole was "better than the death penalty." (Id. at 40.)

The prosecutor's second reason for excusing Troyer is also supported by the record. On the questionnaire, pertaining to the respondent's criminal justice experience, Troyer identified a son, daughter and granddaughter as having been victims of crime. Asked what kind of crimes were involved, she wrote: "murder kidnapping-assault assault & battery." (ECF No. 302, Vol. I, Ex. 2 at 30.) In another criminal justice experience inquiry, when asked whether any member of her family or friend had ever been accused of or arrested for a crime, Troyer checked the box "yes." Asked to describe the nature of the accusation or offense, she wrote" "Young man shot – ruled self-defen[s]e all charges dropped." (Id. at 30.) These responses are ambiguous as to who was involved in what incident, as well as what role the individual played, to wit: victim or actor.

During voir dire, the prosecutor asked Troyer about her responses:

> MR. MARLETTE: Now, you mentioned, I have a couple of questions from your responses on the questionnaire.
> It appears that somebody was the victim of a crime, and you listed a couple people that, your son, a daughter and some granddaughters were victims of crime, including murder, kidnaping and assault, and assault and battery.
> A. Uh-huh.
> Q. Is that all one situation, or different situations?
> A. No, different situations. But they came to Court, some, you know, like I'm doing now, they got their day in court, like I feel he's going to get, somebody did this job, if I'm picked it will be my job, I'm prepared. Doesn't matter what went on with my family, or didn't go on with my family, it's just something I feel.
> Q. Can you tell us what each one of those situations was?
> A. The first one with two sons, there was a shooting and my son was brought to a trial and he was acquitted; it was self-defense.
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> Q. In the situation with your son, how, when he was taken to trial, how long ago was that?
> A. Eight years ago.
> Q. And do you realize that he would have been prosecuted by somebody, was that here in Sacramento?
> A. Yes.
> Q. He would have been prosecuted by somebody from my office?
> A. Yes.
> Q. Okay. Would that have any effect on your feelings about me or your feelings about this trial?
> A. No, I don't think so, because the law said he had to go to court on it, he went to court, he was set free, he had his day in court. That's what the system is supposed to be about.

Q. And you mentioned a murder, as well?
A. It was a murder that he was charged with.
Q. Oh, the young man died?
A. Uh-huh yes.

(7 RT 1227-29.)

"A prospective juror's negative experience with the criminal justice system, including arrest, is a legitimate, race-neutral reason for excusing the juror." People v. Cowan, 50 Cal.4th 401, 450 (2010) (prospective juror arrested for welfare fraud); People v. Lenix, 44 Cal.4th 602, 628 (2008) (negative experience concerning traffic ticket received by prospective juror upheld); People v. Wheeler, 22 Cal.3d at 277 & n.18 (relative convicted of crime "give[s] rise to a significant potential for bias against the prosecution"); United States v. Vaccaro, 816 F.2d 443, 457 (9th Cir. 1987) (associations by blood or marriage constitute a proper for the potential juror's exclusion) (overruled on other grounds, Huddleston v. United States, 485 U.S. 61 (1988)). This is true whether it is the juror herself or a family member who was involved. People v. Cowan, 50 Cal.4th at 450. The record in this case supports the prosecutor's feeling that he could not count on Troyer being fair and impartial in light of her son having been tried and acquitted of murder and she identified her son as a victim on the questionnaire.

Petitioner's argument that while the record supports "the prosecutor's explanation that he struck Mrs. Troyer because her son had been charged and acquitted," it did not support his "assumption that that fact would make Mrs. Troyer biased against the prosecutor." (ECF No. 330 at 158.) This argument, however, ignores the Batson/Wheeler standard which requires the court to consider the subjective genuineness, not the objective reasonableness, of the prosecutor's nondiscriminatory reasons for excusing prospective jurors. People v. Reynoso, 31 Cal.4th 903, 924 (2003) Here, the prosecutor's belief is neither implausible nor fantastic. Purkett v. Elem, 514 U.S. at 768.

Lastly, Petitioner complains "the trial court did not analyze any of the prosecutor's

reasons, finding instead that all of his reasons, regarding Mrs. Troyer and the six other jurors, were not 'sham excuses.'" He claims the finding "did not result from a careful and sensitive inquiry into the prosecutor's motives." (ECF No. 330 at 159.) As previously concluded, the record reveals otherwise. Again, the trial court indicated it had spent many hours reviewing the voir dire transcripts, the questionnaires prepared by "the seven individuals in question" as well as the questionnaires of "other individuals that were excused by the prosecution." (11 RT 2178.) The trial court indicated following that review that it was "satisfied that in reviewing the manner in which the prosecution examined the members of the panel and exercised challenges, that certainly it does not prove that he was trying to exclude a cognizable group" and that the prosecutor "was able to put forth neutral explanations" that it was satisfied were "not just sham excuses that were contrived to avoid admitting acts of group discrimination." (11 RT 2180.) Again, it is widely acknowledged that the trial judge is in the best position to evaluate the prosecutor's credibility. Rice v. Collins, 546 U.S. at 343; Hernandez v. New York, 500 U.S. 352 (1991). The undersigned finds the trial court's ruling more than sufficient. Batson v. Kentucky, 476 U.S. at 93; McDaniels v. Kirkland, 813 F.3d at 777-78.

### Comparative Analyses

Comparative juror analysis bears on the question of the prosecutor's credibility. Snyder v. Louisiana, 552 U.S. at 482-85.

The court must compare the prosecutor's treatment of challenged jurors with that of any retained jurors who are of a different race but share characteristics identified as objectionable by the prosecutor. Disparate treatment of similarly situated jurors may demonstrate that a prosecutor's facially race neutral reasons are a pretext for discrimination. See Snyder v. Louisiana, 552 U.S. at 482-83; Miller-El v. Dretke, 545 U.S. at 240. If a reason given by a prosecutor as a basis to utilize a peremptory strike against a juror who is a member of a cognizable racial group applies equally to a retained juror not of that race, the reason may be

considered pretextual.  See Miller-El, at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that evidence is tending to prove purposeful discrimination to be considered at Batson's third step").

The ultimate question is whether the exercise of the peremptory challenge was "motivated in substantial part" by race.  Cook v. LaMarque, 593 F.3d at 815.  If the answer is yes, relief must be granted.  The inquiry is limited to whether the prosecutor was motivated in substantial part by a discriminatory intent, not whether the discriminatory motive was the "but for" cause.  Id. at 814-15.  Inconsistent concern about a facially legitimate factor suggests pretext.  Lewis v. Lewis, 321 F.3d 824, 830-31 (9th Cir. 2003).  "Comparative juror analysis involves determining whether non-challenged jurors possess any of the characteristics on which the prosecution challenged jurors in the protected group."  Young v. Gipson, 163 F.Supp.3d 647, 673 (E.D. Cal. 2015).

Although all jury questionnaires were not provided as a part of the record, the voir dire transcript may provide a basis for the comparative analysis.  Miller-El v. Dretke, 545 U.S. at 241, n.2.

### James Del Rosario

As previously noted, the prosecutor indicated he struck Del Rosario due to his feelings about the death penalty and because he favored imposition of a life without the possibility of parole sentence over imposition of the death penalty. The prosecutor also indicated Del Rosario's statement concerning solving the crime problem was a reason, and because Del Rosario compared unfavorably to other jurors.  Petitioner has not argued that a comparison of other empaneled jurors reveals discriminatory motive, nor has he engaged in any such comparison.  Nevertheless, the court has engaged in a comparative analysis and finds support for the prosecutor's dismissal of Del Rosario as a result.

Unlike Del Rosario's response to the court's inquiry about whether they had strong feelings concerning the death penalty ("it depends," qualifying he "worr[ies] about how the crime is committed"), jurors Barnes, Bass, King, Lambert,  Ralston, Reisinger, Gill, Cox, Atwood, Williams, Wells, Cummings, and Greathouse indicated they had no particularly strong feelings

////

and expressed no anguish or apprehension about it.[13] (3 RT 514, 532; 5 RT 920, 970-971; 6 RT 1096; 8 RT 1396; 9 RT 1753, 1857-58; 11 RT 2121; 12 RT 2389, 2460, 2504, 2555.)  Even Juror Novak, who originally qualified, "No, not really.  It just depends on the particular case and the circumstances," did not also express apprehension.  (12 RT 2487.)  Additionally, unlike Del Rosario, the voir dire responses of ultimately-empaneled jurors Barnes, Bass, King, Lambert, Ralston, Trimble, Reisinger, Gill, Cox, Atwood, Wells, Novak, Cummings and Greathouse did not indicate they favored one penalty over another.  (3 RT 516-18, 533-35; 5 RT 922-25, 972-78; 6 RT 1101; 7 RT 1234-35; 8 RT 1398-400; 9 RT 1756-57, 1859-62; 11 RT 2122-25, 2128; 12 RT 2389-401, 2459-76, 2486-502, 2503-15, 2556-59.)

Petitioner observed that Del Rosario at one point, despite indicating he would lean towards a sentence of life without the possibility of parole where the felony murder rule was involved (distinguishing the circumstance from those involving premeditation and planning), replied he would not vote for the death penalty "at this time" in response to the prosecutor asking whether he could vote for the death penalty if he felt it was appropriate.  (4 RT 690.)  Notably, the prosecutor received a similar response from another prospective juror.  (10 RT 1932 [Candlish replied "don't feel that would be a problem" "[a]t this time" in response to prosecutor's inquiry whether there was "anything in [her] mind that would tell her she "could never vote" for the death penalty].)  During the second peremptory challenge series, the prosecutor exercised a challenge against the non-minority juror.  (11 RT 2199.)

Notably too, the court's review revealed Del Rosario's response to the inquiry by the court regarding strong feelings about the death penalty disclosed it to be similar to that offered by two other prospective jurors against whom the prosecutor exercised a challenge, to wit: Leon Soto and Katrina George.  When asked whether he had any strong feelings about the death penalty generally, Soto replied, "I think for the most part, I have, I would agree with the laws and go along with the views from the top.  I have no question, I have never questioned it - - I don't feel that I'm totally qualified myself, to make such a big determination, so I have confidence in the

---

[13] Jurors Trimble and Ceaglio indicated they were in favor of the death penalty.  (7 RT 1234; 12 RT 2402.)

laws." (7 RT 1201.)  In response to the same question, George responded, "I'm not for it, but I'm

not against it either."  The court replied, "Okay," and George qualified her response as follows: "I

don't feel like I even want to make that decision if it came to that."  Asked why she felt that way,

George continued, "Well, I don't know.  I just feel like the death penalty - - It serves a purpose.

I'm not sure what that purpose is.  [¶] A person can do so much wrong.  There is a way - - There

is no way to change it or nothing, but there is a way that we can keep them at a certain state of

mind in society without putting him to death.  . . . I'm not the one to make that decision." (9 RT

1796.)  Both Soto and George, like Del Rosario, qualified their responses to the court's inquiry.

And as to both Soto and George, each expressed obvious reluctance to make a finding that an

individual be sentenced to death.  Therefore, the record reveals the prosecutor was consistent

regarding his concerns, further suggesting a lack of pretext.  Lewis v. Lewis, 321 F.3d at 830-31.

Moreover, a review of the record reveals the prosecutor exercised peremptory challenges

against prospective jurors who did not apparently identify as either African-American, Hispanic

or of mixed race, where a similar, qualified response was given to the court's inquiry about

whether the juror had strong feelings about the death penalty.  See, for example, the responses

given by prospective jurors Allen and Franchino.  (3 RT 480; 9 RT 1570.)

None of the empaneled jurors can be said to have responded similarly to Del Rosario

when asked about their opinion concerning a solution to the crime problem because none were

asked that question on voir dire, nor are their questionnaires a part of this record. As a result,

comparative analysis is of no help.  Cook v. LaMarque, 593 F.3d at 817 (comparison to a juror

who is not "otherwise similar" nullifies the comparative value).

**Charso Elliott**

As noted previously, the prosecutor's reasons for striking Elliott include her feelings

regarding the death penalty and preference for the life without possibility of parole sentence, a

specific response indicating a burden of "beyond any shade of doubt," and where the prosecutor

believed other prospective jurors "would be better" from his point of view.

Petitioner argues the prosecutor's failure to clarify some of Elliott's answers on the

questionnaire regarding her feeling on the death penalty is similar to his approach with

prospective juror Gonzales and dissimilar to empaneled jurors King, Cox, Lambert and Reisinger. (ECF No. 330 at 174.) However, a review of the record reveals there were several factors considered by the prosecutor relative to his ultimate determination about Elliott's feelings about the death penalty and his concern that he could not "count on" her "for a death penalty vote." It was not merely one answer in either the questionnaire or during her voir dire testimony.

In any event, in the case of empaneled juror King, the prosecutor did ask her whether she believed the death penalty should not be an option in cases that are less extreme than those identified in her response, referring to "Ted Bundy and Charles Manson, mass murderers and so on." (5 RT 924.) Empaneled juror Lambert was asked about his belief "that the death penalty would be appropriate in cases of first-degree murder with premeditation." (5 RT 975.) In the case of empaneled juror Reisinger, he was asked about his questionnaire response wherein he "felt the death penalty would be appropriate, if there were special circumstances." (8 RT 1399.) The question was posed to make a distinction between "special circumstances" as a legal term of art versus its meaning to a lay person. (8 RT 1399-400.) Empaneled juror Cox was asked about her questionnaire response "in a couple of places that you felt the death penalty would be appropriate, or might be appropriate in the case of serial killers." (9 RT 1861.)

It is accurate to state that the prosecutor did not ask a clarifying question of Elliott regarding her questionnaire response concerning the type of case where imposition of the death penalty might be appropriate. (4 RT 738-44.) However, the fact he did ask clarifying questions of four other empaneled jurors does not automatically lead to the conclusion his reasons relating to Elliott were a pretext. Briggs v. Grounds, 682 F.3d at 1176 ("The fact that seated jurors shared one of those characteristics does not ineluctably lead to the conclusion that the prosecutor's concern was pretexual").

Not one of the seat jurors shares all of the troubling characteristics the prosecutor identified as contributing to Elliott's excusal, to wit: she felt the death penalty served no purpose and that it might be appropriate for serial and mass murders; she exhibited significant confusion regarding an understanding of "life without the possibility of parole," and that once she understood the penalty she seemed to favor it; she noted in her questionnaire in response to the

90

statement, "[p]ersons sentenced to the death penalty should be swiftly executed" that she somewhat agreed and added "[n]ot all people sentenced to death is guilty;" and "she would have to be convinced beyond any shade of doubt" as to Petitioner's guilt. Again, sharing one of those characteristics – referencing serial killers, mass murders or the like in response to a question posed in the specific portion of the juror questionnaire pertaining to the prospective jurors' feelings on the death penalty – does not make the existence of pretext inevitable.

Over and above these findings, a review of the record concerning voir dire testimony by other prospective jurors against whom the prosecutor exercised a peremptory challenge reveals favoring a life without the possibility of parole sentence over the death penalty and/or confusion concerning relevant concepts led to the exercise of a peremptory challenge by the prosecutor. (See 2 RT 479-511 [Allen; challenged for cause]; 9 RT 1669-76 [Garland], 1824-38 [Daniels]; 11 RT 2056-74 [McLaughlin; challenged for cause], 2078-101 [Bragdon; challenged for cause], 2101-12 [Packard].) Further, a review of the voir dire testimony of other prospective jurors reveals the prosecutor excused others who seemed to indicate a greater burden of proof, over and above beyond a reasonable doubt, might be expected in a case such as this. (See 9 RT 1570-83 [Franchino] & 1599-610 [Ringo].) The record reveals the prosecutor's reasons for excusing Elliott were consistently applied. Lewis v. Lewis, 321 F.3d at 830-31.

### Sylvia Gonzalez

Petitioner contends a comparison of the prosecutor's voir dire of Gonzalez to that of empaneled jurors King, Cox, Lambert and Reisinger establishes that the prosecutor's first proffered reason for exercising a peremptory challenge against Gonzalez is not supported by the record. (ECF No. 281-1 at 186-187.) The court finds otherwise.

Petitioner makes much of the fact that the prosecutor did not ask Gonzalez "what she meant by extremely brutal or without mercy" when responding to questions pertaining to her feelings about the death penalty. Petitioner's argument assumes such a question was necessary, yet those words and phrases are commonly understood without elaboration. Assuming elaboration was needed, the undersigned finds it relevant to note that Gonzalez was questioned early in the voir dire process. In fact, she was 19th of more than 119 prospective jurors subject to

voir dire.[14]  By comparison, King was 25th, Lambert was 28th, Reisinger was 56th, and Cox was

77th.  Jury selection is a fluid process, and it hardly seems unusual that an attorney's technique

would develop and change as the process proceeded.  See People v. Hartsch, 49 Cal.4[th] 472, 489,

fn.16 (2010); People v. Lenix, 44 Cal.4[th] at 623.  Moreover, the fact that a juror or jurors who

ultimately served also shared one of the characteristics with a juror excused by peremptory

challenge does not automatically lead to the conclusion that a prosecutor's concern was

pretextual.  Briggs v. Grounds, 682 F.3d at 1176.

With regard to the questions the prosecutor subsequently posed to juror King, the court

notes the clarifying questions addressed a very specific response by King on the questionnaire.

King identified "Ted Bundy and Charles Manson, mass murderers and so on" as persons who

should be subject to the death penalty.  (5 RT 924.)  That specificity reveals the questionnaire

responses of King and Gonzalez to be dissimilar for purposes of a comparison.  Gonzalez did not

identify particular individuals in response to the question posed by number 104:  In what types of

cases/offenses do you feel the death penalty should be imposed?  Gonzalez responded, "When

people are badly mutilated, beheaded, mass or serial murderers, baby killers."  (ECF No. 302,

Vol. I, Ex. 3 at 62.)

With regard to the prosecutor's voir dire of Cox, he did not ask Cox what she meant by

her references to "serial killers" when responding to the questionnaire. In other words, the

question posed did not seek to clarify the terms or the language employed by Cox; rather, the

prosecutor's questions sought to understand what types of crimes or individuals who committed

murder in Cox's opinion should potentially be subject to the death penalty.  (9 RT 1861-62.)

Petitioner next complains that the prosecutor inquired of jurors Lambert and Reisinger

regarding their responses concerning the appropriateness of the death penalty.  Yet, those

inquiries or clarification questions focused on the respondents' use of words particularly

associated with legal terms of art.  Lambert referred to "premeditation" in his response whereas

Reisinger used the phrase "special circumstances."  (5 RT 975-77 & 8 RT 1399-400.)  Thus,

---

[14] This number does not include those prospective jurors who were granted hardship excuses.

1    asking clarifying questions of both Lambert and Reisinger cannot be contrasted with the

2    prosecutor's failure to ask clarifying questions of Gonzalez where her words did not involve legal

3    terms of art.

4         In sum, a comparison of the Gonzalez voir dire conducted by the prosecutor to that

5    conducted with empaneled jurors King, Cox, Lambert and Reisinger does not support a finding

6    that the prosecutor's reason is unsupported by the record, or is otherwise suspect.

7         Further, while an attorney advocate may be concerned about a particular answer, another

8    answer offered by the prospective juror may provide a reason to have greater confidence in the

9    overall thinking and experience of that juror.  Attorneys often do not evaluate prospective jurors

10   based upon a single answer.  Neither should a reviewing court.  Therefore, asking clarifying

11   questions of King and Cox, and even Lambert and Reisinger, but not Gonzalez, may have been

12   due to the prosecutor having a greater confidence in those jurors.  Certainly, none of them

13   displayed a similar level of confusion to that of Gonzalez as revealed by a review of the record.

14        The undersigned's own comparison finds dissimilarities between Gonzalez's voir dire

15   testimony and that of the other empaneled jurors.  For example, Juror Barnes indicated that he

16   had no particular type in mind when asked what particular type of cases he considered appropriate

17   for the two penalties at issue.  (3 RT 516-18.)  Juror Atwood indicated he had no particular type

18   of case in mind either when concluding the death penalty is appropriate in some circumstances.

19   (11 RT 2122-24.)  Juror Bass's questionnaire apparently did not identify a particular type of

20   crime or crimes that she believed were appropriately punished by a sentence of death.  (3 RT 533-

21   34.)  The same can be inferred from the voir dire of Jurors Ralston, Trimble, Gill, Williams,

22   Ceaglio, Wells and Greathouse.  (See 4 RT 1100-02; 7 RT 1234-36; 9 RT 1754-58; 12 RT 2389-

23   401, 2401-09, 2462-63 & 2554-61.)

24        The comparison also found a similarity between Gonzalez and other prospective jurors

25   who were dismissed by the prosecutor due to their responses on the questionnaire concerning the

26   types of crimes for which the death penalty may be appropriate.  Prospective juror Silva replied,

27   "brutal murders, mass murders and intentional murders."  (10 RT 1922-23.)  The People excused

28   Silva during the morning session involving the third series of peremptory challenges exercised.

(12 RT 2417.)  Additionally, prospective juror Garland replied the death penalty would be appropriate "in cases such as Charles Manson and mass murders." (9 RT 1672.)  The People excused Garland during the second series of peremptory challenges exercised.  (11 RT 2195.) Hence, in this instance, as in others, the record establishes the prosecutor's reasons for excusing a juror were consistently applied.  Lewis v. Lewis, 321 F.3d at 830-31.

### Thomas Harris

Petitioner did not undertake a comparative analysis of Harris's responses to those offered by empaneled jurors.  A review by the undersigned of the voir dire testimony of all empaneled jurors reveals none of the individuals selected indicated they had lost contact with family; to the extent they were asked questions in this area, all are readily distinguishable from Harris's response.  Nor did the empaneled juror responses during voir dire indicate a significant reluctance to impose the death penalty.  (See 3 RT 514-31 [Barnes], 532-45 [Bass]; 5 RT 919-34 [King], 970-83 [Lambert]; 6 RT 1095-115 [Ralston]; 7 RT 1231-42 [Trimble]; 8 RT 1395-405 [Reisinger]; 9 RT 1752-60 [Gill], 1857-68 [Cox]; 11 RT 2120-31 [Atwood]; 12 RT 2389-401 [Williams], 2401-15 [Ceaglio], 2459-78 [Wells], 2486-502 [Novak], 2503-15 [Cummings] & 2554-69 [Greathouse].)

In fact, that review of the record reveals the prosecutor exercised a peremptory challenge against another prospective (and apparently Caucasian) juror, who also indicated during voir dire, conducted by defense attorney Holmes, that she had lost track of her father where there was no "major problem going on with the family." (12 RT 2368-70 [Stebbins].)  Moreover, the record establishes the prosecutor also exercised peremptory challenges against other jurors who favored a sentence of life without the possibility of parole over the death penalty.  (See 2 RT 479-511 [Allen; challenged for cause]; 9 RT 1669-76 [Garland], 1824-38 [Daniels]; 11 RT 2056-74 [McLaughlin; challenged for cause], 2078-101 [Bragdon; challenged for cause], 2101-12 [Packard].)  These challenges reveal the prosecutor to be consistent with his concerns.  Lewis v. Lewis, 321 F.3d at 830-31.

### Rachel Klose

Petitioner argues that answers provided by empaneled jurists Atwood, Barnes, Bass, King,

94

Ralston, Reisinger, Novak, Greathouse and Cox, reveal that the prosecutor's first reason for excusing Klose – that he could not count on her for a death penalty verdict – to be a pretext for discrimination.  (ECF No. 330 at 151-52.)  To recap, the prosecutor gave two reasons for excusing Klose:  (1) his belief that she would be sympathetic to the defendants based upon her responses in the questionnaire and her emotional state; and (2) there were other more favorable jurors pursuant to his assessments.  (8 RT 1437.)

Petitioner points to the responses of the empaneled jurists to the court's preliminary voir dire inquiry regarding whether the venireperson has any strong feelings one way or another about the death penalty.  But this is not an apt comparison.  The prosecutor expressly relied on two questionnaire responses by Klose, numbers 58 and 106, not the more general inquiry posed by the court.  The only oral voir dire testimony identified by the prosecutor pertained to Klose's emotional response and the death of her mother-in-law days prior.  And while the undersigned does not have the questionnaires from the empaneled jurists available for comparison, a review of their testimony does not reveal any potential response that could be interpreted to evince sympathy for the defendant.  (See 3 RT 514-31 [Barnes: prosecutor did not address any particular questionnaire responses pertaining to the death penalty], 532-45 [Bass: prosecutor did not address any particular questionnaire responses pertaining to the death penalty]; 5 RT 919-34 [King: prosecutor asked a series of questions addressing King's questionnaire response identifying Ted Bundy, Charles Manson & mass murderers as appropriate persons for a sentence of death], 970-83 [Lambert: prosecutor inquired into Lambert's understanding of felony murder rule]; 6 RT 1095-115 [Ralston: prosecutor sought to clarify response by Ralston that she "believed the death penalty were appropriate if it were proved that the person was going to kill again"]; 7 RT 1231-42 [Trimble: prosecutor did not address any particular questionnaire responses pertaining to the death penalty]; 8 RT 1395-405 [Reisinger: prosecutor addressed Reisinger's use of "special circumstances" in response to an inquiry about the appropriateness of the death penalty]; 9 RT 1752-60 [Gill: prosecutor asked general questions about Gill's understanding of the two penalties], 1857-68 [Cox: prosecutor asked a series of questions addressing Cox's questionnaire response identifying serial killers as appropriate persons for a sentence of death]; 11 RT 2120-31

[Atwood: prosecutor did not address any particular questionnaire responses pertaining to the death penalty]; 12 RT 2389-401 [Williams: prosecutor addressed Williams's reply of "whatever types of cases its called for" in response to the specific question asking what types of cases or offenses warrant the death penalty], 2401-15 [Ceaglio: prosecutor did not address any particular questionnaire responses pertaining to the death penalty], 2459-78 [Wells: prosecutor did not address any particular questionnaire responses pertaining to the death penalty], 2486-502 [Novak: prosecutor did not address any particular questionnaire responses pertaining to the death penalty], 2503-15 [Cummings: prosecutor did not address any particular questionnaire responses pertaining to the death penalty] & 2554-69 [Greathouse: prosecutor did not address any particular questionnaire responses pertaining to the death penalty].)

**Maximina Troyer**

Petitioner compares Troyer's answers to those of a number of empaneled jurors (ECF No. 330 at 157), contending the comparison establishes pretext. But, the strike exercised by the prosecutor was not based on a single subject. The prosecutor claimed two reasons: Troyer's "strong feeling against the death penalty," including her belief it had "no effect," coupled with his primary reason - that her son had been tried for murder.

Troyer's equivocal responses pertaining to her feelings about the death penalty cannot be compared to other juror responses on that subject where those jurors exhibited little or no equivocation and did not express a belief the death penalty had no effect. The undersigned's review of the voir dire proceedings did not identify another empaneled juror who expressed that same belief. Cook v. LaMarque, 593 F.3d at 817 (comparison to a juror who is not "otherwise similar" nullifies the comparative value).

**Leon Soto**

Petitioner contends a comparative analysis of five empaneled jurors' testimony speaks to the concern expressed by the prosecutor that Soto's death penalty views were problematic and reveals that reason to be unsupported by the record. He claims "White jurors whom the prosecutor accepted" offered no assurance "that the death penalty should be a possible sentence." (ECF No. 330 at 190-91.) This purported comparison, however, is no comparison at all and

therefore has no value.  Cook v. LaMarque, 593 F.3d at 817.

Petitioner points to a quotation from the prosecutor's voir dire of Soto wherein he asks Soto if he could be personally responsible for the reality of deciding an individual should be put to death.  Soto replied that he could and would make such a personal choice.  (7 RT 1206.) Petitioner then claims a comparison of the exchanges between the prosecutor and empaneled jurors Barnes, Bass, Lambert, Ralston, Novak and Cummings, reveals that those jurors "gave no such assurance."  While the latter is true, it is of no consequence whatsoever because none of those jurors was asked a question even remotely similar to that asked of Soto.  (See 3 RT 518-24 [Barnes], 535-41 [Bass]; 5 RT 975-79 [Lambert]; 6 RT 1102-08 [Ralston]; 12 RT 2492-94 [Novak] & 2508-13 [Cummings].)  And not one of them expressed any hesitancy in imposing the death penalty.

Petitioner also attempts a comparative analysis as it pertains to Soto's response indicating he was the subject of a military proceeding or investigation, asserting the prosecutor's credibility is "undercut because other white jurors whom he had accepted had circumstances in their background that might raise similar concerns."  (ECF No. 330 at 192-93.)

More specifically, Petitioner identified empaneled jurors Lambert, Bass, Ceaglio, Cummings, King, Trimble and Williams as having indicated prior personal or familial experiences that would affect that juror's impartiality.  But a review of those specific circumstances – ranging from Lambert having gone AWOL while serving in the military decades earlier and Ceaglio's then-pending speeding ticket case, as well as the various theft and driving while intoxicated offenses suffered by the children of the remaining empaneled jurors identified – reveals they are quite dissimilar to that circumstance experienced by Soto.  None involved an allegation of inappropriate, personal contact with a minor.  Neither Lambert nor Ceaglio's personal "past encounters with criminal proceedings" is on par with that facing Soto five years prior.  The mere fact Lambert and Ceaglio had experienced a personal circumstance involving a legal type of proceeding does not make that experience similar to Soto's experience.

In light of the foregoing, Petitioner's comparison has no value.  Cook v. LaMarque, 593 F.3d at 817.

<u>The Second Motion & Ruling</u>

On the afternoon of April 4, 1989, peremptory challenges as to the second venire panel were exercised. The eleven prospective jurors that remained following the initial exercise of peremptory challenges as to the first panel were seated, and then four randomly-selected prospective jurors from the second panel were also seated. (11 RT 2190-93.)

Alvarez and Ross jointly excused four venirepersons and the prosecutor excused three venirepersons before electing to pass on the panel as then comprised. (11 RT 2193-96.) The defendants had then exhausted their joint peremptory challenges and proceeded with their respective separate allotted challenges. (11 RT 2195-96.) Petitioner Alvarez, the People, and codefendant Ross then each exercised a challenge. (11 RT 2196-97.) With the exercise of codefendant Ross's separate challenge, Katrina George entered the jury box. (11 RT 2197.) The prosecutor then exercised his next challenge, thanking and excusing George. (11 RT 2197.) Defense counsel asked to approach and an unreported bench discussion occurred. (11 RT 2197.) Proceedings resumed: Petitioner Alvarez thanked and excused another three venirepersons, codefendant Ross also thanked and excused another three, and the prosecutor thanked and excused another five within that same period, before passing again on the panel as then comprised. (11 RT 2197-200.) Alvarez and the People each excused a prospective juror before codefendant Ross elected to pass. (11 RT 2200-01.) The prosecutor then excused a prospective juror before Petitioner Alvarez passed on the panel as then comprised. (11 RT 2201.) Codefendant Ross and Petitioner each exercised another challenge, and the prosecutor exercised another two, before the Court took a recess. (11 RT 2201-03.)

Outside the presence of the prospective jurors, the following occurred:

THE COURT: When I said 15 minutes, I wasn't thinking about the <u>Wheeler</u> motion, but let's hear that first and see if that is resolvable.

For the record, Counsel approached the bench after the prosecution excused juror No. 15 - -

[DEFENSE COUNSEL]: Gill.

THE COURT: Who was the last - -

[DEFENSE COUNSEL]: George.

MR. MARLETTE: It was Katrina George.

98

1    THE COURT: Okay. So after the People excused Miss George, then counsel
2  approached the bench, indicated they had a renewed <u>Wheeler</u> motion.
       Go ahead, [defense counsel].
3      [DEFENSE COUNSEL]: Yes, your Honor.
       The motion is similar to the one previously made, and regarding the first panel.
4      In this panel, I think that it can be agreed that there are two blacks in the group that
   finally got through hardship and death-qualification, and that's what we have.
5      One of those was Miss George, who was excused by the prosecution. Due to the
   fact that there were only two blacks on the panel, I chose to make the motion immediately
6  so that you would know that the motion was pending.
       And the same pattern is emerging. Whenever a black juror comes up, a black juror
7  is excused.
       Now, I know that there is one black juror remaining on the panel at this time, but I
8  think the - - I think the case law is not a proper determination to determine that the
   exercise of peremptory challenge is taking place, and <u>People versus Snow</u> indicated that.
9      In any event, the basis for the motion is that it is the defense's position that this is a
   continuing pattern - - state his reasons for excusing the juror, I think that that would be
10  sufficient to show a prima facie case.
       THE COURT: Okay.
11     Okay. I've ruled on the motion previously when it was raised on the basis of the
   previous excusals. And the prosecution's excusing one additional minority, in this Court's
12  opinion, does not present - - does not reach the level of a prima facie showing that there is
   a pattern of excusing any cognizable group, and, therefore, I am not going to require a
13  showing by the prosecution.
       I'm not satisfied that the initial burden has been met by the defense.
14     [DEFENSE COUNSEL]: It may be, your Honor, that this is somewhat premature,
   inasmuch as there are still peremptories left and what have you, and maybe what we need
15  to do - - I appreciate what the Court is saying at this point, and I would ask to state
   without prejudice renewal of the motion and renew the matter if it continues.
16     What we're doing is piecemealing it with one panel and another panel - - The
   Court may disagree with that, but it seems that that would be possibly the most
17  productive.
       I could indicate as we go along my concerns and then talk about it at the end.
18     THE COURT: I'm not sure what is the appropriate way of doing it.
       On the other hand, I don't think we can require the prosecution, every time he
19  exercises a challenge, to justify it, and we do have two separate panels.
       We agreed that the last challenge would go only to the last panel, so at this time
20  I'm denying the motion.
       We'll have to wait and make another motion, and we're rule on that one.
21     [DEFENSE COUNSEL]: Okay.
       [COUNSEL FOR CODEFENDANT ROSS]: Your Honor, I just want the record to
22  be clear that I have joined in all these <u>Wheeler</u> motions, that this is something that I am
   very concerned for about my client too. As much as we hear from the Alvarez team, I
23  also want you to understand that this is a concern of Belinda Ross also.
       THE COURT: The record is clear. You did join in the last motion, and you've
24  now joined in this motion.
       [DEFENSE COUNSEL]: Thank you.
25     [COUNSEL FOR CODEFENDANT ROSS]: Thank you, your Honor.

99

MR. MARLETTE: Your Honor, I would like to point out that on this panel, every other minority has been excused by the defense.

Mr. Esparza, a Mexican, was excused jointly. Stella Carr, a Hispanic, by the Defendant Alvarez.

Mr. Gill is black, he was left on.

Jennifer Karsikas is Portuguese and excused by Alvarez, and Mr. Farfan is a Spaniard and was excused by Defendant Alvarez.

I go along and make showings when I make them, and I want to make it clear that this is not a pattern by any means that's emerging in my situation.

And, just very briefly, I don't even have Katrina George's questionnaire here, but if my memory serves, she's been convicted of a credit card deal where she picked up somebody's purse and gone off and charged up about $400 on the credit cards.

THE COURT: Okay.

(11 RT 2203-06; see also 5 CT 1066.)

## This Court's De Novo Review

To satisfy his burden of producing evidence sufficient to permit the court to draw an inference that discrimination occurred under the first step of Batson, a petitioner must establish that the prospective juror who was removed is a member of a cognizable group, that the prosecution exercised a peremptory challenge to remove the juror, and that the circumstances of jury selection raise an inference that the challenge was motivated by race. Cooperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th Cir. 2001).

Here, the first two components of a prima facie showing were established where defense counsel proffered the fact that his client is of African-American descent and that the prosecutor exercised a peremptory challenge to excuse an African-American juror. Cooperwood v. Cambra, 245 F.3d at 1045-46. Thus, the issue before this court is whether the third component of a prima facie showing was or has been established: whether the circumstances of jury selection raise an inference that the prosecutor's use of the challenge was motivated by race.

The Ninth Circuit has expressly held that statistical disparities alone can give rise to an inference of exclusion based on race. See, e.g., Williams v. Runnels, 432 F.3d 1102, 1107 (9th Cir. 2006) (finding a prima facie showing where the prosecution exercised three of its first four peremptory challenges against African-Americans (75%) and three of its total of five peremptory challenges (60%) against African-Americans where African-Americans constituted 8% of the

venire); Fernandez v. Roe, 286 F.3d 1073, 1078 (9th Cir. 2002) (finding a prima facie showing where the prosecution struck four out of a possible seven Hispanics (57%) and at the time of the motion, had used four of its fourteen peremptory challenges against Hispanics (29%) where Hispanics constituted only 12% of the venire); Turner v. Marshall, 63 F.3d 807, 811-12 (9th Cir. 1995) (finding a prima facie showing where the prosecution struck five out of a possible nine African American jurors (56%) and used five of its nine peremptory challenges against African-American jurors (56%) where only 30% of those called for voir dire were African-American) (overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999)).

However, "[t]here is no magic number of challenged jurors" that automatically establishes a prima facie case of discrimination. United States v. Chinchilla, 874 F.2d 695, 698 (9th Cir. 1989). Additionally, "[a]lthough a pattern of strikes against African-Americans provides support for an inference of discrimination," a defendant "must point to more facts than the number of African-Americans struck to establish such a pattern." Williams v. Woodford, 384 F.3d 567, 584 (9th Cir. 2004). For example, in Woodford, the petitioner failed to create an inference of discrimination when he alleged that the prosecutor used two of 19 challenges to remove the only two African-American females on the jury, and one of three challenges to remove a male African-American alternate juror. Id. at 583-84. "[B]ecause Williams failed to allege, and the record does not disclose, facts like how many African-Americans ... sat on the jury, how many African-Americans were in the venire, and how large the venire was, it is impossible to say whether any statistical disparity existed that might support an inference of discrimination." Id. at 584. Cf. Johnson v. California, 545 U.S. at 164, 173 (finding a prima facie case when the prosecutor used three of 12 peremptory challenges against the only three African-Americans in the jury pool); Williams v. Runnels, 432 F.3d at 1107 (finding a prima facie case when only four of the first 49 prospective jurors were African-American and the prosecutor used three of his first four challenges against African-Americans).

A petitioner can also satisfy the third component of a prima facie showing by pointing to other relevant circumstances surrounding the strikes. For example, historical evidence of racial discrimination by the District Attorney's Office and the practice of jury shuffling may support a

prima facie case. <u>Miller-El v. Cockrell</u>, 537 U.S. at 346-47; <u>see</u> <u>United States v. Esparza-Gonzalez</u>, 422 F.3d 897, 903 (9th Cir. 2005) ("jury selection procedures may give rise to an inference of discriminatory intent"). The Ninth Circuit has also held that the prosecutor's questions and statements during voir dire examination may support or refute an inference of discriminatory motive (<u>Tolbert v. Gomez</u>, 190 F.3d 985, 988 (9th Cir. 1999)); the attitude and behavior of the challenging attorney and the prospective jurors can support or refute a prima facie showing (<u>Tolbert v. Page</u>, 182 F.3d at 683); and the prosecutor's behavior striking venirepersons of another minority may support an inference of discrimination (<u>Fernandez v. Roe</u>, 286 F.3d 1073, 1079 (9th Cir. 2002)).

Here, Petitioner asserts there was a pattern of strikes against racial minorities. More specifically, he claims that prior to striking George, the prosecutor exercised "seven of twelve strikes against minorities, or 58%." (ECF No. 330 at 202.) As to the African-American prospective jurors, the prosecutor struck two of the three persons included in the first panel, or 66 percent of African-Americans. (ECF No. 330 at 203.) As to the Hispanic prospective jurors, the prosecutor struck five out of seven persons included in the first panel, or 71 percent of Hispanics. (ECF No. 330 at 203.)

Even assuming arguendo there was a pattern of strikes against African-American and Hispanic jurors supporting an inference of discrimination, Petitioner "'must point to more facts than the number'" of minorities "struck to establish such a pattern." <u>Williams v. Woodford</u>, 384 F.3d at 584. This is true because a prima facie showing based on statistical disparity may be dispelled by other relevant circumstances during the voir dire process. <u>United States v. Collins</u>, 551 F.3d 914, 921 (9th Cir. 2009). Here, because the trial court had already considered the circumstances surrounding the prosecutor's exercise of peremptory challenges as it concerned the first panel, determining at <u>Batson</u>'s third step that there was no purposeful discrimination, its finding is a relevant circumstance that works to dispel any statistical disparity inference asserted by Petitioner. After defense counsel argued, "this is a continuing pattern," the trial court stated, "I've ruled on the motion previously when it was raised on the basis of the previous excusals. And the prosecution's excusing one additional minority … does not reach the level of a prima

facie showing that there is a pattern of excusing any cognizable group." (11 RT 2204.)

Petitioner asserts that the "prosecutor's strike of Ms. George must be considered with 'all the relevant circumstances.'" (ECF No. 33 at 204.) Yet, it has been so considered. The trial court was familiar with all of the relevant circumstances, and a review of the record establishes the prosecutor did not discriminate against any of the individuals at issue in the first venire panel on the basis of race. The trial court did not ignore, despite Petitioner's assertions to the contrary, any pattern of strikes against minorities. It simply concluded that it had not found a pattern earlier – a relevant circumstance to be considered on this occasion.

As Respondent points out, although the trial court did not find that a prima facie case had been established, a review of the record supports the prosecutor's statement following the trial court's ruling on the second motion: that he excused George because she had "been convicted of a credit card deal where she picked up somebody's purse and gone off and charged up about $400 on [that person's] credit cards." (11 RT 2206.) The prosecutor's recollection is accurate. During voir dire, the prosecutor asked George about a response on her questionnaire that involved someone "arrested for fraudulent documents;" she indicated she was the person arrested. She explained, "I found a . . . young lady's purse in a restaurant in one of the downtown restaurants, and I used her identification - - My identification and her credit cards." (9 RT 1807.) She was charged with felony fraud and forgery, but pled no contest to a misdemeanor and served her time. (9 RT 1807-08.)

In this case, there is no historical evidence of racial discrimination by the District Attorney's Office, nor is there evidence of the practice of jury shuffling to support a prima facie case. Miller-el v. Cockrell, 537 U.S. at 346-47; United States v. Esparza-Gonzalez, 422 F.3d at 903. The prosecutor's questions and statement during voir dire examination did not support an inference of discriminatory motive. Batson, 476 U.S. at 97; Tolbert v. Gomez, 190 F.3d at 988. Nor did the prosecutor's behavior in exercising peremptory strikes support an inference of discrimination. Fernandez v. Roe, 286 F.3d at 1079.

Lastly, the undersigned notes that the prosecutor exercised peremptory challenges against other prospective jurors who admitted a personal criminal conviction. Boyd v. Newland, 467

F.3d at 1149-50 (comparative juror analysis may be necessary at the first or third step of the Batson analysis). Those included prospective jurors Lacy (5 CT 959-60 [prior burglary conviction], 8 RT 1414 [excused]); Kollman (9 RT 1768-69 [DUI two years prior], 11 RT 2202 [excused]); and Hummer (11 RT 2157 [marijuana possession/diversion program], 12 RT 2417 [excused].)

Given the circumstances then known to the trial court – where it had previously conducted a thorough analysis of seven peremptory challenges exercised by the prosecutor – Petitioner's argument that the prosecutor acted with discriminatory purpose in excusing George failed to raise an inference of discrimination. More particularly, the trial court already had evaluated the jury voir dire transcript and juror questionnaires in order to conduct an analysis of the jurors who were previously stricken against those who were allowed to remain, concluding that the prosecutor did not act with purposeful discrimination in excusing prospective jurors Del Rosario, Elliott, Harris, Gonzalez, Klose, Troyer or Soto.

If a "wide variety of evidence" can support an inference of discrimination (Johnson v. California, 545 U.S. at 169), the trial court's consideration of its previous ruling finding no purposeful discrimination at step three can likewise support a finding that Petitioner did not establish a prima facie case at step one following the prosecutor's subsequent excusal of George.

As set forth above, this record simply is not sufficient to raise an inference that the prosecutor used a peremptory challenge to exclude George, an African-American prospective juror, because of her race.

### Conclusion

As explained in detail above, an independent review of the record reveals that Petitioner failed to establish purposeful discrimination by the prosecutor in the exercise of peremptory challenges. The prosecutor's reasons for striking the jurors at issue shared a logical nexus to the concerns expressed and his efforts to obtain a favorable jury for the prosecution, and those reasons are supported by the record. Nor does a comparative juror analysis undermine this holding. Finally, it is worth noting that a review of the entire record revealed no other evidence that the prosecutor's peremptory challenges were based on race. Unlike the situation in Miller-El

II, this record does not include evidence of the prosecutor or his office's reliance on racial factors in the exercise of such challenges, nor does it include evidence of procedural manipulation or deceptive questioning, nor any other sign of a constitutional violation. Because the prosecutor's race-neutral reasons for excusing the jurors at issue are supported by the record, it is hereby RECOMMENDED the claim be DENIED in its entirety.

### Claim GG: Right to Appeal and Loss of Juror Questionnaires

Petitioner contends that he was deprived of his right to appeal by the trial court's failure to preserve, or loss of, the juror questionnaires. He claims he is unable to attack the trial court's finding that there was no purposeful discrimination by the prosecutor during jury selection, and that he is foreclosed from a comparison between the venirepersons who were stricken and those persons the prosecutor found acceptable. As a result, he asserts the California Supreme Court was unable to conduct a meaningful review of his Batson claims, and that this court is likewise unable to conduct a meaningful comparative analysis as is required by Miller-El. Petitioner asserts these errors entitle him to habeas relief. (ECF No. 330 at 210-35; ECF No. 361 at 76-82.)

On the other hand, Respondent argues the California Supreme Court's rejection of Petitioner's due process claim was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Therefore, he contends Petitioner is not entitled to relief. (ECF No. 345 at 95-99.)

#### *The California Supreme Court's Determination*

The California Supreme Court addressed Petitioner's claim on direct appeal as follows:

> At the outset, defendant maintains that his *Wheeler/Batson* claim must be resolved in his favor on the ground that the record on appeal is not adequate to permit meaningful review. The deficiency of which he complains is the absence of certain questionnaires, which were completed by prospective jurors, then lodged with the superior court, subsequently lost by its clerk's office, and finally determined by the superior court to be beyond reconstruction. A criminal defendant is indeed entitled to a record on appeal that is adequate to permit meaningful review. That is true under California law. (*People v. Howard* (1992) 1 Cal.4th 1132, 1165.) It is true as well under the United States Constitution—under the Fourteenth Amendment generally, and under the Eighth Amendment specifically when a sentence of death is involved. (*People v. Howard, supra*, 1 Cal.4th at p. 1166.) The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal.

(*See id*. at pp. 1165–1166.) It is the defendant's burden to show prejudice of this sort. (*Id*. at p. 1165.) Defendant attempts to carry this burden, but does not succeed. He simply does not show that the absence of the questionnaires is prejudicial to his ability to urge his *Wheeler/Batson* claim—or any other. Indeed, material from the now lost items survives in the reporter's and clerk's transcripts through quotation and paraphrase.

People v. Alvarez, 14 Cal.4th at 196, n.8.

### *The Applicable Legal Standards*

Although, "the Constitution does not require states to grant appeals as of right to criminal defendants seeking to review alleged trial court errors," where such a system of appellate review occurs, its procedures must comport with due process. Evitts v. Lucey, 469 U.S. 387, 393 (1985). Due process and equal protection are satisfied where a state court's appellate process provides "a criminal appellant pursuing a first appeal as of right [the] minimum safeguards necessary to make that appeal 'adequate and effective.'" Smith v. Robbins, 528 U.S. 259, 276 (2000) (quoting Evitts, 469 U.S. at 392).

In Griffin v. Illinois, 351 U.S. 12, 19 (1956), the United States Supreme Court held that states must afford indigent defendants an "adequate appellate review" equal to "defendants who have enough money to buy transcripts." "In terms of a trial record, this means that the State must afford the indigent a 'record of sufficient completeness' to permit proper consideration of [his] claims." Mayer v. Chicago, 404 U.S. 189, 194 (1971) (quoting Draper v. Washington, 372 U.S. 487, 499 (1963)). The high court explained that a "'record of sufficient completeness' does not translate automatically into a complete verbatim transcript." Mayer, 404 U.S. at 194. Rather, what violates the Constitution is a total denial of a transcript without explanation. Draper, 372 U.S. at 498; Eskridge v. Washington State Bd. of Prison Terms and Paroles, 357 U.S. 214, 215 (1958).

### *Analysis*

Petitioner argues the California Supreme Court's determination of this claim is contrary to or an unreasonable application of United States Supreme Court precedent because that court misapplied the high court's test regarding an effective appeal. He further asserts the California Supreme Court misapplied the law regarding the burdens associated with proving "suitable

alternatives."

Significantly, the undersigned finds Petitioner's interpretation of the California Supreme Court's holding to be inaccurate. Petitioner interprets the court's holding as requiring him to prove no reasonable alternative to the missing juror questionnaires was available, contrary to the United States Supreme Court's holding in Britt v. North Carolina, 404 U.S. 226 (1971). However, the California Supreme Court's holding referenced the burden associated with Petitioner's ability to prosecute his appeal: "The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal." People v. Alvarez, 14 Cal.4th at 196, n.8. Petitioner's reference to Britt and the availability of an alternative is misplaced in the procedural sense and therefore distinct.

In Britt, the issue before the high court concerned the state's duty to provide a free transcript of prior proceedings to an indigent defendant claiming a right to such a transcript and the factors relevant to a determination of need relative to an effective defense at retrial. Britt, 404 U.S. at 226-27. The court noted its prior cases had "identified two factors that are relevant to the determination of need: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." Id. at 227. The North Carolina courts rested their denials of the defendant's request upon the availability of "adequate alternatives to a transcript" rather than the defendant's particularized need of the transcript. Id. at 228. The high court held that "[a] defendant who claims the right to a free transcript does not, under our cases, bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight." Id. at 230.

Here, Petitioner interprets the California Supreme Court's denial of his claim to be the equivalent of requiring him to prove that alternatives suggested are inadequate. The ability to prosecute an appeal however is not synonymous with a requirement to prove inadequate alternatives. The defendant's indigent status was central to the holding in Britt, where the determination of need was plainly at issue. Petitioner's needs as it concerns the jury questionnaires does not equate to the defendant's need for a trial transcript of prior proceedings,

as was the case in <u>Britt</u>.  In fact, need is presumed in a capital case appeal where the record is to include any and all proceedings and documentation.  <u>See</u> Cal. Pen. Code, § 190.7.  Hence, considering whether the record that is available is adequate to provide meaningful review is precisely the determination the state court must make.

The California Supreme Court referenced its decision in <u>People v. Howard</u>, 1 Cal.4th 1132 (1992), in support of its resolution of Petitioner's claim.  In <u>Howard</u>, the state court acknowledged that "[u]nder the Fourteenth Amendment, the record of the proceedings must be sufficient to permit adequate and effective appellate review," citing to <u>Griffin v. Illinois</u> and <u>Draper v. Washington</u>.  <u>Howard</u>, 1 Cal.4th at 1166.  The court in <u>Howard</u> held that because the defendant could not show the omissions in the record – three bench conferences and one chambers conference that could not be recreated – prejudiced his ability to argue each of his points, he was not entitled to relief.  <u>Howard</u>, 1 Cal.4th at 1164-66.  The Ninth Circuit has held similarly.  In <u>United States v. Carrillo</u>, 902 F.2d 1405-10 (9th Cir. 1990), where a portion of the transcript was missing, the court indicated a defendant must demonstrate that the missing portion specifically prejudices his appeal before relief is afforded.  <u>See also</u> <u>United States v. Anzalone</u>, 886 F.2d 229, 232 (9th Cir. 1989) ("even assuming there were omissions in the transcripts, appellant cannot prevail without a showing of specific prejudice").

Petitioner's overriding contention is that the record is not complete without the missing or lost juror questionnaires.  And while Petitioner is entitled to a complete record, a perfect one is not mandated by either the state or federal courts.  <u>See, e.g.</u>, <u>Mayer v. City of Chicago</u>, 404 U.S. at 194 ("A 'record of sufficient completeness' does not translate automatically into a complete verbatim transcript"); <u>People v. Harris</u>, 43 Cal.4th 1269, 1283 (2008) (a perfect record cannot always be achieved).

This court also notes defense counsel has an "obligation to bring to the trial court's attention any disagreement with the prosecutor's representations as to the content of the questionnaires." <u>People v. Heard</u>, 31 Cal.4th 946, 970 (2003).  Here, the prosecutor regularly relied upon the prospective jurors' responses to the juror questionnaire during voir dire.  Additionally, he specifically identified a number of those questionnaire responses when asked to

provide justification for exercising his peremptory challenges. (8 RT 1436-43.) More particularly, the prosecutor referred to the questionnaire responses provided by prospective jurors Klose, Harris, Gonzalez, Elliott, Del Rosario and Soto; he referenced voir dire exclusively when providing justification for striking prospective juror Troyer. (8 RT 1437-43.) Defense counsel then addressed the prosecutor's reasons for striking the prospective jurors at issue in written points and authorities filed with the court. (5 CT 1001-09.) It is significant to note however that counsel did not challenge the *content* of the questionnaire responses identified by the prosecutor, but rather the prosecutor's *interpretation of that content*. (See CT 1002-07.) In other words, counsel did not challenge that a particular thing was said, but rather what he believed was meant by it. At argument on the first Batson/Wheeler motion, the prosecutor made further references to the specific questionnaire responses provided by the stricken jurors, and defense counsel had another opportunity to present his challenges to the prosecutor's interpretations of those responses relied upon. (10 RT 1963-74.) Additionally, although the prosecutor was not required to state a justification for exercising a peremptory challenge against Katrina George when defense counsel made the second Batson/Wheeler motion, the prosecutor nevertheless stated his reason for doing so on the record. (11 RT 2203-06.) He expressly referenced George's questionnaire and a specific response revealing she had "been convicted of a credit card deal where she picked up somebody's purse and gone off and charged up about $400 on the credit cards." (11 RT 2206.) Defense counsel did not object to the statement or the prosecutor's recitation of the questionnaire response. (Ibid.) The above referenced portions of the reporter's transcript sufficiently allowed the California Supreme Court to examine the propriety of the prosecutor's exercise of peremptory challenges and whether or not purposeful discrimination was shown. That same record allows this court to adequately consider the same question as part of its de novo review.

To the degree Petitioner contends the loss of all juror questionnaires does not permit a meaningful comparative juror analysis, his argument is not persuasive. The questionnaires completed by other prospective jurors who were not selected to serve on the jury are of debatable value; only those seated to try the case are to be compared to the jurors against whom peremptory strikes were improperly exercised. See Miller-El v. Dretke, 545 U.S. at 239-45 (side-

by-side comparisons of jurors who were struck and those allowed to serve).

While the questionnaires of those allowed to serve are not a part of the record available to the reviewing courts, the questionnaires of six of the eight prospective jurors against whom the prosecutor exercised a peremptory strike are a part of the record. Additionally, the voir dire reporter's transcript is complete. And that same record reflects the trial court permitted the parties freedom to explore the prospective jurors' views on the death penalty and a variety of other subjects. More particularly, the attorneys were permitted to reference or read from the juror's questionnaire and ask questions pertaining to the juror's given responses. In so doing, "the salient material from the lost juror questionnaires survives in the reporter's and clerk's transcript through quotation and paraphrase." People v. Jordan, 146 Cal.App.4th 232, 251 (2006). The undersigned finds the available information to be more significant than the "clues" Petitioner paints the information to be.

Next, Petitioner contends the loss of the juror questionnaires prohibits him from discerning the racial composition of the various jury panels, information relevant to statistics and analysis of the prosecutor's peremptory strikes against minority venirepersons. However, the United States Supreme Court found this type of statistical evidence to be less compelling than side-by-side comparisons of those jurors against whom the prosecutor exercised a peremptory challenge and those jurors ultimately seated. Miller-El v. Dretke, 545 U.S. at 240. In this case, the complete reporter's transcript of the voir dire testimony allows for a meaningful, side-by-side comparison.

This case is distinguishable from Boyd v. Newland, 467 F.3d 1139, 1146-50 (2006), cited by Petitioner, where the Ninth Circuit granted relief on a Batson claim where the entire transcript of the voir dire was not before the court. There, the petitioner had raised a Batson claim on direct review and repeatedly requested the transcript of the entire jury voir dire, which the California courts had denied. The Ninth Circuit held that, while the Supreme Court had never explicitly held that an indigent defendant is entitled to an entire voir dire transcript as of right, since a comparative juror analysis was a centerpiece of the Batson analysis under Miller-El II, and that analysis could not be done in the absence of a voir dire transcript, the state court's refusal to

provide petitioner with the whole voir dire transcript in the face of a plausible <u>Batson</u> claim involved an unreasonable application of clearly established Supreme Court precedent. <u>Boyd</u>, 467 F.3d at 1146-50. Here, however, there is no refusal to provide Petitioner with an entire voir dire transcript; in fact, the transcript of the voir dire proceedings is indeed complete. The omissions in this case are the questionnaires rather than a stenographic record of the voir dire proceedings, a distinguishing fact making <u>Boyd</u> inapplicable.

Further, a comparative analysis was indeed performed by the undersigned, employing a complete record of the voir dire proceedings. The reporter's transcript includes the pertinent jury selection proceedings as well as the proceedings involving both <u>Batson/Wheeler</u> motions entertained by the trial court. In fact, it involves nearly 2,200 pages spanning 10 separate volumes of the reporter's transcript, commencing March 1, 1989, and concluding on April 10, 1989. (3 RT 370 - 12 RT 2566.) The prosecutor justified his peremptory challenges on both the jury questionnaires and the voir dire testimony. A review of the record reveals that the prosecutor also read a number of the challenged jurors' responses to specific portions of the questionnaire into the stenographic record. (8 RT 1436-43; 10 RT 1963-70.) Hence, despite the loss of the juror questionnaires, the record provides substantial evidence to support the trial court's decision to deny the defense motions, as well as for purposes of any review of the trial court's ruling in that regard.

The trial court and all counsel read the jurors' questionnaires. There was no dispute as to the content of those questionnaire responses. The salient material from the lost questionnaires survives in the form of references thereto in the reporter's transcripts of the voir dire testimony. Therefore, the fact certain jury questionnaires have been lost did not deny Petitioner his right to an adequate and effective review of his <u>Batson</u> claims. <u>Mayer v. Chicago</u>, 404 U.S. at 194. The California Supreme Court's determination that the record on appeal was adequate to permit meaningful review was not contrary to, nor an unreasonable application of, clearly established Supreme Court authority, nor was it based on an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to habeas relief on this claim and the undersigned RECOMMENDS that Claim GG be DENIED.

## Claims FF, PP & UU: The Presentation of Mitigating Evidence

Petitioner asserts that trial counsel rendered ineffective assistance by failing to reasonably investigate and present mitigating evidence. More specifically, he takes issue with counsels' refusal to stipulate to the admission of statements of Petitioner's relatives, failure to investigate and present additional evidence regarding his background, and failure to properly investigate, prepare and present mental health evidence. (ECF No. 330 at 235-591; ECF No. 361 at 83-109.) Respondent contends the California Supreme Court's rejection of Petitioner's ineffective assistance claims related to personal background mitigation evidence was not contrary to, nor an unreasonable application of, Supreme Court precedent. (ECF No. 345 at 99-144.)

### *The Applicable Legal Standards*

"The Sixth Amendment right to counsel in a criminal trial includes 'the right to the effective assistance of counsel.'" Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). "This right extends to 'all critical stages of the criminal process,' including capital sentencing." Id. (citations omitted). The Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is well established. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984).

### Deficient Performance

Under the first prong of the Strickland test, a petitioner must show that counsel's conduct failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687. There is "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689). Petitioner must rebut this presumption by demonstrating that his counsel's performance was unreasonable under prevailing professional norms and was not the product of "sound trial strategy." Strickland, 466 U.S. at 688–89. Judicial scrutiny of defense counsel's performance is

"highly deferential," and thus the court must evaluate counsel's conduct from the perspective at the time it occurred, without the benefit of hindsight.  Id. at 689.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'"  Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 688).  Nevertheless, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate."  Summerlin, 427 F.3d at 629.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.  But,

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.

Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690–91).

With respect to defense counsel's role in presenting penalty phase mitigating evidence, "[t]he duty to investigate is critically important."  Summerlin, 427 F.3d at 630.  As explained by the Ninth Circuit, counsel in a capital case has an affirmative duty to unearth all relevant mitigating information because

> [t]he determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors give the jury broad latitude to consider amorphous human factors, to weigh the worth of one's life against his culpability.

Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999).

This duty on the part of defense counsel to investigate begins prior to trial.  It is well-recognized that competent strategy decisions cannot be made regarding presentation of mitigating

evidence without a foundation of knowledge based upon a thorough defense investigation that was completed long before jury selection begins.  Williams v. Taylor, 529 U.S. at 395 (holding that the petitioner received ineffective assistance in connection with the penalty phase of his trial and noting the record established "that counsel did not begin to prepare for that phase of the proceeding until a week before the trial"); Earp v. Ornoski, 431 F.3d at 1175 ("The Supreme Court has conveyed a clear, and repeated, message about counsel's sacrosanct duty to conduct a full and complete mitigation investigation before making tactical decisions").  Counsel should attempt to discover "'*all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"  Wiggins, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ["ABA Guidelines"] 11.4.1(c), p. 93 (1989), emphasis in original); see also Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999) ("It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase").  Where "'indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued."  Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007) (quoting Stankewitz v. Woodford, 365 F.3d 706, 719–20 (2004)); Summerlin, 427 F.3d 623, 632 (9th Cir. 2005) (counsel found ineffective for failing to obtain readily available mental health evidence when he had been told by defendant's prior attorney that defendant may be mentally ill); Stankewitz, 365 F.3d at 719–22 (counsel found ineffective for failing to thoroughly investigate the defendant's childhood, history of drug abuse and mental health problems notwithstanding the fact that counsel was on notice that such an investigation might yield mitigating evidence); Mayfield v. Woodford, 270 F.3d 915, 927–28 (9th Cir. 2001) (counsel ineffective for failing to consult appropriate medical experts or collect relevant records after "his investigator's limited efforts revealed evidence of diabetes and substance abuse," and for failing to explain to the jury the relevance of the evidence that was presented).

Of course, if defense counsel conducts a reasonable investigation, and nothing put counsel on notice of the existence of certain evidence, counsel cannot be faulted for failing to locate and present such evidence.  Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998).  In addition, "a

lawyer may make reasonable decisions that render particular investigations unnecessary." Id.

Mitigating evidence counsel should consider includes "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Wiggins, 539 U.S. at 524 (citing ABA Guidelines 11.8.6, p. 133 (1988), emphasis omitted). Counsel has a "'duty to investigate and present mitigating evidence of [any] mental impairment.'" Summerlin, 427 F.3d at 630 (quoting Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)). Furthermore, in preparation for the penalty phase, "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002). "The defendant's history of drug and alcohol abuse should also be investigated." Summerlin, 427 F.3d at 630 (citing Jennings v. Woodford, 290 F.3d 1006, 1016–17 (9th Cir. 2002)). In addition to investigating the mitigating evidence, "[c]ounsel also has an obligation to present and explain to the jury all available mitigating evidence." Hamilton v. Ayers, 583 F.3d 1100, 1113 (9th Cir. 2009) (citing Correll v. Ryan, 539 F.3d 938, 946 (9th Cir. 2008)); see also Stankewitz v. Wong, 698 F.3d 1163, 1172 (9th Cir. 2012) (citing Hamilton, 583 F.3d at 1113).

When determining whether the state court's application of the Strickland standard was reasonable, the federal court must be "doubly" deferential. Richter, 562 U.S. at 105. In this regard, the "standard for judging counsel's representation is a most deferential one" and the reasonableness standards of § 2254(d) are also "highly deferential." Id. Further, because the Strickland rule is a "general" one, courts have "more leeway ... in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial." Id. at 101; Premo v. Moore, 562 U.S. 115, 122–23 (2011). As the Supreme Court explained in Richter, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." 562 U.S. at 105.

**Prejudice**

The second prong of the Strickland test requires a petitioner to show that counsel's

conduct prejudiced him. <u>Strickland</u>, 466 U.S. at 691–92. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A reasonable probability is one "'sufficient to undermine confidence in the outcome.'" <u>Summerlin</u>, 427 F.3d at 640 (quoting <u>Strickland</u>, 466 U.S. at 693). "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" <u>Richter</u>, 562 U.S. at 112 (quoting <u>Strickland</u>, 466 U.S. at 693). "The likelihood of a different result must be substantial, not just conceivable." <u>Id.</u>

Although, "[i]n establishing prejudice under *Strickland*, it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." <u>Correll</u>, 539 F.3d at 951–52 (citing <u>Williams v. Taylor</u>, 529 U.S. at 398); <u>see also</u> <u>Rompilla v. Beard</u>, 545 U.S. 374, 393 (2005) ("[A]lthough we suppose it is possible that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test"). Instead, in evaluating prejudice, the court must "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently," <u>Bonin v. Calderon</u>, 59 F.3d 815, 834 (9th Cir. 1995), and evaluate whether the difference between what was presented and what could have been presented is sufficient to "undermine confidence in the outcome" of the proceeding. <u>Strickland</u>, 466 U.S. at 694. Prejudice is established in this context if "there is a reasonable probability that at least one juror would have struck a different balance" between life and death. <u>Wiggins</u>, 539 U.S. at 537.

When examining the effect of counsel's failure to unearth and present mitigating evidence at the penalty phase, the Supreme Court has stressed the relevance of evidence of a petitioner's abusive childhood and mental health problems. It has been recognized that there is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." <u>Boyde v. California</u>, 494 U.S. 370, 382 (1990) (quotation and emphasis omitted). The Ninth Circuit recently described the Supreme Court's consideration

of such evidence:

> In *Wiggins*, ... a capital habeas petitioner's defense counsel failed to introduce social history mitigation evidence during the penalty phase, including evidence that "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother [, and that h]e suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Wiggins*, 539 U.S. at 535. The Court pointed out that this is the type of evidence that is "relevant to assessing a defendant's moral culpability," *id.*, and held that the failure to introduce this evidence at the penalty phase was prejudicial: "[H]ad the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* at 536.

Stankewitz v. Wong, 698 F.3d at 1175.

### The California Supreme Court's Application of the Strickland Standard

Petitioner contends the California Supreme Court applied the Strickland standard inappropriately in a number of ways that affected its consideration of all of his Sixth Amendment claims. To satisfy 28 U.S.C. § 2254(d)(1), a petitioner must establish that the California Supreme Court's "decision … was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Petitioner's argument here falls within the first part of the subsection (d)(1) standard. He argues the California Supreme Court applied a rule "that contradicts the government law set forth" in Supreme Court cases. Price v. Vincent, 538 U.S. 634, 640 (2003).

### Inappropriate Pleading Standard

Initially, Petitioner complains that the California Supreme Court applied a higher pleading standard in assessing his ineffective assistance of counsel claims than was permitted by the Supreme Court in Strickland. According to Petitioner, the California Supreme Court created a pleading standard in People v. Duvall, 9 Cal.4th 464, 474 (1995), that directly contravenes a dictate of Strickland that ineffective assistance of counsel claims be adjudged without a presumption that the trial was fair. In Strickland, the Supreme Court held that a Sixth Amendment challenge to counsel's effectiveness is an "attack on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 697. As a result, the Court observed, "[t]he principles governing ineffectiveness claims should apply in federal collateral

117

proceedings as they do on direct appeal or in motions for a new trial." Id. The Court specifically

mentioned the presumption of finality of criminal judgments that is recognized in habeas in

stating that "no special standards ought to apply to ineffectiveness claims made in habeas

proceedings." Id., at 97–98.

Even assuming the California Supreme Court's presumption of correctness described in

Duvall were to run afoul of the United States Supreme Court's holding in Strickland, and further

assuming, for the sake of argument, that the California Supreme Court must have applied that

presumption of correctness in considering Petitioner's ineffective assistance of counsel claims,

this court may only find § 2254(d)(1) satisfied if the California Supreme Court's decision was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). It is difficult to

find the "rule" Petitioner cites from Strickland to be "clearly established" when he cites no post-

Strickland Supreme Court or other authority citing or applying that "rule." To be "clearly

established federal law" the rule must have been "'squarely established by th[e] Court.'" Richter,

562 U.S. at 101 (quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)). Petitioner's entire

argument hinges on one statement in a more than thirty-year-old decision. Further, while the

California Supreme Court may have been incorrect in its interpretation of the law, its decision

only runs afoul of § 2254(d)(1) if that interpretation also "was so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." Richter, 562 U.S. at 103. See also Williams v. Taylor, 529 U.S. at 410

("an unreasonable application of federal law is different from an incorrect application of federal

law"). Even making all the assumptions regarding the existence of the rule in the state court and

its application in this case, this court cannot find the California Supreme Court's decision to be so

lacking that it runs afoul of § 2254(d)(1).

### Improper Prejudice Standard

Petitioner next argues that the California Supreme Court applied an incorrect test for

determining prejudice stemming from the alleged ineffective assistance of counsel by relying

upon the United States Supreme Court's decision in Lockhart v. Fretwell, 506 U.S. 364 (1993), to

1    modify the <u>Strickland</u> standard.  In <u>Fretwell</u>, the Court was confronted with a unique situation.

2    There was no question that the petitioner's trial attorney acted unreasonably in failing to object to

3    consideration of an aggravating factor used to determine Fretwell's penalty.  <u>Id.</u> at 369 n.1.

4    Rather, the issue was whether that failure prejudiced the petitioner.  At the time of trial, the

5    answer to that question was "yes."  <u>Id.</u> at 367.  The Eighth Circuit Court of Appeals had ruled the

6    use of that aggravating factor unconstitutional.  <u>Id.</u>  However, later, after the petitioner sought

7    federal habeas relief, the Court of Appeals overruled its decision and held that reliance on that

8    aggravating factor did not violate the federal constitution.  <u>Id.</u>  Recognizing that strict application

9    of the <u>Strickland</u> standard under those circumstances would result in "an error in [the petitioner's]

10   favor," the Court looked beyond <u>Strickland</u>'s outcome determinative standard and considered

11   whether the failure of petitioner's trial counsel to object rendered the defendant's trial "unreliable

12   or the proceeding fundamentally unfair."  <u>Id.</u> at 372.  It held that the result of Fretwell's

13   sentencing proceeding "was neither unfair nor unreliable."  <u>Id.</u> at 371.  Accordingly, the Court

14   found Fretwell suffered no prejudice as a result of the performance of his counsel.

15         In April 2000, the United States Supreme Court held that a state court erred in finding that

16   the Court's decision in <u>Fretwell</u> modified the standards governing ineffective assistance of

17   counsel claims announced in <u>Strickland</u>.  <u>Williams v. Taylor</u>, 529 U.S. at 391–98.  The Court

18   recognized that there may be limited situations in which "it would be unjust to characterize the

19   likelihood of a different outcome as legitimate 'prejudice.'"  <u>Id.</u> at 391–92.  The Court

20   characterized cases such as <u>Fretwell</u> as ones involving an unreasonable action of a trial attorney

21   that did "not deprive the defendant of any substantive or procedural right to which the law entitles

22   him."  <u>Id.</u> at 393 n.17.  It concluded that the state court holding that <u>Fretwell</u> modified <u>Strickland</u>

23   "was contrary to, or involved an unreasonable application of, clearly established Federal law."

24   <u>Id.</u> at 399.

25         Petitioner herein argues that the California Supreme Court, "both before and after its

26   decision in Mr. Alvarez's first habeas petition, has repeatedly relied upon <u>Fretwell</u> when

27   adjudicating ordinary ineffective-assistance claims."  (ECF No. 330 at 243.)  However, almost

28   every case cited by Petitioner in support of that contention pre-dates the United States Supreme

Court's April 2000 decision in Williams.  (See ECF No. 330 at 243-45 [citing People v. Earp, 20 Cal.4th 826, 870 (1999) (citing Fretwell for the prejudice standard and noting that the challenged conduct must have "some effect ... on the reliability of the trial process"); In re Avena, 12 Cal.4th 694, 722 & n.5 (1996) (describing the lack of clarity about application of a Fretwell standard and finding no prejudice under either Strickland or Fretwell); In re Harris, 5 Cal.4th 813, 833 (1993) ("[T]his second prong of the Strickland test is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair'" quoting Fretwell, 506 U.S. at 372); In re Clark, 5 Cal.4th 750, 766 (1993) (To succeed on an ineffective assistance of counsel claim, a petitioner must show that the attorney's "incompetence ... resulted in a fundamentally unfair proceeding or an unreliable verdict")].)

The only post-Williams case cited by Petitioner is In re Cox, 30 Cal.4th 974 (2003).  (ECF No. 330 at 244.)  In Cox, the California Supreme Court quoted the Fretwell standard from its earlier decision in Clark, but did not include a citation to Fretwell in doing so.  Cox, 30 Cal.4th at 1016.  Here, although the California Supreme Court's first decision addressing Petitioner's ineffective assistance of counsel claims (asserted in case number S073670) was rendered in 1998, before Williams was decided, its second consideration of his ineffective assistance of counsel claims (asserted in case number S146501) occurred in 2011, after Williams was decided.  Neither denial included a citation to Fretwell, nor did the California Supreme Court's opinion in Petitioner's direct appeal.

When determining whether a state court's decision was contrary to or an unreasonable application of federal law, this court must "presum[e] that state courts know and follow the law." Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002)); see also Clark v. Arnold, 769 F.3d 711, 724 (9th Cir. 2014).  Of course, Petitioner may rebut this presumption, but he has not done so here.  Petitioner has shown only that on occasion after the United States Supreme Court issued its decision in Williams, the California Supreme Court mentioned the prejudice standard based upon Fretwell.  Yet, in the vast number of cases decided around the time of the California Supreme Court decisions in Petitioner's direct appeal

and habeas petitions, the California Supreme Court properly cited and/or applied the prejudice standard announced in Strickland in addressing ineffective assistance of counsel claims. The state court decision is entitled to the benefit of the any doubt. Visciotti, 537 U.S. at 24. Petitioner's showing is insufficient to convince this court that the California Supreme Court likely applied an incorrect prejudice standard to his claims.

### Failure to Consider Cumulative Effect of Errors

Finally, Petitioner argues that the California Supreme Court also failed to consider the effect of his counsels' alleged errors cumulatively. (ECF No. 330 at 245.) He relies primarily on a single statement in a dissenting opinion indicating that the California Supreme Court majority had, in that case, inappropriately divided one of the petitioner's claims into subparts and then applied timeliness standards to each subpart, rather than to the claim as a whole. In re Robbins, 18 Cal.4th 770, 820–21 (1998) (Kennard, J., dissenting). Petitioner's argument is unpersuasive. He has provided this court with no basis to find that the California Supreme Court engaged in a "practice of diluting a petitioner's prejudice evidence by not considering cumulative prejudice" (ECF No. 330 at 245) resulting in a contrary to or unreasonable application of United States Supreme Court precedent.

### *Claim FF: Failure to Stipulate to the Admission of Certain Statements*

Petitioner contends defense counsel rendered ineffective assistance of counsel for refusing to stipulate to the admission of certain third-party statements, tendered through a defense expert witness, for their truth. Respondent asserts trial counsels' actions were not ineffective, and in fact were tactical.

### The California Supreme Court's Determination

In rejecting Petitioner's claim, the California Supreme Court found as follows:

> In his case, defendant called Gail McGarrity to the witness stand. As noted, she testified to her opinion, as a cultural anthropologist, on matters concerning his background and character in Cuba, and expressed the view that he suffered from conditions including "profound emotional immaturity" and "extreme culture shock." In so doing, she stated that she had been unable to go to Cuba to conduct an investigation and hence had been unable to corroborate certain information on which she relied. As she was relating certain

out-of-court statements on direct examination by Attorney Gable, Prosecutor Marlette made a hearsay objection and requested the superior court to instruct the jury that it could not consider any such statement for its truth. Attorney Gable declared that he was not offering statements of that sort for that purpose, but solely to reveal the basis of her opinion. He also declared that he did not object to the instruction requested. The superior court largely overruled the hearsay objection, and instructed the jury that it could not consider any out-of-court statement she related for its truth, but only as a basis for her opinion. Attorney Gable completed the direct examination. Prosecutor Marlette then subjected her to cross-examination. After she left the stand, he moved the superior court to "withdraw" the instruction it had given at his request, and to instruct the jury instead that it could consider any out-of-court statement she related for its truth. The superior court declared that it would do so only if defense counsel stipulated. They refused. It effectively denied the motion.

Complaining of defense counsel's refusal to stipulate to Prosecutor Marlette's motion, defendant contends that he was provided with ineffective assistance of counsel in violation of the Sixth Amendment. We disagree.

Defendant does not demonstrate either deficient performance or prejudice. As to the absence of deficient performance: Evidently, Prosecutor Marlette made his motion in order to prevent the jury from drawing any inference favorable to defendant or adverse to the People based on McGarrity's inability to go to Cuba to conduct an investigation and her consequent inability to corroborate certain information on which she relied. Without offending any objective standard of professional reasonableness, defense counsel could have refused to stipulate, and apparently did refuse to stipulate, in order to allow the jury to draw precisely such an inference. Of course, they had to pay a price for their refusal: They had to give up an opportunity to use the out-of-court statements she related for their truth. The price, however, was not too high: the statements in question had little independent mitigating weight, coming as they did largely from defendant himself, who was affected by self-interest. As to the absence of prejudice: There is no reasonable probability of an effect on the outcome. By giving up an opportunity to use these statements for their truth, they gave up little.

> FN. 38. To the extent that defendant claims that, because defense counsel refused to stipulate to Prosecutor Marlette's motion, he was provided with ineffective assistance of counsel in violation of article I, section 15 of the California Constitution, he is unsuccessful. Here, as with the Sixth Amendment to the United States Constitution, he would have to demonstrate deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of an effect on the outcome. (E.g., *People v. Ledesma, supra*, 43 Cal.3d at pp. 215–218.) As explained in the text, he cannot do so.
>
> In a single paragraph in his reply brief, defendant claims for the first time that he was provided with ineffective assistance of counsel in violation of the Sixth Amendment if any of defense counsel's acts or omissions resulted in a failure to preserve any of 11 issues for review. Again, he "asserts the point perfunctorily," and "[w]e deny it in the same fashion." (*People v. Ashmus, supra*, 54 Cal.3d at p. 1011, fn. 29.)

<u>People v. Alvarez</u>, 14 Cal.4th at 240-41.

**Relevant Excerpts of the Record Below**

Gail McGarrity, a cultural anthropologist retained by the defense, began testifying on Tuesday, July 25, 1989. Direct examination briefly continued into the morning of Wednesday, July 26, before the prosecutor began cross-examination. (29 RT 6580-680; 30 RT 6681-87.)

During direct examination, the issue giving rise to Petitioner's claim surfaced during McGarrity's response to Mr. Gable's question about whether Petitioner entered military service in Cuba:

> [McGARRITY]: His father confirmed to me on the phone that he had been in the military, that the defendant seems very confused about exactly when he went into it, what his experiences were.
> There - - there seems that this is largely attributable to the fact that he suffered an accident when he was in the military.
> He was in the back of a military truck, and he fell out of the truck and was run over by a passing vehicle, and he suffered pretty severe injuries.
> He was in a hospital in Havana for quite a long period of time, and his father stated to me on the phone that he had a metal plate or some kind of insertion put into his brain. His father also said that he'd been told by - -
> MR. MARLETTE: Your Honor, I'm going - - I will object at this point, that this seems to simply be hearsay, unrelated to any kind of cultural or that he's in Cuba. It's just as if Mr. Alvarez is testifying, it's hearsay.
> MR. GABLE: Your Honor, if we need to have a hearing outside the presence, that's fine.
> THE COURT: Ladies and gentlemen, would you please step outside for a few minutes?
> (The jury was excused)
> MR. MARLETTE: The objection I have, and with all due respect to the witness, it appears that she has very impressive qualifications in the cultural area, but it seems that what we're getting into is just wholesale hearsay about the defendant's early life, that is not related to the witness's expertise.
> I can understand that some of these things are foundations for her expert opinion, as it relates to the cultural influences where Mr. Alvarez grew up, on his later emotions, then perhaps that hearsay is admissible, but it seems that we're going far afield from her expertise, particularly when we're getting into epileptic seizures and some kind of psychological problems and having a metal plate in his head.
> And I would ask that we be limited to the witness' expertise.
> THE COURT: Mr. Gable?
> MR. GABLE: First of all, I think this is - - I'm having difficulty understanding the objection.
> If it's hearsay, this is not offered for the truth of the matter, it's offered under Section 801 as the information that the witness acquired for the purpose of forming her opinions, and - -

123

THE COURT: In particular, though, the reference to medical difficulties, particularly a metal plate - -

MR. GABLE: Well, she's a - - first of all, one of her sub-specialties is medical anthropology. As far as whether or not Mr. Alvarez has a metal plate in his head, I don't think that this witness knows that for a fact.

And I think, if I asked her in front of the jury she'd say she didn't know that for a fact. That it was just a report she got from the father, that something was put in his head.

I think that if that's the only, if that's the only problem that we're having an objection to, fine, I don't have a problem with not talking about that anymore.

We'll talk about that tomorrow when Dr. Vickery [*sic*] gets here, but if there's more objection along these lines, I think we ought to deal with it now.

THE COURT: No, that's my only concern.

MR. GABLE: Okay.

Because otherwise, I think everything that's being done here is totally proper, and I don't see where she's going into anything that is outside of the necessary information, which she had to gather in order to render her opinion.

And I think that, if I were to ask her that, she would say that that was what, she got this information so she could give me an opinion.

THE COURT: All right.

MR. MARLETTE: If we go, though, to the factors that involve the witness' expertise of the cultural situation in Cuba, we come up with very few ways, and that is that children might drink at a young age and that was accepted, that there were extended families.

We got into kind of an African slant to the religion before the revolution, and every once in a while, those things are tied into, and the defendant drank at an early age, or - - and the defendant went around from aunt to grandparent and so forth.

But other than that, we're getting into things about his education, and his school, that do not have particular significance in terms of the cultural aspect, which this witness is being presented for.

THE COURT: I think, I understand your objection, but I think, this witness is presenting basically the defendant's background in relationship with other people, not necessarily just limited to any difference in any cultural differences between what the average United States citizen may have experienced as opposed to what somebody else from another country may have experienced.

MR. MARLETTE: In that case, if we're getting into psychology, I'm not aware of an individual psychological expertise that the witness has.

It was my understanding that it was her expertise in cultural anthropology and especially the social and medical anthropology, but relating to the societal conditions to what the defendant is doing.

And essentially, what we've ended up with is a wholesale hearsay exception, despite the fact that what she's relating may not have any specific significance to her expertise.

THE COURT: Okay.

With the exception of the reference to the metal plate, the objection is overruled.

MR. MARLETTE: May I ask that the witness be, or that the jury be admonished, as Mr. Gable explained, that these things are not for the truth of the matter, that they are simply foundational?

THE COURT: Yes.

MR. GABLE:  I would have no objection, if the Court wanted to read Section 801 of the Evidence Code to the jury.  There's also a CALJIC instruction on the issue, that may be - -

MR. MARLETTE:  I think it would be appropriate to admonish them at this time while the witness is testifying.

(29 RT 6620-25 .)[15]  Thereafter, the trial court instructed the jury accordingly.  (29 RT 6625-26.)

The issue arose again on cross-examination when the prosecutor questioned McGarrity about fighting behavior versus assaultive behavior, and then began to inquire into McGarrity's interpretation of certain instances of conduct by Petitioner that she did not consider to be theft behavior (30 RT 6687-97):

MR. MARLETTE: Now, you also understand that Mr. Alvarez has been convicted by this jury of theft behavior, stealing?

A.  I do understand that, yes.

Q.  And were there instances of stealing in Cuba that you did not talk about yesterday - -

A.  No.

Q.  - - on direct?

A.  Absolutely none at all.

Q.  What about the motorcycle?  We didn't hear about the motorcycle yesterday, did we?

A.  No, we didn't, but I didn't consider that taking the bike and bringing it back to someone of their same age who they knew, was the same as stealing it because they returned it.  Maybe I'm incorrect in that.

Q.  Let me ask you this:  Do you consider that is a situation where Mr. Alvarez wanted something, and took it without permission?

A.  I think that, that's definitely what happened, but I was under the impression that the term "joy riding" was used for adolescents, including in this country, where they take something, and it's illegal to do it but they bring it back.

So I didn't think it was the same as stealing it.

Q.  Where did you get the term "joy riding?"

A.  I heard it used in the United States for youngsters taking cars and bringing them back without permission.

Q.  Who described this incident with taking the motorcycle in Cuba as joy riding?

A.  I did, because when he was reprimanded by the juvenile authorities there, they didn't charge him with theft.

Q.  But there was no mention of this situation in Cuba, where he wanted something that belonged to somebody else, and he just took it.  There was not mention [of] that

[15] Prior to this point, McGarrity had thrice made reference to the fact she had been unable to travel to Cuba to corroborate information she had been provided by Petitioner.  (29 RT 6592, 6606, 6617.)

125

yesterday, was there?

    A.  There wasn't, but it wasn't my intent to conceal it.  I thought I would have a chance to talk about it today.

    Q.  Understanding that the reason we are here is because of Mr. Alvarez's convictions, including theft behavior, would you have had this jury make the important decision they have to make without that important information, that you had to give them?

    MR. GABLE:  Your Honor, I'm going to object, and I'd ask the Court to reread section 801 of the Evidence Code, which relates to the fact that the jury cannot consider any of this information for the truth of the matter asserted, but only in relying upon or in ascertaining the credibility of the expert witness, because the way it's posed right now, it[] sounds like the prosecutor is eliciting this information for the truth, and it's not for the truth of the matter at all, it's based upon hearsay.

    MR. MARLETTE:  Testing her opinion, your Honor, that she's given because she has left significant facts out of the basis for that opinion.

    THE COURT:  Objection is overruled.  She has testified as an expert.  She is subject to extensive cross examination.

(30 RT 6697-99.)

Cross-examination continued with the prosecutor inquiring into an incident involving Petitioner having been found in the possession of an item of contraband – specifically, ducks – in Cuba and serving time in jail as a result.  (30 RT 6699-704.)  Further questioning and testimony covered these same subjects (assaultive or fighting behavior and theft behavior or taking things belonging to others without permission) and how they related to McGarrity's opinion that Petitioner suffered from culture shock in the United States.  (30 RT 6704-10.)  The prosecutor then asked McGarrity the following:  "You know, in talking about the extent of the fighting problem or in talking about the motorcycle situation and calling that joy riding, and then it came back and he intended to give it back, and in fact, even in talking about the situation that landed him in prison, in Cuba, what was your primary source for all that?;" McGarrity responded, "His father and the defendant."  (30 RT 6710.)  Similar questioning continued on these topics, and additional testimony addressed the documentation available to and relied upon by McGarrity, in addition to the information provided by Petitioner and his father.  (30 RT 6711-36.)  Thereafter, McGarrity's testimony concerned Petitioner's experiences upon arriving in the United States, including the detention camps, his time with the Metcalf family, his conduct while residing in Los

Angeles, including the incident wherein Petitioner killed a man with a knife, and whether or not Cuban cultural influences made certain acts involving assaultive behavior, theft and murder acceptable. (30 RT 6736-72.)

After redirect and recross, McGarrity was excused, subject to recall. (30 RT 6772-80.) Outside the presence of the jury, the prosecutor advised the court that he wished to withdraw his earlier request that the jury be instructed pursuant to California Evidence Code section 801, and instead, that the jury be instructed "they may consider the statements that the witness relied on for the truth of the matter." (30 RT 6782.) He explained his reason for the request: "because the witness said a number of times she felt hampered by not being able to go to Cuba" and indicated he was "asking the Court to accept [his] waiver of a hearsay objection." (30 RT 6783.) The trial court advised that it would only reverse an earlier evidentiary ruling if "by stipulation both sides wish to do that." (30 RT 6783.) In response to the court's comment, Mr. Gable advised that he was "not going along with that" because the jury was advised, at the prosecutor's request, pursuant to that particular Evidence Code section and now that the prosecutor's efforts to discredit McGarrity's testimony would benefit from the information she relied upon in forming her opinion being regarded as offered for their truth, it would be unfair to rescind the earlier evidentiary ruling. (30 RT 6783-84.) After the court excused the jury for the day, Mr. Gable indicated he was not prepared to argue the issue. (30 RT 6786.) The court later clarified that it was only willing to "reverse an evidentiary ruling after a witness" has finished testifying with a stipulation by the parties. (30 RT 6792.) No such stipulation or agreement between the parties concerning the expert's testimony and its nature was reached. (30 RT 6792; 31 RT 6794.)[16]

---

[16] During those Wednesday afternoon proceedings, the trial court indicated a Friday morning hearing would only be necessary should the parties reach an agreement and wish to enter a stipulation on the record. No proceedings were recorded for Friday, June 28, 1989, and proceedings resumed again on August 2, 1989.

When trial resumed on August 2, 1989, McGarrity was recalled by the defense during the afternoon session. (31 RT 6837.) That testimony concerned a tape-recorded interview of Petitioner's father, obtained by an American journalist while on a recent trip to Cuba, as well as additional information provided to McGarrity via telephone by Petitioner's brother, sister and father. It served to corroborate information she had previously been provided by Petitioner. (31 RT 6838-55.)[17]

**Analysis**

The California Supreme Court's determination that defense counsel was not ineffective for failing or refusing to stipulate to allow the jury to considering certain evidence for its truth does not amount to a determination contrary to, or involving an unreasonable application of, federal law.

To recap, in asserting a claim of ineffective assistance of counsel, federal law requires a petitioner must first show that counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. A petitioner must also prove prejudice, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 693.

*Deficiency*

As to the first prong, the California Supreme Court's determination that defense counsel did not perform deficiently is supported by the record. The prosecutor previously objected to certain testimony given by McGarrity on direct, on the basis it was hearsay. While the prosecutor's objection was overruled, defense counsel did not object to the prosecutor's request that the jury be instructed at that point that the testimony given by McGarrity – namely, that based upon information provided to her by Petitioner or his father – was to be considered for a

_____

[17] Following McGarrity's testimony, the defense rested and the trial court preliminarily instructed the jury. (31 RT 6855-82.) Final jury instructions were given following closing arguments. (31 RT 7025-31.)

limited purpose: to wit, it formed the basis for her expert opinion and was not to be considered for its truth. There is nothing unusual about the instruction or counsel's acquiescence to it being given.

In California, during the relevant period, an expert could rely upon and testify regarding the sources on which the expert has based his or her opinions, including hearsay of a type that professionals in that same field would reasonably rely upon. People v. Gardeley, 14 Cal.4th 605, 618-19 (1996). And an expert witness in a capital case may testify about a defendant's psychosocial history. See In re Scott, 29 Cal.4th 783, 823 (2003) (noting an expert witness "may base an opinion on reliable hearsay, including out-of-court declarations of other persons"); People v. Hughes, 27 Cal.4th 287, 396 (2002); In re Gay, 19 Cal.4th 771, 816 (1998).

When the prosecutor originally objected on the basis of hearsay during McGarrity's testimony on direct, the expert witness's credibility had not yet been subjected to any challenge. While the prosecutor's hearsay objection was overruled but for McGarrity's reference to a metal plate, the jury was instructed it was to consider the evidence for a limited purpose rather than for its truth.

But when the prosecutor later offered to "withdraw" his request to have the jury so instructed, the landscape had changed. The prosecutor had since subjected McGarrity to a cross-examination that may have harmed her credibility with the jury. And although the prosecutor couched his request as one weighing in Petitioner's favor – that the People also had an interest in ensuring Petitioner received a fair trial given the defense's inability to obtain the information it had hoped to obtain in Cuba – defense counsel was not required to see it that same way. And obviously defense counsel did not share in that interpretation of the prosecutor's actions. Rather, defense counsel reasonably believed the prosecutor was seeking to allow the jury to consider the evidence at issue for its truth at that point because he (the prosecutor) had successfully attacked McGarrity's credibility with the jury. Defense counsel chose this tactic to counter the prosecutor's efforts to discredit McGarrity on the basis of her reliance upon information provided by Petitioner or his family.

The information provided by Petitioner and his family to McGarrity regarding his

upbringing and youth in Cuba would no longer have the same force or effect it may have had

prior to cross-examination.  The undersigned thus finds the California's Supreme Court's

determination that Mr. Gable's refusal to stipulate on this issue was the product of a tactical

choice, rather than any deficiency, is reasonable and not contrary to Supreme Court precedent,

when evaluating counsel's conduct from his perspective at the time it occurred, without the

benefit of hindsight.  Strickland, 466 U.S. at 689.

　　　　Petitioner claims that by refusing to stipulate, defense counsel deprived him of the

opportunity to present mitigating evidence; he cites to Ake v. Oklahoma, 470 U.S. 68, 76 (1985)

in support of his assertion.  There, the indigent defendant's sole defense at trial was insanity, yet

he was denied the assistance of a court-appointed psychiatrist (or the funds to retain one's

assistance) who would have been able to provide testimony regarding the defendant's mental state

at the time he committed the crimes, as well as to provide mitigating evidence for the jury's

consideration at the time of capital sentencing.  Ake, at 76-87.  Here, in contrast, the trial court

did not deny Petitioner the opportunity to present mitigating evidence through the testimony of a

defense expert.  McGarrity was retained for the express purpose of offering mitigating evidence

during the penalty phase of Petitioner's trial, and she did just that.

　　　　Next, asserting a jury is required to consider any aspect of a defendant's character or

record, Petitioner cites to Lockett v. Ohio, 438 U.S. 586 (1978).  Lockett too is distinguishable.

There, an Ohio statute allowed only a "limited range of mitigating circumstances" that could be

considered by the sentence.  Namely, whether the victim induced or facilitated the offense,

whether the offender was under duress, coercion or strong provocation making it unlikely the

offense would have otherwise been committed, and lastly, whether the offense was a product of

the offender's mental deficiency or psychosis.  Lockett, 438 U.S. at 597-608.  California's death

penalty statute does not limit the mitigating circumstances a jury may consider as did the one at

issue in Lockett.  Rather, California's statute affords a defendant the opportunity to present

evidence "as to any matter relevant to … mitigation, … including, but not limited to, … the

defendant's character, background, history, mental condition and physical condition."  (Cal. Pen.

Code, § 190.3.)  Furthermore, Petitioner's citation to Eddings v. Oklahoma, 455 U.S. 104 (1982),

130

for the same proposition - that a jury is required to consider any aspect of defendant's character or record – is misplaced.  In Eddings, despite a statute that permitted the sentencer to consider all relevant mitigating evidence, the trial court refused to consider "the circumstances of Eddings' unhappy upbringing and emotional disturbance," finding only his youth was properly regarded. Eddings, 455 U.S. at 109.  The Oklahoma Court of Criminal Appeals "found that the evidence in mitigation was not relevant because it did not tend to provide a legal excuse from criminal responsibility."  Id. at 113.  The Supreme Court held "that the limitations placed by [those] courts upon the mitigating evidence they would consider violated the rule in Lockett."  Id. at 113.  A sentencer may not refuse to consider any relevant mitigating evidence as a matter of law.  Id. at 114.  This case does not involve either the trial court or sentencer's refusal to consider an appropriate mitigating circumstance of the type at issue in Eddings.

And, unlike the situations presented in Penry v. Lynaugh, 492 U.S. 302, 325-28 (1989) (subsequently overruled on other grounds in Atkins v. Virginia, 536 U.S. 304 (2002),) and Hitchcock v. Dugger, 481 U.S. 393, 395-99 (1987), Petitioner's jury was not precluded from considering, or instructed not to consider, mitigating evidence.  The trial court's instruction to the jury that McGarrity's testimony regarding the information or statements provided to her by Petitioner and Petitioner's family were not to be considered for their truth,[18] but rather as the bases for her opinions, does not amount to a circumstance in which Petitioner was deprived of an opportunity to present any relevant mitigating evidence, nor does it equate to those cases wherein the applicable statutory authority limited the type of mitigating evidence a jury or sentencing court could properly consider.  The jury heard the evidence and it was permitted to consider that evidence by way of McGarrity's opinions.  It was not limited to consider only certain types of mitigating evidence or only that evidence enumerated by statute.

Also, a limiting instruction concerning the manner in which certain evidence may be considered by the jury does not equate to the loss of an opportunity to present mitigating evidence to the jury.  "The rule allowing all relevant mitigating evidence has not 'abrogated the California

---

[18] The jury was instructed pursuant to CALJIC Nos. 2.09 (Evidence Limited As To Purpose) and 2.80 (Expert Testimony).  (5 CT 1165, 1188; 6 CT 1373-74; see also 31 RT 6874-77.)

1  Evidence Code.'"  People v. Carpenter, 15 Cal.4th 312, 404 (1997) (abrogated on other grounds in

2  People v. Diaz, 60 Cal.4th 1176 (2015)).  Meaning, a trial court retains the discretion to rule on

3  evidentiary issues concerning mitigating evidence, and that discretion does not, and did not,

4  violate Petitioner's right to present mitigating evidence.

5       Lastly, to the degree that Petitioner argues the California Supreme Court's determination

6  involves an "unreasonable factual finding regarding trial counsel's deficient performance"

7  because it "'plainly misapprehende[d] or misstate[d] the record in making their findings, and the

8  misapprehension goes to a material factual issue that is central to petitioner's claim,'" the

9  undersigned is not persuaded.

10      The record supports the state court's factual finding.  As discussed above, the prosecutor's

11  cross-examination of McGarrity challenged the expert's credibility with the jury and involved

12  McGarrity's reliance upon information provided by Petitioner and his family members,

13  particularly his father, as the basis for her expert opinion.  It was not unreasonable for the

14  California Supreme Court to conclude that the prosecutor "made his motion in order to prevent

15  the jury from drawing any inference favorable to the defendant or adverse to the People based on

16  McGarrity's inability to go to Cuba …"  McGarrity mentioned that inability during direct

17  examination on three occasions.  The first when she was asked whether she had consulted with

18  other individuals similarly situated:

19

20       Q.  And did you also consult with other individuals who had experienced the
     similar process of being brought over to the United States during the Mariel Boatlift.
21       MR. MARLETTE: I'll object to the relevance of that.
     THE WITNESS: Yes, I did.
22       MR. GABLE:  It's just to give a basis for her research which she'll ultimately be
     giving an opinion on under 801 of the Evidence Code.  It's more for the expert to state the
23  basis of an opinion.
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
24       THE COURT:  The objection is overruled.  You may answer.
     THE WITNESS: Thank you.
25       Yes.  Well, originally I had thought I was going to be able to visit Cuba, and
     therefore, I could corroborate the information that the defendant was giving me with
26  information provided by his family and other people who knew him in Cuba.
27       But when that trip was no longer possible, I felt that it was really important to be
     able to confirm some of the statements that the defendant had made to me.

28

So I contacted some people in the Bay Area who were Cuban from the same part of Cuba as the defendant, and who had entered the United States through Mariel.

(29 RT 6591-92.)  And later,

[McGARRITY]: So although I haven't been to Cuba, to substantiate every step of the way, I do know that close family members died, that he was living with them at the time of death and that the whole family never recovered from the loss of the mother.  The father, for example, never remarried until quite recently.

(29 RT 6606.)  And, finally, when asked about the period between Petitioner's thirteenth and nineteenth years of age:

[McGARRITY]: This is a period where I feel that I - - I'm handicapped because I wasn't able to visit Cuba, because the defendant's memory seems to be a little vague about this period.  And although what he says is totally consistent with what his father says, it's not as clear to me as some of the other stages.

(29 RT 6617.)  Thus, to interpret the prosecutor's motion as an effort to forestall any favorable inference for the defense from McGarrity's references regarding an inability to travel to Cuba to corroborate this information is in no way unreasonable.

Further, neither Mr. Gable's later declaration, nor the prosecutor's statements at page 6790 of the Reporter's Transcript, as cited by Petitioner, demand a finding otherwise.  When the prosecutor made his motion on July 25, 1989, following the noon recess, he stated he was doing so because the defense was "claiming that they had lost some ability to present their case because they were not able to go to Cuba, [but] this witness did have numerous contact[s] with people from Cuba, and have contact with the defendant and contact with the defendant's [] father, and expressed related statements by those people about conditions in Cuba."  (30 RT 6782.)  The prosecutor wished to "put on the record very clearly [his reasons], and that is that, so the jury can consider those facts, because the witness said a number of times she felt hampered by not being able to go to Cuba, so I wanted to - -."  (30 RT 6783.)  When the trial court indicated it would not reverse an earlier evidentiary hearing despite the prosecutor's "waiver of a hearsay objection," Mr. Gable made his position known: that despite the prosecutor's attempts to discredit McGarrity's testimony as a result of the information provided by defendant being uncorroborated, where the prosecutor had previously objected and successfully sought a limiting instruction as to

1 that testimony, he believed it unfair were the court to entertain allowing that information to

2 subsequently be considered for its truth. (30 RT 6783-84.) In sum, the California Supreme Court

3 did not misapprehend or misstate the record.

4 *Prejudice*

5        As to the second prong, again, a petitioner must show that but for counsel's

6 unprofessional error, there exists a reasonable probability of a more favorable outcome. But here,

7 allowing the jury to consider certain evidence proffered by Petitioner and/or his family members

8 for its truth, by way of the testimony of expert witness McGarrity, would not have resulted in a

9 more favorable outcome at the penalty phase.

10        As the California Supreme Court pointed out, Petitioner "was affected by self-interest"

11 and the jury clearly did not find Petitioner to be a credible witness during the guilt phase

12 proceedings. There is no reason to believe the jury would have assigned great weight to

13 Petitioner's statements during the penalty phase. And Petitioner's father and other family

14 members would have been similarly interested or concerned with providing information

15 beneficial to Petitioner, understandably so. In fact, Petitioner's father was described by

16 McGarrity as feeling guilty or responsible for his own behaviors during Petitioner's childhood in

17 Cuba. Nevertheless, it is reasonable to infer Petitioner's family would be motivated to tell

18 McGarrity information designed to help Petitioner.

19        Hearing the evidence at issue for its truth, as opposed to for the more limited purpose of

20 forming the bases for the expert's opinion would not have undermined confidence in the outcome

21 of this proceeding. Strickland, 466 U.S. at 694. Given the aggravating factors here, particularly

22 Petitioner having killed before, it was not unreasonable for the state court to conclude there was

23 no reasonable probability of at least one juror striking a different balance between a life or death

24 sentence. Wiggins, 539 U.S. at 537.

25        It was not unreasonable for the California Supreme Court to conclude there was no

26 substantial likelihood of a different result. Richter, 562 U.S. at 112. Viewed in context and as a

27 whole, the California Supreme Court's ruling was neither an unreasonable application of Supreme

28 Court precedent, nor did it involve an unreasonable determination of facts. 28 U.S.C. § 2254(d).

## Claim PP: Failure to Investigate & Present Additional Evidence Concerning Petitioner's Life in Cuba

Petitioner complains that defense counsels were ineffective for failing to investigate and present additional evidence regarding his life in Cuba, including a failure to request an extension of time in order to obtain the necessary time to prepare a proper mitigation investigation "and put the results of it into context through expert testimony." These "largely bungled efforts," Petitioner asserts, severely prejudiced him, and thus entitle him to habeas relief. (ECF No. 330 at 253-59.) Respondent contends that this claim is unexhausted and must be dismissed because the claim presented in the points and authorities supporting the operative habeas petition is different than that presented to this court in the second amended petition itself, differing as well from those presented to the California Supreme Court in his first and second state habeas petitions. Respondent maintains that version of the claim "focused on the adequacy of counsel's investigative efforts related to mounting a mental defect defense immediately following McGarrity's testimony during the penalty phase," and that the instant claim is an "expansive challenge to the adequacy of counsel's investigative efforts – both before and during trial – to send an agent to Cuba." Further, Respondent contends the claim must be denied even as originally presented because Petitioner has failed to carry his burden of demonstrating it was unreasonable for the California Supreme Court to determine counsel was not ineffective. (ECF No. 345 at 111-12.)

Following a review of the claims as presented in this court and in the California Supreme Court, the undersigned finds this claim to be sufficiently exhausted for purposes of review.

### Relevant Trial Court Proceedings

The record reveals several references to an ongoing investigation and information the defense hoped to obtain from a trip to Cuba, often, although not always, arising in the context of the California Penal Code § 989.7 proceedings.[19]

On June 8, 1988, counsel sought funds for a psychiatric evaluation and funds to continue

---

[19] The undersigned will refer to the *in camera* hearings concerning funding as § 989.7 proceedings, the statute's present numerical form, for consistency and ease of reference.

"the investigation both from the penalty phase and the guilt phase" as to Petitioner's background.

(RT § 989.7 Proceedings 8-14.)

In a hearing held *in camera* on September 8, 1988, prior to trial and in relation to a motion to continue the trial then set for September 13, 1988, Mr. Holmes proffered the following:

> [MR. HOLMES]:  The main reason why we want to continue it to this time is my client spent - - he was born in Santiago, Cuba, and he was raised there.  He was in the army there, and he didn't come to the United States until he was about 17 or 18 years of age, so our penalty phase investigation, *we have been four months now trying to make arrangements* for investigators, translators and everything, to go to Cuba - - Santiago, Cuba, mainly to get records, talk to people, take video-taped statements and so forth of individuals, his mother, his sister, his brother, and I think his father still lives there, if we can find him, *to do all the various things that are necessary for a social history* on him to present to the jury during the penalty phase.
> The last time we had a meeting on this case, our investigators informed me that they could not make the arrangements and, believe me, they have had letters, phone calls back and forth here trying to arrange this thing.
> The earliest date we can do this is October 10th, and it's going to be about a six or seven-day trip.  We have the money, arrangements already made for this, and so, while if it works out, they will go down there on October 2.  They will be down there for six or seven days, and we will probably need more time after they get back to kind of decipher and assimilate what we have from that trip, and it's my understanding that the whole thing is very complicated.
> First of all, when you talk to any State Department officials and we say that we want to send an investigator down to Cuba, they say, n-o, no way.  So, you start checking with people that have been there under these like circumstances.  Then you find out there are ways, but it's very complicated and basically it's my understanding what they do is they take a trip to Guadalajara, Mexico, and from there it's kind of a tour situation they get on, a ten-day tour, and from there they go down, and those things only leave on certain dates, and special arrangements have to be made, so that's our main reason.
> There is no way we can - - we could start trial on this thing and after that try to prepare for the penalty phase.

(RT [9/8/88] P-118-19, italics added.)

On November 21, 1988, both counsel appeared at a hearing and sought additional funding, including travel costs to Cuba.  It was also noted that efforts were underway to assess whether Petitioner suffered brain damage as a result of events occurring in Cuba.  Further, counsel advised the court efforts would be made to obtain documentation regarding allegations of child abuse, Petitioner's educational records, and any criminal record.  Counsel noted the difficulty in

obtaining information from Cuba as well as the difficulty associated with traveling to Cuba. On that occasion, the court asked counsel to provide more specific information regarding the need "to go to Cuba, what you intend to get, who you'll see, [and] what kind of backup preliminary work" justified the funding sought. (RT § 989.7 Proceedings 15-24.)

On January 18, 1989, both counsel again appeared at a hearing concerning funds. More particularly, counsel sought additional monies to send two persons to Cuba. (RT § 989.7 Proceedings 25-26.) After discussions concerning the possibility of a plea offering that would negate the need for a capital trial, as well as medical testing related to seizures or "alleged mental problems" (RT § 989.7 Proceedings 27-36), the court expressed concern about incurring the expenses before being certain the matter was "in fact, go[ing] to trial." (RT § 989.7 Proceedings 36.) Further discussion ensued (RT § 989.7 Proceedings 36-39) and the following occurred:

THE COURT: Well, seems to me, you could still schedule this.
The trial date is February 1st, 3rd, whatever. You can still schedule it thirty days ahead and still be well within your guilt phase.
MR. GABLE: That's fine.
THE COURT: And still make the thirty-day deadline [referencing need to purchase airline tickets in advance].
You wouldn't finish the guilt phase - - unless you are going to move quickly picking the jury. It's going to take a month picking a jury.
MR. HOLMES: That's pretty minimum.
THE COURT: I wish it wasn't.
MR. HOLMES: It is though, by the time you go through it.
MR. GABLE: If we get - - we get rolling on this as soon as we start the trial, we are in good shape.
THE COURT: I will grant it.
MR. HOLMES: Okay.
THE COURT: I will put in, however, shall not be expended until trial has actually commenced.
MR. HOLMES: Which would be being assigned - -
THE COURT: Being assigned.
MR. HOLMES: - - a court. We will have motions, and everything else to start with.
MR. GABLE: Would the court indicate, also, we can get an advance on the actual costs of airfare and - - that so everything but the - -
THE COURT: Well, I think you can do that.
If I sent you out that day, then you can get the money as of that day and can make the reservations to get at - - to pick a jury. You have another couple of months on the guilt phase alone.

137

You have got three months of time, conservatively, to get this done. It's not going to take you fourteen days.

MR. HOLMES: May have to get a longer time between the two trials, if that comes up.

THE COURT: And you may have - - have some delay between. But I don't think you are going to run into that if you get started during the guilt phase.

MR. HOLMES: Getting them down there. When he comes back, it will be almost automatic.

THE COURT: We better go ahead on the permit, if that takes thirty days.

MR. GABLE: We will [be] getting on that right away. [¶] Thank you.

THE COURT: You are welcome. Thanks.

(RT § 989.7 Proceedings 39-41.)

On February 24, 1989, Mr. Holmes sought additional investigative cost funding, noting that his investigator Mr. Wilcox while not traveling to Cuba as was already planned for Messrs. Mayorga and Myers, was "coordinating the Cuba trip," and "putting together some of the applications and things of that nature, getting visas, passports and so forth." (RT § 989.7 Proceedings 44-45.)

Later, on April 24, 1989, Mr. Holmes sought additional funding for the costs associated with investigator Wilcox's work and expert witness fees. No specific mention of Cuba was made. (RT § 989.7 Proceedings 47-50; see also RT *In Camera* Hearings 208-12.) In a May 19, 1989 appearance, Mr. Holmes advised the court that the figure represented "isn't as bad as it looks because my guess is the way things stand right now, we'll never get [to Cuba]." (RT § 989.7 Proceedings 52.) He further advised the court the investigators "got as far as Mexico City here couple weeks ago, and we found out we were misled by all the officials, everything, as far as type of visa that was required. [¶] We're still working on it." (RT § 989.7 Proceedings 52.)

On June 16, 1989, in an *in camer*a session with Judge Lewis and defense counsel and the defense investigator, Mr. Gable advised the court regarding the efforts undertaken to "gather relevant mitigating evidence" in light of the "difficulty securing passage to Cuba." (RT *In Camera* Hearings 5966.) More particularly, Mr. Gable advised that he had reached out to a capital litigator in South Carolina with experience representing a Cuban client who offered "several different avenues to approach the problem of securing passage to Cuba, including talking

138

to the United States attorney for Mr. Castro – apparently he has an attorney on retainer in New York City, so we're in the process of contacting him." (RT *In Camera* Hearings 5967.) Contact had also been made with the "United States Conference of Catholic Bishops and a Havana-based law firm that may also be of assistance." (RT *In Camera* Hearings 5967.) Mr. Gable further advised the court he had "secured the names of four experts on Cuban immigration" and intended to offer one of those individuals as an expert witness. (RT *In Camera* Hearings 5968.) Because family and friends in Cuba could not be subpoenaed to testify, the defense team indicated it "had intended … all along [to] send a team down to Cuba, armed with video recorders, and interview these people." (RT *In Camera* Hearings 5969.)

On June 21, 1989, additional funds were approved related to Mr. Holmes's request for "witness travel expenses" and "expert witness fees and costs … strictly for penalty phase witnesses and experts, which will start on Monday." (RT § 989.7 Proceedings 62-64.)

On July 5, 1989, in proceedings held *in camera* concerning "a continuance for the purpose of going to Cuba," defense counsel indicated social anthropologist McGarrity could testify concerning the "utmost importance" of such a trip "to gather the information relating to [Petitioner]'s background, in order to make valid assessments." (RT *In Camera* Hearings 6181-82.) The following day, McGarrity testified regarding her need to travel to Cuba to obtain witness statements and other information regarding Petitioner's upbringing. (RT *In Camera* Hearings 6191-200.) In a statement to the court following McGarrity's testimony, Mr. Gable indicated: "We have been attempting to send a team to Cuba since early, yeah, since about, actually since about May of 1988, is when we first started." (RT *In Camera* Hearings at 6200:25-27.) McGarrity later indicated she wished to visit at least one of the schools Petitioner attended, in addition to talking with his family and attempting to gain access to hospital and medical records. (RT *In Camera* Hearings 6205.)

On July 7, 1989, during the defense case at the penalty phase concerning scheduling matters, and outside the presence of the jury, Mr. Gable indicated McGarrity had a "confirmed flight to Mexico City on [July] 11th," heading into Cuba on the 15th, returning via Mexico City and ultimately arriving back in the United States on July 22nd. (28 RT 6308.)

On July 10, 1989, a hearing was held wherein the court questioned Mr. Gable specifically about the defense team's plans for sending two people to Cuba. He relayed that Mayorga and Myers "got all the way to Mexico City and were turned back by the Cuban government for reasons that had to do, I think, primarily with the fact that they - - they advised them what they were actually going down there for; and secondly because it was right at the time when the Russian leader Gorbachev was down in Cuba and they didn't want them down there, anyway." (RT § 989.7 Proceedings 66-67.)  Thereafter, discussion centered on the defense's retention of McGarrity and its desire to send her to Cuba in place of Mayorga and Myers.  Ultimately however, the 989.7 court withdrew its prior authorization of funds to be expended for a trip to Cuba in order to obtain documentation of Petitioner's social history, believing the circumstances of the planned trip would make the court a party to a subterfuge.[20]  (RT § 989.7 Proceedings 68-86.)

Thereafter, two additional *in camera* hearings were held concerning the appropriation of funds to cover fees for social anthropologist McGarrity and medical expert William Vicary, and additional funds for investigator Wilcox.  (RT § 989.7 Proceedings 87-92.)

**Analysis**

First, Petitioner contends his attorneys were ineffective for failing to request an extension of time within which to prepare a proper mitigation investigation.  He claims this failure severely prejudiced him.  The undersigned finds no ineffective assistance of counsel for a failure to request an extension of time in light of the circumstances.  Nor was there a failure to investigate and/or prepare a proper mitigation case for the penalty phase, as alleged by Petitioner.

<u>Deficiency</u>

In June 1988, counsel sought funds for the investigation pertaining to both the guilt and penalty phases.  In September 1988, at a hearing on a motion to continue the trial, defense

---

[20] The subterfuge involved the defense team's failure to advise the § 989.7 court of the change in its plans regarding who was being sent to Cuba for purposes of the investigation, as well as the fact that by joining a tour group traveling from Mexico into Cuba, the Cuban government would be unaware of the true purpose for the visit.

counsel noted efforts to arrange for a trip to Cuba had been ongoing for a period of four months. On that occasion, it was anticipated the trip to Cuba would happen on October 2, 1988.  (RT [9/8/88] P-118-19.)  When counsel sought additional funds in late November 1988 for a medical expert and/or medical tests, and travel costs to Cuba, he represented to the court the defense had encountered difficulty associated with the previous travel plans.  The court asked counsel to provide additional information in support of the request, and counsel agreed to do so.  (RT § 989.7 Proceedings 15-24.)  In January 1989, the court approved additional funds for sending two investigators to Cuba, to be expended once trial had commenced.  (RT § 989.7 Proceedings 39-41.)  At that point then, the defense team had been working on arranging a trip to Cuba for approximately nine months.  The trial had been continued on at least two occasions for this reason.  (3 CT 547-50, 574-75, 599-603.)[21]

About five months later, in mid-May 1989, defense counsel reported to the court its efforts were recently thwarted when Messrs. Mayorga and Myers could get no farther than Mexico City, having been "misled by all the officials" with regard to the proper documentation necessary for entry to Cuba.  (RT § 989.7 Proceedings 52.)  The guilt phase was then ongoing, the defense presenting their case during that same period. (5 CT 1101, 1103, 1106, 1109, 1111-13, 1115, 1118, 1121.)  After guilty verdicts had been rendered in the guilt phase (6 CT 1276-82) and prior to the penalty phase beginning,[22] Mr. Holmes requested additional funds for expert witness fees.  (RT § 987.9 Proceedings 62-64.)  Those funds were intended to be used by the defense team to cover the costs of sending their social anthropologist expert to Cuba in an effort to obtain

---

[21] The parties were assigned to trial before Judge Darrel W. Lewis in Department 15 on February 2, 1989.  (4 CT 771.)  Pretrial motions were considered on February 7, 22, 23 and 28, 1989.  (4 CT 786, 917, 947-48, 961.)  Jury selection proceedings commenced March 1, 1989.  (4 CT 962.)  A jury was sworn on April 11, 1989, and the guilt phase of the trial began that same date.  (4 CT 1075.)  Deliberations commenced June 1, 1989.  (5 CT 1139.)

[22] The penalty phase was originally scheduled to begin July 10, 1989.  (6 CT 1283.)  Following an *in camera* hearing held June 16, 1989, the court ordered the People's penalty phase case would begin June 26, 1989, whereas the defense case would commence July 5, 1989.  (6 CT 1284.)  The government put on its case June 26 (6 CT 1285) and rested July 5 (6 CT 1291); Petitioner's case began that same date (ibid.).  Testimony for the defense continued through July 11, 1989.  (6 CT 1292, 1294-95.)  The trial was then recessed to July 25, 1989.  (6 CT 1295-96.)

the long sought after social history information concerning Petitioner. (RT § 987.9 Proceedings 62-86.) Efforts continued despite repeated setbacks relating to the team's ability to get representatives into Cuba.

In light of all the circumstances, failure to request an extension of time was not outside the wide range of professionally competent assistance. Strickland, 466 U.S. at 690. Counsel tried to get representatives into Cuba for the purpose of obtaining witness statements and documentation relevant to Petitioner's social history for more than a year and were skeptical such a trip could be completed despite continued efforts to make it happen. The trial court noted the jury was "already extremely frustrated" because they had been told they would be "finished in early July," and a continuance would affect that timeline. (RT *In Camera* Proceedings 6200, 6210.) Moreover, the court expressed concern over the uncertainty of the availability of the evidence at issue. (RT *In Camera* proceedings 6200.) To that end, counsel "exercised acceptable professional judgment" by not seeking an extension in what would have likely been an exercise in futility. Counsel was not deficient. Strickland, 466 U.S. at 689-90.

With specific regard to Petitioner's complaints about defense counsels' conduct concerning their efforts to obtain mitigating evidence from Cuba, the undersigned likewise finds no deficiency.

> In preparation for the penalty phase of a capital murder trial, counsel has an "obligation to conduct a thorough investigation of the defendant's background." (*Williams v. Taylor* (2000) 529 U.S. 362, 396; *see also Wiggins v. Smith* (2003) 539 U.S. 510, 522 (*Wiggins*); *In re Lucas* (2004) 33 Cal.4th 682, 728.) "[I]nvestigations into mitigating evidence 'should comprise efforts to discover *all reasonably available mitigating evidence* and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' [Citation.]" (*Wiggins, supra*, 539 U.S. at p. 524.)

People v. Doolin, 45 Cal. 4th 390, 427–28 (2009) (italics in original). This is not a matter that involves counsel failing to act in one way or another. Rather, this case involves efforts by defense counsel to present mitigating evidence in the form of a social history obtained as a result of a visit to Cuba, where those efforts ultimately did not pay off.

////

Here, the evidence counsel had hoped to obtain in communist Cuba was simply not reasonably available. Travel to and from Cuba was certainly not common and required special arrangements. Diplomatic relations between the United States and Cuba had been severed for decades at that point. Counsel had sought the same evidence for about a year by the time the jury reached its verdicts on June 9, 1989, in the guilt phase, to wit: Mr. Holmes represented in September 1988 the team had been working on arrangements for four months, since May or June 1988.[23] There are specific references in the record pertaining to the defense team's efforts to work with the State Department and related agencies to gain access to Cuba.[24]

Before the penalty phase began, the two persons initially retained by the defense to travel to Cuba to obtain videotaped witness statements, medical, academic and military records, were stopped in Mexico City and never made it to Cuba. Defense counsel represented those individuals were considered "persona non grata" thereafter and would not be permitted to enter Cuba. (RT § 989.7 Proceedings 70.) Counsel tried yet again, retaining expert McGarrity who had studied and lived in Cuba previously. McGarrity testified to the court that based on her prior experience in Cuba, she believed she had a good chance of getting into the country and gaining access to the information sought by the defense team. (RT *In Camera* Hearings 6191-2100, 6205.) But that second effort would not pay off either.

Petitioner's assertion that defense counsel took a "hands off" approach to the efforts undertaken by Mayorga and Myers, as well as the efforts of McGarrity, is not well taken. Based on the record before the court, and the presumption that counsel acted within the wide range of reasonable assistance and exercised acceptable professional judgment (Strickland, 466 U.S. at 689-90), Petitioner cannot and has not established any deficiency.

This case is unlike Wiggins v. Smith, 539 U.S. 510 (2003), upon which Petitioner relies. There, defense counsel failed to put on any mitigating evidence involving Wiggins' childhood. In

---

[23] This representation is consistent with Mr. Gable's statement in July 1989 that the defense had been attempting to send a team to Cuba since May 1988.

[24] The defense team represented it had been working with the State Department "for months," starting "a year and a half ago," and had worked on gaining permission to travel to Cuba with related agencies "for a real long time." (RT § 987.9 Proceedings 78-80.)

143

an opening statement during the sentencing proceedings, defense counsel advised the jury it would hear evidence that Wiggins "had a difficult life" and no criminal record. Wiggins, 539 U.S. at 515. But counsel "introduced no evidence of Wiggins' life history" during the proceedings. Id. at 515. Yet, outside the presence of the jury and before closing arguments, counsel proffered that had a bifurcation motion been granted, the defense would have introduced "expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other." Id. at 515-16. Nevertheless, the jury heard no such evidence. Id. at 516. The high court found counsel were deficient for electing not to introduce evidence of Wiggins' background given the information available to them. Id. at 520-34. That background involved many forms of abuse perpetuated by petitioner's mother and foster parents. The high court further held that counsels' failures prejudiced Wiggins' defense; a reasonable probability existed that, but for counsels' unprofessional errors, the result of the sentencing proceeding would have been different. Id. at 534-37. "Wiggins' sentencing jury heard only one significant mitigating factor - that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." Id. at 537.

Here, defense counsel did not fail to pursue avenues of readily available information such as school, court or hospital records; counsel did in fact pursue such records, but the fact the records were located in Cuba made them less than readily available. Doe v. Ayers, 782 F.3d 425, 435 (9th Cir. 2015). Defense counsel did present mitigating evidence regarding Petitioner's social history through the testimony of its expert witness, as well as through the testimony of David Myers. Nor did counsel fail to investigate Petitioner's mental condition as a mitigating factor. Counsel did so, and, ultimately, determined such efforts would not inure to Petitioner's benefit at the penalty phase, thus making a strategic or tactical decision not to present such evidence. Doe v. Ayers, 782 F.3d at 441-42.

Petitioner cites to a statement by Mr. Holmes that sixty percent of the mitigation case was denied to Petitioner when the court withdrew the funding for the trip to Cuba. First, the record

also indicates that when asked, Mr. Holmes admitted he made the statement during argument and had "just picked that figure out of the hat." (30 RT 6682.) Second, regardless of any numerical value assigned to the evidence in Cuba, the comment does not speak to the fact the evidence was simply not readily available; and, it was unavailable well before the funding was withdrawn on July 11, 1989.

With specific regard to the new evidence pertaining to physical abuse perpetrated by Petitioner's father, that information was not known to defense counsel because Petitioner had never alleged any abuse by his father at the time of trial. Neither had Petitioner's brother Dagoberto, despite providing plenty of other relevant information during telephone conversations with defense expert McGarrity in 1989.[25] His October 28, 2003, declaration does comport with declarations offered by others (compare ECF No. 302, Vol. X, Ex. 22), but a fair-minded jurist could have concluded these declarations were contradicted by other evidence in the record and thus did not support Petitioner's claim. To the degree Petitioner claims this information would have been uncovered had the investigation in Cuba occurred, as previously found by the undersigned, information from Cuba was unavailable to the defense team for reasons other than ineffectiveness of trial counsel. The evidence proffered by Petitioner's neighbors and teachers was similarly unavailable and, in some cases, includes information that could not have been personally known by the declarant.

It was not unreasonable for the California Supreme Court to conclude counsel were not ineffective based upon the record and evidence. Richter, 562 U.S. at 101-03.

Petitioner relies upon the declarations of clinical and forensic psychiatrist Pablo Stewart, clinical and forensic psychologist Patricia Perez-Arce, and clinical psychologist Monica Delgado to support his claim. (ECF No. 302, Ex. 64; ECF No. 320, Exs. 143 & 163.) The undersigned has reviewed the reports prepared by these experts and concludes the evidence does not require a finding that the California Supreme Court's determination was unreasonable. Significantly, the reports were generated approximately 15 and 20 years after trial in this matter. As a result, the

---

[25] The undersigned notes Dagoberto was able to impart this information via telephone to Ines Monguio, Ph.D. on September 9, 1998. (ECF No. 302, Vol. X, Ex. 32.)

1    reports are not persuasive.  See Deere v. Cullen, 718 F.3d 1124, 1146-47 (9th Cir. 2013) ("as we

2    pointed out in Deere I, 'belated opinions of mental health experts are of dubious probative value

3    and therefore disfavored'").  Without exhaustively detailing the inconsistencies in the new expert

4    reports with the information available at the time of trial, and even accepting the content of the

5    three expert opinions, the evidence simply does not establish that trial counsel was deficient for

6    failing to present a mental health defense.  Strickland, 466 U.S. at 689 (the court's scrutiny is

7    "highly deferential and is evaluated without the benefit of hindsight").

8         Next, the undersigned has reviewed Mr. Gable's declaration of November 4, 2004, and

9    notes that the statements in paragraph 18 are lacking in important detail.  (ECF No. 302, Vol.

10   XXII, Ex. 63 at 4288-89.)  Gable claims he retained Dr. Vicary to evaluate Petitioner's mental

11   health but provides no date for having done so.  He goes on to state he "tried to communicate"

12   with the doctor "numerous times" in advance of the penalty phase yet was not provided with any

13   information until the night before Vicary was to testify.  (Id. at 4288-89.)  Again, Gable's

14   declaration lacks detail: how and when did he attempt to communicate with the expert.  The

15   undersigned notes too that Dr. Vicary's report is dated July 24, 1989, but does not include the

16   date upon which he was retained.

17        It is interesting to note that the record indicates Mr. Holmes advised the § 989.7 judge on

18   June 21, 1989, that the defense was working with a "Ph.D., J.D." medical expert – Dr. Vicary has

19   both a J.D. and a Ph.D. - and sought related expert witness fees and costs of $9,750.  (RT § 989.7

20   Proceedings 62-63.)  On that date, Holmes indicated to the court the defense case was scheduled

21   to commence July 5, 1989.  (RT § 989.7 Proceedings 63.)  On July 6, 1989, after McGarrity

22   testified in camera regarding the importance of traveling to Cuba, Gable indicated to the trial

23   court that he was unsure as to the length of time the medical expert might be required to testify

24   during the penalty phase because he had not yet "totally prepared him.  He's kind of hanging out

25   there, waiting for the information that was hopefully forthcoming."  (RT In Camera Hearings at

26   6212.)  On July 10, 1989, Gable represented to the court that he had "been told by the psychiatrist

27   who is working on this case, it's vitally important to gather this type of information about Mr.

28   Alvarez …."  (RT § 989.7 Proceedings 75.)  On July 21, 1989, Holmes appeared for a hearing

before the § 989.7 judge and indicated to the court that Gable was "working with this particular expert [referring to McGarrity]" whereas he (Holmes) was "working with other experts …." (RT § 989.7 Proceedings 88.) Holmes further indicated to the court that Dr. Vicary's report was incomplete on that date because they were "still waiting for some medical results on some MRIs … that we've had done out at Sutter Hospital." (RT § 989.7 Proceedings 88.)

The record, therefore, indicates continuing contact between the defense team and Dr. Vicary, and also reveals that any delay Mr. Gable's declaration appears to attribute to Dr. Vicary came from the expert awaiting additional medical testing results. A fairminded jurist could have concluded that Dr. Vicary's report was not anticipated earlier than it was in fact received by the defense, and that once it was received, the defense team's strategy changed because there was no evidence to indicate Petitioner suffered from a mental defect. Richter, 562 U.S. at 101, 103. Moreover, the record indicates the medical expert retained by the defense had been told of Petitioner's medical history as relayed by Petitioner and his family members through McGarrity. (RT *In Camera* Hearings 6183, 6197-98 [McGarrity "collaborating" with Vicary], 6212.)

Dr. Vicary's report itself reveals he reviewed neurological and psychological reports, among other information. With regard to the former, the report states the February 1989 EEG was "essentially normal" and a "computer enhanced EEG revealed some abnormalities in the rear of the brain and right lateral aspect," that a June 1989 MRI was "normal" and that skull x-rays were "normal." (ECF No. 302, Vol. XXI, Ex. 58 at 4115.) The psychological test reports reviewed by Dr. Vicary revealed numerous troubling items: (1) that Petitioner told "Dr. Campos that he was intoxicated" on a drug that "'makes you act crazy,'" and that later he "became more aggressive" and "did whatever he felt like doing without regard for any consequences;" (2) Petitioner reported having been "discharged from his [college] studies because of disciplinary problems;" (3) "that the homicide victim could not have been robbed because [Petitioner] stabbed him to help out a friend who was in a heated argument with the victim;" and (5) that Petitioner's MMPI inventory revealed elevated findings on the hypochondriacal, manic and antisocial scales, sensitivity to criticism, "extremely poor anger control," poor judgment, paranoid thought and "a high likelihood of continuing assaultive behavior." (ECF No. 302, Vol. XXI, Ex. 58 at 4116.)

147

The "Family History" interview included Petitioner advising Dr. Vicary that his brother had a "history of antisocial behavior" who was incarcerated in Cuba for shooting a lieutenant in the Cuban Army. (ECF No. 302, Vol. XXI, Ex. 58 at 4116-17.) The "Psychiatric" interview with Petitioner revealed Petitioner "stabbed [a school bully] a few times with a knife" and "tied up another school bully and poured gasoline on him," threatening to light it before the "victim managed to escape." (Id. at 4118.) When asked about his criminal history, Petitioner advised Dr. Vicary that in response to a "guy rap[ing his] old lady and [stealing their] stuff," he "went looking" for the guy and "stabbed three or four guys." (Id. at 4119.)

Ultimately, Dr. Vicary identified several mitigating factors: (1) traumatic family background; (2) chronic depressive mental illness; (3) brain damage and seizure disorder, based on Petitioner's report; (4) substance abuse; and (5) remorse. (ECF No. 302, Vol. XXI, Ex. 58 at 4121-23.)

It would appear from the record that the defense team opted not to present a mental health defense at the penalty phase because Dr. Vicary's report was not helpful and was potentially more harmful. Under the circumstances, the California Supreme Court could have reasonably concluded that action to be sound trial strategy. Strickland, 466 U.S. at 689. A court should not overlook "'the constitutionally protected independence of counsel and … the wide latitude counsel must have in making tactical decisions.'" Pinholster, 563 U.S. at 195 (citing Strickland, 466 U.S. at 689).

Next, the undersigned has also reviewed the declarations of Petitioner's family, friends and neighbors submitted in support of his state habeas proceedings and a part of the record before this court. (ECF No. 320, Exs. 146-56.) Again, foregoing a summary of that material here, the new evidence or information does not serve to establish that trial counsel was deficient for failing to provide this type of information in 1989. The efforts of the trial team relative to information and evidence located in Cuba is discussed extensively elsewhere in these findings. Suffice to say, in that regard, defense counsel was not deficient. Further, absent the information concerning claims that Petitioner's father subjected him to brutal beatings, the information contained in these declarations was largely known to, and considered by, the jury. And to the degree the

148

declarations offer information not considered by the jury, trial counsel cannot be faulted for deficiency where counsel was not made aware of the information and it would not have otherwise been available. The record otherwise reveals not a hint of physical abuse perpetrated by Petitioner's father. Quite the contrary, the information provided to counsel at that time, including information provided to defense expert McGarrity from Petitioner's brother, pointed only to Petitioner's stepmother as the source of physical abuse. In any event, the California Supreme Court could have reasonably concluded that counsel was not deficient in this regard.

In sum, the undersigned finds the California Supreme Court could have reasonably concluded, considering the aforementioned evidence, that defense counsels' performance was not deficient for a failure to present a mental health defense. Richter, 562 U.S. at 101.

Prejudice

Even assuming for the sake of argument that defense counsel had been deficient as alleged by Petitioner, he must still prove that any alleged "deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. To demonstrate actual prejudice, a petitioner "must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "To assess that probability, we consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. 30, 41 (2009).

*Evidence Adduced at Trial*

To start, penalty phase mitigation testimony was offered by Sergeant Mark Fluitt with the Department of Corrections, giving greater context to Petitioner's conviction for escape from the California Men's Colony, a minimum-security facility. More specifically, Petitioner was assigned to the forestry unit or honor camp where he and others were housed in unlocked dorms and the outside gate was typically left open. (27 RT 6121-29.) In December 1982, officers conducting a count reported "they had found some dummies in the bed." A search began for the escapees. Sergeant Fluitt and the search team caught up with Petitioner and the other inmates the

following day near the train depot in San Luis Obispo, about four miles from the correctional facility. Because he knew Petitioner spoke better English, Fluitt told Petitioner to advise the others "in Cuban" to stand, put their hands on their heads and walk towards him. Petitioner did so and did not resist being returned to custody. (27 RT 6129-36.)

Joan Mary Archie and Neetlefer Hawkins, mother and daughter, both testified that Petitioner helped care for Hawkins' special needs son during the period he was involved with Neetlefer, shortly before these crimes. (27 RT 6144-50, 6164-69.) They also testified that Petitioner made numerous attempts to find employment in Sacramento. (27 RT 6150-53, 6169-71.) Archie testified Petitioner was "always a proper gentleman" and also offered to help with gardening chores. (27 RT 6153-55.) Hawkins indicated Petitioner "cooked, cleaned, bathed [her] son, fed him, he was just really good with [her] son." (27 RT 6172.)

Siro Delcastillo testified "as an expert in …Cuban emigration and the impact on the Cuban refugees of the Cuban political and social policies, as they exist in Cuba," providing the jury with valuable information about life in Cuba and immigrant experiences in the United States. (28 RT 6241-307.)

Next, Robert and Elaine Metcalf testified concerning their experiences as Petitioner's sponsors in Richmond, Virginia, following his release from Fort Chaffee. (28 RT 6320-65.) More specifically, the Metcalfs sponsored two men, Petitioner and an older man named Alfredo; the idea was to assist them with assimilating into life in America. (28 RT 6323, 6360.) The jury heard about those efforts and Petitioner's difficulty fitting in. (28 RT 6326-29, 6358.) The Metcalfs testified Petitioner was great with their young children and helpful around the house. (28 RT 6330-31, 6350, 6355, 6361-62.) They described their experience with Petitioner as positive, and noted he remained in contact with them. (28 RT 6338-39, 6355, 6361-62.)

Robert Wissmath testified regarding his encounters with Petitioner in 1987 and 1988; Wissmath teaches independent study courses in Sacramento County jails. Petitioner was studying English, history, art, and government, with an emphasis on English; he was making good progress and had never presented any difficulty. (28 RT 6366-81.)

Defense counsel called Steven Arthur to testify concerning an incident wherein it was

alleged that Petitioner struck Arthur while the two were incarcerated. Arthur was apparently

expected to testify that Petitioner did not strike him as alleged in earlier testimony proffered by

the government. He was wholly uncooperative as a witness, however, and testified he did not

know Petitioner, did not throw feces on him, and that Petitioner had never struck him in the face.

(29 RT 6531-36.)

The defense also called David Gutierrez, then an inmate at the California Medical Facility

in Vacaville, in an effort to provide context for the incident that resulted in Petitioner's prior

conviction for voluntary manslaughter. Gutierrez testified concerning an incident in Los Angeles

in late December 1981. Petitioner lived down the hall from Gutierrez at the St. Francis Hotel

during that time. One evening Gutierrez left his apartment and returned to find it had been

burglarized; he knew which two individuals were responsible because they were exiting his

apartment with his television and stereo as he was returning from the store. Later that same

evening he mentioned the incident to Petitioner, describing the two individuals. Gutierrez did not

believe calling the police would have done any good given the questionable individuals who

resided in the hotel. He testified Petitioner was concerned, but did not say anything to him about

confronting the individuals, and he denied seeing Petitioner in possession of a knife. (29 RT

6537-52.)

McGarrity's testimony as an expert in social anthropology involved details concerning

Petitioner's upbringing in Cuba as told to her by Petitioner and his family members. Those

details included the fact Petitioner's mother died when he was about three years old, his

grandparents took he and his infant brother in, but when his grandmother died of cancer, they

were sent to an aunt and uncle's home until the uncle passed away. Ultimately, when he was

about seven years old, Petitioner went to live with his father. By that time, his father had become

involved with another woman who was to care for the boys while he was away working during

the week. This woman mistreated Petitioner and his brother in a number of ways, including

physical and emotional abuse, and often left them unattended. McGarrity also testified about

injuries Petitioner received as a toddler and teenager, including significant separate injuries to his

head requiring hospitalization, as well as psychological counseling he received during his teens in

Santiago, and epileptic attacks he suffered requiring medication.  In his teens, Petitioner attended a number of schools in Santiago where he lived, as well as a boarding school in Havana, before ultimately serving in the military.  During his military service, Petitioner fell from a military truck and was struck by a passing vehicle, suffering severe injuries.  Additionally, McGarrity testified concerning the types of crimes Cubans could be sentenced to prison for that would not result in a prison sentence had the same conduct occurred in the United States.  McGarrity further testified concerning the Mariel boat lift, and Petitioner's time in the Fort Chaffee and Fort McCoy detention centers.  Ultimately, the jury learned that in McGarrity's expert opinion, Petitioner suffered from extreme culture shock as a result of the circumstances of his upbringing in Cuba and abuse suffered while a detainee in Fort Chaffee.  (29 RT 6579-74; 30 RT 6682-87, 6772-78.)

McGarrity subsequently testified about telephone conversations she had just had with Petitioner's father and other family members.  Those conversations served to confirm information she had previously been provided by Petitioner, as well as provided new information.  As to the new information, for example, Petitioner was bullied and taunted by others, and considered to be "somewhat mongoloid," and referred to as the "village idiot."  He was often depressed and cried a lot after being injured as a teenager.  A first cousin, who was considered to be like a sister, relayed that Petitioner had always had physical and mental problems, having endured a lot of mistreatment.  When asked whether this new information changed her expert opinion, McGarrity said that it did not, only that she felt more confident in her opinion in light of these conversations.  She did add that she felt the entire family suffered from emotional problems.  (31 RT 6838-55.)

Finally, David Myers testified concerning his translation of a tape-recorded statement of Manuel Machado Urquia, Petitioner's father, that was read to the jury.  (30 RT 6822-26.)  The statement confirmed information previously relayed to the jury through McGarrity's testimony, particularly regarding Petitioner's childhood upbringing and the injuries he sustained as a child and teenager.  Urquia also admitted punishing Petitioner by confining him to his room and prohibiting Petitioner from participating in activities.  (ECF No. 349 at 2-5.)

*Evidence Adduced in the Habeas Proceeding*

The 2004 opinion of Dr. Pablo Stewart (ECF No. 302, Vol. XXII, Ex. 64) and the 2009

opinions of Dr. Patricia Perez-Arce and Dr. Monica Delgado (ECF No. 320, Exs. 143 & 163) were proffered in state habeas proceedings before the California Supreme Court.

Briefly stated, Dr. Stewart identified three psychiatric conditions affecting Petitioner's mental functioning: (1) complex post-traumatic stress disorder; (2) substantial frontal lobe impairment likely caused by brain injury; and (3) chronic alcohol and cocaine abuse. (ECF No. 302, Vol. XXII. Ex. 64 at 4310-11.) Dr. Perez-Arce's neurological assessment concluded there was "strong evidence of prefrontal brain impairment resulting in cognitive and socioemotional deficits in behavior," "evidence of fine-motor coordination impairment in both hands indicating a brain abnormality in the area of the posterior aspect … of the frontal lobes of the brain," "decreased tactile discrimination … indicating a dysfunction in the associated area of the sensory strip in the anterior aspect of the right parietal lobe," stuttering, "a history of posttraumatic onset of seizures that reflect an electrophysiological brain abnormality," and "cognitive, motor, sensory, and emotional-regulation deficits [expressing a] dysfunction predominantly, but not solely, of his front lobes." (ECF No. 320, Ex. 143 at 5324-26.) And, finally, Dr. Delgado opined that Petitioner was "mentally slow, emotionally volatile, and suffered from seizures, and impaired brain functioning," "suffered extreme physical and emotional damage from early childhood onward," "was further brutalized during incarceration in a Cuban prison and in detention centers in the United States," "faced cultural isolation and a growing dependence on drugs," all of which combined to place him "at highly increased risk for involvement in violence and criminal activity." (ECF No. 320, Ex. 163 at 5512.)

The above-referenced mitigating expert opinions and the associated reports proffered in the habeas proceeding before the California Supreme Court do not amount to a reasonable probability that this evidence would have changed the jury's verdict. The expert opinions reference, in part, material already known to and considered by the jury. And to the degree those opinions included new factual allegations or evidence, its value is questionable. Had Drs. Stewart, Perez-Arce and Delgado testified at trial, the People could have, and undoubtedly would have, offered a rebuttal expert or experts. Wong v. Belmontes, 558 U.S. 15, 25-26 (2009). The government's expert could contradict any diagnoses offered by the defense, and offer a different

diagnosis, undermining the value of the mitigation evidence.  Pinholster, 563 U.S. at 177, 201.

The government appeared prepared to counter the anticipated testimony of Dr. Vicary, but

ultimately did not need to do so.  It is reasonable to infer the prosecutor would have been

prepared to offer expert opinion contradicting any diagnoses offered by the defense, whether

offered by a neuropsychologist or neuropsychiatrist, or any other specialist.

Academic records that may have served to support Petitioner's family's statements as

relayed through McGarrity's testimony – that Petitioner's grades were good and his teachers

thought highly of him – could also work to the government's advantage.  In other words, despite a

difficult upbringing, Petitioner was able to succeed in an academic setting.  A success that could

be seen as mirroring that Petitioner exhibited while detained, wherein he was the first detainee to

earn a GED.  Additionally, those same records may have revealed, as referenced in McGarrity's

testimony, that Petitioner had been known to engage in fights with his peers, or as the prosecutor

argued, that he was an individual who simply took what he wanted when he wanted it.

*Reweighing the Evidence*

Lastly, the court reweighs the aggravating and mitigating evidence, considering whether

there is a substantial likelihood that had the jury heard that evidence it would have concluded that

the balance of aggravating and mitigating circumstances did not warrant death.  Strickland, 466

U.S. at 695.

Here, the aggravating evidence proffered by the government involved (1) the

circumstances of the crime of which Petitioner was convicted, (2) prior felony convictions, and

(3) criminal acts of violence.  (27 RT 5986.)

As to the first aggravating factor, the jury was told it could properly consider the evidence

adduced during the guilt phase portion of the trial.  That evidence was strong and compelling as

discussed elsewhere in these findings.

As to the second aggravating factor, documentary evidence was introduced regarding

Petitioner's April 1982 conviction in Los Angeles County Superior Court for voluntary

manslaughter with use of a deadly weapon and assault with a deadly weapon, and March 1983

conviction in San Luis Obispo County Superior Court for escape from state prison without use of

force.  (27 RT 5990-91.)

Further, Aram Karsian testified concerning the events of December 1981 that relate to Petitioner's conviction for voluntary manslaughter.  Karsian worked at a liquor store in Hollywood and was working with another store employee on a Sunday evening when a man ran inside the store followed by another man, the latter identified as Petitioner.  At the back of the store, the man being chased put his hands and a foot up to protect his body.  Petitioner said, "Chinga su madre," pulled the other man's hands down and stabbed him in the throat with a long-bladed knife.  Then he removed the knife and turned toward Karsian.  Karsian's coworker pointed a shotgun at Petitioner and told him to stop; Petitioner then ran from the store.  (27 RT 5992-6003, 6014-15.)

Robert Rozzi testified in rebuttal concerning the Los Angeles homicide investigation that ultimately resulted in Petitioner's conviction for voluntary manslaughter.  Rozzi testified that David Gutierrez said Petitioner told him he would "take care of" the individuals who had burglarized Gutierrez's apartment, and that the following day Petitioner advised Gutierrez he had stabbed both men.  (30 RT 6802-11.)  The man stabbed by Petitioner in the liquor store survived his injuries.  The second man was found dead in a nearby alley; he too had been stabbed.

Regarding the third aggravating factor, Raymond Lopez testified concerning an incident that occurred at the Sacramento County Jail during an inmate transportation on October 16, 1987.  As he was escorting four inmates off an elevator, Lopez heard a thump behind him and turned to observe a restrained Steven Arthur lying on the floor and Petitioner standing nearby, his hands unrestrained and fists clenched.  In his incident report, Lopez noted a red mark on Arthur's face and Arthur's statement that Petitioner had struck him once in the face with his fist.  Lopez later learned that Arthur had apparently thrown feces on Petitioner when they were housed together on third floor of the jail.  (27 RT 6017-27, 6037.)

Stanton Newcomb testified concerning an incident of May 31, 1988, at the Sacramento County Jail.  Newcomb escorted Petitioner from his cell to the elevator lobby area so that Petitioner could be prepared for transport to court.  When an inmate trustee approached Newcomb about supplies, words were exchanged between the trustee and Petitioner, who had accused the

1  trustee of removing a towel from his cell.  Petitioner and the trustee "squared off" when the

2  trustee denied doing so; Newcomb ordered them to separate and step away from one another.

3  The trustee turned to do so, and then Newcomb observed Petitioner strike the trustee on the side

4  of the head with his fist.  (27 RT 6038-43, 6049.)

5  In reweighing the evidence in aggravation against the total of mitigating evidence, the

6  California Supreme Court could have reasonably concluded that there was no reasonable

7  probability that, absent the assumed errors, the jury would have concluded that the death penalty

8  was not warranted.  Pinholster, 563 U.S. at 202; Richter, 562 U.S. at 112-13.  Even considering

9  the new evidence – whether medical expert opinions or the declarations of family and friends in

10  Cuba, and others – in this case, the aggravating evidence plainly outweighs the mitigating

11  evidence, particularly where Petitioner killed a man, and injured another, a few years prior to the

12  murder of Allen Birkman.  The circumstances of the crime for which he was tried, Petitioner's

13  prior felony convictions and prior acts of violence, are significant and weighty.  They serve to

14  portray a man, readily wielding a knife, without regard for human life.  Wong v. Belmontes, 558

15  U.S. at 22-24, 27-28 (concluding evidence regarding difficult childhood and expert testimony

16  regarding petitioner's mental state unlikely to outweigh facts of brutal murder, and even less

17  likely because he had committed prior murder; any failure to present additional mitigation

18  evidence not prejudicial); see also Strickland, 466 U.S. at 699-700.

19  For those reasons, the undersigned finds that the California Supreme Court could have

20  reasonably concluded that "'fairminded jurists could disagree' on the correctness of the state

21  court's decision."  Richter, 562 U.S. at 101.  Therefore, its denial of his ineffective assistance of

22  counsel claim in this regard involved neither an unreasonable or contrary application of Supreme

23  Court precedent, nor did it involve an unreasonable application of the facts.  28 U.S.C. § 2254(d).

24  ***Claim UU: Failure to Present Evidence Concerning Petitioner's Incarceration in Cuba***

25  ***& in U.S. Detention Facilities***

26  Petitioner contends trial counsel were ineffective for failing to investigate and present

27  mitigating evidence during the penalty phase regarding his incarceration in Cuba and in INS

28  detention facilities in the United States.  He asserts there exists a reasonable probability of a

156

different outcome had the jury learned of this information.  (ECF No. 330 at 259-83.)

Respondent maintains trial counsels' investigation was adequate and resulted in tactical decisions

to limit or omit this evidence.  Moreover, Respondent argues that even if counsel were deficient,

Petitioner suffered no prejudice.  (ECF No. 345 at 132-44.)

### Incarceration in Cuba

Petitioner argues trial counsel performed no investigation "whatsoever" into his prison

experience in Cuba, asserting that Quivican prison is one of the most violent and brutal prisons in

Cuba where hardened felons were housed alongside youthful offenders.  According to Petitioner,

McGarrity's testimony was "truncated" and hindered by trial counsels' failure to visit Cuba and

obtain any records in this regard.  On this point, Respondent asserts that this claim fails at the

outset because Petitioner has offered no evidence that he was actually confined at Quivican

prison.

The undersigned has reviewed Vicente Fournier's declaration and notes Fournier was

serving a "20-year" sentence at the Quivican prison in Cuba before emigrating to the United

States in 1980; a significant length of term difference as compared to Petitioner's sentence.  One

that would be served at a facility different than a facility that housed first time, youthful offenders

as described at trial by McGarrity concerning Petitioner's confinement in Cuba.  Further, Fournier

does not declare he served any time at Quivican alongside Petitioner, or even that the information

provided in his declaration would have been available to trial counsel at the time of Petitioner's

trial.  Hence, his declaration, even assuming the truth of its content, does not serve to establish

trial counsel were ineffective for failing to present this evidence.

The undersigned has also reviewed McGarrity's 2000 report entitled "Cuba's Legal,

Judicial and Penitentiary System."  (ECF No. 302, Vol. X, Ex. 30.)  Interestingly, McGarrity's

report significantly departs from her trial testimony.  At trial, McGarrity testified those young

persons who had committed minor crimes against the state, such as possessing or transporting

ducks on a bus, were jailed with other youthful offenders, separate from those considered to be

hardened criminals, whereas in this report she claims "[i]n most prisons, adults and minors are not

separated."  (Id. at 2061.)  Notably too, McGarrity's report states the following:  "Although

reports of torture, both physical and psychological are common, I will not analyze this aspect of incarceration in Cuba here, as there is no evidence that Machado was subjected to this form of punishment." (Id. at 2062.) And,

> [i]t would be incorrect to consider Alvarez to have been a hardened criminal when he left the island. As was outlined in several ethnographic reports which I prepared for the defense, Alvarez had a very difficult childhood and did not excel at his studies. However, he was not by any stretch of the imagination, a sociopath. He was first imprisoned for transported [*sic*] a duck and a few chickens on a public bus in Santiago. This would be considered delinquent behavior ….

(Id. at 2062-63.)

Nothing about the information McGarrity provided to trial counsel in 1989 would have warranted further information about Petitioner's incarceration in Cuba. Further, her contrary report of more than a decade later does not support a finding of deficiency or prejudice.

More particularly, in her testimony of July 25, 1989, gleaned in large part from between 10 to 18 hours spent interviewing Petitioner (29 RT 6591), McGarrity first referenced Petitioner's criminal background in Cuba as occurring during the period she referred to as the "third stage" or that period between the ages of 13 and 19. (29 RT 6603-30.) She reported Petitioner "was convicted of carrying two ducks on a bus" to supply a friend's restaurant, "and he was sent to prison, I think, for a period under a year." (29 RT 6631.) She continued: "My understanding of the Cuban penal system *and of his experiences there,* was that it was *a pretty benign setting. It was a pretty open prison.*" (29 RT 6631 (italics added).) "They played guitar and played drums and sang, and although they were certainly restricted and they were in jail, *he was in a jail for first offenders and for young adults.* [¶] *He was not with hardened criminal*s or people who had committed felonies, so I think at the time he left [Cuba], he had served like five months of a nine-month sentence …" (29 RT 6631-32 (italics added).) Neither did McGarrity include this incarceration experience when identifying the numerous bases for her expert opinion that Petitioner suffered from extreme culture shock following his immigration to the United States. (29 RT 6643-44; 30 RT 6683-85.)

////

158

In his points and authorities, Petitioner cites to page 6,631 of the Reporter's Transcript involving McGarrity's testimony, to support his assertion that he was "imprisoned in Quivican prison" following his arrest for illegally transporting two ducks. And yet, significantly, a review of the record establishes McGarrity never testified Petitioner was imprisoned at "Quivican." Rather, as noted above, McGarrity testified Petitioner was jailed in "a pretty benign setting," "a pretty open prison" "for first time offenders and young adults" where they played guitar and drums. (29 RT 6631.) She further testified Petitioner "was not with hardened criminals or people who had committed felonies …" (29 RT 6631-32.)

During cross-examination, McGarrity indicated she received equal parts information concerning Petitioner's incarceration in Cuba from Petitioner and from the INS records she was provided by trial counsel. (30 RT 6712.) She testified she "knew about the ducks [from the INS records] before" speaking with Petitioner. (30 RT 6712.) There was mention on cross-examination of a "Cubacan" and "Quibican" as reflected on certain INS documents. (30 RT 6722-24.) McGarrity even spelled it for the record: "Q-U-I-B-I-C-A-N". (30 RT 6723.) She testified she thought "Quibican" was the "name of a juvenile center there" in Havana, and Cubacan was "the prison where they have both juveniles and adults." (30 RT 6723-24.)

McGarrity also testified on cross-examination that she thought the time Petitioner spent in jail in Cuba was not very significant. (30 RT 6733.) And, McGarrity made no mention of Petitioner's incarceration in Cuba when testifying as to her ultimate conclusion on direct: "Okay, my ultimate conclusion is that his early childhood experiences, the loss of his mother, the traumatic experiences with this stepmother, the unstable childhood, the military accident which caused some kinds of memory problems, the experiences in the detention centers, led to a state of mind which was essentially unstable. [¶] I think [he] suffered from extreme culture shock …." (29 RT 6643-44; see also 30 RT 6683-85 [Cuban incarceration omitted].) During redirect and in relation to Petitioner's incarceration in Cuba and the inconsistencies related thereto, McGarrity also testified that the INS "criminal record worksheet" was "totally blank." (30 RT 6776.)

The INS documents do identify "Quivica[n] (Prison)" or "Quibican" as a previous address of Petitioner's in Cuba, but those documents also include a Chronological Record of Medical

Care form that states Petitioner "was being questioned by INS [and] became upset and put hand [right] through window," a memorandum dated September 10, 1980, indicating Petitioner "was seen carrying banners and helping to instigate the riot of 9/7/80" and that he "broke 2 panes of glass with his fists," a memorandum dated August 12, 1980, indicating he "escaped" Fort McCoy with another detainee and was headed to Chicago when he was "picked up by US Border Patrol"; the memo further stated Petitioner was placed in "800" detention overnight "and was reported to have given the Detention Officers many problems." Hence, while the INS documents reflect Petitioner's custody in a Cuban prison, they also reveal particulars about his detention in the United States that the government could have used in aggravation: physical outbursts, instigating a riot, and escape.

During closing arguments in the penalty phase, Mr. Holmes argued Petitioner was not a criminal in Cuba. (31 RT 6946.) Mr. Gable argued that testimony established a person might be sentenced to jail or prison in Cuba for acts that are not crimes in the United States (31 RT 7002), plainly inferring that Petitioner was not a criminal in Cuba and had no true criminal record.

This record reveals that trial counsel had no reason to believe Petitioner spent time in a "notorious" Cuban prison. Additionally, the record establishes that trial counsel elected to minimize the Petitioner's Cuban incarceration as a trial strategy. Hence, there appears to be no deficiency as to trial counsels' performance. Richter, 562 U.S. at 109.

Based upon the foregoing, Petitioner was not prejudiced by defense counsels' election to pursue a mitigation strategy that involved depicting Petitioner's criminal behavior in Cuba as non-existent or minor. Had defense counsel even been aware that Quivican prison was worthy of further investigation as Petitioner alleges – because the record plainly reveals the defense expert believed it to be a "benign" facility for first time offenders rather than hardened criminals, based on hours of interviews with Petitioner wherein he apparently made no mention of a stay in a violent and brutal prison – the jury could have come away with the impression that Petitioner was a violent offender even before coming to the United States. Clearly that was an impression the defense team sought to avoid. The government certainly would have been free to make use of Quivican's reputation as a violent and brutal prison, even if it housed youthful minor-crime

offenders – to bolster its case that Petitioner had always been a violent individual.

It is interesting to note also that a May 7, 2000 report prepared by Ines Monguio, Ph.D., a clinical neurologist who met with Petitioner for a period of ten hours, states Petitioner "spent some months in a labor camp for juveniles." (ECF No. 302, Vol. X, Ex. 32 at 2139.) The report further states, "he was sentenced to a juvenile prison camp in Cuba for stealing two ducks." (Id. at 2140.) It makes no mention of "Quivican" or a prison facility that also housed both adults and children. This information also supports the finding there was no reason for trial counsel to further investigate Petitioner's detention in Cuba, even assuming the documentation was available to them; there was no deficiency on their part and Petitioner was not prejudiced.

Given the above, a fair-minded jurist could have concluded that trial counsel's investigation was adequate and there was no need for further development or investigation concerning Petitioner's incarceration in Cuba, and that Petitioner suffered no prejudice. Richter, 562 U.S. at 101-03, 109, 112-13.

**Detention at Fort McCoy**

The evidence offered by Petitioner to support his claims about Fort McCoy does not serve to prove counsel were deficient or that he was prejudiced by any failure to investigate Petitioner's detention at Fort McCoy.

Defense expert Gail McGarrity testified at trial that Petitioner "spent time" in both "Fort Chaffee and Fort McCoy." (29 RT 6637.) She indicated that although Petitioner had not expected to have to stay at a detention camp when he arrived in the United States (29 RT 6636), at Fort McCoy "he spent time outside the camp, he'd gone into town, [and] he bought American kind of clothes." (29 RT 6639.)

Again, Petitioner complains there was "no investigation whatsoever" into his time at Fort McCoy, and because trial counsel failed to present evidence regarding that period, they rendered ineffective assistance of counsel. And yet, the record reveals their expert's understanding of Petitioner's time at Fort McCoy, as relayed by Petitioner to McGarrity in anticipation of the penalty phase, would have given trial counsel no reason to further investigate his detention at Fort McCoy. Petitioner relayed to McGarrity that he was able to leave the camp and shop in town. He

apparently made no mention of abuse taking place there, apart from being part of a generally unwelcome group of immigrants. On cross-examination, McGarrity agreed that during Petitioner's time at Fort McCoy, he was "given passes" to leave the "compound on occasion." (30 RT 6742.)

This record establishes that trial counsel had information indicating Petitioner's detention at Fort McCoy was, like his incarceration in Cuba, a benign experience. McGarrity's testimony indicates Petitioner never complained of any abuse at Fort McCoy. Further, the record reveals that Dr. Vicary's report makes no mention of Petitioner's detention at Fort McCoy involving any abuse whatsoever.

Specifically, a review of McGarrity's testimony concerning Fort McCoy reveals Petitioner's experience at that initial detention facility differed from his later experience at Fort Chaffee. On the whole, McGarrity offered nothing, based upon the information she had been provided by Petitioner, to suggest Petitioner suffered abuse at Fort McCoy. Conversely, throughout her testimony, whether on direct or cross-examination, it is plain her understanding of Petitioner's experiences at Fort Chaffee were those involving abuse physical and mental. This understanding is further reflected in the closing argument given by Mr. Gable wherein his reference to the abuse Petitioner suffered at the "detention center" was in the singular. (31 RT 7005.)

The undersigned has also reviewed other exhibits offered in support of Petitioner's claim. (ECF No. 302, Vol. XI, Ex. 34-37.) The review does not change the analysis. The fact that there may have been issues at Fort McCoy is, at most, a separate consideration from a determination of whether trial counsel in this case were ineffective.

Following a thorough review of the record, the undersigned finds that the California Supreme Court could have reasonably concluded that fairminded jurists, at most, could disagree whether defense counsel rendered ineffective assistance of counsel for a failure to investigate and present further evidence concerning Petitioner's detention at Fort McCoy. Richter, 562 U.S. at 101-03.

////

### Detention at Fort Chaffee

In her trial testimony, McGarrity had the following to say about Fort Chaffee:

[McGARRITY]: … At Fort Chaffee, when they arrived, the detainees were separated into those who [were] considered to be compliant and [well] behaved detainees and those who, by their style of dress, indicated that they'd had some contact with U.S. society, and therefore, in the view of the guards, [were] more apt to be trouble makers.

The metaphor that I would choose to use in this situation is that a lot of the Cubans when they came here, they were sort of cooped up, and so when they were allowed to get out and see what was on the outside, they were not able to function in the detention center, in a way that was easier for the guards to control them, I don't think that sounded correct - - what I mean is the ones that had been outside of camps got a taste of life in the U.S., experienced things, were gonna be more trouble in a detention center because they would have contacts on the outside, they'd be more likely to go out on passes and to get involved in things that might cause disciplinary problems, whereas the ones who had always stayed inside the camps would be more used to detention life and would be less of a disciplinary problem, anyway, some of the defendants - - I'm sorry, some of the research informants who I spoke with, as well as the defendant, said they were separated in this manner.

When the defendant was separated and placed with other people, who were seen to be potential trouble makers, they were made to do what could be considered quite demeaning acts.

They were stripped in front of the guards, they were made to jump up and down and say things ….

(29 RT 6646-47.)  And, "they were forced to imitate animals like ducks and chickens and pigs, and to jump up and down in imitation of those animals, and they were forced to repeat in English, 'I am a faggo[]t, I am a gay,' and sort of make themselves ridiculous while the guards laughed at them."  (29 RT 6654.)  Because this behavior was afflicted upon Cuban males – members of a "very so-called macho" and "exaggerated" masculine society – it was particularly demeaning, and McGarrity believes it served to compound the culture shock.  (29 RT 6655.)  She also testified regarding Petitioner's having earned the first GED diploma awarded to a Cuba detainee at Fort Chaffee.  (29 RT 6656-58.)  A defense exhibit dated January 24, 1981, published in Spanish, was shared with the jury; it concerned Petitioner's academic accomplishment and included his photograph alongside the director of Fort Chaffee.  McGarrity explained to the jury that the article noted the fact Petitioner performed maintenance and janitorial work at the camp, and "had good relations with all of the employees there," and also referenced Petitioner's hope of

1 continuing his education in the United States. (29 RT 6658-59.)

2 The record reveals that trial counsels' strategy involved providing general information

3 concerning the difficulties faced by Cuban refugees on the whole, including conditions at the

4 detention centers. Mr. Holmes's September 1, 1999 declaration confirms as much. (ECF No.

5 302, Vol. XXVI, Ex. 136 ["As to the conditions of confinement in Fort Chaffee, Arkansas, we did

6 present experts Siro Del Castillo and Gail McGarrity on the problems of Cuban refugees in the

7 United States"]). That strategy was not unreasonable because it is "at least arguable that a

8 reasonable attorney could decide to forgo" further inquiry into Petitioner's detention at Fort

9 Chaffee. <u>Richter</u>, 562 U.S. at 106. There are "'countless ways to provide effective assistance in

10 any given case. Even the best criminal defense attorneys would not defend a particular client in

11 the same way.'" <u>Id.</u> at 106 (citing <u>Strickland</u>, 466 U.S.at 689).

12 The evidence offered to support Petitioner's claim that the defense team was ineffective

13 for a failure to investigate and present additional mitigation evidence concerning Petitioner's

14 detention at Fort Chaffee also serves to reveal that same evidence contains information the jury

15 would very likely have considered aggravating rather than mitigating.

16 More particularly, although the documents generated as a part of the government's

17 investigation into numerous abuses perpetrated at Fort Chaffee may have served to give greater

18 context to the testimony of Del Castillo and McGarrity, that same evidence would have served to

19 reveal Petitioner's own assaultive-type behavior and grand jury testimony lacking in veracity and

20 credibility. For example, frustrated with a process he apparently did not understand, upon his

21 arrival at Fort Chaffee, Petitioner kicked the door of the holding cell. Yet, despite the accounts of

22 other eye-witnesses present, during his grand jury testimony, Petitioner denied kicking the door.

23 (ECF No. 302, Vol. XIII, Ex. 39 at 2661, 2664.) Significantly too, when asked what he had been

24 to jail for in Cuba, Petitioner did not admit to possessing or stealing two ducks during his grand

25 jury testimony; rather, he claimed the police arrested him for a crime other Cubans in the area

26 committed, and that he was convicted of robbery because the police "couldn't find the other

27 people, the people who had actually stolen from that place." (ECF No. 302, Vol. XIII, Ex. 39 at

28 2660.) Petitioner's grand jury testimony stands in stark contradiction to all previous accounts of

the stolen duck story.  Further, the not guilty verdicts recorded against the four detention officers facing federal criminal charges regarding the abuses perpetrated at Fort Chaffee could have been used by the prosecutor to argue or infer that Petitioner's own poor behavior was the cause of his injuries.

By offering the testimony of Del Castillo and McGarrity with regard to the general conditions at Fort Chaffee, the defense successfully presented some mitigating evidence and avoided having the jury learn information that would have negatively affected their mitigation efforts.  "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." Richter, 562 U.S. at 108 (citing Strickland, 466 U.S. at 691).

In any event, even assuming counsel were deficient for failing to present more specific evidence concerning Petitioner's detention at Fort Chaffee, the California Supreme Court could have reasonably concluded Petitioner suffered no prejudice because it was not reasonably likely the result would have been different had the jury learned the more specific information, particularly where it may also have been harmful.  Richter, 562 U.S. at 111-13.  As previously noted, the aggravating factors in this case greatly outweighed those in mitigation, even had the jury learned about certain abuses Petitioner suffered either in Cuba or in INS detention facilities.

A review of the entire record before the California Supreme Court reveals that fairminded jurists could disagree about whether the defense team was ineffective for failing to present evidence about more specific evidence about detention facilities in either Cuba or the United States.  Richter, 562 U.S. at 101-03.  Hence, the California Supreme Court's denial of Petitioner's ineffective assistance of counsel claim is neither contrary to nor does it involve an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d).  The undersigned hereby RECOMMENDS that Claim UU be DENIED.

### Claim KK: Failure to Investigate Glidewell

Petitioner claims trial counsel were ineffective for failing to investigate Edwin Glidewell's background, which would have led to impeachment evidence due to Glidewell's cocaine addiction.  Petitioner alleges that had the information been presented, there is a reasonable

probability he would not have been convicted or sentenced to death. (ECF No. 330 at 237-38.) Respondent contends the California Supreme Court's rejection of this claim was not necessarily unreasonable or contrary to Supreme Court precedent. (ECF No 345.)

Petitioner presented this claim in his first and second state habeas petitions; both were denied on their merits. Despite Petitioner's assertion otherwise, as previously addressed by the undersigned, the AEDPA applies.

### Relevant Background

Edwin Glidewell testified at trial. (13 RT 2688-730.) On May 13, 1987, Glidewell traveled from his home in Washington state to Sacramento for a medical appointment. (13 RT 2689-90.) He stopped first at his brother's home located at 2485 Boxwood, leaving the keys in the ignition of his red 1975 Chevrolet Camaro. (13 RT 2689-90, 2696.) As Glidewell stood at the open door of his brother's home trying to hurry his wife along, he observed Petitioner walking toward El Camino Boulevard; Glidewell recognized Petitioner as someone who frequented the Boxwood area. (13 RT 2693-95.) Once Petitioner neared the passenger door of the Camaro, he jumped around the vehicle and into the driver's seat, starting the car and driving away, spinning its tires. (13 RT 2695-96, 2699.) Glidewell gave chase, yelling to the family inside the house to call 911. (13 RT 2696-97.) When police arrived, Glidewell described the individual who stole his car. (13 RT 2701-02.) Glidewell admitted a prior felony conviction for burglary approximately ten years prior. (13 RT 2704.)

When Petitioner testified about these events, he claimed that as he left Stramaglia's apartment and headed down the street, he ran into "an older Cuban guy" who told him that a "white dude that I be dealing with him for the last, you know, two or three days, that he was looking for me again …," identifying Glidewell as that man. (18 RT 4056-57, 4061, 4068; see also 19 RT 4435-36.) Petitioner testified he met Glidewell on his first visit to the Boxwood

166

neighborhood and they discussed Petitioner having "good cocaine." (18 RT 4057-60.) Petitioner walked to the home Glidewell previously identified to him as his residence; Glidewell was on the front porch. (18 RT 4069.) He asked Petitioner to "front" a half ounce of cocaine; Petitioner declined. (18 RT 4069-71.) Glidewell then offered to trade crank for cocaine; Petitioner again declined. (18 RT 4071-72.) Finally, Glidewell offered his car as collateral for the half ounce of cocaine and Petitioner agreed. (18 RT 4072-75.) The drug transaction took about ten to fifteen minutes and occurred inside the house. (18 RT 4075-76.) Petitioner left in Glidewell's car. (18 RT 4077-78.) On cross-examination, Petitioner claimed Glidewell did not leave any luggage or anything of value in the car. Rather, there was a bag of dirty laundry and a "piece of junk" camera. (19 RT 4307-08.) Petitioner never returned to the house where Glidewell stayed to tell him "here's your car, I want my money," before leaving Sacramento. (19 RT 4312.) He testified he didn't do so because he had been told "the white dude, you know, was talking to the police, and that he was saying that I ripped him off;" if he tried to return the car, he would be arrested and Glidewell would get his car back and Petitioner's "dope." (19 RT 4313.) Petitioner told Neetlefer that he bought the car for $500 and some cocaine because it wasn't "her business" to know he was holding the car as collateral. (19 RT 4349-57.)

**Analysis**

Initially, the undersigned notes that Respondent is correct: Petitioner has offered no evidence to support his claim that Glidewell was an addict. Conclusory allegations that are not supported by specific facts do not merit habeas relief. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

In any event, Mr. Holmes's September 1, 1999 declaration states the following: "I have little recollection of why the defense did not investigate Glidewell's drug use except that such drug use, if true, did not seem helpful to the defense; that is, as defense counsel, we reasoned that

our client would appear in a worse light as Glidewell's drug supplier than as the thief of his car." (ECF No. 302, Vol. XXVI, Ex. 136 at 5254-55.)  Neither of Mr. Gable's declarations address the issue.  (ECF Nos. 302, Vol. XXII, Ex. 63 & 320.)  Counsel therefore made a reasonable, strategic decision not to investigate Glidewell's drug use, if any.  Strickland, 466 U.S. at 691 ("counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary").

> In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, 466 U.S. at 689, and by giving a 'heavy measure of deference to counsel's judgments,' *id*., at 691.

Rompilla v. Beard, 545 U.S. at 381.  "It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.]"  Richter, 562 U.S. at 105. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  Id.  Here, while habeas counsel in the place of trial counsel, or any other counsel in place of trial counsel, would have or may have investigated and even presented evidence of Glidewell's addiction, assuming it existed, trial counsels' election not to pursue Glidewell's drug use in favor of avoiding the additional or further taint of Petitioner being labeled a drug dealer or supplier does not amount to incompetence under prevailing professional norms.  "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."  Richter, 562 U.S. at 108.  Furthermore, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  Id. at 109.

Even if the undersigned were to find counsel to have been deficient, Petitioner cannot establish the required prejudice.  Assuming evidence of Glidewell's supposed crack addition existed, there is no reasonable probability that, but for the errors of Messrs. Holmes and Gable,

the result of the penalty phase would have been different.  All Petitioner can potentially show is that those "errors had some conceivable effect on the outcome of the proceeding," but that "is not enough."  Strickland, 466 U.S. at 693-94.

Glidewell testified that when Petitioner jumped into the Camaro and started the engine, he immediately gave chase and yelled to the occupants of his brother's home to call 911.  The police responded to the call and Glidewell made a report concerning the theft of his vehicle.  (13 RT 2695-702; see also 17 RT 3813-20 [Testimony of Michael Tupper].)  In addition to testifying that Glidewell gave him the car as collateral for a half ounce of cocaine, Petitioner testified that Glidewell told him "he, you know, was moving dope back and forth," between Oregon or Washington and California.  (18 RT 4076-77.)  And, Petitioner denied Glidewell chased after the car as he drove off.  (18 RT 4077.)

The jury heard both versions of the events surrounding Petitioner's possession of the Camaro and apparently found Glidewell's version to be the more credible of the two.  The jury did so in spite of Glidewell's criminal background and the inferences raised on cross-examination that he was a drug user.  Additionally, as Respondent contends, the significance of the taking of Glidewell's Camaro was not why or how Petitioner came to be in possession of it – but rather, that the vehicle was the one used by Birkman's killer.  Petitioner admitted he was in possession of the Camaro.  Whether that possession was the result of a theft or not, the jury was not substantially likely to return a different verdict on the murder charge.  Hence, the California Supreme Court was not unreasonable in concluding Petitioner's evidence of prejudice fell short of the Strickland standard.  Richter, 562 U.S. at 112.

A fairminded jurist could have found defense counsel were not deficient by failing to investigate and present evidence that Glidewell was a crack addict and, in any event, that Petitioner was not prejudiced thereby.  Strickland, 466 U.S. 687-98.  Therefore, the California

Supreme Court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, the undersigned RECOMMENDS that Claim KK be DENIED.

### Claim XX: Failure to Rebut Aggravating Evidence

Petitioner also asserts trial counsel were ineffective for failing to mitigate the aggravating evidence of Petitioner's prior Los Angeles conviction for voluntary manslaughter and assault with a deadly weapon. Specifically, he contends that had counsel employed the preliminary hearing transcript, versus the testimony of David Gutierrez, there is a reasonable probability that he would not have been convicted or sentenced to death. (ECF No. 330 at 285-86.) Respondent maintains the California Supreme Court's denial of the claim is neither unreasonable nor contrary to established Supreme Court precedent. (ECF No. 345 at 148-54.)

Petitioner presented this claim in his first and second state habeas petitions; both were denied on their merits. Despite Petitioner's assertion otherwise, and as previously addressed by the undersigned, the AEDPA applies.

### Relevant Background

The prosecution admitted exhibits 136 and 137, establishing Petitioner had been convicted of voluntary manslaughter with the use of a deadly weapon and assault with a deadly weapon on April 19, 1982, in Los Angeles County Superior Court. (27 RT 5990.)

Thereafter, Aram Karsian testified concerning the events of December 27, 1981. (27 RT 5992-6015.) More particularly, at about 11:00 p.m., Karsian was stocking the cooler at a liquor store on Hollywood Boulevard where he worked with another employee, Jim. A man ran inside the store toward the back, being chased by another man armed with a knife. (27 RT 5992-99.)

170

The first man tried to protect himself by putting his hand and a foot up, but the second man – identified by Karsian as Petitioner – pulled the other man's hands down and stabbed the man in the throat. (27 RT 5997-99, 6001.) Just before Petitioner stabbed the man, he said, "Chinga su madre," or "fuck your mother, motherfucker." (27 RT 5999-6000.) The victim fell to the ground and Petitioner pulled his knife from the man's throat and started to move towards Karsian. (27 RT 6001-02.) Karsian backed up, and Jim – now armed with a shotgun – shouted "stop;" Petitioner ran out of the store. (27 RT 6002.) Karsian described Petitioner's knife as about 18 inches long, with a 14-inch blade. (27 RT 6014-15.)

In his opening statement to the jury during the penalty phase, Mr. Holmes told the jury the defense team was going to "present some evidence of facts leading up to" the prior conviction so that the jury would "understand from the evidence, that along with other things, other than one man walking up to another man, putting a knife into his neck, there were some things leading up to this." (27 RT 6111.) That evidence came in the form of David Gutierrez's testimony.

Concerning the day of the incident specifically, Gutierrez testified that he had gone to the store and returned to find two men exiting his apartment at the St. Francis Hotel with his television and stereo. (29 RT 6538-43.) When Gutierrez asked the men why they had his television, one of the men threw the television at him and both ran downstairs. (29 RT 6043-44.) Later that evening he told Petitioner about it, describing the two men. Petitioner was concerned, but not hostile. (29 RT 6544-45, 6547.) Petitioner left and didn't return that evening; Gutierrez saw him the next day. (29 RT 6547, 6566.) Gutierrez testified Petitioner never told him he had confronted the two men or taken care of the "Mexicans." (29 RT 6566-68.) Gutierrez later identified the man who had his television when police showed him the photograph of a dead man. (29 RT 6546, 6553, 6565-66.) He denied telling detectives that Petitioner had been living with

him, or that they were lovers, and denied that police had to kick in the door when they came to arrest Petitioner.  (29 RT 6553-55, 6562-64.)

Homicide detective Robert Rozzi testified on behalf of the People.  (31 RT 6802-21.)  On December 28, 1981, Rozzi was assigned to investigate a body found behind a business on the northeast corner of Hollywood Boulevard and Gramercy Place.  (31 RT 6803, 6805.)  During the course of his investigation, that homicide was connected to the assault occurring at a nearby liquor store.  (31 RT 6804-05.)  The body showed evidence of a stab wound to the left side of the back, near the hip.  (31 RT 6806, 6812.)

Ultimately, Rozzi contacted David Gutierrez.  (31 RT 6806.)  Gutierrez and Petitioner were found in Gutierrez's room after the detective and his partner received no response to Rozzi's knock and the hotel manager opened the door with his key.  (31 RT 6806-08.)  Rozzi took a statement from Gutierrez.  (31 RT 6809.)  Gutierrez told him that when Petitioner returned to the apartment the day after the burglary incident, Petitioner told Gutierrez he had "taken care of the Mexicans, that he had stabbed them both down by the liquor store."  (31 RT 6810-11.)  Gutierrez identified one of the men as the homicide victim found in the alleyway.  (31 RT 6811.)

**Analysis**

Initially, the undersigned notes Petitioner's points and authorities include the following statement:  "[t]he Los Angeles homicide was emphasized by the prosecution during closing argument as evidence that [Petitioner] was a vicious unredeemable killer; the trial judge expressly adopted this view when he found that death was the appropriate sentence ….  RT 7052." (ECF No. 330 at 285.)  However, a review of Volume 32 of the Reporter's Transcript, in context of the court's overall comments, reveals it placed significance on a number of factors in making its determination that death was the appropriate penalty, including the circumstances of the Birkman murder, the Slatten assault and robbery, and the Stramaglia rape.  Less significant than those

crimes and Petitioner's prior conviction for voluntary manslaughter and assault with a deadly

weapon were the "fairly minor scuffles in the jail setting" and the escape from prison in 1983. (32

RT 7051-53.)  The court then commented that

> of significance, something that was pointed out in the Prosecution's argument is Mr. Alvarez's propensity for violence and that the fact that he chooses to impose violence and death on other individuals, personally, by direct contact, and to me, that indicates a particularly vicious attitude toward his fellow human beings, and the fact that he can walk up to a person and shove a knife in their chest or back or neck and walk away from it and then do it twice again, is a significant factor indicating that there's no possibility of any type of rehabilitation of this individual, and there's no possibility that he can live in society and not place in danger the lives of other human beings, and that includes being in prison.

(32 RT 7053.)

In any event, Petitioner argues trial counsel were deficient because the only thing

Gutierrez's testimony provided was "evidence that [he] had a motive for attacking the victims,

and a stated intent to do so" (ECF No. 330 at 286), but the undersigned disagrees.  It was not

unreasonable for trial counsel to offer the testimony of Gutierrez for the reason stated during

opening argument, or to provide context or "some evidence of facts leading up to" the incident

giving rise to the conviction.  That was not an unreasonable strategy.  Nor would it be

unreasonable for the California Supreme Court to determine counsel were not ineffective for

having done so because fairminded jurists could disagree.  Richter, 562 U.S. at 101-03.

Nonetheless, Petitioner argues that introducing the preliminary hearing transcript would

have "been far more effective mitigation," claiming the prosecution had no evidence that

Petitioner "killed the 'John Doe."  (ECF No. 330 at 286.)  But this is nothing more than hindsight

or second-guessing.  Richter, 562 U.S. at 105.  Offering Gutierrez's testimony for context

regarding Petitioner's prior convictions for voluntary manslaughter with the use of a deadly

weapon and assault with a deadly weapon did not amount to incompetence under ""prevailing

professional norms.'"  Id.

Respondent argues that had defense counsel admitted the preliminary hearing transcript from the Los Angeles conviction, the jury would have learned that Petitioner was held to answer on murder and attempted murder charges,[26] and that the graphic depiction of the crimes would have revealed there were three victims rather than the two referenced during the penalty phase proceedings.  (ECF No. 345 at 150-52.)  Respondent is correct.

The undersigned's review of the preliminary hearing transcripts, dated January 22 and January 25, 1982, from the proceedings before Division 37 of the Los Angeles County Superior Court involve the testimony of Juan Abundez, who, on December 27, 1981, at about 11:00 p.m., witnessed Petitioner attempting to start a fight with his friends - known as "Louie" and "Guatemala" – and chasing them from the area of 5555 Hollywood Boulevard.  Abundez saw Petitioner push at Guatemala while he had something shiny in his hand, and also witnessed Petitioner chase Louie into a nearby liquor store and exit seconds later armed with a big knife. James Whitworth, a clerk working in the liquor store, identified Petitioner as the man who chased "Louie" into the store.  Petitioner knocked the other man down, stabbed him in the neck with a long knife and then "took off," running out of the liquor store.  Testimony was also offered by a Los Angeles homicide detective who observed a blood trail, or "dropping and splatterings," from 5555 Hollywood Boulevard to Gramercy Place where the decedent was found on December 28, 1981, and a Los Angeles coroner's investigator who estimated the decedent had been dead for approximately 14 to 16 hours based upon body temperature and rigor mortis.  The parties stipulated that an autopsy performed on the decedent identified his cause of death as a stab wound to the back that perforated the left kidney, stomach, liver and pericardial sac.  Ultimately, Petitioner was held to answer for murder and attempted murder.  (ECF No. 302, Vol. XXVI, Ex. 119.)

_____

[26] The trial court was careful to ensure the jury understood the prior conviction involved manslaughter rather than murder.  (27 RT 5980-81.)

Notably too, had defense counsel relied exclusively on the preliminary hearing transcript, prosecution trial witness Aram Karsian's testimony would have been bolstered by that given by James Whitworth, or "Jim" as Karsian's referred to him, at the 1982 preliminary hearing. All without the benefit of the context for Petitioner's actions and leaving the jury with the impression Petitioner confronted and assaulted completely innocent individuals.

In light of the foregoing, it would not be unreasonable for the California Supreme Court to conclude trial counsels' strategy spared the jury an impression that Petitioner stabbed two men in the absence of provocation and was, therefore, not deficient. Richter, 562 U.S. at 108.

Even assuming arguendo there was deficient performance, Petitioner was not prejudiced. He argues trial counsels' "failure to mitigate the prior conviction was deficient performance that prejudiced [him] because the State's aggravating evidence came in unrebutted and unmitigated," citing Rompilla v. Beard, 545 U.S. at 383-84. (ECF No. 330 at 286.) However, it is inaccurate to say the evidence of Petitioner's prior conviction for voluntary manslaughter and assault with a deadly weapon was "unmitigated." As explained above, providing context for the incident giving rise to the conviction revealed the victims to be burglars known to be associated with other criminal types who targeted residents of the St. Francis Hotel, rather than innocent bystanders.

Furthermore, it is not reasonably probable that had trial counsel opted to introduce the preliminary hearing transcript from the Los Angeles conviction, versus present the testimony of Gutierrez, that the outcome of the penalty phase would have been any different. Strickland, 466 U.S. at 696. In the scenario preferred by Petitioner, the California Supreme Court could have concluded that the jury would have been left with a more negative impression of him because it would not have heard from any witness about a prior burglary occurring at the St. Francis Hotel that involved both of Petitioner's victims in the role of burglars. Any likelihood of a different

175

result was nothing more than remotely conceivable.  <u>Strickland</u>, 466 U.S. at 693-94; <u>Richter</u>, 562 U.S. at 111-13.  Simply stated, fairminded jurists could disagree.  <u>Richter</u>, at 101-03.

In sum, the undersigned finds the California Supreme Court's denial of Petitioner's ineffective assistance of counsel claim for defense counsels' failure to mitigate a prior conviction for voluntary manslaughter by introducing the preliminary hearing transcript for that conviction, rather than the testimony given by David Gutierrez, was neither an unreasonable application of, nor contrary to, existing Supreme Court precedent.  28 U.S.C. § 2254(d).  Therefore, Petitioner is not entitled to relief and the undersigned RECOMMENDS that Claim XX be DENIED.

**Claim ZZ: Failure to Retain Mental Health Experts**

Petitioner maintains that he is entitled to relief for trial counsels' failure to retain, in both the guilt and penalty phases, an expert in the field of pharmacology or drug abuse and its effects on the brain.[27]  (ECF No. 330 at 286-96.)  Respondent counters that the California Supreme Court's adjudication of the claim was neither contrary to, nor an unreasonable application of, <u>Strickland</u>.  (ECF No. 345 at 145-62.)

The claim is exhausted as Petitioner presented it in both his first and second state habeas petitions, and the state's highest court denied the claim on its merits.  And, despite Petitioner's assertion otherwise, as previously addressed in these findings by the undersigned, the AEDPA applies.

**Relevant Background**

<u>Guilt Phase</u>

As previously noted, Petitioner testified in his own defense.  With specific regard to his drug use, Petitioner did testify to such use (18 RT 4023, 4097-100, 4104-07, 4113-16; 19 RT

---

[27] "Psychopharmacology is the study of the effects of drugs and mechanisms of drug action on the brain and behavior."  <u>Williams v. Calderon</u>, 41 F.Supp.2d 1043, 1051 (C.D.Cal. 1998).

176

4365-66); however, most of the testimony centered on Petitioner's *sales* of (and reputation related to those sales) or "rocking up" of the drug, rather than his use of it. (18 RT 4027, 4029-33, 4057-60, 4070-75, 4101-04; 19 RT 4189-90, 4192-99, 4257-59, 4281-84, 4287-97, 4315, 4332-34, 4341, 4405-06, 4435-36). During that testimony, Petitioner made no reference to his own use or sale of heroin,[28] and denied smoking cocaine while at Neetlefer's home. (19 RT 4359). Other witnesses testified to Petitioner's drug use, e.g., Gail Patton and co-defendant Ross. Petitioner also testified to drinking to excess on two occasions: once the evening before his encounter with Stramaglia, and again the following Saturday with co-defendant Ross. (18 RT 4019-20, 4139-40, 4149; see also 19 RT 4288-89, 4365-66, 4373.)

Addressing the trial generally and the guilt phase particularly, trial counsel Holmes' declaration pertaining to this issue states:

> Claim ZZ, the alleged failure of counsel to investigate and obtain expert advice on Petitioner Alvarez's use of crack cocaine.
> The defense observed and/or ascertained nothing that would indicate that Mr. Alvarez's drug use affected him in any significant way. Moreover, to have presented the defense that Mr. Alvarez did not have the ability to form specific intent at the time of the crimes at issue would have contradicted Mr. Alvarez's testimony that he did not commit any of the charged crimes.

(ECF No. 302, Vol. XXVI, Ex. 136 at 5259.)

<u>Penalty Phase</u>

Defense expert Gail McGarrity testified that her interviews with Petitioner revealed he first consumed alcohol in Cuba at the age of 14 or 15, and that he was exposed to a variety of illicit drugs when he arrived in the United States. (19 RT 6591, 6616-17, 6667-69; 30 RT 6747-50.) McGarrity believed Petitioner began to feel disgusted by the lifestyle he was leading, including his sales of drugs, and that he used drugs to escape. (29 RT 6669; 30 RT 6706-07.) That drug use clouded his faculties (30 RT 6705) and altered his "mental condition," making him

---

[28] Petitioner testified that Black Tony told him he only used heroin, not cocaine. (18 RT 4024.)

more capable "of worse acts" (30 RT 6756). McGarrity also testified that she was told by Petitioner and the defense team that he was under the influence of drugs at the time he committed these crimes, having been on a days-long binge. (30 RT 6757-58.)

Trial counsel Gable's November 2004 declaration provides the following:

> Upon the advice of another local attorney, I retained Dr. Vicary to evaluate Mr. Alvarez's mental health for penalty phase purposes. I tried to communicate with Dr. Vicary numerous times prior to the penalty phase trial in order to determine what his report would be. Dr. Vicary did not provide me with any information until the night before he was scheduled to testify. I was surprised to find that Dr. Vicary's report contained information, received from Mr. Alvarez and about which I was unaware prior to examining the report, that could potentially have been inflammatory. Dr. Vicary's failure to cooperate made it impossible for me to seek other mental health assistance prior to trial. Dr. Vicary did not review Gail McGarrity's report of Mr. Alvarez's background, nor did he talk to her about any of the information she had gathered from family members. Dr. Vicary did not interview any of Mr. Alvarez's family members himself. Without appropriate background material I felt Dr. Vicary's evidence could not be used. I had not used Dr. Vicary prior to the Alvarez trial, and would never use him again after that experience.

(ECF No. 302, Vol. XXII, Ex. 63 at 4288-89.) Mr. Gable's declaration makes no specific mention of Petitioner's drug use, nor does his 2009 declaration address the issue. (ECF No. 320, Ex. 160.)

Although Forensic Psychiatrist William Vicary did not ultimately testify at trial, he met with Petitioner on three occasions for a total of about eight hours prior to issuing his July 24, 1989 report. He reviewed numerous documents provided by counsel, including preliminary hearing transcripts, Petitioner's trial testimony, investigator interviews with Petitioner, neurological reports and psychological test reports. (ECF No. 302, Vol. XXI, Ex. 58 at 4110.) Exploring Petitioner's mental condition and the existence of any mitigating circumstances (id., at 4110), the doctor identified "Substance Abuse" as a mitigating factor:

> The defendant began abusing alcohol and drugs during his teens. The drugs of abuse included marijuana, amphetamines, heroin, and cocaine. In part, the defendant's substance abuse was an attempt at self-medicating his depressive symptoms. He did achieve some short-term relief of his frustration and despair. Over time, however, his substance abuse only exacerbated his mental deterioration. His use of alcohol,

amphetamines, and cocaine was an inflammatory factor with regard to his seizures and aggressive outbursts. The defendant was in an intoxicated state during virtually all his antisocial behavior. At the time of the manslaughter he was drunk and under the influence of amphetamines. During the period just prior to the current offenses, the defendant had been consuming substantial amounts of alcohol and cocaine each day. At the time of the offenses, he was intoxicated on alcohol and cocaine. His acute and chronic intoxication compromised his judgment and impulse control.

(ECF No. 302, Vol. XXI, Ex. 58 at 4122-23.)

**Analysis**

To review, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. In considering whether trial counsel was ineffective on federal habeas review, the

> pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. … For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.' [Citation.] A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."

Id., at 101 (emphasis in original). "Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id., at 105. Applying Strickland and § 2254(d) to this claim calls for '"doubly"' deferential review. Id., at 105.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101. The undersigned "must determine what arguments or theories supported or ... could have supported, the state court's decision" and then "must ask whether it is

possible fairminded jurists could disagree that those arguments or theories are inconsistent" with a holding of the Supreme Court. Id. at 102.

"[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Richter, 562 U.S. at 102. Petitioner is required to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

Deficient Performance

**Guilt phase**

Petitioner contends trial counsel were deficient for failing to retain a medical expert who specialized in drug abuse and its effects on the brain.

Trial counsel Holmes's declaration provides two bases for electing not to do so: (1) counsel did not believe Petitioner's drug use "affected him in any significant way" based upon their observations and investigation; and (2) presenting a defense wherein it was asserted Petitioner's drug use prevented him from forming specific intent was inconsistent with the defense asserted – that Petitioner did not commit the crimes charged. (ECF No. 302, Vol. XXVI, Ex. 136.) Giving counsels' actions the double deference to which they are entitled, the undersigned finds the California Supreme Court could have determined defense counsel were not deficient. Richter, 562 U.S. at 105.

"Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" Richter, 562 U.S. at 105. Both Holmes and Gable "interacted with the client" regularly and would have knowledge of materials outside the record. Mr. Holmes's declaration

indicates the defense team "observed and/or ascertained nothing that would indicate that Mr. Alvarez's drug use affected him in any significant way." Mr. Holmes continued, stating "to have presented the defense that Mr. Alvarez did not have the ability to form specific intent at the time of the crimes at issue would have contradicted Mr. Alvarez's testimony that he did not commit any of the charged crimes." Neither of Mr. Gable's declarations specifically address Petitioner's drug use. The undersigned will not "second-guess" counsel's assistance.

Trial counsel Holmes and Gable knew the facts of the case, and Holmes's declaration makes clear the defense team did not believe Petitioner's drug use was a significant factor. This determination is not unreasonable, even in the face of Petitioner's significant use of drugs and alcohol, given his actions and decisions following the involved crimes: (1) after raping Stramaglia, he stole Glidewell's nearby vehicle (Camaro) and fled the area; (2) following the Birkman robbery and stabbing, Petitioner and co-defendant Ross fled to Patton's apartment until the police arrived to question residents about a Camaro parked nearby because it had just been used in a robbery; (3) Petitioner then leaves Patton's apartment alone on foot, assaulting the elderly Slatten and robbing her of her purse and vehicle (Taurus) at a nearby convenience store; (4) leaving the state altogether before being apprehended more than a week later in Mississippi driving that same vehicle. Given that evidence, trial counsel could "reasonably surmise … that character and psychological evidence would be of little help." Strickland, 436 U.S. at 699. "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." Richter, 562 U.S. at 108.

Further, counsel may have made the strategic decision that evidence of drug use and any brain disorder or impairment related thereto could also function as a double-edged sword, demonstrating Petitioner's dangerousness. Atkins v. Virginia, 536 U.S. at 321. Counsel may have reasonably concluded that calling such an expert would have other risks, including shifting

attention away from whether Petitioner was telling the truth, or cause the case to become a battle of the experts. Richter, 562 U.S. at 108-09. In any event, the California Supreme Court could have reasonably concluded counsel were not ineffective on this basis because fairminded jurists could disagree. Id., at 101.

Moreover, given Petitioner's testimony and the defenses to his four crimes, offering the testimony of a mental health or pharmacology expert to address drug abuse and its effects on the brain would have been contradictory. To briefly summarize, Petitioner testified (1) there was consent in relation to the rape of Stramaglia, (2) that he did not steal Glidewell's vehicle, rather Glidewell offered it as collateral in a drug deal, (3) that he didn't have access to Glidewell's vehicle at the time of the Birkman robbery and murder, inferring someone else committed those crimes, and (4) that he bought Slatten's vehicle from a couple of young men, trading drugs despite knowing it was stolen. See, e.g., Williams v. Woodford, 306 F.3d 665, 709 (9th Cir. 2002) ("Given this factual support for the alibi defense, it was clearly within the wide range of professionally competent assistance for [defense counsel] to choose not to present a psychiatric defense theory that could conflict with the alibi defense") (amended & superseded on other grounds, 384 F.3d 567 (9th Cir. 2004), cert. denied, 546 U.S. 934 (2005)); Bean v. Calderon, 163 F.3d at 1082 (rejecting claim that defense counsel failed to thoroughly investigate Bean's mental impairment and drug use and unreasonably rejected a mental impairment defense because "[o]nce [defense counsel] reasonable chose [an alibi] theory, largely on the basis of Bean's own representations, his duty to investigate the directly conflicting [mental impairment] defense was at an end"); Correll v. Stewart, 137 F.3d 1404, 1411 (9th Cir. 1998) (defense counsel not ineffective for failing to present psychiatric evidence that would have contradicted the primary defense theory of misidentification), cert. denied, 525 U.S. 984, 996 (1998); Turk v. White, 116 F.3d 1264, 1267 (9th Cir. 1997) ("After [trial counsel] reviewed the preliminary facts of the case, he

reasonably decided that he would pursue only a theory of self-defense.  Even if Turk told [trial counsel] of his mental problems, [trial counsel] did not need to investigate Turk's competency.  As Strickland suggests, once [trial counsel] reasonably selected the self-defense theory, his duty to investigate the competency defense, which directly conflicted with the self-defense theory, ended"), cert denied, 522 U.S. 1125 (1998); Villafuerte v. Stewart, 111 F.3d 616, 630 (9th Cir. 1997) (counsel properly declined to raise an intoxication defense because it would have contradicted defense theory that someone else committed crime) (cert. denied, 522 U.S. 1079 (1998)); Fritchie v. McCarthy, 664 F.2d 208, 215 (9th Cir. 1981) (counsel not ineffective for choosing not to present evidence of petitioner's diminished capacity that would have undermined primary defense theory of mistaken identity).

Thus, the undersigned finds that the California Supreme Court could have reasonably concluded that trial counsel were not ineffective because the defense theory was that Petitioner was not present when Birkman was robbed and stabbed, nor when Slatten was robbed and injured, and that Stramaglia consented to a sexual encounter and Glidewell offered Petitioner his vehicle as collateral for a half ounce of cocaine, all of which would have been inconsistent with expert testimony offered to explain that polysubstance abuse can affect one's state of mind.  It was at least arguable that reasonable attorneys could have decided to forego inquiry into Petitioner's drug abuse and its effects in light of the circumstances.  In sum, fair-minded jurists could disagree.  Richter, 562 U.S. at 101-02.

### Penalty phase

Petitioner claims trial counsel Gable admitted "that he did not learn what his mental health expert had to say until the night before he was supposed to testify in the penalty phase" (ECF No. 330 at 294), arguing reasonable counsel would not "wait until the night before the penalty phase to learn the facts necessary to make an informed decision" about mitigation evidence (id. at 295).

Notably, Petitioner fails to recognize that trial counsel would have had the findings and opinion of "Dr. Campos" before those of Dr. Vicary, and it is clear from Vicary's references to Dr. Campos's report that Campos's opinion was not helpful to the defense. Plainly then, counsel had conducted an investigation into the issue of Petitioner's mental health and any defense, and that counsels' continued efforts by way of Dr. Vicary's involvement served to essentially confirm those offered previously by Dr. Campos. More specifically, Dr. Vicary's report provides the following:

> The defendant told Dr. Campos that he was intoxicated on Dexedrine at the time of his involvement in a vehicle accident in Cuba in July of 1978. He stated that Dexedrine "makes you act crazy." The defendant felt like a bullfighter confronting a charging bull. After the accident he had a personality change and became more aggressive. He did whatever he felt like doing without regard for any consequences.
> The defendant was hooked on cocaine in 1986 and was using it almost daily for two months prior to the offenses which occurred in 1987. In his social history he reported that he finished high school and almost completed a college degree in physical education. He was apparently discharged from his studies because of disciplinary problems. The defendant missed his mother and believed that if she had been around to take care of him, none of his major problems would have happened.
> The defendant reported that the homicide victim could not have been robbed because the defendant stabbed him to help out a friend who was in a heated argument with the victim.
> Intellectually the defendant functioned in the average range. His MMPI profile revealed elevations on the hypochondriacal, manic and antisocial scales. The defendant was overly sensitive to criticism or implied slights. He had extremely poor anger control. His judgment was poor and he tended to act impulsively. His resourcefulness in coping with stress was limited. There was a high likelihood of continuing assaultive behavior. There was some paranoia in his thinking.

(ECF No. 302, Vol. XXI, Ex. 58 at 4116.) Hence, defense expert Dr. Campos's earlier psychological assessment and opinion established little if any basis upon which to assert a mental defect defense at trial. In fact, his report was more damaging than helpful as it reveals inconsistencies with Petitioner's defense (stabbed Birkman to defend a friend, not to rob him) and facts about Petitioner's youth in Cuba that were best avoided (drug use began there contrary to his report to McGarrity that he first used drugs in the U.S.), over and above other inconsistencies and psychological testing results that were less than compelling.

With specific regard to the penalty phase, trial counsel may have refrained from presenting this type of testimony because they believed that evoking sympathy from the circumstances of Petitioner's upbringing in Cuba and subsequent experiences as a part of the Mariel boatlift, including time spent at detention camps, was a better penalty phase strategy. Pinholster, 563 U.S. at 193, 197. The California Supreme Court could have reasonably concluded so, and it is certainly possible that fair-minded jurists could disagree that the argument is not inconsistent with Strickland. Richter, 562 U.S. at 102.

Furthermore, Petitioner's reliance upon Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002), to support his position is misguided. Jennings is distinguishable on its facts. There counsel failed to: (1) follow up with a psychiatrist who had conducted a preliminary assessment of competency at the request of Jennings' first attorney; (2) request copies of the petitioner's voluminous medical records; (3) inquire into possible child abuse in the petitioner's family; (4) seek the appointment of an additional expert regarding the petitioner's mental state; (5) discuss drug use with his client; (6) follow-up on a report by the petitioner's ex-spouse about the petitioner's attempted suicide and schizophrenia diagnosis; (7) investigate an incident wherein a judge ordered Jennings committed involuntarily for a psychiatric evaluation; (8) review, in whole, medical records subpoenaed by the district attorney; and (9) investigate the petitioner's commitment to a boys' ranch for molesting two young boys. Jennings v. Woodford, at 1013-14.

Petitioner's reliance on Porter v. McCollum is also misplaced. There, trial counsel did almost nothing to prepare for the penalty phase. Counsel had one brief meeting with his client, "did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family." Porter v. McCollum, 558 U.S. 30, 39 (2009). "[H]e ignored pertinent avenues for investigation of which he should have been aware" and in so doing "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family

185

background, or his military service.  The decision not to investigate did not reflect reasonable professional judgment."  Id. at 40.

In this case, trial counsel investigated Petitioner's mental health or mental impairment, retaining medical experts who provided counsel with their findings.  Counsel also made efforts to obtain Petitioner's school and medical records from Cuba, although they ultimately proved unavailable.  Trial counsel presented Petitioner's family background by way of McGarrity's testimony and the testimony of the translator who read Petitioner's father's statement into the record.  Unlike counsel for Porter, trial counsel investigated Petitioner's mental health and/or impairments; however, following consideration of the findings prepared by medical experts, counsel determined the expert opinions would be more harmful than helpful to Petitioner and therefore elected not to present evidence in that regard.  "[A] tactical decision may constitute constitutionally adequate representation even if, in hindsight, a different defense might have fared better."  Bemore v. Chappell, 788 F.3d 1151, 1163 (9th Cir. 2015).

Pablo Stewart's November 2004 declaration indicates he was asked by habeas counsel to determine Petitioner's "mental status currently, when in custody, at the time of his trial, and at the times of the charged crimes."  (ECF No. 302, Vol.  XXII, Ex. 64 at 4294.)  The doctor was also asked, among other things, to determine influencing factors on "the effect of a life-long history of severe physical abuse and psychological abuse and humiliation, organic brain damage, [Petitioner's] attempts to cope with substance abuse, and the extreme stressors extant in the time frames prior to and at the time of all of his crimes."  (Id. at 4294.)  In making those determinations, Dr. Stewart "conducted psychiatric examinations" (the number and length of the examinations is not provided), and "an extensive set of documents … includ[ing] various life history documents and other mental health evaluations."  (Id. at 4294-95.)  The doctor also noted that those materials "were of the type that are commonly relied upon by psychiatrists in rendering

a full and accurate assessment and expert opinion of an individual's psychiatric and neurological condition."  (Id. at 4295.)

Dr. Stewart's diagnoses and conclusions were as follows:

> It is my professional opinion that Manual Alvarez suffers from three psychiatric conditions that have detrimentally affected his functioning throughout his life and almost certainly were a major factor in the commission of his crimes.  He suffers complex Post-Traumatic Stress Disorder, related to an extensive history of devastating emotional and physical injuries from substantial front lobe impairment, most likely the result of traumatic brain injury, and chronic alcohol and cocaine abuse, most likely attributable in large part to the mental effects of his PTSD and front lobe syndrome.  Each of these conditions tends to exacerbate the others and the presence of the three together can have, as it did in Manual's case, a catastrophic effect on mental status and functioning.

(ECF No. 302, Vol. XXII, Ex. 64 at 4310-11.)  It is interesting that Dr. Stewart makes no mention of the medical reports and/or findings relied upon by Dr. Vicary, nor any by Dr. Campos – two medical experts retained by the defense in anticipation of trial, but neither of whom testified.

In any event, the fact a subsequently retained expert suggests a more comprehensive mental or neurological examination could have been performed is not evidence that it should have been done, or that counsel should have further investigated the issue.  In light of the testing performed, the results obtained therefrom, and the opinion of the medical experts consulted by the defense team prior to or during trial, trial counsel were not required to "shop" for a more favorable expert.  See Payton v. Cullen, 658 F.3d 890, 896 (9th Cir. 2011) ("experts examined Payton, but no red flags warranted further investigation" thus it was not unreasonable for counsel, having already retained qualified experts, to "not seek others").  Notably too, in this case Dr. Stewart's opinion rests upon information that was unavailable to Dr. Vicary, not for any lack of effort on trial counsels' part.  Additionally, fifteen years had elapsed between the time of Petitioner's trial and Stewart's November 2004 opinion.  For all of those reasons, the undersigned does not second guess trial counsel.

187

Trial counsels' forensic psychiatric expert, Dr. Vicary, who was made aware of Petitioner's social and medical history as it was then known, found no significant mental disorder or defect.  Dr. Vicary's review of the neurological reports provided to him revealed an "essentially normal" February 1989 EEG, a normal June 1989 MRI scan, normal skull x-rays, and a "computer enhanced EEG [that] revealed some abnormalities in the rear of the brain and right lateral aspect."  (ECF No. 302, Vol. XXI, Ex. 58 at 4115.)  Regarding his mental status examination of Petitioner, the doctor noted "[t]here was no consistent evidence of any psychosis or gross physical brain damage."  (Id. at 4121.)  Ultimately, Dr. Vicary opined that Petitioner suffered "from a chronic depressive mental illness and a seizure disorder and that "alcohol and drug abuse" had been "a major exacerbating factor."  (Id. at 4111.)

In the end, trial counsel elected not to present the testimony of two defense experts who considered Petitioner's mental status.  The constitutional guarantee of effective assistance of counsel does not necessarily require the introduction of expert testimony.  Richter, 562 U.S. at 106-07; see also Bonin v. Calderon, 59 F.3d at 834 ("the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense").  It would not have been unreasonable for the California Supreme Court to conclude Petitioner had failed to establish deficient performance by trial counsel pursuant to the dictates of Strickland where counsel did not present a mental health expert's testimony.  Richter, 562 U.S. at 101.

Prejudice

Even assuming trial counsel were found to be deficient, the state court's denial of Petitioner's claim is not an unreasonable application of Strickland.

In assessing prejudice, Strickland asks whether it is "reasonably likely" the result would have been different.  Strickland, 466 U.S. at 696.  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 562 U.S. at 112, citing Strickland, at 693.

188

In the guilt phase, then, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068-69. Likewise, in the sentencing phase, "the question is whether there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*

Hendricks v. Calderon, 70 F.3d 1032, 1036-37 (9th Cir. 1995) (citing Strickland, 466 U.S. 668).

Here, the California Supreme Court could have reasonably concluded that, even had a mental health expert testified during the guilt phase concerning Petitioner's drug abuse and its effects on his mental state, the jury would not have had reasonable doubt of Petitioner's guilt. The jury heard evidence of Petitioner's drug use from a number of witnesses, including Petitioner himself. And while it did not hear evidence of the effects of such use on an individual's brain, there was substantial evidence pointing to Petitioner's guilt. As noted above, Petitioner left Stramaglia's apartment after Simpkins arrived, stealing Glidewell's Camaro in an effort to escape;[29] days later, after robbing Birkman at an ATM machine while armed with a knife, Petitioner jumped into the getaway Camaro piloted by co-defendant Ross, fleeing the scene; he and Ross took refuge at Patton's apartment immediately thereafter, Ross provided Patton with a knife to return to Petitioner, before the police arrived to question Patton about the Camaro parked nearby that was used in a robbery; Petitioner then left Patton's apartment on foot after the police left, assaulting and robbing Greta Slatten of her purse and vehicle, using it to run from the area; more than a week later, he was apprehended in Mississippi driving Slatten's vehicle. Hence, the

---

[29] Stramaglia's residence was located at 2447 Boxwood #5 (13 RT 2615); Glidewell's brother's home address is 2485 Boxwood (13 RT 2689). Stramaglia testified she woke to find Petitioner in her apartment "close to noon" on May 13, 1987 (13 RT 2619-20), he raped her over the course of about 10 minutes (13 RT 2627) and kept her in the bathroom (13 RT 2631-333) before running out once Simpkins arrived (13 RT 2633-34, 2638). Glidewell's Camaro was stolen on May 13, 1987 (13 RT 2689), the police responding to a 911 call made at 12:39 p.m. (13 RT 2701; see also ECF No. 302, Vol. III, Ex. 8 at 538 [911 printout]); Officer Michael Tupper of the Sacramento Police Department responded, interviewed Glidewell about one o'clock and finished his report at 2:15 p.m. (17 RT 3813-14; see also 17 RT 3819 [Glidewell advised Tupper the theft occurred about 12:30 p.m.].)

likelihood of a different result absent the error asserted by Petitioner is merely conceivable, rather than substantial. Conceivability of a different result is not the test. Strickland, 466 U.S. at 693-94.

Therefore, the California Supreme Court could have reasonably concluded that, even had a mental health expert such as Dr. Stewart testified during the penalty phase concerning Petitioner's drug abuse and its deleterious effects on the brain, it was not reasonably likely the jury would have concluded that the mitigating factors outweighed the aggravating factors warranting a sentence of life in prison.

Additionally, any mental health expert's testimony on the part of the defense "would have opened the door to rebuttal by a state expert." Cullen v. Pinholster, 563 U.S. at 173; see also Wong v. Belmontes, 558 U.S. at 24 (explaining that "expert testimony discussing [petitioner's] mental state, seeking to explain his behavior, or putting it in some favorable context would have exposed [petitioner] to" damaging evidence in aggravation). The state could have called a rebuttal expert, meaning "counsel faced a serious risk that a mitigation case could turn out to be aggravating." Pinholster v. Ayers, 590 F.3d 651, 707 (9th Cir. 2009) (en banc) (Kozinski, C.J., dissenting) (rev'd sub nom. Cullen v. Pinholster, 563 U.S. 170).

Here, while the jury may have been sympathetic to Petitioner's evidence of mental and emotional problems, those same problems could have suggested future dangerousness or that Petitioner was simply beyond rehabilitation. Particularly given the circumstances of the then-current crimes and Petitioner's prior convictions for manslaughter and assault with a deadly weapon. A severe criminal history carries great weight. Belmontes, 558 U.S. at 22-24, 27-28 (evidence a defendant previously committed another murder may be "most powerful imaginable" aggravating evidence). Therefore, it would not have been unreasonable for the California Supreme Court to conclude the aggravating evidence was overwhelming, and hence, any failure

to introduce certain mitigating evidence did not amount to prejudice.

Considering the totality of the evidence before the jury, the original as well as the "new mitigating evidence," as against the aggravating evidence presented at trial, the California Supreme Court could have reasonably concluded that Petitioner suffered no prejudice where trial counsel did not present expert testimony concerning Petitioner's drug use and its effects.  Sears v. Upton, 561 U.S. 945, 955-56 (2010); Belmontes, 558 U.S. at 20; Berghuis v. Thompkins, 560 U.S. 370, 389 (2010).

**Conclusion**

In sum, the California Supreme Court's decision to deny habeas relief on Petitioner's ineffective assistance of counsel claim for failure to investigate and present medical expert testimony addressing Petitioner's drug use and its effect on his brain at the guilt and penalty phases was not contrary to or an unreasonable application of clearly established federal law.  The undersigned hereby RECOMMENDS that Claim ZZ be DENIED.

### *Claims II, JJ & G:  Errors Depriving Petitioner of the Opportunity to Impeach Sandra Stramaglia & Other Related Constitutional Errors*

In Claim II, Petitioner asserts that a combination of errors related to the testimony of rape victim Sandra Stramaglia resulted in a deprivation of his constitutional rights.  (ECF Doc. 330 at 297-381.)  Respondent replies that habeas relief must be denied because the state court's adjudication of the claim was not contrary to, nor an unreasonable application of, Supreme Court precedent.  Respondent also alleges the claim is unexhausted.  (ECF No. 345 at 162-83.)

With regard to the issue of exhaustion in particular, Petitioner asserts his claim is exhausted.  Yet, Respondent contends Petitioner's claim in this court is now more broadly asserted, and includes numerous arguments not asserted in the California Supreme Court, and as a result, "this new and much broader version of claim II is not exhausted."  (ECF No. 345 at 163-64.)  More particularly, Respondent argues the "newly phrased claim II lumps together supposed

191

impeachment evidence beyond Sandra S.'s 'history of drug abuse' to include her supposed

relationship with the Sacramento Police Department as a confidential informant, her prior

testimony in a different criminal case where she alleged rape, and her prostitution activities."

(ECF Doc. 345 at 163:20-23.)  A review of the first and second state habeas petitions reveals that

while the first state habeas petition clearly did not cover the "broader version" (as Respondent

deems it) of Petitioner's argument here, the second state habeas petition sufficiently presented the

claim.[30]  <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257-58 (1986).  Therefore, the undersigned finds it to

be exhausted.

Finally, Petitioner's Claim JJ argues trial counsel were ineffective for failing to investigate

and present evidence concerning Stramaglia's relationship with law enforcement and that the

prosecution failed to disclose she acted as an informant, depriving him of the effective assistance

of counsel.  (ECF No. 330 at 381-83.)  Petitioner's Claim G argues the trial court's refusal to

admit evidence of Stramaglia's belated rape complaint deprived him of due process and the right

to a fair trial.  (ECF No. 330 at 383-84.)  These claims will be addressed alongside Claim II.

### Relevant Background Information

#### Trial Counsels' Declarations

Concerning this claim, trial counsel Holmes declared as follows:

> Claim II, the failure of counsel to argue against the trial court's ruling excluding
> victim Sandra St[r]amaglia's history of drug abuse.
> I would have filed a California Evidence Code section 782 motion if it had been
> necessary to admit into evidence the past sexual conduct of Stramaglia in order to
> impeach her.  However, since the prosecution did not object to the admission of
> Stramaglia's "profession" as a prostitute, and in fact introduced it, a section 782 motion
> was not necessary.  Moreover, questions about Stramaglia's drug use at the time of the
> crime and at the time of her testimony were properly allowed (RT 2586); and the defense
> did secure a ruling that, if Stramaglia denied past drug use, she could be impeached with it

---

[30] Respondent's Informal Response to Petitioner's second state habeas petition addresses these
contentions.

(RT 2586). Other than these three areas, the defense did not believe that Stramaglia's past drug use was relevant. (RT 2586.)

(ECF Doc. 302, Vol. XXVI, Ex. 136 at 5253-54 (emphasis in original).)

Trial counsel Gable declared the following:

> 16. I was told by Mr. Holmes to cross-examine Sandra Stramaglia, the prosecution's first witness in the guilt phase. At the time, I was unaware that Ms. Stramaglia had testified for the prosecution in the rape trial of Thomas Korves. I attempted to get permission to question Ms. Stramaglia about her failure to report previous rapes, as she had testified during the preliminary hearing. I was unaware that shortly before Ms. Stramaglia testified at the Alvarez preliminary hearing, Ms. Stramaglia had testified at Mr. Korves's trial, nor that Roxanne Simpkins, Anthony Simpkins and Michael Hopper had been involved as witnesses either at trial or during the investigation of the Korves case. I was unaware that Ms. Stramaglia had testified, in the Korves case, that she had been assured by a police officer on a prior unreported rape (the one in which she testified she was stabbed) that she and her sister prostitutes should never hesitate to report rapes, that they would not be "hassled" for being prostitutes; nor was I aware that Ms. Stramaglia had testified in that case that she had so much confidence in the officer's word that she encouraged Roxanne Simpkins to report being raped by Mr. Korves. Had I known that, I would have used this knowledge to support my arguments to Judge Lewis that I should be allowed to question Ms. Stramaglia concerning prior unreported rapes. I would also have used it to challenge her testimony at Mr. Alvarez's trial, when she perjured herself in light of her testimony in, and the circumstances of, the Korves trial by saying that she didn't report her alleged rape by Mr. Alvarez because she believed that police officers disregarded the rape complaints of prostitutes.
>
> 17. I was not aware that Roxanne Simpkins had information that she and Ms. Stramaglia often exchanged sex for drugs, that Ms. Stramaglia would do or say anything for drugs, and that she and Ms. Stramaglia had been provided with money to purchase heroin so that they would not be "sick" from withdrawals during their testimony at, presumably, the Korves trial. Had I been aware of this, I would certainly have cross-examined Ms. Stramaglia about this. I also believe this information would have been very helpful to bolster the testimony of Danny Stokes.

(ECF No. 302, Vol. XXII, Ex. 63 at 4287-88.)

<u>Relevant Preliminary Hearing Testimony</u>

Ms. Stramaglia testified at the preliminary hearing; the relevant testimony is excerpted below:

> Q. When the man was pinning you down, did you attempt to resist in any way?
> A. I started to and then I remembered being raped before and I got stabbed real

bad and I just - - I didn't - - no, I didn't resist after awhile cause I just didn't want to - -
didn't want to be hurt again.

Q. Initially you did resist, though?

A. A little bit at first and then I - - I started to push and then I didn't, I stopped
remembered all that.

I saw the - - I still have a scar on the back of my neck from the time I was raped
before.

MR. HOLMES: Number one your Honor, I can't hear her, what she's saying; and
number two, I believe that was probably non-responsive to the last question.

MAGISTRATE: The answer was non-responsive - - not the answer but the
comment.  It may be stricken.

(1 CT 180.)

On cross-examination, Mr. Holmes made the following inquiries and elicited this

testimony:

Q. Now, you indicated you had been raped before.  Was that within the last couple
years?

A. Yes.

Q. Was that here in Sacramento?

A. Yes.

Q. And did you report that rape?

A. No.

MR. MARLETTE:  Objection, your Honor, to the relevance.

MAGISTRATE:  Objection overruled.

THE WITNESS:  I talked - -

MAGISTRATE:  Just a moment, ma'am.  You've answered the question.  If he
has other questions, he'll ask you.

THE WITNESS:  Oh, okay.

Q. … I didn't even hear your answer.  Did you say no, you did not report it?

A. No, I didn't report it at first is a better answer.

Q. All right.  [¶] How long after that prior rape did you report it?

A. Well, I didn't report it until the officer discovered it that picked me up on a
drunk driving warrant that I had and she saw - - the wound in the back of my neck which
had happened a couple weeks before that.

Q. Okay.  So, the answer is - -

A. And I told her.

Q. You did report it about two weeks afterwards after the officer confronted you?

A. But yeah, but I didn't - - I never made an official report.  She told me to go
down to the detectives and they never wrote it down.  They just told me if I see the guy to
come in and tell 'm.

Q. All right.   [¶] So nothing ever came of that case?

A. No.

Q. And had the officer not confronted you, you would have never reported that?

A. No.

194

1     (1 CT 185-86.)  The prosecutor's objections to the last question were overruled.  (1 CT 186-87.)

2     Later, the following testimony was elicited:

3

4          Q.  … Okay.  Was that date May 17th, four days later that you talked to an officer about this?

5          A.  I don't remember the date.  If you want to know the truth, I don't remember.
         Q.  All right.  That's fair. [¶] But is - - was it about four days later that you're

6 talking told an officer?
         A.  I'm not sure.  I believe so. I'm not positive.

7          Q.  And when that officer talked to you, did he originally talk to you concerning at that time an attempted murder, a stabbing?

8          A.  Nobody said anything about that until later after I was through giving a

9 testimony - - or not testimony, my whatever – - my statement.
         Q.  Well, let me put it this way:  Why were you called down - - were you called

10 down to the Police Department to give a statement?
         A.  Yes.

11          Q.  And was your understanding that you were called down there to give a

12 statement about rape?
         A.  Right.

13          Q.  All right.  Nothing about a homicide or an attempted homicide?
         A.  No.

14          Q.  Did the officer contact you or did you contact the officer?
         A.  They contacted me.

15          Q.  You at no time had ever phoned the Police Department to make a report of a

16 rape?
         A.  No, but I told the officer Lister, Jim Lister.

17          Q.  That's okay.  Just let me ask you another question.  Is that correct that you never - - you personally never called in to report the rape?

18          A.  No.
         Q.  Okay.

19          A.  I did not.

20          Q.  I take it then, correct me if I'm wrong, that when the officer had contacted you about four days after this incident, that the officer had some information about a possible

21 rape?
         MR. MARLETTE:  Objection, your Honor, calls for speculation.

22          MR. HOLMES:  I'll withdraw it, your Honor.
         Q.  … You never had any intentions of ever reporting this, did you?

23          A.  I did.

24          Q.  At what point in time?
         A.  Right after it happened.

25          Q.  About the time you're telling the defendant that you wouldn't report it if he'd let you out of the bathroom?

26          A.  Yeah.

27     (1 CT 196-98.)

28          Ms. Stramaglia testified she was "a prostitute by profession."  (1 CT 199.)  She denied

being paid money on this occasion, and also indicated she was not given any drugs in payment for the act. (1 CT 199-200.) Following an objection by the prosecutor and brief argument, Stramaglia's "[n]o" answer to Mr. Holmes's question, "have you ever accepted cocaine or any other drug in exchange for the act of prostitution," was stricken when the objection was sustained by the court. (1 CT 201-04.) During her preliminary hearing testimony, Stramaglia denied being "on any drugs," "on heroin" or "cocaine," or taking "any drug or any controlled substance within the last 24 hours." (1 CT 206-07.)

<u>Relevant Trial Proceedings & Testimony</u>

Prior to Ms. Stramaglia's testimony at trial, the prosecutor moved as follows:

MR. MARLETTE: Regarding Miss Stramaglia, who'll be the first witness, she is an admitted prostitute, and she is the alleged victim in the rape count.

I would make, I have a motion in two areas. One is her sexual habits, and the other is drug use.

Although she is an admitted prostitute, I would move the Court ma[k]e an order in limine that her prior sexual history or subsequent sexual history, for that matter, not be inquired [into], on the grounds of relevance and the statute protecting such.

THE COURT: Who's going to argue?

MR. GABLE: It's my witness, so I'll go ahead and argue.

THE COURT: Okay.

MR. GABLE: I think it's highly relevant, with regard to whether or not Miss Stramaglia was plying her trade at the time of the alleged rape.

If in fact, she was, and the subsequent charge or allegation of rape was a result of a breach of some agreement, then that certainly would be relevant to inquire into the nature of her profession.

The reason - - the reason it's so relevant is, otherwise, she's presented to the jury in a false light.

They think she's asleep in her bedroom, and that she did - - was accosted by the defendant, that she did not have a history of having sexual intercourse with men, and I think it's highly relevant, because at the time that this was going on, that was what she was doing. I suppose she's still doing it, but I don't know - -

THE COURT: Is that in fact your contention, that this was consen[s]ual sexual intercourse?

MR. GABLE: At this time, if the Court wants us to offer more information in camera, I'd be happy to.

I don't want to disclose our defense at this time, as to what - - but I'm saying, though, that within the limits of common sense, that would be certainly an inference that could be raised, and whether or not there will be evidence presented in that regard by the defense, which I don't think is necessary to argue the relevance of any piece of evidence, I can't tell you at this time.

THE COURT: Mr. Marlette, would you step outside for a moment?

196

MR. MARLETTE: I'm sorry?

THE COURT: Would you step outside for just a moment?

MR. MARLETTE: Yes. [¶] Perhaps I should clarify; that is, that I intend to ask her what her occupation is, and she will say that she's a prostitute.

The reason I'm going into that is that she did not report this until she was approached by the police.

What I would ask to limit, though, is the extent of her prior habits, when the previous time she'd had sex, if she had ever been raped before, if she'd ever reported rapes before, and that kind of thing.

Also, the fact that, she had no felony conviction, but she does have a number of B's, and I would ask that she not be asked about that, but I do not, by any means, intend to hide the fact that she's a prostitute. In fact, that will come out in direct.

…………………………………………………………………………….

MR. GABLE: I don't think we need to have an in camera, then, in light of what Mr. Marlette just said.

I would indicate, though, that there is the issue regarding a prior rape that she stated had occurred to her, and this in the preliminary hearing transcript.

It was one where she said that she also did not report the incident at the time, but only reported the incident after she was confronted by the police, very similar to the circumstances that gave rise to this particular allegation.

She did not report this alleged rape until she was confronted by the police in connection with her knowledge of Mr. - -

THE COURT: What fact in issue does that prior conduct tend to prove or disprove?

MR. GABLE: Well, I would assume that it would tend to show that there's a potential for her to fabricate information; in other words, instead of making a - - what's called a fresh complaint when it occurs, she doesn't say anything about anybody until such time as the police confront her and then, "Oh, yes, I remember that."

THE COURT: Isn't that analogous to a propensity to commit crime?

MR. GABLE: On her part?

THE COURT: If you were looking at it from, analogizing it to, if she were on trial as a defendant, wouldn't that be bringing in prior conduct to a showing a propensity to commit a crime or, in your case, a propensity to make false reports?

MR. GABLE: Exactly, and I think that's the relevance here, a propensity to fabricate, and that's, I think, highly relevant.

Obviously when you're dealing with a witness, and it's not a question of propensity to commit a crime, although it happens to be a crime, to make a false report, that isn't why it's being offered. It's being offered on the issue of credibility and fabrication.

THE COURT: But you're offering a single incident.

MR. GABLE: Which I think is appropriate, in light of Proposition 8 and subsequent rulings in People versus Taylor, and - -

THE COURT: What's Taylor about?

MR. GABLE: Taylor was, I believe - - and there's two cases that came out, but Taylor, I believe, dealt with 790 of the Evidence Code, and said that proposition had repealed that.

There's been a subsequent case that came out dealing with Section 787, that went along with the Taylor rationale.

197

I'm trying to remember the name of that case, <u>Adams</u>, I believe, <u>People versus Adams</u>.

MR. MARLETTE:  Your Honor, I'll submit that one of the difficulties here is that we're not dealing with a prior false report, and even if we were, it will be necessary, if this is going to her credibility, to show that her failure to make a report on the prior occasion somehow shows that she was false on this occasion, that would require a showing of the prior - -

THE COURT: What evidence do you have . . . Mr. Gable - - that this other incident was a false report?

MR. GABLE: The information that I've been able to glean from the preliminary hearing transcript is that she made the report after being confronted by the police. They did not even write a formal report of the incident and told her if she ever sees the guy again to let them know.

And they basically didn't themselves take it as a reporting of a - - an actual crime, but just elected not to do anything about it, which, the inference is, they didn't really feel it was a crime.

THE COURT:  I'm satisfied that's not admissible.[31]

MR. GABLE: The drug use, drug usage.

MR. MARLETTE: Right.  [¶] I also, in regards to sexual habits, I'd ask she not be asked about B convictions. She's got misdemeanor B's, a number of them.

THE COURT: I don't see any reason why that would be admissible.

MR. GABLE:  I'm not even going to argue that.

THE COURT: About what about drugs?

MR. MARLETTE:  In drug usage, she testified in the preliminary hearing transcript that she did not use, at least, cocaine and heroin at the time of the offense.

I'll ask that she not be asked about her drug use in general.  [¶] I think the only time this may be relevant is at the time she's testifying or at the time of the act, and other than that, I submit that her general drug usage is irrelevant.

THE COURT:  Mr. Gable?

MR. GABLE:  Well, that may be true, except to the extent that if she indicates on the stand that she's never taken cocaine or heroin, then I think it becomes relevant to impeach her, and although it's somewhat collateral, I think it goes directly to her credibility.

THE COURT:  Yeah, if she says that that makes it a very close issue, but otherwise, use of drugs outside of the p[a]rameters of the time frame here, where she, in fact, wouldn't be under the influence, would not be admissible.

MR. GABLE: Okay.

MR. MARLETTE:  That's all.

(13 RT 2580-86.)

---

[31] A prior false accusation is admissible to challenge a victim's credibility, but only if it is first established that the prior accusation was false.  <u>People v. Tidwell</u>, 163 Cal.App.4th 1447, 1457 (2008).  When earlier complaints "'never reached the point of formal charges'" and there is no conclusive evidence of falsity, a trial court may properly exclude the evidence under Evidence Code section 352.  <u>Tidwell</u>, 163 Cal.App.4th at 1458.  Stramaglia's complaint never resulted in formal charges and there was no conclusive evidence of falsity.

At trial, Stramaglia did in fact testify on direct, when asked what her occupation was at the time of the rape, that she "was a prostitute," and that she was currently "retired." (13 RT 2616.) With specific regard to the incident itself, Stramaglia testified that after Petitioner raped her, he kept her from leaving her bathroom (13 RT 2631-32); she told him she would not "say anything to anybody" about the rape if he allowed her to leave the bathroom. (13 RT 2633.) Asked if she reported the rape, Stramaglia replied she did not do so until "a day or so later," telling "Detective Jim Lister, because he's kind of a friend." (13 RT 2639.) Following up, she explained she did not immediately report it to police because "[p]eople don't usually care about prostitutes." (13 RT 2639.) Stramaglia testified that Lister was driving by on his beat in her area and "was saying something about a guy stealing a car and stuff, killing somebody or something, and I - - we got to talking about it, and it was the same guy, I told him what he did." (13 RT 2640.)

On cross-examination, Stramaglia acknowledged prostitution as her occupation during the relevant time period and that she was "now retired." (13 RT 2646-47.) Although she denied plying her trade the evening she met Petitioner, Stramaglia testified she "was pretty much tired and didn't want to work anymore, but it - - if somebody happened to come by, [she was] not gonna turn down money." (13 RT 2648.)

After Petitioner raped her, Stramaglia tried "to convince him" to let her out of the bathroom telling him her friends would be there "in a minute" and that neither she nor her friends would "say anything to anybody" if he let her out. (13 RT 2674.) When Mr. Gable asked Stramaglia about telling Lister about the rape and making a report to another officer later, she indicated she did so when the officer went out to her residence and picked her up, taking her back to the station. (13 RT 2683-84.) In response to being asked "isn't it true that you would never have reported this incident if you had not been approached by the officers, Stramaglia said she "was still thinking about going up there and reporting" but that she "hadn't decided." (13 RT 2684.)

<u>The California Supreme Court's Determination</u>

The California Supreme Court considered a part of Petitioner's claim here on direct

appeal, to wit: the superior court erred by granting the People's motion to bar, as irrelevant, the introduction of evidence of Stramaglia's prior misdemeanor prostitution convictions and her prior belated rape complaint, arguing the evidence would have been relevant for impeachment. It determined there was no error, as follows:

In its first part, as to evidence of Sandra S.'s prior misdemeanor prostitution convictions, we reject the claim at the threshold. Defendant has not preserved the point for review in this respect. He may not offer an argument here that such evidence would have been relevant for impeachment because he did not offer any to that effect below. (*People v. Rowland* (1992) 4 Cal.4th 238, 262, fn.2; *People v. Gordon* (1990) 50 Cal.3d 1223, 1251–1252.) We recognize that, at the time of the motion, we had yet to decide *People v. Wheeler* (1992) 4 Cal.4th 284, in which we held that article I, section 28, subdivision (d), of the California Constitution supersedes Evidence Code section 787 insofar as it impliedly renders evidence of prior misdemeanor convictions, or more precisely, evidence of the misconduct underlying such convictions, generally inadmissible for impeachment. But that is of no consequence. Defendant could surely have argued that it did. Indeed, on another point, he relied on *People v. Adams* (1988) 198 Cal.App.3d 10, in which the court held that article I, section 28, subdivision (d), of the California Constitution supersedes Evidence Code section 787 insofar as it expressly renders evidence of misconduct generally inadmissible for impeachment. If he had so argued, the superior court might well have been persuaded. To the extent that he attempts to excuse his omission by asserting that any act would have been futile, he fails: his assertion is mere conjecture.

[FN] 11. We note in passing that, although defendant was precluded from using evidence of Sandra S.'s prior misdemeanor prostitution convictions for impeachment, he could, and did, use evidence of her work as a prostitute for that very purpose. Strictly speaking, evidence of prior misdemeanor convictions themselves is not relevant for impeachment, but rather the misconduct underlying such convictions (*People v. Wheeler, supra*, 4 Cal.4th at p. 299)—and then only if it involves "moral turpitude" (*id.* at p. 295).

In its second part, as to evidence of Sandra S.'s prior belated rape complaint, we reject the claim on the merits. Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion. (See, e.g., *People v. Rowland, supra*, 4 Cal.4th at p. 264.) Specifically, it scrutinizes a decision on a motion to bar the introduction of evidence as irrelevant for such abuse: it does so because it so examines the underlying determination whether the evidence is indeed irrelevant. (*E.g.*, *People v. Gordon, supra*, 50 Cal.3d at p. 1239.) After review, we find no abuse of discretion. The superior court impliedly determined that any relevance that evidence of Sandra S.'s prior belated rape complaint might have for impeachment was premised on the falseness of the prior complaint. It was not unreasonable in this regard. Indeed, under the reasoning of *People v. Neely* (1964) 228 Cal.App.2d 16, 18, if her prior complaint was in fact true, it would have no relevance for impeachment whatsoever. The superior court also impliedly determined that the premise that the prior complaint was false was without sufficient support. In this regard too, it was not unreasonable. Defense counsel's

speculation that the police might not have "really fe[lt] it was a crime" could obviously have been deemed inadequate. Defendant here asserts that *Neely* entitled him to inquire of Sandra S. in the presence of the jury in the hope of establishing the falseness of her prior complaint. It did not. The *Neely* court held only that the defendant therein should have been allowed to so inquire of a woman who "was a mentally ill person who had been" institutionalized "for several years," and had "indicate[d] some uncertainty and confusion concerning the exact nature of her charges...." (*People v. Neely, supra*, 228 Cal.App.2d at p. 19.) From all that appears, Sandra S. was not such a woman.

> [FN] 12. Defendant claims in substance that, because the superior court committed reversible error under California law by granting the People's motion, it thereby committed reversible error under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. In the text, we have rejected the assertion that the superior court committed error under California law.

People v. Alvarez, 14 Cal.4th at 200-02.

*Stramaglia's Drug Use*

Petitioner makes much of Stramaglia's drug use and abuse. He complains trial counsel failed to make an offer of proof concerning its relevance, to request an *in camera* review of evidence that could have established that relevancy, or to lay a foundation for questioning Stramaglia about drug use and addiction. (ECF No. 330 at 299-302, 340-45.)

To begin, Petitioner ignores trial counsel Holmes's declaration on the subject, revealing the defense position on Stramaglia's drug use to be a tactical one. Holmes declared in September 1999 that other than questions pertaining to "Stramaglia's drug use at the time of the crime and at the time of her testimony," or in the event of any denial on her part of past drug use that "the trial court's ruling that she could be impeached with it," "the defense did not believe that Stramaglia's past drug use was relevant." (ECF No. 302, Vol. XXVI, Ex. 136.)[32]

_____

[32] Defense counsels were not precluded from all inquiry into this area; rather the trial court limited the inquiries into whether or not Stramaglia was under the influence at the time of the incident or at the time of her testimony, and that in the event she was to deny ever using drugs, defense counsel would be permitted to impeach her. "[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" Crane v. Kentucky, 476 U.S. 683, 689-90 (1986) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)); see also Taylor v. Illinois, 484 U.S. 400, 410-11 (1988) (defendant's right to present evidence is not absolute for defendant must comply with established rules of evidence and procedure). In California, the trial court enjoys "wide discretion" in determining the relevancy of evidence. People v. Green, 27 Cal. 3d 1, 19 (1980) (abrogated on other grounds by

1    Mr. Gable's 2004 declaration states that had he known about Roxanne Simpkins

2    statements concerning Stramaglia – that she exchanged sex for drugs, would do or say anything

3    for drugs, and had been provided money to purchase heroin to avoid withdrawals during

4    testimony in *Korves* trial – Gable "would certainly have cross-examined" Stramaglia about those

5    statements.  (ECF No. 302, Vol. XXII, Ex. 63.)  Gable's declaration does not deny at the time of

6    trial the team believed Stramaglia's past drug use was irrelevant.  And, Gable's declaration

7    potentially invites the "distorting effects of hindsight" that are to be avoided when this court

8    considers an ineffective assistance of counsel claim.  Strickland, 466 U.S. at 669; Richter, 562

9    U.S. at 107.  Gable's 2009 declaration does not address the subject.  (ECF No. 320, Ex. 160.)

10    Further, Petitioner's citation to page 2586 of the Reporter's Transcript, indicating counsel

11    "intended to impeach Stramaglia with evidence of her drug use," is accurate to the degree Mr.

12    Gable noted that if Stramaglia were to testify "she's never taken cocaine or heroin," such a

13    statement "becomes relevant to impeach her," after agreeing that her drug use would be relevant

14    "at the time she's testifying or at the time of the act."  That same record citation, however, does

15    not establish that "counsel failed to anticipate the impeaching nature of Stramaglia's drug use and

16    addiction."  (ECF No. 330 at 340.)  In fact, Mr. Gable's statements during the discussion and

17    argument that followed the People's motion seeking to limit the information about drug usage (13

18    RT 2580-81, 2585-86), mirror the strategy reflected in Mr. Holmes's declaration on this issue, to

19    wit: Stramaglia's drug use was relevant only as to "use at the time of the crime and at the time of

20    her testimony," as well as in the event she "denied past drug use, she could be impeached with it

21    … [o]ther than these three areas, the defense did not believe that Stramaglia's past drug use was

22

23    People v. Martinez, 20 Cal. 4th 225 (1999)).  Notably, the Confrontation Clause guarantees an
      opportunity for effective cross-examination, not cross-examination that is effective in whatever
24    way, and to whatever extent, the defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20
      (1985) (per curium).  In this case, Stramaglia testified she had not taken any controlled substance
25    the night before the incident, nor did she drink any alcohol.  (13 RT 2651-52.)  She was not
      asked whether she was under the influence of any substance at the time of the rape.
26    Nevertheless, there was testimony from which it could be inferred she was not under the
      influence of any substance at the time of the rape, to wit: she went to bed about 4:00 a.m. and
27    awoke just before noon to find Petitioner masturbating in her bedroom.  (13 RT 2619-23; 1 CT
      177-78.)
28

202

relevant." (ECF No. 302, Vol. XXVI, Ex. 136 at 5254.)

At trial in this matter, on cross-examination, Stramaglia denied using drugs the night before the rape, when she first met Petitioner. (13 RT 2651.) She also specifically denied "using coke" or "shooting heroin" that evening. (13 RT 2652.) In California, testimony as to narcotic addiction, or expert testimony as to the effects of the use of such drugs, is not considered admissible in order to impeach the witness unless followed by testimony showing that the witness was, *inter alia*, under the influence of drugs at the time of the events in testimony. People v. Hernandez, 63 Cal.App.3d 393, 405 (1976); People v. Smith, 4 Cal.App.3d 403 (1970). Stramaglia was not asked at trial whether she was under the influence of drugs at the time of the rape. However, she testified that she went to bed at 4:00 a.m. and awoke just before noon to find Petitioner masturbating at the foot of her bed. One can infer from her testimony – consistent with that offered on the subject at the preliminary hearing in this matter – that she was not under the influence at that time. Thus, counsel would not have been deficient for failing to present evidence of Stramaglia's addiction in these circumstances, over and above their chosen trial strategy.

There is a strong presumption that counsel acted for tactical reasons rather than through sheer neglect. Pinholster, 563 U.S. at 191. The reviewing court therefore must not simply give counsel the benefit of the doubt but instead must affirmatively entertain the range of possible reasons counsel may have had for proceeding as he did. Id. at 196. The California Supreme Court could have reasonably concluded that trial counsel elected not to pursue inquiry into Stramaglia's drug use and/or addiction as a matter of trial strategy. Richter, 562 U.S. at 101.

Petitioner also contends counsel was ineffective for failing to impeach Stramaglia in the form of evidence that she traded sex for drugs. (ECF No. 330 at 340-42.) At the preliminary hearing of October 16, 1987, Stramaglia testified that Petitioner did not pay her with either money or drugs in exchange for sex. (1 CT 200.) Mr. Holmes asked Stramaglia if she had "ever accepted cocaine or any other drug in exchange for the act of prostitution;" she answered "No." (1 CT 201.) The prosecution objected, argument was heard, and ultimately the magistrate sustained the objection on the ground of relevance; the answer was stricken. (1 CT 201-04.) Mr.

Holmes stated that Stramaglia "appeared to be kind of slurring [her] words a little bit," and asked her whether she felt "okay at this time?" (1 CT 205.) Stramaglia denied being ill or under the influence of any drug, including heroin or cocaine, or using any other controlled substance within the preceding twenty-four hours. (1 CT 206-07.)[33] At trial, Stramaglia was not asked whether she traded drugs for sex.

Petitioner argues that had the information been presented, the jury would have learned from Roxanne Simpkins that Stramaglia regularly traded sex for drugs. He points to Simpkins' February 18, 1999, declaration: "It was common for Sandra Stramaglia and me to lie or be deceptive in order to obtain drugs or whatever we needed. It was also common for Sandra Stramaglia and me to trade drugs for sex." (ECF No. 302, Vol. IX at 1841.)

As pointed out by Respondent, the California Supreme Court could have reasonably concluded that there is no evidence Roxanne Simpkins would have testified in 1987 to the information contained in her declaration of 1999. This is a reasonable inference where there is other evidence in the record that had Roxanne Simpkins testified at trial, her testimony could have been harmful to Petitioner.

Specifically, when Roxanne Simpkins was interviewed on May 25, 1987, her statement to Detective Adam recited an incident involving Petitioner on May 12, 1987, the day she first met him. He became angry because Roxanne and "Gloria" left him out of a drug deal. He locked Roxanne in the bathroom after throwing "$5 on top of the toilet and [taking] what he wanted" of the drugs purchased by the two women. (ECF No. 302, Vol. III, Ex. 8 at 536.) Roxanne Simpkins was afraid of Petitioner; he had to be "talked [] down" and told to "lighten up" by others present. (ECF No. 302, Vol. III, Ex. 8 at 536.) Simpkins also told the detective:

> Mannie was raping my sister Sandra when Tony walked in on the rape. Tony went and got my brother and some other people and returned to the apartment. Mannie left the

---

[33] Magistrate George Nicholson noted that from his perspective, he did not "detect any slurring of the witness' speech at all;" rather he did "detect a stress." (1 CT 207.) He added: "I wouldn't want the record to have only the indication of your opinion and conclusion as to her speech pattern because I - - that's your personal observation and I want the record to reflect that." (1 CT 207.)

apartment, but returned shortly with a butcher knife, and he had a pistol, but they thought it was a fake one.  I was told this by my brother.

(Id. at 536.)  Certainly, there is evidence in the record that Roxanne Simpkins believed Petitioner had raped Stramaglia in May 1987.  Notably too, the record contains indications that near the time of Petitioner's trial in 1989, Stramaglia and Roxanne Simpkins remained close.  (13 RT 2633 [Stramaglia: "we refer to each other as sisters, we've be friends so long.  We frequently refer to each other as sisters. We've be together for years"]; 16 RT 3535 [Anthony Simpkins: "real good friend with my sister and our family"], 3553-54.)  Roxanne Simpkins' 1999 declaration – about 12 years after Petitioner's trial - does not speak to the relationship between she and Stramaglia as it then existed.

Further, had Roxanne Simpkins been called to testify at Petitioner's trial, and, even assuming she would have testified as to the content of her 1999 declaration, Simpkins' credibility would have been subject to scrutiny.  Trial counsel clearly had access to Simpkins' statement given in May 1987 and would have been aware that putting her on the stand would have allowed the prosecution the opportunity to impeach her with facts harmful to Petitioner.  The ultimate decision not to call witnesses at trial is well within counsel's "full authority to manage the conduct of the trial."  Taylor v. Illinois, 484 U.S. at 418; Eggleston v. U.S., 798 F.2d 374, 376 (9th Cir. 1986).

It is also significant to note that Roxanne Simpkins' 1999 declaration asserting the prosecution provided she and Stramaglia with money to purchase heroin prior to their testimony "in a Sacramento County case in which a defendant was charged with rape-murder" is not credible.  The record establishes the only case in which Stramaglia and Roxanne Simpkins were called as "prosecution witnesses" is the Korves case. That case did not involve a "rape-murder." In Korves, the case against the defendant involved a rape allegation by Simpkins, and an assault charge stemming from Stramaglia jumping out of Korves's moving vehicle after he pulled a knife

on her. There was no murder charge. And the case wherein Stramaglia testified as a prosecution witness that did involve murder was Petitioner's case; however, Roxanne Simpkins did not testify for either the prosecution or the defense.

Lastly, Petitioner's assertions about the purported benefits of any testimony that Roxanne Simpkins could have offered at trial fail to recognize that Simpkins would have suffered from the same credibility problems he attributes to Stramaglia: prostitution, willingness to trade sex for drugs, drug use and addiction, et cetera. It is reasonable to infer from Simpkins' declaration that she too possesses a criminal history involving convictions for prostitution and drug-related offenses, as does Stramaglia. The California Supreme Court could have reasonably concluded that the defense team elected not to call Roxanne Simpkins as a witness because its focus and strategy did not involve Stramaglia's drug use or addiction. Alternatively, that court could have concluded that Simpkins' statement in May of 1987 – close in time to Petitioner's trial - would have been more harmful to Petitioner than any potential benefit, even had Simpkins been willing to testify. Hence, it could have reasonably concluded that defense counsels were not ineffective. In sum, fair-minded jurists could find the state court's ruling consistent with Supreme Court precedent. <u>Richter</u>, 562 U.S. at 102, 105.

The California Supreme Court's determination on direct appeal that Petitioner did not preserve his claim pertaining to the use of Stramaglia's misdemeanor prostitution convictions for impeachment purposes is reasonable because the ruling does not violate federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving him of a fundamentally fair trial guaranteed by due process. <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984). That court's statement that "the superior court might well have been persuaded" had he argued the evidence was admissible does not equate to a denial of due process that deprived him of a fair trial. <u>Id</u>.

Possession of Hypodermic Syringe (before trial)

With regard to Petitioner's argument that the trial court's ruling limiting the use of Stramaglia's prior misdemeanor convictions and belated rape complaint was error, the California Supreme Court's determination of the claim on direct appeal is neither contrary to, nor an unreasonable application of, Supreme Court precedent.

As the state's highest court initially pointed out, Petitioner waived his claim for purposes of appeal by failing to raise the issue in the trial court. In general, a state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. at 41. States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials. Holmes v. South Carolina, 547 U.S. 319, 324 (2006).

"[A] trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." Menendez v. Terhune, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); see Montana v. Egelhoff, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

The Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes. [Citations.]" Nevada v. Jackson, 569 U.S. 505, 512 (2013). The high court explained:

> The Constitution guarantees criminal defendants a meaningful opportunity to
> present a complete defense, but we have also recognized that state and federal rulemakers
> have broad latitude under the Constitution to establish rules excluding evidence from
> criminal trials. Only rarely have we held that the right to present a complete defense was

violated by the exclusion of defense evidence under a state rule of evidence. Id., at 509 (internal citations & quotation marks omitted).

Petitioner's exhibits do not include a criminal history printout for Stramaglia dated near the time of trial; therefore, it is not known what arrests, warrants, and convictions appeared then. Rather, a February 2001 criminal history has been provided. That document reflects an arrest by the Sacramento Police Department on June 27, 1986, on an outstanding warrant for possessing a hypodermic needle or syringe. The following related notations appear: "DISPO:RELEASED" and "COM: ENROUTE TO PLACER ON WARR NBR CR 21848." (ECF No. 302, Vol. II, Ex. 8 at 238; see also ECF No. 302, Vol. IV, Ex. 8 at 710.) On October 22, 1986, the same agency arrested Stramaglia, apparently on the same warrant: "ROSEVILLE PD WARR NBR CR21848." (Id. at 238.) Another arrest entry dated February 2, 1987, references the same warrant: "WARR NBR CR21848 PLACER COUNTY SHERIFF." (Id. at 238-39.) There are no corresponding court-related or conviction entries, nor further references pertaining to the warrant or Placer County on the criminal history report. (Id. at 238-43.)[34] Apparently, no records pertaining to the Placer County arrest exist. (ECF No. 302, Vol. IV, Ex. 8 at 930-39.)

An arrest report form prepared by officers of the Sacramento Police Department, dated October 22, 1986, also references warrant number CR21848 originating with the Roseville Police Department regarding possession of a syringe. (ECF No. 302, Vol. II, Ex. 8 at 274.) An arrest report form, also completed by the Sacramento Police Department, dated September 3, 1987, references Placer County warrant number CR21848, but this arrest does *not* appear on the

_____

[34] In July 1988, trial counsel sought "[r]ecords of any felony convictions of any persons who are called to testify in this action." (3 CT 523.) Arrest information was sought specifically for those "investigated as suspects for any the offenses charged ...." (3 CT 523-24.) Further, the government was to "[p]rovide criminal charges pending [in] this county and any other county in the State of California as disclosed by CI&I rap sheets against any potential witnesses ...." (3 CT 525.) The points and authorities associated Gable's motion for discovery, cited, without analysis, to Hill v. Superior Court, 10 Cal.3d 812 (1974), Engstrom v. Superior Court, 20 Ca.App.3d 240 (1971), People v. Sims, 8 Cal.App.3d 599 (1970), People v. Allen, 77 Cal.App.3d 924 (1978), People v. Coyer, 142 Cal.App.3d 839 (1983), and Evidence Code section 1103(a). (3 CT 528-35.) Counsel also sought notification "of the existence of any informant used in connection with the investigation or prosecution of the pending matter." (3 CT 524.)

Judge Ronald W. Tochterman granted Petitioner's motion for discovery of these items on July 15, 1988. (3 CT 543; see also 1 RT 98-101.)

aforementioned criminal history report.  (Id. at 288.)

A separate arrest for possession of a hypodermic syringe, unrelated to any warrant out of Placer County, appears on the criminal history report as occurring November 21, 1987, in Sacramento.  (ECF Doc. 302, Vol. II, Ex. 8 at 239.)  A corresponding arrest report form prepared by the Sacramento Police Department is included with Petitioner's exhibits.  (Id. at 289.)  Another arrest for possession of a hypodermic syringe appears on the criminal history report as occurring March 7, 1989, in Sacramento.  (Id. at 239.)  A corresponding arrest report form prepared by the Sacramento Police Department is included.  (Id. at 316 [see crime report at 317-22].)

In sum, neither the November 21, 1987 arrest nor the March 7, 1989 arrest for possession of a hypodermic syringe correspond to any court proceeding or conviction.

Disorderly Conduct: Prostitution (before trial)

Again, Petitioner's exhibits do not include a criminal history printout for Stramaglia dated near the time of trial; therefore, it is not known what arrests, warrants, and convictions appeared on Stramaglia's criminal history report at that time.  The February 2001 criminal history document reflects an arrest by the Sacramento Police Department on February 17, 1987, and a corresponding conviction in the Sacramento Municipal Court for that crime, wherein the sentence imposed included a three-year probation term.  (ECF No. 302, Vol. II, Ex. 8 at 239 & Vol. IV, Ex. 8 at 712.)  Corresponding arrest and crime reports prepared by the Sacramento Police Department are also attached as exhibits.  (ECF No. 302, Vol. II, Ex. 8 at 426-32.)

Next, the criminal history report, and arrest and crime reports, reflect another arrest of Stramaglia by the Sacramento Police Department on April 29, 1987.  (ECF No. 302, Vol. II, Ex. 8 at 239, 433-41.)  Warrants subsequently issued and an arrest followed on August 17, 1987.  (ECF No. 302, Vol. IV, Ex. 8 at 239 & ECF No. 302, Vol. IV, Ex. 8 at 713.)  A conviction recorded two days later resulted in a 90-day jail sentence.  (ECF No. 302, Vol. II, Ex. 8 at 239 & ECF No. 302, Vol. IV, Ex. 8 at 714.)

None of the court records related to the aforementioned misdemeanor convictions are available; all had been destroyed in accordance with California Government Code sections 68152

and 68153.  (ECF No. 302, Vol. IV, Ex. 8 at 836, 840, 901.)

The above-information appears to substantiate Stramaglia's criminal history as referenced in the trial record, to wit: "she has no felony *conviction*, but she does have a number of [Pen. Code, § 647]B's" (13 RT 2582 [emphasis added]), and "[s]he's got misdemeanor B's, a number of them" (13 RT 2585).  The prosecutor's references arose during a colloquy specifically concerning Stramaglia's prostitution activities.  And, as Respondent points out, defense counsel did not correct the prosecutor's recounting to include any further arrests or convictions of any kind.

Analysis

At the time of Petitioner's trial, misdemeanor convictions were generally inadmissible to impeach a witness's credibility at trial.  Following Petitioner's trial, the California Supreme Court decided People v. Wheeler, 4 Cal.4[th] 284 (1992), wherein it held misdemeanor conduct that constitutes a crime of moral turpitude is admissible to impeach a witness, and that prostitution is a crime of moral turpitude.  Wheeler, at 297.  Possession of a hypodermic syringe however – whether arrested for or convicted of - does not amount to a crime of moral turpitude for purposes of impeachment.  People v. Anderson, 20 Cal.3d 647, 650 (1978) ("evidence of ... prior arrests is inadmissible"); People v. Castro 38 Cal.3d 301, 317 (1985) (misdemeanors are proper for impeachment only when they involve moral turpitude).

At the time of Petitioner's trial, Stramaglia's misdemeanor convictions were generally inadmissible to impeach her credibility.  As such, it would have been reasonable for the California Supreme Court to conclude trial counsel was not deficient for failing to impeach Stramaglia's credibility on that basis.  Furthermore, even after the California Supreme Court decided Wheeler, permitting impeachment of a misdemeanor conviction involving moral turpitude, Stramaglia's prior convictions for possession of a hypodermic needle remained inadmissible and, hence, did not give rise to any deficiency on the part of trial counsel.  Richter, 562 U.S. at 101-03.

Even assuming for the sake of argument that counsel was deficient for failing to question Stramaglia about her misdemeanor arrests and/or convictions for purposes of impeachment,

210

1   Petitioner cannot show prejudice.

2       At trial, Stramaglia testified she earned her living as a prostitute before recently retiring.

3   (13 RT 2616.)  In addition to the jury learning Stramaglia was working as a prostitute at the time

4   of the crime alleged against Petitioner, it also learned a number of facts that the jury would have

5   considered as going to her credibility on direct examination, to wit: she lived with her

6   boyfriend/fiancé and then 11-year-old son in an apartment on Boxwood and had "guests from

7   time to time" (13 RT 2615); people regularly congregated outside the apartment, drinking and

8   smoking (13 RT 2617); she stayed up late and went to bed at 4:00 a.m. on a Wednesday,

9   apparently not waking to ensure her son ate breakfast or got to school (13 RT 2619-21); her son

10  slept in the dining room as she and her boyfriend used the only bedroom (13 RT 2619-20);

11  "several people," "three, maybe four people" slept in her living room the evening before the

12  incident (13 RT 2620); and she did not immediately file a police report because "[p]eople don't

13  usually care about prostitutes" (13 RT 2639).  On cross-examination, the jury learned Stramaglia

14  did not actually rent the apartment, that she did not recall the name of the friend who did, and she

15  did not pay any rent because the apartments were to be condemned (13 RT 2643-44); she did not

16  completely support herself via prostitution, receiving welfare assistance when not "sanctioned"

17  (13 RT 2646); and "[s]ometimes the dates would drive by" the front of the apartment (13 RT

18  2647).  In light of all this information for the jury's consideration, Petitioner cannot show

19  prejudice from a limitation or omission regarding Stramaglia's misdemeanor convictions for

20  prostitution.  Further, Stramaglia was also impeached with her preliminary hearing testimony as

21  to whether or not Petitioner removed her nightgown (13 RT 2663-64), how far along the sexual

22  act was when Black Tony walked in (13 RT 2667-69), and how much of Petitioner's knife she

23  saw (13 RT 2680-82).

24      Stramaglia was an admitted prostitute living an unsavory lifestyle, one to which her young

25  son was subjected.  Impeaching her credibility on the basis of three misdemeanor convictions for

26  prostitution, or arrests for misdemeanor possession of hypodermic syringes, would likely not have

27  made any difference in the jury's verdict.  Further, her testimony that she was raped and did not

28  consent to sexual relations with Petitioner was partially corroborated by the testimony of Anthony

                                            211

Simpkins. (16 RT 3535-37 [awoke to Sandy screaming], 3538 & 3589 [black man named Tony leaving her apartment; told him to "let it be"], 3541-42 [Petitioner carrying knife], 3543 & 3550 [Sandy "semi-hysterical"], 3543-44 [Sandy left and walked toward El Camino], 3545-46 [Sandy told him Petitioner had just raped her; Simpkins told Sandy to "calm down" because she was "yelling and babbling"], 3550-51 [Sandy was crying & said she had been raped], 3572 [heard screams], 3574 [same], 3577 ["Nippy" also heard screams], 3579 [Sandy was hysterical], 3580 & 3582-83 [Petitioner walking toward El Camino], 3582 [Sandy crying when he arrived], 3589-90 [Sandy screaming and calling for Mike], 3597-99 [saw Petitioner walk towards El Camino after leaving Sandy's apartment carrying knife], 3601-03 [Petitioner had what looked like a butcher knife].)

Moreover, Petitioner's actions immediately following his encounter with Stramaglia were also before the jury: after leaving Stramaglia's apartment, he stole a vehicle parked just down the block and took off at a high rate of speed. (13 RT 2688-730; 17 RT 3813-21.) That conduct plainly infers guilt. Therefore, it is not likely that had the jury learned that Stramaglia had suffered three misdemeanor convictions for prostitution and that she'd been arrested for possessing hypodermic syringes, it would have concluded that she consented to sex with Petitioner, thereby finding him not guilty of rape. While remotely conceivable, it was not reasonably likely the jury would have returned a different verdict. Richter, 562 U.S. at 111 (citing Strickland, 466 U.S. at 696).

The undersigned finds Stramaglia's credibility was sufficiently challenged at trial. Even if trial counsel had confronted Stramaglia with prostitution convictions or other misdemeanor arrests, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. For the foregoing reasons, it would have been reasonable for the California Supreme Court to conclude defense counsel were not ineffective. Richter, 562 U.S. at 101-03.

Right to Present Defense & to Confront Witnesses

Similarly, Petitioner did not suffer a constitutional violation of his right to present a defense nor of his right to confront the witnesses against him on these same bases.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him…." U.S. Const. Amend. VI. It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense. See Washington v. Texas, 388 U.S. 14, 19 (1967). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. at 409-10. States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials. Holmes v. South Carolina, 547 U.S. at 324. The Confrontation Clause does not prevent a trial judge from imposing "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. at 679. "[A] trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." Menendez v. Terhune, 422 F.3d at 1033 (citations omitted); see Montana v. Egelhoff, 518 U.S. at 42-43 (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

The Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes. [Citations.]" Nevada v. Jackson, 569 U.S. at 512. The high court explained:

> The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, but we have also recognized that state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence.

Id., at 509 (internal citations & quotation marks omitted).

Confrontation Clause errors are subject to harmless-error analysis. Winzer v. Hall, 494 F.3d 1192, 1201 (9th Cir. 2007). Errors are harmless if they do not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S.

at 623; Winzer, 494 F.3d at 1201.

Petitioner is entitled to "a meaningful opportunity to present a complete defense," Crane v. Kentucky, 476 U.S. 683, 690 (1986), and "states may not impede a defendant's right to put on a defense by imposing mechanistic ... or arbitrary ... rules of evidence," LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir. 1998). Nonetheless, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." United States v. Scheffer, 523 U.S. 303, 308, (1998); see also Montana v. Egelhoff, 518 U.S. at 53 ("the introduction of relevant evidence can be limited by the State for a 'valid' reason").

The California Supreme Court could have concluded that the trial judge's limits regarding Stramaglia's drug use were reasonable. Delaware v. Van Arsdall, 475 U.S. at 679. Certainly, it could have concluded that his rulings were neither arbitrary nor disproportionate. Menendez v. Terhune, 422 F.3d at 1033. Petitioner was permitted to present admissible evidence concerning Stramaglia's drug use. He was not denied his right to present evidence in the form of Stramaglia's addiction because there was no evidence she was under the influence of any drug at the time of the rape. Simply put, Petitioner was not denied the right to present a meaningful defense. Nevada v. Jackson, 569 U.S. at 509; Crane v. Kentucky, 476 U.S. at 690.

Even if the California Supreme Court erred in concluding there were no violations of the Confrontation Clause, any such errors were harmless. Given the evidence presented at trial that corroborated Stramaglia's testimony that Petitioner raped her, any error in excluding the evidence of Stramaglia's drug use would not have had a substantial influence on the jury's verdict. Despite credibility issues, Stramaglia's testimony was corroborated by that of Anthony Simpkins. (16 RT 3535-37 [awoke to Sandy screaming], 3538 & 3589 [black man named Tony leaving her apartment; told him to "let it be"], 3541-42 [Petitioner carrying knife], 3543 & 3550 [Sandy "semi-hysterical"], 3543-44 [Petitioner left and walked toward El Camino], 3545-46 [Sandy told him Petitioner had just raped her; Simpkins told Sandy to "calm down" because she was "yelling and babbling"], 3550-51 [Sandy was crying & said she had been raped], 3572 [heard screams], 3574 [same], 3577 ["Nippy" also heard screams], 3579 [Sandy was hysterical], 3580 & 3582-83 [Petitioner walking toward El Camino], 3582 [Sandy crying when he arrived], 3589-90 [Sandy

screaming and calling for Mike], 3597-99 [saw Petitioner walk towards El Camino after leaving

Sandy's apartment carrying knife], 3601-03 [Petitioner had what looked like a butcher knife].)

Her testimony was also indirectly bolstered by the testimony of Edwin Glidewell.  (13 RT 2688-

2730; 17 RT 3813-3821.)  In fact, the jury reached its verdicts as to all crimes alleged against

Petitioner – including the rape of Stramaglia – in the first two days of its deliberations.  (See 6 CT

1276-80 [all verdict forms related to Petitioner's crimes dated June 6 & 7].)[35]  The excluded

evidence did not have a "substantial and injurious effect or influence in determining the jury's

verdict."  Brecht v. Abrahamson, 507 U.S. at 623.

### *Korves Matter, Retirement, Subsequent Arrest & Probation,*
### *And Law Enforcement Relationship*

Petitioner contends that had his jury known that when Stramaglia testified at his trial that

"she believed the police would not care about her rape allegation against Petitioner," it had

already been "demonstrated to Ms. Stramaglia" as a part of the Korves case "that authorities did

care about prostitutes and would respond to their complaints," the jury would have rejected her

testimony.  (ECF No. 330 at 347.)  Further, Petitioner complains the prosecutor knew she was

"not reluctant to report an alleged rape, and yet he deliberately elicited testimony from her to the

contrary."  (Id. at 347.)  He claims that had the jury "disbelieved Stramaglia about the reason for

her delay in reporting the alleged rape by Petitioner, there is a reasonable probability that the jury

would have disbelieved Stramaglia's testimony in other respects, including whether she had been

raped at all."  (Id. at 348.)

Additionally, Petitioner maintains Stramaglia's "relationship with law enforcement would

have made her more, not less, likely to report rape."  (ECF No. 330 at 348.)  He points to the

involvement of Detective Terry Brown as the lead detective in both the Korves matter and this

one, her relationship with Officer Lister, and the prosecution's failure to "disclose that she was

his informant."  (ECF Doc. 330 at 348.)

////

---

[35] Deliberation continued for another two days concerning those charges facing Petitioner's
codefendant.  (6 CT 1282 [minutes reflecting Ross verdicts reached June 8 & 9].)

**The Applicable Legal Standards**

2        The court may grant habeas relief on a prosecutorial misconduct claim only if the

3   misconduct rises to the level of a due process violation.  Sechrest v. Ignacio, 549 F.3d 789, 807

4   (9th Cir. 2008).  A violation of a defendant's rights occurs if the government knowingly uses

5   false evidence in obtaining a conviction.  Giglio v. United States, 405 U.S. 150, 153-54 (1971);

6   Napue v. Illinois, 360 U.S. 264, 269 (1959).  It is clearly established that "a conviction obtained

7   by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood

8   that the false testimony could have affected the jury's verdict.  United States v. Bagley, 473 U.S.

9   667, 680 n.9 (1985); see also Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The

10  due process requirement voids a conviction where the false evidence is 'known to be such by

11  representatives of the State'") (quoting Napue, 360 U.S. at 269).  Due process is violated in such

12  circumstances regardless of whether the false testimony was obtained through the active conduct

13  of the prosecutor, or was unsolicited.  Napue, 360 U.S. at 269 ("[t]he same result obtains when

14  the State, although not soliciting false evidence, allows it to go uncorrected when it appears");

15  Hysler v Florida, 315 U.S. 411 (1942); Mooney v. Holohan, 294 U.S. 103 (1935).  This rule

16  applies even where the false testimony goes only to the credibility of the witness.  Napue, 360

17  U.S. at 269; Hayes v. Brown, 399 F.3d 972, 986 (9th Cir. 2005).

18       To establish a claim where a prosecutor has purportedly introduced perjured testimony,

19  the petitioner must first establish that the testimony was false.  United States v. Polizzi, 801 F.2d

20  1543, 1549-50 (9th Cir. 1986).  Next, the petitioner must demonstrate that the prosecution

21  knowingly used the perjured testimony.  Id.  And lastly, the petitioner must show that the false

22  testimony was material.  United States v. Juno-Arce, 339 F.3d 886, 889 (9th Cir. 2003).  False

23  evidence is material "if there is any reasonable likelihood that the false [evidence] could have

24  affected the judgment of the jury."  Hein v. Sullivan, 601 F.3d 897, 908 (9th Cir. 2010) (quoting

25  Bagley, 473 U.S. at 678).  Mere speculation regarding these factors is insufficient to meet the

26  required burden on the petitioner.  United States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).

27       In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held "that the

28  suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The duty to disclose such evidence is applicable even though there has been no request by the accused. United States v. Agurs, 427 U.S. 97, 107 (1976). The duty encompasses impeachment evidence in addition to exculpatory evidence. Bagley, 473 U.S. at 676. A Brady violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 438 (1995) ["the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"]).

As stated in Strickler v. Greene, 527 U.S. 263, 281-82 (1999), three components are required to establish a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." See also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005). "The prosecutor, although 'not required to deliver his entire file to defense counsel,' is required to turn over evidence that is both favorable to the defendant and material to the case." Amado v. Gonzalez, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting Bagley, 473 U.S. at 675).

A defendant is prejudiced by a Brady violation if the evidence that was not produced is material. Amado v. Gonzalez, 758 F.3d at 1134. Evidence is material if "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289. "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether 'in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. (quoting Kyles, 514 U.S. at 434); see also Silva, 416 F.3d at 986. Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. Kyles, 514 U.S. at 435-36; Silva, 416 F.3d at 986. "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." Silva, 416 F.3d at 986.

1          **Analysis**

2          <u>Testimony about reporting or not reporting</u>

3          The California Supreme Court could have reasonably concluded that Petitioner could not

4   establish that Stramaglia's testimony during his trial was false.  Of note, Stramaglia testified that

5   she did not think "people" cared about prostitutes; she did not use the word "police."  Moreover,

6   neither Stramaglia's testimony nor the testimony of Officer Ramsey in the <u>Korves</u> matter can be

7   said to be "contrary" to Stramaglia's testimony in this case.

8          In <u>Korves</u>, Stramaglia testified that she had been previously raped and stabbed.  (ECF No.

9   302, Vol. I, Ex. 7 at 142.)  When asked whether she urged Roxanne Simpkins – the victim of the

10  rape crime alleged in the *Korves* case – to report, Stramaglia testified Simpkins was "afraid" to

11  tell the police; Stramaglia told Simpkins she herself had "talked to the police a couple weeks"

12  after her own rape and "they told [her she] wouldn't have been in trouble" if she had reported it

13  herself.  (<u>Id</u>. at 150.)  Stramaglia told Simpkins it was "perfectly okay," and encouraged her to tell

14  "them right now before it's too late."  (<u>Id</u>. at 150.)  On cross-examination in <u>Korves</u>, when asked

15  whether she reported the rape and stabbing that happened to her, Stramaglia replied, "I didn't

16  really report it offic - - I did, Ramsey, the same – just happens to be the same officer that was

17  there on the scene, and I had talked to her before about it."  (<u>Id</u>. at 154.)  Later, her reply was

18  clarified:

19

20          Q.  You say you were raped at the same time you were stabbed?
            A.  Yeah.  I was raped and stabbed about a month before all this happened.
21          Q.  And Officer Ramsey was arresting you on a warrant for some charge?
            A.  Yeah.
22          Q.  You told Officer Ramsey that you were raped and stabbed?
            A.  Yeah.  When we got up to the police station she noticed the wound on the back
23      of my neck.  She wanted to know about it.  And I told her about it.  I hadn't report that
        rape because I was afraid to.
24          Q.  And you didn't report that rape until you were arrested for something?
            A.  Right.
25

26  (ECF No. 302, Vol. I, Ex. 7 at 192.)

27          On redirect, Stramaglia was asked if the wound on her neck was visible at the time of her

28  arrest; she replied no, explaining that Officer Ramsey was "searching" her and "noticed it."  (<u>Id</u>.

                                              218

at 226.)  The following colloquy occurred:

> Q. Did she ask you how you got the wound?
> A. Yes.
> Q. Did you tell her?
> A. Yes.
> Q. By telling her how you got that wound, were you intending at that point in time - - was it your intention to make a report about being raped and stabbed?
> A. No. Because at that point in time I was afraid to tell anybody like most of the girls are.
> Q. All right.
> A. Most of the girls are afraid because they are going to be in trouble because they are a prostitute.  So most of them are scared to death.  However, when Roxanne got - - that had already happened to me and Detective Ramsey assured me I wouldn't get in any trouble, and I hadn't gotten in any trouble, and a couple other girls that reported rapes didn't, and I let Roxanne know that when that happened.  I said you better get yourself over there and let them know.
> Q. So what you're telling me is that at least - - well, you and some [of] the other girls were afraid to report rapes because they were afraid to get in trouble for being prostitutes?
> A. Right.
> Q. After talking to Diane Ramsey you felt better about being able to report things?
> A. Yes.

(ECF No. 302, Vol. I, Ex. 7 at 226-27.)

At Petitioner's trial, when asked whether she reported "this rape to the police," Stramaglia replied, "No, not 'til a day or so later.  I told Detective Jim Lister, because he's kind of a friend." (13 RT 2639.)  Asked why she did not "immediately report" it to police, she testified: "People don't usually care about prostitutes."  (13 RT 2639.)

In both instances, Stramaglia elected not to report a rape to police on her own.  Rather, in the incident occurring prior to the <u>Korves</u> trial, she told an officer only in response to questions posed of her during the booking process related to an outstanding warrant.  Following the rape by Petitioner, again Stramaglia elected not to report it to police on her own, or at least had not yet decided one way or another.  (13 RT 2684.)  In <u>Korves</u>, she explained most prostitutes were afraid to report a rape for fear they would face charges themselves.  In this case, she did not testify she was not afraid or no longer afraid; rather, she expressed a belief that "[p]eople don't usually care about prostitutes."  Her statement can be reasonably inferred to mean that some

people care and others do not. Those that may not care who are working in a law enforcement capacity may still represent a reason for fear on the part of the prostitute. In other words, Stramaglia's previous experience with Officer Ramsey – someone who did care about the rape of a prostitute – did not necessarily mean she would feel safe in reporting that same crime to another law enforcement officer.[36] Whether Stramaglia feared facing criminal charges herself if she reported a rape is a separate consideration from her beliefs concerning whether others cared about the crime of rape where the victim is a prostitute. United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997) (the fact "that a witness may have made an earlier inconsistent statement or that other witnesses have conflicting recollection of events, does not establish that the testimony offered at trial was false"). Furthermore, one's fear of facing criminal charges does not necessarily evaporate with a single positive experience. Fearing prosecution for prostitution is not the same as maintaining a belief that people don't care about whether prostitutes are raped. The first concerns a personal instinct to avoid criminal liability whereas the second concerns a society's judgment about whether a prostitute can even be the victim of a rape. Simply stated, the California Supreme Court could have concluded that Petitioner failed to establish that Stramaglia's testimony was false, the first requirement for establishing a claim that the prosecution introduced perjured testimony. United States v. Polizzi, 801 F.2d at 1549-50; Richter, 562 U.S. at 103.

Moreover, Stramaglia testified at Petitioner's preliminary hearing on October 16, 1987, that when she reported the prior rape (as encouraged by Officer Ramsey), no official report was generated because the detectives with whom she spoke just told her to come in and tell them if

---

[36] Officer Diane Ramsey's testimony in the Korves matter does not change this conclusion. Regarding her interaction with Stramaglia following Stramaglia's prior arrest on an outstanding warrant, Ramsey testified on cross-examination that she knew Stramaglia prior to the Korves assault and kidnapping. (ECF No. 302, Vol. XXII, Ex. 67 at 4357.) Ramsey arrested her about a month prior. (Id. at 4357.) In completing the booking report, medical information concerning the arrested person is recorded, including any injuries present. Stramaglia indicated then that she had been "stabbed in the back of the neck" and showed Ramsey "the stitch in the back of the neck." (Id. at 4357-58.) Learning the injury was tied to a rape, Ramsey told Stramaglia to report it to police, and to report any such attacks against Stramaglia and other prostitutes to police. (Id. at 4358.)

she saw the guy again. Thus, while Officer Ramsey was concerned about Stramaglia's report, it might be inferred that the detectives with whom Stramaglia subsequently spoke lacked that same concern. (1 CT 185-86.) Said another way, they were possibly people who didn't care. Which means Stramaglia's testimony was consistent, and not false. Mr. Gable argued the police's lack of action meant Stramaglia's report was false: "They did not even write a formal report … elected not to do anything about it, which, the inference is, they didn't really feel it was a crime." (13 RT 2585.) But Gable's argument was speculation. United States v. Aichele, 427 U.S. 97. Certainly, fairminded jurists could disagree as to the nature of Stramaglia's testimony. Based upon this record, the California Supreme Court could have reasonably concluded Petitioner failed to establish the second requirement - that the prosecutor knowingly used perjured testimony – because the testimony was not false or perjured. United States v. Juno-Arce, 339 F.3d at 889; Richter, 562 U.S. at 103.

Even assuming for the sake of discussion the previous two requirements had been met, the state's highest court could also have concluded that Petitioner failed to show the testimony was material. Again, false evidence is material "if there is any reasonable likelihood that the false [evidence] could have affected the judgment of the jury." Hein v. Sullivan, 601 F.3d at 908.

This crime is one wherein credibility is important; the victim testified she did not consent to sexual intercourse and Petitioner testified she did. But, whether Stramaglia was no longer afraid to report a rape as she had been in the past, was not reasonably likely to have affected the jury's verdict. Stramaglia's testimony that a rape occurred was corroborated in part by the testimony of Anthony Simpkins. (16 RT 3535-37 [awoke to Sandy screaming], 3538 & 3589 [black man named Tony leaving her apartment; told him to "let it be"], 3541-42 [Petitioner carrying knife], 3543 & 3550 [Sandy "semi-hysterical"], 3543-44 [Petitioner left and walked toward El Camino], 3545-46 [Sandy told him Petitioner had just raped her; Simpkins told Sandy to "calm down" because she was "yelling and babbling"], 3550-51 [Sandy was crying & said she had been raped], 3572 [heard screams], 3574 [same], 3577 ["Nippy" also heard screams], 3579 [Sandy was hysterical], 3580 & 3582-83 [Petitioner walking toward El Camino], 3582 [Sandy crying when he arrived], 3589-90 [Sandy screaming and calling for Mike], 3597-99 [saw

1  Petitioner walk towards El Camino after leaving Sandy's apartment carrying knife], 3601-03

2  [Petitioner had what looked like a butcher knife].)

3  Additionally, Stramaglia's testimony was indirectly corroborated by the testimony of

4  Edwin Glidewell and Officer Michael Tupper regarding the theft of Glidewell's vehicle minutes

5  after Petitioner left Stramaglia's apartment, allowing Petitioner to flee the scene of his crime.  (13

6  RT 2688-730; 17 RT 3813-21.)  See Hovey v. Ayers, 458 F.3d 892, 920 (9th Cir. 2006)

7  (corroborating testimony reduces prejudice of withheld impeachment evidence).

8  The evidence was not material because it could not have affected the judgment of the jury.

9  There is no reasonable probability that had the jury heard Stramaglia's testimony in the Korves

10  matter concerning the prior rape and reporting or not reporting it, that disclosure would have

11  resulted in the jury acquitting Petitioner of the crime of rape.  Stramaglia's credibility, as noted

12  elsewhere in these Findings, was challenged in a number of ways.  Ultimately, the California

13  Supreme Court could have reasonably concluded that even absent this evidence, Petitioner

14  received a fair trial and the jury's verdict was worthy of confidence.  Strickler, 527 U.S. at 289;

15  Kyles, 514 U.S. at 434; Silva, 416 F.3d at 986.  Thus, the California Supreme Court's rejection of

16  Petitioner's claim was not unreasonable as fairminded jurists could disagree.  Richter, 562 U.S. at

17  103.

18  <u>Testimony about retirement</u>

19  Petitioner also argues that had he known about Stramaglia's arrest shortly before trial on

20  June 8, 1988, he could have impeached her testimony at trial that "she retired from prostitution

21  since the alleged rape by Mr. Alvarez in May 1987." (ECF No. 330 at 343.)

22  Specifically, at trial, on April 11, 1989, Stramaglia testified as follows on direct

23  examination:

24

25  [PROSECUTOR]: And Miss Stramaglia, what was your occupation [in May
      1987]?

26  A.   At that point in time, I was a prostitute.
      Q. And are you a prostitute now, as well?

27  A.  No, I'm retired.

28  (13 RT 2616.)  No further testimony was given on the issue at trial.

Stramaglia did <u>not</u> testify as Petitioner asserts in his points and authorities, "that she retired from prostitution *since the alleged* rape …" (emphasis added.)

Petitioner reasons Stramaglia must then have retired sometime between October 16, 1987 (preliminary hearing testimony) and April 11, 1989 (trial testimony). He then speculates that Stramaglia's January 31 and June 7, 1988 arrests could have impeached her trial testimony on this point.

Even assuming Stramaglia retired between October 1987 and April 11, 1989, neither the 1988 arrests nor her probationary status are evidence she was not "retired" on April 11, 1989. Based upon the testimony itself, Stramaglia could have retired the day prior – or April 10, 1989 – or on June 8, 1988, after pleading guilty to one count of disorderly conduct: prostitution, electing to retire from that date forward. And, her testimony at trial would be consistent and thus not subject to impeachment.

Again, based on this record, the California Supreme Court could have reasonably concluded that Stramaglia's testimony was not false or perjured (<u>U.S. v. Polizzi</u>, 801 F.2d at 1549-50), that the prosecutor did not knowingly use perjured testimony (<u>U.S. v. Juno-Arce</u>, 339 F.3d at 889), and that it was not likely Stramaglia's testimony she was retired from prostitution affected the jury's judgment (<u>Hein</u>, 601 F.3d at 908). <u>Richter</u>, 562 U.S. at 103.

Neither was the prosecutor required to disclose Stramaglia was a "retired" prostitute, even assuming he knew of her retirement. Whether Stramaglia had retired is neither exculpatory nor is it impeaching.

Stramaglia's date of retirement is not known. Although impeachment evidence is exculpatory within the meaning of <u>Brady</u> (<u>see</u> <u>Giglio v. United States</u>, 405 U.S. at 154), <u>Brady</u>'s "reasonable probability" test requires more than mere speculation that evidence withheld was of such a nature that its exclusion undermines confidence in the outcome of the proceeding. <u>See</u> <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6–8 (1995). Petitioner has failed to provide anything beyond mere speculation that any arrest of Stramaglia after May 1987, or probationary term to which she might have been then subject to, could have been used to impeach her trial testimony and ultimately undermine confidence in the jury's verdict.

<u>Arrests following rape/Probation</u>

Petitioner also contends a <u>Brady</u> violation occurred because the prosecutor did not disclose that Stramaglia was arrested following the May 1987 rape allegation, nor did the government disclose she was on probation.  He asserts that evidence would have been impeaching.

The undersigned notes again that the record does not include documentary evidence of Stramaglia's criminal history as it existed when the government originally disclosed it.  Rather, a California Department of Justice printout dated February 2001 is relied upon to support Petitioner's arguments.

Significantly, Mr. Holmes made no representation that Stramaglia's criminal history had been withheld in any way.  (ECF No. 302, Vol. XXVI, Ex. 136.)  Mr. Gable's 2004 declaration specifically addresses his cross-examination of Stramaglia, and in particular, the testimony she gave in the <u>Korves</u> matter.  It does not, however, represent that he was unaware of her arrests after May 1987, or that he was unaware she was on probation.  (ECF No. 302, Vol. XXII, Ex. 63.)  Neither does Gable's 2009 declaration make any such assertion.  (ECF No. 320, Ex. 160.)

Furthermore, during the hearing on the prosecutor's motion to limit "prior sexual history or subsequent sexual history," he advised the court Stramaglia "had no felony conviction" and acknowledged she had "a number of B's," or "misdemeanor B's, a number of them," referring to California Penal Code section 647(b), the statute concerning prostitution. (13 RT 2581, 2582, 2585.)  Mr. Gable responded that he was "not even going to argue that," referring to Stramaglia's criminal history as it relates to prostitution.  (13 RT 2585.)  Prior to the rape allegation, Stramaglia incurred two convictions for prostitution; after the rape allegation and prior to her testimony in April 1989, she incurred a third prostitution conviction.  (ECF No. 302, Vol. II. Ex. 8 at 238.)  The prosecutor's words imply a number greater than two ("a number of" "a number of them").  Significantly, neither Mr. Gable nor Mr. Holmes expressed any concern for the prosecutor's assertions about Stramaglia's criminal record, nor did either seek clarification of any kind.  It is likely the parties were aware of each of Stramaglia's three convictions for prostitution.

Based upon this record, the California Supreme Court could have reasonably concluded

there was no Brady violation. This conclusion is reasonable because it's not clear there was any evidence withheld in the first instance. Petitioner's argument is based on pure speculation. See Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005) (rejecting Brady claim based on "mere speculation"). Richter, 562 U.S. at 102, 105.

The same analysis applies to Petitioner's argument that his rights were violated when the prosecutor failed to disclose Stramaglia was on probation at the time of her testimony.

Turning again to the record, and in particular Petitioner's exhibits, Stramaglia's criminal history indicates she was placed on a 36-month probation following her first conviction for disorderly conduct/prostitution in February 1987. (ECF No. 302, Vol. II, Ex. 8 at 239.) Plainly, defense counsel knew of Stramaglia's first conviction, and at the time of Petitioner's trial, the 36-month probationary period would still have been in effect, to wit: February 1987 through February 1990. The California Supreme Court could have reasonably concluded there was no Brady error for a duty to disclose Stramaglia's probationary status. Richter, 562 U.S. at 102, 105.

Relationship with law enforcement

Petitioner also claims the prosecutor failed to disclose that Stramaglia was a police informant, asserting Brady error. Applying the required analysis to these facts, *if* Stramaglia were a police informant, such information would clearly be impeaching and would serve to establish the first of three necessary components for a Brady violation. Strickler v. Greene, 527 U.S. at 281-82. Petitioner had to next show that the impeaching evidence was "suppressed by the State, either willfully or inadvertently." Strickler, 527 U.S. at 281-82. This he cannot do because his evidence does not establish Stramaglia was an informant in the first instance.

The undersigned must agree with Respondent that neither Jim Lister's October 21, 2003 letter, nor Charles Formosa's July 15, 2004 declaration, amount to evidence that Stramaglia was a confidential and/or paid informant of the Sacramento Police Department. More particularly, Mr. Lister's letter does not make such a claim. It states only that he has knowledge of so-called "'red files'" maintained by the "Office of Investigations," consisting of "the informant's name, mug shot, biographical information, cases [in] which they have given testimony and any amounts of money paid to them by the City of Sacramento." (ECF No. 301, Ex. 12, ¶ 11-attachment.) Lister

makes no claim that Stramaglia was a confidential reliable informant and/or that information about her could be found in the "red files." (ECF No. 301, Ex. 12, ¶ 11-attachment.)

Notably, Lister does note in his letter that it was not his practice to "submit an informant's name to the 'red file'" because he "had great success in using informants as tipsters, as opposed to using their information to write search warrants." (ECF No. 301, Ex. 12, ¶ 11-attachment.) He protected his "street informants" from being exploited by other officers or inadvertent leaks, by keeping their information from the "red file," and "never paid for information from an informant and [] never dealt off a case for their information." (ECF No. 301, Ex. 12, ¶ 11-attachment.)

Mr. Formosa's declaration indicates his February 1999 and 2003 interviews with Lister revealed Lister "remembered knowing Mike Hopper and Sandra Stramaglia" as a result of his patrol beat in the mid to late 1980s that included the Boxwood Apartments. (ECF No. 301, Ex. 12, ¶¶ 2-4].) Specifically, Mr. Formosa's declaration concludes:

> While Mr. Lister was working for the Sacramento Police Department, all information about an informant would have been kept in a separate file. This file was commonly known as the "red file" or the "snitch file". Anyone who was used as an informant should have a "red" or "snitch" file on record. To his knowledge, the department maintained these files from the time he started working there. His understanding was they are still maintained.

(ECF No. 301, Ex. 12, ¶ 10.) Petitioner makes the inaccurate and unsupported assumption, based upon Lister's general statements concerning informant files maintained by the Sacramento Police Department, that Stramaglia was such an informant. Yet, he ignores Lister's correspondence that plainly indicates to the contrary: that Lister kept that information to himself rather than share it with a wider law enforcement audience where it might be exploited. And significantly, Lister never indicated Stramaglia was a formal or "red file" informant of the Sacramento Police Department.

Mr. Holmes' declaration on this issue indicates defense counsel were "aware that Detective Jim Lister talked extensively to the people in the area of Stramaglia's residence as a way of keeping himself informed about his 'beat.' Therefore, the fact that Stramaglia referred to

Lister as a 'friend' did not suggest to the defense a need to investigate her now-alleged 'connections' with law enforcement." (ECF No. 302, Vol. XXVI, Ex. 136 at 5254.) Neither of Mr. Gable's declarations address this issue. (ECF Nos. 302, Vol. XXII, Ex. 63 & 320, Ex. 160.)

> To establish deficient performance a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688 []. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id*., at 689 []. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*., at 687 [].

Richter, 562 U.S. at 104.

Petitioner cannot establish deficient performance by trial counsel. As explained above, the record does not support the need for additional investigation into any relationship between Stramaglia and Lister. Mr. Holmes' declaration reveals counsel reasonably concluded that Stramaglia's friendship with Lister was benign and merely the result of Lister's policing method; a method that did not include paid informants or "red files."

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694 []. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding. *Id*. at 693 []. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687 [].

Richter, 562 U.S. at 104.

Neither can Petitioner establish prejudice even assuming deficiency. There is no reasonable probability the result of the trial would have been different had the jury learned that Lister's regular contact with residents in the Boxwood area, including Stramaglia, provided him with information on an informal basis.

Accordingly, the California Supreme Court could have reasonably concluded that Petitioner failed to establish a Brady violation or that defense counsels were ineffective in some manner for failing to offer this evidence to impeach Stramaglia's testimony at trial. That court's

determination is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

As to Detective Terry Brown's involvement in both cases, the evidence is not favorable to Petitioner. Brown testified in the Korves matter that he interviewed Roxanne Simpkins. He indicated Stramaglia was "involved" in the case he "handled," but he did not interview her or show her suspect photographs for purposes of identification. (ECF No. 302, Vol. XXII, Ex. 68 at 4366-67.) The simple fact Brown was lead detective in both cases in which Stramaglia was a victim is not exculpatory or impeaching. Strickler v. Greene, 527 U.S. at 281-82. Neither is there a reasonable probability that the result of the trial would have been different had the jury learned Brown was also the lead investigator in the Korves matter, having had no personal contact with Stramaglia in that case. In the absence of that evidence, the verdict remains worthy of confidence. Id. at 289.

The same can be said of the last component. The state's highest court could have concluded that Petitioner was not prejudiced. It is immaterial that Stramaglia was friendly with an officer or detective assigned to her neighborhood, because she was not a police informant whose name would appear in the so-called "red files." The California Supreme Court could have determined that in the absence of that information, and the information that Detective Brown was lead detective in this case and in the Korves case, Petitioner received a fair trial and a verdict worthy of confidence was rendered. Strickler, 527 U.S. at 289-90; Richter, 562 U.S. at 103.

In any case, this matter is unlike United States v. Kizer, 569 F.2d 504, 506 (9th Cir. 1978). This record does not establish that Stramaglia was a *paid* government informer with pending criminal charges against her, where criminal charges were dropped against her prior to trial, or where the fact of addiction is probative of other motivation for testifying, or where she was intoxicated at the time of her testimony. None of those circumstances applied here.

Finally, it would not have been unreasonable for the California Supreme Court to conclude that trial counsel was not ineffective for failing to discover this information in order to present it to the jury as a reason to question Stramaglia's credibility due to her purported close

228

relationship with law enforcement. Stramaglia and Lister were familiar with one another due to the fact she plied her trade as a prostitute in the area to which he was assigned as a member of the Sacramento Police Department. While Stramaglia might have provided him with information from time to time, he never paid her for the information, nor did he make any effort to affect the outcome of any case she was facing.

The second prong of the Strickland test requires showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." Strickland, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 104. "Only those habeas petitioners who can prove under Strickland that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial." Kimmelman v. Morrison, 477 U.S. 365, 382 (1986). Even had counsel learned of the close relationship between Lister and Stramaglia, Petitioner cannot show the result of the trial would have been different; the jury already knew Stramaglia was a prostitute, the fact she considered Lister a "friend," and that she may have provided him with information about things relevant to his patrol route. A different result might be conceivable, but it is not substantially likely. Richter, 562 U.S. at 104.

Further, the undersigned disagrees that Stramaglia's purported relationship with law enforcement, and prior belated rape allegation, amount to violations of his constitutional rights to present a defense and confront witnesses.

With specific regard to belated rape reports, any delay in reporting other rapes had little relevance to the circumstances surrounding the manner in which this rape was reported. As previously discussed, Stramaglia's testimony regarding reporting was not false or inconsistent. The jury knew that Stramaglia did not report this rape immediately and allegedly why, and that she ultimately told Lister about it. And there is evidence in this record to suggest that Lister approached Stramaglia after other investigators working the Birkman robbery/murder learned that the same suspect wanted for that crime and the theft of Glidewell's Camaro was also responsible for the rape of an area prostitute. (ECF No. 302, Vol. III, Ex. 8 at 475 [Natalie Glidewell's

statement of 5/17/87 at 1710 hours], 532-33 [crime scene summary], 751 [Stramaglia's statement of 5/17/87 at 1930 hours] & 940 [crime report dated 5/17/87].)  Hence, it would be reasonable for the California Supreme Court to conclude the absence of this evidence did not prevent Petitioner from presenting a complete defense.  Crane v. Kentucky, 476 U.S. at 689-90; Nevada v. Jackson, 569 U.S. at 509.

Regarding Stramaglia's alleged relationship with law enforcement, as previously discussed, the undersigned finds that because there was no evidence to support the assertion that Stramaglia's was an informant, the California Supreme Court could have concluded that Brady error did not occur.  Similarly, the California Supreme Court could have concluded Petitioner was not denied his right to confront Stramaglia on this point because any foreclosure of inquiry to demonstrate potential bias was harmless.  The jury was aware Stramaglia considered Lister "a friend" (13 RT 2639), and the evidence does not support Petitioner's assertions about a relationship.  Thus, the state's highest court could have reasonably concluded that Petitioner was not denied his constitutional right to present a complete defense, nor his right to confront witnesses.  Fairminded jurists could disagree on the issue.  Richter, 562 U.S. at 101-03.

Percy Spence

In passing, Petitioner claims that defense counsels were ineffective for failing to object to the prosecutor having elicited testimony about witness Percy Spence's drug use.  Specifically, defense counsel were allegedly ineffective for an "unreasonable failure to object to the prosecutor's questioning of Percy Spence regarding his past drug use and failure to urge the court to revisit its ruling *in limine* preventing the defense from questioning Sandra Stramaglia about her past drug use."  (ECF No. 330 at 352, 354.)

In the absence of any citation to the record identified by Petitioner, the apparent exchange at issue is as follows:

> Q. Mr. Spence, what were you doing over at those apartments that day?
> A. Well, I lived in the neighborhood, you know, I know everybody over there, you know, I go and visit friends, you know, Roxanne, her brother sometime.
> Q. Where had you been the - - where had you slept that night?
> A. Matter of fact, I don't even think I slept that night.

230

Q. Did you and Mr. Alvarez stay up that whole night?

A. Yeah, we drank beer, you know, had a few drinks.

Q. Smoked cocaine?

A. What make you say something like that? Do you?

Q. Do I smoke cocaine?

A. Yeah.

Q. No, sir.

A. Why would I have to be smoking cocaine to stay up?

Q. You give me the answer and then we'll know.  [¶]  You were smoking cocaine the night before?

A. How you know what I was doing?  I wasn't smoking nothing.  I was drinking some beer, man.

Q. I'm not - -

THE COURT:  Mr. Spence, just do your best to answer the question that he asks.

THE WITNESS:  I was drinking some beer.

Q. [PROSECUTOR]: I'm not gonna get you in trouble.

A. You can't get me in trouble.

Q. That's right.  [¶]  You were smoking cocaine the night before with Mr. Alvarez and Roxanne; is that right?

MR. GABLE:  I'm going to object as being argumentative, the answer was given.

THE COURT:  Overruled.

Q. [PROSECUTOR]:  Were you smoking cocaine with Manny and Roxanne in Roxanne's apartment?

A. Say what you want to say, I tell you I was drinking some beer.  I may have smoked some marijuana, I wasn't smoking no cocaine, due to the fact my funds was low. If I had funds, I probably would have.

Q. The way you get funds is by selling cocaine, isn't it?

MR. GABLE:  Objection, your Honor irrelevant.

THE COURT:  Sustained.

(17 RT 3788-89.)

Petitioner complains Mr. Gable failed to object where the prosecutor failed to lay a foundation for his questions concerning Spence's drug use; he asserts that "[r]easonably competent counsel would have capitalized on the prosecutor's questioning of Spence to urge the court to revisit the issue and allow the defendant to recall Stramaglia."  (ECF No. 330 at 354.) Again, the record reflects defense counsels' trial strategy involved treating Stramaglia's past drug use as irrelevant.  Therefore, counsel was not unreasonable in failing to object to the cross-examination of Spence on this issue to "capitalize" on it in order to urge the court to revisit its earlier ruling regarding Stramaglia.  That earlier ruling was consistent with the trial strategy adopted by counsel.  Hence, it would not have been unreasonable for the California Supreme

231

1  Court to conclude counsel was not ineffective on this basis.  <u>Strickland</u>, 466 U.S. at 687; <u>Richter</u>,

2  562 U.S. at 104.

3                              ***Conclusion***

4         For the foregoing reasons, the California Supreme Court could have reasonably concluded

5  that Petitioner was not deprived of any opportunity to impeach Stramaglia, that he received the

6  effective assistance of counsel concerning investigation of Stramaglia, and that Petitioner was not

7  deprived of any right to due process and a fair trial.  28 U.S.C. § 2254(d).  Accordingly, the

8  undersigned RECOMMENDS that Claims II, JJ and G be DENIED.

9       **Claim RR: Alleged Errors Depriving Petitioner of the Opportunity to Impeach**

10      **Anthony Simpkins**

11        In this claim, Petitioner asserts trial counsel failed to properly investigate and present

12  evidence that Anthony Simpkins was a heroin addict, and also failed to properly argue in favor of

13  his impeachment on the basis of his heroin addiction; their failures resulted in the denial of his

14  right to confront Simpkins and to present a defense.  (ECF No. 330 at 381-405.)  Respondent

15  maintains Petitioner is not entitled to habeas relief because the California Supreme Court's

16  adjudication of the claim was not unreasonable or contrary to Supreme Court precedent.  (ECF

17  No. 345 at 198-207.)

18                    **The Applicable Legal Standards**

19        As noted elsewhere, to succeed on a <u>Strickland</u> claim, a defendant must show that (1) his

20  counsel's performance was deficient and that (2) the "deficient performance prejudiced the

21  defense."  <u>Strickland</u>, 466 U.S. at 687.  Counsel is constitutionally deficient if his representation

22  "fell below an objective standard of reasonableness" such that it was outside "the range of

23  competence demanded of attorneys in criminal cases."  <u>Id.</u> at 687-88 (internal quotation marks

24  omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial

25  whose result is reliable.'"  <u>Richter</u>, 562 U.S. at 104 (quoting <u>Strickland</u>, 466 U.S. at 687).  A

26  reviewing court is required to make every effort "to eliminate the distorting effects of hindsight,

27  to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct

28  from counsel's perspective at the time."  <u>Strickland</u>, 466 U.S. at 669; <u>see also</u> <u>Richter</u>, 562 U.S. at

107.

In order to show ineffectiveness of counsel based on the failure to investigate, a petitioner must show that his counsel did not make a reasonable investigation or did not make a reasonable decision that made a particular investigation unnecessary.  See Strickland, 466 U.S. at 691; Wiggins v. Smith, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further"); Duncan v. Ornoski, 528 F.3d 1222, 1235 (9th Cir. 2008) ("We allow lawyers considerable discretion to make strategic decisions about what to investigate, but only after those lawyers 'have gathered sufficient evidence upon which to base their tactical choices'").

**Relevant Background**

Prior to Anthony Simpkins' testimony before the jury on the afternoon of April 26, 1989, the following colloquy occurred:

> THE COURT:  Counsel, do you want me to conduct the preliminary inquiry regarding his felonies?
> MR. GABLE:  That would be fine.
> THE COURT:  Mr. Simpkins, do you know if you've been convicted of any felonies.
> THE WITNESS:  Yes, sir, I have.
> THE COURT:  What were those?
> THE WITNESS:  11550.
> THE COURT:  Okay.  When were those convictions?
> THE WITNESS:  1986 and 19 - - 1986 and 1988.
> THE COURT:  Now, 1150 [sic], was that for, I take it, well, was that for just straight possession, possession for sale?
> THE WITNESS: Straight possession, personal use.
> THE COURT:  Okay.  Have you had any other criminal convictions of any kind?
> THE WITNESS: A few misdemeanors.
> THE COURT: What were those?
> THE WITNESS: Under the influence and petty theft.
> THE COURT:  Okay.  Mr. Holmes, Mr. Gable, you wish to inquire further?
> MR. HOLMES: I'm sorry, I was rustling through some papers here. [¶] Sir, what were the dates on the 11550, 86'?
> A.  '86, I believe, and '88.
> Q.  So, we're talking about two different offenses for being under the influence of narcotics; is that right?
> A.  Two different offenses for being in possession of narcotics.

233

Q. Possession, all right. And those were both in Sacramento County?

A. No. Washoe County, Reno, Nevada and San Francisco County.

Q. Okay. Now, did you get picked up on a federal offense for drugs in 1987?

A. No, sir. It wasn't for drugs, it was a misdemeanor for petty theft of government property.

Q. On government property, like a railroad or something? What happened in that case?

A. Post office. I served nine months, Terminal Island, Lompoc.

Q. Did you have any other federal offenses, which you were arrested for and charged with?

A. No, sir.

Q. Okay. You didn't tell Mr. Marlette here earlier today that your federal offense was for narcotics, did you?

A. No, sir.

Q. Okay. What happened on your burglary down in Fairfield?

A. It was dissolved. It wasn't a burglary, it was a petty theft.

Q. Dissolved, you mean resolved as a petty theft misdemeanor?

A. Yeah.

Q. Did some time on that one?

A. Credit for time served, I believe.

Q. Then, on your federal offense, you failed to appear on that; is that correct?

A. Yes, sir.

MR. MARLETTE: Objection, your Honor, relevance.

THE COURT: Overruled at this time, this is just inquiry.

(BY MR. HOLMES): That resolved, pertaining to the same petty theft of government property?

A. Yeah, it resolved, one incident.

Q. What did you fail to appear for Court for, doing time or what?

A. No, I failed to appear because I was in custody one time in Sacramento, and because when I was arrested, it was under an alias.

Q. Okay. And then in December of - - out of San Francisco, December of 1988, you had a felony possession of narcotics?

A. Yes. I already - - I've already told you about that.

Q. Just inquiring. That started off as a possession for sale?

A. I'm not sure.

Q. Okay. Well, were you ever charged with possession for sale of narcotics?

A. Never sold any narcotics to anybody.

Q. No, possession for sale, holding it out there package - -

A. It was a very minor amount. It was possession as far as I know.

Q. Okay. Thank you, sir.

MR. GABLE: That's all I have.

THE COURT: Do you have any charges pending right now?

THE WITNESS: Yes.

THE COURT: What charges are pending? So you're still - - you have Court appearances to - -

THE WITNESS: I have one, under the influence from 1987.

THE COURT: That you haven't been sentenced on yet.

THE WITNESS: No.

234

1  THE COURT:  Why - - what jurisdiction is that in?
2  THE WITNESS:  It's in San Mateo County.  I filed a 1389 while I was in Lompoc, but I never got any reply, and after I was released, they picked me up on it.
3  THE COURT: And you're doing time now on a misdemeanor charge?
   THE WITNESS:  Yes.
4  THE COURT:  Have you talked to anybody about whether or not your testifying today in this case will be of any benefit to you?
5  THE WITNESS:  No, I haven't talked to anybody about that.
   THE COURT:  Do you expect that it will be of any benefit to you, at all?
6  THE WITNESS:  I don't expect it, no.
7  THE COURT:  Do you intend to - -
   THE WITNESS:  I don't intend to.
8  THE COURT:  Do you intend to ask for any benefit from testifying today?
   THE WITNESS:  Absolutely not.
9  THE COURT:  Any further questions?
10 MR. MARLETTE:  No, sir.
   THE COURT:  Okay.
11 MR. HOLMES:  No.
   THE COURT:  Bring the jury in, please.
12 MR. MARLETTE:  Your Honor, I would ask, before the jury comes in, that inquiry into Mr. Simpkins' criminal background be prohibited.
13 THE COURT:  As far as impeachment is concerned?
   MR. MARLETTE:  Yes.
14 THE COURT:  Yes, there does not seem to be any impeachment prior convictions.
15 The two felonies which I assume are 11350's, and I'm not sure, I think the one in Nevada, I'm not sure, but anyway, if they are for possession only, that's - - that doesn't qualify as a
16 crime involving moral turpitude.
   MR. HOLMES:  I would agree with that.  It appears that the most he had was one
17 where he was picked up on possession for sale, this is in San Francisco.
18 This may end up as possession, but I would ask to be permitted to at least ask him, you know, if he's in custody right now, so forth.  I think Counsel is going to do that, to
19 start off with.
   THE COURT:  Yes, questions of that nature may lead to any possible promises or
20 bias, it would be permissible.  Okay.

21 (16 RT 3529-34.)  During testimony before the jury, Simpkins was asked whether he was "in

22 custody in San Mateo County" at that time; he replied, "Yes, sir."  He agreed also that he was

23 serving "a 45-day sentence for a misdemeanor."  (16 RT 3552-53.)

24 Mr. Holmes' 1999 declaration provides as follows:

25

26 Claim RR, the failure to investigate and present evidence that Anthony Simpkins was a heroin addict.

27 While I have little recollection of this particular issue, I do recollect that we did considerable investigation for Mr. Alvarez's trial and that Simpkins' alleged heroin
28 addiction was not particularly relevant or important to the charge of Mr. Alvarez's rape of

Sandra Stramaglia. (ECF No. 302, Vol. XXVI, Ex. 136 at 5257.)  Neither of Mr. Gable's declarations address this issue.  (ECF No. 302, Vol. XXII, Ex. 63 & ECF No. 320, Ex. 160.)

**Analysis**

Petitioner begins by claiming Mr. Holmes' "declaration indicates he saw no way in which Simpkins's heroin addiction could be used as impeachment."  (ECF No. 330 at 389-90.)  Next, he contends that both Mr. Holmes' declaration and the trial record suggest Holmes believed that misdemeanor convictions are never admissible for impeachment purposes, citing to page "3533" of the Reporter's Transcript.  (ECF No. 330 at 390.)  The undersigned begins with the latter contention.

*Impeachment*

Mr. Holmes' declaration does not address Simpkins' misdemeanor convictions in any way; it addresses only the drug issue.  If Petitioner's assertion is based solely on the fact the declaration does not address those misdemeanor convictions, it is not well taken.  As for the reference to page 3533, Holmes is quoted on a single line, to wit: answering "No," in response to the court's inquiry concerning any further questions.  (16 RT 3533.)  Therefore, the undersigned assumes Petitioner intended reference to the following page of the Reporter's Transcript wherein Mr. Holmes agreed with the trial court's assessment that "[t]he two felonies which I assume are 11350's …are for possession only, that's - - that doesn't qualify as a crime involving moral turpitude."  (16 RT 3533-34.)  Holmes then went on to state, "[i]t appears that the most he had was one where he was picked up on possession for sale, this is in San Francisco.  [¶] This may end up as a possession, but I would ask to be permitted to at least ask him, you know, if he's in custody right now, so forth."  (16 RT 3534.)

Mr. Holmes could have been referencing a September 20, 1988 arrest of Simpkins by the San Francisco Police Department for a violation of California Health and Safety Code § 11351, possession of a controlled substance for sale.  (ECF No. 302, Vol. V, Ex. 10 at 951.)  The complaint filed thereafter alleged a single count of possession of a controlled substance in violation of California Health and Safety Code § 11350(a) (ECF No. 302, Vol. VII, Ex. 10 at

1   1349), to which Simpkins pled guilty (ECF No. 302, Vol. VII, Ex. 10 at 1351-1360), resulting in

2   a conviction for possession and a suspended prison sentence and three-year probationary term.

3   (ECF No. 302, Vol. VI, Ex. 10 at 1117-26 & Vol. VII, Ex. 10 at 1343.)

4        However, Holmes was more likely referencing a March 5, 1989 arrest by the San

5   Francisco Police Department for a violation of that same section – possession of a controlled

6   substance for sale – wherein an entry dated one day later on March 6, 1989, indicated the

7   following "DISPO:PROS REL-DET ONLY-COMB W/OTHER CNTS/CASE." (ECF No. 302,

8   Vol, V, Ex. 10 at 952.)[37]

9        In any event, this record does not support Petitioner's assertion that trial counsel

10  misunderstood the use of Simpkins' prior convictions for purposes of impeachment or that he

11  "believed misdemeanor convictions were never admissible for impeachment." Rather, the record

12  reveals defense counsel was informed regarding Simpkins' record, which at that time included

13  misdemeanor convictions involving possession of a controlled substance and petty theft. Notably

14  too, co-counsel Gable clearly understood that a misdemeanor conviction involving moral

15  turpitude could potentially be admissible for purposes of impeachment. (20 RT 4642-46.)

16       Avoiding the distorting effects of hindsight from the perspective of counsel at the time of

17  trial, and because it was not outside "the range of competence demanded" for Holmes to agree

18  with the trial court that Simpkins' criminal history did not include an impeachable admissible

19  offense, the California Supreme Court could have concluded trial counsels' representation of

20  Petitioner did not fall "below an objective standard of reasonableness," amounting to a

21  constitutional deficiency. Strickland, 466 U.S. at 687-88 (internal quotation marks omitted).

22  Moreover, even assuming error, the state's high court could have concluded any error did not

23  result in the deprivation of a fair trial because fairminded jurists could disagree that counsels'

24  representative was ineffective. Richter, 562 U.S. at 104; Strickland, 466 U.S. at 687.

25                                    *Investigation*

26       Petitioner's assertion that counsel failed to consider "specific facts" is not borne out by the

27

28  [37] Other arrests prior to April 1989 for this same violation involved unlawful searches and
    seizures; none resulted in the filing of a complaint. (ECF No. 302, Vol. V, Ex. 10 at 952.)

record.  Mr. Holmes's declaration indicates consideration was given to the issue of Simpkins' drug addiction and a strategic or tactical decision was made to disregard the information.  (ECF No. 320, Vol. XXVI, Ex. 136.)

More specifically, counsel's strategy with regard to Simpkins' testimony, as was evident during cross-examination and in closing argument, included pointing to the close relationship that Simpkins shared with Stramaglia as a basis for Simpkins' corroborating testimony.  More particularly, during his cross-examination, Mr. Holmes addressed Simpkins' close relationship with Stramaglia and asked whether he had "an interest in this case, as far as helping out Sandra and making sure that someone's convicted of this act?"  (16 RT 3595, 3596.)  In closing argument, Mr. Gable argued that Simpkins and Stramaglia "were like sister and brother, very, very close relationship, known each other for years.  [¶] It doesn't seem implausible at all that a person of his ilk would and could be capable of coming in here and lying to make sure that somebody who he thought had done his sister wrong, got his just desserts."  (25 RT 5733.)  And, "Simpkins, also known as White Tony, who as I indicated, is a very close friend of Sandra, considers her to be a sister, I'd submit to you that his story is a complete fabrication."  (25 RT 5744-45.)  This strategy also involved two defense witnesses who testified regarding conversations they were alleged to have had with Simpkins while in jail, wherein Simpkins indicated he intended to lie on the stand in order to implicate Petitioner because he believed Petitioner had raped his sister.  (17 RT 3825-41 [Jacobs 5/1/89]; 24 RT 5404-29 [Stokes 5/26/89]; see also 25 RT 5745-46 [closing argument].)

A wide measure of deference must be given to counsel's tactical decisions.  Indeed, Strickland notes that "counsel's tactical decisions are virtually unchallengeable."  Strickland, 466 U.S. at 690; see also Furman v. Wood, 190 F.3d 1002, 1007 (9th Cir. 1999); Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984) (tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available); United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981) (difference of opinion as to trial tactics does not constitute denial of effective assistance).  A petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Strickland, 466

1    U.S. at 689 (citations omitted).

2        The California Supreme Court could have reasonably concluded that the defense team's

3    chosen strategy was a sound one even if a better tactic might have been to address Simpkins' drug

4    use or heroin addiction.  Richter, 562 U.S. at 102.  Further, as similarly discussed in Claim II,

5    neither Roxanne Simpkins' 1999 declaration, nor the declaration of Charles Formosa concerning

6    Jim Lister, make the California Supreme Court's denial of Petitioner's claim unreasonable.

7        While Roxanne Simpkins' declaration includes the statement that her brother Anthony

8    was "addicted to heroin" during the period he stayed "with [her] on Boxwood in May 1987"

9    (ECF No. 302, Vol. IX, Ex. 11), there is no evidence Roxanne would have testified similarly at

10   the time of Petitioner's trial.  See Allen v. Woodford, 395 F.3d 979, 1002 n.2 (9th Cir. 2005);

11   United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988).[38]  And, as discussed above,

12   Simpkins' heroin use or addiction was not addressed because defense counsel's strategy was

13   expressly focused elsewhere.  As for Mr. Formosa's declaration, including the letter from Lister

14   appended as an exhibit thereto, it makes no reference to Anthony Simpkins in any way.  (ECF

15   No. 302, Vol, IX, Ex. 12.)  To the degree it is offered to support a claim that Simpkins was a

16   government informant, the California Supreme Court could have reasonably denied the claim on

17   this basis, for the reasons previously addressed in Petitioner's related Claim II.

18       With regard to Petitioner's cursory argument that evidence of Simpkins' lying to law

19   enforcement "was Brady material: it was known to law enforcement, it was favorable, it was

20   suppressed" (ECF No. 330 at 394), the record does not establish the material was suppressed in

21   any way.

22       Initially, the undersigned notes that some of the material Petitioner expressly cites to

23   occurred after Petitioner's trial and hence obviously could not have been suppressed.  Nor is there

24   any evidence in the record that defense counsel failed in its asserted "duty to discover Simpkins's

25   lies to law enforcement."  (ECF No. 330 at 394.)  Simpkins' criminal history was known to the

26

27   [38] Petitioner asserts that Roxanne "would have testified that at the time of the alleged rape,
     Simpkins was addicted to heroin" (ECF No. 330 at 394), however, the declaration itself does not
28   include such a declaration.

                                        239

defense team, including Simpkins' willingness to lie to law enforcement. By way of example, in November 1986, Simpkins was arrested for providing false identification to a police officer. (ECF No. 302, Vol. V, Ex. 10 at 95 & Vol. VIII. Ex. 10 at 1637-40.) Additionally, Simpkins' record as of 1988 included his use of at least two aliases: David Eric Scorsonelli and Mark Simpkins. (ECF No. 302, Vol. V, Ex. 10 at 950-52 [names 4 & 5], Vol. VI, Ex. 10 at 1233-39 & Vol. VIII, Ex. 10 at 1667-76.) In fact, Simpkins admitted using an alias during questioning outside the jury's presence; neither Holmes nor Gable expressed surprise. (16 RT 3531.) Further, as noted, counsels' strategy or tactic was focused on inferring that Simpkins' testimony was not worthy of belief due to his close relationship with Stramaglia.

The undersigned herein incorporates the previous discussion in Petitioner's Claim II concerning prejudice. There is no reasonable probability of a different outcome had Simpkins been impeached "with his heroin addiction and its manifestations in his dishonest behavior" (ECF No. 330 at 395), for the jury could still have accepted all or some of his testimony.[39] The question of a witness's credibility is a matter for the jury. And again, Petitioner ignores the indirect corroboration evidence offered by Edwin Glidewell and Officer Michael Tupper concerning the theft of Glidewell's vehicle at that same time, allowing for Petitioner's escape and a reasonable inference of guilt relating to Stramaglia's rape.

The jury knew Simpkins was in custody at the time of his testimony. (16 RT 3552-53.) And while Simpkins denied using drugs the night before the Stramaglia incident, his testimony did not amount to a categorical denial of any drug usage on his part. On cross-examination, Simpkins was asked if he was "taking drugs" that evening and he replied, "Not myself, *not that night*." (16 RT 3564 (emphasis added); see also 16 RT 3565-66.) He did specifically deny using crack cocaine. (16 RT 3567.) Hence, the jury knew Simpkins was a drug user.

It is possible that, even had evidence of Simpkins' heroin addiction and willingness to lie to law enforcement to avoid criminal consequences been presented, the jury could still have

---

[39] The jury was instructed regarding the credibility of witnesses. (25 RT 5594-95.)

chosen to believe his testimony concerning the circumstances of his encounter with Stramaglia and others on the morning in question. Based on this record, the California Supreme Court could have reasonably concluded that defense counsel did not provide ineffective assistance of counsel. Richter, 562 U.S. at 102.

As for Petitioner's assertion that because rape is considered by the jury pursuant to Penal Code § 190.3, subdivisions (a) and (b), and is "a particularly aggravating circumstance" there is a reasonable probability the jury would not have sentenced him to death had it not convicted him of raping Stramaglia, the record suggests otherwise.

Petitioner faced numerous aggravating circumstances for his various then-current crimes and other incidents, over and above the Stramaglia rape. Those numerous other aggravating factors included the robbery and murder of Alan Birkman, the robbery of Greta Slatten (who sustained significant injuries as a result of the force employed during the robbery), and two incidents involving the use of force against other inmates. (31 RT 6900-10; 6 CT 1353; see also 2 CT 361-64; 3 CT 544-46; 4 CT 993.) The jury also considered, as an aggravating factor pursuant to subdivision (c) of Penal Code § 190.3, Petitioner's prior conviction for voluntary manslaughter. (31 RT 6907-09; 6 CT 1353, 1380.) Given the circumstances surrounding the various and numerous aggravating factors considered by the jury, the undersigned finds the California Supreme Court could have reasonably concluded there was no reasonable probability of the jury imposing a sentence other than death, even had it not convicted him of rape. Murder and robbery are also "particularly aggravating," to use Petitioner's words. In sum, Petitioner has failed to show that no reasonable jurist could have found that he failed to make a prima facie showing of prejudice as a result of counsels' alleged failure to investigate and present evidence regarding Simpkins' heroin addiction, and failure to impeach Simpkins. Richter, 562 U.S. at 102.

Because the undersigned has found the California Supreme Court could reasonably have concluded there was no violation of Petitioner's constitutional right to the effective assistance of counsel, Petitioner could not have been deprived of his constitutional right to confront Simpkins or to present a defense predicated on that same basis. Washington, 388 U.S. at 19; Taylor, 484 U.S. at 409-10.

Petitioner also argues that the cumulative effect of the trial errors complained of warrants reversal. (ECF No. 330 at 396.) "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." Peyton v. Cullen, 658 F.3d 890, 896–97 (9th Cir. 2011) (citing Chambers v. Mississippi, 401 U.S. 284, 298, 302–03 (1973)). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. at 623 (citation omitted). As discussed, however, Petitioner's allegations in Claim RR, as well as those related thereto, do not amount to error, and thus he demonstrates no errors that can accumulate to a level of a constitutional violation. See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

Lastly, the undersigned notes that, like he did in Claim II, Petitioner spends some time repeating the arguments asserted by Respondent in the habeas proceedings previously pending before the California Supreme Court and attempting to explain how *if* that court accepted Respondent's arguments, it was wrong to do so. But the test is not whether the California Supreme Court was persuaded by and/or adopted a respondent's arguments as posed. Rather, it is whether there are arguments or theories that could have supported the state court's decision, and whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the United States Supreme Court. Richter, 562 U.S. at 102.

### Conclusion

The undersigned finds that the California Supreme Court could have reasonably concluded that trial counsel was not ineffective for a failure to investigate and present evidence that Simpkins was a heroin addict, or for a failure to properly argue impeachment of Simpkins on that basis; relatedly, it could also have reasonably concluded Petitioner was not denied his rights to confront Simpkins as a witness or to present a defense. Richter, 562 U.S. at 101-13. Therefore, the California Supreme Court's determination of Petitioner's claim is neither contrary to, nor does it involve an unreasonable application of, Supreme Court precedent; he is not entitled

242

to relief.  The undersigned RECOMMENDS that Claim RR be DENIED.

### Claim F: Deprivation of the Constitutional Right to a Defense When Trial Court Refused to Permit Petitioner to Impeach Stramaglia and Simpkins with Long History of Arrests and Convictions for Drug and Prostitution Offenses

Petitioner contends the trial court erroneously precluded impeachment of Stramaglia and Simpkins with their criminal records," and incorporates the related arguments he asserted in Claims II and RR.  He further contends that because "the State put on no physical evidence to support the rape allegation, Stramaglia and Simpkins were the State's entire case for the rape charge," meaning the claim should be considered with his Claims II, JJ, G, and RR.  (ECF No. 330 at 405-09.)  Respondent asserts that the California Supreme Court's rejection of Petitioner's claim of erroneous preclusion of misdemeanor conviction evidence was neither unreasonable nor contrary to Supreme Court precedent.  (ECF No. 345 at 207-10.)

This claim is exhausted for it was presented in Petitioner's direct appeal to the California Supreme Court, as well as in his second state habeas petition filed with that same court.

### The California Supreme Court's Adjudication

The California Supreme Court's decision pertaining to Stramaglia's criminal history is excerpted in its entirety above, in the undersigned's discussion concerning Claim II.  As for its determination of the same concerning Simpkins' criminal history, the state's highest court found as follows:

> In the course of trial, the People moved the superior court, in limine, to preclude defendant and Ross from impeaching Sandra S.'s friend Anthony Simpkins in the presence of the jury with evidence of prior convictions, including one for the misdemeanor of petty theft. Neither defendant nor Ross opposed the motion. The superior court observed that "there does not seem to be any impeachable prior convictions." Defense counsel expressly "agreed with that." The superior court granted the motion. Defendant requested permission to inquire in the jury's presence whether Simpkins was then in custody. The superior court gave leave to do so.
> At the guilt phase, Simpkins testified on the People's behalf. On direct examination, he admitted that he was then in custody following a prior, otherwise unidentified, misdemeanor conviction. On cross-examination by defendant, he was impeached with evidence of misconduct, but not such as underlay his prior petty theft

243

misdemeanor conviction. On cross-examination by Ross, he was not impeached at all, testifying inter alia that he had never seen her previously.

Defendant now contends that the superior court erred by granting the People's motion to bar impeachment of Simpkins with his prior petty theft misdemeanor conviction.

We reject the claim at the threshold. Defendant has not preserved the point for review. He may not offer an argument in favor of impeachment because he did not offer any to that effect below.  [Fn. omitted.]

People v. Alvarez, 14 Cal.4th at 202.

**Analysis**

Initially, the record confirms that trial counsel did not object to the People's motions below, and for that reason the state's highest court found the argument had been waived for purposes of appeal. Petitioner contends, in the absence of any citation to legal authority, that by "not alternatively address[ing] the merits of the claim … [t]he state court defaulted the claim." (ECF No. 330 at 407:8-12.)  In the next paragraph, Petitioner acknowledges raising the claim in his second state habeas petition wherein the "state court denied the claim on the merits and as procedurally defaulted."  (ECF No. 330 at 407:13-15.)  Thereafter, however, he asserts, this court "need not decide whether the state court decision was reasonable" because the state court "did not adjudicate Claim F on the merits."  (ECF No. 330 at 407:17-18.)

The undersigned finds the claim was rejected on the merits by the California Supreme Court's denial of the claim in the second state habeas petition.  See Richter, 562 U.S. at 98-99. As a result, the court considers what arguments or theories supported or could have supported the California Supreme Court's decision, and whether it is possible fairminded jurists could disagree about whether those arguments or theories are inconsistent with Supreme Court precedent. Richter, at 101-02.  The undersigned herein incorporates the discussion and analyses performed in related Claims II, RR, JJ, and G.

At the time of Petitioner's trial in 1989, arrests that did not lead to convictions were inadmissible for impeachment purposes.  See People v. Anderson, 20 Cal.3d 647, 650-51 (1978)

("it has long been held that evidence of an accused's prior arrests is inadmissible"). To the degree Petitioner's claim can be understood to complain the trial court erred in precluding admission of either Stramaglia or Simpkins' arrest record, the California Supreme Court could have reasonably concluded such evidence was inadmissible, and that fairminded jurists could disagree on the issue of whether his constitutional rights were violated as a result. Richter, 562 U.S. at 101-02.

Regarding any conviction involving moral turpitude by either Stramaglia or Simpkins and its admissibility, at the time of Petitioner's trial, felony convictions involving moral turpitude were admissible, subject also to a determination pursuant to Evidence Code § 352. People v. Castro, 38 Cal.3d 301, 315 (1985). Not until 1992 did the California Supreme Court determine that a misdemeanor crime of moral turpitude was admissible for purposes of impeachment. People v. Wheeler, 4 Cal.4th 284, 295-96 (1992). And again, admissibility or exclusion would be subject to Evidence Code § 352 analysis. People v. Clair, 2 Cal.4th 629, 654-55 (1992). As a result, and despite any deficiency in preserving the issue by a failure to object, the state's highest court could have reasonably concluded that the trial court did not err in precluding its admission, and that disagreement could exist among fairminded jurists. Richter, 562 U.S. at 101-02.

Here, in October 1988, Simpkins incurred a misdemeanor conviction pursuant to California Penal Code § 32 and served one day in jail.[40] (ECF No. 302, Vol. V, Ex. 10 at 952.) A review of Petitioner's exhibits concerning this conviction reveals Simpkins pled guilty to the misdemeanor crime of being an accessory after having been originally charged with possession of a controlled substance (Cal. Health & Saf. Code, § 11350(a)) and driving without a valid driver's license (Cal. Veh. Cod, § 12500(a)). (ECF No. 302, Vol. VI, Ex. 10 at 1273.) His plea was

---

[40] A violation of California Penal Code § 32 "necessarily involves moral turpitude since it requires that a party has a specific intent to impede justice with knowledge that his actions permit a fugitive of the law to remain at large." In re Young, 49 Cal.3d 257, 264, 261 (1989).

considered a lesser included offense, by stipulation, to the crime of possession of a controlled substance.  (ECF No. 302, Vol. VI, Ex. 10 at 1270.)  Hence, this conviction is (1) a misdemeanor and (2) despite typically being considered a crime of moral turpitude, the original crime to which this charge was considered a lesser of, did not involve moral turpitude.

The crime of possession of heroin is not a crime involving moral turpitude.  People v. Castro, 38 Cal.3d at 317 (the crime possession of heroin for sale involves moral turpitude).  "Misdemeanor convictions themselves are not admissible for impeachment, although evidence of the underlying conduct may be admissible subject to the court's exercise of discretion."  People v. Chatman, 38 Cal.4th 344, 373 (2006).  Regarding Simpkins' convictions for petty theft, and other misdemeanor convictions, the trial court may have elected to exercise its discretion pursuant to Evidence Code § 352.  It is entirely speculative to assert that Stramaglia and Simpkins could have been impeached on these convictions.  Trial judges retain wide latitude to impose reasonable limits on impeachment based on concerns about harassment, prejudice, confusion of the issues, repetition or marginal relevance.  Delaware v. Van Arsdall, 475 U.S. at 679.  Here, Judge Lewis made no ruling concerning either Stramaglia or Simpkins' arrests.  He was not asked to admit evidence concerning Simpkins' other misdemeanor convictions because counsel agreed with the trial court that those convictions were not admissible for purposes of impeachment.

This record confirms Petitioner was given an opportunity to effectively cross-examine Stramaglia and Simpkins.  He is entitled to do so in an "effective" manner, not in "whatever way, and to whatever extent" Petitioner wished.  See Delaware v. Fensterer, 474 U.S.at 20.  Further, Petitioner was permitted, and able, to expose Simpkins' motivation for testifying.  Davis v. Alaska, 415 U.S. 308, 316-17 (1974).  And to the degree the trial court imposed limits on Petitioner's right to confront witnesses, those limits were reasonable.  Delaware v. Van Arsdall, 475 U.S. at 679.  It was not unreasonable for the California Supreme Court to conclude that the

exclusion of the evidence at issue was neither contrary to nor an unreasonable application of Supreme Court precedent. Nor is that decision based upon on an unreasonable determination of the facts. Certainly, fairminded jurists could disagree concerning the admissibility of the evidence at issue for purposes of impeachment. Richter, 562 U.S. at 101-03.

Even assuming for the sake of argument that the impeachment evidence identified by Petitioner should have been admitted at trial, Petitioner is only entitled to federal habeas relief where he can show that the error had a substantial and injurious effect on the jury's verdict, resulting in actual prejudice. Brecht, 507 U.S. at 622-23, 638. But, Petitioner has failed to show actual prejudice resulting from the trial court's exclusion of either Stramaglia or Simpkins' criminal history including arrests and convictions for drug and other misdemeanor offenses.

The jury was aware that Stramaglia and Simpkins resided in and frequented an area known for drug and prostitution activity, that both lived in an apartment building that had been condemned and for which no one paid rent or utilities. It knew that while each denied using drugs at or around the time of the incident giving rise to the rape allegation, and while testifying, it could be inferred that drug use occured at other times. It heard Simpkins testify that his sister Roxanne, a Boxwood resident with whom he was staying, had smoked crack cocaine the prior evening with others. It knew Stramaglia had been a prostitute by profession and that she raised a young son in a dangerous and delinquent environment, and could reasonably infer that she did not trouble herself with ensuring her son awoke in time for school and had breakfast before leaving for school. The jury also learned that, at the time of his testimony, Simpkins was serving a sentence in jail for a misdemeanor crime. Therefore, in the eyes of the jury, the evidence at issue would not have created a significantly different impression of either Stramaglia or Simpkins' credibility.

Both Stramaglia and Simpkins' testimony was important, as acknowledged, and it was not

cumulative. The evidence excluded did not contradict the testimony on material points other than the question of credibility; in other words, the excluded evidence did not speak directly to whether a non-consensual sexual encounter occurred. Moreover, the extent of the cross-examination of Stramaglia and Simpkins was not otherwise limited. And, significantly, the state's case was not as weak as Petitioner paints. Briefly, Stramaglia testified that she awoke to find Petitioner masturbating in her bedroom, and that he raped her despite her calls for help. Simpkins testified that when he responded to the screams coming from Stramaglia's apartment, he found her semi-hysterical and crying. Simpkins testified that Petitioner was still present when he arrived, but after finishing dressing and displaying a knife, Petitioner left the apartment on foot in the direction of El Camino Boulevard. Stramaglia and Simpkins testified Stramaglia told him she had been raped and that Black Tony did not help her. Simpkins indicated Stramaglia continued to cry and ask for her fiancé Mike. At about that same time, Edwin Glidewell's Camaro was parked in front of his brother's home on Boxwood near El Camino. As Glidewell waited for his wife to say her goodbyes before they headed to a medical appointment, he noticed Petitioner walking nearby. Before Petitioner passed the Camaro however, he jumped into the driver's seat of the waiting vehicle and sped off. Glidewell immediately reported the vehicle as stolen.

The undersigned notes that the entire cast of characters relating to the rape charge (referring to the testimony of Stramaglia, Simpkins, Petitioner, Stokes, and Jacobs, even Glidewell's testimony, albeit indirectly) suffered from significant credibility issues. And, although it is true that the jury's evaluation of the credibility of Stramaglia and Simpkins was a critical factor at trial, the jury would not have had a significantly different impression of their veracity even if the evidence at issue had been admitted. Given all of the information available to the jury, the undersigned cannot conclude that the exclusion of Stramaglia and Simpkins' arrests

and misdemeanor convictions had a substantial and injurious effect in determining the jury's verdict. Hence, error, if any, was harmless. <u>Van Arsdall</u>, 475 U.S. at 684; <u>Brecht</u>, 507 U.S. at 638.

For the foregoing reasons, the undersigned RECOMMENDS that Claim F be DENIED.

**Claims O, OO & SS: Denial of Adequate Interpreter Services**

In a series of claims pertaining to interpretation services, Petitioner complains he was denied an adequate interpreter at all critical stages of the trial (Claim SS), that trial counsel did not use an interpreter to communicate with him (Claim OO), and that he testified without the assistance of an interpreter (Claim O). He argues he is entitled to habeas relief as a result of these constitutional violations. (ECF No. 330 at 409-83.) Respondent contends the California Supreme Court's rejection of these claims is not contrary to, nor an unreasonable application of, Supreme Court precedent; as a result, Respondent argues Petitioner's claims must be denied on habeas review. (ECF No. 345 at 210-40.)

Claim O is exhausted following its presentation to the California Supreme Court on direct review and subsequent denial in a reasoned opinion. Claims OO and SS were presented in both habeas petitions filed in that same court; both were denied on the merits. Concerning Claim O, the undersigned determines whether the California Supreme Court's denial is contrary to, or involves an unreasonable application of, Supreme Court precedent, or was based on an unreasonable determination of the facts. § 2254(d)(1) & (2). Regarding Claims OO and SS, the undersigned will determine what arguments or theories could have supported the California Supreme Court's decision and whether it is possible fairminded jurists could disagree those arguments or theories are inconsistent with prior holdings of the Supreme Court. <u>Richter</u>, 562 U.S. at 101-03.

**Relevant Background**

Various pre-trial proceedings were held between November 1987 and January 1989, including arraignment, the preliminary hearing, and numerous motions, without the assistance of an interpreter for Petitioner. (1 RT 1-184; 1 CT 1-250, 2 CT 251-355.) More particularly, at the

249

preliminary hearing held October 15, 16 and 19, 1987, Petitioner made no request for the assistance of an interpreter. (1 CT 1-250; 2 CT 251-355.) More than twenty appearances in the superior court occurred thereafter without a request for assistance. (2 CT 367-68, 377, 381-82, 418, 444, 495-97; 3 CT 508-09, 516, 543, 574, 580, 599, 603-06.) Not until late January or early February 1989, did Petitioner request the assistance of an interpreter "during all proceedings of the Trial commencing February 1, 1989." (4 CT 767-69.) Mr. Holmes declared that he and Petitioner "discussed need" for an interpreter because "technical" or complex issues posed Petitioner difficulty. (4 CT 768.) Petitioner's request or motion for the assistance of an interpreter was granted. (4 CT 771, 947.) When proceedings commenced before Judge Lewis on February 2, 1989, an interpreter was sworn (2 RT 2-14) and employed thereafter.

More specifically, on January 31, 1989, before trial began, Petitioner's motion to substitute counsel pursuant to People v. Marsden, 2 Cal.3d 118 (1970) (see 3 CT 608-11), was heard before Judge Rodney Davis (ECF No. 302, Vol. XXI, Ex. 55). During those *in camera* proceedings, Petitioner requested "the use of a translator, interpreter," claiming it would be "more useful" and allow him to better explain himself. (Id. at 4089.) After inquiring of Petitioner whether he had written the motion himself, Judge Davis inquired of both Holmes and Gable whether they had had any difficulty communicating with their client, particularly Petitioner's "command of the English language." (Id. at 4089-90.) Holmes initially responded, "No, your Honor, there has been full communication on this," and then indicated that while he and Petitioner could carry on a conversation, Petitioner had expressed that he does not understand "the detailed things" or "what's going on when we start talking about different motions and things like that." (Id. at 4089-90.) The proceedings were then recessed until an interpreter could be located; state certified Spanish interpreter Jessie Correa assisted at the *in camera* hearing. (Id. at 4090-95I.)[41]

Immediately after the interpreter was sworn, Judge Davis stated the following:

---

[41] The pagination employed in the exhibit involves numerals, and at page 4095 capital letters are thereafter employed (i.e., 4095A, 4095B, …).

> The record will indicate that the Court finds that the defendant at this time, based on his communications, his oral communications in court as well as his written communication, which is marked and filed as part of the permanent records in this case, is capable of proceeding without the assistance of a court interpreter.
>
> However, for the sake of - - or out of an abundance of caution, in order to make Mr. Alvarez feel entirely comfortable during these <u>Marsden</u> proceedings, I have asked Court Interpreter Correa to interpret for him.

(ECF No. 302, Vol. XXI, Ex. 55 at 4091.)

During those same proceedings, defense counsel Holmes was asked to respond to Petitioner's "statement that [he had] declined to arrange for a court interpreter to be present to assist him with [his] interviews;" Holmes explained he had represented Petitioner for about two years and that he recalled "meetings with Mr. Alvarez with an interpreter in the past," but that within the previous year he did not believe there was a "need" if he (Holmes) slowed his speech and chose "different terms." (ECF Doc. 302, Vol. XXI, Ex. 55 at 4095C.) Holmes further stated that Petitioner had indicated that "detailed things, such as different motions, grounds for motions things like that, that he does have some difficulty understanding. In fact, he's requested that at trial we have an interpreter for him during the trial, and we will be bringing a written motion on that on those bases." (<u>Id.</u> at 4095C-D.) Holmes noted he had no complaints regarding any ability of either Mr. Gable or defense investigator Wilcox to communicate with Petitioner, and, further, that Petitioner himself had no complaints until recently:

> [A]ctually the first time I was aware of Mr. Alvarez's request for an interpreter in court is when he had a new case which is in Department C, possession of an illegal item in the county jail, which is still pending. [¶] He, at that time, asked for an interpreter, and there has been an interpreter in that court each time, but as far as all Superior Court proceedings, he's never directly asked me for an interpreter.
>
> I have also been aware that there was a little bit of an area where he maybe was not understanding fully, but I always felt like since I spent so much time talking to him on the phone, talked to him at the county jail, and the investigator talks to him, Mr. Gable talks to him, that anything he needs to be filled in on we can fill him in on, either before we go to court or after court. I never felt like it was a real serious problem as far as my commun[]ication with him and vice versa.

(ECF Doc. 302, Vol. XXI, Ex. 55 at 4095D-E.) Gable concurred, and concluded: "Certainly, if he needs an interpreter, I certainly am not going to stand in the way of that, and I don't think Mr.

Holmes is, either. That's certainly not our intention. In fact, if he indicates he needs an interpreter, I will be the first to stand up and request that on his behalf." (Id. at 4095E.)

On or about February 2, 1989, defense counsel filed a pretrial motion requesting the assistance of a Spanish speaking interpreter during trial. (4 CT 767-69.) The motion was granted and an interpreter assisted from that point forward. (4 CT 771, 947; 2 RT 2-14.)

Mr. Holmes' 1999 declaration provides the following:

> I do not recall whether or not I took an interpreter to talk to Mr. Alvarez in the jail. However, I do know that if I had needed an interpreter, I would have used one. Communicating with Mr. Alvarez was not a problem. He spoke English well, and I know some Spanish, so we were able to communicate effectively with each other at all times.
> The allegation that Mr. Alvarez did not understand his right not to testify and did not know the difference between the adversarial system and the inquisitorial system is the most bizarre argument I have ever heard. I always treat the issue of whether a defendant does or does not testify at trial with great respect. I always take time to explain the rights and options the defendant has to testify or not to testify. I always discuss with each of my clients the pros and cons of taking the stand in their own defense. In the case of Mr. Alvarez, he decided he needed to testify in his own defense because of the significant evidence against him.

(ECF No. 302, Vol. XXVI, Ex. 136 at 5255-56.)

Mr. Gable's 2004 declaration includes the following relevant information:

> With regard to the interaction between Yolanda Oliver and Mr. Alvarez, I did not observe anything in their interaction that was inappropriate nor do I believe that there was anything inappropriate in her behavior. I believe that Ms. Oliver comported herself in a professional manner throughout her appearances as interpreter for Mr. Alvarez.
> I recall that Mr. Alvarez told me that he was very concerned about Carmen Krewson's inability (or unwillingness) to accurately translate his testimony. Mr. Alvarez told me that she was a lousy interpreter, but I discounted his complaints. I personally have no opinion on Ms. Krewson's abilities as an interpreter as I do not speak or understand Spanish.
> It was Mr. Alvarez's choice to testify in English. I tried to persuade him to testify in Spanish through an interpreter because his English wasn't good, but Mr. Alvarez told me that he was very concerned that Carmen Krewson would not accurately translate his testimony. I didn't take him very seriously, and thought he was being somewhat paranoid.

(ECF No. 302, Vol. XXII, Ex. 63 at 4285.)

////

////

Interpreter Yolanda Oliver[42] assisted on the following dates: 2/28/89, 3/1/89, 3/13/89, 3/14/89, 3/15/89, 7/25/89, 8/2/89 (partial), 8/3/89, 9/14/89 and 9/20/89.  (4 CT 961-62, 970, 972, 975; 6 CT 1344, 1346, 1406, 1480, 1488.)

Interpreter Carmen Krewson assisted on the following dates: 3/16/89, 3/20/89-3/21/89, 3/27/89, 3/30/89, 4/3/89-4/6/89, 4/10/89-4/12/89, 4/17/89-4/20/89, 4/25/89-4/28/89, 5/1/89-5/4/89, 5/15/89-5/17/89 (partial), 5/18/89, 5/22/89-5/26/89, 5/30/89-6/2/89, 6/5/89-6/9/89, 6/13/89, 6/16/89, 6/26/89, 6/29/89, 7/5/89-7/7/89, 7/11/89 and 7/12/89.  (4 CT 981, 983-85, 995; 5 CT 1010, 1020, 1063, 1066, 1072-75, 1081, 1083, 1086, 1089, 1095, 1097, 1101, 1104, 1107, 1109, 1111-13, 1115, 1118, 1121, 1129-31, 1133, 1135-40, 1144; 6 CT 1271, 1273-74, 1281, 1283-85, 1290-92, 1294-96.)

Occasionally, other interpreters assisted: Daniel Robert (3/2/89 [4 CT 966]), Gladys Cook (partial 5/17/89 [5 CT 1121]), Frank Valdes (7/26/89 [6 CT 1345]), Christina Beebe and Arnulfo Hernandez (8/2/89 [6 CT 1346-47]).  On July 24, 1989, Petitioner "personally waived the presence of the [S]panish interpreter" during proceedings held outside the jury's presence concerning a purported breach of confidentiality by the interpreter's office.  (6 CT 1343.)

The record also contains a relevant Sacramento County Sheriff's Department Inmate Incident Report dated March 14, 1989, reciting the following circumstances:

> During the first jury selection that I sat with ALVAREZ, who was seated next to his attorney on one side and his interpreter on the other, I noted that he and his interpreter were engaged in personal conversation for at least a five minute period.  Both were laughing, his female interpreter more so than he.  It was obvious neither he nor the interpreter were paying attention to what was going on. I brought this situation to Bailiff Lynn Taff, who advised Judge Lewis. Shortly Judge Lewis observed what appeared to be personal conversation between the two and went on record about this conversation.
> During the second day I escorted ALVAREZ to court, and while in court his interpreter produced a small pill box from her purse, opened it and removed two brown pills.  She very quickly showed them to me and stated, "Advil, he has a headache."  She

---

[42] The record contains a photocopy of a California State Personnel Board identification card dated September 30, 1986, indicating Yolanda P. Oliver had passed the Court Interpreter Examination for fluency in both English and Spanish.  (4 CT 785.)

then handed them to ALVAREZ.  I objected to anyone giving inmate ALVAREZ medication off the street.  This matter was quickly settled. Bailiff Taff gave him two Tylenol tablets.  It should be noted that on March 13, 1989, Monday, the interpreter produced the same pill box, removed what appeared to be an aspirin or Tylenol pill which she herself took. [¶] On March 14, 1989, Tuesday, ALVAREZ complained he could not take aspirin because of his ulcers.  [¶] At this point, I cannot help but to believe that ALVAREZ told the interpreter that he had a headache, could not take aspirin, and asked her to bring him the Advil.

(4 CT 997.)

### Applicable Legal Standards

Initially, the undersigned notes the United States Supreme Court has not yet recognized a constitutional right to a court-appointed interpreter.  United States v. Si, 333 F.3d 1041, 1043, n.3 (9th Cir. 2003).  The Ninth Circuit has held that a defendant whose fluency in English is so severely impaired as to inhibit comprehension of the proceedings and/or interfere with the exercise of his constitutional rights has a constitutional right to an interpreter.  United States v. Lim, 794 F.2d 469, 470-71 (9th Cir. 1986).  The failure to provide the defendant with an interpreter so that he may deliver his own testimony clearly implicates defendant's Fifth Amendment right to testify on his own behalf.  See United States v. Mayans, 17 F.3d 1174, 1181 (9th Cir. 1994).  And the failure to provide a defendant with an interpreter to help him understand those who testify against him may implicate his Sixth Amendment right to confront witnesses. Id. at 470.  It may also violate due process by rendering the trial fundamentally unfair.  See Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989).

And, although the United States Supreme Court has not yet recognized a specific constitutional right to a court-appointed interpreter, improper denial of an interpreter could violate clearly established federal law, as determined by the Supreme Court, including the right to testify on one's own behalf (Riggins v. Nevada, 504 U.S. 127, 144-45 (1992)), right to counsel (Gideon v. Wainwright, 372 U.S. 335, 344 (1963)), right to communicate effectively with counsel (Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)), right to understand the nature of the

proceedings (<u>Cooper v. Oklahoma,</u> 517 U.S. 348, 368 (1996)), and right to cross-examine witnesses (<u>Pointer v. Texas</u>, 380 U.S. 400, 403-04 (1965)).

Generally, the use of interpreters is a matter within the trial court's discretion. <u>See</u> <u>Perovich v. United States</u>, 205 U.S. 86, 91 (1907); <u>see also</u> <u>Gonzalez v. United States</u>, 33 F.3d 1047, 1051 (9th Cir. 1994). In the face of an uncontradicted statement that a defendant needs an interpreter, a trial court must satisfy itself through personal observation that the defendant has no difficulty speaking English before an interpreter is denied or withdrawn. <u>See</u> <u>Mayans</u>, 17 F.3d at 1180; <u>see also</u> <u>Gonzalez</u>, 33 F.3d at 1049-51 (lack of interpreter does not violate 5th or 6th Amendment where record of district court's sua sponte inquiry supported finding that defendant's language difficulties was not a "major" problem).

**Analysis**

<u>**Claim SS**</u>

Petitioner asserts he did not have adequate interpreter services at all critical stages of his trial because counsel did not request an interpreter until trial was about to begin, because interpreter Carmen Krewson had difficulty translating for Petitioner as she used a Mexican dialect of Spanish wherein he spoke with a Cuban dialect, and because Krewson was "taking large amounts of medication [to treat a terminal illness] that adversely affected her ability to translate." Petitioner further asserts Krewson was inadequate for a "lack of understanding of her role as a member of the defense team" and her inability to maintain confidentiality.

***No request prior to trial***

As previously noted, the record establishes no request for the assistance of an interpreter was made until just prior to trial. (4 CT 767-69.) Nearly two dozen court appearances over the course of more than one year occurred prior to any request by Petitioner. (1 CT 1-250; 2 CT 251-

////

355.)  To the degree Petitioner argues trial counsel was ineffective in this regard, he cannot establish deficient performance or prejudice.  Strickland, 466 U.S. at 687-94.

The undersigned notes Mr. Holmes' 1999 declaration is consistent with the trial record. In 1989, Holmes indicated to the superior court that he did not have difficulty communicating with Petitioner, but that Petitioner did struggle with technical or more complex subjects, hence the request for an interpreter at trial.  Holmes expressly indicated that Petitioner never directly asked him for the assistance of an interpreter until after an early 1989 appearance by Petitioner in another matter involving criminal conduct in the county jail.  In his 1999 declaration, Holmes declared that communicating with Petitioner "was not a problem" because Petitioner "spoke English well" and Holmes knew "some Spanish."  He further declared that if an interpreter was needed, he would have used one.  (ECF No. 302, Vol. XXVI, Ex. 136 at 5255-56.)

Notably too, Mr. Gable's declaration does not address any communication difficulties between Petitioner and defense counsel, nor does it serve to contradict Holmes' declaration.  In fact, Gable's comments at the Marsden hearing could reasonably be read and understood to reflect that that occasion was the first time the issue had even been brought to Gable's attention. (ECF No. 302, Vol. XXI, Ex. 55 at 4095E ["if he indicates he needs an interpreter, I will be the first to stand up and request that on his behalf"].)

Petitioner's own words at the Marsden hearing wherein he requested the assistance of an interpreter at that proceeding can be reasonably understood to infer he wanted the assistance of an interpreter moving forward.  Petitioner advised the court on that occasion that an interpreter would be "more useful" (ECF No. 302, Vol. XXI, Ex. 55 at 4089), implying improvement rather than any prior deficiency in understanding the proceedings.

Petitioner's requests to the court hearing the Marsden motion, as well as the request for an interpreter during the trial proceedings presented by trial counsel, were granted.  The record

simply does not support Petitioner's claim for the need of an interpreter prior to those requests. As a result, Petitioner has failed to demonstrate that his trial attorneys were aware of any need for an interpreter prior to the January or February 1989 request and failed or refused to act. Thus, Petitioner has not established trial counsel were deficient. Strickland, 466 U.S. at 688. Because Petitioner received the assistance of an interpreter during the entire trial, there is no reasonable probability of a different outcome had an interpreter been appointed earlier. Id.

It is possible, based upon the foregoing and the record, that fairminded jurists could disagree whether counsel were ineffective for failing to request an interpreter during all proceedings occurring prior to trial. Richter, 562 U.S. at 101-03. In fact, Petitioner has not shown that the California Supreme Court's denial of the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, at 103.

### Krewson's Adequacy as an Interpreter

Petitioner complains interpreter Carmen Krewson performed inadequately on several bases. This claim and the evidence Petitioner relies upon for support are discussed variously below.

The undersigned begins with an examination of a declaration by Yolanda Riley-Portal and a report by Roseann Gonzalez, Ph.D.

### Yolanda (Oliver) Riley-Portal

Yolanda Riley-Portal has provided a declaration in support of Petitioner's claims. (ECF No. 302, Vol. IX, Ex. 17.)[43] Initially, the undersigned notes Ms. Riley-Portal's declaration is purportedly based upon "personal knowledge," yet it contains statements that cannot possibly be

---

[43] The undersigned is personally familiar with Ms. Riley-Portal's interpreter services in federal court and thinks highly of her abilities. Nevertheless, the undersigned has concerns with her declaration as set forth below.

based upon Ms. Riley-Portal's personal knowledge. Furthermore, in several instances, Ms. Riley-Portal's declaration relies upon assumptions and mere speculation. In others, the record does not support Ms. Riley-Portal's assertions. Of equal concern are Ms. Riley-Portal's specific assertions in paragraph nineteen of her declaration concerning ethics and professionalism. For these reasons, addressed with particularity below, the declaration is unavailing.

First, Ms. Riley-Portal's declaration includes statements about matters of which she had no personal knowledge. One example appears in paragraph thirteen wherein she states: "Ms. Cook then went to Judge Lewis to tell him that Ms. Santivanez was not a certified interpreter and anything she brought back would be discredited" and that "Judge Lewis then called Judge Cecily Bond" and made certain statements resulting in the denial of travel funds (conversations to which Ms. Riley-Portal was not a party), concluding with "I think this happened during the beginning of penalty phase or it was just getting started when this occurred." (ECF No. 302, Vol. IX, Ex. 17 at 1858-59.) To the degree Ms. Riley-Portal's declaration is not based on personal knowledge, it is neither helpful nor admissible. Fed. R. Evid. Rules 602 ("Need for Personal Knowledge") & 1101 (FREs apply to habeas proceedings); see, e.g., Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d1193, 1200 (10th Cir. 2006) (affidavit inadmissible if the witness could not have actually perceived or observed that which he testifies to). Ms. Riley-Portal does not have personal knowledge of any conversation between Gladys Cook and Judge Lewis, nor of the telephone conversation between Judge Lewis and Judge Bond. To the degree that information is included beyond providing context, it is unreliable.

Next, the declaration includes the following assertion: "I told Judge Lewis that I was not having personal conversations with Mr. Alvarez. Judge Lewis said he just wanted to make sure I was interpreting and nothing more." (ECF No. 302, Vol. IV, Ex. 17 at 1855, ¶ 5.) However, a review of the record reveals the interpreter did not address Judge Lewis to advise him she "was

258

not having personal conversations" with Petitioner after the judge made a record of his concerns. (4 RT 752-54.) Rather, after the recess and the judge's further comments about the situation, the prosecutor advised the judge that it was his "understanding that the interpreter has been interpreting the complete proceedings to Mr. Alvarez, despite that he may ask her a question now and then, but that she has been interpreting the complete proceedings to him." (4 RT 754.) Ms. Riley-Portal merely agreed with that statement when asked, but did not at any point deny having had personal conversations with Petitioner.

There are a number of statements attributed to Judge Lewis by Ms. Riley-Portal some fourteen years after the trial, but for which there is no corresponding record because those statements purportedly occurred during a recess. (ECF No. 302, Vol. IX, Ex. 17 at 1856-57 ¶¶ 8-9, 11 & 1859-60 ¶¶15-16.) Due to the passage of time and lack of record, the undersigned afforded little weight to this information on review. Ms. Riley-Portal's declaration also contains statements attributed to Gladys Cook and Carmen Krewson. (Id. at 1857-58 ¶ 12 & 1859-60 ¶¶ 14, 18.) The undersigned notes again the passage of nearly fifteen years between the time the statements were purportedly made to the declarant and the date of her declaration. Where Ms. Riley-Portal's declaration is critical of Ms. Krewson's purported statements or acts in particular, the undersigned also considered the fact Ms. Krewson is now deceased and thus unable to provide any response thereto. For example, Ms. Riley-Portal's declaration infers in paragraph eighteen that Ms. Krewson was untruthful about her birthplace and/or heritage. (Id. at 1860.)

Paragraph ten of the declaration is a curious inclusion. Ms. Riley-Portal's complaints about defense counsel assigning the "very patronizing" defense investigator to "brief" her "on their case because [she requested it and] it would better help" her "translate for Mr. Alvarez" (ECF No. 302, Vol. IX, Ex. 17 at 1857) is simply not helpful to this court, and potentially calls into question her objectivity.

Notably too, Ms. Riley-Portal's declaration can be interpreted to make inappropriate legal conclusions. For example, she declared: "Mr. Holmes and Mr. Gable both stood silently while I was standing up for their client's rights. I was amazed that Mr. Alvarez's attorneys did not say anything to protect their client's rights." (ECF No. 302, Vol. IX, Ex. 17 at 1856.) Simply put, whether defense counsels were acting appropriately is outside Ms. Riley-Portal's expertise.

Finally, Ms. Riley-Portal's declaration includes the following:

> As [interpreters], we have a code of ethics and professionalism we must maintain. This was the policy at the Sacramento County Courts Interpreters Office all throughout my contracting with them. We are not to reveal confidential conversations between defendants and their attorneys to anybody. We are to translate thoroughly everything that is said in the courtroom. We are not to interact and cultivate personal relationships with the defendants. We are not to make vested interests in specific cases. I have followed and continue to follow these ethics.

(ECF No. 302, Vol. IX, Ex. 127 at 1860-61, ¶ 19.) Yet, Ms. Riley-Portal's declaration curiously fails to address a matter that appears in the trial court record speaking directly to her own lapse in professionalism.

In an incident report dated March 14, 1989, an escort officer of the Sacramento County Sheriff's Department recorded his observations involving Petitioner and Ms. Riley-Portal during court proceedings. On the first day of jury selection, March 13, 1989, the officer allegedly observed Petitioner and the interpreter engaging in "personal conversation for at least a five minute period," wherein both were "laughing." The officer stated that it was "obvious" neither Ms. Riley-Portal nor Petitioner were "paying attention to what was going on." The officer brought his observations to the attention of the bailiff, and shortly thereafter, Judge Lewis made statements on the record. (4 CT 997; see also 4 RT 752-54.)[44] On the following day, March 14,

---

[44] This behavior is corroborated somewhat in the form of Allen Birkman's wife's statement to the probation officer that she was "amazed how some of the women involved in the case 'fall at the defendant's feet.' She stated some of the interpreters, along with some of the expert witnesses, seemingly are enamored by the defendant." (6 CT 1443.) And by Mr. Birkman's father who attended proceedings and advised the probation officer that he was "amazed at the laughing and

260

1989, the same escort officer observed Ms. Riley-Portal take a small pill box from her purse, open it, remove two brown-colored pills, and quickly showing them to the officer while stating, "'Advil, he has a headache.'" The officer then observed her handing the pills directly to Petitioner. (4 CT 997.)

California Rules of Court, rule 2.890, formerly rule 984.4, addresses professional conduct for interpreters. In relevant part, it provides: "An interpreter must be impartial and unbiased and must refrain from conduct that may give an appearance of bias." Cal. Rules of Court, rule 2.890(c)(1). It further provides that an "interpreter must not engage in conduct creating the appearance of bias, prejudice or partiality" and "must maintain an impartial, professional relationship with all court officers, attorneys, jurors, parties, and witnesses." Cal. Rules of Court, rule 2.890(c)(3) & (f). The conduct reported by the escort officer is in direct conflict with Ms. Riley-Portal's statements that she always followed the applicable ethical code.

Ms. Riley-Portal's declaration asserts she recalls just "two instances where the interactions" between she and Petitioner were "misinterpreted." Both involve statements by Petitioner to the interpreter – one about a talkative juror whom Petitioner said "must have eaten a parrot for breakfast" causing her to "react by smiling" and another comment concerning the temperature in the courtroom, causing her to shrug her shoulders. (ECF No. 302, Vol. IX, Ex. 17 at 1855, ¶¶ 6-7.) Plainly those two instances do not amount to the five-minute period reported by the escort officer; the former instances would amount to mere seconds. Ms. Riley-Portal's declaration fails to address in any way her alleged conduct of March 14, 1989, to wit: attempting to provide or dispense medication directly to an in-custody defendant on trial for murder and other crimes. (4 CT 997; 5 RT 919-20.) That behavior, uncontradicted in the record, appears to be violative of the professional conduct expected of interpreters, for it was conduct that could

chatter that went on throughout the trial between the interpreters and the defendant. He noted that the behavior was totally inappropriate." (6 CT 1444.)

give "an appearance of bias" and "partiality," and called into question Ms. Riley-Portal's ability to "maintain an impartial, professional relationship" with Petitioner.[45]

As to Petitioner's claims concerning the adequacy of the interpreter provided and Ms. Riley-Portal's declaration in support thereof, the California Supreme Court could have reasonably determined her declaration lacked objectivity, reliability, credibility or record support.  <u>Richter</u>, 562 U.S. at 101-03.

### Roseann Duenas Gonzalez, Ph.D.

Petitioner also relies upon a report entitled "An Investigation of the Linguistic Issues in the Case of Mr. Manuel Machado Alvarez: English Language Proficiency, Linguistic Ability to Testify in English, and Ethical and Competency Issues Surrounding the Interpreter Services, and other Related Topics," prepared by Roseann Duenas Gonzalez, Ph.D., Professor of English at the University of Arizona.  (ECF No. 302, Vol. IX, Ex. 19.)  The undersigned has reviewed Dr. Gonzalez's report and notes the following.

First, Dr. Gonzalez's report includes opinions on matters beyond her area of expertise.  For example, she opined that Petitioner's constitutional rights had been violated, that he received ineffective assistance of counsel, and even that the trial court committed error.

Next, the doctor performed a series of tests designed to assess Petitioner's linguistic abilities, concluding that Petitioner "does not have the English language proficiency and fluency needed to express himself fully and understandably in English during any kind of critical communication, such as a trial, hearing, or or [sic] critical medical interchange."  (ECF No. 302, Vol. IX, Ex. 19 at 1872.)  However, it is difficult to square her opinion with the record.  For example, Dr. Gonzalez's report states that "during the 7 years that he spent in the United States

---

[45] Mr. Gable's declaration involves two related statements.  First, that he "did not observe" any impropriety, and second, that he did not believe any impropriety occurred.  (ECF No. 302, Vol. XXII, Ex. 63 at 4285.)  The former speaks for itself and the latter is belied by the record and the escort officer's report.

before his arrest, Mr. Alvarez never took any classes or courses to learn English" and that in Cuba he studied "German as a second language requirement instead of English." (<u>Id.</u> at 1876.) Notably missing from Dr. Gonzalez's report is any acknowledgment of Petitioner's having earned a GED while at Fort McCoy. In fact, he earned the first GED awarded at the facility. Dr. Gonzalez concluded that Petitioner's current (in 2004) English proficiency was "a 2- on the OPI (Oral Proficiency Interview) scale of zero to five, which is a limited English speaker of low intermediate proficiency." (<u>Id.</u> at 1879.) The score translates to a limited vocabulary and a lack of "consistent control of grammatically complex structures." (<u>Id.</u> at 1879.) At the time of trial, based upon her "analysis of transcripts at the time of his trial in 1989," Dr. Gonzalez found Petitioner "to have possessed a 1+ proficiency on the OPI scale of 0-5" and that individuals of that limited ability "should always be provided an interpreter in any law enforcement, judicial, critical medical, or social service setting." (<u>Id.</u> at 1880.) The doctor considered Petitioner to lack the proficiencies necessary to be "'linguistically present' at trial." (<u>Id.</u> at 1880-81.) In noting his "extremely limited speaking ability" and "very limited ability to comprehend spoken English," Dr. Gonzalez opined Petitioner has "a working vocabulary of perhaps 400 words (less than what is required of first graders to be able to begin reading instruction)." (<u>Id.</u> at 1881.) Again, the record as a whole conflicts with Dr. Gonzalez' opinions and findings.

Citing an "analysis of transcripts," Dr. Gonzalez makes a series of conclusions concerning Petitioner's English grammar and punctuation, "memorized proficiency" and "lack of English proficiency" causing misunderstandings, and speech lacking "grammatical control." Gonzalez cites to specific pages of the transcript pertaining to Petitioner's trial testimony in support thereof. (ECF No. 302, Vol. IX, Ex. 19 at 1881-89.) The undersigned notes that the *only* portion of the trial transcripts that Dr. Gonzalez reviewed was Petitioner's trial testimony.

////

Furthermore, Dr. Gonzalez often cites a portion of the record in the absence of context, then proceeds to make conclusions based upon the lack of that context. By way of example, asserting that Petitioner's "limited" proficiency "caused the judge, his own attorney, and the court reporter to misunderstand him" (ECF No. 302, Vol. IX, Ex. 19 at 1883), Dr. Gonzalez cites and excerpts testimony appearing at page 4022, lines 13 through 26, as evidence that "the Court, the prosecutor, and Mr. Gable all ignored Mr. Alvarez' difficulty and expected him to continue answering in English." Reviewing the passage, the undersigned cannot credit Dr. Gonzalez' conclusion. First, her report fails to acknowledge in any way that it was Petitioner who elected to testify in English. To the degree her report infers otherwise, it is simply wrong. Second, while far from any model of clarity, a total of approximately 400 pages encompass Petitioner's testimony at trial. A review of the entirety of that testimony is at odds with Dr. Gonzalez' conclusions and citations to a dozen or so pages. Further, the record includes multiple exchanges Petitioner had with the court during proceedings that occurred over the course of the more than two years the matter was pending. Those exchanges reveal Petitioner was very often able to communicate in English without any misunderstanding on the part of the court, counsel, clerk, reporter or bailiffs.

The undersigned notes that following a thorough review of the record it is obvious that Petitioner knew how to interrupt the proceedings in order to be heard (e.g., 1 RT P-202, 8 RT 1428 [interrupts argument re motion], 11 RT 2149 [interrupts his attorney], 19 RT 4325-26 [complains about phone calls and medication problems at jail]; 20 RT 4631-32 [outburst during co-defendant Ross' testimony]), and how to ensure his concerns are relayed to the court through counsel (e.g., 4 RT 681-82 [concern re medication], 5 RT 984-86 [concern re clothing], 9 RT 1738 [reports Petitioner was victim of assault], 13 RT 2733-34 [complaint re access to shower], 15 RT 3183-84 [complaint re harassment at jail], 15 RT 3281-84 [complaint re access to

physician], 17 RT 3804-05 [complaint re inability to shave]; 18 RT 4066 [concern re medication].) Despite whatever deficiencies Dr. Gonzalez assigns, the record could be viewed otherwise.

In a section entitled "Mr. Alvarez did not have a cultural understanding of U.S. judicial process," Dr. Gonzalez makes conclusory statements unsupported by the record or based upon speculation. (ECF Doc. 302, Vol. IX, Ex. 19 at 1905-09.) For example, Dr. Gonzalez wrote: "Like many Hispanic recent immigrants, Mr. Alvarez relied on his own cultural knowledge and cultural rules and superimposed them upon the United States' system of justice. Respect is a deeply ingrained cultural belief that pervades the actions and perceptions of Hispanics in many situations." (Id. at 1906.) While the statement may be accurate as to "many Hispanic recent immigrants," it is not supported by the record here. This record reveals that Petitioner has significant experience with our system of justice, even if those experiences did not involve a trial. Originally charged with murder, Petitioner's previous conviction for voluntary manslaughter involved an adversarial proceeding in 1982 at which he was present, with the benefit of an interpreter, to wit: People v. Alvarez, Los Angeles County Superior Court. (ECF No. 302, Vol. XXVI, Ex. 119 at 5063-115.) Petitioner also participated as a witness in an adversarial proceeding relating to his time at Fort Chaffee, to wit: United States versus Clark, a federal case involving the prosecution of correctional officers for abuse perpetrated against Cuban immigrants at the detention facility. (ECF No. 302, Vol. XIII, Ex. 39 & Vols. XIV-XX, Ex. 42.) As far as respect for proceedings and authority, and any acquiescence related thereto, this record contains evidence in contradiction of compliance with and respect for authority. Petitioner defied authority and had no difficulty expressing himself or his needs as cited elsewhere in these findings.

////

As for Dr. Gonzalez's statement that Petitioner "would be inclined to submit to the defense strategies of his attorney, including making the entire defense depend upon Mr. Alvarez' personal testimony" (ECF No. 302, Vol. IX, Ex. 19 at 1907-08), this too is unsupported. Defense attorney Holmes represented to the court during the <u>Marsden</u> hearing that Petitioner had participated in "meetings" with counsel and an interpreter and that the defense team "had tape recorded statement from him trying to determine what our defense is going to be, witnesses to contact and so forth …." (ECF No. 302, Vol. XXI, Ex. 55 at 4095B-D.) In his 1999 declaration, Mr. Holmes declared under penalty of perjury the following:

> The allegation that Mr. Alvarez did not understand his right not to testify and did not know the difference between the adversarial system and the inquisitorial system is the most bizarre argument I have ever heard. I always treat the issue of whether a defendant does or does not testify at trial with great respect. I always take time to explain the rights and options the defendant has to testify or not to testify. I always discuss with each of my clients the pros and cons of taking the stand in their own defense. In the case of Mr. Alvarez, he decided he needed to testify in his own defense because of the significant evidence against him.

(ECF No. 302, Vol. XXVI, Ex. 136 at 5256.) Hence, Holmes' declaration stands in contradiction to Dr. Gonzalez' report.

Finally, it is significant that Dr. Gonzalez' statements include compelling factual inaccuracies. For example, she wrote, "Moreover, since his counsel had not used an interpreter when they met with him, *even though they spoke no Spanish …*" (ECF No. 302, Vol. IX, Ex. 19 at 1909 [italics added].) As noted above, counsel did use an interpreter when meeting with Petitioner; but more importantly, Mr. Holmes did some speak Spanish, as did defense investigator Wilcox who also met with Petitioner. (<u>See</u> 4 CT 767-69; 2 RT 39; ECF No. 302, Vol. XXI, Ex. 53 at 4059 & Vol. XXVI, Ex. 136 at 5256.)

With respect to Dr. Gonzalez' opinion that Petitioner was not provided effective interpreter services, it is not disputed that the various interpreters employed during the trial were

266

California or state certified interpreters, including both Yolanda Oliver and Carmen Krewson. To the degree Dr. Gonzalez contends the federal court interpreter certification involved a higher standard of competence and is thus superior, that is of no consequence here. At the time of Petitioner's trial, he was assisted by appropriately licensed Spanish-language interpreters as required by state statute. (Cal. Govt. Code, § 68560; Cal. Rules of Court, Rule 2.890.)[46]

Dr. Gonzalez' report maintains there exists "a significant difference" between those who speak Mexican/Southwestern Spanish and those who speak Cuban Spanish. (ECF No. 302, Vol. IX, Ex. 19 at 1913-16.) The undersigned notes first that the California statute at issue concerning interpretive services does not provide for interpretative services in a variety of dialects. Rather, the statute speaks to "language" rather than "dialect." (Cal. Govt. Code, § 68562(a).)

Interestingly, in proceedings held before an Alabama district court concerning the constitutionality of that state's statute providing for an English-only driver's license test, Dr. Gonzalez participated as a linguistics expert. See Sandoval v. Hagan, 7 F.Supp.2d 1234 (M.D. Ala. 1998) (in subsequent determination, as to private right of action, reversed by Alexander v. Sandoval, 532 U.S. 275 (2001)). As a part of her report in those proceedings, Dr. Gonzalez addressed the Alabama Department of Public Safety's position that "there are too many 'dialects' to accommodate'" the call for providing driver's license testing in various foreign languages:

> All languages have a standard written form that is understood by all speakers of the language, regardless of their native country or region. [*See* Gonzalez test.] In Spanish, for example, people from one country may use the word "carro" and people from a different country may prefer the work [sic] 'automovil.' But everyone who speaks Spanish understands that both words mean 'car.' Moreover, to the limited extent that particular words vary from country to country, alternative words can be provided. *Id*. For example, the Spanish exam previously administered by the Department provided some

---

[46] In 1992, the California Legislature mandated that the Judicial Council implement a comprehensive court interpreter program to increase the number and quality of interpreters. In 1994, requirements and guidelines for court interpreter certification, certification renewal, and continuing education, were approved by the Judicial Council. (See 2 Witkin, Cal. Proc. 5th Courts, § 387, Interpreters and Translators (2008); California Criminal Procedure, § 21:24, Interpreters-Certification (2017).)

267

alternative Spanish words. [*See* Pls.' Tr.Ex. 13, Spanish Examination [Providing both 'pito' and 'bocino' as alternatives for the English word 'horn').] In any event, any problems with dialect variations on the exams did not pose significant obstacles in the past ….

Sandoval v. Hagan, 7 F.Supp.2d at 1305-06. The aforementioned opinion calls into question the objectivity of Gonzalez' statement here that Petitioner's "Spanish was significantly much more marked by his Cuban variety, *making it virtually impossible for any interpreter not trained or experienced in that variety to interpret accurately*." (ECF No. 302, Vol. IX, Ex. 19 at 1913-14 [emphasis added].) By crediting both statements, the court is left with conflicting opinions by the same expert.

Notably too, other courts have determined that differences in dialect do not amount to impossible interpreting scenarios. See Matias v. Sessions, 871 F.3d 65 (1st Cir. 2017) (due process challenge denied re interpretation in immigration proceedings involving speaker of Todos Santos Mam and Spanish-language interpreter); Kuqo v. Ashcroft, 391 F.3d 856 (7th Cir. 2004) (applicant not denied due process where interpreter at asylum hearing spoke different dialect of Albanian language); United States v. Pitino, 887 F.2d 42, 47 (4th Cir. 1989) (refusing to set aside a guilty plea when the official interpreter and defendant were able to communicate with one another though the defendant spoke Sicilian dialect and the official interpreter spoke Italian); United States v. Mejia-Ruiz, 433 Fed.Appx. 455 (6th Cir. 2011) (no violation of constitutional rights involving speaker of Mayan dialect).

Dr. Gonzalez' conclusory statement that "Mr. Alvarez was unaware that he should have asked the judge for assistance if he did not understand the interpreter or if he felt that the interpreter was misinterpreting his testimony" (ECF No. 302, Vol. IX, Ex. 19 at 1914) is also belied by this record. As specifically cited elsewhere in these findings, Petitioner repeatedly displayed the ability to interrupt the proceedings to have his needs heard, whether he did so personally or through the assistance of defense counsel.

Despite Dr. Gonzalez' numerous references to Carmen Krewson's alleged incompetence, and Petitioner's assertions that she "distorted everything he said" and his attorneys failed to "resolve the communication problem" (ECF No. 302, Vol. IX, Ex. 19 at 1914-16), again, the record finds little support for Gonzalez' opinion. Certainly, Petitioner's complaints years later are suspect where he failed to raise the issue at the time of trial. Even where Mr. Gable's 2004 declaration indicates Petitioner told him "he was very concerned that Carmen Krewson would not accurately translate his testimony" and that he (Gable) did not "take him very seriously, and thought he was being somewhat paranoid," Petitioner knew how to, and indeed did, speak up for himself on other matters prior to the commencement of trial. (E.g., ECF No. 302, Vol. XXI, Ex. 55.)

The undersigned notes too that the record contains other evidence standing in contradiction to Dr. Gonzalez' report and opinions. For example, Robert and Elaine Metcalf, who sponsored Petitioner upon his release from Fort Chaffee and with whom Petitioner lived for about six weeks in 1980, testified regarding his language skills at that time. Robert Metcalf testified "Manuel had a better command of English than did Alfredo, and an easier time of learning." (28 RT 6333.) Elaine Metcalf testified Petitioner "didn't speak much English at all," but that he was "very" interested in learning it. Elaine Metcalf "taught English as a second language" and testified the two "spen[t] a good deal of our time during the day, talking English and with his teaching me Spanish." (28 RT 6349.) Compared to the testimony of Robert Wissmath, a credentialed teacher in an independent study program with the Elk Grove School District that includes students at the Sacramento County Jail, who testified that Petitioner was his student as of November 1988, primarily studying English. Wissmath considered Petitioner a "pretty advanced" English as a second language student. (28 RT 6369, 6371.) In 1989, Wissmath believed Petitioner was probably at "the point he actually thinks in English when he's

speaking English." (28 RT 6372.)  Petitioner took other courses, presumably taught in English, in the program geared toward earning a high school diploma.  (28 RT 6373.)

Lastly, Dr. Gonzalez' report alleging Ms. Krewson violated several ethical standards of interpreter practice (ECF No. 302, Vol. IX, Ex. 19 at 1916-19) relies upon inapplicable standards, speculation and misrepresentations of the record.  As a result, it is of little help.

In sum, Dr. Gonzalez' investigative report, for all the foregoing reasons, is not entitled to this court's full credit or acceptance.

Interpreter Krewson appeared and interpreted on more than four dozen occasions without complaint or challenge to her competence.  In fact, Ms. Krewson assisted Petitioner for nearly four months before mid-July 1989, when defense counsel assumed and alleged that Ms. Krewson had breached her duty of confidentiality.

The question of an interpreter's competence is a factual one for the trial court.  People v. Mendes, 35 Cal.2d 537, 543 (1950); People v. Roberts, 162 Cal.App.3d 350, 355 (1984).  The ideal time to question the qualifications of an interpreter is before he or she is permitted to interpret.  People v. Phillips, 12 Cal.App. 760, 763 (1910).  However, if the competence of an interpreter becomes an issue after he or she has begun interpreting, it can be raised at that time. People v. Estrada, 176 Cal.App.3d 410, 415-16 (1986).  When no objection is raised to the competence of the interpreter during trial, the issue cannot be raised on appeal.  Estrada, at 416.

At no point does the record indicate that Ms. Krewson was incapable of interpreting the language Petitioner spoke, or that he spoke a different dialect.  In United States v. Lim, 794 F.2d at 471, the Ninth Circuit rejected a contention that the defendant's Sixth Amendment rights had been violated due to inadequate translation, noting the absence of any objection to translation.

////

////

The California Supreme Court could have reasonably concluded that Carmen Krewson's interpretation services were adequate and in no way violated Petitioner's constitutional rights. Richter, 562 U.S. at 101-03.

### Krewson's medical issues

Petitioner also argues that Ms. Krewson's "difficulty in translating" for him was "exacerbated" by a hearing impairment and terminal illness. (ECF No. 330 at 365.) Respondent "entirely disagrees with this characterization of Ms. Krewson's health," and maintains the California Supreme Court's denial of the claim was not unreasonable. (ECF No. 351-1 [sealed].)

A review of the sealed exhibit containing documents from Ms. Krewson's medical records reveals that neither Ms. Krewson's hearing difficulties nor colon cancer diagnoses affected her adequacy or ability to provide interpretation services during Petitioner's trial. (ECF No. 320; see also ECF No. 223 [same].)

Regarding Ms. Krewson's hearing difficulties, the record reveals that she began using a hearing aid in 1983 due to hearing loss in her right ear (ECF No. 320 at 5307-08), and that in October 1986 Ms. Krewson reported additional hearing loss in that ear, seeking a referral for a new hearing aid. (Id. at 5309-11.) On January 29, 1989, Ms. Krewson reported hearing loss in both ears. (ECF Doc. 320 at 5318-20.) A January 31, 1989, audiology evaluation notes "mildly moderate sensorineural hearing impairment at the right ear and a mild to moderately several sensorineural hearing impairment at the left ear," also noting that "[a]uditory discrimination for speech was good bilaterally, with scores of 80% at the right ear and 84% at the left ear." Further, there was "normal tympanic mobility bilaterally" and "no significant amount of adaptation on the Tone Decay Test or on the PB-Max Test" administered bilaterally. (Id. at 5321, 5326-27.) The audiologist noted his recommendation that Ms. Krewson "be seen ontologically . . . in regards to her subjective decrease in her auditory abilities at the left ear" and that certain records be obtained

for a comparative analysis. (Id. at 5321-22.) Ms. Krewson was referred for a consultation with an ENT physician. (Id. at 5323-25.) In an audiological evaluation dated March 6, 1989, "significant improvement" was noted as "compared to [the] 1/31/89 findings." (Id. at 5329.) She reported improvement in her left ear during an appointment with her ENT physician on that same date. (Id. at 5330.) Therefore, any deficiency had been resolved and improvement realized *before* Krewson's first appearance in this matter as an interpreter on March 16, 1989.

Following the improvement documented in March 1989, Ms. Krewson did not complain of hearing loss again until April 1990 during a comparative audiological evaluation, more than six months after she last provided interpreting services during Petitioner's trial. (ECF Doc. 320 at 5331 ["her hearing recovered in March of 1989, but she now states that her hearing abilities are again decreased at the left ear"]; see also 5333 [reported to ENT physician on 5/2/90 hearing was back to normal].) Ms. Krewson again complained of hearing loss in November 1990 (id. at 5337) and underwent a comparative audiological evaluation in December 1993 prior to receiving chemotherapy (id. at 5347). Those latter occasions are not relevant.

In sum, Petitioner's exhibit establishes that before Ms. Krewson began providing interpreter services on March 16, 1989, her prior hearing loss issues had "significantly improved" and she did not complain again of any hearing loss until months after Petitioner was convicted.

The same exhibit reveals Ms. Krewson was diagnosed with colon cancer in July 1986 and she underwent surgery as a result. (ECF Doc. 320 at 5312-16.) In an operation record dated October 22, 1990, it was noted that a September 1990 radiograph revealed a ureteral obstruction, thus necessitating "[a]bdominal exploration with retroperitoneal biopsy and segmental left ureterectomy." (Id. at 5334.) As a result of the procedure, it was discovered Ms. Krewson's cancer had returned. (Id. at 5334-36.) An oncology consultation record dated November 30, 1990, notes Ms. Krewson had been "followed closely" after her 1986 sigmoid colectomy and had

"remained with no evidence of the disease" until a then-recent admission for pyelonephritis.  (Id. at 5338.)  Further, the oncologist noted "a relatively slow-growing malignancy" that "took four years for her to develop a localized recurrence."  (Id. at 5338.)  Ms. Krewson thereafter received radiation treatment.  (Id. at 5339-41.)  In September 1993, following her complaints of chest discomfort, an x-ray and CT scan confirmed the cancer had spread and chemotherapy was suggested.  (Id. at 5342-46.)  Ms. Krewson continued to battle cancer (id. at 5348-49) until eventually succumbing to the disease in 1995.

In conclusion, Petitioner's exhibit establishes that while Ms. Krewson was diagnosed and treated for colon cancer in 1986, at the time of Petitioner's trial, she was living "with no evidence of the disease."  Petitioner's argument that Ms. Krewson lived in fear or that she likely experienced symptoms like fatigue, nausea and vomiting during the period she served as his interpreter, is nothing more than speculation, unsupported by the record.

In light of the foregoing, it is reasonable to conclude that fairminded jurists could disagree that Ms. Krewson's hearing loss and cancer diagnosis affected her ability to perform her duties as a court interpreter.  Richter, 562 U.S. at 101-03.  Petitioner cannot show that the California Supreme Court's denial of his claim on this basis "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 103.

### Krewson's confidentiality obligation

Petitioner next challenges Ms. Krewson's adequacy as an interpreter for an alleged breach of confidentiality.  However, the record reveals there is no evidence of the purported breach; rather, the record is rife with mere speculation on behalf of the defense.  The undersigned finds it necessary to provide a number of excerpts of record to address Petitioner's claim, beginning with

////

proceedings occurring on July 11, 1989, including the testimony of Gladys Cook, supervising

court interpreter.

On the morning of July 11, defense counsel advised the court, in chambers and on the

record, that he would be making "a motion to recuse the interpreter's office in this action, on the

basis that there's been a breach of confidentiality, whose source was in that office," that he

intended to move for mistrial, and would be "requesting an evidentiary hearing to establish by

evidence the basis for that motion." (28 RT 6382.) Counsel believed matters addressed during *in

camera* proceedings "were disseminated through the interpreter's office" and to the press, and

that that certain other ex parte communications were had. (28 RT 6382-83.) After considering

Mr. Gable's arguments (28 RT 6383-95), the trial agreed to hear testimony from Ms. Cook later

that afternoon. (28 RT 6395-96.)

When the afternoon session resumed, the judge clarified certain comments he made during

the conversation with Judge Bond and further discussion was had outside the jury's presence (28

RT 6397-403) before Ms. Cook took the stand:

> [MR. GABLE]: Last Friday, did you receive information concerning this case, specifically concerning the fact that the defense was intending to send certain individuals to Cuba?
> A. Yes.
> Q. Approximately, what time of the day did you receive that information?
> A. Actually, I don't know whether it was on Friday, I think it probably was like on Thursday, Thursday, but I'm not exactly sure which of the two days it was. But I did receive information.
> David Myers came into the office, and he said that for x reasons, he was unable to go as the interpreter investigator, and he asked me if I would be interested in going, and I told him absolutely not, that I couldn't.
> And then later, I believe it was on Friday, or Thursday afternoon, I had an interpreter by the name of Ramone Castanada working in the office, and he told me that David had come and asked him if he would be interested in going, because he's also a certified interpreter.
> And being that he has a Cuban wife, it would be, he might be able to know how his way around, and he had already travelled and been to Cuba, and also Mr. Castanada said he would be unable to go.
> Q. Was this on Thursday also?
> A. I don't remember whether - - it was between Thursday and Friday.
> Q. Okay.
> A. Thursday and Friday morning before noon, all of this and then sometime, I don't know, in one of my breaks, I believe it was Friday, Ramone came into my office and

274

he told me, he was like astounded, because one of our administrative interpreters has just taken the certification test, and he said that, unfortunately, she did very, very poorly, and he was very surprised that the County of Sacramento was choosing her, Patricia, to go as the interpreter in a matter that was so serious, and she was no qualifications, being that she only has the administrative hearing certification.

Q. Did you have any idea whether, under what capacity anybody was going to Cuba, at that time?

A. When they're in the interpreter's office, we all just assumed that it was in the interpreting capacity.

Q. Did you, at any, time attempt to contact either Mr. Holmes or myself to determine whether or not that was true?

THE COURT: Let me interject at this time. I think the purpose of this hearing is to determine whether or not there have been any leaks [of] confidential information. [¶] If you'll limit your questions to that area, please.

MR. GABLE: Okay. [¶] Did you ascertain from Mr. - - how do you pronounce - -

A. Castanada.

Q. Castanada, as to where he obtained the information that he gave you?

A. Probably because he was also asked by the investigator, and a certified interpreter and federally certified interpreter, David Myers, to go in his place.

Q. But - -

A. And being that David is a interpreter and, both in the courts here in Sacramento and for the federal, we just knew that there was, you know, it had to be a bilingual person with a certification that would be going to do this sort of thing, and they were coming out of our office to talk about it and make phone calls about it.

Q. Did you find out from Mr. Castanada, where he obtained his information that Patricia was going?

A. I imagine that David told him.

Q. You don't know that?

A. No, I don't know.

Q. Did you receive any information regarding the fact that Patricia was going from Carmen?

A. No, sir.

Q. None at all?

A. None.

Q. Never talked to her about the case, at all, on Friday, after the hearing?

A. No, sir. It was Mr. Castanada with his, with my office door closed, that he was talking to me about it.

Q. You didn't talk to Carmen about the name of the individual that was going or - - does that ring a bell?

A. No. I'm saying that I believe that Mrs. Krewson brought her sandwich and was sitting eating her lunch in the office when all these people were, but she was busy eating her lunch, and was not, you know, talking about it.

It was mostly Mr. Castanada, that was very surprised and a couple of other interpreters like Mr. Rick McBride was there, that is right now taking down at the Monterey School of Languages, preparing for the federal exam, and he said, "Gosh, I wish I would have been given this opportunity. I guess this stuff is done, you know, without even, you know, asking other people that have the certification do so this."

Q. I see. And at that point, you contacted Judge Lewis; is that right?

A. Yes.

Q. Okay.

A. My job as, I'm an officer of this Court, and I have worked here for the last 20 years, and as an officer of the Court, when anything, and being the supervisor of the interpreters and it's my job to ask or, you know, get a clarification, and I immediately

275

called the judge, and I made an appointment to see him.

Q. Did you also call the reporters from the Sacramento Union and the Sacramento Bee?

A. I believe that the girl from the Union uses our office, and so she was walking by, and I did call my friend, Mr. Wilson, and he told me, and I told him that, if he knew anything, and then he said probably you should talk to the judge, and that's what gave me the idea.

I talked to him first, and that's what gave me the idea, that is a good idea, I will talk to the judge, and I called the judge immediately.

Q. And then you also called Mr. Marlette; is that right?

A. I was, no - - I don't know how it was that we talked, or that - - no, I did not call him. [¶] Did I call you?

MR. MARLETTE: I returned a message, there was a message when I got back from lunch, and I called you back.

[GLADY COOK]: Oh, well, see I didn't call to talk to you, I called to talk to Kathy Canlis, 'cause she's my friend, and it was a surprise that she wasn't there anymore, and the probably they, you know, then they probably told you that I had called. But I guess that's what it was, you called me, and I just - - and I said, I know that it's not correct that I talk to you about this, because you know, so that's the conversation that I had with you.

I says, "And thank you very much for returning my call, but I have already talked to Judge Lewis," and that was it, that I said to you, isn't that correct, I believe?

(BY MR. GABLE): What did you tell Judge Lewis, about this?

A. Exactly what we just talked about, that the interpreters had come to me as the head interpreter for over 20 years in Sacramento, to say that they were appalled that somebody that was noncertified was being sent to do an assignment, and what would, you know, that somebody without a certification was being sent, that nobody complained of when David Myers, because he is completely certified both as an investigator and also as a court and federally certified interpreter.

MR. GABLE: I have no further questions.

[CROSS-EXAMINATION BY MR. MARLETTE]

Q. Miss Cook, now, what is this Patricia's last name?

A. She's got a very pretty last name, Santivanias, Santivanias.

Q. Is she a full-time employee of your office?

A. She is really studying to become a court interpreter, and she has passed the administrative hearing. And I do give her work to do like jail interviews or Public Defender interviews. [¶] Sometimes I ask her to help in Department T, you know, traffic Court.

Q. Is she generally here from, like, five days a week, eight hours a day, or is she on call, or how does that work?

A. She has her own business. She's sitting right back there, you'll be able to talk to her, if you like.

Q. Now, if she had gone on this Cuba trip, would she have had to take vacation from, in other words, would she have had to fill out a vacation request form?

A. She's a contract interpreter, self-employed. There are only two staff employees that are interpreters at the courthouse, and all other interpreters are self-employed contract interpreters.

Q. All right.

A. So I don't know what, you know, how - - I have no idea.

Q. She could have just come to you and said, I'm not gonna be available for the next ten days?

A. Her answering machine would have probably said, whatever, you know.

MR. MARLETTE: All right. Thank you, Miss Cook. [¶] I have nothing further.

MR. GABLE: Nothing further.

THE COURT: Okay, thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Have a good day.  [¶] Anything further, Mr. Gable?

MR. GABLE:  Not at this time, unless this Ramon Castanada is here in the courthouse.

THE COURT:  All right.  I haven't [the] slightest idea.

MR. GABLE:  Let me ask.

THE INTERPRETER KREWSON:  Your Honor, may I approach the bench?

THE COURT:  Yes.  [¶] (Interpreter at bench, not reported)

MR. GABLE:  Mr. Castanada is in Willows today, interpreting up there, so he's not available to testify, and I was not aware of his involvement in this until just now.

THE COURT:  Well, what I suggest is, if you want to have an investigator, or if you want to do some investigation on this matter, you can do that, and we will not use the Court as an investigative tool, but I wanted to give you an opportunity to clarify what we could.

MR. GABLE:  I appreciate that, your Honor, and we will utilize the services of an investigator to track down additional information on this, and at this point, I would like to reserve the right to reopen this issue, if we develop additional information.

THE COURT:  Okay.

MR. GABLE:  You know, in other words, not have the Court rule on the motion at this time.

THE COURT:  That's fine.

MR. GABLE:  Appreciate it.

(28 RT 6404-12.)

On Wednesday, July 12, 1989, the court convened for an afternoon session.  (28 RT 6414.)  The prosecutor made a record regarding his offer to defense counsel to approach the presiding judge to ask that the decision to withdraw funding for the trip to Cuba be reconsidered, and the defense responded and explained why the offer was not accepted.  (28 RT 6414-20.)  After a brief statement about recent articles published in the Sacramento Bee and Sacramento Union, the following colloquy occurred:

MR. GABLE:  Judge, I just wanted to, we have another witness in this matter.  We did locate the interpreter Miss Cook indicated she heard this information from, and I would like to present his testimony sometime this week.  [¶] We will be available tomorrow or Friday, and it is relevant.

THE COURT:  Well, I will not have time to do it Friday.  I'm going to be working on other matters tomorrow, so we can make some time for it, if that's important to do that, and again, we're almost like the abuse in the jail situation, I'm not sure what my authority is in this.  You're using the Court as an investigator, really, to - -

MR. GABLE:  No, I can give an offer of proof as to what, what I Mr., I believe his name is - -

THE COURT:  Castanada.  The name that was mentioned.

MR. GABLE:  What he will testify to, according to my investigator, is that he had absolutely no conversation with Miss Cook on Friday, or Thursday, that he was out of town in Willows all day Friday, that the first he ever heard of this incident was on Monday, when Miss Cook brought it to his attention, and she was incensed about the whole thing, and that was the first that he ever heard of it, so obviously, the information

did not come from him and I want to establish that on the record.

    MR. MARLETTE:  In terms of what we're trying to do - -

    THE COURT:  For purposes, for purposes of the hearing, I'll accept your offer of proof as being accurate.

    MR. GABLE: Well, if the District Attorney will, and if we could stipulate to that, then we can, I can continue my investigation. [¶] What I'm trying to do is find out where this came from.  Obviously, it did not come from Mr. Castanada.

    THE COURT:  I suggest you continue your investigation, then, because just simply convening Court to hear that evidence isn't gonna have any effect at all on the Court's ruling, and you're using it to preserve testimony or to pursue your investigation. That's not a proper use of this Court's time.

    MR. GABLE:  I understand that we're doing this piecemeal, but of course, I'm trying to get to the bottom of it, and apparently I'm not doing a very good job of it so far, because what has happened thus far is basically we are stonewalled, because it seems to begin and end with Miss Cook the way her testimony was the other day, so we're going to continue our investigation.

    THE COURT:  That's fine.  I think that's what you should do.  [¶] Okay, let's proceed.

(28 RT 6421-23.)

    Before the afternoon proceedings concluded, the subject arose yet again. The court indicated it was not yet convinced any breach of confidentiality had occurred, that it was inclined to deny the motion, that the court was not to be used "as a grand jury" or as part of defense counsel's investigation, and that when the defendant had "something to present, then present it." (28 RT 6476.)  Mr. Gable was to provide notice to the court and parties if the defense wished to "have further hearings on the 24th" concerning its investigation into the issue.  (28 RT 6473.)

    When trial proceedings resumed on the afternoon of July 24, 1989, the court noted that no interpreters were available at that time.  Petitioner waived the presence of an interpreter for purposes of "this motion."  (29 RT 6479-80; 6 CT 1343.)  The court noted it had read the written motion filed that morning and was prepared to rule.[47]  (28 RT 6482.)  It thereafter heard argument

---

[47] The pleading filed on that date was entitled "Notice and Motion for Order Precluding Prosecution from Seeking the Death Penalty; Recusal of Judge and Prosecutor; Declaration; Points and Authorities; Attachments."  (6 CT 1297-310.)  In the motion's points and authorities, under a heading entitled, "A court interpreter is an officer of the court and must be held to a similar standard re confidentiality as exists with other court personnel," the defense team asserted that it was "presently conducting an investigation to determine the course of the leak" and whether that "came to Gladys Cook via the court interpreter assigned to Department 15, or through some other source," the interpreter's office had violated the California Rules of Court,

278

from attorneys Holmes and Gable, as well as a brief statement by the prosecutor. (29 RT 6482-93.) During argument, when the trial court inquired of Mr. Gable "[f]rom whom did [Ms. Cook] obtain this information," Gable replied as follows:

> That's what we've been trying to determine, and that is what will be the subject of any further hearings conducted in this matter.
> I can indicate to the Court right now that we have been unable to interview the interpreter here that has been in court, Miss Krewson.
> We attempted to talk to her on Friday, July the 21st, at about 4:30 p.m. through my investigator, and she was asked to discuss the matter of the incident by which Miss Cook learned of this information, and she said that she would not, she had nothing to say to us, and then that was the end of it, and we're now informed that she is on vacation for the next three or four months, and apparently unavailable to anybody.
> What we have discovered through our investigation and which we are prepared to present by way of testimony today, is the fact that Miss Cook lied on the witness stand, and she lied when she said that there was certain people present when she learned of this, she lied when she said that Mr. Ramon Castanada told her about this, she lied when she said the other people were there when this happened. We've interviewed all of them and they deny it.
> She lied when she said she didn't have a conversation of any import with Mr. Marlette. Mr. Marlette will testify to that.
> What we have been confronted with so far under oath is perjury, and I hate to say that in such strong language, but I'm firmly convinced of it, on the basis of the investigation that had been conducted here, and every attempt that we have made thus far to ascertain the source of the leak has been stonewalled.
> I think that the only fair inference that can be drawn is that the leak emanated right out of this courtroom, and I'm prepared to testify to that, so I'm a witness in this.
> My credibility, just like Mr. Marlette's credibility, and Mr. Holmes' credibility is on the line in this hearing, and I don't think we have any business representing the respective parties in this action, at least for this motion.

(29 RT 6488-90.)

Ultimately, the court denied the motion, ruling and entertaining additional argument as

---

and further, that Ms. Cook additionally violated those standards by contacting the prosecutor and "Wayne Wilson of the Sacramento Bee." (6 CT 1301.) Petitioner concluded he was prejudiced because it was "now common knowledge as to the intent of the defense to send individuals to Cuba for investigation" and "it would be virtually impossible to send the same two individuals, or anyone else …" (6 CT 1301.) The remainder of the motion concerns the actions of the trial and presiding judge (6 CT 1301-03) and asserts that because the defense was precluded from presenting mitigating evidence during the penalty phase and hence suffered prejudice, the prosecution should be precluded from seeking the death penalty (6 CT 1304-08), that Petitioner should be appointed new counsel because present counsel were "potential witnesses in this matter was well as their credibility being under attack," and that both Judge Lewis and Prosecutor Marlette "should be recused" because they "were both involved in the events leading up to" the motion (6 CT 1308-09). A copy of a newspaper article that apparently appeared in the Sacramento Bee on July 12, 1989, was appended to the motion. (6 CT 1310.)

279

follows:

THE COURT: Okay. Thank you, gentlemen.

I have read the motion and I considered it, and just as I went through it - - I made some notes to myself.

Number one, there has been no breach of anything by the trial court judge.

I informed the 987 judge of the circumstances of the situation. I simply mentioned to her that there was an anthropologist going, and as I told her, which I now understand is incorrect, that she was taking an investigator and an interpreter, and I just questioned the need for those three individuals, and I mentioned to her the other interpreters were upset, they felt this interpreter was not qualified, and I told him that that was simply not a factor to be considered in the situation, but that just happens to be what brought the focus on the situation, and I informed the presiding judge that it sounded to me like someone was getting a paid vacation and perhaps she should look into it, and that was the extent of it.

I did not discuss with her the application or the contents of the application or anything, just since she's the presiding judge and handles all 987 application. I knew either she or the law and motion, the criminal department from which this came, had to be the 987 judge.

There was no breach by the 987 judge, because she did not discuss the application or its approval or its contents or anything about it.

The only thing she stated at all was just a kind of startled reaction when I mentioned there was an anthropologist going, and she made a response to, you know, the question, an anthropologist and wanted to know why an anthropologist was going, and that was the extent of any comment on her part, so there was no disclosure by the 987 judge, so 987 is simply not a basis for any motion in this case.

I can understand your frustration and your headaches, because from your viewpoint, something has gone wrong and all of a sudden something that you had you no knowledge of and therefore you want to get some remedy from it, but it just isn't there.

And on page nine, line seven, from your Points and Authorities, you said that as a result of the trial court's conversation with Judge Bond, funds were withdrawn, more correctly, as a result of the consideration, as a result of statements by the trial Court to the 987 judge, they then conducted a hearing which then resulted in her determination that the trip was not appropriate.

And you're saying that you can't now send anything to Cuba.

It's my understanding this was a last resort in any event. There was no other way to get anybody into Cuba any way but through this means, so just don't see how you can say that you suffered prejudice in that sense, and your request to appoint Counsel to replace yourselves to conduct this proceeding is just not necessary.

For one thing, it's not at all unusual in proceedings outside the presence of the jury to have an attorney give brief testimony.

That is a totally different situation from an attorney testifying in a trial before a jury, and your claim that your credibility has been attacked just simply doesn't hold water at all.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

There is no reason to recuse the prosecutor, because they're just peripherally involved if at all in this situation, and there's no reason for this Court to recuse itself, because my involvement had been just exactly as I stated, just passing some information to the 987 judge to see if she wanted to look into the matter, and there's just simply no legal or factual basis for recusing either the prosecutor or this Court, and so it's my full intention to proceed with the trial tomorrow morning.

MR. GABLE: For purposes of any further appellate review on this matter, does the Court make a finding that there was a privilege that extended to the interpreter's office, not to disclose any confidential information that was gained through, as a result of the interpreter's acting as the interpreter for the defendant and interesting or overhearing

discussions between the defense team?

THE COURT: I hadn't given that a great deal of thought, but I think it's clear there's an attorney-client privilege there, where her employment is in essence as an agent for you to interpret.

The attorney-client privilege certainly isn't waived by having that sort of third person present, whose presence is required for you to communicate with your client.

I think it was clearly an attorney-client privilege that applies.

MR. GABLE: The next question that I would ask the Court, then, is does the Court make any determination that by Miss Cook going directly to the Court ex parte, that she - - and also, I might add, to the press and to the District Attorney, that the interpreter's office breached their duty of confidentiality in this case?

THE COURT: No, I cannot draw that conclusion, because I don't know the source of her information.

The [mere] fact she came to the Court with a concern, which her very, I think, sincere feeling was that this was going to reflect back on the court and the interpreter's office and she was concerned about it, and that was her concern in coming to this Court in the first place, so I cannot say that breached any confidentiality, because I don't know where she got the information.

The information she gave to me had little or nothing to do with any proceedings that I've been involved in.

There seemed to be a very strong personality conflict involved there, and I frankly just wasn't concerned about that.

The only thing that got my attention was when she talked about having three people going, and that's when I put in a call to your office, and after an hour or so, when you had an opportunity to call - - I don't mean that d[e]rogatorily, I think it was during the lunch hour and finally came to a point where I had to leave and just called Judge Bond and suggested she look into it.

MR. GABLE: Well, the reason I'm asking that is because we have additional witnesses to represent on that issue.

We have a very serious problem; however, with the interpreter that was interpreting in this proceeding.

She has refused to discuss the matter with my investigator. He's here in court today and is prepared to testify as to that.

And at this point, we don't know where she is. We've been attempting to contact her since Friday in an effort to subpoena her to be here, and of today, we learned that she is on an extended vacation to, we believe, Hawaii, but we're not certain.

THE COURT: Florida.

MR. GABLE: Is it Florida?

THE COURT: I don't think the motorhome could make it to Hawaii, no, it's my understanding this is something she's been planning for a long time, she's mentioned to me and the court staff for quite sometime.

She was a little, kind of irritated that she was not going to be able to conclude the trial, but anyway, the point is, if there was any impropriety of that nature, then the Superior Court should handle that as a personnel matter and will look into it, but even if what you say is correct, that there was a breach of the attorney-client privilege which resulted in ultimately the presiding judge withdrawing the funds, that's not a basis for any action by this Court as a trial Court, that would affect this trial, because what is ultimately ended up with - - again I have to assume that Judge Bond's withdrawal of the funds was based on a full and fair hearing and that decision was made and is correct, and if it's not correct, then you should take a writ on it.

MR. GABLE: What I want to make sure, and I would beg the Court's indulgence in this regard, but I want to make sure that the record is clear that we are, we would like to be able to prove by way of testimony where the breach came from; however, if the Court is indicating that even if we were to prove to the Court's satisfaction that the breach emanated right here in this courtroom through Miss Krewson, that that would not make

281

any difference whosoever as to the Court's ruling tin this regard, then I think that we've possibly satisfied, in other words, I don't think the Court would find it relevant and not allow us to put testimony on.

THE COURT: I think you've satisfied what you need for purpose of an appeal, because even if I were, even if somehow you put Miss Krewson on the stand and she said, "Yes, I sat there and listened to this confidential information and I went ahead and told somebody else about it," given the end result, the most would do would be to remove her or have her disciplined or take some action against her, but it would not affect the outcome of this trial.

MR. GABLE: If I were to put on evidence which indicated to the Court's satisfaction that Miss Cook was not telling the Court what really happened and how she got the information and what she did with it, would that an any difference as far as the Court's ruling goes?

THE COURT: No, I'd give you the same answer.

(29 RT 6495-502.)

Mr. Gable then continued to ask the court whether it had considered a certain procedure and Mr. Holmes continued to advocate for a hearing. (29 RT 6502-04.) The court further explained its action, and Mr. Gable then asked for "a continuance of the trial to enable" the defense "to take a writ." (29 RT 6505.) That motion or request was denied. (29 RT 6505.) The court asked if there was anything further, and this brief exchanged occurred:

MR. MARLETTE: I just have one comment. [¶] As this proceeds, I kind of learn more and more about it, and as crux of the 987 judge's withdrawal of the authorization was the substitution of parties who were actually going to go to Cuba, that is something that for the record, I wanted to state, I don't believe was confidential.

It had been disclosed to me, I was aware that it was not the same as the original parties, and I believe it had actually been discussed in open court.

MR. GABLE: Whether that be the case or not, and the transcripts of the proceedings would obviously disclose that, I would indicate that the identity of the parties other than Miss McGarrity had not been disclosed to anybody, because we didn't even know who the second party was going to be until the day that Miss [McGarrity] testified in camera in this courtroom, so I doubt very much that that would have been the source of common knowledge prior to that time, and that was on Thursday, and it was Friday that Miss Cook came and spoke to the Court.

THE COURT: Okay, gentleman. [¶] What we're discussing, I was aware it was anthropologist, apparently I never was aware of the actual, the identity by name of the person, until these proceedings that we're involved in right now, this hearing today.

(29 RT 6505-06.)

The California Supreme Court could have reasonably concluded that Carmen Krewson did not breach any duty of confidentiality owed to the defense team. The evidence adduced during

the trial indicated as much. Ms. Cook testified she learned the defense team was sending an interpreter investigator to Cuba from fellow interpreter David Myers when he visited the interpreter's office the previous Thursday or Friday morning.[48] Cook further testified that on Friday morning she learned from Ramon Castanada, another interpreter in the office, that Myers had approached Castanada about his interest in traveling to Cuba because Myers could no longer go himself. Ms. Krewson, meanwhile, was providing interpreting services in this matter on both Thursday and Friday mornings. (6 CT 1292 [Thurs. 7/6/89], 1294 [Fri. 7/7/89]; see also 27 RT 6110-89 [Wed. 7/5/89]; 28 RT 6216-39 [Thurs. 7/6/89 a.m. session], 6240-318 [Fri. 7/7/89 a.m. session]; *In Camera* RT 6181-85 [Wed. 7/5/89], 6190-214 [Thurs. 7/6/89].) Ms. Cook also testified that she and other interpreters "all just assumed" the non-court certified interpreter later identified to be travelling to Cuba, Patricia Santivanias, would be acting as an interpreter on the trip, rather than an investigator.

Significantly too, Ms. Cook expressly testified under oath that she did *not* receive any information from Carmen Krewson, including the fact that Patricia Santivanias was traveling to Cuba. Cook testified that while Krewson was present in the interpreter's office during her lunch breaks to eat her lunch, Krewson did not talk about the subject.

The undersigned notes that some states recognize "a rebuttable presumption that an interpreter in the course of performing his official duty has acted regularly." State v. Casipe, 5 Haw.App. 210, 686 P.2d 28, 33 (Haw.Ct.App. 1984); see also, e.g., Shaha v. State, 44 Kan.App.2d 334, 236 P.3d 560, 565 (Kan.Ct.App. 2010) ("Absent some contrary showing, courts presume that an interpreter exercising his or her official duties has acted properly"); State v. Mendoza, 181 Ariz. 472, 891 P.2d 939, 942 (Ariz.Ct.App. 1995) ("it is presumed that court

_____

[48] Notably, Mr. Myers was an investigator and a state and federally certified interpreter. And, on Wednesday, July 5, in open court, the defense team indicated its expert anthropologist "and an investigator" were planning to travel Cuba. (27 RT 6178, 6186.)

interpreters will correctly carry out their duties and that oaths will be properly administered").

Some federal courts have similarly recognized a presumption of regularity in court interpreter official duty.  See Michel v. United States, 849 F.Supp.2d 649, 656 (W.D. Virg. Mar. 28, 2012); Hou v. Walker, No. CV 96 1365, 1996 WL 684442, at *3 (E.D.N.Y. Nov. 20, 1996) (quoting People v. Bicet, 180 A.D.2d 692, 580 NY.S.2d 55, 56 (1992); Clervil v. McNeil, No. 08-20144-CIV, 2008 WL 4753575, at *12 (S.D.Fla. Oct. 28, 2008) (citing Hou, 1996 WL 684442, at *3).  If the undersigned were to apply such a presumption here, the undersigned would conclude that Petitioner has failed to rebut the presumption regarding Carmen Krewson.

And even in the absence of such a presumption, the record does not support Petitioner's allegations.  During her testimony, in response to three or four inquiries by defense counsel, Cook expressly denied learning any information from Krewson.  Cook's testimony indicates the information she obtained and shared with others came from David Myers and Ramon Castanada.  Even Gable's offer of proof regarding Castanada's anticipated testimony did not involve Krewson in any way; rather, it challenged the accuracy of Cook's testimony and would have resulted in a credibility contest between Cook and Castanada.

No declarations have been offered in support of Petitioner's claim as referenced by trial counsel.  In other words, Petitioner has not offered a declaration from Castaneda or any other interpreter despite Mr. Gable's comment that there were others who could establish that Gladys Cook had perjured herself.  Neither is there a declaration from the defense investigator regarding his purported efforts to obtain Krewson's cooperation or his efforts to subpoena her.

Petitioner, then and now, attempts to make much of Krewson's purported decision not to speak to the defense investigator, inferring guilt or wrongful conduct on Krewson's part.  But the California Supreme Court could have found a reason for Krewson's doing so that did not involve any inappropriate conduct.  The undersigned notes that the record reveals Mr. Gable's focus was

284

not on Ms. Krewson after Ms. Cook's testimony, but rather on speaking with Ramon Castanada. Ms. Krewson was apparently available for at least the next week or so, but the defense team did not attempt to speak with her until Friday, July 21st, some ten days after Cook's testimony and apparently just prior to Krewson's planned vacation, for she had already departed on that vacation by July 24. Even assuming Krewson refused to speak with the defense investigator, she could have done so because she simply did not have the time prior to her planned vacation.

Petitioner infers some nefarious purpose for Ms. Krewson's asking for permission to approach the bench after Cook's testimony on July 11, 1989. But other reasonable inferences can also be made – the trial court stated it knew Ms. Krewson was excited about her planned RV vacation to Florida and disappointment that she may not be able to complete interpreter services through the conclusion of Petitioner's trial. It is equally, if not more, reasonable to infer that Krewson was simply reminding the court of her forthcoming vacation plans given the anticipated delays the defense team's motion had raised.

The new evidence offered by Petitioner in the state habeas proceedings does not change the fact the state's highest court could have concluded the claim lacked merit. Dr. Gonzalez' opinion or report makes no reference to the testimony of Ms. Cook or to the fact Ms. Krewson was unavailable due to a long-planned RV-across-the-country vacation to Florida. Ms. Riley-Portal's declaration was addressed at length above and does little to support Petitioner's position for the reasons previously stated.

Notably, even had Ramon Castanada testified as laid out in Mr. Gable's offer of proof, Krewson would not have been implicated. Castanada was simply going to contradict Cook's testimony that he had complained to her about Santivanias. Gable's offer of proof made no reference to Castanada having some personal knowledge concerning any act by Krewson.

A review of this record could support a finding that David Myers may have been the cause

of the uproar in the interpreter's office. Cook testified that it was Myers who approached and asked both she and Castanada to take his place on the defense trip to Cuba. At a minimum, Myers also approached Santivanias, who reportedly agreed to travel in his place. By asking others in the interpreter's office if they were available to travel to Cuba as the interpreter investigator, coupled with the various assumptions made by Cook and others in the interpreter's office, it appears word got around. The record reveals that such information being disseminated could have happened without any interference by Krewson. There was reference in open court on the morning of July 5, 1989, that the defense was planning to send an anthropologist and an investigator to Cuba within a matter of days (27 RT 6178, 6186), and that information formed the basis of a defense request to continue the penalty phase of the trial to allow for the travel to take place. A review of the record could also support a determination that Cook may have perjured herself. But even so, that fact, even assuming it is a fact, does not operate to implicate Krewson.

Petitioner's attempts to lay the sole blame at Ms. Krewson's door are simply not supportable by any evidence in this record. And even were there some evidence, above and beyond inference, given the conflicting accounts available, it would have been reasonable for the California Supreme Court to conclude that fairminded jurists could disagree. Richter, 562 U.S. at 101-03.

Petitioner was not denied an interpreter at any critical stage of the proceedings. Cooper v. Oklahoma, 517 U.S. at 368. Further, the record does not support Petitioner's claims that interpreter Carmen Krewson was in any way inadequate or incapable of providing interpreting services. Perovich v. United States, 205 U.S. at 91; Gonzalez v. United States, 33 F.3d at 1051. Therefore, the California Supreme Court could have reasonably concluded that a fairminded jurist could disagree that Petitioner was denied the assistance of an interpreter at all critical stages and that he was unable to proceed effectively with the assistance of Spanish language interpreter

286

Carmen Krewson.  <u>Richter</u>, 562 U.S. at 101-03.  Accordingly, the undersigned RECOMMENDS that Claim SS be DENIED.

### Claim OO

Petitioner also complains trial counsel did not use an interpreter to communicate with him, and that as a result, he was unable to meaningfully communicate and participate at trial.

Briefly, to prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel performed deficiently, and that, as a result of that deficiency, he suffered prejudice. <u>Richter</u>, 562 U.S. at 104.

As noted elsewhere in these findings, the record reveals the defense team had no difficulty communicating with Petitioner in English.  It was decided that due to the fact the trial proceedings might involve more complex matters and technical material than had the pretrial proceedings, Petitioner would benefit from the assistance of an interpreter moving forward.  (ECF No. 302, Vol. XXI, Ex. 55 at 4089-90, 4095C-E & Vol. XXVI, Ex. 136 at 5255-56.)  The defense team's representation of Petitioner did not fall below an objective standard of reasonableness, and Petitioner cannot overcome the court's strong presumption that their representation fell within the wide range of professional assistance.  <u>Richter</u>, 562 U.S. at 104.  Nor was Petitioner prejudiced by the defense team's failure to request the assistance of an interpreter earlier because there was no reasonable probability of a different result.  <u>Id.</u> at 112.  Petitioner was provided with the assistance of an interpreter throughout the entirety of the trial proceedings, from the first day the trial was assigned to Judge Lewis' courtroom through the conclusion of all trial related proceedings.  The California Supreme Court could have reasonably concluded that fairminded jurists could disagree on the issue of the necessity of interpreter services at all times in the case. <u>Id.</u> at 101-03.

////

Petitioner's argument that he was unable to meaningfully communicate with his attorneys before that point is not supported by the record, nor are his assertions that he did not understand the differences between the judicial systems in the United States and Cuba.

His reliance upon the declaration of Ms. Riley-Portal in support of this argument is questionable for the reasons previously discussed in Claim SS. Further, the undersigned notes Ms. Riley-Portal's opinion that Petitioner needed an interpreter was based upon a single appearance with him in "Judge Stroud's court," whereas counsel for Petitioner had represented him for nearly two years at that point. Counsels' opinions regarding Petitioner's ability to understand English and his need for an interpreter, and in particular when that need arose, are entitled to this court's deference. Richter, 562 U.S. at 109.

And, while Leslie Colyer, Clay Jones, and Thomas Richardson found Petitioner's English language skills lacking in their respective opinions, their declarations are contradicted by other evidence in this record. In addition to both defense attorneys' impressions at the time of trial, as reflected in the record, there is the testimony of Robert Metcalf and Robert Wissmath.

Also addressed in Claim SS was the report prepared by Dr. Gonzalez. The undersigned disagrees with Petitioner's assertion that her credentials are "unimpeachable" for the reasons explained previously.

Simply put, this record does not support a conclusion that Petitioner was unable to communicate with trial counsel because they did not use an interpreter. Dusky v. United States, 362 U.S. at 402. Neither does this record establish that Petitioner was unable to meaningfully communicate and participate at trial. Riggins v. Nevada, 504 U.S. at 144-45; Cooper v. Oklahoma, 517 U.S. at 368; Pointer v. Texas, 380 U.S. at 403-04. In any event, the California Supreme Court could have reasonably concluded that fairminded jurists could disagree on these issues. Richter, 562 U.S. at 101-03. Therefore, the California Supreme Court's adjudication of

the claim was not contrary to, nor did it involve an unreasonable application, of, Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  Accordingly, the undersigned RECOMMENDS that Claim OO be DENIED.

### Claim O

Petitioner complains his constitutional rights were violated because the trial court permitted him to testify without the assistance of an interpreter "when it became clear after he had testified for a short time that his English proficiency was so poor that he neither understood the questions nor could make himself understood in English."  (ECF No. 330 at 410.)

The California Supreme Court considered Petitioner's Claim O, and held as follows:

> Prior to trial, defendant moved the superior court to appoint an interpreter to assist him throughout the proceedings. In support, defense counsel declared, in substance, that defendant had spent most of his life in Cuba, and there spoke Spanish; he had been in the United States for only eight or nine years; he could carry on a conversation in English on a limited basis; but he "appear[ed] not to understand where the conversation involves anything technical such as explaining different Court procedures"; and he "indicated that he does have a great deal of difficulty when the language becomes technical in nature." The superior court granted the motion. It made an interpreter from the interpreter's office for the superior and municipal courts available to assist him throughout the proceedings. An interpreter did in fact assist.
>
> In his case, defendant took the witness stand on his own behalf. At the commencement of direct examination, defense counsel asked, "Now, you're going to be testifying in English today; is that correct?" Defendant answered, "Yes." Defense counsel: "And that's at your request; is that right?" Defendant: "Right." Defense counsel: "[W]hat's your native language?" Defendant: "Spanish." Defense counsel: "And the interpreter is next to you here, and if you have any problems either understanding me or expressing yourself, then just feel free to ask the interpreter to help out. Will you do that?" Defendant: "Okay." The superior court made plain that, if anyone was unable to understand defendant, he should so indicate.
>
> Subsequently, in a recess during cross-examination by the People, defense counsel requested the superior court, outside the presence of the jury, to cause the interpreter to simultaneously translate for defendant "the questions that are being asked on cross-examination, because I noted that, it appeared to me at least, that he had misunderstood a couple of the questions that were asked, and" had given answers "not necessarily responsive to them...." The superior court declined to order simultaneous translation, stating that it "prefer[red] to continue the way we're going," that is, with sequential translation. "If you feel ... that he's misunderstanding the question, you may use that as an objection, in this case." Defense counsel said, "Okay." Later, the superior court explained its "preference" by calling on the interpreter to state for the record: "[W]e never do simultaneous [translation] at the witness stand, only at counsel table"; "[t]he main reason

289

is, because of the confusion of hearing two languages at the same time, ... and also, you lose the continuity of the questioning...." Defense counsel commented, "I think that by giving me an additional grounds [sic] of objection, other than those provided for in the [E]vidence [C]ode itself, to solve the problem, ... at least I can stop the proceedings and make sure that he understands what the question is." The superior court stated, "I think things went well, that way, and we'll continue that way."

Defendant now contends that the superior court erred by denying him his right to the assistance of an interpreter in the course of his testimony.

We shall assume that defendant did in fact have a right to the assistance of an interpreter. For example, article I, section 14 of the California Constitution provides that "[a] person ... who is charged with a crime has a right to an interpreter"—meaning an interpreter's assistance—if he is "unable to understand English." For present purposes, defendant may be deemed to have been "unable to understand English."

We cannot conclude, however, that the superior court denied defendant any right he had to the assistance of an interpreter. It made an interpreter available to assist him throughout the proceedings. Furthermore, an interpreter did in fact assist. Taking the witness stand, he chose to testify in English. The superior court continued to make the interpreter available to assist him there—and the interpreter did in fact continue to assist. True, it impliedly prohibited simultaneous translation. But it expressly allowed sequential translation.

Against our conclusion, defendant argues that the superior court denied him any right he had to the assistance of an interpreter, at least when it impliedly prohibited simultaneous translation. We disagree. The superior court did not disallow assistance. Even with the implied prohibition, it merely affected the manner in which it was provided. A trial court has the power—indeed, the duty—to conduct the proceedings in an orderly manner. (Code Civ. Proc., § 128, subd. (a)(3).) An appellate court reviews the exercise of such power for abuse of discretion. (*People v. Jackson* (1967) 250 Cal.App.2d 851, 855; *People v. Miller* (1960) 185 Cal.App.2d 59, 77.) There was no such abuse here. The superior court did not act unreasonably. As indicated, simultaneous translation was explained by the interpreter to be impracticable. As also indicated, sequential translation was found satisfactory by the superior court, and was even accepted by defense counsel. We do not overlook the fact that, during his testimony, defendant experienced difficulties in understanding and in making himself understood. But neither can we overlook the fact the superior court did not refuse him any assistance.

Defendant also argues that he did not effectively waive any right he had to the assistance of an interpreter. That is true. But it does not matter. The reason is simple: Defendant retained any right he had, and went on to exercise it as he saw fit, subject only to the superior court's implied prohibition of simultaneous translation.

[FN] 16.  At oral argument, defendant attempted to raise a claim that, in the proceedings recounted in the text, defense counsel provided ineffective assistance, apparently in violation of his rights under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. He "assert[ed] the point perfunctorily. We deny it in the same fashion." (*People v. Ashmus* (1991) 54 Cal.3d 932, 1011, fn.29.)

People v. Alvarez, 14 Cal.4th at 208-10.

The California Supreme Court's determination is neither contrary to, nor does it involve an unreasonable application of, then existing Supreme Court precedent. Moreover, that court's findings did not involve an unreasonable determination of the facts based upon the record before it.

On May 2, 1989, Petitioner took the stand in his own defense. (18 RT 4002.) It was Petitioner's request to testify in English rather than Spanish. (18 RT 4003.) Petitioner agreed with defense counsel Gable that he would ask the interpreter present and next to him – Carmen Krewson - for help if he had "any problems either understanding [Gable] or expressing" himself. (18 RT 4003.)

During direct examination commencing that afternoon, Petitioner was assisted by the interpreter in approximately nine instances. (18 RT 4020, 4022, 4038-39, 4042, 4047-49.) On the morning of May 3, 1989, the court stated the following, outside the presence of the jury:

> I had a brief discussion this morning with the court reporter and the interpreter, because they indicated they were having some difficulties with - - in reporting or interpreting for Mr. Alvarez. The problem that the court reporter presented to me was ....
>
> Now with the interpreter, she wasn't sure what she should do when Mr. Alvarez turns to her and just asks her to clarify something, and I told her that in a situation where she's acting as a consultant to him, where he just turns and says, you know, what words should I use or just simply wants her to tell him what a word is, that - - that doesn't - that doesn't have to be translated, if it's just - - if they're just talking back and forth to, and she's in essence, acting as a consultant.
>
> However, if he wants her to actually translate what has been said to him, or what he was to say, then you need to translate verbatim. So if it's - - if he doesn't understand a word in a question and asks you about it, then that should be translated. If he simply trying to - - wants some advice from you on how to compose an answer, or maybe what word to use in answer, I don't think that needs to be translated.
>
> Number one, is that clear to Counsel, and number two, any objection to that?
>
> MR. GABLE: I don't have any objection. I'd like to be able to speak to my client for a moment, privately?
>
> THE COURT: Yes.

(18 RT 4064-66.)

No objection was made, nor any concern whatsoever noted, regarding Ms. Krewson's assistance. Thereafter, Ms. Krewson assisted Petitioner about five times that morning before the

291

proceedings concluded due to Petitioner's illness that same afternoon. (18 RT 4085, 4139, 4148-49, 4158.) On May 4, 1989, Petitioner's direct examination testimony resumed; Ms. Krewson assisted approximately ten times. (19 RT 4175-76, 4181, 4193, 4195-96, 4213, 4218, 4225.) Cross-examination began later that morning. During that session, Petitioner was assisted by Ms. Krewson three times before the lunch recess. (19 RT 4242, 4259.) When proceedings resumed, Mr. Gable addressed the court with his concerns as previously excerpted. (19 RT 4267-68.)

A review of the exchange between the prosecutor and Petitioner prior to Gable's request simply does not support his assertion that Petitioner misunderstood the questions. It is evident in the more than two dozen pages of testimony that Petitioner understood the questions posed and answered them in a responsive fashion. Moreover, Ms. Krewson's assistance during that portion of the testimony was not of great significance: (1) when Petitioner identified a particular date and added that it was "dusking, you know - -," Ms. Krewson added "That would be about dawn" (19 RT 4242) and (2) when Petitioner was attempting to identify the location of a purse inside the Slatten vehicle, he testified, "I told you, about underneath of the, you know, he got the division of the seat - - ," the prosecutor asked "Arm rest?" as Ms. Krewson added, "Right below the arm rest," with which Petitioner agreed (19 RT 4259). Outside the jury's presence, the court made the following record:

> THE COURT: I just want had to amplify one point on denying the simultaneous interpretation on cross-examination, that is, that, that that was also - - the information I had but I didn't articulate is that when, well, before Mr. Alvarez started testifying, I was talking with the interpreter about making arrangements where she should sit and things, and at that time she told me that she would not simultaneously interpret when he's testifying, but that she would have to listen to the question and repeat it and she wouldn't do it simultaneously.
> Carmen, maybe you can explain, you explained to me why you didn't do that, and when I found out that there wasn't a request to, I didn't go into that any further.
> THE INTERPRETER: The main reason is, because of the confusion of hearing two languages at the same time, the court reporter, also, with Counsel, and also, you lose the continuity of the questioning, because most of the time, we have to switch the words so that question will make sense.

If I were to use simultaneous, it would be almost interpreting word by word, and it would be just a lot of mush.

THE COURT: Okay.

THE INTERPRETER: We never do, I'm sorry, we never do simultaneous at the witness stand, only at counsel table.

MR. GABLE: Your Honor, I think that by giving me an additional grounds of objection, other than those provided for in the evidence code itself, to solve the problem, because at least I can stop the proceedings and make sure that he understands what the question is.

THE COURT: I think things went well, that way, and we'll continue that way.

(19 RT 4320-21.)

When cross-examination resumed and testimony continued until completion (19 RT 4321-441), Ms. Krewson continued to assist Petitioner when necessary. (See 19 RT 4299, 4354-58, 4360-62, 4364-65, 4370-71, 4373, 4375-77, 4382, 4391, 4402, 4406.) During that portion of testimony, the court inquired about the arrangement:

[THE COURT]: Miss Krewson, I just wanted to find out how this is working out with out, right now.

For the last 45 minutes or so, Mr. Alvarez has been responding to some questions himself and then going through you on others, is that working out all right?

That's putting you in a difficult position 'cause you don't know - -

THE INTERPRETER: It's no problem. I just have to pay attention to what both parties are saying, that's all.

THE COURT: Okay, do you want Mr. Alvarez to - - when he starts to answer, if he was to go through you, do you want him to turn and look at you or to say something to you, or is it - -

THE INTERPRETER: That would help. It also would help if his question would be completely in Spanish, instead of half and half, I would be prone to interpret the English into Spanish.

THE COURT: Yes, I notice that's happened a couple times.

Mr. Alvarez, if you would, then, when you want to go through Miss Krewson, then just turn to her and give her your complete answer in Spanish, or I mean, respond to her in Spanish, rather than some Spanish and some English, if you can.

[PETITIONER]: I be trying to, you know, I just - - I don't know, you know, it's hard for me, you know, after all this time speaking English all the time, then my Spanish, and I can't speak the English that well, you know, just get me stop in my head, just get me stop.

THE COURT: That's fine. My main concern was so that Miss Krewson wouldn't be put on the spot.

[PETITIONER]: That's what I'm trying.

THE COURT: Just let her know that you're gonna go through her when you do want her, so maybe this might be best if you kind of turned towards her and so that she knows that when you start speaking, that she's going to be interpreting.

293

> If you're just going to answer directly, in English like you have most of the time, just simply remain facing the front, and respond, okay? [¶] Anything further? [¶] All right, we're in recess for 20 minutes.

(19 RT 4374-75.)

Again, a review of this portion of that testimony reveals no significant difficulties. The court addressed Petitioner directly, yet Petitioner offered no complaint about the accuracy of Krewson's interpreting skills, nor did he complain of an inability to understand the questions or to make himself understood.

Viewing the entire record of the testimony reveals Petitioner was arguably able to communicate and understand adequately in English. In any event, where necessary, Petitioner was assisted by a Spanish language interpreter throughout the trial proceedings, including during his own testimony.

The trial court's refusal to permit simultaneous translation on this record did not result in a refusal or failure to provide Petitioner with an interpreter implicating his Fifth Amendment right to testify on his own behalf. United States v. Mayans, 17 F.3d at 1181. Unlike Mayans, here, Judge Lewis did not urge Petitioner "over and over to try testifying in English—to 'try it.'" Id. at 1180. Petitioner alone elected to testify in English; he was not urged by the court to do so.

Neither did the trial court's limitation amount to a violation of due process rendering the trial fundamentally unfair. Valladares v. United States, 871 F.2d at 1566. Even in continuous word-for word translations, "occasional lapses in the standard will not necessarily contravene a defendant's constitutional rights. [Citation.]" United States v. Long, 301 F.3d 1095, 1105 (9th Cir. 2002). There is no such thing as an error free, perfect trial, or an error free, perfect interpreter. Id. at 1105; United States v. Gomez, 908 F.2d 809, 811 (11th Cir. 1990) (no constitutional right to flawless, word for word translations). Petitioner elected to testify in English and was provided with a Spanish language interpreter should he require additional

294

assistance.  The record reveals Petitioner benefitted from the assistance of an interpreter and the trial court's actions did not violate his constitutional rights, entitling him to habeas corpus relief.

In sum, the California Supreme Court's denial of Petitioner's claim does not involve an unreasonable application of clearly established Supreme Court precedent, nor is it based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).  Thus, the undersigned RECOMMENDS that Claim O be DENIED.

### Claims U, V, W, X, VV & YY: Breach of Duty of Loyalty – Interpreter's Office

In a related series of claims, Petitioner contends certain interpreters breached their duty of loyalty to his constitutional detriment.

### Claim U: Ineffective Assistance of Counsel

Here, Petitioner asserts interpreters Cook and Krewson leaked confidential information, adversely affecting his trial and defense counsels' ability to perform essential functions. Particularly, that the interpreters' actions resulted in the withdrawal of funds essential to the penalty phase mitigation investigation, and poisoned the relationship between Petitioner and his interpreters, contributing to inadequate interpreting and Petitioner's inability to meaningfully present and participate in his defense.  (ECF No. 330 at 493-94.)  Respondent contends any leak did not infringe on Petitioner's right to counsel, and that the California Supreme Court's determination of his claim was not unreasonable or contrary to Supreme Court precedent.  (ECF No. 345 at 247-54.)

Petitioner unsuccessfully presented Claim U in his direct appeal to the California Supreme Court, as well as in both state habeas petitions filed with that court.  For this court's purposes, the claim is exhausted.

////

### *The California Supreme Court's Determination*

In its reasoned decision following Petitioner's direct appeal, the state's highest court held

as follows:

> Defendant also claims, in effect, that the interpreter's office committed misconduct
> by improperly disclosing information about the trip to Cuba by McGarrity and
> Santivanias. It is improper for an interpreter to disclose information reflecting "privileged
> communications between counsel and client." (Cal. Standards Jud. Admin., § 18.3(c).)
> Judge Lewis impliedly assumed that at least one interpreter had indeed improperly
> disclosed information of this sort. We shall expressly do the same.
>
> We cannot conclude, however, that any improper disclosure would require
> reversal. We believe that a defect of this sort is subject to the general rule for error under
> California law that reversal requires prejudice. When, as here, it bears on the penalty of
> death, prejudice requires a reasonable possibility of an effect on the outcome. No such
> possibility appears. Attorneys Holmes and Gable had themselves disclosed to Judge Lewis
> and Prosecutor Marlette a significant part of the information concerning the trip to Cuba
> by McGarrity and Santivanias. Although revealing varied misconceptions and
> resentments, the interpreter who we assume made an improper disclosure disclosed
> nothing of substance other than the names of the travelers. That fact, however, was
> inconsequential. Indeed, while they were still pursuing the trip to Cuba by Mayorga and
> Myers, Attorneys Holmes and Gable had themselves disclosed their names.
>
> We do not ignore the fact that Judges Lewis and Bond initially looked with
> disfavor on Attorneys Holmes and Gable as a result of what we assume to be the improper
> disclosure by at least one interpreter of information about the trip to Cuba by McGarrity
> and Santivanias. We agree with defendant that the judges appear to have falsely believed
> that the attorneys were "misusing court-approved funds." We also agree that they may
> consequently have doubted their "credibility." For example, Judge Lewis admitted that he
> had thought that "it seemed like this could be a boondoggle," and might have told Judge
> Bond "something like this sounds like a county paid vacation."
>
> But the disfavor of Judges Lewis and Bond toward Attorneys Holmes and Gable
> passed as the judges learned of the difficulties the attorneys faced. Judge Lewis told them
> that he recognized that they found themselves in a "very frustrating" situation, and that he
> did "not doubt[ ] the good faith of either of you." For his part, Judge Lewis stated:
> "[F]rom now what I understand about the situation," "I'm of the opinion that you have
> done nothing wrong...." "Your credibility before this Court is just as high as it has ever
> been, which is high, I must say...."
>
> Neither do we ignore the fact that what we assume to be the improper disclosure
> by at least one interpreter of information about the trip to Cuba by McGarrity and
> Santivanias might have had a "chilling effect" (*Barber v. Municipal Court* (1979) 24
> Cal.3d 742, 753) on communications between defendant and Attorneys Holmes and
> Gable, and indeed on their relationship. But even a reasonable possibility of an effect on
> attorney-client communications or even the attorney-client relationship—which we do not
> discern here—does not amount to a reasonable possibility of an effect on the outcome.
>
> [FN] 33. Defendant claims in substance that what we assume to be
> misconduct by the interpreter's office through the improper disclosure of

> information about the trip to Cuba by McGarrity and Santivanias amounts to reversible error under, apparently, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Any such error is not reversible. The People have shown that any improper disclosure was harmless beyond a reasonable doubt: As explained in the text, such improper disclosure revealed nothing of substance other than the names of the travelers—a fact that was inconsequential.

People v. Alvarez, 14 Cal.4[th] at 235-36.

As adjudicated, the claim presented to the California Supreme Court on direct review and its denial thereof, does not involve an unreasonable application of Supreme Court precedent.

### *Analysis*

Initially, for all claims in this series, the undersigned incorporates all portions of this court's previous determinations concerning claims O, OO and SS above. Particularly, record citations will be referred to as though fully excerpted to avoid unnecessary repetition where possible. Moreover, because the undersigned recommended Claims O, OO and SS be denied, and because Claim U and others in the series rely upon some of those same facts found wanting in the former set of claims, the reasons for those denials are fully incorporated here as well.

Because Claim U was also presented in Petitioner's state habeas petitions, the denial of which did not involve a reasoned opinion, this Court shall additionally consider what arguments or theories could have supported the California Supreme Court's decision and whether it is possible fairminded jurists could disagree those arguments or theories are inconsistent with prior holdings of the Supreme Court. Richter, 562 U.S. at 101-02.

To establish an ineffective assistance claim based on a conflict of interest, a petitioner must demonstrate that: (1) counsel actively represented conflicting interests; and (2) an actual conflict of interest adversely affected counsel's performance. Cuyler v. Sullivan, 446 U.S. 335, 348-50 (1980). In contrast to a general claim of ineffective assistance of counsel, if a petitioner is able to satisfy both prongs under Sullivan, prejudice is presumed. Id. at 349-50 (a petitioner who

can demonstrate "that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice"), citing <u>Holloway v. Arkansas</u>, 435 U.S. 475, 487-91 (1978). The representation of multiple defendants simultaneously, an attorney's private financial interests, and other alleged conflicts may give rise to a conflict of interest. <u>Mannhalt v. Reed</u>, 847 F.2d 576, 580 (9th Cir. 1988); <u>United States v. Hearst</u>, 638 F.2d 1190, 1194-95 (9th Cir. 1980).

To establish the second prong under <u>Sullivan</u>, a petitioner must demonstrate the conflict "actually affected the counsel's performance, as opposed to a mere theoretical division of loyalties." <u>Mickens v. Taylor</u>, 535 U.S. 162, 171 (2002). Said another way, a petitioner must show that "some effect on counsel's handling of particular aspects of the trial was 'likely.'" <u>United States v. Miskinis</u>, 966 F.2d 1263, 1268 (9th Cir. 1992). The adverse effect "must be one that significantly worsens counsel's representation of the client before the court or in negotiations with the government," reasoning that a conflict limited to causing problems in the attorney-client relationship but without significant impact on counsel's representation is insufficient to constitute an adverse effect under <u>Sullivan</u>. <u>United States v. Mett</u>, 65 F.3d 1531, 1535-36 (9th Cir. 1995).

In <u>Mickens v. Taylor</u>, the United States Supreme Court explained:

> The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defense." This right has been accorded, we have said, "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658 (1984). It follows from this that assistance which is ineffective in preserving fairness does not meet the constitutional mandate, see *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); and it also follows that defects in assistance that have no probable effect upon the trial court's outcome do not establish a constitutional violation. As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors the results of the proceedings would have been different." *Id.*, at 6945.
> There is an exception to this general rule. We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where the assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. See *Cronic, supra*, at 658-59; *see also Geders v. United States*, 425 U.S. 80, 91 (1976); *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963). But only in "circumstances of that magnitude" do we forgo individual inquiry

298

into whether counsel's inadequate performance undermined the reliability of the verdict. *Cronic, supra,* at 659, n.26.

Mickens v. Taylor, 535 U.S. at 162.

First, Petitioner contends the withdrawal of funds for the trip to Cuba in order to obtain mitigation evidence to be presented at the penalty phase, a circumstance he attributes to the actions of Gladys Cook and Carmen Krewson, adversely affected counsels' ability to perform essential defense functions. But the record does not support Petitioner's position.

Even assuming a conflict for purposes of Sullivan's first prong, Petitioner cannot meet the requirements of the second prong by demonstrating a conflict that "actually affected" his attorneys' performance "as opposed to a mere theoretical division of loyalties." Mickens v. Taylor, 535 U.S. at 171. There was never any guarantee that defense counsel would be successful in sending a representative or representatives to Cuba in order to obtain information and records relating to Petitioner's upbringing in the communist country. The record indicates that after one failed attempt that apparently involved the traveling parties advising the Cuban authorities of their true intent to investigate Petitioner's background and obtain documents while visiting the country, a second attempt was planned that would involve those traveling to pose as tourists and hide the true reason for their travel to Cuba. As the California Supreme Court recognized, the identity of the persons traveling was not significant where all parties were aware of the defense team's efforts to send representatives to Cuba for information gathering purposes. Thus, to the degree any interpreter breached a duty of loyalty and confidentiality is of less significance on these facts. Gail McGarrity admitted in testimony before the purported breach occurred that she was not certain she would be able to enter Cuba, even as part of a tour group. Therefore, any actual conflict of interest did not affect counsels' performance. United States v. Miskinis, 966 F.2d at 1268.

////

299

Moreover, the record establishes that while McGarrity was not able to travel to Cuba, she did present evidence in the form of statements from Petitioner's father and others pertaining to Petitioner's upbringing in Santiago, corroborating information Petitioner provided to McGarrity and forming the basis of her opinions. Because obtaining information via a visit to Cuba was never certain, and speculative about what other information might have been obtained, any adverse effect caused by any breach of confidentiality or loyalty by an interpreter cannot be said to "be one that significantly" worsened Holmes and Gable's representation of Petitioner at trial. United States v. Mett, 65 F.3d at 1535-36. Nor, for the same reason, was there a likelihood of an unreliable verdict, so high as to make case-by-case inquiry unnecessary. Mickens v. Taylor, 535 U.S. at 162. Thus, Petitioner is not entitled to a presumption of prejudice pursuant to Sullivan. Instead, his claim is assessed in the traditional Strickland manner.

Moving directly to the second prong of the Strickland analysis, and assuming deficiency for the sake of argument only, Petitioner cannot establish that but for counsel's performance, there is a reasonable probability of a different outcome.

Through expert McGarrity, a social anthropologist with personal knowledge of and experiences in Cuba because of her prior studies there, Petitioner was able to present evidence concerning his upbringing in Cuba. Petitioner's father and other family members spoke with McGarrity and corroborated information Petitioner shared with her concerning his upbringing in Cuba. That information included abuse by a stepmother following his mother's death, injuries he sustained as a toddler and young adult, emotional difficulties, academic experiences, military service and time spent incarcerated in Cuba for committing a theft crime against the state.

Had representatives been able to get into Cuba, and then had they been successful in obtaining medical, academic, military and jail or prison records, that information would have served only to corroborate that to which McGarrity was able to testify. In other words, the jury

already had that information before it for consideration.  To presume those records would have been more helpful to Petitioner than McGarrity's testimony is nothing more than speculation.

The jury did hear from Petitioner's father in the form of a tape-recorded, audio statement. And, had representatives of the defense team successfully entered Cuba, obtaining videotaped statements from Petitioner's father and other family members, there was no guarantee the evidence would have been admitted.  Those individuals would not have been available for cross-examination at Petitioner's trial given their Cuban residency, and despite trial counsels' arguments based upon their loose interpretation of Green v. Georgia, 442 U.S. 95 (1979).

Even assuming the evidence the defense sought to obtain from Cuba was helpful to Petitioner's case – that all his assertions about a physically and mentally abusive stepparent, physical injuries affecting his mental wellbeing, et cetera, were accurate – that mitigating evidence was not likely to outweigh the aggravating evidence properly considered by the jury.

The jury was familiar, of course, with the circumstances of the crimes for which it had already found Petitioner guilty, including a robbery resulting in a man's death, another robbery resulting in an elderly woman's significant injuries, and an earlier car theft facilitating Petitioner's escape after committing rape.  The jury also properly considered Petitioner's prior felony convictions including voluntary manslaughter and assault with a deadly weapon and an escape from prison without force.  (27 RT 5990-6003, 6014-15; 30 RT 6802-11.)  Finally, the jury also properly considered criminal acts of violence by Petitioner, including assaults on other inmates during his incarceration at the Sacramento County Jail.  (27 RT 6017-27, 6037-43, 6049.)

There is no reasonable probability that, but for counsels' error – or those attributed to staff of the interpreter's office – that the jury would have elected to impose a sentence of life without the possibility of parole.  Petitioner killed a man and injured another man years before encountering Allen Birkman, Greta Slatten, Sandra Stramaglia and Edwin Glidewell.  And

evidence of a troubled childhood, and the lasting effects of head injuries and mental problems, would not serve to overcome the devastation wrought by Petitioner in May 1987, particularly in light of his criminal history.

Notably too, the leak occurred after the jury had already found Petitioner guilty of his crimes, after the People had presented their penalty phase case, and during the penalty phase case presented by the defense. More specifically, assuming interpreter disclosure, it came after Petitioner had been convicted of his crimes (6 CT 1275-80 [6/9/89]) and during the penalty phase portion of the capital trial (6 CT 1295). Mr. Gable complained on July 11 that a breach of confidentiality had come from the interpreter's office. (28 RT 6382.) In fact, following the proceedings of July 11, only two and a half days of trial testimony remained in the penalty phase case: July 25 (for the defense: Steven Arthur, David Gutierrez, Aaron Carnalla, Gail McGarrity) and 26 (for the defense: Gail McGarrity), and August 2 (for the People: Robert Rozzi; for the defense: David Myers & Gail McGarrity). (6 CT 1344-47.)[49] The timing therefore does not lend itself to any finding that the relationship between Petitioner and his defense team was significantly affected. Mickens v. Taylor, 535 U.S. at 162.

Addressing briefly Petitioner's position that defense counsels' reputations were harmed by the conduct at issue, the record is plain that any early frustration or doubt entertained by the trial judge was passing. Judge Lewis expressly stated counsels' credibility was "just as high as" ever after the incident. (29 RT 6498.) He further stated an "opinion that" counsel had "done nothing wrong." (29 RT 6498.) Judge Bond similarly expressed her regard for counsel. (SCT[50] 63-64.)

---

[49] Closing arguments began on August 2nd and concluded on August 3rd. (6 CT 1347,1406.) After less than five hours, the jury returned with its verdict. (6 CT 1406.)

[50] "SCT" refers to the Supplemental Clerk's Transcript on Appeal, alternatively identified as Volume 8 of the Clerk's Transcript on Appeal.

In sum, the California Supreme Court's denial of Claim U is neither contrary to, nor did it involve an unreasonable application of, Supreme Court precedent. Further, its subsequent considerations of the claim as presented in state habeas could have involved a determination that fairminded jurists could disagree as to whether arguments or theories on this issue were inconsistent with prior holdings of the Supreme Court. The undersigned thus RECOMMENDS that Claim U be DENIED as Petitioner is not entitled to habeas relief.

**Claim V: Improper Ex Parte Communications**

Petitioner avers that Judges Lewis and Bond engaged in improper ex parte communications because of the "breach of interpreter's obligations." (ECF No. 330 at 483-84, 494-95.) Respondent counters the communication between the judges did not violate due process and that the California Supreme Court's rejection of the claim was neither unreasonable nor contrary to Supreme Court precedent. (ECF No. 345 at 254-61.)

*The California Supreme Court's Determination*

Defendant next claims that Judge Lewis erred by determining that neither he nor Judge Bond committed judicial misconduct by communicating between themselves about his application for authorization to incur expenses for a trip to Cuba.

[FN] 34. At the outset, defendant asserts that Judge Lewis conducted an inadequate hearing on the question of judicial misconduct, but does not follow through successfully.

Any such judicial misconduct would not entail reversal. A defect of this sort is subject to the general rule for error under California law that reversal requires prejudice. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1133–34.) When, as here, it bears on the penalty of death, prejudice requires a reasonable possibility of an effect on the outcome. No such possibility appears. "The fundamental ... harm" threatened in this situation is "the disclosure of potentially significant information to the prosecution." (*Id*. at p. 1134.) There was no disclosure of this kind. Even before Judges Lewis and Bond communicated between themselves about defendant's application for authorization to incur expenses for a trip to Cuba, Attorneys Holmes and Gable had themselves disclosed its existence and substance to Prosecutor Marlette. Defendant argues that the communications in question had a "tendency ... to deprive [him] of the right to challenge 'questionable facts or opinions'...." The tendency, however, did not result in a deprivation. Judges Lewis and Bond themselves brought the communications to light. Defendant then exercised his "right," and mounted a successful "challenge." It is true that the communications between

Judges Lewis and Bond resulted in the withdrawal of authorization to incur expenses for a trip to Cuba. But, as explained above, such withdrawal of authorization did not affect the outcome within a reasonable possibility.

> [FN] 35.  To the extent that defendant claims that Judge Lewis erred by determining that he did not commit judicial misconduct by receiving from interpreter Cook her complaint about Santivanias's participation in the trip to Cuba with McGarrity, he fails to persuade. As a general matter, an appellate court reviews a trial court's ruling on judicial misconduct for abuse of discretion. (Cf. 2 Childress & Davis, Federal Standards of Review, supra, § 12.03, pp. 12–23 to 12–31 [setting forth the standard of review under federal law].) There was no such abuse here. Judge Lewis was not unreasonable in determining that he did not commit judicial misconduct. "A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities...." (Cal.Code Jud. Ethics, canon 3B(7)(b), asterisk omitted; accord, former Cal.Code Jud. Conduct, canon 3A(4) commentary, eff. Jan. 1, 1975.) Such "court personnel" include interpreter Cook. Since Judge Lewis could actively "consult" with her, we believe he could passively receive her complaint. But, even if judicial misconduct had occurred, it would not be reversible because it would not have been prejudicial: there is no reasonable possibility of an effect on the outcome.

People v. Alvarez, 14 Cal.4th at 236-37.

### *Applicable Legal Standards*

The Due Process Clause guarantees a criminal defendant the right to a fair trial before a fair and impartial judge.  See In re Murchison, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); Hurles v. Ryan, 752 F.3d at 788 (same). To establish a due process violation based on judicial bias, a petitioner must overcome the "strong presumption that a judge is not biased or prejudiced."  Rhoades v. Henry, 598 F.3d 511, 519 (9th Cir. 2010) (citing Bracy v. Gramley, 520 U.S. 899, 909 (1997)); see also Withrow v. Larkin, 421 U.S. 35, 47 (1975) (there is "a presumption of honesty and integrity in those serving as adjudicators").

Under clearly established Supreme Court precedent, absent actual bias, such presumption may be rebutted by evidence that, as an objective matter, "the probability of actual bias on the part of [an average judge under the same circumstances] ... [was] too high to be constitutionally

304

tolerable." <u>Withrow v. Larkin</u>, 421 U.S. at 47; <u>see also</u> <u>Caperton v. A.T. Massey Coal Company,</u>

<u>Inc.</u>, 556 U.S. 868, 876-77 (2009).  However, allegations that the state courts erred do not

demonstrate judicial bias.  <u>See</u> <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994) ("judicial

rulings alone almost never constitute a valid basis" for a showing of bias); <u>Taylor v. Regents of</u>

<u>Univ. of Calif.</u>, 993 F.2d 710, 712 (9th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1076 (1994) (adverse

ruling does not show judicial bias); <u>Hasbrouck v. Texaco, Inc.</u>, 842 F.2d 1034, 1046 (9th Cir.

1987), <u>aff'd on other grounds</u>, 496 U.S. 543 (1990) ("[e]ven if trial court's rulings were erroneous

..., they could not justify a finding of judicial bias").  Further, on habeas review of a state

conviction, judicial misconduct will warrant habeas relief only where "the state trial judge's

behavior rendered the trial so fundamentally unfair as to violate federal due process under the

United States Constitution." <u>Duckett v. Godinez</u>, 67 F.3d 734, 740 (9th Cir. 1995), <u>cert. denied</u>,

517 U.S. 1158 (1996).

　　　　For purposes of a claim governed by § 2254(d), "Supreme Court precedent reveals only

three instances in which an appearance of bias—as opposed to evidence of actual bias—

necessitates recusal" or due process will be violated.  <u>Crater v. Galaza</u>, 491 F.3d at 1131 (finding

that § 2254(d)(1) precluded habeas relief when none of these three circumstances were present

and the judges' comments were not evidence that overcame the presumption of honesty and

integrity accorded by <u>Withrow</u>).  The first is when the judge has a direct, personal, and substantial

pecuniary interest in reaching a particular conclusion against one of the litigants.  <u>Crater</u>, at 1131.

The second is when the judge becomes embroiled in a running, bitter controversy with one of the

litigants.  <u>Id.</u>  And the third is when the judge acts as part of the accusatory process, such as

holding the trial after acting as a one-man grand jury.  <u>Id.</u>

////

////

*Analysis*

The California Supreme Court's denial of the claim on direct review does not involve any unreasonable application of Supreme Court precedent.   And its denial of the claim in state habeas proceedings could have involved a determination that fairminded jurists could disagree about whether Petitioner had been denied any federal constitutional right.

California Penal Code § 987.9, subdivision (a) states:

> In the trial of a capital case or a case under subdivision (a) of Section 190.05, the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. The application for funds shall be by affidavit and shall specify that the funds are reasonably necessary for the preparation or presentation of the defense. The fact that an application has been made shall be confidential and the contents of the application shall be confidential. Upon receipt of an application, a judge of the court, other than the trial judge presiding over the case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to the defendant's attorney. The ruling on the reasonableness of the request shall be made at an in camera hearing. In making the ruling, the court shall be guided by the need to provide a complete and full defense for the defendant.

"The confidentiality requirement was evidently intended to prevent the prosecution from learning of the application for funds and thereby improperly anticipating the accused's defense." People v. Anderson, 43 Cal.3d 1104, 1132 (1987).  As correctly noted by the California Supreme Court in this matter, the prosecutor did not learn anything as a result of any breach of confidentiality that would allow him to improperly anticipate Petitioner's defense.  (28 RT 6393-94.)

Here, the record also reveals the trial court and the prosecutor were already aware that an application for investigative funds had been made by the defense; that information was provided by the defense team during various discussions with the trial court concerning scheduling in open court.  Messrs. Mayorga and Myers were identified in open court on June 13, 1989.  (26 RT 5945-46, 5948-49.)  On June 26, 1989, Mr. Gable stated in open court that the "prosecutor is well aware that we're trying to gather information from Mr. Alvarez's homeland …."  (27 RT 6052.)

Further, on July 5, 1989, the defense indicated it was sending a cultural anthropologist and an investigator to Cuba around July 10, 1989. (27 RT 6178, 6186.) And the specific contents of the application for funds were not revealed in any way by Judge Bond as § 987.9 judge. Judge Lewis was aware from defense counsel that certain funds had been set aside to obtain information and records regarding Petitioner's upbringing in Cuba, and that two representatives would be traveling to Cuba. Judge Lewis also knew that the defense team's first attempt to gain entry into Cuba was not successful. When Judge Lewis learned from Gladys Cook that "an interpreter that was going was not really needed, and was just, in fact, had kind of boasted, to mean that she was getting this free vacation" (28 RT 6389), Lewis eventually called Judge Bond, advising her that he had some concerns about the necessity of three people traveling to Cuba, and that he "simply wanted to bring that to her attention." (28 RT 6391.) Judge Lewis mentioned to Judge Bond that he had been advised in open court that those traveling would have to be in Mexico for three or four days in order to "get the visas" and that "they're part of a tour group." (28 RT 6392.)

> "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond." (Cal.Code of Jud.Conduct, canon 3A(4).)

People v. Hernandez, 160 Cal.App.3d 725, 738 (1984). And,

> [t]he commentary to canon 3A(4) states in pertinent part: [¶] "The proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and other persons who are not participants in the proceeding, except to the limited extent permitted. *It does not preclude a judge from consulting with other judges, or with court personnel whose function is to aid the judge in carrying out his adjudicative responsibilities.*" (Emphasis added.)

Id. at 739. Judge Lewis did not improperly communicate with either Judge Bond or interpreter Cook. Judge Lewis was understandably concerned with the completion of the penalty phase of the trial and circumstances affecting the trial schedule. Nor was Judge Bond precluded from

receiving communications from Judge Lewis as that information aided her adjudicative responsibilities relative to funding requests.

Even if the communication between Judges Bond and Lewis "injected misinformation into the proceedings," the California Supreme Court could have concluded there was no prejudice to Petitioner. He did not have a right to leave the 987.9 judge with inaccurate information once it was learned that Messrs. Mayorga and Myers were "persona non grata" and that other persons had to be sent to Cuba in their place. Mr. Gable expressly admitted he had avoided advising Judge Bond of the changed circumstances because Mayorga and Myers' unsuccessful attempt to enter Cuba involved the pair truthfully advising Cuban authorities of their intent to obtain information to be used during Petitioner's trial. The second attempt to obtain the information would not involve being forthright with Cuban authorities. Rather, the second attempt would involve two persons, one everyone understood to be defense expert Gail McGarrity and an unnamed investigator-interpreter, posing as tourists in order to avoid being refused admittance as had Mayorga and Myers.

Petitioner claims prejudice by asserting Judge Bond was "obviously angry" and had "already determined," prior to summoning defense counsel to a hearing, that the funds would be denied. The record does not support this position. There is no dispute that Judge Bond was frustrated and perhaps even angry initially, but she heard from both Gable and Holmes and obviously considered their arguments and reasoning, before ultimately concluding she could not permit the funds to be expended where a ruse was to be employed in an admitted effort to circumvent the Cuban authorities because those same authorities had previously denied Petitioner's representatives admittance. (SCT 42-64.) An average judge faced with these same circumstances does not lead to a probability of actual bias "too high to be constitutionally tolerable." Withrow v. Larkin, 421 U.S. at 47.

The undersigned briefly addresses Mr. Gable's declaration, submitted in support of this claim and those related, to note that his declaration fails to address the reality of the basis for Judge Bond's election to withdraw previously approved funds: the subterfuge the defense intended to employ in order to gain entry to Cuba.

Petitioner did not overcome the presumption that Judges Lewis and Bond were neither biased nor prejudiced. Rhoades v. Henry, 598 F.3d at 519. The judges' communications with each other and their adverse rulings do not demonstrate bias. Liteky v. United States, 510 U.S. at 555; Taylor v. Regents of Univ. of Calif., 993 F.2d at 712; Hasbrouck v. Texaco, Inc., 842 F.2d at 1046. Neither Judge Lewis nor Judge Bond's behavior was so fundamentally unfair as to violate federal due process. Duckett v. Godinez, 67 F.3d at 740. Moreover, neither Lewis nor Bond had a direct, personal or substantial pecuniary interest in reaching the conclusion each did, nor were either embroiled in a running, bitter controversy with Petitioner, and neither acted as part of the accusatory process. Crater v. Galaza, 491 F.3d at 1131.

For the foregoing reasons, the California Supreme Court's denial of this claim was reasonable. 28 U.S.C. § 2254(d). Furthermore, that court's denial of the claims on state habeas could have reasonably concluded that fairminded jurists could disagree that any judicial misconduct or bias occurred. Richter, 562 U.S. 101-03. Thus, the undersigned RECOMMENDS that Claim V be DENIED.

**Claim W: Judicial Misconduct**

Petitioner complains that Judge Lewis' failure to recuse himself in light of the circumstances surrounding this incident amounts to judicial misconduct because the judge testified as an unsworn witness while hearing his complaints about interpreter breach of confidentiality. (ECF No. 330 at 483-84, 495-96.) Respondent maintains the California Supreme Court's denial of Petitioner's claim on direct appeal, and again in his second state

habeas petition, was neither unreasonable nor contrary to Supreme Court precedent, thereby precluding habeas relief.  (ECF No. 345 at 261-64.)

### *The California Supreme Court Determination*

The state's highest court denied the claim as follows:

> Defendant then claims that Judge Lewis erred by denying his motion to recuse himself from his other motions relating to his application for authorization to incur expenses for a trip to Cuba.
>
> As a general matter, an appellate court reviews a trial court's ruling on a recusal motion for abuse of discretion. (<u>Cf.</u> 2 Childress & Davis, Federal Standards of Review, <u>supra</u>, § 12.05, pp. 12–35–12–40 [setting forth the standard of review under federal law].)
>
> No such abuse appears. Judge Lewis was not unreasonable in declining to recuse himself. Certainly, he was not required to do so. Defendant argues to the contrary. He asserts that Judge Lewis had "personal knowledge of disputed evidentiary facts concerning the proceeding" (Code Civ. Proc., § 170.1, subd. (a)(1))—including whether he and Judge Bond communicated about his application for authorization to incur expenses for a trip to Cuba—and hence might, and indeed did, serve as a "de facto" witness. Judge Lewis cannot be deemed to have had "personal knowledge of disputed evidentiary facts": he removed such facts from dispute by resolving them for present purposes in defendant's favor, as through his implicit concession that he and Judge Bond communicated about the application.
>
> > [FN] 36.  Defendant claims in substance that, because Judge Lewis committed reversible error under California law by denying his motion to recuse himself, he thereby committed reversible error under the Fifth and Sixth Amendments to the United States Constitution. As explained in the text, he did not commit any error under California law.

<u>People v. Alvarez</u>, 14 Cal.4th at 237-38.

### *Analysis*

Recusal is required in those circumstances "in which experience teaches us that the probability of actual bias on the part of the judge...is too high to be constitutionally tolerable." <u>Caperton v. A.T. Massey Coal Co., Inc.</u>, 556 U.S. at 877.  In performing this analysis, a court does not evaluate the actual judge harbored subjective bias but whether "the average judge in her position was likely to be neutral or whether there existed an unconstitutional potential for bias." <u>Hurles v. Ryan</u>, 752 F.3d at 789.  Put another way, the court must consider "whether 'under a realistic appraisal of psychological tendencies and human weakness,' the [judge's] interest 'poses

such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be absolutely implemented.'" Hurles, at 789 (citing Caperton, 556 U.S. at 883-84). The "risk of unfairness has no mechanical or static definition. It 'cannot be defined with precision' because '[c][ircumstances and relationships must be considered." Hurles, at 789 (quoting In re Murchison, 349 U.S. at 136).

When hearing and considering Petitioner's motions, Judge Lewis assumed a breach of confidentiality by the interpreter's office had occurred. (28 RT 6502-03 [assuming breach by Krewson & assuming Cook testified untruthfully].) He admitted calling Judge Bond to advise her of his concerns about the defense team's plans to travel to Cuba. Thus, when he stated for the record the content of his conversations with Judge Bond and supervising interpreter Glady Cook, he was not doing so in a disputed-evidentiary-fact context, unlike the situation in Hurles v. Ryan. Furthermore, the information Judge Lewis provided to Judge Bond did not relate directly to Petitioner's guilt. In re Murchison, 349 U.S. at 138. This is not an extreme or extraordinary case that due process would prohibit Judge Lewis presiding over. Caperton, 556 U.S. at 876.

Judge Lewis' interest was motivated by maintaining the trial's schedule – a schedule exceeding predictions. Judge Bond's interest concerned the propriety of government funds appropriated for preparation of the defense. Neither judge's interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden" to guarantee due process. Hurles v. Ryan, 752 F.3d at 789.

A review of this record reveals that the circumstances at play did not reveal a prohibited interest or proceeding rendering the judge unable to maintain detachment; fair judgment was possible. Caperton, at 876, 887-88; Liteky, 510 U.S. at 555; Mayberry v. Pennsylvania, 400 U.S. 455, 466 (1971). Hence, the California Supreme Court reasonably denied Petitioner's claim. 28

////

U.S.C. § 2254(d); <u>Richter</u>, 562 U.S. at 101-102.  The undersigned RECOMMENDS that Claim W be DENIED.

**Claim X: Deprivation of Due Process and Fair Trial for Failure to Take Sworn Testimony of Prosecutor**

Next, Petitioner asserts Judge Lewis failed to conduct an adequate hearing and violated his rights to due process and a fair trial by not obtaining "sworn testimony establishing the impact of Gladys Cook's disclosure of privileged information to the prosecution."  (ECF No. 330 at 483, 496.)  Respondent argues the state court's adjudication of the claim was neither contrary to, nor did it involve an unreasonable application of, Supreme Court precedent, thereby precluding relief in this proceeding.  (ECF No. 345 at 264-65.)

Petitioner presented this claim in his direct appeal to the California Supreme Court and in his second state habeas petition filed with that court.  Because the claims were denied, they are exhausted for purpose of federal habeas review.

*The California Supreme Court's Determination*

The California Supreme Court reasoned as follows:

> Defendant then claims that Judge Lewis erred by failing to require Prosecutor Marlette to testify, sua sponte, as to his receipt of what we assume to be the improper disclosure by at least one interpreter of information about the trip to Cuba by McGarrity and Santivanias. We disagree. Defendant's premise is that Judge Lewis was under a duty to demand such testimony, even in the absence of a request. It is unsupported.
>
> [FN] 37.  Defendant claims in substance that, because Judge Lewis committed reversible error under California law by failing to require Prosecutor Marlette to testify sua sponte, he thereby committed reversible error under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. As explained in the text, Judge Lewis did not commit any error under California law.

<u>People v. Alvarez</u>, 14 Cal.4th at 238.

////

////

***Analysis***

Petitioner has not explained how the California Supreme Court's ruling is unreasonable. He offers no legal authority holding that the trial court had a sua sponte duty to take the prosecutor's sworn testimony.

Further, the record arguably does not support Petitioner's claim that Judge Lewis permitted "the prosecutor to 'testify' about what Gladys Cook told him …." (ECF No. 330 at 496.) The prosecutor merely stated information for purposes of making a record. Certainly, defense counsel did not object to the statements nor did counsel make any request for formal testimony by Prosecutor Marlette. (28 RT 6382-473; 29 RT 6479-507.) It is plain from this record that the prosecutor was well informed by the defense team about its efforts to obtain information from Cuba to be used in the penalty phase portion of the trial. (See 26 RT 5945-46, 5948-49; 27 RT 6052, 6177, 6186.)

On July 7, 1989, in open court and outside the presence of the jury, this exchange occurred:

> THE COURT: Now, it's my understanding - - and I think Mr. Marlette is aware of the basics of sending somebody to Cuba - -
> MR. GABLE: I don't have any problem with it.
> THE COURT: Let me know if you think I'm disclosing something that should have been in camera, but my understanding, you have this expert who has now, you have a confirmed flight to Cuba, on Tuesday the 11th?
> MR. GABLE: That's correct, your Honor.
> THE COURT: Okay.
> MR. GABLE: Actually it's a confirmed flight to Mexico City on the 11th, the tour is set, the details are worked out for confirmation for the flight to leave from Mexico City on the 15th, the return to Mexico City into the United States is on the 22nd, so it's all confirmed for the time period that we discussed.
> THE COURT: Okay, a minor detail why is she going down to Mexico on the 11th, assuming she's going to be, is she going to paid this whole time, and if so, why is she going down five days or four days before?
> MR. GABLE: Here's how it works: It's a tour package, that's how you have to do it.
> You have to go there three days in advance, you have to go to the Cuban embassy and get your passports in order, that's just the way that they set it up.

(28 RT 6308-09.)  At that point, as previously noted, three of the four travelers had already been identified by name, if not profession, in open court.

On July 11, 1989, during the morning session, the prosecutor offered the following after the court had advised the defense team about "what [its] participation was in" the matter:

> MR. MARLETTE:  Perhaps I should as well, because I'm outside that vale of confidentiality.
> There were a number of things I knew about the entire operation, *and there was one thing that I found out through Miss Cook*, and what I had known before was that Rod Mayorga and somebody else, who I didn't know, was going to try to go down.
> But I knew that before they went, I knew that they had hit Mexico City and then turned around.
> I knew after that, that they were gonna try and send somebody else again, and I assumed there was a reauthorization for a second trip at that time.
> I knew through conversations with Counsel just out in the custody hall or wherever, that I guess some stuff here in open Court, as well, that the plan then was to send a cultural anthropologist, and all that information I had from conversations with Counsel or just listening when we were in open court.
> *The information that I got from Miss Cook, that was the first time* I heard that there was a second person or that *the second person going on this current trip was identified to me*.
> I don't even recall what the woman's name was, but then she told me some things about her, and her situation and some problems that she this person who was going, and her husband were having.
> It's my understanding however that this additional person, who also happens to be like a junior grade interpreter or something, was not someone who'd been testifying in the trial, or somebody who - - against who I could use the information Miss Cook conveyed to me.
> But save for that, identifying that extra person and telling me some things about that person's background, there was as nothing else that I learned, other than through Counsel.

(28 RT 6393-94, emphasis added.)   Finally, on July 24, 1989, the prosecutor stated the following:

> MR. MARLETTE:  I just have one comment.  [¶]  As this proceeds, I kind of learn more and more about it, and as crux of the 987 judge's withdrawal of the authorization was the substitution of parties who were actually going to go to Cuba, that is something that for the record, I wanted to state, I don't believe was confidential.
> It has been disclosed to me, I was aware that it was not the same as the original parties, and I believe it had actually been discussed in open court.

(29 RT 6505.)

////

314

Given the foregoing, the California Supreme Court's determination is not contrary to Supreme Court precedent, nor does it involve an unreasonable application of such precedent. 28 U.S.C. § 2254(d). That court could have reasonably concluded that fairminded jurists could disagree on the issue. Richter, 562 U.S. at 101-03. As a result, the undersigned RECOMMENDS that Claim X be DENIED as Petitioner is not entitled to habeas relief.

**Claim VV: Failure to Object to Prosecutor's Testimony**

Next, Petitioner complains that defense counsel were ineffective for failing to object to the prosecutor's "unsworn testimony and failed to object to the process whereby the prosecutor was permitted to testify but was not subject to cross-examination." (ECF No. 330 at 483, 498-501.) In reply, Respondent contends the adjudication of the claim by the California Supreme Court was reasonable, and, thus, precludes habeas relief. (ECF No. 345 at 266-68.)

Petitioner presented this claim in his direct appeal and in both state habeas petitions considered by the California Supreme Court; the claim is exhausted.

***The California Supreme Court's Determination***

On direct appeal, the state's highest court concluded as follows:

> Underlying all the foregoing points urged by defendant is a broad and somewhat undefined claim of violation of the right to the assistance of counsel granted him by the Sixth Amendment to the United States Constitution.
> A defendant's Sixth Amendment right to the assistance of counsel includes a right to effective assistance. (*E.g.*, *People v. Ledesma, supra*, 43 Cal.3d at p. 215.) For present purposes, "counsel" may embrace an attorney's agent, such as an interpreter. (*See Chacon v. Wood* (9th Cir. 1994) 36 F.3d 1459, 1463–65.)
> To establish ineffective assistance of counsel entitling him to relief, a defendant must demonstrate that counsel performed deficiently under an objective standard of professional reasonableness and thereby caused prejudice under a test of reasonable probability of an effect on the outcome. (*E.g.*, *People v. Ledesma, supra*, 43 Cal.3d at pp. 215–18.)
> Defendant expressly attempts to establish ineffective assistance of counsel. He fails. We shall assume for argument's sake that there was deficient performance on the part of at least one interpreter. (There would be no basis for a similar assumption about either Attorney Holmes or Attorney Gable.) We cannot, however, find prejudice. There is no reasonable probability of an effect on the outcome as a result of the withdrawal of authorization to incur expenses for a trip to Cuba. That is because, as explained above,

there is no reasonable possibility: with McGarrity herself stating that she was uncertain of success, it is merely conjectural whether McGarrity and Santivanias would have made it to Cuba, and if so, whether they would have discovered substantially more favorable information than what McGarrity had already obtained, as through her telephonic interview with defendant's father in Cuba, and if so, whether they would have made it back to the United States in a timely fashion. Neither is there any reasonable probability of an effect on the outcome on any other basis.

A defendant's Sixth Amendment right to the assistance of counsel also includes a right to loyal assistance. (*See, e.g., People v. Bonin* (1989) 47 Cal.3d 808, 834 [holding that included in the right to counsel "is 'a correlative right to representation that is free from conflicts of interest ...'"].) For these purposes too, "counsel" may embrace an attorney's agent, such as an interpreter.

To establish "disloyal" assistance of counsel entitling him to relief, a defendant must demonstrate that counsel served an interest other than his (*see Cuyler v. Sullivan* (1980) 446 U.S. 335, 350 [considering the right to conflict-free counsel]; *People v. Bonin, supra*, 47 Cal.3d at pp. 834–35 [same]), and that, in so doing, "counsel 'pulled his punches,' i.e., failed to represent [him] as vigorously as he might have" otherwise *(People v. Easley* (1988) 46 Cal.3d 712, 725 [same]).

Defendant does not expressly attempt to establish "disloyal" assistance of counsel. He speaks much about an "invasion[ ] of the defense camp" by the state (*Barber v. Municipal Court, supra*, 24 Cal.3d at p. 760 (conc. and dis. opn. of Manuel, J.); accord, *United States v. Mastroianni* (1st Cir.1984) 749 F.2d 900, 906 ["intrusion"]; *United States v. Seale* (7th Cir. 1972) 461 F.2d 345, 364 [same]), which assertedly requires automatic reversal or at least raises a presumption of prejudice. He does so inappropriately. There was no true "invasion" or "intrusion" into the "defense camp." Rather, as he himself recognizes at times, there was simply a "leak" therefrom. Beneath his talk about "invasion" and "intrusion," he impliedly attempts to establish "disloyal" assistance of counsel. Here, too, he fails. We shall assume for argument's sake that at least one interpreter served an interest other than his. (Here, too, there would be no basis for a similar assumption about either Attorney Holmes or Attorney Gable.) We cannot, however, find any "pulling" of "punches." The record on appeal is simply barren of any indication thereof.

People v. Alvarez, 14 Cal.4th at 238-41.

### *Analysis*

Initially, the undersigned notes Petitioner's misinterpretation of the record, to wit: attributing communication with or from Gladys Cook for the prosecutor's knowledge of "the entire history of the defendant's attempts to enter Cuba, including that an earlier team, comprised of an attorney, Rodrigo Mayorga, and an investigator, David Myers, had tried unsuccessfully to enter Cuba." (ECF No. 330 at 499.) A careful review and reading of the record makes clear the prosecutor was aware of many details of the Cuba trip from comments made in open court and as

a result of out-of-court discussions with defense counsel.  (See 26 RT 5945-46, 5948-49; 27 RT 6052, 6177, 6186.)  The only information he learned from Gladys Cook was the identity of the "junior grade" interpreter and a few details of her personal life.  (28 RT 6393-94.)

Even assuming for the sake of argument that defense counsel were deficient for failing to object and demand an adversary hearing, prejudice did not occur.  Petitioner contends that by failing to object, thereby losing the opportunity to subject the prosecutor's account to cross-examination, and without "knowing what the prosecutor learned, the defense was unable to make a showing sufficient to convince Judge Lewis to grant a mistrial."  (ECF No. 330 at 500.)  Petitioner claims the information revealed to the prosecutor "involved a communication of defense strategy to the prosecution."  (ECF No. 330 at 500.)  That assertion is simply not so.  Again, this record plainly reveals the prosecutor was aware of the defense team's strategy of sending representatives to Cuba in an effort to gather information for use as mitigation evidence in the penalty phase of the trial well before any breach of confidentiality by any member of the interpreter's office.  That strategy was no secret.  As a result, Petitioner's reliance on United States v. Danielson, 325 F.3d 1054, 1070 (9th Cir. 2002) (recorded conversations involving trial strategy and defendant's testimony revealed) and Weatherford v. Bursey, 429 U.S. 545, 558 (1977) (undercover officer attended meeting with defendant's attorney wherein strategy was discussed) are unavailing.  To the degree the specific identity of one of the two would-be travelers was revealed to the prosecutor, it simply does not serve to establish prejudice.  There is no reasonable probability that had defense counsel objected to the prosecutor's statements and demanded an adversarial hearing that the trial court would have granted Petitioner's motion for mistrial.  Richter, 562 U.S. at 104, 111-13.

The California Supreme Court's denial of the claim on direct appeal was neither contrary to, nor involved an unreasonable application of, Supreme Court precedent.  28 U.S.C. § 2254(d).

Further, to the degree the claim was supplemented by Mr. Gable's declaration during state habeas proceedings, that court could still have reasonably concluded that fairminded jurists could disagree that defense counsel had rendered ineffective assistance of counsel on this basis. Richter, 562 U.S. at 101-03. Therefore, the undersigned hereby RECOMMENDS that Claim VV be DENIED.

### Claim YY: Judges Lewis and Bond & Recusal for Receipt of Extra-Judicial Info

In the last of this related series of claims, Petitioner maintains that due to the receipt of extra-judicial information, both the trial judge and the 987.9 judge should have recused themselves. (ECF No. 330 at 483, 496-98.) Respondent disagrees and argues neither Judge Lewis nor Judge Bond was unconstitutionally biased against Petitioner. (ECF No. 345 at 268-71.)

This claim was presented to the California Supreme Court in both of Petitioner's habeas petitions filed in that court. On each occasion the claim was denied on its merits. Hence, for the court's purposes the claim is exhausted.

#### *Applicable Legal Standards*

To briefly reiterate, establishing a due process violation based on judicial bias requires a petitioner to overcome a strong presumption against judicial bias or prejudice. Rhoades v. Henry, 598 F.3d at 519. Absent actual bias, the presumption may be rebutted by evidence that "the probability of actual basis on the part of [an average judge under the same circumstances]" was constitutionally intolerably high. Withrow v. Larkin, 421 U.S. at 47. And, allegations that state courts erred do not demonstrate judicial bias. Liteky v. United States, 510 U.S. at 555. Only where the "state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process" will habeas relief be warranted. Duckett v. Godinez, 67 F.3d at 740.

////

318

*Analysis*

To support his claim concerning Judge Bond, Petitioner complains the judge's receipt of extra-judicial information caused the withdrawal of funds set aside for the defense trip to Cuba. Elsewhere in these findings the hearing before Judge Bond has been excerpted in large part and will not be repeated here. Suffice to say, a review of the entire transcript from the hearing (RT § 987 Proceedings 65-86) does not support Petitioner's argument that the judge's decision was based on "gossip and innuendo that had no place in her decision-making." (ECF No. 330 at 497.) The withdrawal of funds was *not* based on any gossip or innuendo, but rather on the reality that the defense team planned to perpetrate a ruse against the Cuban authorities by sending representatives posing as tourists to circumvent an anticipated refusal by the Cuban government, as admitted by defense counsel:

> [THE COURT]: I mean, you're really asking - - mean what you're really telling me is that they're going in under a subterfuge. I never authorized that. I did authorize, initially, Mr. Mayorga and Mr. Myers to go there aboveboard for the purpose for which they're being sent. I did not authorize anybody to create some sort of a subterfuge to get into a country which we do not have any relations on false pretenses and then go off and do investigations.

(RT § 987 Proceedings 72.) Mr. Gable admitted there was no intent to "tell the Cuban authorities" about the true purpose for the visit. (RT § 987 Proceedings 73, 74 [Gable: "but we don't have to tell the Cuban government that"], 75 [Gable: "You can't tell the Cuban government that, they won't let you in"].) Mr. Gable's admission itself does not involve either gossip or innuendo.

After a brief recess, Judge Bond continued to express her concerns, none of which were based on gossip or innuendo:

> THE COURT: Now the way you have this set up, it's a subterfuge, and I just don't think the Court or the state ought to be a party to that. You're talking about an international incident here. You're not talking about, you know, going into Georgia. You're talking about going into a foreign country, with which the United States does not have diplomatic relations, under a guise that's not true. And I - - you want the state to do

319

that with the state's money and, you know, I just can't authorize that. I'm not going to do that.

(RT § 987 Proceedings 77-78, 80.) When Mr. Gable advised Judge Bond he hoped she could "appreciate that" they "weren't trying to put the court" in a position of being part of a subterfuge, he also stated he thought there had "been a breach of confidentiality between the court interpreters" (RT § 987 Proceedings 83), and the following colloquy occurred:

> THE COURT: Wait a minute. I authorized Rod Mayorga and Mr. Myers. Now, the fact that Judge Lewis fortuitously discovered you were sending an anthropologist and someone else, he didn't know it, and I didn't discuss it with him, he just called to see if I've authorized it, and if I did, he wanted me to look at that again. And as I said, he is fully aware of the provisions - -
> MR. GABLE: I'm not pointing to Judge Lewis.
> THE COURT: - - and so am I.
> But you had an obligation to come to me and tell me this has changed because what I authorized is not what you were intending to do. I did not authorize you to go in in some surreptitious manner.
> MR. GABLE: I couldn't do that because I was going to be a little concerned about making the Court a party.
> THE COURT: Don't you - - what I'm saying to you, Mr. Gable, is that the authorization I gave you initially for Mr. Mayorga and Mr. Myers was predicated on the idea that they were going to go down there and be honest about why they were going in, at least to the extent they had to go visit the family, and as far as I'm concerned, good cause for them to be permitted to go in. Now, if the Cuban government feels differently, that's fine. But this Court can't be party to some sort of subterfuge.
> MR. GABLE: I know that.
> THE COURT: Okay.
> MR. GABLE: I do know that.

(RT § 987 Proceedings 83-84.) Again, the record demonstrates the reason for the withdrawal of funds had nothing to do with gossip or innuendo. Neither did it involve any communication regarding Petitioner's application for funding. Interestingly, the undersigned finds it could not have involved the contents of Petitioner's application since no application involving McGarrity or Santivanias as travelers was apparently ever made. It had everything to do with the court's very real concern about the dishonesty associated with the defense team's substitute, and unauthorized, plan. In effect, by his argument, Petitioner seeks to gain from the interpreter's office breach of confidentiality, ignoring the reality of the § 987.9 judge's ruling.

To support his claim concerning Judge Lewis, Petitioner contends the judge's "bias and antagonism … pervades[s] the record," and goes on to provide a series of examples. (ECF No. 330 at 497.) However, "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality. Likety v. United States, 510 U.S. at 555-56. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." Id. at 556.

Specifically, Petitioner contends Carmen Krewson's breach exacerbated the ill will Judge Lewis already harbored and resulted in the judge's "personal interest in the case and motive to make" Petitioner "look as bad as he possibly could." (ECF No. 330 at 497-98.) The undersigned's review of the record finds no personal interest or motive on the part of Judge Lewis to make Petitioner "look … bad," nor does the undersigned agree with Petitioner's claim that any antagonism pervades the record. One could also conclude from this record that Judge Lewis was patient and fair.

Petitioner concludes his argument with a citation to Liteky for the proposition that "[a] judge who, because of extra-judicial information or even because of acts adduced or events occurring at trial, finds himself so ill-predisposed toward a defendant that a fair judgment is no longer possible, should recuse himself." (ECF No. 330 at 498.) That statement is legally accurate, but it simply does not apply here. The undersigned's review of this record reveals no such ill-predisposition precluding fair judgment. Liteky also reads as follows:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (CA2 1943).

<u>Liteky v. United States</u>, 510 U.S. at 550–51.  Any ill will disposed toward Petitioner could have legitimately arisen from the completion of evidence or during the course of the proceedings themselves.  Petitioner did not overcome any presumption that Judges Bond and Lewis were neither biased nor prejudiced.  <u>Rhoades v. Henry</u>, 598 F.3d at 519; <u>see also</u> <u>Withrow v. Larkin</u>, 421 U.S. at 47.

For the foregoing reasons, the California Supreme Court's denial of this claim was not unreasonable.  That court could have reasonably concluded that fairminded jurists could disagree that recusal was required of Judge Lewis and of Judge Bond given the circumstances.  <u>Richter</u>, 562 U.S. at 101-03.  Thus, the undersigned RECOMMENDS that Claim YY be DENIED.

## Claim A: Illegal Arrest

Petitioner argues that the trial erred in denying his motion to suppress evidence concerning the stop in Mississippi because the Fourth Amendment requires certain tests be met, and the roadblock implemented in Mississippi did not pass constitutional muster.  More specifically, Petitioner asserts the Mississippi troopers acted in the absence of supervisory approval, or with unregulated discretion, when they set up a roadblock to check driver's licenses, vehicle registration and inspection stickers.  Additionally, Petitioner complains the decision to set up the roadblock was not made pursuant to any guidelines.  (ECF No. 330 at 502-04.)  Respondent replies this claim is not reviewable in federal habeas corpus proceedings pursuant to <u>Stone v. Powell</u>, 428 U.S. 465 (1976), and must be denied on that basis.  And, in any event, Respondent argues the California Supreme Court's resolution of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor did its resolution involve an unreasonable determination of the facts in light of the evidence presented.  (ECF No. 345 at 272-75.)

Petitioner raised this claim in his direct appeal to the California Supreme Court and

1    reasserted it in state habeas proceedings before that court.  Therefore, it is exhausted.

### Relevant Background & The California Supreme Court's Determination

The state court record includes Petitioner's motion to suppress evidence pursuant to California Penal Code section 1538.5, including an exhibit referred to as "[a] portion of Officer Sinclair's report …," and the People's opposition thereto.  (4 CT 773-83, 846-54.)  It further includes the testimony of a Mississippi law enforcement officer, the argument considered by the trial court, and its ruling on the motion.  (2 RT 68-121 [testimony]; 11 RT 2214-21 & 12 RT 2571-73 [argument]; 13 RT  2574-75 [ruling].)

The California Supreme Court determined the superior court properly considered whether the Mississippi checkpoint stop was reasonable in light of the Fourth Amendment's prohibition against unreasonable searches and seizures, discerning no error as to the applicable legal principle.  That court further determined the superior court's application of the law to the facts was supported by substantial evidence and reasonable in light of the evidence presented.  More specifically, that court held:

"In *People v. Washburn* (1968) 265 Cal.App.2d 665, 668, 670 (hereafter *Washburn* )—on which the superior court expressly relied—the court held in substance that a stop of a vehicle by a law enforcement officer is generally a reasonable seizure for Fourth Amendment purposes, if it is made at a checkpoint for routine license and registration inspection of all passing vehicles. In *Delaware v. Prouse* (1979) 440 U.S. 648, 663, the United States Supreme Court suggested as much. Indeed, on Professor LaFave's reading, the court "manifest [ed] approval of the '[q]uestioning of all oncoming traffic at roadblock-type stops.'" (4 LaFave, Search and Seizure (3d ed. 1996) § 10.8(a), p. 679, quoting *Delaware v. Prouse, supra*, 440 U.S. at p. 663.) The stop of Slatten's Taurus by the MHSP troopers was a reasonable seizure inasmuch as it was made at the highway 24 checkpoint for routine license and registration inspection of all passing vehicles. It was not rendered otherwise by any of the circumstances peculiar to the incident, including the fact that it was established on the initiative of an officer in the field. Tried by the Fourth Amendment's "touchstone" of "reasonableness" (*Florida v. Jimeno* (1991) 500 U.S. 248, 250), it is not found wanting.
In arguing against the denial of his motion to suppress, defendant attacks the vitality of *Washburn*. He is unsuccessful. In *Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, a so-called "sobriety checkpoint" decision on which he relies perhaps most heavily, we indicated our approval of *Washburn*. (*Ingersoll v. Palmer, supra*, 43 Cal.3d at p. 1333 [citing *Washburn* for the proposition that "[r]egulatory inspections and stops have ... been permitted under

323

decisions of ... the California courts ... in ... license and registration inspection checkpoints"].) We did not withdraw our approval in any of the cases that followed, including *People v. Banks* (1993) 6 Cal.4th 926, another "sobriety checkpoint" case. We will not do so here. Contrary to defendant's implication, the fact that *Washburn* does not anticipate the kind of analysis set out in *Ingersoll* and followed in *Banks* is not fatal.

<u>People v. Alvarez</u>, 14 Cal.4th at 184-85 (fns. Omitted).

### *Analysis*

As Respondent correctly notes, violations of the Fourth Amendment's exclusionary rule are not cognizable under federal habeas review. <u>Stone v. Powell</u>, 428 U.S. 465. Where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted habeas corpus relief on the grounds that evidence obtained in an unconstitutional search or seizure was introduced at his trial. <u>See</u> <u>Stone</u>, 428 U.S. at 494; <u>Newman v. Wengler</u>, 790 F.3d 876, 878 (9th Cir. 2015) (<u>Stone</u> survived the passage of the AEDPA and bars a Fourth Amendment claim on federal habeas review where a petitioner had a full and fair opportunity in state court to litigate such claim). "The relevant inquiry is whether the petitioner had the opportunity to litigate his claim, not whether he did in fact do so or whether the claim was correctly decided." <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996) (internal citations omitted).

Here, the trial court considered Petitioner's written motion to suppress and the opposition thereto, the arguments presented, and the testimony offered at the hearing on the motion. Thus, Petitioner was afforded a full and fair opportunity to litigate this claim in the state courts. <u>Moormann v. Schriro</u>, 426 F.3d 1044, 1053 (9th Cir. 2005); <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d at 899; <u>Gordon v. Duran</u>, 895 F.2d 610, 613 (9th Cir. 1990). Petitioner's assertion that his claim is cognizable because the trial court prevented defense counsel from eliciting certain testimony is a challenge to the correctness of the court's decision. Accordingly, federal habeas corpus review of the warrantless search of the vehicle Petitioner was operating at the time of the stop in Mississippi

1    is precluded.

2        In any event, the California Supreme Court's decision was neither contrary to, nor did it

3    involve an unreasonable applicable of, clearly established federal law.  Nor was that decision

4    based upon an unreasonable determination of the facts as presented in the state court.

5

6                                The testimony in the state court

7        Mississippi Highway Patrolman John Wayne Leggett testified that he and two other

8    officers were on duty at about 8:30 p.m. on May 27, 1987, on Highway 24, east of Liberty,

9    Mississippi.  (2 RT 68-70.)  He and Officers Ricky Sinclair and Albert Johnson set up a

10   roadblock, stopping traffic in both directions, in order to check driver's licenses, vehicle

11   registration and inspection stickers.  (2 RT 70.)  A marked patrol vehicle was parked on the

12   shoulder of the two-lane highway with its flashing blue light operating; the officers were standing

13   in the roadway with flashlights.  (2 RT 70-71.)  The roadblock could be seen by approaching

14   vehicles in both directions, "for a long distance" or "a long way."  (2 RT 72.)

15

16       In Mississippi, vehicles are inspected once a year to ensure the vehicle is roadworthy. The

17   inspection includes checking the operation of the headlights and turn signal lights.  (2 RT 72.)

18   The annual inspection sticker is displayed on the windshield on the driver's side.  (2 RT 72-73.)

19

20       Officer Leggett explained that when a vehicle approached the roadblock, an officer would

21   flag down the vehicle with their flashlight, check for the inspection sticker on the windshield and

22   registration tag on the license plate, and ask to see the operator's driver license.  (2 RT 73.)  If the

23   proper sticker, tag and license are displayed and provided, the stop is brief, and the driver is not

24   asked to step out of the vehicle.  (2 RT 74.)

25       When a light-colored Ford Taurus approached the roadblock heading east, Officer Leggett

26   approached the vehicle and made contact with the driver, later identified as Petitioner.  (2 RT 74-

27   75.)  The officer asked Petitioner for his driver's license; Petitioner felt around as if retrieving a

28

license, but then indicated he could not find it.  (2 RT 76.)  Officer Leggett directed Petitioner to pull over, out of the traffic lane.  (2 RT 76.)  After having done so, Petitioner handed the officer a driver's license belonging to his passenger.  (2 RT 76.)  When Officer Leggett explained to Petitioner that he needed to see Petitioner's driver's license, Petitioner stated he had left his license at work.  (2 RT 76-77.)

During his conversation with Petitioner, Officer Leggett noticed signs of intoxication.  (2 RT 77.)  The officer asked Petitioner to exit the vehicle.  Petitioner acted as though he were about to comply, but instead slammed the driver's side door, "cranked up [the engine] and took off."  (2 RT 77.)  His passenger jumped out.  (2 RT 78.)

Officers Leggett, Sinclair and Johnson pursued Petitioner in their marked vehicle, ultimately locating the vehicle and Petitioner in a store parking lot and placing him under arrest.  (2 RT 78-80.)  A search of the Ford Taurus revealed two marijuana cigarettes, "a fillet-type knife," in a "black sheath" under the car seat, and a sawed-off shotgun, assorted women's clothing, a suitcase, and another license plate in the trunk.  A check of the Colorado license plate and name provided by Petitioner produced no matches.  The vehicle identification number revealed the Ford Taurus had been reported stolen in California.  (2 RT 81-86.)

On cross-examination, Officer Leggett explained the decision to set up the roadblock to check for license, registration and inspection stickers was initiated by senior Officer Sinclair.  (2 RT 99, 117-18.)

The type of checkpoint or roadblock

In Delaware v. Prouse, 440 U.S. 648 (1979), the United States Supreme Court held that random spot checks of either the vehicle or its occupant, in the absence of at least articulable and reasonable suspicion, are unreasonable under the Fourth Amendment.  The Court also expressly stated that its holding did "not preclude the State of Delaware and other States from developing

326

methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." Delaware, at 663.

Officer Leggett's testimony is clear and without contradiction: the purpose of the checkpoint or roadblock on Highway 24 near Liberty, Mississippi was a routine check of driver licenses, registration tags and inspection stickers wherein every vehicle was checked, whether it was traveling east or west on the roadway. This type of roadblock or checkpoint is permissible as it involved less intrusion than the random spot checks at issue in Prouse and is limited so as to avoid an "unconstrained exercise of discretion" by law enforcement. Delaware v. Prouse, 440 U.S. at 663 & n.26.

The California Supreme Court's reference to Washburn arises in the context of its holding in Ingersoll v. Palmer, 43 Cal.3d 1321 (1987), wherein that court expressly cited the Second District Court of Appeal's Washburn holding for the propriety of regulatory-type inspections and stops such as the one at issue in this case.[51] Ingersoll involved the challenge to the propriety of sobriety checkpoints on Fourth Amendment grounds by California taxpayers. Ingersoll, 43 Cal.3d at 1325. The court concluded that because the purpose of the sobriety checkpoint was "to promote public safety by deterring intoxicated persons from driving on the public streets and highways," such stops are not "traditional criminal investigative stops" but are "investigative detentions and inspections conducted as part of a regulatory scheme in furtherance of an administrative purpose." Id., at 1328.

Noting that administrative screening is "measured against the constitutional mandate of reasonableness" (Ingersoll, 43 Cal.3d at 1328), and must be "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers" (id., at 1329), the court discussed several of its prior decisions concerning seizures that did not require a reasonable suspicion (id., at 1330-33), as well as the United States Supreme Court holding in United States v.

---

[51] In People v. Washburn, 265 Cal.App.2d 665, 668 (1968), the defendant was stopped at a checkpoint at Crescent Junction by a Utah Highway Patrolman who was conducting a routine check of driver's license and registration on all vehicles. Id., at 668. Defendant showed a registration certificate, but the numbers did not match the vehicle he was operating. Id., at 668.

327

Martinez-Fuerte, 428 U.S. 543 (1976), involving an immigration checkpoint. Ingersoll, 43 Cal.3d at 1333-34. The court in Ingersoll cited to Delaware v. Prouse, 440 U.S. 648, noting that the high court was careful to point out that its holding would not preclude states from performing "spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion," but are conducted pursuant to certain "predetermined neutral criteria." Ingersoll, at 1335.

For the foregoing reasons, the California Supreme Court's decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). Nor did its decision involve an unreasonable determination of the facts in light of the evidence presented in the trial court. 28 U.S.C. § 2254(d)(2). Accordingly, the undersigned RECOMMENDS that Claim A be DENIED.

**Claims B, C & NN: Improper Joinder**

In this series of claims, Petitioner asserts he was denied a fair trial by the improper joinder of the rape charge (Claim B) and the improper joinder of his trial with that of co-defendant Ross's (Claim C), resulting in his inability to present a defense (Claim NN). (ECF No. 330 at 504-09.) Respondent maintains the California Supreme Court's adjudication of these claims was neither contrary to, nor did it involve an unreasonable application of, Supreme Court precedent. Thus, Respondent contends federal habeas relief is barred. (ECF No. 345 at 275-80.)

Claims B and C were presented on direct appeal and reasserted in habeas proceedings before the state's highest court. Claim NN was presented in both Petitioner's first and second state habeas petitions. The claims are thus exhausted for this court's purposes.

**Claim B – Joinder of Charges**

Petitioner asserts he was deprived of a fair trial because the rape count involving Sandra Stramaglia was erroneously joined with the remaining counts against him. (ECF No. 330 at 505-06.)

*Applicable Legal Standards*

There is no clearly established Federal law which holds that joinder or consolidation of

charges may violate the Constitution.  In <u>United States v. Lane</u>, 474 U.S. 438, 446 n.8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."

However, in <u>Young v. Pliler</u>, the Ninth Circuit stated:

> <u>Lane</u> considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. <u>See</u> <u>Lane</u>, 474 U.S. 438, 446 & n.9 (1986). Thus, <u>Lane</u>'s broad statement - found in a footnote without citation to any legal authority - that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71−72 (2003).

<u>Young</u>, 2008 WL 1757564 at *n.1 (9th Cir. 2008) (unpublished); <u>see also</u> <u>Collins v. Runnels</u>, 603 F.3d 1127, 1132−33 (9th Cir. 2010).

To determine "clearly established Federal law," this court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  <u>Williams v. Taylor</u>, 529 U.S. at 412.  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  <u>Id.</u>  Given that there is no clearly established Federal law in this instance, the court cannot grant relief because habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law.  <u>See</u> <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009) (absent a Supreme Court decision that squarely addresses the issue it "cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent...and so we must defer to the state court's decision").

### *Relevant Background & The California Supreme Court's Adjudication*

Petitioner filed his Motion for Order Severing Counts on April 12, 1988.  (2 CT 437-43.) The People filed an opposition on May 11, 1988.  (2 CT 457-67.)  Following argument on May 24, 1988, the trial court denied Petitioner's motion. (3 CT 509; 1 RT 62-69.)

////

The California Supreme Court, after summarizing the motion and argument before the trial court, and the standards of its review, held as follows:

> After review, we believe that the superior court did not abuse its discretion by denying defendant's motion to sever and thereby refusing to sever trial of the Sandra S. rape from the trial of the Birkman robbery and murder, the Glidewell vehicle theft, and the Slatten robbery.
>
> At the outset, the superior court's implicit conclusion that the Sandra S. rape was properly joined under Penal Code section 954 with the Birkman robbery and murder, the Glidewell vehicle theft, and the Slatten robbery survives de novo scrutiny.
>
> The Sandra S. rape is "of the same class of ... offenses" as the Birkman robbery and murder and the Slatten robbery. Rape is an assaultive crime against the person, as are robbery and murder. [Citation.] Defendant states that this analysis "does not apply where, as here, multiple defendants are charged in the same information." His assertion, however, is without basis and must therefore be rejected.
>
> Also, the Sandra S. rape was "connected in [its] commission" with the Glidewell vehicle theft. As shown by the evidence introduced at the preliminary examination – which was similar to that later introduced at trial – the rape occurred very close in time and place to the theft of the vehicle, and the theft of the vehicle may have been motivated by a desire to avoid apprehension for the rape. Defendant admits the close temporal and spatial relationship. He could not do otherwise. But he denies the possible linkage by motive as speculative. True, there was no direct evidence on this matter. There was, however, sufficient circumstantial evidence to support what the superior court rightly considered a "fair inference."
>
> Further, the superior court's implicit determination that the Sandra S. rape did not require separation from the Birkman robbery and murder, the Glidewell vehicle theft, and the Slatten robbery in the interests of justice was not an abuse of discretion. Its reason, which is set out above, is indeed reasonable. Defendant simply failed to show "sufficient [potential] prejudice." He argues now, as he argued then, that the relatively "weak" evidence of the Sandra S. rape might improperly be amplified by the relatively "strong" evidence of the Birkman robbery and murder, and that the rape might inflame the jury against him with regard to the robbery and murder. He does not persuade us, as he did not persuade the superior court. His premise is unsupported by the record on appeal: the evidence was not relatively "weak" as to the Sandra S. rape and relatively "strong" as to the Birkman robbery and murder; and the rape was not potentially inflammatory as to the robbery and murder."

People v. Alvarez, 14 Cal.4th at 188-89 (fn. omitted).

### *Analysis*

The evidence concerning the rape of Stramaglia and the theft of Glidewell's Camaro is cross-admissible to the robbery and murder of Birkman four days later. This link is so because

////

////

the vehicle theft occurred so close in both time and location to the rape,[52] and because the vehicle stolen on May 13 was used during the commission of the robbery and murder on May 17 and spoke to the suspect's identity. See Cal. Evid. Code, § 1101(b) (evidence that person committed crime admissible to prove fact other than disposition to commit act).

Petitioner argued the consolidation resulted in joinder of a weak case (the rape of Sandra S.) and a strong case (robbery and murder of Birkman). Here, however, the California Supreme Court reasonably concluded the evidence was not unequal.

The evidence concerning the rape included Sandra S.'s testimony (13 RT 2614-87) and that of Anthony Simpkins (16 RT 3534-605), which, if believed, was compelling. Simpkins' testimony largely corroborated that of Sandra S. The jury apparently found the testimony of Sandra S. and Mr. Simpkins more credible than the claimed impeachment of that same testimony coupled with Petitioner's own testimony or that of Mr. Spence. See Bruce v. Terhune, 376 F.3d 950, 954 (9th Cir. 2004) (a jury's credibility determinations are entitled to deference on federal habeas review). The undersigned's review of that same testimony finds nothing unreasonable about such a determination.

As Respondent points out, the jury was instructed pursuant to CALJIC No. 17.02. As given in this case, that instruction provides as follows: "Each count charges a distinct offense. You must decide each count separately. The defendant may be found guilty or not guilty of [any or all] of the offenses charged. Your finding as to each count must be stated in a separate verdict." (5 CT 1244; 25 RT 5639-40.) A jury is presumed to follow its instructions. Richardson v. Marsh, 481 U.S. 200, 211 (1987).

The undersigned agrees with the California Supreme Court that the evidence of the rape involved the same class of offenses as the murder and robberies, and that the rape was connected to the Glidewell vehicle theft. Further, the undersigned agrees the evidence against Petitioner

---

[52]Petitioner's motion notes the rape occurred at "approximately 11:45 a.m. on May 13, 1987," whereas the vehicle theft occurred at approximately 12:15 p.m." that same date. (2 CT 438.) The California Supreme Court decision expressly notes that Petitioner admitted "the close temporal and spatial relationship" between the two crimes, and that "[h]e could not do otherwise." People v. Alvarez, 14 Cal.4th at 188.

concerning the rape was not as weak as he alleges. Even assuming that the Supreme Court's footnote in <u>Lane</u> could be considered clearly established Federal law, no constitutional violation occurred because the prejudice was not so great as to deny Petitioner his right to a fair trial. <u>Lane</u>, 474 U.S. at 446, n.8.

Hence, the state court's resolution of this claim is not contrary to, nor does it involve an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). Therefore, the undersigned RECOMMENDS that Claim B be DENIED.

### Claims C & NN

Petitioner complains that he was compelled to go to trial with a co-defendant whose entire defense was premised on convicting him of homicide and attempted robbery despite his defense that he was not even present at the scene. He argues his constitutional rights to a fair trial were violated when the trial court denied his motion to sever his trial from that of codefendant Ross, claiming his defense and Ross's defense were conflicting and that certain evidence concerning Ross's claimed fear of Petitioner would not have been admissible in a separate trial. (ECF No. 330 at 507-09.) Respondent maintains the California Supreme Court's determination of the claim was not contrary to, nor did it involve an unreasonable application of federal law or an unreasonable determination of the facts. (ECF No. 345 at 278-79.)

By presenting Claim C on direct review and in state habeas proceedings, and Claim NN in state habeas proceedings, Petitioner has exhausted his claims for purposes of federal review.

### *The Record & The California Supreme Court's Determination*

Co-defendant Ross filed a Motion to Sever Trials of Defendants Pursuant to Penal Code Section 1098 on April 11, 1988. (2 CT 383-406.) On or about April 15, 1988, Petitioner filed his own motion seeking severance of his trial from that of codefendant Ross. That motion asserted severance was appropriate because (1) Petitioner and Ross were facing different penalties; (2) both had conflicting considerations for purposes of jury selection; and (3) Ross's statement could not be sanitized for purposes of the jury's consideration. (2 CT 419-26.) On May 11, 1988, the People filed their opposition to the trial severance motions. (2 CT 468-82.) Petitioner filed supplemental points and authorities in support of his motion on or about May 19, 1988. (2

332

CT 498-500.)  Codefendant Ross also filed supplemental points and authorities in support of her

motion.  (3 CT 501-07.)  Oral arguments were heard, and the motions were denied on May 24,

1988.  (1 RT 69-93; 3 CT 509.)

Petitioner's claim was considered on direct review to the California Supreme Court.  That

court determined, in relevant part, as follows:

> Prior to trial, Ross moved the superior court to sever her trial from defendant's.  In like manner, defendant then moved the superior court to sever his trial from hers.  Relying, in part, on the evidence introduced at the preliminary examination, each claimed, inter alia, that the superior court should separate the trial because his or her defense would conflict with the other's – defendant's would be alibi and misidentification, Ross's would be lack of the requisite mental state. … The superior court denied the motions, concluding, as pertinent here, that there was an insufficient showing that defendant and Ross would present conflicting defenses and that, even if there had been such a showing, it would not require separate trials: "the mere fact that [they] may well be pointing fingers at each other doesn't justify necessarily severance."
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> An appellate court reviews a trial court's ruling on a motion for separate trials for an abuse of discretion. [Citations.]
>
> We find no such abuse here.  Under Penal Code section 1098[53], a trial court must order a joint trial as the "rule" and may order separate trials only as an "exception." [Citation.] The superior court not unreasonably conformed to the rule and avoided the exception.  Its conclusion – that separation was not required even if there had been a sufficient showing that defendant and Ross would present conflicting defense and might each attempt to shift responsibility to the other – anticipated *People v. Cummings* (1993) 4 Cal.4th 1233, 1287, in which we held to that very effect.  (Cf. *Zafiro v. United States* (1993) 506 U.S. 534, 538 [] [decided under Fed. Rules Crim. Proc., rules 8(b) and 14, 18 U.S.C., which are similar to Pen.Code, § 1098: declining "to adopt a bright-line rule, mandating severance whenever codefendants have conflicting defenses"].)

People v. Alvarez, 14 Cal.4th at 189-90.

---

[53] California Penal Code § 1098 states the following:

> When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials.  In ordering separating trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants to be tried at one trial and any number of others at different trials, or may order a separate trial for each defendant; provided, that where two or more persons can be jointly tried, the fact that separate accusatory pleadings were filed shall not prevent their joint trial.

*Analysis*

Here, the California's Supreme Court's finding that Petitioner's alibi and misidentification defenses and Ross' lack of mental state defense were not so conflicting as to require severance is not unreasonable or contrary to controlling federal precedent.

The jury heard Petitioner's testimony: that while he had been in the company of co-defendant Ross prior to the Birkman incident, he denied being with Ross at the time of the robbery and assault of Birkman. The jury also heard Ross' testimony that she did not know that Petitioner intended to rob or assault Birkman. Conflicting or antagonistic defenses do not require severance per se; therefore, Petitioner is required to show actual prejudice. United States v. Tootick, 952 F.2d 1078, 1083 (9th Cir. 1991). This he cannot do.

The testimony of Charles Kosobud, Gail Patterson, and Edwin Glidewell is circumstantial evidence placing Petitioner at the scene of the murder, as is the testimony of Greta Slatten concerning events occurring shortly thereafter. (13 RT 2689-90, 2694-97, 2702, 2711-12 [Glidewell]; 13 RT 2801-03, 2807-09, 2817, 2831, 2834-36 [Kosobud]; 14 RT 2978-90, 3015, 3096 [Patton]; 14 RT 3116-21 [Slatten].) The foregoing testimony is independent evidence pertaining to locations and timelines, as well as suspect identity, concerning the circumstances of the Birkman murder, and demonstrating Petitioner's guilt. People v. Letner and Tobin, 50 Cal.4th 99, 150 (2010) (antagonistic defenses support severance where the acceptance of a party's defense precludes the other's acquittal; severance not required where sufficient independent evidence demonstrates guilt); People v. Carsai, 44 Cal.4th 1263, 1296, 1298 (2008). Severance was not required here because there was sufficient independent evidence of Petitioner's guilt.

Also, the jury was instructed with CALJIC No. 17.00. That instruction provided as follows: "In this case, you must decide separately whether each of the [two] defendants is guilty or not guilty as to counts one and two. If you cannot agree upon a verdict as to [both] the defendants, but do agree upon a verdict as to one of them, you must render a verdict as to the one upon which you agree." (5 CT 1243; 25 RT 5639.) Again, a jury is presumed to have followed its instructions. Richardson v. Marsh, 481 U.S. at 211.

There was no "prejudice so great as to deny" Petitioner his right to a fair trial. United

334

States v. Lane, 474 U.S. at 446, n.8.  Nor was the jury prevented from making a reliable judgment concerning Petitioner's guilt or innocence.  See, e.g., Zafiro v. United States, 506 U.S. 534, 538 (1993) (holding where multiple defendants have been properly joined under Federal Rules of Criminal Procedure, severance is proper only if a joint trial would present a "serious risk" to a "specific trial right of one of the defendants, or prevents the jury from making a reliable judgment about guilt or innocence").

The California Supreme Court's determination is not contrary to, nor does it involve an unreasonable application of, clearly established federal law.  As a result, the undersigned RECOMMENDS that Claim C be DENIED.

### Claim NN

Because the California Supreme Court reasonably denied Claim C on its merits, Claim NN necessarily fails.  There can be no denial of the right to present a defense where the court did not err in denying the severance motion upon which this claim depends.  Therefore, for the reasons explained above, the California Supreme Court's denial of this claim on its merits in state habeas proceedings is not contrary to, nor does it involve an unreasonable application of, Supreme Court precedent.  28 U.S.C. § 2254(d); Richter, 562 U.S. at 101, 103.  Thus, the undersigned RECOMMENDS that Claim NN be denied.

### Claims E & LL: Shackling

Petitioner's claim that he was unjustifiably shackled during trial was rejected on direct appeal when the California Supreme Court found the trial court was justified in ordering the use of a security chair and other restraint devices, and that Petitioner's own actions revealed the presence of the shackles to the jury.  Petitioner's shackling claim – that it was excessive and prejudicial and deprived him of the right to be present at trial - was again rejected by the California Supreme Court in both his first and second state habeas petitions.  As a result, the claim is exhausted for our purposes.

In a related claim, Petitioner argues trial counsel rendered ineffective assistance of counsel by failing to object to the shackling imposed by the trial court.  This claim is also exhausted,

having been presented to the California Supreme Court in a habeas corpus petition.

Respondent maintains the California Supreme Court's decisions are not contrary to, nor do they involve an unreasonable application of, Supreme Court precedent, thus precluding Petitioner's requested relief.

**Claim E**

*The California Supreme Court's Determination*

The California Supreme Court considered Petitioner's unjustified shackling claim on direct review. It held as follows:

> Prior to trial, defendant moved the superior court to limit, inter alia, the physical restraints to which it would subject him in the presence of the jury. After a hearing on the motion, it granted his request not to be placed in fetters. It also stated its intention to cause him to sit in a "security chair" both at counsel table and on the witness stand, and to cause him to be put into, and removed from, such chair outside the jury's presence. The chair in question was generally similar to others in the courtroom; it was different only in that it allowed a chain encircling his waist to be attached at its back and prevented the chain from being seen so long as he placed his clothing properly. The superior court asked, "Is there any objection to that procedure?" Defense counsel responded, "No." It commented that, in the absence of an objection, "it is not necessary ... to specifically state good cause...." Nevertheless, it "stat[ed] ... for the record" that it had obtained information to the effect that, not two months earlier, defendant had been found in possession of an "explosive device" in jail, "apparently consistent with what's commonly called a match bomb," which was, specifically, a "device approximately four inches long wrapped tightly in plastic," containing "match heads" and "several nitroglycerine pills," with a "paper-wrapped fuse protruding from one end of it." Defendant did not dispute the information.
>
> Subsequently, in the course of jury selection, the superior court ordered defendant placed in manacles that could be concealed in his lap. It did so because it impliedly determined that he might attempt to escape or at least might injure someone if he became displeased with events as they transpired. It based its determination on information such as the following: He had attempted to saw through his waist chain; he had tried to take contraband into jail; he had drawings in his cell for the fashioning of a realistic "gun" out of soap; he had engaged in misconduct in jail on several occasions, including "threatening officers, fighting with other inmates, starting fires, [and] possessing weapons of various sorts"; he had exhibited "little if any control over his emotions and little, if any, respect for authority or anyone's rules"; and he had previously been convicted of an escape from prison, which, although executed without force or violence, had been somewhat elaborately planned. It stated for the record that he had exposed his manacles to prospective jurors. It told him: "[T]hat's your choice. If you don't care that they see that, that's fine." It reiterated: "Again, it's your choice. If it doesn't bother you that they see that, then that's fine with the Court." Before long, it modified its order to allow his right hand to be free.
>
> Later, at the guilt phase, the superior court noted outside the presence of the jury

336

that defendant, who was then on the witness stand, had made no attempt to conceal his waist chain at any point during the proceedings. It offered to give a curative admonition—such as a statement, which it acknowledged was not "entirely true," that it was "simply flat Court policy" to so restrain a defendant at a death penalty trial. Defendant declined. On reconsideration, it determined that, because the waist chain had been visible, it was required to give an admonition under *People v. Duran* (1976) 16 Cal.3d 282, 292, to the effect that "such restraints should have no bearing on the determination of the defendant's guilt." It stated that it would in fact give an admonition of this sort unless defendant should object. It further stated that, in giving such an admonition, it would say "something that is not the truth," such as, "this is standard procedure in all homicide cases or in all death penalty cases, to so restrain the defendant." Defendant objected. Defense counsel expressed a view that an admonition that restraints should have no bearing on guilt draws "undue attention" to the restraints themselves. He stated that defendant would probably request an instruction on the matter. The superior court proceeded not to give an admonition.

Finally, after defendant did in fact make a request, the superior court instructed the jury as follows: "In your deliberations, the fact that a defendant has been subjected to physical restraints during the trial is not to be discussed or considered by you. There is no connotation of guilt of any kind because a defendant was restrained. Such restraints are a part of the normal procedures in a case of this nature and should have no bearing on your determination of a defendant's guilt or innocence."

Defendant now contends that the superior court erred by denying his motion to limit physical restraints.

We reject the claim at the threshold. The superior court did not in fact deny defendant's motion. Rather, it granted what he sought. He asked it to limit physical restraints. It indeed limited such restraints. It ordered no fetters. It ordered only confinement to a security chair. It questioned whether he objected. Through defense counsel, he answered no.

We would also reject the claim on the merits. An appellate court reviews a trial court's ruling on a motion to limit physical restraints for abuse of discretion. (*See, e.g.*, *People v. Duran, supra*, 16 Cal.3d at p. 293.) Even if we were to deem that the superior court denied defendant's motion—which we do not—we could not conclude that it erred thereby. In view of the undisputed information it had obtained about such matters as his possession of a "match bomb" in jail, it could have determined, not at all unreasonably, that confinement to a security chair was appropriate.

[FN] 7. Defendant claims in substance that, because the superior court committed reversible error under California law by denying his motion to limit physical restraints, it thereby committed reversible error under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. As explained in the text, the superior court did not deny the motion and hence did not commit any error under California law.

To the extent that defendant claims that the superior court erred by subjecting him, or continuing to subject him, to any or all physical restraints after its ruling on his motion, he has not preserved the point for review. He had to make a motion against such restraints. (*See People v. Tuilaepa* (1992) 4 Cal.4th 569, 583*, affd. sub nom. Tuilaepa v. California (1994) 512 U.S. 967.*) He did not do so. Insofar as he complains about the visibility of such restraints, he will not be heard. On that score, he has only

337

himself to blame.

People v. Alvarez, 14 Cal.4th at 190-92.

### ***Analysis Concerning Direct Review***

Initially, Petitioner complains it is unclear what law the state court applied on appeal, and that because the state court denied the habeas petitions summarily, "there is no telling what law the court applied to those claims either."  (ECF No. 330 at 524.)  The state court's actions are plain.

A review of Appellant's Opening Brief and the resulting California Supreme Court opinion indicates that court did not expressly find the restraints had been seen by the jury despite Petitioner's assertion "the trial court acknowledged that appellant's waist chain was visible to the jury."

To begin, the California Supreme Court determined in the first instance that the trial court did not err by denying Petitioner's motion to limit restraints.  Instead, it held the trial court "granted what he sought," and that defense counsel acquiesced to the trial court's orders to employ a security chair.  The trial court briefly addressed the issue of physical restraints with defense counsel at the parties' initial appearance before the judge who would try the case.  (2 RT 9-11.)  Five days later, it ordered that Petitioner would be restrained in a security chair and that leg shackles would not be employed, as expressly agreed to by defense counsel.  (2 RT 26-29.)  On February 23, 1989, Judge Lewis noted the defense motion to limit physical restraints was "mooted by agreement."  (2 RT 203.)  Hence, the record supports the California Supreme Court's initial determination, and, as a result, does not involve either an unreasonable application of clearly established federal law, nor is it based upon an unreasonable determination of the facts presented.

Next, the California Supreme Court held it would reject Petitioner's claim on the merits, in any event.  It concluded confinement to a security chair in light of the information available to the trial court - that Petitioner possessed a "'match bomb' in jail" - was not an unreasonable.  The state court determined the trial court was justified in ordering Petitioner be confined to the security chair in early February when it considered the motion to limit restraints, before voir dire

had even commenced.  Therefore, at that time, the visibility of those restraints was not an issue. And where restraints are not seen by the jury, any error regarding the use of restraints in that circumstance is not considered to be one of a constitutional magnitude and is therefore tested under the state's <u>Watson</u> standard for prejudice; however, where the jury has seen the restraints, any unjustified restraints are subjected to the federal <u>Chapman</u> standard.  <u>See</u> <u>People v. Jackson</u>, 14 Cal.App.4th 1818, 1829-30 (1993).  Here, because the California Supreme Court did not consider Petitioner's claim to involve shackling seen by the jury, its citation to <u>Duran</u> wherein the <u>Watson</u> standard was employed for purposes of a prejudice analysis, does not indicate it was unreasonably applying federal law, nor was it relying on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

In footnote seven, the California Supreme Court explained that Petitioner had failed to preserve any claims that the superior court had erred by subjecting him or continuing to subject him to restraints after it ruled on his motion to limit restraints, because he made no motion against those subsequent or continuing restraints, citing to its decision in <u>People v. Tuilaepa</u>, 4 Cal.4th 569, 584 (1992) (failure to object to restraints and to make a record below waives the claim).  The footnote concluded as follows:  "Insofar as he complains about the visibility of such restraints, he will not be heard.  On that score, he has only himself to blame."  This finding also does not involve an unreasonable application of federal law, nor does the holding rest upon an unreasonable determination of the facts presented in the state court.  28 U.S.C. § 2254(d).

Arguably, there was no indication then that the jury actually saw the restraints absent the court and defense counsels' presumptions in that regard.  Petitioner's citations to the record in Appellant's Opening Brief indicate only that the judge noted, outside the presence of the jury, that it was possible for the jury to see the restraints, and later that due to Petitioner's having moved his chair the jurors must have seen the restraints.

More specifically, Petitioner's opening brief cited to pages "4109-4111" of the reporter's transcript on appeal.  There, the trial judge stated that when Petitioner turned to speak with the interpreter while on the witness stand, the judge thought it was "obvious to the jurors there's a chain around his waist," but he did not "know for sure."  (18 RT 4109.)  He further stated, "the

fact throughout this trial he doesn't stand up, I think ultimately the jurors are going to know he is chained down." (18 RT 4109.) The judge offered to "make a statement" to the jury, essentially advising them that such restraints were "Court policy" in a death penalty matter despite the fact that statement was not "entirely true." (18 RT 4109.) Defense counsel then observed Petitioner from the jurors' perspective and Holmes indicated the waist chain could "definitely" be seen. He also indicated counsel would "think about" the court's offer of a statement to the jury. (18 RT 4110.) The judge concluded by stating, "there has been no attempt by Mr. Alvarez or Counsel to really try to make an effort to cover up the chains" (18 RT 4110) and that during voir dire proceedings Petitioner had moved his chair in such a manner that "it was very obvious that the jurors saw it at that time." (18 RT 4111.) Thereafter, defense counsel did not move the court to remove the restrains or otherwise limit the use of physical restraints; the record supports this finding.

Petitioner also cited to "4429-4430" of the reporter's transcript on appeal in support of his argument in the opening brief. There, the judge indicated that he had "walked up into the jury box" and that it appeared to him "it's quite obvious that there is a chain around [Petitioner's] waist." (19 RT 4429-30.) The trial court then stated, "so unless Counsel object to it, I will instruct the jury that they are to disregard the fact of this restraint," believing it had a sua sponte duty to so instruct in the absence of an objection. (19 RT 4430-31.) Continuing on the following page, the trial court advised defense counsel that unless they objected, he would "give the jury some instruction on that, in that regard; however, if you and your client desire that I not do that, then I will not do it." Further, the court advised that if counsel did not object to such an admonition, it would welcome counsels' "input into what type of an admonition should be given to the jury …." (19 RT 4431.) Gable initially replied that, in his opinion, giving such an admonition would result in "undue attention to" the restraints, but then changed course and indicated he "probably would submit … an instruction for the Court's consideration …." (19 RT 4431.) Defense counsel did not file a motion with the court objecting to the apparently visible restraints. Thus, again, the California Supreme Court was referencing a lack of objection on the part of Petitioner resulting in a waiver of the issue of restraint visibility for purposes of appeal. In

light of the foregoing, the state court's decision involved neither an unreasonable application of Supreme Court precedent, nor did it rely upon an unreasonable application of the facts as the decision was predicated upon the doctrine of invited error by way of a failure to object. 28 U.S.C. § 2254(d).

Petitioner's shackling claims presented in two state habeas petitions to the California Supreme Court were also summarily denied. Most recently, on July 13, 2011, that court denied the habeas petition filed in September 2006. Specifically, the shackling claim was denied on the merits, as well as on the following bases: it was untimely; it was raised and rejected on appeal; and, it could have been raised in the prior petition for writ of habeas corpus. Richter, 562 U.S. at 99 ("[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary").

When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review ... is not de novo review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable." See Himes v. Thompson, 336 F.3d at 853. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." See Richter, 562 U.S. at 98.

Following an independent review, the undersigned finds the state court's decision to be objectively reasonable. Petitioner is not entitled to relief on this claim for the reasons explained below.

### Applicable Legal Standards

The Sixth and Fourteenth Amendments to the United States Constitution assure a criminal defendant the right to a fair trial. See Estelle v. Williams, 425 U.S. 501, 503 (1976). Visible shackling of a criminal defendant during trial "undermines the presumption of innocence and the

related fairness of the factfinding process" and "'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" <u>Deck v. Missouri</u>, 544 U.S. 622, 630-31 (2005) (quoting <u>Illinois v. Allen</u>, 397 U.S. 337, 344 (1970)); <u>see also</u> <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1062 (9th Cir. 2008). The Supreme Court has therefore held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." <u>Deck</u>, 544 U.S. at 629. Those interests include "physical security," "courtroom decorum" and "courtroom security." <u>Id.</u> at 624, 628. Accordingly, criminal defendants have "the right to be free of shackles and handcuffs in the presence of the jury, unless shackling is justified by an essential state interest." <u>Ghent v. Woodford</u>, 279 F.3d 1121, 1132 (9th Cir. 2002). <u>See also</u> <u>Jones v. Meyer</u>, 899 F.2d 883, 884 (9th Cir. 1990); <u>Wilson v. McCarthy</u>, 770 F.2d 1482, 1484 (9th Cir. 1985).

Shackling is not unconstitutionally prejudicial per se. <u>Illinois v. Allen</u>, 397 U.S. at 343-44; <u>Duckett v. Godinez</u>, 67 F.3d at 748 ("shackling is inherently prejudicial, but it is not per se unconstitutional"). Unjustified shackling does not rise to the level of constitutional error unless the defendant makes a showing that he suffered prejudice as a result. <u>Ghent</u>, 279 F.3d at 1132 (citing <u>United States v. Olano</u>, 62 F.3d 1180, 1190 (9th Cir. 1995), & <u>United States v. Halliburton</u>, 870 F.2d 557, 561-62 (9th Cir. 1989)); <u>see also</u> <u>Larson</u>, 515 F.3d at 1064 (state trial court's violation of the petitioner's due process rights in requiring him to wear security leg brace during trial, found to be harmless). The Ninth Circuit has held that "the greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice." <u>Spain v. Rushen</u>, 883 F.2d 712, 722 (9th Cir. 1989). Thus, it has been recognized that "physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint." <u>Larson</u>, 515 F.3d at 1064.

In <u>Larson v. Palmateer</u>, 515 F.3d 1057 (9th Cir. 2008), the jury saw the defendant's leg shackles, and, when the shackles were removed in the midst of the trial, the Court commented to the jury that the defendant had previously been wearing the shackle for security reasons, and he would no longer be wearing it, due to a leg impairment of the defendant. <u>Id.</u> at 1062. Because

the record reflected no justification for the visible leg shackle to be used during the first two days of trial, the Ninth Circuit agreed that the defendant's "due process rights were violated when the trial court failed to make a finding on the record justifying the necessity of physical restraints...." Id. at 1063. The Ninth Circuit went on to determine, however, that, based on the record, the error did not have a substantial and injurious effect or influence in determining the jury's verdict under the harmless error standard articulated in Brecht v. Abrahamson, 507 U.S. at 623.

In Ghent v. Woodford, 279 F.3d 1121, issued before the Supreme Court's decision in Deck, the Ninth Circuit determined that, "[i]n order for a defendant to prevail on a claim of this nature, a court must find that the defendant was indeed physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests." Id. at 1132. In addition, the defendant must show prejudice (harmful error). Id. After reviewing the evidentiary hearing transcript on appeal and considering the arguments of the parties in Ghent, the United States Court of Appeals for the Ninth Circuit determined:

> The evidence suggests that a few jurors at most glimpsed Ghent in shackles in the hallway and as he was entering the courtroom. The jury's "brief or inadvertent glimpse" of a shackled defendant is not inherently or presumptively prejudicial, nor has Ghent made a sufficient showing of actual prejudice.

Id. at 1133. See also Williams v. Woodford, 384 F.3d at 592 ("Even if we assume that Williams's physical restraints at trial were unjustified, we conclude that the district court properly held that the error was harmless. When the jury never saw the defendant's shackles in the courtroom, we have held that the shackles did not prejudice the defendant's right to a fair trial.").

In a federal habeas corpus proceeding such as this one, the federal court must determine whether any error had a "substantial and injurious effect" on the jury's verdict. Brecht v. Abrahamson, 507 U.S. at 623; Larson, 515 F.3d at 1064. See also Frye v. Pliler, 551 U.S. 112, 121-22 (2007) (Brecht harmless error review applies whether or not the state court recognized the error and reviewed it for harmlessness). In this context, a federal habeas court is to "determine whether what [the jurors] saw was so inherently prejudicial as to pose an unacceptable threat to

343

defendant's right to a fair trial." Holbrook v. Flynn, 475 U.S. 560, 572 (1986). In the Ninth

Circuit, "only the most egregious kind of shackling has been found ... to deny due process."

Castillo v. Stainer, 983 F.2d 145, 148 (9th Cir. 1991).

### *Discussion*

To review, Petitioner argues he was unjustifiably, visibly shackled throughout the guilt

and penalty phases of his trial in violation of his rights to a fair trial, due process, his right to be

present and to the effective assistance of counsel, and to a fair penalty phase proceeding. (ECF

No. 330 at 509-37.) Respondent contends the use of physical restraints was justified; therefore,

due process was satisfied. Further, respondent asserts counsel was not ineffective, nor would the

California Supreme Court have found counsel's performance to be deficient because there was no

reasonable probability the trial court would have imposed any lesser restraints in light of the

security risk Petitioner posed, nor would that court have found prejudice. (ECF No. 345 at 280-

88.)

### The Relevant Proceedings

On February 2, 1989,[54] the first day of the proceedings before the Honorable Darrel W.

Lewis to whom the trial of this matter was assigned,[55] the subject of restraints was addressed

during a conversation between the court and all counsel concerning various pretrial motions and

other matters (2 RT 2-9; see also 4 CT 771-72):

---

[54] Petitioner's Notice of Motion to Limit Security was filed February 2, 1989. It sought to limit the number of security personnel or law enforcement officers present in the courtroom during trial, citing a Sixth Circuit Court of Appeals case and California Penal Code § 1044. (3 CT 666-69.) Following the motion pleading in the Clerk's Transcript is a copy of an Information (and although largely an illegible reproduction, it appears to involve two counts related to possession of an explosive device), endorsed December 13, 1988, as well as a number of documents pertaining to Petitioner's criminal history, including a December 12, 1988, violation of California Penal Code § 4574, subdivision (a), for possession of an explosive device in jail. Among this documentation is a notation that Petitioner was classified an "escape risk." (3 CT 670-91.)

[55] The matter was assigned to Judge Lewis by Judge James T. Ford on February 2, 1989, at 8:30 a.m. More particularly, that court ordered the matter "trail to TUESDAY, FEBRUARY 7, 1989, at 9:00 a.m., for trial in Department 15, the Honorable Darrel W. Lewis presiding." (3 CT 770.) Nevertheless, at 10:00 a.m. on February 2, 1989, proceedings commenced before Judge Lewis. (3 CT 771-72.)

MR. MARLETTE:  I expect perhaps our next meeting, Counsel will be moving for some lessening of the restrictions on Mr. Alvarez, and between now and then I'll be looking to see if there are any problems.

I also ask the bailiffs to check with their office - -

THE COURT: Excuse me a second. [¶]  Mr. Alvarez, you have an interpreter.  The purpose of the interpreter is to assist you in understanding what's going on.

If you need to talk to your attorney, then raise your hand or something and let me know that you need to talk to your attorney, but when you are talking back and forth with the interpreter, you can't at the same time understand what is going on and she can't talk to you at the same time to interpret what everybody else is saying.

THE INTERPRETER:  Okay.

THE COURT:  Thank you.

MR. MARLETTE:  So between now and our next meeting I'll be looking into it. I'd ask the bailiffs to look into it as well, see if there are any problems.

[DEFENSE COUNSEL HOLMES]:  Your Honor, that is one of the motions that I have, and but I assume we have these chairs, they can do the chain or wherever is necessary in the back.

THE COURT:  Yes.

MR. HOLMES: Security chairs, whatever they call them, and he was concerned about having his hands free, you know, to get the paperwork and so forth.

THE COURT:  At the very least, we'll have the security chair here for the next appearance, and he will either be shackled in the security chair or in a chair and not shackled at all, depending on –

MR. HOLMES:  I can tell the Court right now, I've represented Mr. Alvarez for about a year and a half, I don't think we've had one single outburst from him, so I don't see any problems.

THE COURT:  Okay, we'll take up that matter next time.

MR. HOLMES:  Okay.

(2 RT 9-11.)  When the proceedings next resumed on the afternoon of February 7, 1989, the court noted the defense had filed seventeen pretrial motions.  (2 RT 16, 18; 4 CT 786.)  The following then occurred:

THE COURT:  It's my intention in this case to have, as usual, which is one custody officer for each defendant and the courtroom bailiff, which is standard, and in addition for Mr. Alvarez, I intend to use the security chair, which is a chair which is similar in color and design to most of the other chairs in the courtroom.

The chairs used by Counsel happen to be different from the others, because we acquired those strictly for the use of Counsel and staff, but defendants' chairs are similar to the other chairs in the courtroom, including other chairs in front of the bar and in the audience portion, with the only exception, with the security chair has a vinyl flap covering the rear portion of the chair, right around a person's buttocks.

That is normally open in the other chairs, and that vinyl flap is covering a fastening device, an eye, so to speak and then a chain is placed around the defendant's

waste [*sic*] and attached to that eye.

If the clothing is properly placed around the chain, the chain is not visible to anyone.

MR. HOLMES: Your Honor, on this same matter, I note right now that the defendant has the ankle shackles, or whatever they call them, at this time.

I don't have any real problem, unless they're uncomfortable to Mr. Alvarez at this time, but when the jury comes in, what I don't want is to have the jurors sit over and see Mr. Alvarez has his legs shackled and [see codefendant Ross] does not, and suddenly get the distinction that there's two different classes of defendants here in this case.

THE COURT: Yes. Unless something else comes to the Court's attention, I will not require the ankle shackles.

And, also, the courtroom doors have windows that are about four feet long and eight inches wide, a window in each door.

Those are now covered, so that when the defendants are brought into the courtroom and seated and secured, jurors and other people outside the courtroom cannot see that process. When the defendants are either brought in or taken out of the courtroom, that's not visible from the hallway.

Also, if and when the defendant chooses to testify, the witness chair is also set up as a security chair, and he would then be escorted to the witness stand outside the presence of the jury and be fastened to that chair, in a similar manner as I've just described.

Is there any objection to that procedure?

[DEFENSE COUNSEL GABLE]: No.

MR. HOLMES: No objection, your Honor.

THE COURT: Okay. I have reviewed some reports, even though there's no objection, and I should, perhaps, state for the record, my bailiff sought out some information on Mr. Alvarez from the Sheriff's Department.

Included in that information is a report where Mr. Alvarez is accused of having an explosive device in the county jail on December the 9th, 1988, apparently consistent with what's commonly called a match bomb - - apparently had a device approximately four inches long wrapped tightly in plastic, a paper-wrapped fuse protruding from one end of it, and that contained inside the plastic was match heads that had been removed from the stick or paper, and also had a small glass pill bottle containing nitroglycerine pills.

Now, I'm just stating for the record, because since there's no objection to the security proceedings that I've just outlined, it is not necessary for the Court to specifically state good cause; however, that's what was brought to the Court's attention.

(2 RT 26-29.)

On February 23, 1989, the trial court provided its rulings on a number of the pending defense motions, including one pertaining to Petitioner's request to limit courtroom security:

"Number four regarding security, that motion is mooted by agreement of counsel to the procedures that the Court outlined. [¶] And as long as there are no disruptions, that's the procedure that will be followed throughout the trial." (2 RT 203.)

346

On March 15, 1989, the morning session began as follows:


THE COURT: It's nine minutes after 9:00, we're in session, although [counsel for codefendant Ross] is not here at this moment because he's in another Court.

However, I've been informed of several things this morning regarding Mr. Alvarez, and at this time, I'm directing the security officers to place Mr. Alvarez's hands back in the handcuffs and put them down in his lap.

[DEFENSE COUNSEL] HOLMES: Your Honor, could we, for the record, have a little information as far as what happened?

THE COURT: Yes, we're going to. [¶] If there's some way his shirt can be pulled down over the cuffs or something can be put somehow, just sit up close to the table, then the cuffs won't show.

THE DEFENDANT ALVAREZ: It's okay, it's okay.

THE COURT: Sergeant Robinson, would you explain in open court what you explained to me in in chambers just a moment ago? Go ahead and show to the attorneys, what you showed to me.

THE BAILIFF ROBINSON: I was assigned to bring out, on Monday - - [¶] I was originally assigned to escort Mr. Alvarez up here last Monday, my first day in court with him. I, the belly chains, if you understand how they go on they go around the waist, in this fashion, the crotch chain comes up, is locked together back here, and leaves a pigtail. The pigtail, as a rule, is secured to the security chair.

MR. HOLMES: Okay.

THE BAILIFF ROBINSON: Mr. Alvarez, after the first recess, insisted the he didn't have enough room to move, being chained by the pigtail, and he wanted this brought up and chained, the padlock onto this.

You follow that?

MR. GABLE: Uh-huh.

THE BAILIFF ROBINSON: That drew suspicion as to why would he be willing to sit on this. It's uncomfortable; nobody else wants to do it. Why would he want to do it?

There's other things. He wanted to carry his legal work down the day that I talked him out of it, on these recesses. He had his hands in front of him he was continually, would continually flip this in a nervous manner.

So yesterday, at 5:00 o'clock, I decided, Well, I'm gonna check the belly chains, just to see if there's something wrong with them.

I found the cut. It's been done with a string or dental floss, cut almost all the way through.

THE COURT: What he's showing is the weld on the link - -

THE BAILIFF ROBINSON: See that?

THE COURT: - - has obviously been worn down, over halfway through.

MR. HOLMES: I don't think it's halfway through, I think maybe it's closer to a third.

THE COURT: It's worn to the point you can obviously see it.

THE BAILIFF ROBINSON: That didn't fall out - -

MR. HOLMES: Officer, are these the same?

THE BAILIFF ROBINSON: He wore these for two days, and the reason I can testify to that is the fact that one of these cuffs, you have a hard time getting the key in and

347

out of.  It's the same set, identical same set, he'd worn for two days.

MR. GABLE:  Just for the record, I notice that on the other link that's attached to this big ring, you have some of the same type of, what appears to be cracking or

THE BAILIFF ROBINSON:  Cutting.

MR. GABLE:  So they're on both of these.

THE COURT:  It's shown on at least three links, I believe.

THE BAILIFF ROBINSON:  Here is another link that goes around the belly itself.  You see where that's cut?  Down inside here?

Okay, the significance is - - the reason - -

THE COURT:  You still have more to say, gentlemen? [¶] Did he request to have this same set?

THE BAILIFF ROBINSON:  When I took these off him at 5:00 o'clock and replaced it with another set, he questioned me why, why couldn't he have these back.

I told him I found a bent link, and we were gonna have it fixed.  Earlier, he requested [of] Pat Falge to wear the same set of belly chains, that were another set, he wanted to stay, remain in those all the time.

He's requesting to wear these all the time.

THE COURT:  Also yesterday he took his pencil with him when he left the court.  He took his pencil and that was noticed, and called down.  It was confiscated from him, downstairs.

MR. HOLMES:  I discussed the pencil situation with Mr. Alvarez.  He indicated to me that what happened there was that he, they had him chained up, had him handcuffed before he could get his pencil out of his materials, so [it] ended up in his materials.

THE COURT:  All he had to do was tell somebody.  He knows he's not supposed to have it.

THE INTERPRETER:  They were saying it was time for me to leave.

THE COURT:  That doesn't make any difference; you don't take contraband in the jail.

MR. GABLE:  Tell us first.

([Counsel for co-defendant Ross] now present)

(Interpreter conferring with Mr. Holmes and Mr. Gable)

MR. HOLMES:  Your Honor, I appreciate your giving us the time on this - - the only significant thing I can think we have here is that Mr. Alvarez says he has different sets of chains Monday, Tuesday and today; he's had three different sets of chains.

THE COURT:  Well, that's a difference of opinion.  Now - - [¶]  Officer Robinson, anything else?

THE BAILIFF ROBINSON:  That's it.

THE COURT:  Okay.

THE BAILIFF FALGE:  Your Honor, I might put something on the record, in this same regard.

I escorted Mr. Alvarez two weeks ago, because we were in recess for this past week.

It was the week prior to that, and I was assisting the holding officer, when Mr. Alvarez was changing into his court clothes, and another inmate was also, that was in the belly chains, was also dressing out at the same time, and when we replaced the chains.

I put a different set on him, more or less inadvertently, it wasn't necessarily on purpose, and he quickly asked for the same set that he wore over.  And I just told him, no, you wear what we put on you.

348

The next day, I purposely switched chains, and he again immediately requested the set that he had wore over from the jail, and I relayed this information to Officer Robinson.

THE COURT: Okay. [¶] One of you this morning said there was something about, some additional reports from jail about making a gun out of soap or something like that?

THE BAILIFF ROBINSON: That's the information I have received, I heard it numerous times through the courthouse here. Apparently he fashioned a gun out of soap, used something to make it look blue like a gun, had a silencer on it.

THE COURT: Sergeant Beers?

THE BAILIFF BEERS: Your Honor, I spoke with - - I'm [S]eargeant Sam Beers, court security. I went with Sergeant Owens over at the jail the day watch sergeant, just a few minutes ago, after learning about the problem with the chains.

He did not have a gun carved out of soap in his cell. There was a gun, handgun carved out of soap found at the jail, and he had plans for making a gun out of soap, and those were found in Mr. Alvarez's cell.

THE COURT: Mr. Alvarez had some written plans?

THE BAILIFF BEERS: Some kind of drawings or plans actually in his cell for making a gun out of soap.

THE COURT: Do you know where those plans are now?

THE BAILIFF BEERS: I would have to call back to the jail and ask him, to ask Sergeant Owens if he can, if those were booked as evidence or what, what's being done about those.

THE COURT: Okay, I would like Sergeant Owens to come over here sometime today, and speak to me directly about that.

THE BAILIFF BEERS: I can have him bring the entire file, all the problems that have arisen.

[THE PROSECUTOR]: Just as a background, your Honor. [¶] The Court is probably aware of this, but to refresh your recollection, Mr. Alvarez does have an escape conviction.

That was out of C.M.C. East. He was incarcerated in prison, and I believe it was two other felons made up dummies and put them into their beds, and then apparently walked away. There was no force involved, but was quite elaborately planned.

THE COURT: Okay. We'll look into this further. [¶] For the time being, he's going to remain the way he is right now. …

(6 RT 988-95; 4 CT 975.) Later that same afternoon, further information was provided to the trial court:

THE COURT: … Officer Ernie Owens from the jail - - Officer Owens, you tell me what you have to offer concerning any security risks of Mr. Alvarez.

OFFICER OWENS: I have the jail information package and write-ups concerning his conduct while in custody at the Sacramento County main jail, which also includes - - This was handed out by the facility commander.

THE COURT: Okay. Is there anything in there relating to a gun made out of soap?

OFFICER OWENS: No, sir, there is not.

THE COURT: May I see the entire file?

349

(The Court reads the file.)

THE COURT: All right. Rather than going into any lengthy hearing at this time, what I'm going to do is ask Officer Owens to make me a copy of these reports that he has just shown me, and then we can go into it in a little more detail at a later time.

MR. HOLMES: Your Honor, on that same line, on behalf of Mr. Alvarez, we would like to make a motion at this time for discover[y] of those same documents.

It seems to me that they would be relevant at this time on other possible things, such as there's the 190.3 allegations, concerning making of a bomb, a match bomb in jail. For all we know, there may be some documents on that that may pertain to that - -

THE COURT: All right. I'll get a copy, and we will all look at it in detail.

OFFICER OWENS: Your Honor, Mr. Alvarez should have copies of each one of those documents that you've just read.

THE COURT: Okay. If you will, please, make a copy of the entire set for me in the next day or so.

OFFICER OWENS: You'll have them today, sir.

THE COURT: All right, fine.

(6 RT 1074-75; <u>see also</u> 4 CT 975, 996-1000.) Finally, before proceedings concluded on March 15, 1989, the trial court stated the following:

THE COURT: … Okay. I gave each side a copy of a set of - - of incident reports. I don't know if there are any other records but the records from the sheriff's department. So you can look at those. I'll look at them. We can discuss them further if necessary.

I noticed later this afternoon, that Mr. Alvarez is sitting back and has the handcuffs exposed to the potential jurors.

Mr. Alvarez, that's your choice. If you don't care that they see that, that's fine. But that's why we initially - - We talked about having you scoot up close to the table so that your wrists would not be exposed or covering them with the sleeves of your shirt or covering them up somehow. And I notice that you resisted that and told the officer not to do that.

Again, it's your choice. If it doesn't bother you that they see that, then that's fine with the Court.

(A brief discussion was held off the record between the Interpreter and Mr. Gable.)

THE COURT: Thank you.

(6 RT 1189.)

On March 16, 1989, about two hours into voir dire proceedings, the following colloquy occurred:

MR. HOLMES: Your Honor, on behalf of Mr. Alvarez, we would request the Court consider that we go back to the same security precautions we had before, that is, the hands be free.

The reason I say this, we've had a chance to talk with him a little bit, as far as what the officer showed us yesterday, what looked like the links of the chains, where they came together, looked like it had been worked down a little bit.

Mr. Gable and I took a look at the chains that he had on yesterday, which were the,

350

different than the ones the officer held up and even those we saw, what, one link or two.

MR. GABLE:  One link.

MR. HOLMES:  One link which was right at the area where the crotch chain comes up, and it has the same thing, and remember we put on record yesterday about one chain, where it had been apparently filed down or at least it was about a third of that area in the sought are [*sic*: solder) or the welded portion was missing, it's exactly the same thing with the chain he had on yesterday.

I think Mr. Gable would agree with me that it was approximately a third of the way through, so I'm no expert in this, I don't know whether somebody's taken something and filed these things down, or whether that's what happens then these things are soldered, something about the manufacturer of them, or whatever, whether somebody else did it – - I [have] represented to Mr. Alvarez for, gosh, almost a year and a half now, and I've never seen him make any pretense of trying to do anything violent in court or make any actions towards trying to escape or anything of that nature.

I just think what we're doing here, I appreciate the officers and [their] trying to comply with security, but I just think it's excessive keeping this man sitting here.

He can't move his hands; it's obviously uncomfortable.

I think with the waist chain and chained to the back, three or four officers in the court at all times, I don't think we have any problems at all. I think we can release his hands and let him go back to where we were.

THE COURT:  You say three or four officers in court at all times?

We have just the standard one officer for each defendant and then the bailiff is here, but she is going outside and doing other things, so we don't have three or four officers in court at all times.

I'm concerned about Mr. Alvarez, particularly after reading the reports that I received yesterday.

I'm not going to read them all into the record, but I will put them into the file.

He has repeated instances of misconduct, involving threatening officers, fighting with other inmates, starting fires, possessing weapons on various sorts, one of them the same thing twice, the same type of thing, that is, taking a newspaper and rolling it up so that, and covering it with plastic.  Each time he said it was, that he had it to use to depress the - -

MR. HOLMES:  Keep the water faucet on.

THE COURT:  Or something like that, but he was told after the first time that was not allowed, and he was not to have that, but yet he did it again, and the records that I've reviewed indicate that he has little if any control over his emotions and little, if any respect for authority or anyone's rules.

MR. HOLMES:  Your Honor, if the Court is going to continue with the order to keep him chained to where he is, I'm not sure what Mr. Alvarez is thinking at this point, but he's indicated to Mr. Gable and I earlier that he was perhaps going to ask to absent himself during the jury selection portion.

I'm not sure what he still feels that way or not.

I would recommend he stay here, so he can assist us in picking the jury and so forth, but maybe we should inquire at this time, what he feels on that.

THE COURT:  It's his choice.

THE INTERPRETER:  I want to stay other there, I don't want to come here for anything.

[THE PROSECUTOR]:  Your Honor, I would object to Mr. Alvarez not being

351

present.

I think that the right of confrontation, well, according to recent decisions, it works in a number of different ways, but I think the People have a right, too, particularly during this voir dire process.

Part of my questioning has to do with people taking personal responsibility and spending time in this courtroom with the defendant and then having the personal conviction to vote for the death penalty for him.

I think that this is a minor matter with Mr. Alvarez, and he's being further manipulative by his request.

It's not something that is necessary, and I would request it be denied, unless it becomes necessary.

THE COURT: I don't see where technically the right of confrontation comes in during jury selection.

It may be handy to have somebody to point to, but I don't think there's any requirement of that, and if after discussing it with his attorneys further he wants to absent himself from the jury selection process, I think that's fine.

Unless I'm presented with some authority otherwise, I will grant that, and let's finish today, and Monday, then we'll make a final decision on it on Monday.

MR. HOLMES: Your Honor, could we at this time maybe inquire of the officers whether they feel like it's still a potential problem here that would require the cuffs on his hands?

THE COURT: Officer Robinson?

THE BAILIFF ROBINSON: Well, I don't know this individual's whole background, but what I've heard and what I found here at the courthouse, I would say that he needs to be kept in some type of restraints.

I feel that he's a danger to the people at the Court and him. There's a danger of this guy getting up and walking out of Court.

Obviously that's what he attempted to do.

THE COURT: I'm sorry, that's what he attempted to do?

THE BAILIFF ROBINSON: I feel this is what Mr. Alvarez [is] attempting to do, is to break those restraints and leave this courtroom.

THE COURT: I understand what you mean.

THE BAILIFF ROBINSON: And I feel that it's a risk to not restrain him further than locking him in that chair.

THE COURT: Have there been any problems in transporting him back and forth from the holding cell or any problems in him getting dressed in the morning, anything like that?

THE BAILIFF: Not that I know of.

To my knowledge, and from what I've heard, he's been very talkative and I think he's been manipulating the officers.

MR. HOLMES: Your Honor - -

THE COURT: Okay. If you have, Mr. Alvarez, I guess, if he's right handed, if he had his right hand free, then he could write. Is that why he wants his hands free?

MR. HOLMES: Well, for comfort for one thing, and yes, if the Court wants to go with one hand free, we would certainly prefer that over two hands cuffed, but I've been through these before, and the last death penalty case I had with Gary Hines, he was a potential problem almost every day and still didn't get to the point of handcuffs on his hands.

THE COURT:  Last death penalty trial we had, we gave the defendant coffees every day and let him have coffee along with everybody else.  Each one is different.

MR. HOLMES:  I appreciate that.

THE COURT:  This is by no means a standard policy by this Court.  This Court takes each case on its own merits, and this defendant's background gives me great concern.

The fact that he, again, these reports indicate that he has had various weapons of his own making, including a match bomb and he seems to have excuse[s] for various things, well, I had this for that reason, this for that reason, but he also at one time had a sheet metal screw, which obviously has no legitimate purpose and even he come up with a legitimate reason for having something like that.

Those things are legitimate things for me to take into consideration in deciding whether not he's an escape risk, or even, if not an escape risk, a risk of injuring somebody, if he should decide something is happening in this Court he doesn't like.

He's been in fights with two other inmates, he picked up a television and threatened an officer with it, and has at other times threatened to, quote, kick your ass, to officers in the jail, and threatened to get them out on the street, various things like that.  I don't need that type of conduct in my courtroom.  I don't need to have to go through this whole thing all over again because some of his conduct, and if I need to take measures to make sure that that doesn't happen, that's what I'm gonna do.  I'd rather prevent it than try to cure it.

MR. HOLMES:  Can we go along with your original idea as far as having a hand free that he writes with?

THE COURT:  I'll consider that.

MR. HOLMES:  Appreciate that.

THE COURT:  We're in recess.

(7 RT 1250-56; see also 4 CT 981.)

Prior to recess of the day's proceedings, defense counsel Holmes raised the issue again:

MR. HOLMES:  Your Honor, earlier in the day, we were discussing this matter with regard to the security of Mr. Alvarez, and the Court said you were going to consider maybe releasing his hands.

The reason I bring this up again is Mr. Alvarez has made several comments here.  I passed him a note, and he was trying to respond to me.  And I think he's getting frustrated; in fact, that's what he told Mr. Gable here, because he would like to write some notes to us, over some other matters that we're discussing now. And he's feeling very frustrated that he can't do this.

If the Court would consider, at least, releasing his writing hand so he could at least write notes to us during the trial and he could assist us, and we could go back and forth in communication there.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

THE COURT:  Okay.  Okay, unless there's some further incident, then Monday he may have his right hand released.

MR. HOLMES:  Okay.  Thank you.

Are you right-handed?

THE DEFENDANT:  Yeah.

353

THE COURT: But I tell you right now, if there are any further instances, even in the jail, then it's back the way you are. Okay?

We're in recess until 9:00 o'clock, Monday morning.

(7 RT 1348-49.)

During the morning recess on May 3, 1989, more than six weeks later, while Petitioner was on the stand testifying in his own defense and after the jury had been excused (18 RT 4108), the trial court noted as follows:

[THE COURT]: The other thing I wanted to discuss with Counsel is, I know you have some chart paper there, and when Mr. Alvarez turns, and when he turns to talk to the interpreter, I think it's obvious to the jurors there's a chain around his waist.

Now, I don't know for sure, but I don't - - and the fact throughout this trial he doesn't stand up, I think ultimately the jurors are going to know he is chained down.

Now, if you want me to make a statement about that, to tell them something that isn't entirely true, that is, that that's just simply flat Court policy that when somebody's charged in a death penalty trial, then that's the policy, that they are to be confined, so I'm simply bringing this to your attention.

If you want me to make some kind of statement whether it be totally true or not, I will. If you want to just simply ignore it, then we'll ignore it, but the jurors are common, ordinary people and they figure things out very quickly.

MR. HOLMES: Before we make a decision on that, could I have him turn right now, and see - -

THE COURT: Officer, if you'll stand to the side, please.

MR. HOLMES: Manny, turn around toward the chart there.

THE COURT: Turn like you're talking to the interpreter.

MR. HOLMES: You can definitely see it, especially in the back row.

MR. GABLE: He doesn't even have to turn too much.

MR. HOLMES: You can see it all the time.

MR. HOLMES: We'll think about it.

THE COURT: Yeah. Normally, when somebody's wearing just a sweater or something, like pull it down to cover it up, but throughout this trial, there has been no attempt by Mr. Alvarez or Counsel to really try to make an effort to cover up the chains, when he first had his - - I recall the day, during voir dire, that when he first had his hands cuffed down, I shouldn't say intentionally, but he obviously moved his chair back and was sitting so it was very obvious that the jurors saw it at that time.

I don't think it's any secret, but anyway, the point is, you want me to say something? If so, you tell me what you want me to say. If it's reasonable, I'll say it.

MR. GABLE: We appreciate that, your Honor.

(18 RT 4109-11.) When asked at the end of the day's testimony[56] whether any decision had been

_____

[56] Petitioner's testimony did not extend beyond the lunch break due to illness. (18 RT 4163; 5 CT 1112.)

354

made about a statement to the jury addressing the restraints, Mr. Gable indicated he would "have an answer for [the court] first thing in the morning." (18 RT 4162.)

The following morning, May 4, 1989, Petitioner resumed testifying on direct; no decision by defense counsel was proffered prior to testimony. (19 RT 4164-65.) Trial was recessed for the period between the afternoon of May 4 and the morning of May 15, 1989. (5 CT 1113.) During an afternoon recess on May 15, 1989, between cross examination and redirect of Petitioner, the following colloquy occurred:

THE COURT: We're in session outside the presence of the jury.
Counsel, as you came into chambers to tell me that you would like some time to talk to your client before you redirected, I mentioned to you I was - - just had run across a cite which, the quotation I had, People v. Lewis and I gave you a cite, stood for the proposition that the Court has a sua []sponte responsibility to admonish the jury whenever extra security measures are used, and the jury becomes aware of those extra security measures.
I looked at that case in the few minutes before we convened, and the case doesn't stand for that. That case dealt with a defendant being removed from the courtroom, so the source that I had, which cites the proposition of increased security is simply - - simply isn't there, so I again will leave it up to you to decide whether or not you want me to give any type of an admonition to the jury regarding the fact that Mr. Alvarez is restrained to his chair.
MR. GABLE: At this time, I think it's on the record, but I would indicate again that, at this time, we're not asking the Court to give such an admonition.
If for some reason, we decide differently during the course of the trial, we'll certainly make that - - advise the Court and make that request.
THE COURT: Okay. At this time, we're taking a recess then so that you can consult with your client before conducting redirect.
MR. GABLE: Okay.
THE COURT: I would ask all other Counsel and court reporter and staff to vacate the courtroom.
(Recess)
THE COURT: We're in session, outside the presence of the jury.
During recess, I read People v. Lewis more carefully, and it does have one sentence in there, and cites back to People versus Duran, at 16 Cal. 3d 282.
Duran is a case directly on point, which is on the point of using additional restraints, and states at page 291 that in those instances when visible restraints must be imposed, the Court shall instruct the jury sua []sponte that such restraints should have no bearing on the determination of the defendant's guilt.
Just before we convened, I walked up into the jury box, and particularly from the closest four or five seats, when Mr. Alvarez turns to the side to address the interpreter or to turn around to write on the wall, on the charts behind him, it appears to me it's quite obvious that there is a chain around his waist.

355

1
2
3

And if it hadn't been described for the record earlier, when Mr. Alvarez is seated both at counsel table and in the witness stand, he does have a chain around his waist, and it also goes between his legs and meets in the back and is padlocked to a hidden I-bolt in the back of the chair.

So the portion that is visible is just a portion of the chain somewhere, either that you can see either around his waist or the portion that goes down to his crotch, so unless Counsel object to it, I will instruct the jury that they are to disregard the fact of this restraint.

And I will - - I would even go further than that, as I think I said earlier, and tell the jury something that is not the truth; that is, that this is standard procedure in all homicide cases or in all death penalty cases, to so restrain the defendant.

This is the sheriff's policy that they have to have additional security, merely because of the nature of the charges, and rather than having two or three officers seated in the courtroom throughout the entire trial, it's the Court's policy to use these type of restraints, feel that this, that type of restraint is less - - I want to say less prejudicial, but I'll think of a better word, than having two or three officers seated right behind the defendant.

But anyway, again, I will leave it up to your discretion, Counsel. I think it's clear that it is sua []sponte, so unless you and your defendant object, I will give the jury some instruction on that, in that regard, however, if you and your client desire that I not do that, then I will not do it.

And exactly what, if you don't object to the Court giving some admonition, I will certainly take your input into what type of admonition should be given to the jury and when it should be given, and again, whether it's something you want the Court to instruct on or it's something, if you would prefer, to even handle it during your argument, simply point out that you, yourself, can admonish the jury they're not to infer anything from it; however you want to do it is - - but I'm satisfied the Court has an obligation to do something, unless you affirmatively object to it.

MR. GABLE: Your Honor, just for clarity of the record, the objection to giving an admonition at this time is, it would draw, in my opinion, undue attention to the fact Mr. Alvarez is restrained.

On the other hand, however, I think and upon further reflection, probably would submit that, an instruction for the Court's consideration to be given with the instruction packet, to the extent that the defendant is in custody, as the jury is well aware, and that to the extent that he has been restrained or has probably been obvious, the jury should not infer anything from that, in that fashion since it would be contained with the balance of the instructions I think the prejudicial effect of that kind of a - - an instruction would be lessened and that would be the desire that I have at this time, and that would be to request of the Court in the package of instructions, an instruction which I would provide, unless I determine that I didn't want to do that, in which case, we would get waivers from the defendant as well as Counsel.

THE COURT: All right, that's fine.

Perhaps we can just incorporate it into the standard instruction, which says that you shall not draw any inference from the fact that the defendants have been arrested, charged and brought to trial and work in something at that point regarding restraints or custody.

356

(19 RT 4428-32; 5 CT 1115.)  Eventually, Petitioner's proposed instruction number 4 was read to the jury:

> In your deliberations, the fact that a defendant has been subjected to physical restraints during the trial is not to be discussed or considered by you.  There is no connotation of guilt of any kind because a defendant was restrained.  Such restraints are a part of the normal procedures in a case of this nature, and should have no bearing on your determination of a defendant's guilt or innocence.

(25 RT 5596; 5 CT 1171.)

<u>Analysis</u>

To the degree Petitioner was visibly shackled during the trial, such a restraint is inherently prejudicial.  But inherent prejudice alone is not enough to warrant relief.  Petitioner must first show the restraints were not justified.  Secondly, Petitioner must prove prejudice.  He cannot do so on this record.

### *Justification*

Petitioner filed a pretrial motion entitled "Notice of Motion to Limit Security" on February 2, 1989.  The written motion sought to limit the number of courtroom security personnel present in the courtroom.  (3 CT 666.)  No mention was made of physical restraints in the pleading.  At those initial pretrial proceedings held on February 2nd, defense counsel Holmes raised the issue of the use of a security chair as a preferred physical restraint, noting Petitioner's concern "about having his hands free" during trial.  (2 RT 10.)  The trial court indicated that a security chair would be available at the next court appearance should it be necessary following its consideration of the motion on that future date.  (2 RT 10-11.)

When the court and counsel met next on February 7, 1989, the subject of courtroom security was considered.  (2 RT 26-28.)  The trial court concluded that Petitioner did not require ankle shackles and discussed the use of a security chair during trial, including during any testimony by Petitioner.  Consideration was also given to Petitioner's transportation to and from

the courtroom while restrained so that the jury did not see the restraints employed for that purpose. (2 RT 26-28.) When the trial court expressly asked defense counsel for Petitioner whether there was any objection to the procedures it described, both responded there was no objection. (2 RT 28.) The trial court then proceeded to make a record of the necessity of the courtroom security procedures despite defense counsels' lack of any objection, expressly referring to the information before it that Petitioner had recently been in possession of an explosive device while in the county jail facility. More particularly, "a match bomb … a device approximately four inches long wrapped tightly in plastic, a paper-wrapped fuse protruding from one end of it, and that contained inside the plastic was match heads that had been removed from the stick or paper, and also had a small glass pill bottle containing nitrogylcerine pills." (2 RT 28-29.)

Petitioner argues that because he was cooperative during court appearances, "[e]ven accepting the findings of the trial court that [he] had been a disciplinary problem at the jail," the "disciplinary problems in the jail are insufficient to justify visible shackling," citing to Illinois v. Allen and Estelle v. Williams. (ECF No. 330 at 528.)

At the time of the trial in this matter, the Supreme Court defined shackling as "the sort of inherently prejudicial practice that ... should be permitted only where justified by an essential state interest specific to each trial." Holbrook v. Flynn, 475 U.S. at 568–69. Those interests include "physical security," "courtroom decorum" and "courtroom security." Deck v. Missouri, 544 U.S. at 624, 628. The determination of an essential state interest "turns on the facts of the case." Hedlund v. Ryan, 854 F.3d 557, 568 (9th Cir. 2017). The trial court "may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." Deck, 544 U.S. at 629.

The essential state interest specific to this case involved the trial court's knowledge that

even prior to the commencement of trial, Petitioner was found to be in possession of an explosive device while housed in the county jail.  He was also considered an escape risk.  (3 CT 670-91.)  Hence, because the possession of an explosive device and the possibility of escape both concern courtroom security, the trial court was justified in imposing the requirement of restraints.

As the Ninth Circuit held in <u>Crittenden v. Ayers</u>, "[a]lthough his escape history stemmed from a time 'long before commencement of trial' and he was cooperative in his previous court appearances, these arguments and their factual basis were before the trial court at the time it decided to impose restraints.  Crittenden has not presented any new evidence to warrant a different conclusion."  <u>Crittenden v. Ayers</u>, 624 F.3d 943, 971 (9th Cir. 2010).  Similarly, Petitioner herein did not present any new evidence to warrant a different conclusion.  What the court knew on February 7, 1989, justified the imposition of restraints during the then-forthcoming trial.  Notably, no prospective juror was present at any proceeding held in February 1989 because jury selection began March 1, 1989.

When the trial court ordered Petitioner's restraints increased on the morning of March 15, 1989, to include handcuffs, over and above the security chair that had been employed after February 7, it again had an essential state interest in doing so, to wit: continued courtroom security.

On that date, the trial court had been advised by transportation staff and courtroom bailiffs of their collective concern that Petitioner had been attempting to escape custody by cutting through the links in the belly chains used to restrain him.  (6 RT 988-95.)  On that same date, the trial court was provided with copies of documentation relating to Petitioner's status as a security risk in the county jail.  (6 RT 1074-75, 1189; <u>see also</u> 4 CT 975, 996-1000.)

The following morning, about two hours into the day's voir dire proceedings, defense counsel asked the court to consider returning to its previous "security precautions" because

Petitioner could not "move his hands" and was "uncomfortable." The court indicated it was concerned about security and recited a number of reasons for that concern, including Petitioner's repeated instances of misconduct in the jail, threats to jail staff and other inmates, possession of weapons inside the jail, and a lack of respect for authority, among others. The trial court agreed to consider allowing Petitioner's right hand to be freed of the additional restraint so that he could communicate with counsel in writing during the proceedings. (7 RT 1250-56.) Ultimately, at the conclusion of the day's proceedings, the trial court permitted Petitioner to have his right hand free. (7 RT 1348-49.)

The trial court had evidence and information before it that Petitioner was actively working to escape his restraints by cutting through the links of the waist chain used to transport him to and from the jail facility and the courtroom during trial. And it already had information that Petitioner had significant behavioral issues warranting his label as a security and escape risk during his period of confinement at the county jail. The foregoing circumstances more than justify the imposition of the restraints employed. Deck, 544 U.S. at 628-29; Hedlund v. Ryan, 854 F.3d at 568; Crittenden v. Ayers, 624 F.3d at 971.

Next, prior to the start of the penalty phase of the trial, the trial court received a letter from Sacramento County Sheriff Glen Craig regarding Petitioner. The letter indicated that in the period between October 17, 1987, and May 15, 1989, Petitioner had received "13 major incident reports," involving fighting, possession of a weapon, assaults on staff, threats against staff, starting a fire, attempted escape and possession of contraband. Sheriff Craig noted no other inmate had received more incident reports than Petitioner. (5 CT 1141-43.) The letter was filed and distributed to counsel on June 5, 1989. (5 CT 1144.)

Petitioner's argument that the trial court should have considered less restrictive alternatives to shackling is unavailing. (ECF No. 330 at 533.) In Deck, the high court clarified

that the requirement to consider less restrictive alternatives was *not* clearly established Supreme

Court precedent at that time, nor has it ruled on the issue since.  Crittenden v. Ayers, 624 F.3d at

971-72.  Hence, "even if the trial court did not weigh the benefits and burdens of shackling or

consider less restrictive alternatives, … clearly established federal law did not require it to do so."

Id. at 972.  As was in the case in Crittenden, at the time of Petitioner's trial, the Supreme Court

did not require consideration of less restrictive alternatives and therefore the trial court was not

required to do so.

Petitioner also suggests the trial court's procedures in this case reflected a regular routine

without regard to the particular matter before it.  That is simply not the case.  As discussed above,

the trial court considered the facts and circumstances particular to this case when determining the

restraints it believed were justified.  Further, the undersigned notes the trial court's comments that

restraints are "by no means a standard policy" in its courtroom and that each trial "is different,"

calling for different measures, some less restrictive than others.  (7 RT 1255-56.)  In any event, a

review of the entire record reveals the restraints imposed upon Petitioner here were not the result

of a routine practice of the trial court in the absence of a specific determination of need.  Deck v.

Missouri, 544 U.S. at 633; Holbrook v. Flynn, 475 U.S. at 568.

### *Visibility*

Petitioner complains the restraints employed by the trial court were visible to the jury "on

a continuing basis."  (ECF No. 330 at 528-30.)  Respondent attacks the juror declarations

submitted by Petitioner in support of his claims by way of state habeas petitions and argues that

even where the truth of the declarations is assumed, the restraints were justified and thus did not

violate his due process rights.  (ECF No. 345 at 285-86.)

Assuming Petitioner's shackles were visible to the jury throughout the trial proceedings

commencing March 1, 1989, without specifically addressing any challenge to the declarations of

the jurors, as well as that of Mr. Gable, and taking them as true, the undersigned concludes

Petitioner was not prejudiced.

### *Prejudice*

In this review, harmless error analysis is conducted pursuant to <u>Brecht v. Abrahamson</u>, 507 U.S. 619. <u>See</u> <u>Bains v. Cambra</u>, 204 F.3d 964, 977 (9th Cir. 2000). And in conducting such a review, the undersigned finds that any errors, presumed or otherwise, did not have "a substantial and injurious effect or influence in determining the jury's verdict. <u>Bains</u>, at 977-78.

> To determine whether the imposition of physical restraints constitutes prejudicial error, we have considered the appearance and visibility of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant. [T]he greater the intensity of the shackling … the greater the extent of prejudice, because elaborate physical restraints are more likely to create the appearance of the defendant's dangerousness. Hence, physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint. Similarly, if the defendant is charged with a violent crime, then the risk of prejudice increases, because shackling essentially brand[s] [him] as having a violent nature. Concerns about prejudice may be mitigated, however, if the state's evidence against the defendant was overwhelming.

<u>Larson v. Palmateer</u>, 515 F.3d at 1064 (internal citations and quotation marks omitted).

<u>Appearance and Visibility</u>

As previously noted, originally the trial court ordered Petitioner be restrained using a security chair. The belly or waist chain worn by Petitioner was to be secured to a chair in the courtroom and was concealed by way of a flap or cover at the back of the chair. Later, in light of additional security concerns, the trial court ordered that Petitioner also be handcuffed, yet it later modified that order to allow his writing hand to be free.[57] Thus, to the degree the waist chain or handcuffs were observable to the jury, a greater extent of prejudice was present.

Regarding Petitioner's complaint that his codefendant was not shackled making Petitioner appear more dangerous, the United States Supreme Court has never ruled that a defendant has a

---

[57] Use of the handcuffs was of a very limited duration because the trial court modified its own order within two days' court time, permitting the release of Petitioner's writing hand. <u>Larson v. Palmateer</u>, 515 F.3d at 1064; <u>Spain v. Rushen</u>, 883 F.2d at 722. The trial court did so against the bailiff's suggestion Petitioner remained fully handcuffed.

1    right to a restrained co-defendant. And a review of the record reveals no mention whatsoever of

2    any need to restrain codefendant Ross. Obviously, codefendant Ross's constitutional rights

3    cannot be infringed upon in order to make Petitioner appear less dangerous.

4              <u>Nature of Crimes</u>

5       In this case, Petitioner was charged with several violent crimes, including murder and

6    robbery, thereby increasing the risk of prejudice where the restraints used were visible to the jury.

7    And capital murder trials always involve violent crimes. <u>Elmore v. Sinclair</u>, 799 F.3d 1238, 1248

8    (9th Cir. 2015), citing <u>Larson v. Palmateer</u>, 515 F.3d at 1063.

9             <u>Strength of the Evidence</u>

10       The strength of the state's case was significant. Petitioner's prints were found on the

11    stolen vehicle used during the attempted robbery and murder of Alan Birkman. He was identified

12    by the owner of that vehicle as having stolen it on the street in the owner's presence a few days

13    prior to the murder. Further, Petitioner was identified by the victim of the rape occurring

14    immediately prior to the theft of the vehicle. And very shortly after the Birkman incident

15    occurred, the evidence established that codefendant Ross and Petitioner returned to Ross's

16    friend's apartment in possession of a knife. When police knocked on the woman's door to ask

17    her about the vehicle parked nearby that was used by the suspects at the time of the murder,

18    Petitioner was asked to leave her apartment shortly thereafter. Petitioner was also identified by

19    Greta Slatten, the victim of another robbery occurring just after the Birkman murder. Petitioner

20    was then apprehended in Mississippi, driving the vehicle stolen from Slatten. Also, at the time of

21    his arrest, Petitioner was in possession of a knife or knives similar to the knife used to kill

22    Birkman. And, the jury heard testimony that Petitioner admitted the killing while in custody in

23    Mississippi. Notably too, Petitioner's testimony was simply not worthy of belief. The

24    aforementioned evidence was strong, mitigating the other concerns.

25       Petitioner argues the rape evidence was weak, inferring the case as a whole was weak.

26    The undersigned does not agree. The jury's credibility determination understandably favored the

27    victim over Petitioner. The victim's profession and lifestyle may have made this allegation of

28    rape more of a he said/she said contest than others, but Stramaglia's testimony was convincing,

and thus, worthy of belief.

The undersigned concludes that the evidence against Petitioner was so overwhelming that any bias created by the visible shackles had no prejudicial effect on the jury's guilty verdicts. See Larson v. Palmateer, 515 F.3d at 1064 (unconstitutional shackling results in prejudice only if the evidence of guilt is not overwhelming).

The aforementioned conclusion is bolstered by the length of the jury's deliberations.[58] As it pertains to the guilt phase,[59] involving the various crimes against both Petitioner and his codefendant, after hearing testimony for approximately 26 days,[60] the jury deliberated for less than 25 hours. (5 CT 1139-40; 6 CT 1271, 1273-74, 1281.) Their deliberations are unlike those cases wherein the jury struggled to reach a verdict after lengthy deliberations, arguably out of proportion to the length of the trial proceedings.

The decisions by the California Supreme Court rejecting Petitioner's shackling claims are not contrary to or involve an unreasonable application of United States Supreme Court authority, nor are they "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to federal habeas relief.

**Claim LL**

*The Ineffective Assistance of Counsel*

Relatedly, Petitioner contends that trial counsel were ineffective for failing to object to the shackling. His claim was raised and rejected in state habeas petitions to the California Supreme

---

[58] The jury was instructed that physical restraints were not evidence and that they were to completely disregard those restraints in making their determination. (25 RT 5596.) Jurors are presumed to have followed instructions. Kansas v. Marsh, 548 U.S. 163, 179 (2006); Richardson v. Marsh, 481 U.S. at 211; Fields v. Brown, 503 F.3d 755, 782 (9th Cir. 2007).

[59] In the penalty phase, the jury deliberated for less than five hours after hearing eight days of testimony and argument. (6 RT 1285, 1291, 1294-95, 1344-47, 1406.) This was simply not a close case.

[60] Testimony in the guilty phase commenced April 11, 1989, and the jury heard evidence and argument over the course of 26 days, through June 1, 1989. (See CT 1075, 1081, 1083, 1086, 1089, 1095, 1097, 1101, 1104, 1107, 1109, 1111-13, 1115, 1118, 1121, 1129-31, 1133, 1135-39.)

364

Court, where it was summarily denied on the merits.

Where the state court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. The United States Supreme Court stated that "a habeas court must determine what arguments or theories supported or … *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in prior decision of this Court." Richter, at 101-03 (emphasis added). Petitioner bears the burden of demonstrating there was no reasonable basis for the state court to deny relief. Richter, 562 U.S. at 98. "Crucially, this is not a *de novo* review of the constitutional question," as "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Richter, 562 U.S. at 102; see also Murray v. Schriro, 745 F.3d 984, 996-97 (9th Cir. 2014).

When reviewing the California Supreme Court's summary denial of a petition, this court must consider that the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that

> the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief. It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also review the record of the trial … to assess the merits of the petitioner's claims.

Pinholster, 563 U.S. at 181, n.12 (quoting In re Clark, 5 Cal.4th at 770); see also Johnson v. Williams, 568 U.S. 289 (2013) (holding that even where the state court does not separately discuss a federal claim there is a presumption that the state court adjudicated the federal claim on the merits). Thus, if this court finds Petitioner has unarguably presented a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable. Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004); Nunes v. Mueller, 350 F.3d 1045, 1054-44 (9th Cir. 2003).

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial. U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; see also Gideon v. Wainwright, 372 U.S. at 343–45; Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002); Murray, 745 F.3d at 1010–11.

The clearly established federal law for ineffective assistance of counsel claims is Strickland, 466 U.S. 668. In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 104 (citing Strickland, 466 U.S. at 688).

Petitioner must show that counsel's errors were so egregious as to deprive him of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence." Id. at 689. Instead, the habeas court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.; see also Richter, 562 U.S. at 106–08. A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 687); see also Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (same). This presumption of

reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." Pinholster, 563 U.S. at 196.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Wiggins v. Smith, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688).

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 687). Under this standard, we ask "whether it is 'reasonably likely' the result would have been different." Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 696).

That is, only when "[t]he likelihood of a different result [is] substantial, not just conceivable," has the defendant met Strickland's demand that defense errors were "so serious as to deprive the defendant of a fair trial." Richter, 562 U.S. at 103–05 (quoting Strickland, 466 U.S. at 687). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697. Because the petitioner must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Under AEDPA, the court does not apply Strickland de novo. Rather, the court must determine whether the state court's application of Strickland was unreasonable. Richter, 562 U.S.

at 100–01.  Establishing that a state court's application of Strickland was unreasonable under 28 U.S.C. § 2254(d) is very difficult.  See Richter, 562 U.S. at 102 (on deferential (2254(d)) review relief is granted only for "extreme malfunctions" in the state criminal justice system, not for ordinary errors that can be corrected on appeal).

Accordingly, because the standards created by Strickland and § 2254(d) are both "highly deferential," when the two are applied in tandem, review is "doubly so."  Richter, 562 U.S. at 102 (quoting Knowles v. Mirzayance, 556 U.S. at 123).  Further, because the Strickland rule is a "general" one, courts have "more leeway ... in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial."  Id. at 101; see also Premo v. Moore, 562 U.S. at 122–23.

The undersigned need not determine whether Holmes and/or Gable acted deficiently before examining the issue of prejudice.  Strickland, 466 U.S. at 697.  The court considers whether counsels' errors, assuming deficiency for the sake of the analysis, are "'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable,'" asking "whether it is 'reasonably likely' the result would have been different."  Richter, 462 U.S. at 104, 112.  For the reasons that follow, the undersigned concludes that the California Supreme Court reasonably decided that Petitioner was not prejudiced under Strickland.

### The Guilt Phase

During the guilt phase, the restraints involved here were a security chair, and, for a brief period of time, handcuffs.  The security chair was employed from the beginning, and the handcuffs were added when Petitioner's conduct during trial (in the form of allegedly attempting to file through the waist chain used to restrain him during transport and in court) increased the trial court's concerns over courtroom security.  As indicated previously, the record reveals that during the course of the trial proceedings Petitioner allegedly attempted to escape by altering or

368

filing several links of the waist chains used to transport him to and from the courtroom. Those same waist chains are what is used to fasten him to the security chair during the proceedings. Typically, "physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint." Larson v. Palmateer, 515 F.3d at 1064. Nevertheless, that is not the sole factor for consideration.

Significantly, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. Here, as previously discussed, the strength of the state's evidence was significant.

Briefly stated, Petitioner's fingerprints were found on the stolen vehicle used during the attempted robbery and murder of Alan Birkman. Petitioner was identified by the owner of that vehicle as having recently stolen it in the owner's presence. Further, Petitioner was identified by the victim of the rape occurring immediately prior to the theft of the vehicle. He was also identified by Greta Slatten, the victim of the robbery occurring just after the Birkman murder. Petitioner was thereafter apprehended in Mississippi, driving the vehicle stolen from Slatten after the Birkman murder. Also, at the time of his arrest, Petitioner was in possession of a knife or knives similar to the knife used to kill Birkman. And, the jury heard testimony that Petitioner admitted the killing while in custody in Mississippi. Petitioner's own testimony was often incredible and inconsistent.

The trial court had significant justification to employ physical restraints and the evidence of Petitioner's guilt could reasonably be said to be overwhelming. There is no reasonable probability or likelihood that had defense counsel objected to the shackling employed by the trial court that the result would have been different. Richter, 562 U.S. at 112. While it may be conceivable that an objection or objections by defense counsel would have had an effect on the proceedings, any error was not so serious as to deny Petitioner a fair trial. Richter, 562 U.S. at

369

104.

## The Penalty Phase

The question of prejudice in the penalty phase "has two layers, but they form a single inquiry: whether the California Supreme Court was (1) *reasonable* in concluding that (2) it is *not reasonably probable* that [Petitioner] would have avoided the death penalty had his counsel objected to the shackle." Walker v. Martel, 709 F.3d 925, 944 (9th Cir. 2013).

Here, Petitioner was convicted of rape, vehicle theft, robbery and murder in the course of an attempted robbery. More specifically, after raping Sandra Stramaglia, Petitioner fled her apartment and stole a nearby vehicle belonging to Edwin Glidewell. Four days later, the vehicle belonging to Glidewell was involved in and used to facilitate the attempted robbery and murder of Alan Birkman. About two hours later, Greta Slatten was physically assaulted and knocked unconscious outside a convenience store; her purse and vehicle were stolen. Ten days thereafter, Petitioner was apprehended in Mississippi, driving Slatten's stolen vehicle. Slatten identified Petitioner as the individual using the phone just prior to her assault.

In aggravation, the jury learned that Petitioner had been previously convicted of the crimes of voluntary manslaughter and assault with a deadly weapon in 1982. More specifically, the jury heard the testimony of witnesses concerning the circumstances of those crimes. The jury also learned that Petitioner was convicted of escape from state prison without the use of force in 1983. Finally, in addition to the foregoing convictions, the jury heard testimony concerning separate assaults involving Petitioner and other Sacramento County jail inmates. In mitigation, the jury heard testimony from several witnesses, including: (1) that Petitioner offered no resistance at the time of his apprehension following an escape from state prison; (2) that Petitioner helped to care for and was devoted to a girlfriend's handicapped son; (3) expert testimony concerning Cuban emigration and its impact on refugees; (4) testimony from a Virginia

370

attorney who provided Petitioner with housing and employment assistance as a church sponsor to Cuban refugees; and (5) expert testimony from a social anthropologist with a specialty in Latin America and the Spanish-speaking Caribbean, who interviewed Petitioner, other Cuban immigrants familiar with the boat lifts of which Petitioner was a part, and Petitioner's father and friends; from that information, the expert opined that Petitioner suffered from emotional and psychological problems as a child, and from culture shock following his arrival to the United States.

The California Supreme Court could have reasonably concluded that the jury's knowledge of the waist chain and/or handcuffs was trivial in relation to the magnitude of Petitioner's crimes and the circumstances presented in aggravation, as compared to those in mitigation. Simply put, the evidence of Petitioner's guilt was strong and the circumstances in aggravation were compelling. See Walker v. Martel, 709 F.3d at 944. The length of the jury's deliberations during the penalty phase is significant and also weighs against a finding of prejudice. The jury deliberated for less than five hours after hearing eight days of testimony and argument during the penalty phase. (6 CT 1285, 1291, 1294-95, 1344-47, 1406.) The California Supreme Court could have reasonably concluded it was not reasonably probable that had Gable and/or Holmes objected to the shackling employed in this case that Petitioner would have avoided the death penalty.

### Conclusion

In the ineffective assistance of counsel context, considering the nature of the restraints employed, the strength of the evidence against Petitioner, and the circumstances in aggravation and mitigation, there are reasonable bases upon which the California Supreme Court could deny relief. That court's decision is not contrary to, nor an unreasonable application of, United States Supreme Court precedent. As a result, the undersigned RECOMMENDS that Claim LL be DENIED.

## Claims H, I, L, M and N: Erroneous Admissions of Certain Evidence

In this next series of claims, Petitioner argues certain evidence admitted during the guilt phase violated his federal due process rights to a fair trial entitling him to habeas relief. (ECF No. 330 at 537-40.) Respondent maintains that the California Supreme Court's determinations of the claims are neither unreasonable nor contrary to Supreme Court precedent, thus proscribing habeas relief. (ECF No. 345 at 288-99.)

### *Legal Standards Applicable to the Series*

A state court's admission of evidence under state evidentiary law will form the basis for federal habeas relief only where the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair" in violation of a petitioner's due process rights. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). "[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief." Id.

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," Dowling v. United States, 493 U.S. 342, 352 (1990), and "has made very few rulings regarding the admission of evidence as a violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). It has opted not to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law." Estelle v. McGuire, 502 U.S. at 75 & n.5 (noting that the Court "express[ed] no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). Moreover, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley, 568 F.3d at 1101 (citing Carey v. Musladin, 549 U.S. at 77). In the absence of clearly established law that admission of even overtly prejudicial evidence constitutes a due process violation, the court

cannot conclude that the state court's ruling was an "unreasonable application."  Id.; see also

Larson v. Palmateer, 515 F.3d at 1066 (holding that because the Supreme Court has expressly

reserved the question of whether using evidence of a defendant's past crimes to show that he has

a propensity for criminal activity could ever violate due process, the state court did not

unreasonably apply clearly established law in determining that the admission of defendant's

criminal history did not violate due process).  A federal court is "without power" to grant a

habeas petition based solely on the admission of evidence.  Id.

Even setting aside the issue of clearly established federal law, "[a] habeas petitioner bears

a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v.

Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), as amended, 421 F.3d 1154 (9th Cir. 2005).  Again,

"'[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial

fundamentally unfair in violation of due process.'" Holley, 568 F.3d at 1101.  "Only if there are

*no* permissible inferences the jury may draw from evidence can its admission violate due

process." Alcala v. Woodford, 334 F.3d 862, 887 (9th Cir. 2003) (emphasis in original); Houston

v. Roe, 177 F.3d 901, 910 n.6 (9th Cir. 1999).  "Even then, the evidence must 'be of such quality

as necessarily prevents a fair trial.'" Jammal v. Van de Kamp, 926 F.2d at 920 (citation omitted).

Such an outcome can only occur if the admission of the evidence had a "'substantial and injurious

effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. at 623

(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

### Claims H & I: Statements by Leslie Colyer

Petitioner maintains the trial court erred by admitting Leslie Colyer's statement that she

told Petitioner, during a telephone conversation between the two when Petitioner was incarcerated

in a Mississippi jail, that Petitioner "had killed a police officer."  (ECF No. 330 at 537, 538.)

Further, he contends it erred by admitting Colyer's statement that police told her Petitioner was

wanted for homicide. (ECF No. 330 at 537-38.) Respondent disagrees. (ECF No. 345 at 289-91.)

## The California Supreme Court's Determination

At the guilt phase, Charles Robinson testified on behalf of the People that, while in jail in Mississippi, defendant told him that "he had killed a police officer in California." Allen Birkman was not a police officer, but rather a civilian identification technician for a police department. At defendant's request, the superior court admonished the jury to the effect that Birkman was not a police officer, and that his homicide was the only one at issue.

In advance of the People calling Leslie Colyer to the witness stand, defendant moved the superior court, *in limine*, to preclude them from eliciting certain testimony as inadmissible hearsay—viz., that, in the course of a telephone conversation soon after the Birkman homicide, she told him that the victim was a police officer. Expressly determining that the testimony was not hearsay, it denied the motion.

Later, Colyer testified in substance that, in the course of a telephone conversation soon after the Birkman homicide, she told defendant that the victim was a police officer. In line with his motion to bar such testimony, defendant objected on the basis of hearsay; in line with its denial of that motion, the superior court overruled the objection. Colyer also testified that, earlier, the police had inquired of her as to his whereabouts. She then testified that they advised her they were seeking him in connection with a homicide. Defendant objected on the basis of hearsay; impliedly determining that the testimony was not hearsay, the superior court overruled the objection.

Defendant contends that the superior court erred by denying his motion to preclude, as inadmissible hearsay, Colyer's testimony that she told him the victim of the homicide was a police officer and also by overruling his hearsay objection to her testimony that the police advised her they were seeking him in connection with a homicide.

As stated, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion. Specifically, it scrutinizes a decision on a motion to bar the introduction of evidence as inadmissible hearsay for such abuse: it does so because it so examines the underlying determination whether the evidence was indeed hearsay. (*People v. Rowland, supra*, 4 Cal.4th at pp. 262–64.) It follows that it gives the same level of scrutiny for the same reason to the passing on a hearsay objection.

We believe that the superior court did not abuse its discretion by denying defendant's motion to preclude, as inadmissible hearsay, Colyer's testimony that she told him the victim of the homicide was a police officer. Hearsay is evidence of an out-of-court statement that is offered by its proponent to prove what it states. Colyer's testimony was not such. Manifestly, it was not offered by the People to prove that Birkman was a police officer: he was not. Rather, it was offered by them to prove that, in admitting that he had killed a "police officer," defendant effectively admitted he had killed Birkman, who he had been told was a police officer. The superior court was not unreasonable in expressly determining that the testimony was not hearsay. Indeed, it would have been unreasonable had it determined otherwise.

We also believe that the superior court did not abuse its discretion by overruling defendant's hearsay objection to Colyer's testimony that the police advised her they were

374

seeking him in connection with a homicide. This testimony too was not hearsay. It was not offered by the People to prove the existence of a police investigation into his whereabouts. Rather, it was offered by them to prove the source of the information she obtained and then communicated to him—in order to prove that, in admitting he had killed a "police officer," he effectively admitted he had killed Birkman. The superior court was not unreasonable in impliedly determining that the testimony was not hearsay.

[FN] 14. To the extent that defendant claims that the superior court erred by denying his motion and by overruling his objection on such grounds as that Colyer's testimony was irrelevant and, if relevant, unduly prejudicial, he has not preserved his point for review. He did not comply with the general rule requiring a "specific" and "timely" objection below, except as to hearsay. No exception covers his noncompliance. In any event, he fails on the merits. The testimony had a tendency in reason to prove a disputed fact bearing on a material issue, viz., the identity of Birkman's killer: in admitting he had killed a "police officer," he effectively admitted he had killed Birkman. Further, the testimony cannot be considered insufficiently probative in light of, inter alia, the risk to the fairness of the proceedings or the reliability of the outcome. (Evid.Code, § 352.) Any such risk was nullified by the superior court's admonition that Birkman was not a police officer and that his homicide was the only one at issue.

Defendant may be understood to argue that irrelevant evidence—such as he now asserts Colyer's testimony to be—is, by that very fact, hearsay evidence. That is not the case. Evidence is hearsay if it is offered in the form of an out-of-court statement to prove what it states. By contrast, evidence is irrelevant if it has no tendency in reason to prove or disprove a disputed fact bearing on a material issue; it need not be offered in the form, or for the purpose, specified for hearsay.

Defendant may also be understood to argue that Colyer's testimony somehow undermined the superior court's admonition that Birkman was not a police officer and that his homicide was the only one at issue. Not at all. It merely, and properly, allowed or supported an inference that, in admitting he had killed a "police officer," he effectively admitted he had killed Birkman.

People v. Alvarez, 14 Cal.4th at 202-03.

**Analysis**

A review of the record reveals that witness Charles Robinson testified that, while the two were incarcerated in Mississippi, Petitioner told him "he had killed a police officer in California." (15 RT 3250, 3251.) At the completion of his testimony, the jury was admonished as follows:

THE COURT: … Ladies and gentlemen, the statement that Mr. Robinson has attributed to Mr. Alvarez was that he had killed a police officer in California.

Now, first of all, I'm not trying to give any greater credibility to the statement or make any connections for you, that's up to you to decide whether that statement has any bearing on this case or if so, what weight you should give to it.

375

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I simply want to clarify that.

As you recall, Mr. Birkman was an employee of the police department, and that there are no charges nor are there any inferences of any other killing.

(15 RT 3268.)

Before Leslie Colyer took the stand in the People's case, Mr. Holmes indicated to the court he had "an in limine motion … to make" concerning her anticipated testimony. (15 RT 3328-29.) He objected to the anticipated statement as hearsay and that it was more prejudicial than probative. (15 RT 3329-30.) The trial court ruled "it's clearly not hearsay to offer something that, in fact, is not true, but would go to his state of mind of what information he was given, assist in tying in the previous statement about killing a cop." (15 RT 3330.)

Colyer then testified that she was contacted by Sergeant Twilling of the Sacramento Police Department May 18, 1987, at about 1:00 a.m., inquiring into Petitioner's whereabouts. (15 RT 3334.) Twilling advised Colyer "[t]hey were trying to locate [him] in connection with some homicide." (15 RT 3336.) Mr. Holmes' hearsay objection was overruled. (15 RT 3336.) Because she had been in contact with Petitioner at that time, Colyer "told him that the papers said that he was being sought in connection with the death of an officer, although, I knew it was not an officer, you know, I did say that." (15 RT 3337.) She agreed she "knew from the police, from the newspaper articles, that the man who had been killed was actually a civilian employee of the police department." (15 RT 3337.) But Colyer did tell Petitioner "that the man who had been killed was a police officer" when he called her from Texas. (15 RT 3337-39.)

Petitioner is not entitled to habeas relief because United States Supreme Court precedent does not clearly establish that admission of this type of evidence violates due process. See Holley v. Yarborough, 568 F.3d at 1101.

In any event, the California Supreme Court's determination was not unreasonable. It determined the trial court did not abuse its discretion in denying defense counsel's motion

because the statement was not hearsay as it was not offered for its truth.   That court explained the statement was not offered to prove Birkman was a police officer, but that Petitioner *was told* that Birkman was a police officer before telling Robinson that he had killed a police officer, thereby implicating himself in the homicide.  Colyer's testimony itself referenced the fact Birkman was not a police officer.  Petitioner was not denied due process or a fair trial.  Colyer's testimony did not "so fatally infect the proceedings as to render them unfair." <u>Jammal v. Van de Kamp</u>, 926 F.3d at 919; <u>see also</u> <u>Estelle v. McGuire</u>, 502 U.S. at 67–68; <u>Kealohapauole v. Shimoda</u>, 800 F.2d 1463, 1466 (9th Cir. 1986) (noting admission of evidence violates due process only when it "rendered the trial fundamentally unfair").

Further, the determination that Colyer's testimony concerning what she was told by Sergeant Twilling was not hearsay is not unreasonable.  Whether the police were investigating Petitioner's whereabouts was not the basis for offering the testimony.  Instead, the testimony was offered to show that Petitioner had certain information from his communication with Colyer prior to the time he purportedly told Robinson he had killed a police officer in California.  Again, the trial court's evidentiary rulings did not "so fatally infect[] the proceedings as to render them fundamentally unfair." <u>Jammal v. Van de Kamp</u>, 926 F.2d at 919.

Moreover, Petitioner cannot show the admission of Colyer's testimony had any "substantial and injurious effect" on the verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. at 637-38.  There was other evidence of Petitioner's guilt regarding the Birkman murder, including, for example, the testimony of his co-defendant Belinda Ross and witness Charles Kosobud.

In sum, the California Supreme Court's rejection of Petitioner's argument was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d).  Therefore, he is not entitled to habeas relief.  The undersigned hereby RECOMMENDS that Claims H and I be DENIED.

*Claim L: Hawkins' Statements on Cross-Examination*

Here, Petitioner complains the trial court violated his due process rights when it permitted

the prosecution to "elicit a host of statements made from Neetelfer Hawkins on cross-examination

that she made to the police, despite the fact these statements were not relevant," prejudicial and

undermining.  (ECF No. 330 at 537-39.)  Respondent disagrees.  (ECF No. 345 at 292-94.)

## The California Supreme Court's Determination

Regarding Petitioner's objection to the cross-examination of Neetelfer Hawkins, the

state's highest court found as follows:

> In his case, defendant called Neetelfer Hawkins to the witness stand. On direct
> examination, he elicited testimony that she welcomed him to stay at her home in March,
> April, and May of 1987—apparently, other evidence suggested, as a lover. He also elicited
> testimony in an attempt to support his alibi defense: at 7:00 a.m. on May 17, 1987—the
> date of the charged robbery and murder of Allen Birkman and the charged robbery of
> Greta Slatten—he placed a telephone call to her and made an (evidently) unsuccessful
> request of her to pick him up.
> On cross-examination, the People sought to inquire, for purposes of impeachment,
> into an interview that officers of the Sacramento Police Department conducted with
> Hawkins about 10:00 p.m. on May 17.  Defendant objected on the grounds that any
> responsive testimony would be irrelevant and also inadmissible hearsay. Outside the
> presence of the jury, the People made an offer of proof: in the course of the interview, the
> officers posed specific questions to Hawkins about defendant and her contacts with him,
> and she gave detailed answers in response, but failed to mention any telephone call that
> day; if she did not admit the omission on cross-examination, they would call one of the
> officers in their case in rebuttal to establish it as a fact. Defendant then effectively
> objected to the People's inquiry into specific questions by the officers and detailed
> answers by Hawkins as lacking in foundation, in advance of their introduction of evidence
> that she indeed failed to mention any call that day. The superior court overruled all
> defendant's objections.
> On cross-examination, the People inquired into the May 17 interview. Hawkins
> testified to specific questions by the officers and detailed answers by her in response. But
> she denied that she failed to mention any telephone call from defendant that day.
> Subsequently, taking the witness stand on his own behalf, defendant testified, inter
> alia, that sometime early in the morning of May 17, he placed a telephone call to Hawkins
> and made an (evidently) unsuccessful request of her to pick him up. He further testified
> that, about 11:30 or 11:40 a.m. that same day, he placed another call and made another
> unsuccessful request.
> In their case-in-rebuttal, the People called Hawkins. She restated that, on May 17,
> defendant placed a telephone call to her at 7:00 a.m. She added that, on that day, to her
> knowledge he did not place any other call to her at any other time.

The People also called Sergeant Ralph Coyle. He was one of the police officers who interviewed Hawkins on May 17. He testified that she failed to mention any telephone call from defendant that day.

Defendant now contends that the superior court erred by overruling his lack-of-foundation objection to the People's inquiry into specific questions by the officers and detailed answers by Hawkins in the course of the May 17 interview, in advance of their introduction of evidence that she failed to mention any telephone call from him that day.

As a general matter, an appellate court reviews a trial court's ruling as to the order of proof for abuse of discretion. That is because, as a general matter, the trial court has authority to "regulate the order of proof" in the exercise of "its discretion." (Evid.Code, § 320.)

We examine the superior court's passing on defendant's lack-of-foundation objection for abuse of discretion. We do so inasmuch as it amounts to the kind of ruling as to the order of proof that is generally entrusted to its discretion.

After such examination, we discern no abuse of discretion. The superior court was not unreasonable in allowing the People's inquiry into specific questions by the officers and detailed answers by Hawkins in the course of the May 17 interview, in advance of their introduction of evidence that she failed to mention any telephone call from defendant that morning. They had made an offer of proof of her omission. Defendant did not contest the issue. Through the testimony of Sergeant Coyle, they subsequently furnished the proof. We do not see any basis for a conclusion that the superior court's regulation of these matters was wanting in any particular.

People v. Alvarez, 14 Cal.4th at 206-207.

**Analysis**

Initially, it is noted that the California Supreme Court's factual summary of the relevant record is accurate. (See 18 RT 3953-96; 22 RT 5121-37; 23 RT 5180-87, 5199-200.) Even so, as noted in Holley v. Yarborough, the "admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Holley, 568 F.3d at 1101.

In Holley, the petitioner was charged with multiple felony counts of lewd and lascivious acts on a child under fourteen; he challenged the trial court's admission of a lewd matchbook and several sexually explicit magazines seized from his bedroom. Holley, 568 F.3d at 1096. The Ninth Circuit denied habeas relief because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Id. at 1101. "Absent such 'clearly established Federal

law,'" the Ninth Circuit in <u>Holley</u> could not "conclude that the state court's ruling was an unreasonable application" of federal precedent. <u>Id.</u> (quoting <u>Carey v. Musladin</u>, 549 U.S. at 77).

It was not fundamentally unfair for the trial court to permit the admission of this evidence where the testimony proffered raised issues of impeachment of the witness. There was no fundamental unfairness by virtue of the admission of the complained of evidence, even if it lacked foundation. And, as explained in the claims addressed immediately above in this series, any error could not have had a "'substantial and injurious effect or influence on the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. at 623 (quoting <u>Kotteakos v. United States</u>, 328 U.S. at 776).

For the foregoing reasons, the undersigned RECOMMENDS that Claim L be DENIED.

### *Claim M: Co-defendant Ross' Testimony Concerning Hawkins & Petitioner*

Petitioner next avers that by allowing co-defendant Ross to testify about a fight she witnessed between Neetlefer Hawkins and Petitioner, the trial court violated his due process right to a fair trial. (ECF No. 330 at 537, 539-40.) Respondent disagrees. (ECF No. 345 at 294-97.)

### The California Supreme Court's Determination

Concerning Petitioner's claim, the state's highest court determined:

> On direct examination, defendant gave testimony in which he presented an alibi for the time and place of the charged robbery and murder of Allen Birkman. In the course of cross-examination by the People, he denied that he had acted violently during an argument with Neetelfer Hawkins at the latter's home on May 16, 1987, the day before the crimes in question.
>
> In her case, Ross took the witness stand in her own defense. On direct examination, in an effort to shift responsibility for the charged robbery and murder off her shoulders and onto defendant's, she testified in substance that she did not even suspect what he had evidently intended, but had accompanied him out of fear.
>
> On cross-examination by the People, Ross was asked, "Why were you afraid of him?," and answered, "Because I had just witnessed what he did to ... Miss Hawkins."
>
> Later in the People's cross-examination, Ross was asked, "What was the thing at Neetlefer's [sic ] that made you afraid of [him]?," but was prevented from answering by defendant's objection that any response would be irrelevant.
>
> At defendant's request, the People then made an offer of proof outside the presence of the jury, by taking Ross on voir dire: She testified about defendant's argument

380

with Hawkins as a "lover's quarrel type of thing," in the course of which she screamed and swore at him and he forcibly covered her mouth almost to the point of stifling and handled her roughly, she telling him she was going to call the police and he threatening her he would kill her if she did.

Defendant restated his objection that any response by Ross to the People's question about his argument with Hawkins would be irrelevant. In addition, he raised objections that such response would be unduly prejudicial and would amount to inadmissible character evidence, i.e., evidence of his character or a trait of his character offered to prove his conduct on the specified occasion of the charged robbery and murder (Evid.Code, § 1101, subd. (a)).

After a hearing, at which it ultimately appears to have accepted the People's position that whether Ross was afraid of defendant was the "nut" of her defense and why she was afraid of him was crucial thereto, the superior court generally overruled all defendant's objections to Ross's expected response to the People's question about his argument with Hawkins, but sustained that based on undue prejudice as to any threat to kill.

Subsequently, on cross-examination by the People, Ross was asked about defendant's argument with Hawkins, and she answered in accordance with her testimony on voir dire, making plain that he had acted violently, but without mentioning his threat to kill Hawkins.

Later, in their case-in-rebuttal, the People called Hawkins and Sergeant Coyle. Hawkins denied that defendant had acted violently during the argument. Sergeant Coyle asserted that she had told him the opposite.

Defendant now contends that the superior court erred by generally overruling his irrelevance, undue prejudice, and inadmissible character evidence objections to the People's question to Ross about his argument with Hawkins.

As stated, an appellate court reviews a trial court's passing on an objection based on irrelevance for abuse of discretion. The same is true for an objection based on undue prejudice. (*See People v. Gordon, supra,* 50 Cal.3d at p. 1239.) Likewise, for an objection based on inadmissible character evidence. (*People v. Memro, supra*, 11 Cal.4th at p. 864.)

There was no abuse of discretion.

The superior court was not unreasonable in impliedly determining that Ross's expected response about defendant's argument with Hawkins would be relevant. It had a tendency in reason to prove a disputed fact bearing on a material issue, viz., the relative responsibility of defendant and Ross for the charged robbery and murder. To the extent that his argument with Hawkins would show a supported fear of him on her part, it might be able to diminish her culpability over against his. But to the extent that it would not, it might not. Defendant argues the evidence was irrelevant: insofar as it would favor Ross's position vis-à-vis the People, it could be presented by her but not elicited by them. He furnishes no support for his assertion, and we find none. Relevance does not depend on the identity of the evidence's proponent. Neither does admissibility. With exceptions not applicable here, "*all* relevant evidence is admissible." ([E]vid.[C]ode, § 351, italics added.)

> [FN] 18.  Underlying defendant's argument seems to be a concern that, if a party introduces relevant evidence favorable to his opponent, he may be doing so in the hope that it will be used by the jury to draw a forbidden inference. A limiting instruction, however, can prevent such an eventuality. No instruction of this sort was sought by defendant. No complaint may therefore be raised.

Neither was the superior court unreasonable in impliedly determining that Ross's expected response about defendant's argument with Hawkins would not be unduly prejudicial (except as to his threat to kill her). Certainly, even though it could be considered somewhat collateral and would (and in fact did) lead to rebuttal testimony by Hawkins and Sergeant Coyle, it did not threaten substantial harm to the fairness of the proceedings, as by confusing the issues or misleading the jury. In contrast, it promised substantial benefit to the reliability of the outcome. It arguably constituted the strongest evidence supporting Ross's fear of defendant. Evidence in support was indeed needed: Ross's fear could not be accepted at face value. Defendant argues the evidence was unduly prejudicial. At most, he shows that his argument with Hawkins might have been used by the jury to draw a forbidden inference. That is not enough.

[FN] 19.  Again, a limiting instruction could have prevented such an eventuality. No instruction of this sort was sought by defendant. No complaint may therefore be raised.

Lastly, the superior court was not unreasonable in impliedly determining that Ross's expected response about defendant's argument with Hawkins would not amount to inadmissible character evidence. True, it might have provided an indication of a propensity toward violence on his part. But it was not offered to prove his conduct on the specified occasion of the charged robbery and murder. Defendant argues the evidence was inadmissible character evidence. Here, as above, the most that he shows is that it might have been used by the jury to draw a forbidden inference. Here, as above, that is not enough.

[FN] 20.  Yet again, a limiting instruction could have prevented such an eventuality. No instruction of this sort was sought by defendant. No complaint may therefore be raised.

Defendant claims in substance that, because the superior court committed error under California law by ruling as it did, it thereby committed error under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. As explained in the text, the superior court did not commit error under California law.

To the extent that defendant claims that the superior court erred under either California law or the United States Constitution by failing to reconsider his motion to sever his trial from Ross's sua sponte, he does not succeed. Contrary to his implication, the superior court was not under a duty to reconsider in the absence of a request.

Even if the superior court had, in fact, erred by overruling any of defendant's objections to the People's question to Ross about his argument with Hawkins—which it did not—reversal would not be called for. "It is the general rule for error under [California] law"—which we believe is applicable here—"that reversal requires prejudice and prejudice in turn requires a reasonable probability of an effect on the outcome" under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Gordon, supra*, 50 Cal.3d at p. 1253.) Such a probability does not appear. In view of all the evidence that was properly admitted on each of the charged crimes, Ross's testimony concerning the "lover's quarrel" between defendant and Hawkins was of no marginal significance.

People v. Alvarez, 14 Cal.4th at 213-16.

**Analysis**

The undersigned notes the California Supreme Court's factual summary of the relevant record is accurate.  (See 18 RT 4127-55, 4359-66, 4563-79, 4593, 4629-30, 4642-62, 4684-93.)

To recap, the United States Supreme Court has not clearly established that admission of this type of evidence violates due process.  Holley, 568 F.3d at 1101.  In any event, the California Supreme Court's determination that the evidence was relevant, not unduly prejudicial or inadmissible character evidence was not unreasonable.

The testimony was not irrelevant for it spoke to Ross' defense.  It bore on whether she feared Petitioner and whether, regardless, she was involved in the crimes charged.  The evidence was not unduly prejudicial where it concerned and spoke to the reliability of Ross' defense and did not confuse the issues or mislead the jury.  (Cal. Evid. Code, § 352.)  The conclusion that the evidence did not amount to inadmissible character evidence was not unreasonable either.  That information was not offered to prove Petitioner's conduct on a specific occasion, but rather that Ross had reason to fear Petitioner as a result of having witnessed the incident.  (Cal. Evid. Code, § 1101.)

The Supreme Court has declined to find that evidence of other crimes or bad acts evidence amounted to a due process violation in Estelle v. McGuire, 502 U.S. at 75 & n.5.  Further, there is no clear ruling that the admission of irrelevant or overtly prejudicial evidence constitutes a due process violation. Holley v. Yarborough, 568 F.3d at 1101 (citing Carey v. Musladin, 549 U.S. at 77).  The trial court's ruling regarding the admission of this evidence cannot be said to have "so fatally infected the proceedings as to render them fundamentally unfair," in violation of Petitioner's due process rights.  Jammal v. Van de Kamp, 926 F.2d at 919.  And, a habeas court cannot conclude a state court's ruling was an unreasonable application of clearly established federal law in the absence of clearly established law that the admission of such evidence

constitutes a due process violation.  Holley, 568 F.3d at 1101; Larson v. Palmateer, 515 F.3d at 1066.

For reasons previously explained, even if error is presumed, it was not substantial, nor did it have an injurious effect or influence on the jury's verdict in light of the other evidence presented.  Brecht v. Abrahamson, 507 U.S. at 623.  Accordingly, the undersigned hereby RECOMMENDS that Claim M be DENIED.

### Claim N: Prosecutorial Misconduct During Petitioner's Cross-examination

In the last claim of this series, Petitioner contends the prosecutor committed misconduct "by flagrantly disregarding the trial court's limiting instruction regarding cross-examination of [him] about his use of Greta Slatten's credit cards."  (ECF No. 330 at 537-38, 540.)  Respondent disagrees.  (ECF No. 345 at 297-99.)

### The California Supreme Court's Determination

Regarding this claim, the California Supreme Court held the following:

> On direct examination, defendant gave testimony in which he presented an alibi for the time and place of the charged robbery of Greta Slatten. He stated, inter alia, that he had gotten possession of Slatten's Taurus the day of the robbery by giving some cocaine in trade to a young man who called himself "J.R."; in the automobile, he found a purse, which evidently belonged to Slatten; he drove south and eventually arrived in Fresno; there, he disposed of the purse.
>
> Outside the presence of the jury, defendant moved the superior court to preclude the People from inquiring into whether he used certain credit cards in Slatten's purse. His basis included that any response would be unduly prejudicial, i.e., insufficiently probative in light of, inter alia, the risk to the fairness of the proceedings or the reliability of the outcome. On that basis, the superior court ruled as follows: the People could ask whether he used the credit cards; if he answered yes, they could not go any further; if he answered no, they could.
>
> In the course of cross-examination, the prosecutor asked whether he used any of Slatten's credit cards, and defendant answered yes; the prosecutor asked if he kept the credit cards after he disposed of the purse or disposed of the purse after he used them, and he answered he used a gasoline company credit card and then disposed of the purse; the prosecutor asked whether he disposed of the purse and all the other credit cards, and he answered yes; the prosecutor asked if the only credit card he used was that of the gasoline company, and he answered yes.
>
> At this point, defendant objected that the prosecutor's questions violated the superior court's ruling. The superior court overruled the objection.

384

Thereupon, the prosecutor asked whether he used a chain-store credit card belonging to Slatten, and defendant answered no; he asked whether he went into one of the stores in the chain, and he answered no.

Defendant contends in substance that the superior court erred by effectively determining that the prosecutor did not commit misconduct by asking all but the initial question on his use of Slatten's credit cards.

As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion. (*Cf.* 2 Childress & Davis, Federal Standards of Review (2d ed. 1992) § 12.01, pp. 12–1 to 12–16 [setting forth the standard of review under federal law].)

We believe that the superior court did not abuse its discretion. "'In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury.' [Citation.] His 'good faith vel non' is not 'crucial.' [Citation.] That is because the standard in accordance with which his conduct is evaluated is objective." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.) Under this rule, the superior court was not unreasonable in impliedly concluding that the prosecutor did not commit misconduct. For it was not unreasonable in impliedly finding that he did not use any method of persuasion that may be deemed deceptive or reprehensible. Defendant argues that, by asking all but the initial question on his use of Slatten's credit cards, the prosecutor violated the superior court's ruling. Plainly, to judge from its overruling of his objection, the superior court discerned no substantial violation. Neither do we. As noted, the prosecutor asked whether he used any of the credit cards, and defendant answered yes. The prosecutor then turned from the matter of "use" to that of "time," asking if he kept the credit cards after he disposed of the purse or disposed of the purse after he used them. Of his own accord, defendant returned to the matter of "use," answering he used a gasoline company credit card and then disposed of the purse. By following where defendant led, the prosecutor cannot be held to have substantially violated the superior court's ruling.

People v. Alvarez, 14 Cal.4th at 212-13.

**Applicable Legal Standards**

Allegations of prosecutorial misconduct are governed by the standard set forth by the Supreme Court in Darden v. Wainwright, 477 U.S. 168, 181 (1986); see Parker v. Matthews, 567 U.S. at 45 (identifying Darden as "[t]he 'clearly established Federal law'" relevant to claims of prosecutorial misconduct arising from prosecutor's closing arguments). In Darden, the Supreme Court explained that prosecutorial misconduct does not rise to the level of a constitutional violation unless it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); Comer v. Schriro, 480 F.3d 960, 988 (9th Cir. 2007). To determine whether a

prosecutor's comments amount to a due process violation, the reviewing court must examine the entire proceedings so that the prosecutor's remarks may be placed in their proper context.  Boyde v. California, 494 U.S. at 384–85.

In making this determination, the reviewing court must be mindful that the standard set forth in Darden is a "very general one."  Parker v. Matthews, 567 U.S. at 48. Consequently, it "leav[es] courts more leeway ... in reaching outcomes in case-by-case determinations."  Id. (citations & internal quotations omitted).  Thus, to establish that a state court's application of the Darden standard is unreasonable, the petitioner must show that the state's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Parker v. Matthews, 567 U.S. at 47. Assuming, however, that a petitioner can establish that the prosecutor engaged in misconduct, habeas relief nevertheless is unwarranted unless the petitioner can show that the misconduct had a substantial and injurious impact on the jury's verdict.  Karis v. Calderon, 283 F.3d 1117, 1128 (9th Cir. 2002) (citing Brecht, 507 U.S. at 638).

**Analysis**

The undersigned notes the California Supreme Court's factual summary of the relevant record is accurate.  (See 19 RT 4190-201, 4234-39.)

Petitioner complains the prosecution violated his due process rights by "flagrantly disregarding" the trial court's limiting instruction concerning the prosecutor's cross-examination of Petitioner regarding the use of Greta Slatten's credit cards.  However, examining the record in context regarding the complained of exchange reveals there is no due process violation.

Petitioner effectively testified he did not rob Greta Slatten because he purchased the vehicle owned by Slatten from a man named "J.R." in exchange for a quantity of drugs.  Slatten's purse was in the vehicle when Petitioner took possession of it from J.R.  When the prosecutor

sought to cross-examine Petitioner about the credit cards in Slatten's purse,[61] the defense objected

and the court ultimately determined the prosecutor could ask Petitioner whether he used the credit

cards. If Petitioner replied affirmatively, that was to be the end of the matter.

The testimonial exchange went as follows:

> [THE PROSECUTOR]: Mr. Alvarez, did you use any of the credit cards that were in Miss Slatten's purse?
> [PETITIONER]: Yes, I did.
> Q. Had you kept them when you dumped the purse or did you dump the purse after you used them?
> A. I believe that I grabbed the Shell, I think it was the Shell for gasoline or something like that, and I used that one, after I used it - - I just dumped it.
> Q. Then you dumped the rest of the cards and the purse?
> A. Everything, dump, you know, I can't use the other ones, no matter what.
> Q. The only cards of Miss Slatten's you used was the Shell card?
> A. Shell card.
> Q. In fact, didn't you - -
> MR. GABLE: Your Honor, I'm going to object to, that this goes beyond the scope of the Court's ruling.
> THE COURT: The objection is overruled.

(19 RT 4238-39.) Petitioner thereafter denied using Slatten's Sears credit card at a Sears store in

Fresno. (19 RT 4239.)[62]

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is

the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209,

219 (1982). The high court's decision in Parker addressed such a claim. In Parker, the Court of

Appeals for the Sixth Circuit had granted habeas relief on a claim that the prosecutor committed

misconduct in closing argument by suggesting that the petitioner had colluded with his lawyer

and expert witness to create an "extreme emotional disturbance" defense. Applying the AEDPA

standard of review, the United States Supreme Court reversed the Sixth Circuit. Id. at 47-48. The

---

[61] Outside the jury's presence, the prosecutor advised the court there was evidence Petitioner used each of Slatten's credit cards. (See 19 RT 4234-38.)

[62] Greta Slatten testified that her purse contained a Weinstocks, Penney's, Sears and Shell credit cards on May 17, 1987, and that charges were made on those cards following the theft of her car and purse. (14 RT 3123.)

Supreme Court reasoned that, even if the prosecutor's comments had directed the jury's attention to inappropriate considerations, Matthews had not shown that the Kentucky state court's rejection of the prosecutorial misconduct claim was "'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Parker v. Matthews, 567 U.S. at 47 (quoting Richter, 562 U.S. at 103).

Here, the prosecutor's alleged misconduct in eliciting excluded evidence did not render Petitioner's trial fundamentally unfair. The challenged evidence did not, as the California Supreme Court noted, pertain to Petitioner's use of the cards once he answered affirmatively. Rather, the questions posed thereafter concerned the timing of that usage. The trial court accorded no limitation in that regard. Petitioner himself returned the inquiry to one of use. The undersigned disagrees with Petitioner's assertion that the prosecutor acted "flagrantly," deceptively or reprehensibly. Even if a court could hold otherwise, the California Supreme Court's determination is not "so lacking in its justification that there was error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Parker, 567 U.S. at 47. Thus, under the circumstances, that determination did not render Petitioner's trial fundamentally unfair. See Parker, 567 U.S. at 47-48; Darden, 477 U.S. at 181; 28 U.S.C. § 2254(d).

For the same reasons, the alleged misconduct did not have any "substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 637-38; Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir. 2004) (Brecht applies to claim of prosecutorial misconduct). Accordingly, the undersigned RECOMMENDS that Claim N be DENIED.

### Claim J: Birkman's Statements to Kosobud & Lim

Arguing the California Supreme Court unreasonably applied Supreme Court precedent, Petitioner argues the admission of victim Allen Birkman's statements to Charles Kosobud and

Officer Calvin Lim was a violation of his constitutional right to confrontation because "[n]either of the statements in question" involve "a moment of excitement" or was "made in the course of procuring medical treatment." (ECF No. 330 at 540-41.) Respondent replies the California Supreme Court's rejection of the claim was neither unreasonable nor contrary to then-existing Supreme Court precedent. (ECF No. 345 at 299-302.)

Petitioner's claim is exhausted for this court's purposes as it was raised and rejected on its merits in both his direct appeal and a state habeas petition filed in the California Supreme Court.

### The California Supreme Court's Determination

On direct appeal, the California Supreme Court denied Petitioner's claim, reasoning as follows:

> Prior to trial, defendant moved the superior court, in limine, to preclude the People from introducing certain evidence on the ground that it was inadmissible hearsay. Ross joined therein. The evidence in question comprised statements by Allen Birkman.
>
> Hearsay, of course, is evidence of an out-of-court statement offered by its proponent to prove what it states. (Evid.Code, § 1200, subd. (a).) Unless it comes within an exception, it is inadmissible. (*Id.*, § 1200, subd. (b).) One such exception is for spontaneous declarations, which: (1) "[p]urport[ ] to narrate, describe, or explain an act, condition, or event perceived by the declarant" (*id.*, § 1240, subd. (a)); and (2) were "made spontaneously" (*id.*, § 1240, subd. (b)), even if in response to questioning (*People v. Poggi* (1988) 45 Cal.3d 306, 319), "while the declarant was under the stress of excitement caused by such perception" (Evid.Code, § 1240, subd. (b)).
>
> At an evidentiary hearing, Charles Kosobud testified, in pertinent part, to the following effect: On May 17, 1987, late in the morning, he was near the Golden 1 Credit Union; a man later identified as Birkman called for help; within seconds, Kosobud went to his aid; Birkman—who was stipulated to have suffered a stab wound to the heart—was holding his right hand to his chest, and had blood flowing through his fingers; he had a wallet in his left hand; he was swaying; steadying him, Kosobud asked if they had robbed him; Birkman responded, "No, but they tried"; Kosobud asked who; Birkman responded, "Two blacks"; he soon collapsed onto the ground. Officer Calvin Lim of the Sacramento Police Department testified, in pertinent part, to the following effect: When he arrived at the Golden 1 Credit Union, Birkman was already receiving emergency medical aid; within several minutes, he was placed in an ambulance for transport to a hospital; Lim rode along; Birkman was semiconscious, had difficulty breathing, was very tense, and appeared to be in extreme pain; he said he felt numbness or tingling all over his body; Lim asked if he knew who had attacked him; he responded, "a male black, approximately six foot tall," who "had gotten into a Camaro"; within several more minutes, they arrived at the hospital—where it was stipulated he died the next day.

389

The superior court denied the motion. It impliedly determined that evidence of Birkman's statements was indeed hearsay. But it expressly determined that it came within, among other exceptions, that for spontaneous declarations. In this connection, it stated that it "recognized" that Kosobud and Officer Lim "asked questions of" Birkman, and "it wasn't something that [he] just blurted out. However, the law is very clear that that doesn't negate the spontaneity required for spontaneous declarations."

At the guilt phase, Kosobud and Officer Lim testified as to Birkman's statements in substantially the same terms as they had testified at the evidentiary hearing.

Defendant contends that the superior court erred by denying his motion to preclude evidence of Birkman's statements.

Unlike below, here defendant does not argue that the evidence in question was inadmissible hearsay. Indeed, he all but concedes that it came within the exception for spontaneous declarations. Unsurprisingly so.

Instead, defendant argues that the evidence in question was barred by the confrontation clause of the Sixth Amendment to the United States Constitution.

Defendant has not preserved his claim for review. "It is, of course, 'the general rule'"—to which we find no exception here—"'that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.'" (*People v. Benson* (1990) 52 Cal.3d 754, 786, fn.7, quoting *People v. Rogers* (1978) 21 Cal.3d 542, 548.) There was neither a "specific" nor "timely" objection below predicated on the Sixth Amendment's confrontation clause. True, there was a bare reference to the "confrontation rule" (capitalization deleted) in moving papers submitted by defendant. But that was all. And that was not enough.

In any event, defendant's claim is lacking in support in the law. His argument is, in substance, that, even if evidence of Birkman's statements came within the exception for spontaneous declarations, it still violated the Sixth Amendment's confrontation clause. "But where ... hearsay ... come[s] within a firmly rooted exception ..., the Confrontation Clause is satisfied." (*White v. Illinois* (1992) 502 U.S. 346, 356.) Among such "firmly rooted" exceptions is that for spontaneous declarations. (*Id*. at p. 355, fn.8.)

> [FN] 4. Defendant claims in substance that, because the superior court committed error under the confrontation clause of the Sixth Amendment to the United States Constitution, it thereby committed error under the confrontation clause of article I, section 15 of the California Constitution. In the text, we have rejected his Sixth Amendment point as not preserved for review and as legally unsupported. Here, we reject his article I, section 15 point on the same basis. Defendant also claims in substance that the superior court's error under the Sixth Amendment's confrontation clause entails error under the Eighth Amendment's cruel and unusual punishments clause. We have found no Sixth Amendment error. Hence, we find no Eighth Amendment error.

People v. Alvarez, 14 Cal.4th at 186-87.

////

////

**Analysis**

Preliminarily, the undersigned agrees with Respondent that the rule articulated in

Crawford v. Washington, 541 U.S. 36 (2004), does not retroactively apply here as was held in

Whorton v. Bockting, 549 U.S. 406, 417 (2007).  Further, Respondent is correct that controlling

precedent at the time of Petitioner's direct appeal to the California Supreme Court was Ohio v.

Roberts, 448 U.S. 56, 66 (1980) (overruled by Crawford v. Washington, 541 U.S. at 68).

Moreover, at the time of Petitioner's direct appeal, "spontaneous declarations" were considered to

be one of the "firmly rooted" exceptions to the hearsay rule, as held in White v. Illinois, 502 U.S.

346, 356 n.8 (1992).

> [I]n *White*, the Supreme Court described a spontaneous statement as one "that has been offered in a moment of excitement-without opportunity to reflect on the consequences of one's exclamation."  502 U.S. at 356 [].  In other words, a statement made *after* the declarant has had an opportunity to reflect or discuss the matter with others does not carry "the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." [Citation.]

Winzer v. Hall, 494 F.3d 1192, 1197-98 (9th Cir. 2007).

Here, Birkman's statements to Kosobud and Lim were made in moments of excitement, in

the absence of opportunity to reflect.  Birkman had just been stabbed after using an ATM

machine.  He was unsteady on his feet and blood was leaking through the fingers of his right

hand. When a good Samaritan – Kosobud - stopped to assist Birkman and asked him if he had

been robbed, Birkman replied, "No, but they tried."  Kosobud logically asked who and Birkman

replied, "Two blacks," before collapsing.

Further, in White, the Supreme Court noted the rationale for permitting hearsay testimony

regarding "statements made in the course of receiving medical care is that such out-of-court

declarations are made in contexts that provide substantial guarantees of their trustworthiness."

White, 502 U.S. at 355.  It held "a statement made in the course of procuring medical services,

where the declarant knows a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony." Id. at 356.

When Officer Lim arrived on scene, Birkman was receiving medical aid. Minutes later, during an ambulance ride to the hospital, a semiconscious Birkman - who was then experiencing difficulty breathing and appeared to be in extreme pain, reporting numbness and tingling of the body - replied to Lim's question about whether he knew his attacker with "a male black, approximately six foot tall" who "had gotten into a Camaro."

Petitioner's claim that neither of Birkman's statements were spontaneous within the meaning of White because "both were made in response to leading questions, not 'offered in a moment of excitement'" (ECF No. 330 at 541) is not well-taken. Certainly, those things are not mutually exclusive, and he offers no authority for the proposition that a leading question asked in a moment of excitement violates his rights under the Confrontation Clause.

In each of the contexts in which Birkman made statements to Kosobud and Lim, applying the holdings of White v. Illinois, it was not unreasonable in any way for the California Supreme Court to conclude the proffered hearsay had sufficient guarantees of reliability and had come within a firmly rooted exception to the hearsay rule. As stated in White, "[t]o exclude such probative statements under the strictures of the Confrontation Clause would be the height of wrongheadedness, given that the Confrontation Clause has a basic purpose of promotion of the 'integrity of the factfinding process.' [Citation.]" White v. Illinois, 502 U.S. at 356-57.

The undersigned therefore concludes the California Supreme Court's determination did not involve an unreasonable application of Supreme Court precedent and thus RECOMMENDS that Claim J be DENIED.

////

<u>**Claims K & HH: Photo Lineup Shown to Greta Slatten**</u>

Claims K and HH relate to victim Greta Slatten's identification of Petitioner as the man using the telephone in the 7-Eleven parking lot immediately prior to her assault and the robbery of her vehicle and purse. Petitioner contends the trial court erroneously precluded him from questioning Detective Darrell Edwards and from presenting the expert testimony of Dr. Robert Shomer concerning the manner of putting "together the photo array;" he relatedly contends that the photo lineup was unduly suggestive and that trial counsel were ineffective for failing to challenge the photo lineup on that basis. (ECF No. 330 at 541-45.) Respondent argues the California Supreme Court's determinations are neither contrary to nor involve an unreasonable application of clearly established Supreme Court precedent, thus barring relief. (ECF No. 345 at 302-05.)

Petitioner presented Claim K in his direct appeal to the California Supreme Court, as well as in both state habeas petitions. Claim HH was presented in both his first and second state habeas petitions. The claims are thus exhausted.

### *The California Supreme Court's Determination*

As noted above, Claim K was presented in Petitioner's direct appeal. The California Supreme Court determined as follows:

> At the guilt phase, in their case-in-chief, the People called Greta Slatten to the witness stand. On direct examination, she testified that she was robbed, and identified defendant as the perpetrator. On cross-examination by defendant, who inquired into the reliability of the identification, she stated in substance as follows: Not long after the robbery, she saw a photograph, which proved to be defendant's, accompanying an article in a local newspaper about the homicide of Allen Birkman; she believed it depicted the robber; Detective Darrell Edwards of the Sacramento Sheriff's Department came to her home; she showed him the newspaper photograph and told him her belief; he then showed her a display of photographs—which she described on defendant's inquiry; she selected one, which turned out to be defendant's; she thought the newspaper and display photographs of defendant might have derived from the same source.
>
> In his case, defendant called Detective Edwards. On direct examination, Edwards testified that he went to Slatten's home to show her the photographic display in order to determine whether she could identify defendant as the robber; before he could show her

393

the display photographs, she showed him the newspaper photograph and said she believed it depicted the robber; he then showed her the display photographs—which he then described on defendant's inquiry; she selected defendant's; the newspaper and display photographs of defendant did in fact derive from the same source.

Defendant then asked Detective Edwards how he prepared the photographic display. The People objected that any response would be irrelevant. Determining that the appearance of the display might have some tendency in reason to prove or disprove a disputed fact bearing on a material issue, viz., the identity of the robber, but that its genesis would not, the superior court sustained the objection. Edwards did not respond.

Defendant apparently expressed an intention to question Robert Shomer, Ph.D., a psychologist, as to how one should prepare a photographic display. The superior court stated that it would sustain an objection that any response would be irrelevant for the same reason.

Defendant called Dr. Shomer. On direct examination, Dr. Shomer gave expert testimony on the suggestiveness of photographic displays in general and also on the suggestiveness of the photographic display in this cause in particular. More broadly, he gave similar testimony on the unreliability of identification by eyewitnesses in general and also on the unreliability of the identification by Slatten in particular.

Defendant now contends that the superior court erred by sustaining the People's objection that any response by Detective Edwards as to how he prepared the photographic display would be irrelevant, and also by stating that it would sustain a similar objection concerning any response by Dr. Shomer as to how one should prepare such a display.

An appellate court reviews a trial court's passing on an objection based on the irrelevance of evidence for abuse of discretion. That is because, as we have stated, it so scrutinizes the underlying determination whether the evidence is indeed irrelevant.

We find no abuse of discretion here. As to both Detective Edwards and Dr. Shomer, the superior court could have determined, not at all unreasonably, that the genesis of the photographic display had no tendency in reason to prove or disprove any disputed fact bearing on a material issue. Defendant's contrary argument is that the display might have been unduly suggestive. But that fact, if it is a fact, turns on its appearance. He was not prevented from inquiring into that matter. Indeed, he did so inquire, in his cross-examination of Slatten, his direct examination of Detective Edwards, and his direct examination of Dr. Shomer. He was not entitled to more.

> [FN]15. Defendant claims in substance that, because the superior court committed error under California law by ruling as it did, it thereby committed error under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As explained in the text, the superior court did not commit error under California law.

People v. Alvarez 14 Cal.4th at 204-06.

### *Analysis*

Evidence of the method or procedure used to create the photo lineup was not relevant in these circumstances. Significantly, Slatten's identification of Petitioner occurred prior to her

viewing the photo lineup and in the absence of any involvement by law enforcement. Slatten was shown a photograph and newspaper article by her daughter after the May 17 incident and before Detective Edwards visited Slatten. Therefore, the manner in which Detective Edwards created the photographic lineup he showed to Slatten does not prove or disprove the identity of Slatten's attacker. Thus, the trial court's limitation in this regard concerning the testimony the defense proffered when it called Detective Edwards and its expert Dr. Shomer to the stand was not error.

The Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." Perry v. New Hampshire, 565 U.S. 228, 232 (2012). "[D]ue process concerns arise ... when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Id. at 724.

> An identification infected by improper police influence, our case law holds, is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is 'a very substantial likelihood of irreparable misidentification,' the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

Perry, 565 U.S. at 232 (citing Simmons v. United States, 390 U.S. 377, 384 (1968)). When "the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." Id. at 239 (citation omitted). The factors to be considered in evaluating a witness' ability to make an accurate identification include "'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" Id. at 239, n.5 (citations omitted).

////

The California Supreme Court's adjudications finding no due process violation here are reasonable and are not contrary to Supreme Court precedent. First, there can be no unduly suggestive identification procedure when the police were not involved in arranging any suggestive circumstance leading to Slatten's initial identification of Petitioner. Slatten identified Petitioner *before* Detective Edwards showed her the lineup he had prepared. No state action or improper law enforcement activity was involved in Slatten's identification of Petitioner from a newspaper article and its accompanying photograph of Petitioner reporting on the Birkman murder. Thus, the Supreme Court has determined that in that situation, "it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, … vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." Perry v. New Hampshire, 565 U.S. at 233.

Defense counsel cross-examined Slatten concerning her identification of Petitioner and was not prevented in any way in that challenge to the reliability of her identification. (14 RT 3129-38, 3140-41.) The defense then called Detective Edwards, eliciting testimony on direct examination concerning Slatten's identification and its reliability, particularly where that identification involved the same photograph of Petitioner that Detective Edwards had selected to employ in the photo lineup. (17 RT 3733-45, 3755-56, 3810-12.) Defense expert Dr. Shomer testified concerning the various factors to be considered in an eyewitness identification, and addressed those factors as they related to Slatten's identification of Petitioner. (21 RT 4810-85, 4908-10, 4916-31.) Dr. Shomer acknowledged that by his testimony he was not offering any opinion as to the credibility of any witness. (21 RT 4900-01.) The jury was instructed regarding eyewitness identification and that guilt must be proven beyond a reasonable doubt. (25 RT 5606-

////

09; 5 CT 1192-95.)  Petitioner thus challenged the reliability of Slatten's identification in the manner to which he is entitled.

Again, Slatten's identification of Petitioner occurred prior to any presentation of a police lineup preventing any claim of improper suggestibility by law enforcement.  Notably too, that initial identification followed Slatten's six to seven-minute observation of Petitioner at the scene of the incident before she lost consciousness.  (14 RT 3140-41.)  See Perry, 565 U.S. at 239, n.5 (factors to consider including time between the crime and confrontation and opportunity to view the suspect at the time of the crime).

Despite Petitioner's claim of prejudice where he was prevented from asking Detective Edwards and Dr. Shomer about methodology concerning the preparation of a photo lineup, even assuming the trial court's limitation was erroneous, Petitioner cannot show substantial and injurious effect.  Brecht, 507 U.S. at 637-638.  It is plain from the record that Petitioner was still permitted to challenge the reliability of Slatten's identification absent the inquiries regarding procedure or methodology.  And the record contains other evidence of Petitioner's guilt that serve to lessen if not wholly negate any showing of a substantial or injurious effect on the jury's verdict.

For many of the same reasons, the denial of Petitioner's claim of ineffective assistance of counsel was not unreasonable or contrary to Supreme Court precedent.  As explained, Slatten's identification of Petitioner did not involve an unduly suggestive photo lineup prepared by law enforcement.  There was no "corrupting effect" via state action present.  Further, Slatten was certain about her identification of Petitioner and she had a significant period of time within which to observe him at the convenience store where his appearance had gained her attention from the beginning and caused her to briefly delay exiting her car and entering the store.  Defense counsels' performance did not fall below an objective standard of reasonableness, and for the

reasons expressed throughout these findings, Petitioner cannot establish prejudice because there is no reasonable probability that, but for counsels' errors, the result of the proceeding would have been otherwise. Strickland, 466 U.S. at 687-88, 694.

Given the above, the California Supreme Court could have reasonably concluded that fairminded jurists could disagree on this issue. Richter, 562 U.S. at 101-03. Thus, the undersigned RECOMMENDS that Claim K be DENIED.

**Claims P & Q: Competency**

These claims concern Petitioner's arguments that he was incompetent to testify "due to the influence of medications" and that the trial court failed to conduct a hearing on his competency in violation of his due process rights. (ECF No. 330 at 545-48.) Respondent maintains the California Supreme Court's adjudication of the claims are reasonable, and are not contrary to controlling Supreme Court authority, precluding Petitioner's requested relief. (ECF No. 345 at 306-08.)

Both claims were presented in Petitioner's direct appeal to the state's highest court, as well as in both state habeas petitions considered by that same court. Hence, they are exhausted for purposes of this court's consideration.

### *The California Supreme Court's Determinations*

Here follows the California Supreme Court's consideration and decision:

By the end of his first day on the witness stand, defendant had not completed his testimony on direct examination. The next day, before the morning session commenced, he commented that he had not been administered certain medication that had been prescribed. The superior court asked, "You feel okay today?," and he answered, "Yeah, I'm feeling okay." It stated, "Let's get started. We'll talk about this later," and he added, "Fine." His direct examination resumed. The morning recess was called. During its course, he was administered his medication. His direct examination resumed again. The lunch recess was called. Before the afternoon session was to commence, the superior court stated that it had been informed by defense counsel that defendant was "groggy" from his medication. Defendant gave confirmation. He also remarked that he had not eaten anything that day. The superior court gave him an opportunity to have some food and drink. Afterwards, it asked, "Okay, ... how do you feel now?," and he answered, "I feel

398

much better." It then asked, "Do you feel like continuing on and testifying for another hour?," and he answered, "My—my tongue feel [sic ] kind of thick." Defense counsel requested a continuance of trial until the next day. The superior court granted what he sought, stating to defendant that "I'm satisfied ... by the expression of your face and the sound of your voice that you're not as alert as you should be." It then asked defense counsel, "Do you want me to tell the jury that he's taking medication or that he just simply isn't feeling well? [¶] Maybe the best thing is simply tell them that he just isn't feeling well, and we gave him an opportunity to have a little food and see if that helped, and it just really didn't." Defense counsel answered, "That would be fine." The superior court so informed the jury. The next day, defendant's direct examination resumed. At its opening, he was asked, "[A]re you feeling better today?," and answered, "Yes, I do."

Defendant contends that the superior court erred: (1) by failing to strike, sua sponte, the testimony he gave immediately after he was administered his medication; (2) by failing to admonish the jury, sua sponte, not to consider such testimony; (3) by failing to inform the jury, sua sponte, that he had been administered medication and had been affected thereby; and (4) by failing to admonish the jury, sua sponte, not to consider the demeanor he displayed while he gave the testimony in question.

We reject the claim. Defendant's premise is that the superior court was under a duty to intervene, even in the absence of a request, because, in the period of time immediately after he was administered his medication, he was "disqualified to be a witness," under Evidence Code section 701, subdivision (a)(1), on the ground that he was "[i]ncapable of expressing himself ... concerning the matter so as to be understood...." It fails. The superior court was not under a duty because he was not disqualified. The record on appeal does not show that he was incapable of expression. Indeed, it does not even raise any such suggestion. That is true as to the period of time immediately after he was administered his medication. It is true as well as to the point at which the superior court granted defense counsel's request for a continuance. Perhaps, as the superior court commented, defendant was then "not as alert as [he] should be." But that is all. Contrary to defendant's implication, the superior court did not grant defense counsel's request because it found any incapability of expression on his part. Rather, it did so simply to accommodate his indisposition.

[FN] 17.  Defendant claims in substance that, because the superior court committed error under the Evidence Code by failing to do what he asserts it should have done sua sponte, it thereby committed error under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and also under article I, section 15 of the California Constitution. As explained in the text, the superior court did not commit error under the Evidence Code.

[] Defendant's Testimony: Mental Competence to Stand Trial

Defendant contends that the superior court erred by failing to order a hearing under Penal Code sections 1367 et seq., sua sponte, in order to determine whether he was mentally incompetent to stand trial, that is, whether, "as a result of mental disorder or developmental disability," he was "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner" (Pen.Code, § 1367, subd. (a)).

We disagree. A trial court is not under a duty to order a hearing on a defendant's mental incompetence to stand trial, in the absence of a request, unless it has been

presented with "substantial evidence of mental incompetence," i.e., "evidence that raises a reasonable doubt on the issue." (*People v. Howard, supra*, 1 Cal.4th at p. 1163.) The superior court was not presented with any such evidence whatsoever. Defendant did not display any mental disorder or developmental disability of any kind. Neither did he reveal any inability to understand the criminal proceedings or to give his assistance to defense counsel. The most that can be said is that, because of anger and other emotions, he was sometimes unwilling to participate. To say that, however, is to say too little.

People v. Alvarez, 14 Cal.4th at 211-12.

### *Applicable Legal Standards*

A criminal defendant may not be tried unless he is competent and he may not waive his right to counsel or plead guilty unless he does so competently and intelligently. Godinez v. Moran, 509 U.S. 389, 396 (1993). The conviction of a defendant while legally incompetent violates due process. Cacoperdo v. Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994). The test for competence to stand trial is whether the defendant demonstrates the ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." Godinez, 509 U.S. at 396; Douglas v. Woodford, 316 F.3d 1079, 1094 (9th Cir. 2003). The question "is not whether mental illness substantially affects a decision, but whether a mental disease, disorder or defect substantially affects the prisoner's capacity to appreciate his options and make a rational choice." Dennis v. Budge, 378 F.3d 880, 890 (9th Cir. 2004).

Due process requires a trial court to order a psychiatric evaluation or conduct a competency hearing sua sponte if the court has a good faith doubt concerning the defendant's competence. Pate v. Robinson, 383 U.S. 375, 385 (1966); Cacoperdo, 37 F.3d at 510. This responsibility continues throughout trial. Drope v. Missouri, 420 U.S. 162, 181 (1975). A good faith doubt about a defendant's competence arises if "'a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" Maxwell v. Roe, 606 F.3d at 568

(quoting de Kaplany v. Enomoto, 540 F.2d 975, 983 (9th Cir. 1976) (en banc)); see, e.g., Stanley v. Cullen, 633 F.3d at 860-61 (not unreasonable for trial court to conclude there is not enough evidence before it to raise a doubt about defendant's competence such that it should have held a hearing sua sponte where, on the one hand, defendant made some questionable choices in strategy and acted oddly but, on the other hand, defense counsel specifically informed trial court several times that they had no doubt about defendant's competency to assist them, defendant was coherent in his testimony and colloquies with the court, state court judges indicated his demeanor in courtroom did not raise a doubt about his competency, and the trial court had very little clinical or psychiatric evidence regarding defendant's mental health history).

Several factors are relevant to determining whether a hearing is necessary, including evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial. Drope, 420 U.S. at 180. Even one of these factors standing alone may, in some circumstances, be sufficient to create a reasonable doubt regarding the defendant's competence. Id. The failure of petitioner or his attorney to request a competency hearing is not a factor in determining whether there is a good faith doubt in the defendant's competency. Maxwell v. Roe, 606 F.3d at 574 (trial judge has an "independent duty" to hold competency hearing if there is a good faith doubt).

Courts generally have found sufficient evidence of incompetence in lengthy histories of acute psychosis and psychiatric treatment, see, e.g., Moore v. United States, 464 F.2d 663, 665 (9th Cir. 1972) (defendant repeatedly hospitalized for acute mental illness and hallucinations), or extremely erratic and irrational behavior during the course of the trial, see, e.g., Tillery v. Eyman, 492 F.2d 1056, 1057-58 (9th Cir. 1974) (defendant screamed throughout nights, laughed at jury, made gestures at bailiff, disrobed in courtroom and butted his head through glass window), or both, see Maxwell, 606 F.3d at 569-70 (defendant's attempted suicide, strained communication

with defense counsel, mental health problems, violent outbursts in courtroom, antipsychotic medications, and psychiatric detentions would have raised a doubt in a reasonable judge and warranted a second follow-up competency hearing even though petitioner had been found competent in an earlier hearing prior to trial).  A defendant's disagreement with his attorneys and inability to control his temper in the courtroom are not enough to create bona fide doubt as to defendant's competence.  United States v. White, 670 F.3d 1077, 1084-85 (9th Cir. 2012) (judge did not abuse discretion in failing to hold second competency hearing sua sponte, despite report that defendant suffered from delusions, had angry outbursts, and refused to communicate with attorneys, because judge presented with certification of competency from doctors as well as opinion of defendant's attorney that defendant was competent to stand trial).

*Analysis*

### Claim P

Despite Petitioner's claim, the record does not reveal that Petitioner was incompetent to testify.  The record establishes that when Petitioner complained of missing a medication dosage, the court asked him how he felt, and Petitioner expressly indicated he was okay.  He also indicated he was fine with resuming his testimony.  Further, the record establishes that when the medication was administered during a break and Petitioner's grogginess thereafter became apparent, the court offered food and drink before ultimately suspending proceedings for the day.  Petitioner was not so negatively influenced that he was incapable of testifying.

Further, a review of the record citations relied upon by Petitioner do not demonstrate that his testimony was "entirely unresponsive" or incapable of being understood.  For example, the same page wherein Mr. Gable advises the court that Petitioner did not receive his medication that morning includes Petitioner's acknowledgment that two weeks prior he was refusing to take the medication furnished to him.  More significantly, however, Petitioner did not state, nor did

counsel assert, that Petitioner felt any effects of missing the medication dosage. (18 RT 4067.)

Another citation relied upon by Petitioner to assert his testimony that morning was nonsensical

involves characters or symbols that appear to relate to court reporting or transcription-recordation

notations that in and of themselves alter the testimony. Simply stated, this record does not reveal

that Petitioner was incompetent as a result of any issue concerning his medications or their

influence. (18 RT 4064-155.) At most, the record establishes that when Petitioner was

administered his medication on an empty stomach, he experienced some minor side effect that did

not substantially affect his competence. No mental disease, disorder or defect appears to have

substantially affected his ability to make rational choices, nor can a finding that Petitioner

demonstrated an ability to consult rationally with counsel and to understand the proceedings

against him be said to be unreasonable. Godinez v. Moran, 509 U.S at 396; Dennis v. Budge, 378

F.3d at 890.

In sum, this record does not serve to establish that the California Supreme Court's

determination of the claim was contrary to, or involved an unreasonable application of, Supreme

Court precedent. 28 U.S.C. § 2254(d). Therefore, the undersigned RECOMMENDS that Claim

P be DENIED.

### Claim Q

Petitioner claims his "testimony and courtroom behavior indicated that he was suffering

from a serious mental disturbance" (ECF No. 330 at 547) that required the trial court to hold a

hearing to assess his competence.

A state appellate court's finding that the evidence before the trial court did not require a

competency hearing is a finding of fact. Davis v. Woodford, 384 F.3d 628, 644 (9th Cir. 2004);

Torres v. Prunty, 223 F.3d 1103, 1105 (9th Cir. 2000). Thus, the court must defer to it unless it

was "unreasonable" within the meaning of 28 U.S.C. § 2254(d)(2). Davis, 384 F.3d at 644;

403

Torres, 223 F.3d at 1105.  Section 2254(d)(2) constitutes a "particularly deferential" standard and requires reversal only if a federal court, after reviewing the state court record, "determines that the state court was not merely wrong, but actually unreasonable."  Taylor v. Maddox, 366 F.3d at 999.  In other words, the reviewing court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record."  Id. at 1000.

Here, there is no substantial evidence of mental incompetence or developmental disability in the record.  Petitioner's courtroom behavior and demeanor, including his testimony, do not evidence something more than bizarre statements and behavior sufficient to raise a doubt about his competency.  A few nonsensical or less than responsive answers do not amount to demonstration of an inability to understand the nature and object of the proceedings, consult with counsel and assist in his defense.  See Stanley v. Cullen, 633 F.3d at 860-61 (defendant's unreasonable insistence on untenable alibi defense, repeatedly making and withdrawing requests to remove his counsel, mental instability, anxiety, and alcohol and methamphetamine abuse were insufficient to raise a doubt regarding his competence when he testified coherently during hearings, behaved normally in the courtroom, and there was little evidence of mental health history); Boag v. Raines, 769 F.2d 1341, 1343 (9th Cir. 1985) (five suicide attempts, repeated head injuries, incident of bizarre behavior, and alcoholism were insufficient to raise a bona fide doubt; head injuries and alcoholism were "properly discounted," because defendant did not show that they caused mental impairment at the time of the trial); de Kaplany v. Enomoto, 540 F.2d at 983-85 (no bona fide doubt of competency despite two emotional and inappropriate outbursts at trial, expert testimony characterizing defendant as severely disturbed and suffering from paranoid schizophrenia, and a bizarre and gruesome crime).

////

Petitioner's behavior and demeanor are unlike those wherein the circuit court has found a competency hearing was required: Tillery v. Eyman, 492 F.2d at 1057-58 (defendant displayed erratic and irrational behavior at the time of trial, such as screaming throughout the night, laughing at the jury, gesturing to the bailiff, ripping off his tie and shirt in the courtroom, and butting his head through a glass window); and Odle v. Woodford, 238 F.3d 1084, 1088 (9th Cir. 2001) (section of defendant's brain was removed and he had a long history of psychotic episodes). Deference is accorded to the state court's finding that the trial court was not required to hold a hearing because the record does not reveal that finding to be unreasonable. Davis v. Woodford, 384 F.3d at 644; Torres v. Prunty, 223 F.3d at 1105.

In sum, there is nothing in this record to show that Petitioner exhibited behavior or demeanor indicative of serious mental disturbance requiring the trial court to hold a competency hearing. Hence, the California Supreme Court's determination was not contrary to, nor did it involve an unreasonable application of, federal law as established in Drope v. Missouri or Pate v. Robinson. § 2254(d). Petitioner is not entitled to habeas relief. Thus, the undersigned RECOMMENDS that Claim Q be DENIED.

**Claims R, S and WW: Instructional Error Affecting Intent**

Petitioner presents a series of claims asserting instructional error amounting to federal constitutional error. (ECF No. 330 at 548-54.) Claims R and S were presented in his direct appeal and were reasserted in his state habeas petitions to the California Supreme Court. Claim WW was presented in Petitioner's first and second state habeas petitions. Therefore, the claims are exhausted.

Respondent maintains that the California Supreme Court's denials of all claims on their merits are neither contrary to nor an unreasonable application of United States Supreme Court precedent. (ECF No. 345 at 309-12.)

### *The California Supreme Court's Determination*

In considering both Claims R and S, the California Supreme Court found as follows:

> In accordance with the pattern instruction set out as CALJIC No. 3.31 (1989 rev.) (5th ed. pocket pt.), the superior court told the jury: "In each of the crimes charged in Counts Two, Three and Five of the information, namely, robbery, auto theft and robbery, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator and unless such specific intent exists the crime to which it relates is not committed."
>
> Defendant contends that the superior court erred by instructing as it did on the concurrence of act and so-called "specific intent." He argues, in substance, as follows: The language did not include the crime charged in count 1, i.e., murder, or the special circumstance alleged therein, i.e., felony-murder robbery; hence, it did not require an intent to kill a human being, which belonged to murder of the first degree under the theory of willful, deliberate, and premeditated killing and, at that time,[] also belonged to the felony-murder-robbery special circumstance.

> [FN] 24. "In *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 153–54 ..., we concluded in substance that intent to kill is an element of the felony-murder special circumstance. In *People v. Anderson* [(1987)] 43 Cal.3d 1104, 1147, ... we overruled *Carlos* and held to the contrary. But when, as here, the 'felony-murder special circumstance is alleged to have occurred after *Carlos* and before *Anderson*, the former governs.'" (*People v. Berryman, supra*, 6 Cal.4th at p. 1088.)

> Against a claim of this kind, which involves the determination of applicable legal principles, an appellate court reviews a trial court's instruction independently.
>
> After such review, we conclude that the superior court did in fact err insofar as its instruction on the concurrence of act and "specific intent" did not include the crime of murder. Even in the absence of a request, a trial court must deliver an instruction of this sort as to a given crime if it is one of "specific intent." (*People v. Turner* (1971) 22 Cal.App.3d 174, 184; see *People v. Germany* (1974) 42 Cal.App.3d 414, 418–19 [following *Turner*].) Murder is such a crime. (*People v. Whitfield* (1994) 7 Cal.4th 437, 450.)
>
> The error, however, does not call for reversal. We believe that a defect of this sort is subject to the general rule for error under California law that reversal requires prejudice and prejudice in turn requires a reasonable probability of an effect on the outcome. Such a probability does not appear. An instruction on murder substantially covered the concurrence of act and "specific intent." It declared as follows: Either it "must be proved" that defendant "unlawfully kill[ed] a human being during the commission or attempted commission of robbery"—which was included in the instruction on the concurrence of act and "specific intent." Or it "must be proved" that he "unlawfully kill[ed] a human being with malice aforethought...." (Italics added.) Another instruction expressly required intent to kill for murder of the first degree under the theory of willful, deliberate, and premeditated killing.

> [FN] 25. In *People v. Turner, supra*, 22 Cal.App.3d at page 184, the court concluded, with a citation to *Chapman v. California, supra*, 386 U.S. 18, that an

406

erroneous failure to instruct on the concurrence of act and "specific intent" "was not prejudicial...." Subsequently, in *People v. Germany, supra,* 42 Cal.App.3d at page 419, the court concluded, without citing *Chapman,* that a like error "was harmless." Despite what its language may be read to suggest, the *Turner* court did not hold that the error in question was of federal constitutional dimension or even that the general rule for error of this sort was applicable. The *Germany* court all but expressly avoided such a holding.

Next, we conclude that the superior court did not err insofar as its instruction on the concurrence of act and "specific intent" did not include the felony-murder-robbery special circumstance. By its very terms, this instruction applies only to "crimes" and not to special circumstances.

Any such error, however, would not require reversal. There was no prejudice because there was no reasonable probability of an effect on the outcome. An instruction on the felony-murder-robbery special circumstance substantially covered the concurrence of act and "specific intent." It declared that "it must be proved" both that defendant "committed" the "murder" either "while he was engaged in the commission or attempted commission of a robbery" or "during the immediate flight" thereafter and that he "intended to kill." (Brackets omitted.) Not only did this instruction impliedly require the concurrence of act and "specific intent," it expressly required intent to kill.

People v. Alvarez, 14 Cal.4[th] at 219-21.

### *Applicable Legal Standards*

Claims of error in state jury instructions are generally matters of state law and thus do not usually invoke a constitutional question. See Gilmore v. Taylor, 508 U.S. 333, 343 (1993). And, the federal court is bound by a state appellate court's interpretation of California state law. See Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held that it is not the province of a federal habeas court to reexamine state-court determinations on state law questions").

To merit federal habeas relief when an allegedly erroneous jury instruction is given, or an instruction is omitted, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. at 71-72; Henderson v. Kibbe, 431 U.S. 145, 155 (1977); see also Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (state court's failure to give jury instruction "does not alone raise a ground cognizable in a federal habeas corpus proceeding").

407

In a criminal trial, a jury instruction violates due process if it fails to give effect to the requirement that the State prove every element of the offense. Middleton v. McNeil, 541 U.S. 433, 437 (2004) (citing Sandstrom v. Montana, 442 U.S. 510, 520-21 (1979)); see also Keating v. Hood, 191 F.3d 1053, 1061 (9th Cir. 1999) (instruction that relieves state of burden of proving mens rea beyond reasonable doubt contradicts presumption of innocence and invades function of jury, thereby violating due process), cert. denied, 531 U.S. 824 (2000), abrogated on other grounds by Mancuso v. Olivarez, 292 F.3d 939, 944 n.1 (9th Cir. 2002) (citation omitted). Claims of instructional error must be evaluated in the context of the instructions as a whole, not in artificial isolation. Estelle, 502 U.S. at 72; United States v. Frady, 456 U.S. at 169. Moreover, a petitioner is not entitled to habeas relief unless an error had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 637-38; see also Clark v. Brown, 450 F.3d 898, 905 (9th Cir. 2006) ("A habeas petitioner must show that the alleged instructional error 'had substantial and injurious effect or influence in determining the jury's verdict'"), cert. denied, 549 U.S. 1027 (2006).

*Analysis*

A review of the jury instructions and the record reveals the California Supreme Court's determinations of Claims R and S to be reasonable. Specifically, as to Claim R, the state court's determination that the trial court's error involving "its instructions on the concurrence of act and 'specific intent'" was harmless or error not requiring reversal, was reasonable because it was not reasonably probable the error had an effect on the outcome. As that court noted, CALJIC No. 8.10 "substantially covered the subject." (See 5 CT 1211; 25 RT 5617.) "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is whether the ailing instruction … so infected the entire trial that the resulting conviction violates due process." Middleton v. McNeil, 541 U.S. at 437 (internal citation &

quotation marks omitted). And, instructions to the jury are to be viewed as a whole rather than in isolation. Boyde v. California, 494 U.S. at 378. Because the instruction regarding murder plainly required the jury to find specific intent, the trial court's isolated error cannot be said to have infected the entire trial, or to have had a substantial or injurious effect or influence on the jury's verdict. Middleton v. McNeil, at 437; Brecht, 507 U.S. at 637-38.

It was also reasonable for the court to conclude that because CALJIC No. 3.31 "[b]y its very terms" applies only to "crimes" rather than to a finding regarding special circumstances, the trial court did not err "insofar as its instruction on the concurrence of act and specific intent. (See 5 CT 1207-08 ["in each of the crimes charged"]). CALJIC No. 8.81.17 covered specific intent and concurrence of act and the jury heard it as well. (5 CT 1221; 25 RT 5624-25.) Instructions are not to be viewed in isolation. Boyde v. California, 494 U.S. at 1378. Even assuming error for the sake of argument, giving CALJIC No. 3.31 did not have a substantial and injurious effect on the verdict in light of the giving of CALJIC No. 8.81.17. Brecht, 507 U.S. at 637-38.

Given the instructions as a whole, it was not unreasonable for the California Supreme Court to deny Petitioner's claim because it cannot be shown the ailing instruction by itself so infected the entire trial. Estelle, 502 U.S. at 71-72. Therefore, Petitioner is not entitled to habeas relief. The undersigned thus RECOMMENDS that Claim R be DENIED.

As to Claim S, the California Supreme Court's determination that the trial court did not err by failing to modify the definition of malice aforethought, thereby creating a conflict with the special circumstance intent to kill requirement, was not unreasonable. The record confirms that the special circumstance instruction on felony murder-robbery expressly requires an intent to kill. (See 25 RT 5624-25; 5 CT 1221.) In contrast, no such express requirement is called for in CALJIC No. 8.11, or the definition of malice aforethought. (See 25 RT 5617-18; 5 CT 1212.) Even assuming error, Petitioner is not entitled to relief. The instructions as a whole are in no way

ambiguous.  Boyde v. California, 494 U.S. at 378.  For those same reasons, Petitioner cannot establish prejudice.  Brecht, 507 U.S. at 637-38.

Accordingly, the California Supreme Court's determination is not contrary to, nor does it involve an unreasonable application of, Supreme Court precedent.  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief.  The undersigned thus RECOMMENDS that Claim S be DENIED.

Finally, regarding Claim WW, it was not unreasonable for the state's highest court to deny the claim on state habeas.  That court could have determined that trial counsels were not ineffective for failing to request a modification to CALJIC No. 8.11 for the reasons expressed and explained in its earlier determinations regarding Claim S.  In other words, because other instructions adequately covered the subject matter, counsel cannot be said to have performed deficiently, nor would a court find prejudice applying the Strickland standard.

The undersigned declines Petitioner's invitation to take Mr. Holmes "silence regarding Claim WW" in his 1999 declaration "as a concession that … no strategic reason" existed for "failing to request a modified implied malice instruction."  (ECF No. 330 at 552; see also ECF No. 302, Vol. XXVI, Ex. 136.)  It could have simply been an oversight.

Ultimately, it is possible that fairminded jurists could disagree on the correctness of the decision.  Richter, 562 U.S. at 101.  Petitioner has not shown that the California Supreme Court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 103.  Accordingly, the undersigned RECOMMENDS that Claim WW be DENIED.

### Claim T: Instructional Error Regarding Causation

Here, Petitioner contends the trial court erred by failing to modify the jury instructions concerning causation of Allen Birkman's death.  (ECF No. 330 at 555-56.)  Respondent maintains

that the California Supreme Court's determination of the claim was reasonable. (ECF No. 345 at 312-15.) This claim is exhausted for this court's purposes by its presentation to the state's highest court in Petitioner's direct appeal, and again in both state habeas petitions filed with that court.

### *The California Supreme Court's Determination*

The state's highest court considered the claim and determined as follows:

In accordance with the pattern instruction set out as CALJIC No. 8.10 (5th ed. 1988), the superior court told the jury that, in order to be "guilty of the crime of murder," a person must "unlawfully kill[] a human being with malice aforethought or during the commission or attempted commission of" an enumerated felony, here "robbery." (Certain brackets omitted.) It defined murder of the first degree under the theory of willful, deliberate, and premeditated killing. It also defined murder of the first degree under the theory of felony-murder robbery or attempted robbery. Specifically, in conformity with the pattern instruction of CALJIC No. 8.21 (5th ed. 1988), it stated that the "unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of" an enumerated felony, here "robbery," "is murder of the first degree when the perpetrator had the specific intent to commit such" felony. (Brackets omitted.)

Defendant contends, in substance, that the superior court erred by assertedly failing to instruct on causation as to the crime of murder.

Against a claim of this kind, which involves the determination of applicable legal principles, an appellate court reviews a trial court's instruction independently.

There was no error. The superior court did not fail to instruct on causation as to the crime of murder. It did indeed instruct thereon. Moreover, it did so adequately. It did not allow guilt to turn on the perpetrator's unrelated act and the victim's unrelated death. Rather, by requiring the perpetrator to kill the victim, it required the act to cause the death.

[FN] 26. Defendant claims in substance that, because the superior court committed error under California law, it thereby committed error under, apparently, the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As explained in the text, the superior court did not commit error under California law.

In part, defendant argues to the effect that the superior court should have amplified its instructions: In defining murder pursuant to CALJIC No. 8.10, he says, it should have referred to, and explained, proximate cause. Had he desired such an amplification, he should have requested it of the superior court. He made no request of this sort. Indeed, defense counsel stated, "I'm not gonna make any issue out of the proximate cause...." Because defendant did not request amplification of the otherwise adequate instructions below, he may not complain here. (*E.g.*, *People v. Sanders* (1995) 11 Cal.4th 475, 533.)

[FN] 27. In the course of his argument, defendant asserts that the superior court should have referred to, and explained, proximate cause in accordance with the pattern instruction set out as CALJIC No. 8.55 (5th ed. 1988): "To constitute

… murder … there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of the death. [¶] A proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred." We note in passing that, in light of our all but express disapproval in *People v. Roberts* (1992) 2 Cal.4th 271, 311-13, CALJIC No. 8.55 was revised in 1992 to remove "proximateness": "To constitute … murder … there must be, in addition to the death of a human being, an unlawful act which was a cause of that death."

In other part, defendant argues to the effect that the superior court should have clarified its instructions: In defining murder of the first degree under the theory of felony-murder robbery or attempted robbery pursuant to CALJIC No. 8.21, he says, it should have referred not to an unlawful killing occurring "during the commission or attempted commission of ... [a] robbery," but rather to one occurring "as a direct causal result" thereof. Had he desired such a clarification, he should have requested it of the superior court. He made no request of this sort. Indeed, defense counsel acquiesced in the "unclarified" instruction containing the during-the-commission language instead of the as-a-direct-causal-result alternative. The reasons are plain. The first is "legal." An unlawful killing is deemed to occur during the commission or attempted commission of an enumerated felony so long as the fatal blow is struck in its course, even if death does not then result. (2 LaFave & Scott, Substantive Criminal Law (1986) Felony Murder, § 7.5(f), p. 223, fn. 88.) Even though Allen Birkman did not die until the next day, he was fatally stabbed during the commission or attempted commission of a robbery. The second reason is "factual." Since Birkman died the day after he was fatally stabbed, the during-the-commission language was more favorable than the as-a-direct-causal-result alternative: the jury would readily find that Birkman was killed "as a direct causal result" of the commission or attempted commission of a robbery, but might hesitate to find that he was killed "during [its] commission or attempted commission." (Italics added.) Because defendant did not request clarification of the otherwise adequate instructions below, he may not complain here. (*E.g.*, *People v. Sanders, supra*, 11 Cal.4th at p. 533.)

[FN] 28. In the course of his argument, defendant cites the first paragraph of the Use Note to CALJIC No. 8.21: "If the death occurs substantially contemporaneously with the commission of the crime, use [the during-the-commission language] and [not the as-a-direct-causal-result alternative]. On the other hand, if death occurs at a later period, use [the as-a-direct-causal-result language] and [not the during-the-commission alternative]." He asserts that Birkman's death did not occur "substantially contemporaneously" with the commission or attempted commission of a robbery, but rather "at a later period." He then concludes that the superior court should have used the as-a-direct-causal-result language instead of the during-the-commission alternative. His unstated premise is that use notes, like the one here, have the force of law. They do not.

People v. Alvarez, 14 Cal.4th at 221-23.

////

////

*Analysis*

There is nothing unreasonable about the state court's determination that in giving CALJIC Nos. 8.10 and 8.21, without alteration, and/or in the absence of CALJIC No. 8.55, the trial court committed no error. Because the jury was instructed pursuant to CALJIC Nos. 8.10 and 8.21, it understood that it must find Petitioner was the cause of Birkman's death. The prosecutor, therefore, was not relieved of any burden associated with his duty to prove every element of murder beyond a reasonable doubt. Middleton v. McNeil, 541 U.S. at 437. Here, it was not reasonably likely that the jury found Petitioner guilty of Birkman's murder while entertaining doubt as to the cause of Birkman's death. Estelle v. McGuire, 502 U.S. at 72.

The undersigned notes also that Pathologist Gary A. Stuart (14 RT 2901-38) testified that the cause of Allen Birkman's death was "complications of a stab wound to the chest." (14 RT 2918.) When asked on cross-examination what he meant by those complications, Dr. Stuart testified as follows:

> [DR. STUART]: If someone dies within a few moments, meaning 20 minutes of a stab wound, and it's apparently due to massive hemorrhage, then I would call the cause of death stab wound of the chest, or hemorrhage, due to stab wound of the chest.
> If survival exceeds 24 hours, then I look for other explanations than just ordinary hemorrhage. And in this case, even though hemorrhage had occurred in my opinion, caused damage to the body organs, the mechanisms where death was not directly hemorrhage, it was pneumonia that occurred as a result of the stab wound. It was brain damage that had occurred as a result of shock and blood loss, and it was damage to the heart muscle that had occurred as a result of shock and blood loss.

(14 RT 2919.) Dr. Stuart acknowledged Birkman had pre-existing "chronic inflammatory process of the airways" and a large heart (14 RT 2921), but indicated that the complications expressly referred to in his cause-of-death opinion were "related to the stab wound, the shock, from that trauma." (14 RT 2937.) The brain damage and pneumonia were the most serious of the complications; both were caused by the stab wound to Birkman's chest. (14 RT 2930-31.)

////

Further, the surgical intervention or treatment that Birkman received did not "interfere" or otherwise cross over the stab wound inflicted to his chest. (14 RT 2936-37.)[63]

The jury understood it was tasked with determining whether Petitioner was guilty of murdering Birkman, and as a part of that task, it was required to find Petitioner was the cause of Birkman's death. In light of the record and the instructions given, Petitioner cannot show any substantial or injurious effect on the jury's verdict. Brecht, 507 U.S. at 637-38.

In sum, the California Supreme Court's determination that there was no instructional error as it concerned causation was not an unreasonable application of, nor was it contrary to, Supreme Court precedent. 28 U.S.C. § 2254(d). Because Petitioner is not entitled to habeas relief, the undersigned RECOMMENDS that Claim T be DENIED.

## Claim Y: Withdrawal of Penalty Phase Investigative Funding

In yet another claim regarding the defense team's attempts to travel to Cuba in order to obtain mitigating evidence to be presented at the penalty phase, Petitioner asserts: the trial court violated his rights to prepare and present a defense; to a fair trial; to a reliable determination of his eligibility for the death penalty; and to equal protection of the law. (ECF No. 330 at 556-60.) Respondent contends the California Supreme Court's denial of this claim was reasonable and not in contravention of federal law, precluding habeas relief. (ECF No. 345 at 315.)

Petitioner presented this claim in his direct appeal and again in state habeas proceedings filed with the California Supreme Court; thus the claim is exhausted.

### *The California Supreme Court's Determination*

> Defendant now presents a number of contentions relating to his application for authorization to incur expenses for a trip to Cuba.
> At the threshold, defendant claims that Judge Bond erred by withdrawing authorization to incur expenses for the trip to Cuba by McGarrity and Santivanias.

---

[63] Petitioner did not present any expert testimony contradicting Dr. Stuart's opinion as to Birkman's cause of death nor any expert testimony that any pre-existing condition of Birkman's contributed to his death or that he received inferior medical treatment.

An appellate court reviews a trial court's ruling on an application for authorization to incur expenses to prepare or present a defense for abuse of discretion. (*See, e.g.*, *People v. Daniels* (1991) 52 Cal.3d 815, 851; *People v. Mattson* (1990) 50 Cal.3d 826, 847.)

We find no such abuse here. Judge Bond was not unreasonable in authorizing the "aboveboard" trip to Cuba by Mayorga and Myers, of which she had been informed, for the purpose of compiling defendant's social history: The end was proper and so were the means. But neither was she unreasonable in withdrawing authorization for the "surreptitious" trip to Cuba by McGarrity and Santivanias, of which she had not been informed: although the end remained proper, the means had become otherwise, threatening harm to international relations and also to the two travelers. Defendant argues in substance that, at least on the facts of a case like this, a judge may not withdraw authorization for improper means. Because he did not offer such an argument below—indeed, Attorney Gable agreed that a judge could do so—he may not offer any to that effect here. He also argues that Judge Bond did not in fact withdraw authorization for improper means, but did so for her own improper reasons. The record on appeal is otherwise.

Even if error had occurred, it would not entail reversal. It is the general rule for error under California law bearing on the penalty of death—which includes the one asserted here—that reversal requires prejudice and prejudice in turn requires a reasonable possibility of an effect on the outcome under *People v. Brown* (1988) 46 Cal.3d 432. (*People v. Ashmus, supra*, 54 Cal.3d at p. 983; *People v. Gordon, supra*, 50 Cal.3d at p. 1267.) No such possibility appears as a result of the withdrawal of authorization to incur expenses for a trip to Cuba. McGarrity herself stated that she was uncertain of success. Hence, it is merely conjectural whether McGarrity and Santivanias would have made it to Cuba, and if so, whether they would have discovered more favorable information than what McGarrity had already obtained, as through her telephonic interview with defendant's father in Cuba, and if so, whether they would have made it back to the United States in a timely fashion.

> [FN] 32.  Defendant claims in substance that, because Judge Bond committed reversible error under California law by withdrawing authorization to incur expenses for the trip to Cuba by McGarrity and Santivanias, she thereby committed reversible error under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As explained in the text, the superior court did not commit any error under California law.

People v. Alvarez, 14 Cal.4th at 234-35.

### *Analysis*

Preliminarily, the undersigned hereby fully incorporates his findings and recommendations concerning related Claims U, V, W, X, FF, PP, UU, VV and YY.

Before withdrawing the investigative funds at issue, Judge Bond conducted a hearing wherein defense counsel fully aired their concerns.  Ultimately however, the judge determined

that the surreptitious nature of the then-scheduled second-attempt by the defense team to enter Cuba did not comport with her prior or initial approval concerning those funds. In other words, she did not authorize the use of those funds where Cuban authorities would be ignorant of the true purpose of McGarrity and Santivanias' visit. (RT § 989.7 Proceedings 65-86.)

As the California Supreme Court reasonably found, Judge Bond was concerned with the potential for an international incident and the uncertainty of the planned effort's success. Petitioner's argument that another capital defense team successfully traveled to Cuba employing the same method his team sought to employ does not make Judge Bond's determination or the state court's holding of no error unreasonable. As the California Supreme Court correctly found, the record supports Judge Bond's concerns regarding uncertainty because there was no guarantee that the team representatives would gain access to the records they sought given the secretive nature of their visit. And, Petitioner's argument that the defense team should have been given sufficient time to conduct the investigation is not well taken for the reasons discussed previously in related claims.

The record does reveal that McGarrity herself could not say with any certainty that the planned trip to Cuba would be successful. The record as a whole further reveals the defense team's efforts to obtain information from and travel to Cuba have always been uncertain.

Moreover, the California Supreme Court's finding that the information sought was largely presented to the jury in the form of McGarrity's testimony was not unreasonable. The defense expert testified concerning Petitioner's childhood, including medical, psychological, legal, military, social and educational matters, as related by Petitioner and his family members. (29 RT 6580-674; 30 RT 6682-780; 31 RT 6837-55; see also 31 RT 6823-26 [Myers testimony re exhibits 144 & 145].) Therefore, even assuming error, there was no prejudice because Petitioner

////

cannot show a substantial and injurious effect or influence on the jury's verdict where it considered this evidence.  Brecht, 507 U.S. at 637-38.

Petitioner was not denied his right to due process by Judge Bond's decision to withdraw funds related to his efforts to obtain mitigating evidence from Cuba for the reasons explained above and in incorporated findings of the related claims. The California Supreme Court's determination was not contrary to nor did it involve an unreasonable application of Supreme Court precedent; neither did it involve an unreasonable factual determination.  28 U.S.C. § 2254. As a result, Petitioner is not entitled to habeas relief.  Therefore, the undersigned RECOMMENDS that Claim Y be DENIED.

### Claim EE: Insufficient Evidence of Use of Deadly Weapon

Petitioner argues that there was insufficient evidence of his use of a deadly weapon during the course of the robbery of Greta Slatten.  (ECF No. 330 at 560-61.)  Respondent disagrees. (ECF No. 345 at 316-17.)  Because Petitioner's claim was presented to the state's highest court, it is exhausted for purposes of federal habeas review.

### *The California Supreme Court's Determination*

The California Supreme Court held as follows:

> Defendant contends that the evidence is insufficient to support the finding that he personally used a deadly weapon in the robbery of Greta Slatten. The question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the underlying enhancement beyond a reasonable doubt. (*People v. Dominguez* (1995) 38 Cal.App.4th 410, 421; *People v. Jacobs* (1987) 193 Cal.App.3d 375, 380.) The answer is yes. Contrary to defendant's claim, such a trier of fact could have determined to the requisite degree of certainty that whatever it was that he personally used in the crime was indeed a deadly weapon: it could have inferred from the nature and extent of the injuries that Slatten suffered—which required suturing with 20 stitches, prevented her from opening her mouth, and blackened the left side of her face from her hairline down through her neck—that it was a blunt instrument that caused them and that such instrument was in fact capable of inflicting death.

People v. Alvarez, 14 Cal.4th at 224-25.

////

417

***Applicable Legal Standards***

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, one who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401−02 (1993). Nevertheless, the petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of Jackson. Juan H., 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

Id. (citations omitted).

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. In performing a Jackson analysis, a jury's credibility determinations are "entitled to near-total deference." Bruce

418

v. Terhune, 376 F.3d at 957. When the factual record supports conflicting inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of the prosecution, and must defer to that resolution. Jackson, 443 U.S. at 326.

*Analysis*

Greta Slatten testified that as a result of the robbery assault, she received "20 stitches" in her head, from the top toward the left ear, her face was "black" from the hair line down through her neck and jaw on the left side, and she "could not open" her mouth. (14 RT 3124-25.) The jury also heard Slatten testify that Petitioner was carrying a knapsack, that he was the only person present in the parking lot, and that after she passed him at telephone booth heading toward her car, she had no further recollection until she regained consciousness during medical treatment. (14 RT 3116-17, 3119-21; see also 14 RT 3132-33, 3137, 3142.) The jury plainly credited Slatten's testimony, including her testimony about the significant injuries she sustained, and their determination is "entitled to near-total deference." Bruce v. Terhune, 376 F.3d at 957.

A rational juror could readily conclude from this evidence that Petitioner used a deadly weapon against Slatten, whether that weapon was his hand or fist, the telephone receiver, or some object he had removed from his knapsack. The fact Slatten did not observe a weapon does not change that finding. The jury was instructed on personal use of a deadly or dangerous weapon pursuant to CALJIC No. 17.16; it reads, in pertinent part, that "[a] deadly or dangerous weapon means any weapon, instrument, or object that is capable of being used to inflict great bodily injury or death" and that "use" includes "intentionally" striking or hitting "a human being with it." (5 CT 1245; 25 RT 5640-41.)

There is no reason to overturn the California Supreme Court's finding for it comports with federal precedent and is in no way unreasonable. A rational trier of fact could have concluded Petitioner used a deadly weapon when assaulting Slatten from behind in the convenience store

419

parking lot.  <u>Coleman v. Johnson</u>, 566 U.S. at 651; <u>Jackson v. Virginia,</u> 443 U.S. at 318-19; 28

U.S.C. § 2254(d).  As a result, the undersigned hereby RECOMMENDS that Claim EE be

DENIED.

**Claim QQ: Delay of Penalty Phase Investigative Funding**

Withholding the disbursement of investigatory funds for travel to Cuba deprived

Petitioner of his right to put on a "guilt phase mental health defense," he argues, violating his

constitutional rights to prepare and present a defense, to a fair trial, a reliable determination of his

eligibility for the death penalty, and to equal protection of the law.  He further contends trial

counsel were ineffective for "failing to sufficiently advise Judge Bond of the need to conduct the

necessary investigation in order to evaluate and prepare a defense during the guilt phase."  (ECF

No. 330 at 561-62.)  Respondent maintains the California Supreme Court's determination of this

claim was reasonable, precluding habeas relief.  (ECF No. 345 at 317-18.)

This claim was presented to the California Supreme Court in Petitioner's state habeas

petitions and denied on its merits, among other reasons, on both occasions.  It is exhausted for

purposes of federal habeas review.

*Analysis*

As above, the undersigned hereby fully incorporates his findings and recommendations

concerning related Claims U, V, W, X, Y, FF, PP, UU, VV and YY.  Petitioner's claim here relies

upon the success of those arguments; however, the undersigned has recommended the

aforementioned claims be denied.

Again, in the absence of a reasoned opinion, this court "must determine what arguments

or theories supported or, as here, could have supported, the state court's decision; and then it must

ask whether it is possible fairminded jurists could disagree that those arguments or theories are

inconsistent with the holding in a prior decision of this Court."  <u>Richter</u>, 562 U.S. at 102.  Relief

420

will not be granted unless a petitioner can "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

The California Supreme Court could have reasonably concluded that Judge Bond's order that the travel funds to Cuba be disbursed once the matter was assigned a courtroom for trial did not deny Petitioner of his right to investigate and present a mental health defense at the guilt phase. The record establishes that the defense team had already received, and apparently expended, funds pertaining to a mental health defense for purposes of the guilt phase. (RT § 989.7 Proceedings 8-14 [6/8/88: funds sought for psychiatric evaluation] & 15-24 [11/21/88: efforts were underway to assess whether Petitioner suffered brain damage as a result of events occurring in Cuba].) The fact a mental health defense was not presented does not mean Petitioner was precluded from investigating or presenting the defense; its omission was a tactical decision by the defense team rather than any error that can be attributed to the court.[64]

The California Supreme Court could have reasonably concluded that the Due Process Clause does not operate to allow Petitioner and his defense team to expend investigatory funds for a trip to Cuba that was to be undertaken via subterfuge, or where the Cuban government was not made aware of the true basis for McGarrity and Santivanias' trip, particularly where the Cuban government did not permit an earlier team comprised of Messrs. Mayorga and Myers to enter when it was apprised of that team's true intent. As for Petitoner's allegations that but for the delay associated with Judge Bond's order, the information could have been obtained and presented, Respondent persuasively points out, it took years and years, rather than mere weeks or even months, for present habeas counsel to successfully obtain the sought-after information and

---

[64] See ECF No. 302, Vol. XXVI, Ex. 136 at 5257.

documentation from Cuba. One can reasonably infer that even had more time been granted, or even had there been no time limitation as to the disbursement of the funds, it would not have made for a different outcome. For those same reasons, Petitioner cannot show, assuming error, that it had a substantial and injurious effect upon the jury's verdict. <u>Brecht</u>, 507 U.S. at 637-38.

To conclude, fairminded jurists could disagree that the delay of the disbursement of certain investigative funds resulted in a violation of Petitioner's constitutional rights to prepare and present a defense, to a fair trial, to equal protection and to a reliable determination of his eligibility for the death penalty. Fairminded jurists could also disagree that the defense team was ineffective for "failing to sufficiently advise" the court of its need to conduct such an investigation. The record contains the many efforts of the defense team to advise the court of the importance of its efforts to travel to Cuba and the evidence it hoped to gain by doing so.

Hence, Petitioner has failed to show the California Supreme Court's denial of his claim was "so lacking in justification" so as to be "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 102-03. The California Supreme Court's determination was not contrary to, nor did it involve an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d). The undersigned hereby RECOMMENDS that Claim QQ be DENIED.

**Claim TT:  Harassment & Abuse at the County Jail**

In this claim, Petitioner asserts he was subjected to harassment and abuse at the Sacramento County Jail during the trial, interfering with his right to be present at critical stages and to be competent; he also complains trial counsel provided ineffective assistance of counsel. (ECF No. 330 at 563-80.) Respondent, on the other hand, contends the California Supreme Court's denial of this claim is neither unreasonable nor involves a contrary application of federal precedent, precluding relief. (ECF No. 345 at 318-37.)

This claim was presented to the state's highest court in both Petitioner's first and second state habeas petitions. Hence, it is exhausted.

### *Applicable Legal Standards*

A criminal defendant may not be tried unless he is competent, and may not plead guilty unless he does so competently and intelligently. Godinez v. Moran, 509 U.S. at 396. The standard for competence to stand trial is whether a defendant has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him. Id. at 396 (citations omitted); Clark v. Arnold, 769 F.3d at 719.

A claim regarding incompetence to stand trial may implicate either substantive due process or procedural due process. The trial or conviction of a person who is legally incompetent is a substantive due process violation. See Cooper v. Oklahoma, 517 U.S. at 354; Maxwell v. Roe, 606 F.3d at 568 ("It is undisputed that 'the conviction of an accused person while he is legally incompetent violates due process'" (quoting Pate v. Robinson, 383 U.S. at 378). A "substantive" competency claim focuses on whether the defendant was actually incompetent at trial. Boyde v. Brown, 404 F.3d at 1165.

A competency claim may also implicate procedural due process. A state may presume that a defendant is competent and may require him or her to prove otherwise by a preponderance of the evidence. Cooper v. Oklahoma, 517 U.S. at 355 (citing Medina v. California, 505 U.S. 437, 449 (1992)). However, procedural due process requires a trial court to hold a competency hearing if there is sufficient evidence before the court to give rise to a substantial and bona fide doubt regarding a defendant's competence. Pate v. Robinson, 383 U.S. at 385; Miles v. Stainer, 108 F.3d 1109, 1112 (9th Cir. 1997) ("Due process requires a trial court to hold a competency hearing sua sponte whenever the evidence before it raises a reasonable doubt whether a defendant

is mentally competent"); <u>Stanley v. Cullen</u>, 633 F.3d at 860 (competency hearing not required unless substantial evidence of incompetence raises "bona fide" doubt whether defendant is competent to stand trial). This obligation exists irrespective of whether defense counsel seeks a hearing. <u>See</u> <u>Odle v. Woodford,</u> 238 F.3d at 1087 (stating that "a trial judge must conduct a competency hearing whenever the evidence before him raises a bona fide doubt about the defendant's competence to stand trial, even if defense counsel does not ask for one").

In reviewing whether a state trial judge should have ordered a competency evaluation, a federal court may consider only the evidence that was before the trial judge. <u>United States v. Lewis</u>, 991 F.2d 524, 527 (9th Cir. 1993). Although no particular facts signal a defendant's incompetence, suggestive evidence includes the defendant's demeanor before the trial judge, irrational behavior, and available medical evaluations of the defendant's competence to stand trial. <u>Drope v. Missouri</u>, 420 U.S. at 180; <u>Miles v. Stainer</u>, 108 F.3d at 1112. A state appellate court's finding that no competency hearing was required is a factual determination entitled to deference unless it is unreasonable within the meaning of § 2254(d)(2). <u>Mendez v. Knowles</u>, 556 F.3d 757, 771 (9th Cir. 2009); <u>Davis v. Woodford</u>, 384 F.3d at 644.

"Counsel's failure to move for a competency hearing violates the defendant's right to effective assistance of counsel when 'there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered.'" <u>Stanley v. Cullen</u>, 633 F.3d at 862 (citation omitted); <u>Hibbler v. Benedetti</u>, 693 F.3d at 1149–50.

### Analysis

The undersigned hereby fully incorporates his findings and recommendations regarding connected Claims OO, PP, QQ and SS.

Procedural Due Process

Despite Petitioner's characterization of a record "replete" with evidence that Petitioner suffered "serious abuse," the record reveals otherwise. In fact, the record before Judge Lewis could be characterized as one involving minor complaints about missing shower or shaving privileges, and phone or exercise privileges, in the absence of any evidence that those instances -- or even the one counsel raised on March 28, 1989, alleging an assault by jail staff[65] -- interfered with Petitioner's ability to consult with counsel with a reasonable degree of rational understanding, or his ability to understand the proceedings against him. Godinez v. Moran, 509 U.S. at 396; Pate v. Robinson, 383 U.S. at 385; Odle v. Woodford, 238 F.3d at 1087.

The California Supreme Court, reviewing the record as it existed before Judge Lewis, could have reasonably concluded that a competency hearing was not required because Petitioner did not show there was a substantial and bona fide doubt regarding his competence. Richter, 562 U.S. at 101; Pate v. Robinson, 383 U.S. at 385. Petitioner cannot show that the California Supreme Court's denial of this claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, at 103.

Substantive Due Process

With a focus on whether the defendant was actually incompetent, a review of the record again supports the California Supreme Court's adjudication of the claim, even considering the evidence presented to that court during habeas proceedings, as addressed below.

////

////

---

[65] A careful review of the record reveals that Mr. Holmes advised the court that Petitioner "was a victim of an assault last night" (9 RT 1738), never referencing jail staff. Petitioner himself advised the trial court that jail staff "assaulted" him, that comment seeming to take Mr. Holmes by surprise. (See 9 RT 1739.)

*Counsels' Declarations*

Petitioner often repeats the assertion that trial counsel should have been aware of his incompetence because counsel were "alerted" to the issue in various ways. Mr. Holmes' September 1999 declaration addresses this notion:

> Claim TT, the claim of abuse and harassment in the Sacramento County jail. I have little or no recollection of this. I do know, from this trial and previous trials in front of Judge Lewis, that he has "taken-on" the Sheriff's Office much more than any other trial judge. *I also observed no physical evidence of the claims Mr. Alvarez is now making - - injuries inflicted by the jail staff, lack of sleep attributed to the jail staff, or an unshaven appearance in court because the jail staff prevented him from shaving.*

(ECF No. 302, Vol. XXVI, Ex. 136 at 5258 (italics added).) Notably, neither Mr. Gable's declaration of November 2004 nor his declaration of April 2009 make any mention of an issue relative to Petitioner's competence, nor any mention of harassment or abuse to Petitioner by jail staff. (ECF No. 302, Vol XXII, Ex. 63 & ECF No. 320, Ex. 160.)

Because "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense," Medina v. California, 505 U.S. at 450, Mr. Holmes' declaration strongly supports the conclusion that Petitioner was competent and that there was no reason that a reasonable trial judge would have entertained a bona fide doubt as to Petitioner's competence. See Stanley v. Cullen, 633 F.3d at 861 ("Trial counsel's assurances to the court are relevant because 'a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings'" [citation omitted]); Brown v. Boyde, 404 F.3d at 1167 (most telling evidence petitioner was competent at trial was that defense counsel did not even hint that petitioner might be incompetent); Williams v. Woodford, 384 F.3d at 608 ("We find especially relevant defense counsel's opinion that Williams was competent to stand trial"); Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991) ("Hernandez's own counsel stated that Hernandez was competent. While the

////

426

opinion of Hernandez's counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings").

The California Supreme Court could have reasonably concluded that Petitioner was not incompetent given Mr. Holmes' informed view of Petitioner and his abilities to comprehend the proceedings. Richter, 562 U.S. at 101-03.

*Defense Investigator Robert Wilcox*

Exhibits 53 and 54 pertain to defense investigator Robert Wilcox and his experience during a visit to Petitioner wherein he was subjected to a search of his person, and an undated transcript of a conversation Wilcox had with Petitioner. (ECF No. 302, Vol. XXI, Exs. 53-54.)

The California Supreme Court could have reasonably concluded the exhibits do not speak to any lack of competence on Petitioner's part. In fact, Exhibit 54 is the lengthy conversation between Wilcox and Petitioner that references a "shoulder sprain" having been diagnosed by a physician at the jail and some back pain. It also chronicles Petitioner's complaints about housing or cell moves, tier "shakedowns," the staff "messing" with his legal paperwork, their bad attitudes and Petitioner's numerous denials that he caused any of the problems of which he complained. In Petitioner's opinion, the jail staff were "picking on" him due to his having befriended a "white supremacist" or "A.B." (ECF No. 302, Vol. XXI, Ex. 54.) In Exhibit 53, particularly regarding Petitioner, investigator Wilcox's letter to defense attorneys Holmes and Gable references Petitioner complaining of "a very bad headache," Petitioner's frustration regarding a lack of access to his notes, and being "bothered so much by jail officers that he cannot concentrate on anything regarding his trying to help defend himself." (ECF No. 302, Vol. XXI, Ex. 53.)

Notably missing from this evidence is any indication that Petitioner complained to investigator Wilcox that he was being subjected to repeated beatings by jail staff angry that he

////

had killed Allen Birkman.  Likewise, there was no mention of actions taken by jail staff that resulted in Petitioner being sleep deprived.

These exhibits do not show Petitioner was incompetent.  In fact, they could reasonably infer the opposite.  Certainly, Petitioner was able to consult and readily comprehend matters discussed with defense investigator Wilcox as evidenced in Exhibit 54.

Even taken as true, this evidence does not equate to a preponderance of evidence sufficient to overcome the presumption of competency.  Medina v. California, 505 U.S. 440. Taken as true, exhibit 54, in particular, can be reasonably interpreted to display a sufficient ability to consult with counsel with a reasonable degree of rational understanding.  Godinez v. Moran, 509 U.S. at 396.  Petitioner cannot show that the California Supreme Court's denial of this claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

*Inmate Declarations*

Four inmates and one inmate's mother submitted declarations in support of Petitioner's claim that he was abused in the Sacramento County Jail.  (ECF No. 302, Volume XXI, Exs. 48-52.)

Clay Joseph Jones was housed next to Petitioner in mid-1988 and recalls him being "very sad," "appear[ing] very depressed," and "crying."  Jones declared the jail "was oppressive and scary," and that if jail staff did not like an inmate, the inmate would be taken on "'an elevator ride.'"  The "elevator ride" involved being struck with a phone book hidden in a pillow case; Petitioner reported to Jones this had "happened to him."  Jones saw officers "drag Manny unwillingly out of his cell and down the hall," returning with "bruises and welts on his face and arms," concluding it was "easy to tell" he had been "beaten" up.  Jones claimed Petitioner told him the officer called him a "'cop killer'" and expressed their hatred for him.  Jones specifically

recalls an occasion wherein officers rushed into Petitioner's cell "and proceeded to beat him," hearing "scuffling sounds" and "yelling and screaming." Jones declared Petitioner "never struck back at the officers" like other inmates because he "never saw Manny do any of that." (ECF No. 302, Vol. XXI, Ex. 48.) Mr. Jones' declaration, even if considered accurate, is lacking for personal observation of any beating by jail staff. At most he witnessed Petitioner being dragged from his cell. He had no personal knowledge of any "elevator ride" to which Petitioner may have been subjected, and made only inferences, reasonable or otherwise, about the cause of reported bruises and welts on Petitioner.

Mary Jones, Clay Jones' mother, declared that her son advised her "there was one inmate who the guards hated," identifying that inmate as Petitioner. In telephone conversations with Petitioner, he would cry; he told Ms. Jones the guard "beat him so bad that he couldn't take it and he wanted to end his life." Ms. Jones visited Petitioner in jail and offered consolation and faith, finding Petitioner to be "always sad and on the verge of tears" and not understanding "why the guards beat and mistreated him." (ECF No. 302, Vol. XXI, Ex. 49.) Ms. Jones did not witness any abuse or mistreatment of Petitioner. Rather, she observed his demeanor, concluding he was depressed and sad. Even assuming the truth of her declaration, it is not evidence of incompetence to stand trial.

Thomas D. Richardson also served time at the Sacramento County Jail with Petitioner. He declared the "guards were mean and very difficult to get along with," beating "everybody," but in particular Petitioner; the guards "hated him because they believe that he had killed a cop." Richardson recounted occasions wherein Petitioner's requests for phone privileges were ignored or cut short, guards refused to "give him his legal mail" and would "constantly" yell at him in an effort to "provoke Manny, but he would never fight them." He too saw guards enter Petitioner's cell, observed him being dragged out, then heard screaming; he observed Petitioner's "face

lumped up" with cracked and bleeding lips and "eyes swollen."  Richardson declared the guards

harassed Petitioner by moving him to "different locations in the jail at all hours" a lot, causing

Petitioner to cry.  (ECF No. 302, Vol. XXI, Ex. 50.)  Taking Mr. Richardson's declaration as true,

it too is lacking for personal observation of any beating by jail staff.  At most he witnessed

Petitioner being dragged from his cell, and made only inferences, reasonable or otherwise, about

the cause of reported facial injuries to Petitioner.

Next, Marc Love served alongside Petitioner in both the old and new jails.  Love declared

Petitioner was moved frequently, was "the target of constant harassment from the jail guards"

who "would try and create reasons to mess with" Petitioner.  Love witnessed Petitioner being

made to stand with his face to the wall with "his hands down the front of his pants," and being

poked in the head.  Love claims the guards "were always messing with" Petitioner's legal mail

and although they would bring Petitioner a phone, they would then "turn it off."  He also claims

guards made Petitioner "live in a very dirty cell" by refusing supplies or providing dirty linens,

and denying showers.  Love also claims the guards interfered with Petitioner's "food and

canteen;" he "heard the guards draw up their spit in their mouth and then spit it out" onto

Petitioner's food tray.  He claims the guards would not let Petitioner sleep by leaving the lights on

in his cell because Love could see the light coming through the bars of Petitioner's cell.  (ECF

No. 302, Vol. XXI, Ex. 51.)  Mr. Love's declaration, even taken as true, is lacking for personal

observation of any beating by jail staff.  He may have personally observed other actions, but none

that rises to the level a preponderance sufficient to overcome the presumption of competency.

Finally, Ralph Cutchens declared he was housed in the jail in 1989, "two cells down

from" Petitioner.  He declares the guards "harassed" Petitioner by messing with his legal mail,

phone calls, and canteen orders; they provided him with dirty linens.  The day after the incident

involving dirty linens, Cutchens observed "little bites" on Petitioner, who told him "the bites were

430

from crabs that were in the sheets." The guards also left the light on in Petitioner's cell and "would mess" with him when he unscrewed it. He reported seeing Petitioner "after the guards beat on him after going into his cell in the middle of the night." He also declared observing "five guards" rush out of the control booth and into Petitioner's cell; when Cutchens tried to "help Manny out," he was told to stay out of it. The guards beat up Manny," he declared and indicated he observed Petitioner bloody and "beaten all over his face" "for no reason." On another occasion, Cutchens believes guards splashed the contents of a mop bucket into Petitioner's cell that "smelled like piss and rotten food" because he "heard the splash" "at about 3 in the morning." Further, Cutchens claims the guards beat him up for defending Petitioner on one occasion, taking him "out to the handball court because there was a blind spot from the cameras" in that area. (ECF No. 302, Vol. XXI, Ex. 52.) Mr. Cutchens' declaration, even taken as true, is lacking for personal observation of any beating of Petitioner by jail staff, despite any inferences that can be made. He may have personally observed other actions, but none of those personal observations rises to the level of a preponderance sufficient to overcome the presumption of competency.

Overall, the inmate declarations are unpersuasive for reasons other than the lack of personal observation of any physical assault. The declarants also make numerous assumptions about intent on behalf of jail staff. Significantly, their descriptions of physical injuries to Petitioner are in direct conflict with both the trial record and attorney Holmes' declaration. In other words, Holmes declared he never observed physical injuries on or to Petitioner during the trial; Gable did not allege otherwise. And the trial record itself is silent in this regard – no party or participant ever noted any injuries to Petitioner's face, and the record establishes that Petitioner had no difficulty making his various complaints or requests known to the court during the trial

////

proceedings, yet he never complained of beatings beyond the incident involving his shoulder in March.

Significantly too, the record as presented to the California Supreme Court, even assuming the truth of the aforementioned declarations, also contained evidence of disciplinary reports pertaining to Petitioner's incarceration at the county jail. Those reports included the following behavior by Petitioner: his having started fires in his cell on two separate occasions (5 CT 1032-33 & 1048-50), having possessed weapons on several occasions (5 CT 1034-35, 1039-40, 1044-45), having possessed various forms of contraband on several occasions (5 CT 1029-30, 1051-52, 1056-62), assaulting or fighting other inmates on a number of occasions (5 CT 1031, 1041-43, 1046-47, 1053-55), as well as threatening jail staff (5 CT 1036-38). It also references Petitioner's "explosive behavior," "history of assaultive and disruptive behavior" and "propensity to start fights." (5 CT 1037, 1050, 1055.) Further, where the report was determined to be true or where Petitioner admitted the behavior alleged, certain restrictions were imposed that affected various privileges or placements in the jail. This evidence, in many ways, directly conflicts claims made in the inmate declarations and in other ways serves to explain the restrictions referenced therein.

For these reasons, the California Supreme Court did not unreasonably reject Petitioner's substantive due process claim, because even assuming the truth of the exhibits in support of the claim, they fail to establish Petitioner's actual incapacity to stand trial by a preponderance of the evidence. Cooper v. Oklahoma, 517 U.S. at 355; Medina v. California, 505 U.S. at 449; Boyde v. Brown, 404 F.3d at 1165; see also Richter, 562 U.S. at 101, 103.

Ineffective Assistance of Counsel

For the same reasons, Petitioner did not receive ineffective assistance of counsel. Mr. Holmes' declaration leaves no doubt that defense counsel had no basis to move for a competency hearing. (ECF No. 302, Vol. XXVI, Ex. 136.) There were insufficient indicia of incompetence to

give attorneys Holmes and/or Gable a reason to doubt Petitioner's competence to stand trial, and there was no reasonable probability that Petitioner would have been found incompetent to stand trial had attorneys Holmes and/or Gable renewed the original motion. Strickland, 466 U.S. at 687-88, 694; Stanley v. Cullen, 633 F.3d at 862; Hibbler v. Benedetti, 693 F.3d at 1149-50.

Finally, any allegation that the California Supreme Court's adjudication rests upon an unreasonable determination of the facts is not persuasive. The facts before that court, for the reasons explained above, do not require relief be granted.

### *Conclusion*

In conclusion, the trial court did not have a sua sponte duty to hold a competency hearing because there was no evidence before it giving rise to a substantial and bona fide doubt regarding Petitioner's competence. Moreover, Petitioner was not convicted while legally incompetent in violation of his substantive due process rights. Lastly, trial counsel were not ineffective for failing to renew an original challenge. The California Supreme Court's adjudication of was neither contrary to, nor did it involve an unreasonable application of, Supreme Court precedent. Nor did it rest upon any unreasonable determination of facts. 28 U.S.C § 2254(d). As a result, Petitioner is not entitled to relief and the undersigned hereby RECOMMENDS that Claim TT be DENIED.

### Claim Z: Improper Fact-Finding in Penalty Phase

Petitioner asserts he was deprived of his constitutional rights to due process and a reliable sentencing proceeding when the trial court refused to instruct the jury not to consider any guilt-phase evidence after two guilt-phase jurors were replaced with alternates during the penalty phase. (ECF No. 330 at 581-82.) Respondent contends the California Supreme Court's adjudication of this claim was not contrary to, nor an unreasonable application of, controlling Supreme Court precedent. (ECF No. 345 at 337-39.)

The claim was presented to the state's highest court both on direct appeal and in state habeas; therefore, it is exhausted for this court's purposes.

### *The California Supreme Court's Determination*

On direct appeal, the California Supreme Court held the following:

> In the course of the penalty phase, the superior court discharged two of the jurors who had sat on the jury when it rendered its verdicts and made its findings at the guilt phase, and put two alternates in their place. By stipulation of the People and defendant, it discharged one because of unavoidable scheduling conflicts. By necessity, it discharged the other because of death.
>
> Defendant moved the superior court to instruct the jury not to consider the guilt phase evidence. He relied on Penal Code section 190.4, subdivision (d), which provides that, "[i]n any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial ... shall be considered at any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase." The superior court refused.
>
> Defendant contends that the superior court erred thereby.
>
> Against a claim of this kind, which involves the determination of applicable legal principles, an appellate court reviews a trial court's instruction independently.
>
> After such review, we find no error. Penal Code section 190.4, subdivision (d), declares in substance that, if the trier of fact at the penalty phase is the same as that at the guilt phase, it must consider the guilt phase evidence. Here, the trier of fact at the penalty phase was the same as that at the guilt phase. It was a jury. Indeed, it was the same jury: it was not rendered otherwise by the substitution of jurors with alternates. (*See People v. Green* (1971) 15 Cal.App.3d 524, 528.) It therefore had to consider the guilt phase evidence. Had it been instructed not to, as requested by defendant, error would have been committed.

People v. Alvarez, 14 Cal.4th at 242-43.

### *Applicable Legal Standards*

The defendant in a criminal case in which the punishment is within the discretion of the trial jury "has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (citations omitted).

California Penal Code § 190.4 provides, in relevant part:

(c) If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes.

(d) In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial, including any proceeding under a plea of not guilty by reason of insanity pursuant to Section 1026 shall be considered an any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase.

In <u>People v. Green</u>, 15 Cal.App.3d 524, 528 (1971), the Fifth District Court of Appeal noted that "the substitution of an alternate juror for one of the original jurors does not change the character of the jury," noting too "that a verdict by 12 jurors, one of whom was originally an alternative juror, is a verdict of the jury originally sworn to try the case." <u>Id.</u>, at 528 (internal quotation marks omitted). The court in <u>Green</u> found no error where "the trial judge excused one of the original jurors at her request from attendance during the sanity and penalty phases of the trial on the basis that she was moving from the State of California." <u>Id.</u>, at 529.

*Analysis*

The undersigned is bound by the California Supreme Court's interpretation of California Penal Code § 190.4. <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) (federal court is bound by "a state court's interpretation of state law"). It expressly held the statute requires consideration of the guilt phase evidence by the "same jury" and that a jury comprised of alternate members in the penalty phase is in fact the "same jury" as that comprised in the guilt phase. Considering the absence of error here, Petitioner cannot show an "arbitrary deprivation" by the trial court's action. <u>Hicks v. Oklahoma</u>, 447 US. at 346.

The undersigned did not identify any Supreme Court precedent, nor did the parties reference any, requiring a penalty phase jury to be comprised of the exact same persons or jurors that comprised the guilty phase jury, requiring the elimination of an aggravating factor or a

435

redetermination where alternates are required to be employed between the two phases of trial.

The Seventh and Eleventh Circuits have addressed somewhat similar issues in the context of federal statutes. United States v. Johnson, 223 F.3d 665, 669-71 (7th Cir. 2000); Battle v. United States, 419 F.3d 1292, 1301-02 (11th Cir. 2005). Both circuits concluded the district court's substitution of an alternate for penalty phase deliberations did not violate the Federal Death Penalty Act. Johnson, 223 F.3d at 670; Battle, 419 F.3d at 1302. Notably, the Johnson court opined that "the issues of guilt and punishment are sufficiently distinct that the alternate didn't have to hear the [guilt phase] deliberations … in order to be able to participate meaningfully in the [penalty phase] deliberations …. [The alternate] had sat through the entire trial which is the important thing." Johnson, 223 F.3d at 670. As the Ohio Supreme Court noted in State v. Hutton, 53 Ohio St. 3d 36, 47, 559 N.E.2d 432, 445 (1990):

> although the issue of guilt or innocence is relevant to sentencing, it is not the only issue in the penalty phase, as it is in the guilt phase. [A] defendant can avoid the death penalty even though the trier of fact does not doubt his guilt at all. [Citation.] With regard to the evidence and arguments adduced in the penalty phase, an alternative juror who was present through the trial and during the whole of the penalty deliberations would be able to take as full and productive a part in those deliberations as any of the original jurors. The substitution "does not change the character of the jury." [Citation.] Thus, the *Fields* court "recognize[d] that unforeseen circumstances may require substitution of a juror at the penalty phase of a capital trial, even though the alternate did not take part in the guilt phase deliberations." [*People v.*] *Fields*, [35 Cal.3d 329], 351, 197 Cal.Rptr. [803], 817, 673 P.2d [680], 693, fn. 9 [(1983)], citing *Green*, [15 Cal.App.3d 524].

In any event, the California Supreme Court's adjudication cannot be said to be contrary to, or an unreasonable application of, Supreme Court precedent. The California Supreme Court could have reasonably concluded that the trial court's denial of Petitioner's motion pursuant to California Penal Code § 190.4(d) (31 RT 6829-31, 6975) did not arbitrarily deprive Petitioner of an important state procedural protection in violation of his due process rights and liberty interests. Hicks v. Oklahoma, 447 U.S. at 346. Nor did it violate the Eighth Amendment by lessening the required heightened reliability in sentencing based on the evidence contained in the record.

Johnson v. Mississippi, 486 U.S. 578, 584 (1988). 28 U.S.C. § 2254(d); Richter, 562 U.S. at 101, 103. Thus, the undersigned hereby RECOMMENDS that Claim Z be DENIED.

### **Claim AA: Use of Rape as an Aggravating Circumstance**

In this claim, Petitioner maintains the trial court erred by allowing the jury to consider the rape as a circumstance of the capital crime under California Penal Code § 190.3(a), violating his Eighth Amendment rights and requiring reversal of the penalty. (ECF No. 330 at 582-83.) Respondent replies that the California Supreme Court's denial of his claim was not unreasonable or contrary to Supreme Court precedent, precluding any relief. (ECF No. 345 at 339-41.)

By presenting his claim on direct appeal and in a subsequent state habeas petition, Petitioner has exhausted the claim for this court's consideration.

### *The California Supreme Court's Determination*

On direct appeal, the California Supreme Court held as follows:

> In accordance with the pattern instruction set out as CALJIC No. 8.85 (5th ed. 1988)—and ultimately with Penal Code section 190.3—the superior court told the jury that, in choosing between the penalty of death and life imprisonment without possibility of parole, it should be guided by certain factors, if applicable, including "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding...."
> Defendant contends that the superior court erred by delivering its instruction on the "circumstances of the crime."
> Here too, against a claim that involves the determination of applicable legal principles, an appellate court reviews a trial court's instruction independently.
> Here too, we find no error. Penal Code section 190.3 impliedly requires a superior court to instruct "on any factor that is applicable on the record of the individual case" (*People v. Marshall* (1990) 50 Cal.3d 907, 932–33 (italics omitted)—which always and everywhere includes the "circumstances of the crime." The superior court here complied.
>
> [FN] 39. Defendant claims in substance that, because the superior court committed error under California law, it thereby committed error under the Eighth Amendment to the United States Constitution. As explained in the text, the superior court did not commit error under California law.
>
> Defendant argues that the superior court should have clarified its instruction on the "circumstances of the crime" (1) to specify that the "crime" referred to was the capital offense involving the murder of Allen Birkman, and (2) to state[40] that its "circumstances" did not embrace the rape of Sandra S., which was assertedly unrelated.

437

Had he desired such a clarification, he should have requested it of the superior court. He made no request of this sort below. Hence, he may not raise a complaint here.

[FN] 40.  Contrary to certain—unobjected-to—comments in the prosecutor's summation.

[FN] 41.  Pursuant to Penal Code section 190.3, the Stramaglia rape was relevant to one or the other of two issues material to the question of penalty, *viz.*, the "nature and circumstances of the present [capital] offense"—if it was deemed related thereto—or the "presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence"—if it was not so deemed. Pursuant to that same provision, it could be considered under one or the other of two parallel factors, *viz.*, the "circumstances of the crime of which the defendant was convicted in the present proceeding ..." and the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Had the superior court's instructions suggested otherwise, they would have been erroneous—against the People, and not defendant.

People v. Alvarez, 14 Cal.4th at 243-44.

### *Analysis*

During the penalty phase, the jury was instructed pursuant to CALJIC No. 8.85 regarding factors for its consideration.  (6 CT 1353-54; 31 RT 6859-62.)  On direct review, the California Supreme Court concluded the giving of the instruction without modification or clarification was not error.  Its finding is binding here.  Bradshaw v. Richey, 546 U.S. at 76.

In California, imposing the death penalty on a criminal defendant requires a determination of death eligibility and an additional death qualification judgment performed by the factfinder. For death-eligibility, a jury must not only convict a defendant of a charged first-degree murder for which the death penalty is a proportionate punishment, but also must additionally find at least one of the special circumstances enumerated in California Penal Code § 190.2 to be true.  See Tuilaepa v. California, 512 U.S. at 972.  If the jury does so, the trial proceeds to a penalty phase where the jury must then take a separate list of sentencing factors into consideration under California Penal Code § 190.3 and make an individualized determination of the punishment based on considerations including the circumstances of the crime as well as the defendant's history and

438

character.  Id. at 972–73.  In fact, the 1978 California statute is also comparable in composition and effect to several state statutes upheld as constitutional by the United States Supreme Court.  See Gregg v. Georgia, 428 U.S. 153 (1976); Profitt v. Florida, 428 U.S. 242 (1976); Jurek v. Texas, 428 U.S. 262 (1976) (capital statutes found to sufficiently narrow the class of defenders eligible for the death penalty through either aggravating factors or by the definition of capital offenses, properly considered mitigation, and guided the discretion of the sentencer).[66]  California juries are "free to consider a myriad of factors to determine whether death is the appropriate punishment."  California v. Ramos, 463 U.S. 992, 1008 (1983).

Even if the trial court erred as alleged, the California Supreme Court reasonably could have found the error was not prejudicial because it did not have a substantial and injurious effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 637.  The aggravating evidence presented by the prosecution even without the challenged "circumstances of the crime" factor as it related to subdivision (a) of section 190.3, included many relevant and proper factors for the jury's consideration under subdivision (b) concerning Petitioner's "use of force or violence."

Ultimately, because California's statutory scheme is constitutional, and because the rape could be properly considered pursuant to that section, Petitioner cannot show a "reasonable

---

[66] See also Ayers v. Belmontes, 549 U.S. 7, 23 (2006) ("California's overall balancing process" provided by the 1978 death penalty statute "requires juries to consider and balance ... factors ... that are labeled neither as mitigating nor as aggravating.... [T]he jury itself must determine the side of the balance on which each listed factor falls"); Harris v. Pulley, 465 U.S. at 51, 52 n.14 ("Assuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review, the 1977 California statute is not of that sort," notwithstanding the fact that "[t]he statute does not separate aggravating and mitigating factor circumstances"); Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995) (holding that the 1977 statute's "failure to label aggravating and mitigating factors is constitutional"); Babbitt v. Calderon, 151 F.3d at 1178 (rejecting a California habeas petitioner's argument that the trial court's instruction to the jury on the current California death penalty statute "was erroneous because the jury was not specifically told which factors it could consider as extenuating").

likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." <u>Boyde v. Brown</u>, 494 U.S. at 380.

The California Supreme Court's adjudication of this claim is not contrary to, nor does it involve an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d). Accordingly, the undersigned hereby RECOMMENDS that Claim AA be DENIED.

### Claim CC: Prosecutorial Misconduct in Penalty-Phase Closing Argument

Petitioner asserts his due process right to a fair trial was violated by certain comments made by the prosecutor during closing argument in the penalty phase. (ECF No. 330 at 583-84.) Respondent maintains the California Supreme Court's rejection of the claim "was not at all unreasonable or contrary to Supreme Court precedent," precluding habeas relief. (ECF No. 345 at 341-42.)

By presenting his claim on direct appeal and in a subsequent state habeas petition, Petitioner has exhausted the claim for this court's consideration.

### *The California Supreme Court's Determination*

On direct appeal, the California Supreme Court held as follows:

> In the course of his summation, the prosecutor made comments characterizing defendant, including remarks to the effect that he was a "creep," was worse than a "predator[ ]" because he "enjoy[ed] ... unnecessary violence," was "your worst nightmare, ... society's worst nightmare." Defendant objected to such comments as "disparaging." Finding in substance that the remarks were not "[i]nflaming the jury," the superior court overruled the objection.
>
> Defendant contends in substance that the superior court erred by effectively determining that the prosecutor did not commit misconduct.
>
> As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion.
>
> There was no such abuse here. The superior court was not unreasonable in effectively determining that the prosecutor did not commit misconduct. For it was not unreasonable in impliedly finding that he did not use any method of persuasion that may be deemed deceptive or reprehensible, including inflammatory comments. Such remarks as those quoted above did indeed characterize defendant in negative terms. Although perhaps unnecessarily colorful, they were consistent with the evidence. Hence, they were not improper. (*See, e.g.*, *People v. Berryman, supra*, 6 Cal.4th at p. 1076.) Defendant

440

argues that "the prosecutor in fact was testifying on behalf of his recommendation of death." The assertion is unsupported. It may be rejected out of hand.

People v. Alvarez, 14 Cal.4th at 241-42.

### *Applicable Legal Standards*

In California, prosecutors are generally granted broad leeway in arguing their case to the jury and may even use "'such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion and prejudice of the jury.'" People v. Tully, 54 Cal.4th 952, 1021 (2012). As the Tully court explained, "a prosecutor is not 'required to discuss his [or her] view of the case in clinical or detached detail,'" and "'the use of derogatory epithets to describe a defendant is not necessarily misconduct.'" Id. at 1021; see, e.g., People v. Friend, 47 Cal.4th 1, 32 (2009) (defendant described as "'living like a mole or the rat that he is'"); People v. Young, 34 Cal.4th 1149, 1195 (2005) (no misconduct where prosecutor characterized crimes as "'serial killing,'" & "'terrorizing and killing'" people [italics omitted]); People v. Jones, 17 Cal.4th 279, 308–09 (1998) (no ineffective assistance of counsel for failure to object to prosecutor's characterization of defendant's crime as a "terrorist attack" and comparison of defendant to "[t]errorists"); People v. Pensinger, 52 Cal.3d 1210, 1250–51 (1991) (no misconduct where prosecutor referred to defendant as a "'perverted maniac'"). Relying on these cases, the Tully court found no misconduct in the prosecutor's statements referring to the defendant as "'a despicable excuse for a man,'" a "'despicable individual,'" "'garbage'" and "'a sucker.'" Id. at 1021.

The United States Supreme Court has made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." Berger v. United States, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. at

441

643; see also Darden v. Wainwright, 477 U.S. at 181; Parker v. Matthews, 567 U.S. at 45

(confirming that Donnelly/Darden is the proper standard). And, because "the Darden standard is

a very general one," courts have "more leeway...in reaching outcomes in case-by-case

determinations." Parker, 567 U.S. at 48 (internal quotation marks omitted).

Assuming a petitioner can establish that the prosecutor engaged in misconduct, habeas

relief nevertheless is unwarranted unless the petitioner can show that the misconduct had a

substantial and injurious impact on the jury's verdict. Karis v. Calderon, 283 F.3d at 1128 (citing

Brecht, 507 U.S. at 638).

### Analysis

Despite his claims, a review of the portions of the record about which Petitioner

complains of amount to prosecutorial misconduct (31 RT 6898-907) actually finds support for the

California Supreme Court's holding.

The prosecutor's comments during his closing argument of the penalty phase (31 RT

6883-929) were all comments upon and consistent with the evidence adduced at trial. As a result,

those comments did not "so infect the trial with unfairness" so as to deny Petitioner due process.

Donnelly, 416 U.S. at 643; Darden, 477 U.S. at 181; see also Parker, 567 U.S. at 45, 48.

Even assuming for the sake of argument the comments amounted to misconduct,

Petitioner cannot establish that the prosecutor's remarks had a substantial and injurious impact on

the jury's verdict. The jury considered evidence that established Petitioner killed an unarmed

man in an attempt to rob him of funds withdrawn from an ATM, robbed and assaulted an

unarmed elderly woman, and prior to those crimes raped a woman and stole a vehicle in an effort

to escape that crime. The jury also properly considered Petitioner's earlier convictions for

voluntary manslaughter, assault with a deadly weapon, and escape without force. Hearing the

////

prosecutor use derogatory comments or names would have had little impact in comparison to the aforementioned evidence. <u>Brecht</u>, 507 U.S. at 637.

In sum, the California Supreme Court's adjudication of this claim was neither contrary to, nor an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d). Accordingly, the undersigned hereby RECOMMENDS that Claim CC be DENIED.

### Claim DD: Improper Denial of Motion to Modify Sentence

Petitioner argues the trial court misconstrued the evidence and the law governing his automatic motion for modification of sentence, resulting in a deprivation of his constitutional rights to due process and a reliable sentencing proceeding. (ECF No. 330 at 585-87.) In contrast, Respondent avers the California Supreme Court's rejection of this claim was neither contrary to, nor did it involve an unreasonable application of, Supreme Court precedent. (ECF No. 345 at 342-44.)

The state's highest court rejected Petitioner's claim on direct appeal and again in state habeas proceedings. Thus, it is exhausted for this court's consideration.

#### *The California Supreme Court's Determination*

In considering Petitioner's argument, the California Supreme Court determined as follows:

> Defendant made an application for modification of the verdict of death under Penal Code section 190.4, subdivision (e). After a hearing, the superior court denied the request.
> Defendant contends that the superior court erred thereby.
> We review a superior court's ruling on a verdict-modification application independently. (*E.g.*, *People v. Berryman, supr*a, 6 Cal.4th at p. 1106.)
> After such review, we find no error. The superior court did all it was required to do. That is to say, it effectively "review[ed] the evidence"; "consider[ed], [took] into account, and [was] guided by the aggravating and mitigating circumstances"; "ma[d]e a determination" that "the jury's findings and verdicts" were not "contrary to law or the evidence presented"; "state[d] on the record the reasons for [its] findings," and also "set forth the reasons for [its] ruling" and "direct[ed] that they be entered on the Clerk's minutes" (Pen.Code, § 190.4, subd. (e)).

443

In arguing to the contrary, defendant makes a "formal" challenge. He attacks on four fronts.

First, defendant asserts that, before making its ruling on his verdict-modification application, the superior court read a probation report, and thereby failed to anticipate our statement in *People v. Lewis* (1990) 50 Cal.3d 262, 287, that the "preferable procedure" is not to do so. But we presume that it was not improperly influenced by the report. (*E.g.*, *People v. Berryman, supra*, 6 Cal.4th at p. 1106.) Our presumption is not rebutted by anything in the record on appeal.

Second, defendant asserts that, in making its ruling on his verdict-modification application, the superior court undertook to independently determine whether the penalty of death was appropriate, and did in fact so determine, instead of simply proceeding to assess whether the jury's choice was contrary to the law or the evidence. He is right in stating that such an assessment is required and that an independent determination of this sort is not called for. (*E.g.*, *People v. Berryman, supra*, 6 Cal.4th at pp. 1105–06.) He is wrong, however, in implying that he has any cause for complaint. For if we assume, as he claims, that the superior court undertook to independently determine that the penalty of death was appropriate, and did in fact so determine, we must conclude that it necessarily found that the jury's choice was not contrary to the law or the evidence.

Third, defendant asserts that, in making its ruling on his verdict-modification application, the superior court "review[ed] the evidence" (Pen.Code, § 190.4, subd. (e)) in an improper manner. He says that it was required to, but did not, "employ the same type of analysis the jury would have done [*sic*] under the instructions." He fails to provide any support for the existence of such a requirement. We find none. To the extent that he maintains that it could not consider the evidence of the rape of Sandra S. or the robbery of Greta Slatten, he is incorrect. Indeed, in his verdict-modification application, he expressly conceded that it could. Correctly so. The Sandra S. rape and the Slatten robbery were each relevant to one or the other of two issues material to the question of penalty under Penal Code section 190.3, *viz.*, the "nature and circumstances of the present [capital] offense"— if it was deemed related thereto—or the "presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence"—if it was not so deemed.

[FN] 42.  *See* footnote 41, *ante*.

Fourth, defendant asserts that, in making its ruling on his verdict-modification application, the superior court was not sufficiently specific in the "reasons" it "state[d]" and "set forth" (Pen.Code, § 190.4, subd. (e)). It was. The proof is apparent on the face of the record on appeal: the reporter's transcript contains six pages of "reasons," and the clerk's transcript incorporates them by reference.

In addition to his "formal" challenge, defendant makes a "substantive" challenge. He attacks on only a single front.

Defendant asserts that the superior court's ruling on his verdict-modification application is unsound as a matter of law. He says that the evidence is insufficient to support the finding of the felony-murder-robbery special circumstance, on which death eligibility rests. We have concluded to the contrary. (*See*, *ante*, at p. 428–29.)

[FN] 43.  Defendant claims in substance that, because the superior court committed error under California law by denying his verdict-modification

444

application, it thereby committed error under the Eighth and Fourteenth
Amendments to the United States Constitution. As explained in the text, the
superior court did not commit error under California law.

People v. Alvarez, 14 Cal.4th at 244-46.

*Analysis*

Initially, it is noted the California Supreme Court's decision is binding here as it involves

a state law determination. Bradshaw v. Richey, 546 U.S. at 76. Hence, Petitioner's procedural

due process argument is a non-starter. Id.; Hicks v. Oklahoma, 447 U.S. at 343.

California Penal Code § 190.4(e) provides:

> In every case in which the trier of fact has returned a verdict or finding imposing
> the death penalty, the defendant shall be deemed to have made an application for
> modification of such verdict or finding pursuant to Subdivision 7 of Section 11.[] In ruling
> on the application, the judge shall review the evidence, consider, take into account, and be
> guided by the aggravating and mitigating circumstances referred to in Section 190.3, and
> shall make a determination as to whether the jury's findings and verdicts that the
> aggravating circumstances outweigh the mitigating circumstances are contrary to law or
> the evidence presented. The judge shall state on the record the reasons for his findings.

On September 14, 1989, the trial court considered Petitioner's application or modification

of the jury's verdict imposing death. (6 CT 1480-82; see also 6 CT 1408-19 [defense motion for

new trial or reduction of penalty].)

A review of the relevant reporter's transcript reveals the trial court complied with the

applicable California statute by reviewing and considering "the evidence" and that it was "guided

by the aggravating and mitigating circumstances referred to in Section 190.3," ultimately

determining the jury's findings and verdicts that the aggravating circumstances outweighed those

in mitigation were in no way contrary to the law or the evidence it heard. (32 RT 7051-56.)

Further, the California Supreme Court's specific holdings – (1) that the presumption the

trial court was not improperly influenced by the probation report is not rebutted by the record, (2)

that even if the superior court undertook to independently determine whether the penalty was

445

appropriate versus assessing whether the jury's choice was contrary to the law or evidence, in so doing it necessarily found the jury's choice as contrary to law or evidence, (3) that the trial court did not improperly review the evidence pertaining to the rape and Slatten robbery because those crimes were relevant for purposes of section 190.3, (4) that the trial court's ruling was sufficiently specific; and finally, (5) that the superior court's ruling is sound as a matter of law because the evidence in support of the felony-murder-robbery special circumstances is sufficiently supportive – do not contravene the Sixth, Eighth or Fourteenth Amendments, or any holding of the United States Supreme Court. See Pulley v. Harris, 465 U.S. at 51-54; Hicks v. Oklahoma, 447 U.S. at 343. Notably, no clearly established federal law requires that, in order to pass muster under the Eighth Amendment, a state's death penalty scheme must provide independent review of the death verdict by the trial judge.

In sum, the California Supreme Court adjudication of Petitioner's claim is neither contrary to, nor an unreasonably application of, Supreme Court precedent. See 28 U.S.C. § 2254(d); Richter, 562 U.S. at 101, 103. The undersigned hereby RECOMMENDS that Claim DD be DENIED.

### Claim AAA:  Ineffective Assistance of Appellate Counsel

In this claim, Petitioner alleges appellate counsel were ineffective "insofar as any of the meritorious claims set forth in his petition were apparent from the record" where those claims were not raised on direct appeal and were subsequently determined to be procedurally defaulted on state habeas. (ECF No. 330 at 587-89.)  Respondent maintains habeas relief must be denied because the California Supreme Court's denial of the claim, in both his first and second state habeas petitions, was not unreasonable or contrary to controlling Supreme Court precedent. (ECF No. 345 at 345-46.)  Claim AAA is exhausted for purposes of this court's consideration.

////

446

*Applicable Legal Standards*

To restate briefly, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision." Id., at 101. Under § 2254(d), "a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 102. And, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

A habeas claim alleging appellate counsel was ineffective is evaluated under Strickland. See Williams v. Taylor, 529 U.S. at 390–91. To establish ineffective assistance of counsel, petitioner must prove: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 687–94, 697. As the high court has observed, appellate counsel performs properly and competently when he or she exercises discretion and presents only the strongest claims instead of every conceivable claim. Jones v. Barnes, 463 U.S. 745, 752 (1983); Smith v. Murray, 477 U.S. 527, 536 (1986). "In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." Miller v. Keeney,

882 F.2d 1428, 1434 (9th Cir. 1989). The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d at 1173. Even if petitioner could demonstrate his appellate attorney acted unreasonably, he must still show prejudice. Smith v. Robbins, 528 U.S. at 285–86. Habeas relief for ineffective assistance of counsel may only be granted if the state-court decision unreasonably applied the Strickland standard. Knowles v. Mirzayance, 556 U.S. at 122.

### *Analysis*

Initially, to the degree Petitioner refers to Claims FF, PP and UU in support of the present claim, the undersigned hereby incorporates his findings and recommendations as to Claims FF, PP and UU.

Petitioner asserts he is entitled to relief because appointed counsel Terrence V. Scott and Andrew E. Rubin failed to raise "any of the meritorious claims set forth in his" habeas petitions presented to the California Supreme Court, wherein those claims were denied pursuant to In re Dixon, 41 Cal.2d 756, 759 (1953). (ECF No. 345 at 587.) Notably, in his first state habeas petition filed in the California Supreme Court, this claim read in its entirety: "Insofar as any of the claims set forth in this petition were apparent from the record, appellate counsel was ineffective in failing to raise them on the direct appeal." In his second state habeas petition filed with that court, the claim asserted, as follows, in its entirety:

> Insofar as any of the meritorious claims set forth in this petition were apparent from the record, appellate counsel was ineffective in failing to raise them on the direct appeal. Appellate counsel's performance was unreasonable, and Mr. Alvarez was prejudiced by appellate counsel's failure to raise issues properly for this Court's review. Such ineffective assistance of counsel violated Mr. Alvarez's right to due process and equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

Significantly however, the claims identified by Petitioner in his points and authorities (S073670 [A, B, E, F, G, L M, O & S] & S146501 [L, HH, II, LL, MM, NN, QQ, SS, TT & YY]) were also

448

denied on their merits. Hence, even ignoring the conclusory nature of the claims as asserted, Petitioner cannot establish ineffective assistance of appellate counsel where none of the claims asserted in his state habeas petitions were meritorious. See, e.g., Miller v. Keeney, 882 F.2d at 1434, n.9 (petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal).

Here, Petitioner has failed to explain how, or to demonstrate that, appellate counsel would have prevailed on any such claim on appeal had those claims been presented. Accordingly, his claim of ineffective assistance of appellate counsel should be rejected on that basis alone. Jones v. Gomez, 66 F.3d 199, 204 (9th[h] Cir. 1995); James v. Borg, 24 F.3d at 26.

In any event, given the insufficient showing of misconduct and prejudice, appellate counsels' purported failure to raise certain issues on direct appeal did not constitute ineffective assistance of counsel where those same issues were adjudicated to be without merit. Boag v. Raines, 769 F.2d at 1344 (noting that failure to raise a meritless argument does not constitute ineffective assistance). Hence, Petitioner has not shown that the state court's denial of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law." See 28 U.S.C. § 2254(d)(1); Richter, 562 U.S. at 101, 103. As a result, the undersigned hereby RECOMMENDS that Claim AAA be DENIED.

**Claim CCC: Cumulative Error**

Finally, Petitioner contends "the cumulative effect of all of the errors set forth in the petition violated" his constitutional rights. He claims because the "summary denials of all of petitioner's other claims" were unreasonable, it follows that this claim was also "unreasonably rejected." (ECF No. 330 at 589.) On the other hand, Respondent maintains the California Supreme Court's adjudication of this claim "reasonably concluded in accordance with Supreme Court precedent, the cumulative effect of any errors did not deprive Petitioner of a fair trial"

where those claims were "either meritless or entirely harmless." (ECF No. 345 at 346-47.) Claim CCC was presented in both habeas petitions filed with the state's highest court; hence, the claim is exhausted.

### *Analysis*

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." Peyton v. Cullen, 658 F.3d at 896–97 (citing Chambers v. Mississippi, 401 U.S. at 298, 302–03). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. See Chambers, 401 U.S. at 294.

As discussed throughout these finding and recommendations, however, Petitioner does not allege any claims that amount to error, and thus he demonstrates no errors that can accumulate to a level of a constitutional violation. See Mancuso v. Olivarez, 292 F.3d at 957. Accordingly, Petitioner is not entitled to relief on his cumulative error claim. The undersigned hereby RECOMMENDS that Claim CCC be DENIED.

### **Claims BB, MM & BBB**

Petitioner concedes that Claims BB and MM – pertaining to penalty phase bias instructions and the loss of peremptory challenges – do not satisfy § 2254 so as to entitle him to federal habeas relief. Additionally, Petitioner elects to withdraw Claim B alleging incompetence to be executed. (ECF No. 330 at 543-44.)

As to Claims BB, MM and BBB, the undersigned RECOMMENDS that Petitioner's concessions and withdrawal be accepted.

**CONCLUSION**

Accordingly, IT IS HEREBY RECOMMENDED that the second amended petition be DENIED as to Claims D, GG, FF, PP, UU, KK, XX, ZZ, II, JJ, G, RR, F, O, OO, SS, U, V, W, X, VV, YY, A, B, C, NN, E, LL, H, I, L, M, N, J, K, HH, P, Q, R, S, WW, T, Y, EE, QQ, TT, Z, AA, CC, DD, AAA and CCC.

IT IS HEREBY FURTHER RECOMMENDED that Petitioner's concessions regarding Claims BB and MM, and withdrawal of Claim BBB, be accepted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within sixty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: April 2, 2019

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/alva1895.fr

451